IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BARRY M. PORTNOY and                                :
GERARD M. MARTIN, as Trustees for                   :
HUB PROPERTIES TRUST                                :
400 Center Street                                   :
Newton, MA  02458,                                  :          Civil Action No. 02-CV-2905
                              Plaintiffs,           :
                   v.                               :
OMNICARE PHARMACEUTICS, INC.                         :
630 Allendale Road                                  :
King of Prussia, PA  19406                          :
                   and                              :
OMNICARE CLINICAL RESEARCH, INC.                    :
630 Allendale Road                                  :
King of Prussia, PA  19406,                         :
                                                    :
                              Defendants.           :

## ORDER

AND NOW, on this _____ day of _____, 2003, upon consideration of

Defendants' Motion for Summary Judgment and supporting Memorandum of Law, and any

opposition thereto, it is hereby ORDERED and DECREED that Defendants' Motion is

GRANTED and Plaintiffs' Complaint is dismissed with prejudice in its entirety.

**BY THE COURT:**


_____

CLIFFORD SCOTT GREEN,            Sr.J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BARRY M. PORTNOY and | : | |
| GERARD M. MARTIN, as Trustees for | : | |
| HUB PROPERTIES TRUST | : | |
| 400 Center Street | : | |
| Newton, MA  02458, | : | Civil Action No. 02-CV-2905 |
| Plaintiffs, | : | |
| v. | : | |
| OMNICARE PHARMACEUTICS, INC. | : | |
| 630 Allendale Road | : | |
| King of Prussia, PA  19406 | : | |
| and | : | |
| OMNICARE CLINICAL RESEARCH, INC. | : | |
| 630 Allendale Road | : | |
| King of Prussia, PA  19406, | : | |
| | : | |
| Defendants. | : | |

**MOTION FOR SUMMARY JUDGMENT OF
DEFENDANTS OMNICARE PHARMACEUTICS, INC.
AND OMNICARE CLINICAL RESEARCH, INC.**

Pursuant to Fed. R. Civ. P. 56, and for the reasons set forth in their supporting

Memorandum of Law, Defendants Omnicare Pharmaceutics, Inc. and Omnicare Clinical

Research, Inc. hereby move for summary judgment as to Plaintiffs' Complaint against them.

Respectfully submitted,

BLANK ROME LLP

BY: _____
Richard P. McElroy
Adam M. Share
Todd A. Schoenhaus
One Logan Square
Philadelphia, PA 19103-6998
(215) 569-5500

Attorneys for Defendants

Dated:  September 22, 2003

115304.00401/21196481v1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BARRY M. PORTNOY and : 
GERARD M. MARTIN, as Trustees for : 
HUB PROPERTIES TRUST : 
400 Center Street : 
Newton, MA  02458, :      Civil Action No. 02-CV-2905
 : 
                 Plaintiffs, : 
 : 
       v. : 
 : 
OMNICARE PHARMACEUTICS, INC. : 
630 Allendale Road : 
King of Prussia, PA  19406 : 
 : 
       and : 
 : 
OMNICARE CLINICAL RESEARCH, INC. : 
630 Allendale Road : 
King of Prussia, PA  19406, : 
 : 
            Defendants. : 

**MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT OF**
**DEFENDANTS OMNICARE PHARMACEUTICS, INC.**
**AND OMNICARE CLINICAL RESEARCH, INC.**

This Memorandum of Law is submitted by Defendants Omnicare Pharmaceutics, Inc.

("OPI") and Omnicare Clinical Research, Inc. ("OCR") in support of their Motion for Summary

Judgment.  Plaintiffs Barry M. Portnoy and Gerard M. Martin, trustees of a real estate investment

trust (collectively "HUB"), have brought this lawsuit to recover accelerated rent which they

claim is due under a lease for a property which has been repeatedly and severely flooded.  The

property, which under the lease is to be used solely for a single, special purpose (conducting a

pharmaceutical business), has become wholly unusable for its intended purpose as a result of

flooding. Judgment is warranted in favor of Defendants because there is no genuine issue that

Defendants cannot use the property to conduct its pharmaceutical business due to the unforeseen

repetitive flooding to which the leased premises have been and will be subjected. The lease

obligations of both Plaintiffs and Defendants have been annulled by the doctrines of frustration

of purpose, impracticability of performance, and mutual mistake. Thus, Defendants are entitled

to summary judgment.

## I.    STATEMENT OF FACTS

### A.    The Formation of the Special Purpose Lease

On December 3, 1996, Bio Pharm Pharmaceutics Services, Inc. ("Bio Pharm") entered

into a lease agreement ("the Special Purpose Lease") (attached hereto as Exhibit "A") with 525

Virginia Drive Associates Limited Partnership ("VDA"), for a commercial building at 525

Virginia Drive, Fort Washington, Pennsylvania ("525"). 525 is located in an industrial/office

park ("the Office Park.") adjacent to the Fort Washington interchange of the Pennsylvania

Turnpike in Upper Dublin Township, Montgomery County ("the Township").

The Special Purpose Lease was for a term of fifteen years, unless renewed or terminated

as provided therein. See Exhibit A, § 1.02(b). Rent was to be paid in monthly installments

totaling $12,378,000 over fifteen years. See Exhibit A, Preamble at p. 2. The Special Purpose

Lease mandates the lessee to use 525 as space for its "offices, laboratories, and warehouse use in

connection with the conduct of [its] business of manufacturing, testing and analyzing, packaging

and distribution of pharmaceutical products, and in support of [its] clinical research divisions . . .

and for no other purpose." See Exhibit A, § 5.01; see also Deposition of HUB's corporate

2

designee David Campoli (the relevant pages of which are attached hereto as Exhibit "B") at 110:12–111:17.[1]

In 1997, HUB purchased a group of buildings, including 525, all of which are located in the Office Park. See Campoli Dep. at 29:7-22. The 525 purchase by HUB was part of its plan to own properties for lease to pharmaceutical companies. See Campoli Dep. at 111:13-17. As part of that purchase, VDA assigned its rights under the Special Purpose Lease to HUB. A year later, in 1998, OPI acquired Bio Pharm and succeeded to Bio Pharm's rights and obligations under the Special Purpose Lease. Bio Pharm, and later OPI, also occupied, pursuant to a lease with a different owner, another smaller building nearby in the Office Park at 425 Delaware Drive ("425").

**B.    The History of Clinical Pharmaceutical-Related Business Operations at 525**

Like Bio Pharm, OPI was in the business of manufacturing, testing and packaging investigational pharmaceuticals for use in clinical trials. A clinical trial is the process by which an investigational drug is tested as part of its sponsor's seeking approval from the U.S. Food and Drug Administration ("FDA") to market that drug. All pharmaceutical companies wishing to market a drug for commercial sale in the United States must conduct extensive testing in humans. OPI's customers were typically major international pharmaceutical companies who were the sponsors of clinical trials of investigational drugs. OPI did not produce its own drugs. Rather, it manufactured, tested, packaged and labeled investigational new drugs for its customers on a third party basis. OPI was therefore considered a "toll" or "contract" manufacturer. See Deposition of Defendants' expert William T. Hensler Ph.D. (the relevant pages of which are attached hereto as Exhibit "D") at 20:6-21:10. The outsourcing of pharmaceutical clinical

---

[1] Prior to execution of the Special Purpose Lease in December 1996, 525 had last been occupied by a defense contractor and had never been used as a site for the contract manufacturing, packaging or testing of pharmaceuticals. See Dames & Moore Environmental Site Assessment Report at 7 (HUB 00157) (attached hereto as Exhibit "C").

3

testing to contract manufacturers such as OPI is a fairly new trend that began only ten to fifteen years ago. See Deposition of HUB's expert John C. Budzinski Ph.D. (the relevant pages of which are attached hereto as Exhibit "E") at 113:19-20.

The clinical trial process is lengthy, complex and very expensive. Clinical trials are performed in accordance with strict standards which are recognized and enforced by the FDA. See Hensler Dep. at 110:16-113:5. Investigational new drugs for clinical trials must be produced in conformity with current good manufacturing practices ("CGMP"). CGMP standards are developed by each pharmaceutical manufacturer, subject to approval by the FDA, to assure the manufacturing process produces quality drugs. See Hensler Dep. at 145:3-146:13; 168:15-170:19. The clinical trial process typically lasts between five and seven years and requires a steady supply of investigational drug so as to insure continuous administration of the drug to the patients participating in the trial. See Hensler Expert Report (attached hereto as Exhibit "F") at 4-5. An interruption in the supply of investigational drugs during a clinical trial threatens the integrity of the trial and can jeopardize the sponsor's investment in the drug. Id. at 9-11.

Once sponsors commit to a contract manufacturer such as OPI to supply investigational drugs for a clinical trial, they are reluctant to change contract manufacturers in the middle of the trial. Id. Changing a contract manufacturing site introduces potential sources of variation and errors in the drug itself, and therefore also in the clinical trial data. Also, if a sponsor changes manufacturing locations, it must notify and obtain the consent of the FDA and other reviewing authorities. Id. at 15. This notification and consent process causes delays in the clinical trial process. Id. at 8-11; see also Budzinski Dep. at 89:17-19.

4

### C.    The History of Flooding at 525

With respect to 525, HUB had purchased the building as part of its plan to acquire commercial buildings which generate rental cash flow. See Deposition of HUB's President John Mannix (the relevant pages of which are attached hereto as Exhibit "G") at 39:7-14. At all relevant times, HUB was in the business of earning revenue from cash flow generated by buildings which it owns. Id. at 29:4-9. Indeed, when it purchased 525, HUB intended that its tenant would and could conduct contract clinical pharmaceutical operations there, guaranteeing rental income for HUB. Id. at 58:5-16; 59:13-60:1.[2]

Prior to purchasing 525, HUB checked public property records which revealed that 525 was located in a 100-year flood zone as designated by the Federal Emergency Management Administration ("FEMA"). See Campoli Dep. at 106:11-19. HUB mistakenly understood this designation to mean that the property "could flood every hundred years as a very violent storm [comes] through." Id. at 40:9-15.[3] Moreover, by its own admission, HUB made no pre-purchase inquiry as to any history of floods actually affecting 525. See Campoli Dep. at 107:1-7. Defendants also did not know that 525 was prone to flooding. See, e.g., Deposition of OPI's former President Kenneth Feld (March 3, 2003) (the relevant pages of which are attached hereto as Exhibit "H") at 27-31 (noting that, having worked in the Office Park from 1983, he knew rain periodically flooded intersections but did not know of water actually having entered 525).

In fact, the Office Park has a long history of flooding dating back to at least the 1960's. See Deposition of Upper Dublin Township Manager Paul Leonard (the relevant pages of which are attached hereto as Exhibit "I") at 24:8-24. The Office Park has persistently flooded since that

---

[2] At different times in its history, HUB has considered but decided not to purchase buildings which it determined were not going to generate income. See Mannix Dep. at 63:18–64:23.

[3] In actuality, a 100-year flood zone designation means that there is a one percent chance of a flood every year. See Budzinski Dep. at 93:8-9.

time. Id. at 108:9-11. The flooding has often been severe, with flood waters even pushing buses off of roadways within the Office Park. Id. at 64:1-8. See also Upper Dublin Township Flood Insurance Study, Revised January 16, 1992 (HUB 00651) (attached hereto as Exhibit "J") ("A number of noteworthy floods have occurred in recent history. Storms . . . have caused flood damage. Most of this damage has occurred in the [Office Park]. . .").

The last episode of flooding in the Office Park prior to HUB's purchase of 525 occurred in September of 1996, a few months before the Special Purpose Lease was signed. That flooding resulted from thunderstorms, and caused FEMA to declare much if not all of the Office Park a disaster area. Leonard Dep. at 16-19.

In September 1999, 525 was surrounded by flood waters which again inundated the Office Park and led FEMA to declare it a disaster area. This flooding was caused by Tropical Storm Floyd. See Campoli Dep. at 154:5–156:1; see also Deposition of OPI's former Controller Jim McDevitt (May 6, 2003) (the relevant pages of which are attached hereto as Exhibit "K") at 77:9–78:22. Although OPI's operations in 525 were not disrupted by the 1999 flood, some flood water did enter 525 at that time. See Campoli Dep. at 154:5–156:1.[4] Despite the flooding history in the Office Park, there is no history of flood waters entering 525 prior to this 1999 flood.

**D.    The 2001 Flood**

On June 16 and 17, 2001, the Office Park generally, and 525 specifically, were again inundated by heavy rains associated with the remnants of Tropical Storm Allison ("the 2001 Flood"), leading FEMA to declare parts of the Township, including the Office Park, a disaster area for the third time in five years. See Leonard Dep. at 18. This time, the entire first

---

[4] While 525 suffered relatively minor damage, 425 was severely damaged in the 1999 flood. See Feld Dep. (March 3, 2003) at 31:5-14.

6

floor of 525 was heavily damaged by two feet of flood water. See McDevitt Dep. (April 22, 2003) (the relevant pages of which are attached hereto as Exhibit "L") at 96-97. All OPI operations ceased. Significant quantities of OPI's customers' manufactured and packaged drug products were destroyed, damaged and/or adulterated. OPI's equipment and manufacturing facilities and office suites in 525 were destroyed. Furthermore, the flood waters contained fecal coliform and other bacteria which rendered the facility contaminated and wholly unsuitable for CGMP manufacturing.[5] See Feld Dep. (March 3, 2003 ) at 80:23–82:1; 95:14–96:11; 128:12–18; McDevitt Dep. (April 22, 2003) at 95:23–99:12; see also Deposition of Defendants' corporate designee David Morra (October 29, 2002) (the relevant pages of which are attached hereto as Exhibit "M") at 133:8–137:11; 145:19-24.

E.    **The Impact of the 2001 Flood on OPI's Customers**

Following the 2001 Flood, OPI contacted its pharmaceutical customers and informed them of the flood damage and contamination of their clinical supply materials at 525. See Feld Dep. (March 3, 2003) at 128:2–129:23; Morra Dep. (October 29, 2002) at 141:11-13. Although OPI had earned the respect of its customers, many of them responded that they did not want to do further business with OPI in 525, due to the significant risk that another flood would disrupt long-term manufacturing projects and contaminate their clinical trial supplies. See Deposition of OPI's former Senior Manager Steve Purdy (the relevant pages of which are attached hereto as Exhibit "N") at 82:4–19; 85:16–86:3; 152:16–153:10; 190:2-16; Morra Dep. (October 29, 2002) at 82:1-84:13; Feld Dep. (March 3, 2003) at 153:7-17; see also Deposition of Astra Zeneca's corporate designee Carmen Molina (the relevant pages of which are attached hereto as Exhibit "O") at 32:1-19; 42:8–18; 54:12-13; 55:3–57:15 (testifying that no matter what steps were taken

---

[5] 525 is located in close proximity to a sewage treatment which overflowed during the 2001 Flood. See Leonard Dep. at 50:24–51:18.

to remediate 525, the risk of future flooding was too great for AstraZeneca to return); Deposition of Novartis Animal Health's ("Novartis") former New Products Technologist Jeff Moore (the relevant pages of which are attached hereto as Exhibit "P") at 23:6–24; 24:21–25:2; 28:15–23; 45:1-16 ("[U]ntil you get a deluge like they had [in 2001], you are never quite sure [if it will happen again]....Maybe that is more risk than we were willing to take"); Deposition of Sanofi-Synthelabo's ("Sanofi") former Compliance Coordinator David Fant (the relevant pages of which are attached hereto as Exhibit "Q") at 34:19–37:21; 38:24–39:11; 41:11–21; 51:5-24 (stating 525 "would not be suitable to use for long term" Sanofi projects).   Additionally, two other customers have recently sued OPI for damages relating to the 2001 Flood.  See Fujisawa Healthcare Complaint (also against OCR and HUB) (attached hereto as Exhibit "R") and Biomedicines Complaint (attached hereto as Exhibit "S").

Immediately following the 2001 Flood, OPI transferred whatever manufacturing and packaging work it could to other sites, either by way of arrangements with competitors for use of their facilities, or by setting up temporary production facilities of its own.  See Feld Dep. (March 3, 2003) at 138:1-12; Morra Dep. (October 29, 2002) at 138:1–139:19.  Ongoing studies, however, had to be completely halted, severely damaging OPI's customers both in lost inventory and lost revenue from manufacturing delays.  For example, AstraZeneca, OPI's largest and best customer accounting for roughly 39% of its business at the time, see Morra Dep. (October 29, 2002) at 96:11-14, suffered approximately $7 million in lost inventory, see Molina Dep. at 46:22-47:2, and potentially hundreds of millions of dollars in lost revenue, see Hensler Dep. at 139:8-140:14.

8

### F.    Consideration of Re-Establishing OPI's Business at 525 After the Flood

After making the above temporary arrangements, OPI attempted to ascertain the risk of future flooding at 525 in an effort to determine the feasibility of re-establishing its business there. On August 20, 2001, OPI representatives including Dr. Feld and HUB representatives including David Campoli met with Paul Leonard, Manager of the Township. The meeting was requested by Dr. Feld so that he could learn from the Township what steps if any were being taken by local government to correct the flooding problem at 525. Dr. Feld was seeking assurances from the Township about flood remediation which he could then convey to OPI's customers in an effort to persuade them to continue doing business with OPI at 525. See Leonard Dep. at 41:11–43:2; Campoli Dep. at 117:7-13. At the August 20, 2001 meeting, Mr. Leonard provided no such assurances: "it's not a question of *if* the property is going to flood. It's a question of *when*." Leonard Dep. at 45-46 (emphasis added). Instead, he told everyone that the best strategy for dealing with the risk of future flooding in 525 was to "get out." Campoli Dep. at 151:3–153:3; McDevitt Dep. (May 6, 2003) at 89:3-9. Mr. Leonard also told Mr. Campoli that 525 was worth "less than zero" because of the flooding problem. Leonard Dep. at 63:5-9.[6]

Apparently HUB did not disagree with Mr. Leonard, as it filed appeals with the Township with respect to 525 and the other buildings it had purchased in the Office Park seeking to reduce its tax liabilities on the buildings. HUB stated in those tax appeals that flooding caused high vacancy with accompanying loss of income. See Mannix Dep. at 57:4-18. See also Deposition of Michael Samuels, a professional real estate appraiser hired by HUB to assist with

---

[6] In recognition of the severe flooding problem, the Township has now installed posts at various locations which mark the depth of flood waters. See Leonard Dep. at 19:15-18. One of these flood water depth markers is located near 525. Id. at 20:9-14. An engineer retained by the Township after the 2001 Flood corroborated that the best strategy for business owners in the Office Park may be to get out of the way of floods. Id. at 94:20-23.

the tax appeals (the relevant pages of which are attached hereto as Exhibit "T") at 36:8-11 (referring to "flooding risk"); HUB's tax appeal documents (attached hereto as Exhibit "U").

In the months following the 2001 Flood, OPI communicated with HUB about the future flooding problem in 525. Based upon its customers' reactions to the floods, OPI determined that its customers were not going to send significant future work to OPI at 525.[7] See Morra Dep. (October 29, 2002) at 82:1-83:8; 87:4-13; 109:22-110:18; see also McDevitt Dep. (April 22, 2003) at 133:3-9 ("Numerous clients have made it clear that due to the frequency and severity of the floods in the [Office Park] and due to the fact that the current plants are located on a flood plane [sic] that if operations are not relocated to another location, they will be forced to find alternative suppliers.") OPI also communicated with HUB about this customer problem. See Mannix Dep. at 71:2–8; 75:4-11.

HUB attempted to ascertain whether the future flooding risk problem at 525 could be remedied by way of physical modifications to the building so that OPI could assure its customers that 525 was no longer going to be subject to flooding. See Campoli Dep. at 119:5-120:7; 139:24–140:6. HUB engaged an engineering firm which proposed various structural changes to 525 to reduce the risk of flooding in the building. Id. at 120:8-122:12; 140:7-19. None of these proposed changes, however, would have prevented flood water from entering 525 in another rain storm similar to that which caused the 2001 Flood. See Mannix Dep. at 94:11-17. Also, the physical modifications to 525 proposed by HUB's engineers would have materially changed the terms of the Special Purpose Lease, because HUB was insisting that the majority of the cost, $4

---

[7] This determination was based upon communications with a multitude of customers, including but not limited to Astra Zeneca, Novartis, and Sanofi, as well as Bristol-Myers Squibb, Integrated Therapeutics, Schering-Plough, Macrochem, Geltex and McNeil. See Purdy Dep. at 85:16-86:3; 152:16-153:10; 190:2-16.

million, be borne by OPI. See Campoli Dep. at 140:7-19.[8]

### G.    Winding-Up Operations at 525

Following the 2001 Flood, which fortunately did not cause *irreparable* damage to 525 itself, many of OPI's customers did continue to have small amounts of their work performed at 525 while OPI attempted to determine whether its business could be fully re-established there. However, the amount of work done in 525 post-flood was but a small fraction of what was being performed there before the flood. See Purdy Dep. at 187:10-13; Feld Dep. (April 9, 2003) at 49:2-11; 51:14–52:3; 86:11-22; McDevitt Dep. (April 22, 2003) at 172:21-174:6. OPI performed only one discreet manufacturing project at 525 after the flood for one customer who, at the time of the 2001 Flood, had obtained FDA approval for that project to be manufactured only at 525. This customer, Virbac Corporation, was under pressure to avoid the delay in its project which would have been caused by attempting to obtain FDA approval to move the project to another site after the flood. See Feld Dep. (April 9, 2003) at 180:7–181:16; Purdy Dep. at 145:20-146:20.

### H.    The Closure of OPI's Operations at 525

Based upon the record of flooding at 525, the palpable threat of more destructive flooding in the future despite any precautions that may have been taken, the inability of the Township to remediate the risk, and the widespread disinclination of existing customers to give OPI significant future long term work at 525, OPI advised HUB that it intended to vacate 525 by the end of August 2002. HUB then initiated this action by filing a complaint against OPI and OCR

---

[8] As an alternative, HUB offered to address the unsuitability of 525 for future OPI operations due to the risk of future flooding by offering OPI a different building to lease from within its portfolio of properties. See Mannix Dep. at 75:4-14; Feld Dep. (April 9, 2003) (the relevant pages of which are attached hereto as Exhibit "V") at 201:24-202:6. HUB made this offer because of OPI's customers' fears of the risk to their future clinical trials posed by doing business in 525. See Mannix Dep. at 98:8–99:5. Each of the alternative properties offered by HUB was not suitable due to either space or location. See Morra Dep. (March 4, 2003) (the relevant pages of which are attached hereto as Exhibit "W") at 63:18-21.

on May 15, 2002, alleging breach of contract and unjust enrichment. Defendants now move for summary judgment with respect to all counts of the complaint because, as a matter of law, their obligation to perform under the Special Purpose Lease is excused by the doctrines of frustration of purpose, impracticability of performance, and mutual mistake.

## II.    ARGUMENT

### A.    <u>Summary Judgment Standard</u>

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue of fact is genuine "only if there is sufficient evidence to permit a reasonable fact finder to return a verdict for the non-moving party. An issue of fact is material only if it might affect the outcome of the suit under the governing law." <u>Leo v. State Farm Mut. Auto. Ins. Co.</u>, 939 F. Supp. 1186, 1187 (E.D. Pa. 1996) (citations omitted), <u>aff'd without published opinion</u>, 116 F.3d 468 (3d Cir. 1997).

Although the moving party has the initial burden of identifying the evidence that demonstrates the absence of a genuine issue of material fact, the non-moving party must establish the existence of each element on which it bears the burden of proof. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). The moving party is not required "to *negate* the elements of the nonmoving party's case. . . ." <u>Lujan v. National Wildlife Federation</u>, 497 U.S. 871, 885 (1990). Rather, once the movant has satisfied its initial burden, the non-moving party must go beyond its pleadings and "make a showing sufficient to establish the existence of every element essential to his case, based on the affidavits or by depositions and admissions on file." <u>Diamond</u>

12

State Ins. Co. v. Ranger Ins. Co., 47 F. Supp. 2d 579, 582-83 (E.D. Pa. 1999) (quoting Harter v.

GAP Corp., 967 F.2d 846, 852 (3d Cir. 1992)).

**B.      Defendants' Obligation To Perform Under The Special Purpose Lease Is Excused By Frustration Of Purpose.**

### 1.      The Frustration of Purpose Doctrine

A party to a contract may be excused from performing its obligations where the purpose

for which the contract was entered is frustrated.  The "frustration of purpose" doctrine is

articulated in the Restatement (Second) of Contracts § 265 (1981) (Discharge By Supervening

Frustration):

> Where, after a contract is made, a party's principal purpose is substantially
> frustrated without his fault by the occurrence of an event the non-
> occurrence of which was a basic assumption on which the contract was
> made, his remaining duties to render performance are discharged, unless
> the language or the circumstances indicate the contrary.

The comments to § 265 explain that the purpose must be one for which the contract was made;

the frustration must be too severe to be regarded as a risk assumed under the contract; and the

frustrating event must not have been contemplated by the parties.  Essentially, the doctrine

excuses a party's performance when an unforeseen and uncontrollable event causes a "failure of

consideration or destruction of the expected value of performance."  17B C.J.S. Contracts § 524.

When leased premises in particular become unfit for the purpose leased, tenants may be

relieved from rent obligations.  See FRIEDMAN ON LEASES § 29.301.  See also 52 C.J.S.

Landlord & Tenant § 486 (noting tenant relieved of rent "where the performance of the lease

depends on the continued existence of the building leased, and the building is destroyed so that it

cannot be used for the purposes for which it was leased"); Restatement (Second) of Property §

5.4 (1977) (Unsuitable Condition Arises After Entry – Remedies Available) (enabling tenant to

terminate lease where "a change in the condition of the leased property . . . caused suddenly by a

13

non-manmade force, makes the leased property unsuitable for the use contemplated by the parties. . . .").[9]

The frustration of purpose doctrine is well accepted under Pennsylvania law. See, e.g., In re Greenfield Dry Cleaning & Laundry, 249 B.R. 634 (Bankr. E.D. Pa. 2000) (citing Alvino v. Carraccio, 162 A.2d 358 (Pa. 1960); Greek Catholic Congregation of Olyphant v. Plummer, 12 A.2d 435 (Pa. 1940)); see also Federal Check Exchange, Inc. v. Brink's Inc., Civ. A. No. 88-5631, 1989 WL 37118 (E.D. Pa.) (granting defendant's motion for summary judgment), aff'd without opinion, 887 F.2d 260 (3d Cir. 1989). Frustration excuses a party's duty to perform and ends all contractual obligations. See Lichtenfels v. Bridgeview Coal Co., 531 A.2d 22 (Pa. Super. 1987).

Pennsylvania courts have routinely adopted the frustration of purpose doctrine to free lessees from their rent obligations. For example, in Greenfield & Co. v. Kolea, 380 A.2d 758 (Pa. 1977), the Supreme Court of Pennsylvania held that the accidental destruction by fire of a one story garage building (the first leased property) made it impracticable for the lessee to use the garage for the purpose of automobile repair and storage, and also made it impracticable for the lessee to use the adjoining outdoor lot (the second leased property) for the sale of used cars. In departing from the common law presumption in property cases that a tenant must continue to pay rent absent a specific lease provision to the contrary, the court stated:

> [W]here a contract relates to specific property the existence or maintenance of which is necessary to the carrying out of the purpose of the agreement, the condition is implied by law, just as though it were written into the agreement, that the impossibility of performance or the frustration of purpose arising from the destruction of the property or *interference with its use*, without the fault of either party, ends all contractual obligations relating to the property. Moreover, impossibility

---

[9] Flooding is one such "non-manmade force." See, e.g., 33 A.L.R.3d 1356, Landlord and Tenant: Constructive Eviction Based on Flooding, Dampness, or the Like (1970).

> in that connection means not only strict impossibility but impracticability
> because of extreme and *unreasonable difficulty, expense, or loss involved.*

380 A.2d at 759 (quoting West v. Peoples First Nat'l Bank & Trust Co., 106 A.2d 427 (Pa. 1954); Greenburg v. Sun Shipbuilding Co., 121 A. 63 (Pa. 1923)) (emphasis added). For the sake of equity and justice, the Greenfield court applied modern contract principles to the landlord-tenant relationship: "if we applied the general rule and ignored the realities of the situation, we would bind the appellant to paying rent for barren ground when both parties to the lease contemplated that the building would be used for the commercial enterprise of repair and sale of used motor vehicles." 380 A.2d at 760.

Similarly, in Biggins v. Stookey, 98-S-153 (C.C.P. Adams Cty. Feb. 2, 1999) (a copy of which is attached hereto as Exhibit "X"), the court held that the purpose of a lease – for defendant to operate a restaurant in the premises where plaintiff operated an auction house – was frustrated by fire damage, thereby terminating defendant's duty to pay rent. Slip op. at 5. The court granted defendant summary judgment on this issue after finding that repairs and additional rent, especially in light of the closing of plaintiff's auction house and attendant loss of customer base on which defendant had relied, would amount to extreme expense. Id.[10] See also Lieber v. Smith, 14 Pa. D. & C.3d 647 (C.C.P. Phila. Cty. 1980) (dismissing claim for rent due for storage space where loss of lessees' property without fault of either party frustrated purpose of lease agreement). Accord Saab v. Norton Family, Inc., No. 9641, 2000 WL 910385 (Mass. App. Div. 2000) (relieving commercial tenant of rent obligation under frustration of purpose doctrine where, although "physically possible" to remain in possession and pay rent, tenant "would have received no value in return" because building commissioner determined tenant could not use

---

[10] Thus, the Biggins case stands for the proposition, inter alia, that a commercial lease can be frustrated by events which, while not necessarily causing physical destruction of the leased premises, do cause a reduction in the customers which were implicitly contemplated by the lease.

premises as a restaurant – "the one and only thing for which it had leased the premises and which it was permitted to do under the Lease"); Smith v. Roberts, 370 N.E.2d 271, 274 (Ill. App. 1977) (excusing performance where fire damage to main clothing store rendered valueless adjacent leased premises intended to be used as additional space for main store because, although not itself fire damaged, leased premises "were never intended to be autonomous" and "operations would have to be changed drastically in order to make the premises self-sufficient").

Indeed, there is long-standing precedent for terminating a lease and excusing unpaid rent due to flooding in particular. See, e.g., Viterbo v. Friedlander, 120 U.S. 707 (1887). In Viterbo, the Supreme Court annulled a lease of a sugar plantation after the Mississippi river unexpectedly flooded the plantation, resulting in a destruction of that year's crop as well as plants necessary for making future cane. In light of the fact that rebuilding the crop would be extremely difficult, the Court found a partial destruction of the plantation "making it cease to be fit for the purpose for which it was leased." 120 U.S. at 736-37. Accordingly, a mere rent abatement was insufficient and the Court granted the lessee an annulment of the lease. Id. See also D & R Realty v. Bender, 431 N.W.2d 920 (Neb. 1988) (entering judgment for lessees on rent claim under farm lease after flood "unlike any in memory" and not contemplated at time of lease precluded lessees from planting entire acreage); cf. Reilley v. Richards, 632 N.E.2d 507 (Ohio 1994) (holding parties' lack of knowledge that significant portion of property was located within flood plain was "mutual mistake" which frustrated purchaser's ability to build home on property as intended and justified rescission of purchase agreement).

In 801 South Fulton Ave. Corp. v. Radin, 526 N.Y.S.2d 143 (N.Y. App. Div. 1988), the court affirmed the dismissal of the landlord's action to recover unpaid rent:

> [T]he building was in such disrepair that the premises were *flooded during every rainfall* to an extent that it was impossible for the occupant,

16

Coordinated, a manufacturer of corrugated cardboard boxes, to conduct its manufacturing operations. Coordinated *eventually had to abandon* the premises after sustaining much property damage and experiencing *great difficulties in continuing its operations.* These circumstances so interfered with the purpose of the occupancy that the trial court was justified in finding that there had been a constructive eviction, and in declaring the rent for the period at issue to have been *totally abated.*

526 N.Y.S.2d at 145 (emphasis added).

Similarly, in <u>Reste Realty Corp. v. Cooper</u>, 251 A.2d 268 (N.J. 1969), the court sustained lessee's constructive eviction defense to lessor's unpaid rent claim because of "sufficient interference" with lessee's use and enjoyment of the leased office space as a result of repeated flooding, the last of which inundated the premises with five inches of water. The court noted: "If [the supervening event's] recurrence follows regularly upon rainstorms and is sufficiently serious in extent to amount to a substantial interference with use and enjoyment of the premises for the purpose of the lease, the test for constructive eviction has been met." 251 A.2d at 275.[11]

> **2.  Unforeseeable circumstances frustrated Defendants' ability to conduct its pharmaceutical related business – the only use permitted by the Special Purpose Lease.**

All the parties to this case intended that 525 would be used by OPI to conduct the business of manufacturing, testing, analyzing, packaging and distribution of pharmaceutics. <u>See</u> Exhibit A, § 5.01. The history of repeated flooding, the 2001 Flood, and the inability of anyone to reduce the risk of future flooding, coupled with the stigma now associated with the Office Park, made it impossible, or at least impracticable, for OPI to retain enough customers at 525 to continue its business there. While the 2001 Flood was largely unforeseeable due to its magnitude and close proximity in time to other floods in the Office Park, it was the reluctance of OPI's customers to continue to use OPI as a contract manufacturer in 525 after suffering serious

---

[11] Although Defendants are not arguing herein that some affirmative act on HUB's part created a constructive eviction, just as no act of the landlord played a role in <u>801 South Fulton,</u> Defendants note the proposition that repeated intrusive flooding may afford a tenant rent relief.

17

time delays and loss of drugs that frustrated the purpose of the Special Purpose Lease. A pharmaceutical contract manufacturing business without customers is no business at all.

The law provides that while a party is not relieved from contractual obligations where a frustrating event simply makes it "less profitable" to perform, a party is relieved where the frustration is such that "performance would be of little value to the frustrated party." Alcoa v. Essex Group, Inc., 499 F. Supp. 53 (W.D. Pa. 1980) (cited in Camerlo v. Howard Johnson Co., 710 F.2d 987 (3d Cir. 1983)). OPI's wrap-up work after the 2001 Flood, only a small portion of which actually was performed at 525, represented barely one-third of its pre-flood business volume. Compare McDevitt Dep. (April 22, 2003) at 172-174 (noting monthly revenue after June 2001 averaged approximately $400,000) with Feld Dep. (March 3, 2003) at 125:16-21 (noting monthly revenue before June 2001 to be between $1.1 and $1.4 million).[12] Further, according to OPI's former Controller: "We were on track for record revenues, record profits, record sales orders. We were having a banner year in 2001 prior to the flood." McDevitt Dep. (May 6, 2003) at 83:10-12. Clearly, the frustration was severe.

The severity of the frustration is not only evidenced by the testimony of OPI's customers, but also by the opinions of the Township officials, as well as HUB's own admissions in appealing the tax assessments for 525 and its other properties in the Office Park. Moreover, the report and testimony of Dr. Hensler, an expert in the fields of pharmaceutical manufacturing and drug development, shows that there is no genuine issue of material fact as to the frustration of purpose that resulted from the 2001 Flood. Dr. Hensler has opined that it would be highly unlikely, if not impossible, for OPI to re-establish its business at 525 after the 2001 Flood.

According to Dr. Hensler, 525's propensity for flooding makes it unsuitable for

---

[12] OPI's annual revenue had been nearly $15 million. See McDevitt Dep. (May 6, 2003) at 81:16-18; Purdy Dep. at 88:3-5.

pharmaceutical manufacturing, packaging or any of the activities performed by OPI as part of its business. See Hensler Dep. at 22:8-22; 23:11–24:4. Dr. Hensler's opinion is directly supported by witness testimony, specifically, every OPI customer who provided testimony in this case concerning 525's suitability after the 2001 Flood , each of whom sent work to 525 prior to the 2001 Flood.[13] As shown below, all three of these customers testified that they would not send significant future work to OPI at 525 due to the risk of future flooding.

### 1. Astra Zeneca

The testimony of Carmen Molina, a corporate designee of Astra Zeneca who visited 525 after the 2001 Flood, conclusively establishes that Astra Zeneca would not have considered outsourcing work to 525 due to the risk of future floods. In Ms. Molina's words, "if a site has flooded, we would not have gone back to it. We will not take that chance...." Molina Dep. at 32:6-7; see also 54:12-13 ("we would not consider a facility if it has an issue with flood"). Indeed, Ms. Molina made it clear that Astra Zeneca's decision to go elsewhere would have been no different had OPI fully restored 525 to CGMP compliance:

> There was no way they would be up and running. *Even if they were, we wouldn't consider bringing it back in there because of the fact that it flooded.* It could happen again as far warehousing, distribution, packaging, doing any of that type of work.

Molina Dep. at 42:12-18 (emphasis added). See also 57:1-15 ("It could have become a GMP facility. But it's just a place that we will not go back to. . . . I would say any pharmaceutical companies would not be considering it because of what happened. It's [sic] common sense.")

Not only did Astra Zeneca directly lose roughly 7 million dollars in inventory due to the flood, see Molina Dep. at 46:22-47:2, but it has also lost potentially hundreds of millions of

---

[13] See, e.g., Feld Dep. (March 3, 2003) at 153:7-17; Purdy Dep. at 82:4–19; 85:16–23; 190:2-16; Molina Dep. at 32:1-19; 42:8–18; 54:12-13; 55:3–57:15; Moore Dep. at 23:6–24; 24:21–25:2; 28:15–23; 45:1-5; Fant Dep. at 34:19–37:21; 38:24–39:11; 41:11–21; 51:5-24.

dollars because of the delay in the manufacturing and commercial sale of the *Exanta* drug brought about by the flood. See Hensler Dep. at 139:8-140:14; Hensler Report at 12-13. As explained by Olga Crowther, another corporate designee of Astra Zeneca, the loss due to the flood was "devastating" to the company. See Crowther Dep. (the relevant pages of which are attached hereto as Exhibit "Y") at 41:1-3. Astra Zeneca, OPI's single largest customer accounting for nearly 40% of its overall business, "would no longer do business at [525] due to its flooding potential, and now includes site location and flooding potential as part of its evaluating process when considering prospective manufacturers." Hensler Report at 13.

    2. Sanofi

    According to the testimony of Mr. Fant, Sanofi made a decision similar to that of Astra Zeneca regarding the suitability of 525 after the 2001 Flood: "Based upon the flood, it was our decision that at that point [525] was not suitable for use *and would not be suitable to use for long term [campaigns].*"[14] Fant Dep. at 39:8-11 (emphasis added). Asked directly whether Sanofi would rule out future work at the site due to the flood, Mr. Fant responded:

> I probably would not have ruled them out completely if it were for a single campaign, for a single run. *If it had been a long-term run, knowing the possibility of another flood and what the impact that it could have on a clinical study, I probably would have used other facilities.*

Fant Dep. at 51:15-24 (emphasis added).

    In reality, prior to the 2001 Flood, OPI was *only* working on long term campaigns for Sanofi. See Fant Dep. at 27:12–29:19. Moreover, at the time of the flood, Sanofi had just awarded an additional long term campaign contract to OPI for which the clinical work was already underway. See Hensler Report at 13. Further, while Sanofi had originally decided to send additional campaigns to 525, that additional work was not ultimately sent to OPI because of

---

[14] Upon further questioning, Mr. Fant clarified that by "long-term" he was referring to manufacturing and testing that would take place over a period of years. See Fant Dep. at 41:11-21.

20

the 2001 Flood. See Fant Dep at 36:7–37:15. Thus, the Sanofi situation illustrates that, after the 2001 Flood, 525 could no longer be used for the same purpose for which it was being used prior to the flood.

### 3. Novartis

Similarly, Novartis would not have given significant future work – the type of work contemplated under the Special Purpose Lease – to OPI at 525 after the 2001 Flood. Prior to the flood, OPI was performing analytical services for Novartis at 525 and was the "leading choice" to commercially manufacture two additional drugs for Novartis at 525. Moore Dep. at 13:21-23; 20:6-24; 27:11-14. These commercial manufacturing contracts would have generated $20 to $30 million in annual revenue to OPI. Moore Dep. at 26:1-9. After the flood, however, Novartis no longer considered OPI as a potential commercial manufacturer as long as it remained in 525. Id. at 23:20-24. Mr. Moore testified: "I would say directly after the flood we were not going to take the risk of manufacturing in that specific building." Id. at 23:20-22. He added, "I am certain that we would not have done the commercial work at that facility." Id. at 45:1-5. As to development work such as analytical services, not in and of itself significant in OPI's overall scheme of bundling customer services, Mr. Moore said it was a "small possibility." Id.

Indeed, even if this "small possibility" of analytical work came to fruition, the purpose for which the parties had entered the Special Purpose Lease would still be frustrated because such work could not even remotely compensate for the loss in manufacturing and packaging work. As stated by Mr. McDevitt:

> I ran a three-year analysis of our sales orders. In other words, I pulled every agreement we had and looked at the procurement. And what I found was, the only way to retain the business was to have the three service offerings. . . The clients wanted manufacturing, packaging and analytical services support.

21

McDevitt Dep. (April 22, 2003) at 160:21–161:11.[15]

As Dr. Hensler describes it, OPI's business was "one stop shopping" for pharmaceutical companies, the key to which was being able to offer bundled services including clinical manufacturing, packaging, labeling, storing, distribution, stability and analytical testing for its customers in one location. Hensler Report at 9; see also Hensler Dep. at 211:2–212:10. After the 2001 Flood, a client such as Novartis "'wasn't going to take the risk of manufacturing in that specific building' (525 Virgina Drive)" because its own internal risk assessment concluded it "could not take the chance that [significant long term] commercial manufacturing would be down due to weather conditions. . . . '". Hensler Report at 14 (quoting Moore Deposition). Because 525 was no longer suitable for pharmaceutical manufacturing, the site was essentially worthless to Novartis and other customers, and thus worthless to OPI for its intended purpose. See Hensler Dep. at 232:6-21.

As demonstrated above, all of the customer testimony supports Dr. Hensler's conclusion that the 525 "is no longer a suitable site for its intended purpose of providing pharmaceutical GMP contract manufacturing or related pharmaceutical services." Hensler Report at 4.[16] On the other hand, considering that every former client who has expressed an opinion in this case spoke uniformly about abandoning 525, there is no support for the rebuttal conclusion of Dr. Budzinski that OPI could restore 525 for its intended purpose and attract both new and old customers to the site. See Budzinski Report (attached hereto as Exhibit "Z") at 2-3. Not only does Dr. Budzinski fail to support his conclusion with a shred of customer testimony, he single-handedly undermines

---

[15] If OPI continued at 525 after the 2001 Flood doing just analytical work, it would have lost an estimated 95% of its business; if OPI had just manufacturing and analytical work, it would have lost 86% of its business; and if OPI had just packaging and analytical work, it would have lost 75% of its business. Id.

[16] Customer correspondence following the 2001 Flood also supports Dr. Hensler's conclusion. See Hensler Dep. at 154:3-13.

his own conclusion by expressing disbelief that a pharmaceutical manufacturer would continue

to operate out of a facility previously affected by flooding:

> Q.     For the customers whose studies were disrupted in 1999,
> the flooding in the other building, [the 2001 Flood] would have
> been twice in two years that their studies were disrupted.
>
> …
>
> A.     Is it a bump – is it a bump along the road?  Is it an
> annoyance? The amazing thing to me is that Sanofi continued to
> operate in [the] 425 building.  They stayed in [the] 425 building
> even after they were flooded in '99.  Now I don't know what they
> were thinking, but they did stay."

Budzinski Dep. at 171:22-172:18.

The law is well settled that expert opinions which are speculative and unsupported by

evidence in the record, such as that of Dr. Budzinski, are insufficient to raise a genuine issue of

material fact for summary judgment.  See e.g. General Electric Co. v. Joiner, 522 U.S. 136, 146

(1997) ("A court may conclude that there is simply too great an analytical gap between the data

and the opinion proffered.").  The Third Circuit has repeatedly affirmed grants of summary

judgment in the face of an opposing expert opinion.  See, e.g., Maldonado v. Ramirez, 757 F.2d

48, 51 (3rd Cir. 1985) (opinion inadequate to oppose motion for summary judgment where

inference drawn from evidence not inexorable); Pennsylvania Dental Ass'n v. Medical Serv.

Ass'n of Pennsylvania, 754 F.2d 248, 262 (3rd Cir. 1984) (holding expert testimony which

expressed opinion based on assumptions for which there was no support in the record did not

raise genuine issue of material fact); Township of Springfield v. Lewis, 702 F.2d 426 (3rd Cir.

1983) (holding expert affidavit consisting of unsupported opinion and internal contradictions did

not create genuine issue of material fact).  Accord Weigel v. Target Stores, 122 F.3d 461 (7th Cir.

1997); Hayes v. Douglas Dynamics Inc., 8 F.3d 88 (1st Cir. 1993); Richardson v. Richardson-

Merrell, Inc., 857 F.2d 823 (D.C. Cir. 1988); Kern v. Tri-State Ins. Co., 386 F.2d 754 (8th Cir.

1968).  The Third Circuit has explained:

> To hold that Rule 703 prevents a court from granting summary judgment
> against a party who relies solely on an expert's opinion that has no more
> basis in or out of the record than . . . theoretical speculations would
> seriously undermine the policies of Rule 56.

Pennsylvania Dental Ass'n, 754 F.2d at 262 (citing Merit Motors, Inc. v. Chrysler Corp., 569

F.2d 666 (D.C. Cir. 1977)).

In the instant case, just as in those cited above, HUB's expert provides nothing more than

surmise and theoretical speculations based on intuition without any data or testimony to back up

his opinion.  He opines that OPI's customers would have returned to 525 after the 2001 Flood,

but the customers themselves say they would not, could not.  As such,  Dr. Budzinski's report is

unsupported opinion in utter conflict with the evidence, creating no genuine issue of fact.  In

light of the foregoing, there is "simply too great an analytical gap" between the testimony and

documents on the record and the opinion proffered by Dr. Budzinski for such an opinion to have

significance in opposing the instant motion.  Accordingly, Defendants should be excused from

performing under the Special Purpose Lease.

**C.      Defendants' Obligation To Perform Under The Special Purpose Lease Is
         Excused By Impracticability Of Performance.**

**1.      The Impracticability of Performance Doctrine**

The impracticability of performance doctrine is often viewed as a corollary to the

frustration doctrine, and is defined as follows in Restatement (Second) of Contracts § 261 (1981)

(Discharge By Supervening Impracticability):

> Where, after a contract is made, a party's performance is made
> impracticable without his fault by the occurrence of an event the non-
> occurrence of which was a basic assumption on which the contract was
> made, his duty to render that performance is discharged, unless the
> language or the circumstances indicate the contrary.

24

115304.00401/21183779v2

"Acts of God" and acts of third parties, such as crop failure or a sudden shutdown of a major supply source, are exemplary events falling within the rule. <u>See</u> Restatement (Second) of Contracts § 261, cmt. d. Notably, performance need not be impossible to be discharged under the law, just impracticable due to "extreme and unreasonable difficulty, expense, injury, or loss to one of the parties." <u>Id</u>.

Pennsylvania courts have routinely applied the doctrine of impracticability to void contractual obligations in cases similar to the present one. <u>See</u>, <u>e.g.</u>, <u>Albert M. Greenfield & Co. v. Kolea</u>, 380 A.2d 758 (Pa. 1977); <u>Greenberg v. Sun Shipbuilding Co.</u>,121 A. 63 (Pa. 1923); <u>see also</u> <u>Specialty Tires of America, Inc. v. The CIT Group/Equipment Financing, Inc.</u>, 82 F.Supp.2d 434 (W.D. Pa. 2000) (granting summary judgment to seller where its failure to deliver tire presses to buyer was excused by third party's detaining of the presses); <u>Ellwood City Forge Corp. v. Fort Worth Heat Treating Co.</u>, 636 A.2d 219, 223 (Pa. Super. 1994) (holding jury should have been instructed that underpowered furnace, which could not provide heat necessary to treat automobile parts, entitled manufacturer to "discharge due to commercial impracticability"); <u>Olbum v. Old Home Manor, Inc.</u>, 459 A.2d 757 (Pa. Super. 1983) (holding lease discharged by supervening impracticability where agreement depended upon continued existence of mineable coal); <u>Biggins v. Stookey</u>, 98-S-153 (C.C.P. Adams Cty. Feb. 2, 1999) ("If Defendant was also required to pay $26,376.79 in repairs, in addition to rent for another 21 months [totaling $14,700.00], that would undoubtedly be an extreme expense constituting impossibility of performance due to impracticability.").

Furthermore, the law of Pennsylvania recognizes situations where "a change in economic conditions renders enforcement of a contract 'unconscionable,' or relieves a party from performance on the basis of impracticability . . . ." <u>Camerlo v. Howard Johnson Co.</u>, 710 F.2d

987, 991 (3rd Cir. 1983) (citations omitted); <u>Sharon Steel Corp. v. Jewell Coal and Coke Co.</u>, 735

F.2d 775, 778 n.8 (3rd Cir. 1984) (citing <u>Aluminum Co. of America ("ALCOA") v. Essex Group,</u>

<u>Inc.</u>, 499 F. Supp. 53 (W.D. Pa. 1980) (applying similar Indiana law)).  In <u>ALCOA</u>, the parties

entered into a 16 year contract for ALCOA to convert Essex's alumina into aluminum.  499 F.

Supp. at 57.[17]  Oil prices rose dramatically after five years, unforeseeably raising ALCOA's

production costs and ultimately causing ALCOA to lose over 10 cents per pound, or more than

$60 million dollars over the life of the contract.  <u>Id.</u> at 58, 73.  The court found performance

under these circumstances to be impracticable, much more than a "mere change in the degree of

difficulty or expense."  <u>Id.</u> at 72-73.  <u>Accord</u> <u>Bartlett Commons Shopping Ctr. V. Schultz Sav-O-</u>

<u>Stores, Inc.</u>, No. 92 C 2787, 1992 WL 345052 (N.D. Ill. Nov. 10, 1992) (denying motion to

strike lessee's impracticability defense in breach of contract action for the five year operation of

a grocery store where recession and depression of real estate market amounted to unforeseeable

economic frustration and where lessee demonstrated a reasonable effort to satisfy its obligation

by "remaining in operation for one year while sustaining losses of approximately one million").

> **2.    Unforeseeable circumstances rendered impracticable Defendants'**
> **ability to conduct its pharmaceutical related business – the only use**
> **permitted by the Special Purpose Lease.**

        There is no genuine issue here that, in accordance with the Special Purpose Lease, OPI

was to utilize 525 for the single, specific purpose of conducting pharmaceutical manufacturing,

testing, packaging and distribution.  <u>See</u> Exhibit A, § 5.01.  The basic assumption on which the

parties entered the Special Purpose Lease was that 525 was suitable for that purpose – that

flooding would not occur to such an extent that OPI's customers would lose confidence in 525 as

---

[17] The price for ALCOA's services was set by pound of aluminum converted and calculated by a complex formula including variable components.  The formula was constructed to achieve an average net income for ALCOA of 4 cents per pound, although it was foreseeable at the time of contracting that the formula might produce a return as low as 1 cent per pound or as high as 7 cents per pound.  <u>Id.</u>

a suitable site for their clinical trial work. OPI's ability to conduct its business in 525 became impracticable, however, when, through no fault of its own and as a result of events for which it had not assumed the risk, the continuation of its business at 525 would have amounted to extreme and unreasonable expense and difficulty.

As discussed in detail above, OPI was unable to retain its core business at 525 because of its customers' refusal to risk future losses due to flooding at 525. Further, due to the industry's preference for the "bundling" of the kind of services contemplated under the Special Purpose Lease, OPI could not alter its business model without losing 75% - 95% of its business, losses well in excess of $10 million a year.[18] Additionally, the engineering plans presented to OPI by HUB in an effort to reduce future flooding, if implemented, might only have limited 525's flood exposure, not eliminated it.[19] In any event, the $4 million cost to OPI for such a stopgap measure, see Campoli Dep. at 140:7-19, almost one-third of its total rental obligation under the Special Purpose Lease, is extreme and unreasonable. See Biggins v. Stookey, 98-S-153 (C.C.P. Adams Cty. Feb. 2, 1999). Such severe circumstances are exactly the type deemed impracticable under the law. Accordingly, Defendants should be excused from performing under the Special Purpose Lease.

> **D.** **Defendants' Obligation To Perform Under The Special Purpose Lease Is Excused By Mutual Mistake.**
>
> **1.** **The Mutual Mistake Doctrine**

The defense of mutual mistake releases a party from contractual obligations where (a) the mistake is made by both parties at the time of contract; (b) the mistake regards a basic assumption on which the contract was made that materially effects the agreed upon exchange of

---

[18] See McDevitt Dep. (April 22, 2003) at 160-61.

[19] See Mannix Dep. at 94:11-17.

performances; and (c) the mistake is one for which no party bore the risk. Restatement (Second) of Contracts § 152(1) (1981) (When Mistake of Both Parties Makes the Contract Voidable).

Pennsylvania courts recognize the defense to a breach of contract claim based on mutual mistake. See e.g. Sullivan v. Allegheny Ford Truck Sales, Inc., 423 A.2d 1292 (Pa. Super. Ct. 1980); Ehrenzeller v. Chubb, 90 A.2d 286 (Pa. Super. 1952). "A contract [made under] a mutual mistake as to an essential fact which formed the inducement to it, may be rescinded on discovery of the mistake, if parties [can be] placed in their former position with reference to the subject-matter of it." Ehrenzeller, 90 A.2d at 287 (quoting Blygh v. Sansom, 20 A. 996 (Pa. 1891)).

In Sullivan, the parties had entered into a purchase agreement under the mistaken belief that the truck at issue recently had its engine overhauled by the previous owner and therefore was suitable for steel hauling. Id. at 1293. Despite finding that plaintiff was motivated by "personal and economic considerations," the court found a mutual mistake of fact concerning the engine's condition at the time of the sale which related to the basic assumption on which the contract was made and for which neither party had assumed the risk. Thus, the court voided the contract and awarded plaintiff damages. Id. at 1295-96.[20]

Other jurisdictions have applied the concept of mutual mistake to void agreements in situations similar to the instant one. See, e.g., Reilley v. Richards, 632 N.E.2d 507 (Ohio 1994); City of Savage v. Formanek, 459 N.W.2d 173 (Minn. Ct. App. 1990). In Reilley, plaintiff brought an action against the buyer of property for enforcement of their purchase agreement. 632 N.E.2d at 507. Defendant counterclaimed, arguing that the contract should be rescinded on the grounds of mutual mistake because neither party was aware prior to the closing that the

---

[20] Because the truck had been repossessed by a third-party after being abandoned by plaintiff and the parties could not therefore be restored to their former status, rescission was not available and the court instead awarded plaintiff the difference in value between a truck suitable for the intended purpose and the inadequate truck actually received. Id. at 1296.

28

property was substantially located in a flood plain thereby frustrating defendant's ability to build a home. Id. at 507-08. The Ohio Supreme Court upheld the rescinding of the contract because the mistake made by both parties concerned "the character of the property such that it severely frustrate[d]" the buyer's ability to use the lot as intended. Id. at 509.

In City of Savage, the Minnesota Court of Appeals voided an assessment agreement between the city and owners of undeveloped land on grounds of mutual mistake, where both parties were mistaken about the potential for permit requirements to halt industrial development on the land. While both parties knew that the land was adjacent to a river and under the jurisdiction of the Army Corp of Engineers (the "Corps"), neither party knew that permits from the Corps were required to develop the land. 459 N.W.2d at 173-74. When the Corps later made it known that permits were required but would not be issued, defendants refused to make further payments, and the city then sued to enforce the agreement. After trial, the court found a mutual mistake of a material fact concerning the issuance of permits, stating "[a]lthough the parties learned of their mistake at a future time, the mistake was their understanding of the facts at the time of contracting." Id. at 176.

Similarly, in ALCOA, where the parties were mistaken about aluminum production costs, the court made clear that a mutual mistake of fact may indeed pertain to future events:

> The Court finds the parties' mistake in this case to be one of fact rather than one of simple prediction of future events. Plainly the mistake is not wholly isolated from predictions of the future or from the searching illuminations of painful hindsight. But this is not a legal test. At the time the contract was made both parties were aware that the future was unknown, and their agreed contract was intended to bind them for many years to come.

499 F. Supp. 53, 63 (W.D. Pa. 1980).

29

2.    **A mutual mistake of fact frustrated Defendants' ability to conduct its pharmaceutical related business - the only use permitted by the Special Purpose Lease.**

While the parties hereto clearly intended at the time of contracting that OPI would use 525 as the site for its long-term pharmaceutical manufacturing, testing, analyzing, packaging, and distribution business, they were mutually mistaken as to the suitability of 525 for its intended purpose. Section 5.01 of the Special Purpose Lease memorializes the parties' intent, providing that 525 was to be used specifically for the purpose stated above "and for no other purpose." See Exhibit A, § 5.01.[21] The parties' mutual misunderstanding as to the propensity for and severity of flooding in 525, as well as customer reaction to such flooding, made them unaware that 525 could not in fact be used for such a purpose.

Thus, as in the cases discussed above, the mistake in this case regarded the basic assumption for which the Special Purpose Lease was entered into by both parties for which neither party bore the risk. Just as the truck in Sullivan was valueless to the plaintiff for its intended purpose due to an unknown lack of engine power, so too 525 became valueless to OPI for its intended purpose of housing pharmaceutical testing, manufacturing, packaging and distribution. Just as the parties in Reilley were mistaken about the nature of the property in a flood plain and consequent insufficiency of the property for a home, HUB and OPI were mistaken about the flooding problem at 525 when they assumed their respective obligations under the Special Purpose Lease, specifically the distinct possibility of multiple floods at 525 during the term of the Special Purpose Lease.[22] And, just as the parties in City of Savage were mistaken as to future events pertaining to the development of land, the parties hereto were under

---

[21] The scope of this use provision is significant, according to HUB's Mr. Campoli, because "the tenant wants to be assured that they can operate what they're going to operate, and from the landlord's perspective that they understand what is being operated within the premises." Campoli Dep. at 110:18-23.

[22] Surely, neither party understood the ramifications of another flood – that OPI's customers would leave.

30

the mistaken belief that customers would continue to send contract manufacturing and related work to OPI at 525 after it flooded.

The testimony of HUB's own expert highlights the existence of the parties' mutual mistake of fact. Speaking about the risk factors considered by customers when selecting contract manufacturers, Dr. Budzinski testified, "In my experience the risk factors are how well the people are trained because most errors come from people, not from Acts of God. And so when you do a risk analysis of a site, you're looking at other things other than flooding. . . The key to outsourcing is to understand the risk and accept what risk you have." Budzinski Dep at 98:20–99:8. Notably, despite his extensive experience in outsourcing to clinical trial contract manufacturers like OPI prior to becoming a consultant to the industry, Dr. Budzinsky admitted: "*I don't think I ever contemplated the risk of flooding until this case started.*" Budzinski Dep at 224:8–9 (emphasis added). In that regard, Dr, Budzinski is not alone.[23] In short, OPI, HUB, and everyone else concerned with 525 were mutually mistaken as to its unsuitability for pharmaceutical related operations due to its propensity for flooding. Accordingly, Defendants should be excused from performing under the Special Purpose Lease.

---

[23] Indeed, the parties' mutual mistake was reasonable considering that the outsourcing industry was in its infancy at the time the Special Purpose Lease was executed. See Budzinski Dep. at 113:19-20. Moreover, although prior to the 2001 Flood major pharmaceutical companies did not inquire about the possibility of flooding when determining which facility to use, flooding history and potential for future flooding have subsequently become relevant factors. See, e.g., Crowther Dep. at 35:23-36:5.

31

III.    **CONCLUSION**

For the foregoing reasons, this Court should grant Defendants' motion for summary

judgment and dismiss Plaintiffs' complaint against them with prejudice in its entirety.

Respectfully submitted,

**BLANK ROME LLP**

BY: _____

Richard P. McElroy
Adam M. Share
Todd A. Schoenhaus
One Logan Square
Philadelphia, PA 19103-6998
(215) 569-5500

Attorneys for Defendants

Dated: September 22, 2003

32

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of September, 2003, I caused a true and correct copy of the foregoing Motion for Summary Judgment of Defendants Omnicare Pharmaceutics, Inc. and Omnicare Clinical Research, Inc., supporting Memorandum of Law, and proposed Order to be served upon the following counsel by Hand-Delivery:

Stephen W.W. Ching, Esquire
OBERMAYER REBMANN MAXWELL & HIPPEL LLP
One Penn Center Plaza, 19th Floor
1617 John F. Kennedy Boulevard
Philadelphia, PA  19103

TODD A. SCHOENHAUS