IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BARRY M. PORTNOY and<br>GERARD M. MARTIN, as Trustees for<br>HUB PROPERTIES TRUST<br><div align=center>Plaintiffs,</div><br><br><div align=center>v.</div><br><br>OMNICARE PHARMACEUTICS, INC.<br><div align=center>and</div><br>OMNICARE CLINICAL RESEARCH, INC.,<br><div align=center>Defendants.</div> | :<br>:<br>:<br>:  NO. 02-CV-2905<br>:<br>:  HONORABLE CLIFFORD<br>:  SCOTT GREEN<br>:<br>:<br>:<br>:<br>: |

APPENDIX OF EXHIBITS
IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

PAUL S. DIAMOND
STEVEN A. HABER
STEPHEN W.W. CHING, JR.
OBERMAYER REBMANN MAXWELL & HIPPEL LLP
One Penn Center, 19th Floor
1617 John F. Kennedy Boulevard
Philadelphia, PA 19103
(215) 665-3000

Attorneys for Plaintiffs Barry M. Portnoy and Gerard M.
Martin, as Trustees for HUB PROPERTIES TRUST

483869

## TABLE OF CONTENTS

| EXHIBIT TAB | ITEM |
|---|---|
| A | 12/3/96 Lease between 525 Virginia Drive Associates Limited Partnership and Bio-Pharmaceutics Services, Inc.<br><br>*(Previously attached to the Complaint at Exhibit A)* |
| B | 09/18/97 Certificate of Amendment of Certificate of Incorporation indicating name change from Bio-Pharmaceutics Services, Inc. to IBAH Pharmaceutics Services, Inc.<br>-and-<br>06/15/2000 Certificate of Amendment of Certificate of Incorporation indicating name change from IBAH Pharmaceutics Services, Inc. to Omnicare Pharmaceutics, Inc.<br><br>*(Previously attached to the Complaint at Exhibit D)* |
| C | 12/3/96 Lease Guaranty Between 525 Virginia Drive Associates Limited Partnership and I.B.A.H., Inc.<br><br>*(Previously attached to the Complaint at Exhibit B)* |
| D | 06/21/2000 Certificate of Amendment of Certificate of Incorporation indicating name change from IBAH, Inc. to Omnicare Clinical Research, Inc.<br><br>*(Previously attached to the Complaint at Exhibit E)* |
| E | 09/17/97 Assignment and Assumption of Leases, Contracts and Agreement between 525 Virginia Drive Associates Limited Partnership and HUB Properties Trust<br><br>*(Previously attached to the Complaint at Exhibit C)* |

483869

| F | 01/16/92 Flood Insurance Study prepared by the Federal Emergency Management Agency for Township of Upper Dublin, Montgomery County<br><br>*(Bates-Stamped No. HUB 00644)* |
|---|---|
| G | 01/03/97 Flood Insurance Rate Map prepared by the U.S. Department of Housing and Urban Development regarding Upper Dublin Township, Community-Panel No. 420708 0005 B<br>-and-<br>02/16/95 Flood Insurance Rate Map prepared by the Federal Emergency Management Agency regarding Upper Dublin Township, Community-Panel No. 4200708 0005 D<br><br>*(Bates-Stamped No. HUB 01077, 1079, 1081, 00677-678, 00680)* |
| H | Selected Pages from the March 11, 2003 Deposition of Janice Rice |
| I | Defendants' Answer and Affirmative Defenses |
| J | Selected Pages from the October 29, 2002 Deposition of Omnicare Corporate Designee David Morra |
| K | Selected Pages from the October 30, 2002 Deposition of Omnicare Corporate Designee Ronald L. Greenspan |
| L | January 22, 2003 Letter from Richard P. McElroy, Esquire to Paul S. Diamond, Esquire |
| M | March 12, 2002 Supplemental Notice of Default and Notice of Acceleration from counsel for HUB Properties Trust to Defendants<br><br>*(Previously attached to the Complaint at Exhibit F)* |

483869

# EXHIBIT A

# LEASE AGREEMENT

**LANDLORD:**

525 VIRGINIA DRIVE ASSOCIATES LIMITED PARTNERSHIP
a Pennsylvania limited partnership
443 South Gulph Road
King of Prussia, Pennsylvania 19406

**TENANT:**

BIO-PHARM PHARMACEUTICS SERVICES, INC.
a Delaware corporation
425 Delaware Drive
Fort Washington, Pennsylvania 19034-2703

**PREMISES:**

525 Virginia Drive
Fort Washington, Upper Dublin Township
Montgomery County, Pennsylvania

**DATE OF LEASE:**

December 3, 1996

142650.7

# TABLE OF CONTENTS

PREAMBLE ............................................................................................................. 1

  BASIC LEASE PROVISIONS AND DEFINITIONS ................................................ 1

ARTICLE ONE ...................................................................................................... 2

  PREMISES AND TERM ........................................................................................ 2
    Section 1.01.  Grant of Lease ............................................................................ 2
    Section 1.02.  Term of Lease ............................................................................. 2

ARTICLE TWO ..................................................................................................... 3

  RENT .................................................................................................................... 3
    Section 2.01.  Fixed Basic Rent ........................................................................ 3
    Section 2.02.  Additional Rent .......................................................................... 3
    Section 2.03.  Manner of Payment .................................................................... 4
    Section 2.04.  Partial Months ............................................................................ 4
    Section 2.05.  Late Charge ................................................................................ 4

ARTICLE THREE ................................................................................................. 4

  EXPENSES AND TAXES ...................................................................................... 4
    Section 3.01.  Tenant's Obligations ................................................................... 4
    Section 3.02.  Installment Payment ................................................................... 4
    Section 3.03.  Apportionment of Taxes; Tenant's Proportionate Share of Taxes .... 4
    Section 3.04.  Receipts ...................................................................................... 5
    Section 3.05.  Right to Contest Taxes ............................................................... 5
    Section 3.06.  Taxes and Impositions Payable by Landlord .............................. 5
    Section 3.07.  Utilities ....................................................................................... 5
    Section 3.08.  Insurance .................................................................................... 5

ARTICLE FOUR .................................................................................................... 6

  CONSTRUCTION OF IMPROVEMENTS ............................................................ 6
    Section 4.01.  Landlord Improvements ............................................................. 6
    Section 4.02.  Tenant Work .............................................................................. 6
    Section 4.03.  Time for Completion .................................................................. 7
    Section 4.04  Delays in Substantial Completion ............................................... 7
    Section 4.05.  Signs ........................................................................................... 8

ARTICLE FIVE ...................................................................................................... 8

  USE AND COMPLIANCE WITH LAWS; ENVIRONMENTAL COVENANTS ....... 8
    Section 5.01.  Use of Premises ......................................................................... 8
    Section 5.02.  Compliance with Law ................................................................ 8
    Section 5.03.  Right to Contest ......................................................................... 8

ARTICLE SIX ........................................................................................................ 9

  REPRESENTATIONS AND WARRANTIES ......................................................... 9
    Section 6.01.  Landlord's Representations and Warranties ............................... 9
    Section 6.02.  Brokerage Commissions ............................................................ 10

ARTICLE SEVEN .................................................................................................. 10

  INDEMNIFICATION ............................................................................................ 10
    Section 7.01.  Tenant's Indemnity .................................................................... 10
    Section 7.02.  Landlord's Indemnity ................................................................ 11

i

142650.7

ARTICLE EIGHT ................................................................................................ 11

  MAINTENANCE AND REPAIRS ........................................................................ 11
    Section 8.01.  Tenant's Obligations ........................................................... 11
    Section 8.02.  Landlord's Obligations ........................................................ 12
    Section 8.04  Access to Premises ............................................................. 12
    Section 8.05.  Landlord as Building Manager; Manager's Fee ................... 12

ARTICLE NINE ................................................................................................ 12

  ALTERATIONS ................................................................................................ 12
    Section 9.01.  Structural Alterations ......................................................... 12
    Section 9.02.  Non-Structural Alterations ................................................. 13
    Section 9.03  Mechanics' Liens ................................................................ 13
    Section 9.04.  Status of Improvements; "As Built" Drawings .................. 13

ARTICLE TEN .................................................................................................. 13

  INSURANCE AND DAMAGE ............................................................................ 13
    Section 10.01.  Insurance ........................................................................ 13
    Section 10.02.  Damage or Casualty ....................................................... 14
    Section 10.03.  Cooperation in Actions ................................................... 14
    Section 10.04.  Notice of Casualty .......................................................... 15
    Section 10.05.  Waiver of Subrogation; Rights Under Insurance Policies .. 15

ARTICLE ELEVEN ........................................................................................... 15

  CONDEMNATION ........................................................................................... 15
    Section 11.01.  Condemnation ................................................................. 15
    Section 11.02.  Total Condemnation ........................................................ 15
    Section 11.03.  Partial Condemnation ...................................................... 16

ARTICLE TWELVE ......................................................................................... 16

  DEFAULT ....................................................................................................... 16
    Section 12.01.  Events of Default; Termination ....................................... 16
    Section 12.02.  Remedies ........................................................................ 17
    Section 12.03.  Non-Waiver .................................................................... 18
    Section 12.04.  Rights and Remedies Cumulative .................................... 18
    Section 12.05.  Waiver of Trial by Jury ................................................... 18

ARTICLE THIRTEEN ...................................................................................... 18

  QUIET ENJOYMENT; SUBORDINATION ......................................................... 18
    Section 13.01.  Quiet Enjoyment ............................................................. 18
    Section 13.02.  Subordination, Non-Disturbance and Attornment ............ 19
    Section 13.03.  Tenant Estoppel Certificate ............................................. 19
    Section 13.04.  Landlord's Lien Waiver ................................................... 19

ARTICLE FOURTEEN ..................................................................................... 19

  OPTION TO RENEW LEASE ........................................................................... 19
    Section 14.01.  Option to Renew ............................................................. 19
    Section 14.02.  Adjustment to Fixed Basic Rent ...................................... 20

ARTICLE FIFTEEN .......................................................................................... 20

  OPTION TO PURCHASE AND RIGHT OF FIRST REFUSAL .............................. 20
    Section 15.01.  Tenant's Option to Purchase ............................................ 20
    Section 15.02.  Tenant's Right of First Refusal ........................................ 21
    Section 15.03.  Memorandum of Lease and Option to Purchase ............... 22

142650.7

ARTICLE SIXTEEN ........................................................................................................ 22

    MISCELLANEOUS ...................................................................................................... 22
        Section 16.01.  Assignment; Sublease ................................................................ 22
        Section 16.02.  Notice ......................................................................................... 23
        Section 16.03  Signage ........................................................................................ 23
        Section 16.04.  Survival of Valid Terms ............................................................ 23
        Section 16.05.  Covenants to Bind and Benefit Respective Parties .................... 23
        Section 16.06.  Captions and Headings .............................................................. 24
        Section 16.07.  Governing Law ......................................................................... 24
        Section 16.08  Confidentiality ........................................................................... 24
        Section 16.09  Lease Guaranty .......................................................................... 24
        Section 16.10  Counterparts .............................................................................. 24

## LEASE AGREEMENT

THIS LEASE (the "Lease") is made as of the 3rd day of December, 1996 between 525 VIRGINIA DRIVE ASSOCIATES LIMITED PARTNERSHIP, a Pennsylvania limited partnership (herein referred to as "Landlord") whose address is 443 South Gulph Road, King of Prussia, Pennsylvania 19406 and BIO-PHARM PHARMACEUTICS SERVICES, INC., a Delaware corporation (herein referred to as "Tenant") whose address is Four Valley Square, 512 Township Line Road, Blue Bell, PA 19422.

### PREAMBLE

### Basic Lease Provisions and Definitions

In addition to other terms elsewhere defined in this Lease, the following terms whenever used in this lease shall have only the meanings set forth in this section, unless such meanings are expressly modified, limited or expanded herein.

A.    Additional Rent shall mean any and all sums other than Fixed Basic Rent which may be due from time to time from Tenant to Landlord pursuant to the terms of the Lease.

B.    Brokers shall mean Preferred Real Estate Advisors, Inc. and Julien J. Studley, Inc.

C.    Building shall mean the commercial building situate at 525 Virginia Drive, Fort Washington, Upper Dublin Township, Montgomery County, Pennsylvania, consisting of approximately 124,000 gross rentable square feet as shown on Exhibit "A" attached hereto.

D.    Demised Premises or Premises shall mean for Lease Year 1:  approximately 40,000 square feet of the Building, as described in Exhibit "A" and for Lease Year 2: approximately 80,000 square feet of the Building, as described in Exhibit "A" and for the balance of the Term and any Renewal Term, the entire Building.

E.    Exhibits shall be the following, attached to this Lease, incorporated herein and made a part hereof:

| | |
|---|---|
| Exhibit A | Description of Building |
| Exhibit B-1 | Plans and Specifications for Landlord Improvements |
| Exhibit B-2 | Plans and Specifications for Tenant Work |
| Exhibit C | Permitted Exceptions |
| Exhibit D | Memorandum of Lease |
| Exhibit E | Form of Lease Guaranty |

142650.7

F.   Fixed Basic Rent shall mean:  Twelve Million Three Hundred Seventy Eight Thousand and 00/100 Dollars ($12,378,000.00), for the Term, payable as follows:

| Year | Yearly Payments | Equal Monthly Payments |
|------|-----------------|------------------------|
| Lease Year 1 | $220,000.00 | $18,333.34 |
| Lease Year 2 | $440,000.00 | $36,666.67 |
| Lease Year 3 - 4 | $806,000.00 | $67,166.67 |
| Lease Year 5 - 6 | $868,000.00  7 | $72,333.34 |
| Lease Year 7 - 15 | $930,000.00  7.50 | $77,500.00 |

G.   Rent Commencement Date is as defined in Section 1.02 hereof.

H.   Permitted Uses is as defined in Section 5.01

I.   Purchase Option is as defined in Article 15 hereof.

J.   Renewal Option is as defined in Article 14 hereof.

K.   Security Deposit shall be Zero and 00/100 Dollars ($0.00)

L.   Term is defined in Section 1.02 hereof.

M.   Guarantor shall mean I.B.A.H., INC., a Delaware corporation.

For and in consideration of the covenants and mutual promises contained herein, and upon the terms and conditions set forth herein, and intending to be legally bound hereby, the parties hereby covenant and agree as follows:

ARTICLE ONE

Premises and Term

Section 1.01.  Grant of Lease.  Landlord does hereby demise, lease and let to Tenant and Tenant does hereby let from Landlord, upon and subject to all terms, covenants and conditions herein contained, the Premises.  Notwithstanding that the Tenant shall not be occupying the entire Building until Lease Year 3, Landlord shall have no right to use or occupy, or lease to any third party, any portion of the Building, without Tenant's prior written consent in each instance.  In addition to the Premises, Tenant shall have the right and license, to place or install temporary modular office and laboratory space on the grounds surrounding the Building, at a location reasonably satisfactory to Landlord, and provided that (i) Tenant has provided notice to Landlord of Tenant's intention and identified the proposed location of such modular office and laboratory space and (ii) such temporary modular office and laboratory space is permitted under and complies with all applicable federal, state and local laws, regulations and code requirements and all of the terms of this Lease.  Tenant and its contractors shall have access to the entire Premises during Lease Year 1, at Tenant's sole risk, for the purposes of commencing construction of improvements in anticipation of Tenant's occupancy and in accordance with Section 4.02 hereof.

2

142650.7

Section 1.02. Term of Lease. The term of this Lease ("Term") shall include a preliminary term, as described in Section 1.02 (a) (the "Preliminary Term"); an initial term, as described in Section 1.02(b) (the "Initial Term") and certain Renewal Terms, as described in Article 14 hereof.

(a) Preliminary Term. The Preliminary Term shall commence on the date this Lease is executed by all parties hereto, and shall terminate on the day prior to the commencement of the Initial Term. All of the terms and conditions set forth in this Lease shall apply during the Preliminary Term except for the provisions of Articles 2 and 3, it being the intention of the parties that during the Preliminary Term, Tenant shall have no obligation to pay Fixed Basic Rent, Additional Rent or any other rent to Landlord. During the Preliminary Term, Tenant shall be permitted to enter the Demised Premises solely for the purpose of performing the Tenant Work (as defined below).

(b) Initial Term. The Initial Term of this Lease shall commence on the later to occur of the following: (i) January 15, 1997 or (ii) a date which is ten (10) days after the Landlord Improvements (as herein defined) have been substantially completed in accordance with Article 4 hereof. The Initial Term as determined above shall be set forth on a written notice from Landlord to Tenant, and the Initial Term of this Lease shall continue for a period of fifteen years, unless this Lease shall be renewed by the Tenant in accordance with Article 14 hereof or sooner terminated as hereinafter provided. (The date upon which the Initial Term commences is referred to hereinafter as the "Rent Commencement Date").

(c) Renewal Terms. Tenant shall have two consecutive options to extend the Initial Term of this Lease, in accordance with the provisions of Article 14 hereof.

(d) Lease Year. The Lease Year 1 of the Term shall commence on the Rent Commencement Date and shall end (i) on the day immediately preceding the first anniversary of the Rent Commencement Date, if the Rent Commencement Date is the first day of the month, or (ii) on the last day of the month in which the first anniversary of the Rent Commencement Date occurs, if the Rent Commencement Date is any day other than the first day of a calendar month. Each subsequent lease year shall be a period of twelve (12) months commencing on the day immediately following the expiration of the prior lease year and expiring on the day immediately preceding the anniversary of the commencement of such lease year.

## ARTICLE TWO

### Rent

Section 2.01. Fixed Basic Rent. Except as hereinafter provided, the minimum annual rent for such Lease Years is in the amounts set forth in the Preamble as "Fixed Basic Rent." The Fixed Basic Rent shall be payable during the Initial Term, in advance, without notice or demand, in equal monthly installments of one-twelfth of the annual amount, on the first day of each month during the Initial Term.

Section 2.02. Additional Rent. All other amounts payable by Tenant hereunder, whether payable to Landlord or to third parties, including without limitation, Taxes pursuant to Section 3.01, insurance premiums, and utility charges, shall be considered additional rent ("Additional Rent") payable by Tenant hereunder. Tenant's obligation for the payment of Additional Rent shall commence upon the Rent Commencement Date.

3

Section 2.03. Manner of Payment. All amounts payable under Section 2.01 of this Lease, as well as all other amounts payable by Tenant to Landlord under the terms of this Lease, shall be paid, at the office of Landlord set forth above, or at such other place as Landlord shall from time to time designate by notice to Tenant. Tenant's obligation to pay the Fixed Basic Rent and Additional Rent shall survive the expiration of the Term.

Section 2.04. Partial Months. In the event that the Rent Commencement Date is a day other than the first day of a calendar month, Fixed Basic Rent for the month in which the first anniversary of the Rent Commencement Date occurs shall be prorated such that the monthly payment of Fixed Basic Rent for such month shall be equal to the sum of (i) the monthly installment payment that is due during Lease Year 1, as set forth in Section F of the Preamble hereof divided by thirty (30) and multiplied by the number of days in such month prior to the anniversary of the Rent Commencement Date, plus (ii) the monthly installment payment that is due during Lease Year 2, as set forth in Section F of the Preamble hereof, divided by thirty (30) and multiplied by the number of days remaining in such month on and after the Rent Commencement Date..

Section 2.05. Late Charge. Landlord shall be entitled to receive from Tenant a late charge equal to five percent (5%) of the amount of any payment or installment of Fixed Basic Rent and Additional Rent, or any portion thereof, if not received within ten (10) days of the date when due. The acceptance of any such payment by Landlord shall not be deemed to be a waiver of any other rights which Landlord may have under the provisions of this Lease or as provided by law.

ARTICLE THREE

Taxes: Utility Charges

Section 3.01. Tenant's Obligations. Tenant will pay and discharge, punctually as and when the same shall become due and payable, but in any event not later than five (5) business days before any fine, penalty, interest or cost may be added thereto for nonpayment, all real estate taxes water charges and sewer charges (each such tax, water charge and sewer charge hereinafter sometimes called a "Tax").

Section 3.02. Installment Payment. If by law any Tax is payable, or may at the option of the taxpayer be paid, in installments, Tenant may, whether or not interest shall accrue on the unpaid balance thereof, pay the same, and any accrued interest or any unpaid balance thereof, in installments as each installment becomes due and payable, but in any event not later than five (5) business days before any fine, penalty, interest or cost may be added thereto for nonpayment of any installment or interest.

Section 3.03. Apportionment of Taxes: Tenant's Proportionate Share of Taxes. Any Tax, a part of which is within the Term and a part of which is subsequent to the Term, shall be apportioned and adjusted between Landlord and Tenant as of the expiration of the Term so that Landlord shall pay the amount of the Tax due after the expiration of the Term, and Tenant shall pay the remainder thereof. With respect to any Tax for public improvements or benefits which by law is payable in installments, a part of which is within the Term and a part of which is subsequent to the Term, Landlord shall pay the installments thereof which become due and payable with respect to periods of time subsequent to the expiration of the Term, and Tenant shall pay all such installments which become due and payable with respect to periods of time prior to the expiration of the Term.

4

Section 3.04.  Receipts.  Tenant shall furnish to Landlord reasonable evidence of payment of any Tax, including official receipts from the appropriate taxing authority evidencing payment or other proof satisfactory to Landlord, not later than five (5) business days prior to the date that such Tax would have become delinquent or within ten (10) days after receipt by Tenant of such receipt or other evidence from the tax authority, whichever is earlier.

Section 3.05.  Right to Contest Taxes.  Notwithstanding anything to the contrary herein contained, if Tenant deems any Tax excessive or illegal, Tenant, upon prior written notice to Landlord, may defer payment thereof so long as (a) the validity or the amount thereof is contested by Tenant with diligence and in good faith, and (b) no tax sale or other action in connection therewith against the Premises or Landlord is threatened.  So long as Tenant is not in default under this Lease, and in good faith and by appropriate legal action shall contest the validity of any Tax, and shall have established by deposit of cash with Landlord, or other securities satisfactory to Landlord, a reserve for the payment thereof in such amount as shall be subject to such contest, the Tenant shall not be required to pay the contested Tax or produce the required receipt while the reserve is maintained and so long as the contest that operates to prevent collection is maintained and prosecuted with diligence, and shall not have been terminated or discontinued adversely to Tenant.  Any such cash held in reserve with Landlord shall be deposited by Landlord with a federally insured financial institution in a separate escrow or trust account, and such funds shall not be co-mingled with other monies of the Landlord.

Section 3.06.  Taxes and Impositions Payable by Landlord.  Tenant shall not be required to pay any of the following Taxes which shall be imposed against Landlord by any governmental authority, whether federal, state, county, city, municipal, or otherwise:

(a)  any estate, inheritance, succession, transfer, legacy or gift tax which may be imposed upon or with respect to any transfer of Landlord's interest in the Premises;

(b)  any capital stock tax or other tax imposed against Landlord for the privilege or franchise of doing business; and

(c)  any federal, state or local income tax levied upon or against the income of Landlord.

Section 3.07.  Utilities.  Tenant shall timely pay or cause to be paid all charges for gas, electricity, light, heat, power, water, telephone or other communication service or other utility or service used, rendered or supplied to, upon or in connection with the Premises throughout the Term.

Section 3.08.  Insurance.  Tenant shall pay or cause to be paid all insurance premiums for the coverages required to be purchased and maintained by Tenant in accordance with Article 10 of this Lease.

ARTICLE FOUR

Construction of Improvements

Section 4.01.  Landlord Improvements.  Landlord, at Landlord's sole cost and expense, shall cause to be completed upon the Premises in accordance with all applicable federal, state and local laws, regulations, and code requirements, including all applicable zoning, building, electrical, health, safety, or fire code requirements, the code requirements and standards established in the most recent

5

editions of "The BOCA National Building Code," and the federal law known as The Americans with Disabilities Act ("ADA")(collectively, the "Laws") affecting the Premises, and in a good and workmanlike manner, the following work (collectively, the "Landlord Improvements"), all in accordance with the plans and specifications attached hereto as Exhibit "B-2" (the "Plans and Specifications for Landlord Improvements" or the "Plans and Specifications"):

(a)    demolition of all interior improvements currently existing in the Premises, including but not limited to, the removal of any asbestos containing materials, polychlorinated biphenyls, underground storage tanks, and any "Hazardous Substances" or "Hazardous Waste" as defined under any "Environmental Laws" (defined below), and all partitions, ceiling and floor coverings, walls (except for structural or load bearing walls), and the removal of the rooftop HVAC units;

(b)    installation of new asphalt paving and striping of the existing parking lot, entrances and exits resulting in a total of 360 parking spaces on the Premises;

(c)    installation of new exterior lighting;

(d)    landscaping around the entire Building;

(e)    painting and stucco repair and/or replacement of the entire exterior of the Building; and

(f)    replacement of the entire roof on the Building; and

Section 4.02.  Tenant Work.  Tenant shall cause to be completed upon the Premises in accordance with applicable Laws, those improvements, other than the Landlord improvements, which are necessary or desirable to Tenant in order to make the Premises suitable for Tenant's use and occupancy ("Tenant Work").  Tenant Work shall be subject to the following conditions:

(a)    Not later than ten (10) days prior to commencing the Tenant Work, Tenant shall provide Landlord with plans and specifications of the Tenant Work, and the identity of the general contractor engaged by Tenant to perform the Tenant Work.  Attached to this Lease as Exhibit "B-2" are any plans and specifications of the Tenant Work that Tenant has completed prior to the date hereof.

(b)    Tenant or Tenant's contractor shall, throughout the period of construction, procure and maintain builder's risk insurance coverage in an amount sufficient to cover the cost of Tenant Work, and naming the Tenant and Landlord as additional insureds, as their interests may appear.

(c)    Tenant shall promptly pay and discharge all costs, expenses, damages and other liabilities which may arise in connection with or by reason of the Tenant Work.

(d)    Tenant shall not permit the filing of any mechanic's lien and, within thirty (30) days after written notice of its existence thereof from Landlord shall discharge or bond over any mechanic's lien for material or labor claimed to have been furnished to the Premises on Tenant's behalf (except for work contracted for by Landlord).  Prior to commencing any of the Tenant Work, Tenant shall (i) file waivers on behalf of each contractor waiving such contractor's right to file for or claim a mechanic's lien under Pennsylvania's Mechanic's Lien Law, and (ii) provide to Landlord a time-stamped copy of such filings.

6

142650.7

(e)    The Tenant Work shall be completed in accordance with a the plans and specifications and construction schedule prepared by Tenant and attached hereto or provided to Landlord, subject to changes as may be approved by Tenant pursuant to a written change order signed by Tenant. Tenant shall provide Landlord with a copy of any change orders approved by Tenant, and any modification or revision to the plans and specifications resulting therefrom prior to commencing any change in the Tenant Work pursuant thereto, unless the change is of an urgent nature or if the prior delivery of such documentation to Landlord is otherwise not reasonably practicable under the circumstances and in such cases Tenant shall provide a copy of any such change orders, and any such modifications to plans and specifications to the Landlord, promptly following the execution of any such change orders or the completion of any such revised plans and specifications.

(f)    The Tenant Work will not weaken or impair the structural integrity or lessen the value of the Premises or any part thereof.

(g)    Not later than two (2) business days prior to commencement of the Tenant Work, Tenant shall obtain, at Tenant's sole cost and expense, all permits and approvals necessary for construction of the Tenant Work and shall provide a copy of same to Landlord promptly upon receipt.

Section 4.03.    Time for Completion.  Subject only to delays caused by Tenant's actions, or delays caused by events wholly beyond the control of Landlord, the Landlord Improvements described in clauses (a) and (f) (except with respect to the portion of the roof above the office spaces in the Building) of Section 4.01 shall be substantially completed on or before the January 15, 1997. The Landlord Improvements pertaining to the removal and replacement of the roof above the office spaces in the Building shall be finally completed by no later than January 31, 1997. The Landlord Improvements described in clauses (b), (c), (d) and (e) of Section 4.01, and any minor or cosmetic repairs that have not been completed by January 15, 1997, shall be finally completed by no later than May 31, 1997.
For purposes of Section 1.02 (b), and the last sentence of Section 4.04, the Landlord Improvements shall be deemed "substantially completed" when the Landlord Improvements described in clauses (a) and (f) (except with respect to the portion of the roof above the office spaces in the Building) have been completed, except for any minor or cosmetic repairs.

Section 4.04    Delays in Substantial Completion.    If the Landlord is delayed for reasons other than those described in this Section 4.03, and fails to achieve substantial completion of the Landlord Improvements, or final completion of the Landlord Improvements, within the times provided herein, then the Tenant's sole and exclusive remedy for such failure shall be to recover from the Landlord the sum of $150.00 for each such calendar day substantial completion or final completion, as the case may be, is so delayed by Landlord and provided that such delay continues for five (5) business days following written notice by Tenant of such failure. The parties acknowledge and agree that it would be extremely difficult and impracticable under the presently known and anticipated circumstances to ascertain and fix the actual damages that the Tenant would incur should Landlord delay in achieving completion of the Landlord Improvements within the times provided herein, and that the aforesaid stipulated liquidated damages is not punitive, but represents an acceptable sum to compensate Tenant for all such damages and losses. In accordance with Section 1.02(b), Tenant shall have no obligation to pay Fixed Basic Rent and Additional Rent or other charges payable by Tenant hereunder, and all such rent and other charges shall be abated, and the Rent Commencement Date shall not occur, until the Landlord Improvements have been substantially completed.

7

Section 4.05.   Signs. Tenant shall not place, erect, construct, or install any signs on the exterior of the Premises or Building, except in accordance with applicable Laws. Tenant shall provide Landlord with a copy of all plans and specifications pertaining to any such exterior signs. Tenant shall be solely responsible for all costs and expenses associated with the construction or installation of any signs installed by Tenant. Any signs erected by Tenant shall remain the property of Tenant, who shall have the right to remove same upon the expiration of the Term, provided that the Premises shall be restored to its present condition, reasonable wear and tear excepted.


## ARTICLE FIVE

### Use and Compliance With Laws; Environmental Covenants

Section 5.01.   Use of Premises. Tenant shall use and occupy the Premises as space for its offices, laboratories, and warehouse use in connection with the conduct of Tenant's business of manufacturing, testing and analyzing, packaging, and distribution of pharmaceutical products, and in support of Tenant's clinical research divisions, in accordance with Section 5.02 hereof, and for no other purpose. Tenant shall not place any weights in any portion of the Premises in excess of the floor load limits, as estimated by Tenant's engineer.

Section 5.02.   Compliance with Law.  Tenant shall comply in all material aspects with all Laws respecting the occupancy, use, enjoyment, maintenance, management, improvement, repair, or alteration of the Premises, provided, however, that such obligation shall not include making any structural or system repairs to the Building, except for the Tenant Work or structural or system repairs to the Building required to correct damage caused by Tenant or Tenant's invitees. Tenant shall not be deemed to have violated this covenant solely because of non-compliance or alleged non-compliance with any regulation, order, direction or rule issued by the U.S. Food and Drug Administration, or any state agency or department with jurisdiction over Tenant's business operations, provided any such non-compliance does not impair or affect, in Landlord's reasonable judgment, in any material aspect, Tenant's ability to perform its other obligations under this Lease.

Section 5.03.   Right to Contest. Tenant shall have the right, upon prior written notice to Landlord, to contest by appropriate legal proceedings, without cost or expense to Landlord, the validity of any Laws so long as (a) such contest is prosecuted in good faith, and (b) no sale or other action in connection therewith is threatened against the Premises or Landlord. If at any time, such a sale or other action against the Premises or Landlord is threatened, then Tenant either (i) shall comply with the Laws, or (ii) post such bonds or other security with the court or appropriate governmental authority in either event in sufficient time and amount to prevent such threat. Tenant agrees to indemnify and hold harmless Landlord against any and all liability, loss, damage, cost and expense which Landlord may sustain during the Term by reason of Tenant's contest, including but not limited to any penalties which may be levied or assessed against the Landlord or the Premises. In the event that any such contest by Tenant involves the dispute over the payment of any fine, penalty, or other charge, and so long as Tenant is not in default under this Lease, and in good faith and by appropriate legal action shall contest the validity of any such fine, penalty or charge, and shall have established by deposit of cash with Landlord, or other securities satisfactory to Landlord, a reserve for the payment thereof in such amount shall be subject to such contest , the Tenant shall not be required to pay the contested item or produce the required receipt while the reserve is maintained and so long as the contest that operates to prevent collection is maintained and prosecuted with diligence, and shall not have been terminated or discontinued adversely to Tenant. Any such cash held in reserve with Landlord shall be

8

deposited by Landlord with a federally insured financial institution in a separate escrow or trust account, and such funds shall not be co-mingled with other monies of the Landlord.

## ARTICLE SIX

Representations and Warranties

Section 6.01. Landlord's Representations and Warranties. Landlord hereby represents and warrants to Tenant as follows:

(a)     Landlord has or shall obtain good and indefeasible fee title to the Premises, subject only to those matters set forth on Exhibit "C" attached hereto (the "Permitted Exceptions") which matters do not adversely interfere with or prohibit Tenant's proposed use of the Premises. Tenant's obligations under this Lease are contingent upon Landlord first acquiring such title to the Premises with thirty (30) days of the date of this Lease. In the event that Landlord fails to obtain such title within such thirty (30) day period Tenant may elect to terminate this Lease upon written notice to Landlord of such election. Notwithstanding whether Tenant elects to terminate, Landlord shall indemnify, defend, and hold Tenant harmless from and against any liability, loss, cost and expense incurred by Tenant as a result of Landlord failing to acquire such title as aforesaid.

(b)     There is no claim, litigation, proceeding or governmental investigation pending, or, so far as is known to you, threatened, against or relating to the Premises, nor is there any basis known to Landlord for any such action.

(c)     The Premises comply, and upon completion the Landlord Improvements and Tenant Work, will comply, with all Laws, and are not in violation of any covenants, conditions or restrictions affecting the Premises.

(d)     There are no outstanding violations of any Laws respecting the Premises. Landlord covenants that it shall be solely responsible for alterations, construction, and improvements to the Landlord Improvements, as may be required by any applicable Laws.

(e)     The Leased Premises shall be ready for use and occupancy by Tenant, and all systems and improvements, including, but not limited to the roof, exterior walls, foundation, structural frame, water supply system, sewage disposal system, and electrical system shall be in good operating condition and repair at the Rent Commencement Date, except to the extent that any such systems or improvements are altered or modified by the Tenant Work.

(f)     To the best of Landlord's knowledge, based on the following environmental reports: (I) "Facility Closure Assessment and Remediation Activities Report Tele-Dynamics Division of Hamilton Standard Fort Washington, Pennsylvania," submitted by Baker Environmental, Inc., dated February, 1993," (ii) "Environmental Site Assessment Update of the Tele-Dynamics Facility Fort Washington, Pennsylvania," prepared by Baker Environmental, Inc., dated April, 1995," (iii) "(Draft) Phase I Environmental Site Assessment of the former Tele-Dynamics Facility Fort Washington, PA, TSD Job No. CRW96003" prepared by TSD Environmental Services, Inc., dated April, 1996, and (iv) "Underground Storage Tank Closure Assessment at the Hamilton Standard Division of UTC Tele-Dynamics Facility Ft. Washington, Pennsylvania," prepared by Baker Environmental, Inc., dated February, 1993," (collectively, the reports described in clauses (I) through (iv) are referred to herein as the "Environmental

142650.7

Assessment Reports"), and without any further investigation by Landlord, (A) neither Landlord, nor any prior owner, tenant, or operator of the Building has performed any activities which would subject the Building to liability under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. 9601 et seq. ("CERCLA"), or any other environmental or quasi-environmental law, statute, act, rule, regulation or ordinance enacted by a municipal, county, state or federal governmental entity or agency (all of the foregoing along with any and all amendments thereof and supplements thereto, are hereinafter referred to individually as an "Environmental Law" and collectively as the "Environmental Laws"); (B) the Building is not now and has never been in violation of any Environmental Law; and (C) neither Landlord, nor any prior owner, tenant, or operator of the Building have used the Building to refine, produce, store, handle, transfer, process, transport or dispose of any "Hazardous Substances" or "Hazardous Waste" as defined under any Environmental Laws, except strictly in accordance with all such Environmental Laws. Landlord acknowledges that Tenant has not undertaken any independent environmental assessment of the Premises, and has executed and accepted the Lease in reliance upon the Environmental Assessment Reports provided by Landlord and above representations and warranty of Landlord.

Section 6.02. <u>Brokerage Commissions</u>. Landlord and Tenant warrant to each other that neither has dealt with any broker or other intermediary with respect to this transaction or the Premises in any manner which would create a right to a commission other than with the Brokers, whose compensation Landlord has separately agreed to pay. Landlord authorizes and directs Preferred Real Estate Advisors, Inc. to share its commissions on the rent paid by Tenant to Landlord with Julien J. Studley, Inc., acting as agent for Tenant.

## ARTICLE SEVEN

### Indemnification

Section 7.01. <u>Tenant's Indemnity</u>. Subject to Section 10.05 hereof, Tenant will protect, indemnify and hold harmless Landlord and its agents, affiliates, subsidiaries, parent companies and the officers and directors thereof, from and against any and all claims, actions, damages, liability and expense (including fees of attorneys, investigators and experts) in connection with loss of life, personal injury or damage to property in or about the Premises or arising out of the occupancy or use of the Premises by Tenant or its Agents or occasioned wholly or in part by any act or omission of Tenant or its Agents, whether during the Term, except to the extent such loss, injury or damage was caused by the negligence or willful misconduct of Landlord or its agents. In case any action or proceeding is brought against Landlord and/or its agents, affiliates, parent companies, officers, directors by reason of the foregoing, Tenant, at its expense, shall resist and defend such action or proceeding, or cause the same to be resisted and defended by counsel (reasonably acceptable to Landlord and its Agents) designated by the insurer whose policy covers such occurrence or by counsel designated by Tenant and approved by Landlord. Tenant's obligations pursuant to this Section 7.01 shall survive the expiration or termination of this Lease.

Section 7.02. <u>Landlord's Indemnity</u>. Subject to Section 10.05 hereof, Landlord will protect, indemnify and hold harmless Tenant and its agents, affiliates, subsidiaries, parent companies, and the officers and directors thereof, from and against any and all claims, actions, damages, liability and expense (including fees of attorneys, investigators and experts) in connection with loss of life, personal injury or damage to property in or about the Premises occasioned wholly or in part by any act or omission of Landlord or its agents, during the Term,

except to the extent such loss, injury or damage was caused by the negligence or willful misconduct of Tenant or its agents. In case any action or proceeding is brought against Tenant and/or its agents, affiliates, parent companies, officers, directors by reason of the foregoing, Landlord, at its expense, shall resist and defend such action or proceeding, or cause the same to be resisted and defended by counsel (reasonably acceptable to Tenant and its agents) designated by the insurer whose policy covers such occurrence or by counsel designated by Landlord and approved by Tenant. Landlord's obligations pursuant to this Section 7.02 shall survive the expiration or termination of this Lease. Landlord agrees that Landlord shall be solely responsible for and shall indemnify and defend and save Tenant harmless from any loss, damage, or liability caused by the presence of any asbestos containing materials, polychlorinated biphenyls, underground storage tanks, or any "Hazardous Substances" or "Hazardous Waste" that were refined, produced, stored, handled, transferred, processed, transported or disposed of on the Premises prior to the Rent Commencement Date.

## ARTICLE EIGHT

## Maintenance and Repairs

Section 8.01. Tenant's Obligations. Subject to Landlord's obligations set forth in this Lease, Tenant shall, throughout the Term, keep the Premises in good working order and condition, at Tenant's sole cost and expense, including all driveways, parking areas, curbs, landscaped areas, and sidewalks, and other improvements now or hereafter erected thereon, including but not limited to the roof, HVAC equipment, finishes, plumbing, lighting and other improvements now or hereafter located upon the Building, or any part of the Premises. Tenant shall, at Tenant's sole cost and expense, during the entire Term, engage a reputable and licensed mechanical contractor to provide routine preventive maintenance service on the heating, ventilation and air conditioning equipment ("HVAC") pursuant to a written service contract, and shall provide a copy of same to Landlord promptly following receipt of same. Tenant shall also provide Landlord with a list of contractors whom Tenant has engaged pursuant to a written agreement for scheduled maintenance or routine repairs of the Premises, or the systems or equipment therein. At the expiration of the Term, Tenant shall deliver the Premises in broom clean condition, reasonable wear and tear excepted.

Section 8.02. Landlord's Obligations. Landlord shall be responsible for and covenants and agrees to maintain in good condition all structural and weight bearing elements of the Building, and shall make all structural repairs to the Building, including but not limited to the external walls, weight-bearing elements and base flooring (below floor covering). Notwithstanding anything to the contrary contained in this Section 8.02, Landlord shall not be responsible for repairs or replacements necessary to correct damage caused by Tenant or Tenant's invitees.

Section 8.03 Access to Premises. Landlord may enter upon the Premises during normal business hours, upon 48 hours prior verbal notice to Tenant's designated representative (except no notice shall be required in the case of emergency), and accompanied by an employee of Tenant, and further provided that the individual or individuals seeking access on behalf of Landlord shall have executed a confidentiality agreement satisfactory to Tenant, for the following purposes:

(a)     to inspect the condition of the Premises;

11

142650.7

(b)    to make repairs to the Building or Premises pursuant to the terms of the Lease, provided that Landlord shall make every reasonable effort to minimize any interference with Tenant's use of the Premises, and so long as Landlord is using reasonable efforts to minimize interference, there will be no liability or abatement of Fixed Basic Rent or Additional Rent while such repairs are being undertaken, and

(c)    to show the Premises to prospective purchasers, mortgagees, or other persons having a legitimate interest in viewing the same, and, at any time within nine (9) months prior to the expiration of the Term for the Premises, to brokers or persons wishing to rent the Premises;

Section 8.04.  <u>Landlord as Building Manager: Manager's Fee</u>.  Tenant shall pay Landlord, or at Landlord's direction, to Landlord's agent, a fee of $400.00 per month, as Additional Rent in accordance with Section 2.02 hereof (the "Manager's Fee").

ARTICLE NINE

Alterations

Section 9.01.  <u>Structural Alterations</u>.  Except as provided in Section 9.02 hereof, and other than the Tenant Work, Tenant will make no other structural alterations to the Premises or any part thereof, without the prior written consent of Landlord, which consent will not be unreasonably withheld, conditioned, or delayed.  Landlord shall not withhold, its consent unless such structural alterations would materially change the character, appearance or use of the Premises, or would weaken or impair the structural integrity or lessen the value of the Premises or any part thereof.  Any such permitted alterations shall be performed in accordance with plans and specifications, and a construction schedule, previously approved in writing Landlord.  Nevertheless, Tenant shall be permitted to install roof top HVAC units in accordance with plans and specifications previously approved in writing by Landlord.  The location of such roof top HVAC units shall be subject to Landlord's reasonable discretion, and such installation shall be performed by a licensed mechanical contractor, which contractor shall be subject to Landlord's approval, which approval shall not be unreasonably withheld, conditioned or delayed.  Any such structural alterations to the Premises shall be subject to the same conditions as apply to the Tenant Work pursuant to Section 4.02 hereof.

Section 9.02.  <u>Non-Structural Alterations</u>.  Tenant may, at its sole cost, and without the prior written consent of Landlord, make such interior nonstructural alterations, additions, and improvements in and to the Premises as it may deem desirable for its use, provided that Tenant notifies Landlord of Tenant's intention to perform such alterations, additions and improvements and provides Landlord with a copy of any plans and specifications relating thereto.  Any such non-structural alterations to the Premises shall be subject to the same conditions as apply to the Tenant Work pursuant to Section 4.02 hereof.

Section 9.03  <u>Mechanics' Liens</u>.  Tenant shall not, in the making of any repairs or alterations pursuant to the provision of this Lease, suffer or permit any mechanic's, laborer's or materialmen's lien to be filed against the Premises, Building, or any part thereof by reason of labor or materials supplied or claimed to have been supplied to Tenant; and if any such lien shall be filed, Tenant, within forty-five days after notice of filing, shall cause it to be discharged of record.  In the event that Tenant fails to discharge any such lien as aforesaid, then Landlord may, but shall not be required to, cause such lien to be discharged.  Any such payments or expenses incurred by

12

Landlord in connection therewith, shall constitute Additional Rent hereunder and shall be due and payable with the next monthly installment of Fixed Basic Rent. Tenant shall provide Landlord with copies of the praecipe or other record evidencing the discharge of such lien promptly following receipt of same.

Section 9.04. _Status of Improvements; "As Built" Drawings_. Any alterations or improvements made pursuant to this Lease shall remain on the Premises at the expiration of the Term, unless Landlord and Tenant shall agree otherwise in writing; provided, however, that Tenant shall, at its option, have the right to remove Tenant's trade fixtures, equipment, furnishings or personal property, provided that if damage is caused by such removal, the damage shall be repaired by Tenant by the expiration of the Term.

ARTICLE TEN

Insurance and Damage

Section 10.01. _Insurance_. Tenant, at Tenant's sole cost and expense, shall keep or cause the Premises to be kept continuously insured during the Term, under policies providing the following insurance coverages: (i) commercial general liability insurance on an occurring basis with a combined single limit for bodily injury and property damage of not less than $2,000,000.00, including the broad form general liability endorsement, contract liability, and products liability coverage; and (ii) a policy of standard fire, extended coverage and special extended coverage insurance (all risks), including a vandalism and malicious mischief endorsement, in an amount equal to the full replacement value of the Premises, new and without deduction for depreciation of fixtures, furniture and improvements. On or before the Rent Commencement Date, Tenant shall provide Landlord with satisfactory evidence that such insurance is in full force and effect or effectively renewed and that the insurance premiums for such insurance have been paid for the first year of the term. Tenant's obligation to carry or maintain any insurance required to be maintained by Tenant under the Lease may be satisfied by Tenant by providing such coverages under Tenant's existing blanket insurance policy. Such liability policy shall name Landlord as an additional insured, and such casualty policy shall name Landlord as the loss payee, and shall provide for at least thirty (30) days' prior notice of cancellation or modification to Landlord. Upon the execution of this Lease, Tenant shall deposit certificates evidencing such insurance coverages with Landlord, and thereafter shall deposit with Landlord certificates evidencing renewal of such coverages at least fifteen (15) days prior to the expiration thereof. In the event that Tenant shall fail to maintain any such required insurance coverages during the Term, Landlord may, but shall not be obligated to, procure and obtain such insurance coverages and Landlord's costs for such insurance shall constitute Additional Rent hereunder and shall be due and payable with the next monthly installment of Fixed Basic Rent.

Section 10.02. _Damage or Casualty_.

(a)    In case the Premises or any portion thereof shall be totally or partially damaged or destroyed by fire or by any other casualty whatsoever, then Landlord and Tenant shall proceed with reasonable promptness, and in accordance with paragraph (c) below, to repair and restore the Premises to at least as good a condition as that which existed immediately prior to such fire or other casualty and during such repair period, there shall be an abatement of rent. In the event Landlord receives any insurance proceeds from the property insurance maintained by

Tenant pursuant to Section 10.01, Landlord shall turn such proceeds over to Tenant for the purpose of making such repairs.

(b)   In the event that any of the insurance monies paid by the insurance companies to Tenant shall remain after the completion of such repairs, restoration or reconstruction, the excess shall be paid to or retained by Tenant, as Tenant's property.  In the event that the proceeds of any insurance policies are insufficient to restore the Premises to the condition that they were in prior to the occurrence of the casualty, either party hereto may terminate this Lease upon ten (10) days prior written notice to the other party of such election, and the Lease shall terminate on the date set forth in such notice unless the other party shall elect and agree to pay any short fall necessary to effect the required repairs, restoration or reconstruction, and in which case the insurance proceeds shall be apportioned between the parties hereto in the same proportion as the cost of the Tenant Work bears to the aggregate of the cost of the Landlord Improvements plus (i) the actual cost to Landlord to acquire the Building (exclusive of the land and appurtenances) or (ii) $1,800,000, whichever is less.

(c)   All repairs, restoration and reconstruction to the interior of the Building, or other portions of the Premises comprising the Tenant Work shall be performed by Tenant subject to the conditions set forth in Section 4.02 and Section 9.01 hereof.  All repairs, restoration and reconstruction to the exterior of the Building, or other exterior improvements to the Premises shall be performed by Landlord.  The parties shall cooperate with one another and shall have mutual responsibility for the adjustment of all insurance claims.

Section 10.03.  <u>Cooperation in Actions</u>.  Landlord and Tenant each will cooperate with the other, to such extent as such other party may reasonably require, in connection with the prosecution or defense of any action or proceeding arising out of, or for the collection of any insurance monies that may be due in the event of, any loss or damage, and each will execute and deliver to such other party such instruments as may be required to facilitate the recovery of any insurance monies.

Section 10.04.  <u>Notice of Casualty</u>.  Tenant shall give prompt written and verbal notice to Landlord with respect to all fires or other casualties occurring upon the Premises.

Section 10.05.  <u>Waiver of Subrogation; Rights Under Insurance Policies</u>.  Each of the parties hereto hereby release the other, to the extent of the releasing party's insurance coverage, from any and all liability for any loss or damage which may be inflicted upon the Premises of such party even if such loss or damage shall be brought about by the fault or negligence of the other party, its agents or employees; provided, however, that this release shall be effective only with respect to loss or damage occurring during such time as the appropriate policy of insurance shall contain a clause to the effect that this release shall not affect said policy or the right of the insured to recover thereunder.  If any policy does not permit such a waiver, and if the party to benefit therefrom requests that such a waiver be obtained, the other party agrees to obtain an endorsement to its insurance policies permitting such waiver of subrogation if it is available and if such policies do not provide therefor.  If an additional premium is charged for such waiver, the party benefiting therefrom, if it desires to have the waiver, agrees to pay to the other the amount of such additional premium promptly upon being billed therefor.

14

## ARTICLE ELEVEN

### Condemnation

Section 11.01.  Condemnation.  In the event that the Premises, or any part thereof, shall be taken in condemnation proceedings or by exercise of any right of eminent domain or by agreement between Landlord, Tenant and those authorized to exercise such right (hereinafter collectively called "Condemnation Proceedings"), Tenant shall have the right to make a claim against the condemnor for moving expenses, business dislocation damages or damages to Tenant's business and personal property owned by Tenant, including but not limited to those items constituting Tenant Work.  The parties agree to execute any and all further documents that may be required in order to facilitate collection of any such award or awards.

Section 11.02.  Total Condemnation.  If title to the fee of the whole or materially all of the Premises shall be taken by Condemnation Proceedings, for any public or quasi-public use, this Lease shall cease and terminate, and all Fixed Basic Rent, Additional Rent and other charges paid or payable by Tenant hereunder shall be apportioned, as of the date possession of the Premises must be delivered to the condemning authority, and the total award, except for any award specifically to Tenant as described in Section 11.01 above, shall be retained by Landlord.  For the purposes of this Section, a taking of the whole or materially all of the Premises shall be deemed to have occurred if the portion of the Premises not so taken, in Landlord's reasonable, good faith judgment, cannot be reconstructed or repaired so as to constitute a facility usable by Tenant for the purposes which the Premises were being used by Tenant immediately prior to such taking.

Section 11.03.  Partial Condemnation.  Unless otherwise required by any mortgage lender of Landlord, if at any time during the term of this Lease, title to less than the whole or materially all of the Premises shall be taken in Condemnation Proceedings, all the award or proceeds collected by Landlord pursuant to Section 11.01 hereof shall be held by Landlord and applied and paid over toward the cost of demolition, repair and restoration, substantially in the same manner and subject to the same conditions as those provided in Section 10.03 hereof with respect to insurance and other monies and provided no Event of Default shall have occurred.  Any balance remaining in the hands of Landlord after payment of such costs of demolition, repair and restoration as aforementioned shall be the sole property of Landlord.  This Lease shall continue in full force and effect; provided however, the Fixed Basic Rent shall be reduced by the proportion that the square footage of the Building taken in condemnation bears to the total square footage of the Building.

## ARTICLE TWELVE

### Default

Section 12.01.  Events of Default; Termination.  The occurrence of each of the following shall be an "Event of Default" hereunder:

    (a)    if Tenant shall make an assignment of a material portion of its assets for the benefit of its creditors, or if a material portion of Tenant's assets shall become subject to a levy or attachment by any judgment creditors or governmental authorities and such attachment or levy is not discharged or dissolved within forty-five (45) days after the date of such attachment or levy; or

    (b)    if Tenant indicates an intention to file a petition or if any petition shall be filed by or against Tenant in any court, whether or not pursuant to any statute of the United States or of any

<div align="center">15</div>

State, in any bankruptcy, reorganization, composition, extension, arrangement or insolvency proceedings, and in the case of an involuntary bankruptcy petition such proceedings shall not be dismissed within ninety (90) days after the institution of the same; or

(c)    if, in any proceeding, a receiver or trustee be appointed for all or any portion of Tenant's property, and such receivership or trustee shall not be vacated or set aside within ninety (90) days after the appointment of such receiver or trustee; or

(d)    if Tenant shall fail to pay any installment of Fixed Basic Rent or Additional Rent, or any part thereof, when the same shall become due and payable for a period of ten (10) business days after written notice to Tenant from Landlord; or

(e)    if Tenant shall abandon the Premises, without the prior consent of Landlord, by removing all or substantially all of Tenant's furniture, equipment and personal property from the Premises, provided that Tenant shall also be delinquent in the payment of Fixed Basic Rent or fail to obtain any additional insurance coverage that may be required by Tenant's insurance carrier in order to insure a vacant building; or

(f)    if Tenant shall fail to perform or observe any other material provision, condition or requirement of this Lease (not hereinbefore in this Section 12.01 specifically referred to) on the part of Tenant to be performed or observed, and such failure shall continue for thirty (30) days after notice thereof from Landlord to Tenant, or, if such Event of Default is of such a nature that it cannot, with due diligence, be cured within a period of thirty (30) days, if Tenant shall have failed to commence the curing of such default within the period of thirty (30) days referred to above and shall thereafter fail to continue with all due diligence to complete the curing of such default and completes such cure in any event within ninety (90) days after notice thereof.

Section 12.02.  Remedies.  Upon the occurrence of an Event of Default, and at any time thereafter, Landlord shall have the following rights and may elect any one or more of the following remedies:

(a)    To accelerate the whole or any part of the Fixed Basic Rent for the remainder of the Term (the "Accelerated Rent"), which Accelerated Rent shall be discounted to present value on the basis of a discount rate equal to the prime rate offered by CoreStates Bank, N.A., applied and calculated on the date of receipt by Landlord of such Accelerated Rent; and shall be deemed due and payable as if, by the terms and provisions of this Lease, such Accelerated Rent was on that date payable in advance.

(b)    Without waiving Landlord's right to recover the Accelerated Rent as herein provided, Landlord may re-enter the Premises, and, at the option of Landlord, remove all persons and all or any property therefrom, either by summary dispossess proceedings or by any suitable action or proceeding at law or by force or otherwise, without being liable for prosecution or damages therefor, and repossess and enjoy the Premises.  Upon recovering possession of the Premises by reason of an Event of Default, Landlord may, at Landlord's option, either terminate this Lease or make such alterations and repairs as may be necessary in order to relet the Premises and relet the Premises or any part or parts thereof, either in Landlord's name or otherwise, for a term or terms which may, at Landlord's option, be less than or exceed the period which would otherwise have constituted the balance of the Term of and at such rent or rents and upon such other term and conditions as in Landlord's sole discretion may seem advisable and to such person or persons as may in Landlord's discretion seem best; upon each such reletting all rents received by Landlord from such reletting shall

16

be applied: first, to the payment of any costs and expenses of such reletting, including brokerage fees and attorney's fees and all costs of such alterations and repairs; second, to the payment of any indebtedness other than Fixed Basic Rent due hereunder from Tenant to Landlord; third, to the payment of Additional Rent due and unpaid hereunder; and the residue, if any, shall be held by Landlord and applied in payment of future rent as it may become due and payable hereunder. If such rentals received from such reletting during any month shall be less than that to be paid during that month by Tenant, Tenant shall pay any such deficiency to Landlord. Such deficiency shall be calculated and paid monthly. No such re-entry or taking possession of the Premises or the making of alterations or improvements thereto or the reletting thereof shall be construed as an election on the part of Landlord to terminate this Lease unless written notice of such intention be given to Tenant. Landlord shall in no event be liable in any way whatsoever for failure to relet the Premises, or in the event that the Premises or any portion thereof is relet, for failure to collect the rent thereof under such reletting. Notwithstanding any such reletting without termination, Landlord may at any time thereafter elect to terminate this Lease for such previous breach.

(c)    Without waiving Landlord's right to recover the Accelerated Rent as herein provided, Landlord may terminate the Lease and thereupon all rights of Tenant under this Lease shall expire and terminate and Tenant shall forthwith quit and surrender possession of the Premises in the condition specified in Section 8.01 hereof.

Section 12.03.  Non-Waiver.  No waiver by Landlord of any breach by Tenant or any of Tenant's obligations, agreements or covenants herein shall be a waiver of any subsequent breach, nor shall any forbearance by Landlord to seek a remedy for any breach by Tenant be a waiver by Landlord of any rights and remedies with respect to any subsequent breach.

Section 12.04.  Rights and Remedies Cumulative.  No right or remedy herein conferred upon or reserved to Landlord is intended to be exclusive of any other right or remedy provided herein or by law, but each shall be cumulative and in addition to every other right or remedy given herein or now or hereafter existing at law or in equity or by statute.

Section 12.05.  Waiver of Trial by Jury.  LANDLORD AND TENANT HEREBY IRREVOCABLY AGREE TO WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER ON ANY MATTER WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT, TENANT'S USE OF OR OCCUPANCY OF THE PREMISES AND/OR ANY CLAIM OF INJURY OR DAMAGE OR REMEDY.

ARTICLE THIRTEEN

Quiet Enjoyment: Subordination

Section 13.01.  Quiet Enjoyment.  Tenant, upon paying the rent herein reserved, and performing and observing the covenants, conditions and agreements hereof upon the part of Tenant to be performed and observed, shall and may peaceably hold and enjoy the said Premises during the term hereof, without any interruption or disturbance from Landlord or anyone claiming by, through or under Landlord, subject, however, to the terms of this Lease and subject to all matters which now affect the Premises and subject to the rights of Landlord's mortgage lenders under all present and future mortgages of Landlord covering the Premises. This covenant shall be construed as running with the

land to and against subsequent owners and successors in interest, and is not, nor shall it operate or be construed as, a personal covenant of Landlord, except to the extent of Landlord's interest in said Premises and only so long as such interest shall continue, and thereafter this covenant shall be binding only upon such subsequent owners and successors in interest, to the extent of their respective interests, as and when they shall acquire the same, and only so long as they shall retain such interest.

Section 13.02. <u>Subordination, Non-Disturbance and Attornment</u>. This Lease, and Tenant's rights hereunder, including, without limitation the Option granted pursuant to Article 15 hereof, shall not be subject or subordinate to the lien of any mortgage, ground lease, or other encumbrance, encumbering the Premises, unless Tenant and such encumbrancer execute an agreement, certificate or other writing, which contains a provision that so long as Tenant shall not be in default under the terms of the Lease, the Lease, the Option and all of Tenant's other rights hereunder, and Tenant attorns to such encumbrancer, the Lease shall remain in full force and effect regardless of any event of foreclosure or termination upon any such mortgage, ground lease or other encumbrance. Such agreement shall also contain a provision, which obligates Tenant, notwithstanding any claim, defense or right of setoff that otherwise may be available to Tenant in the event that Landlord is in default under the terms of this Lease, to make payments of Fixed Basic Rent to such encumbrancer, and provides any claim, defense or right of setoff that Tenant may have under applicable law would only apply to such portion of the Fixed Basic Rent that exceeds the amount of Landlord's regular monthly installment payment of debt service to such encumbrancer.

Section 13.03. <u>Tenant Estoppel Certificate</u>. Tenant shall, within ten (10) days following request of Landlord, execute an estoppel certificate or similar writing, certifying to Landlord's mortgagee or purchaser such facts, if true, and agreeing to such notice provisions and other matters as such mortgagee or purchaser may reasonably require in connection with Landlord's present or future financing or sale of the Building.

Section 13.04. <u>Landlord's Lien Waiver</u> Within thirty (30) days following the written request of Tenant, Landlord shall execute a waiver or similar writing, as may be reasonably required in connection with any present or future financing provided to Tenant by any creditor, in order to evidence that Landlord waives, releases and relinquishes any and all rights (including the right to a landlord's lien), interest, or claim, if any, in or to all equipment, trade fixtures, goods, inventory, accounts, or accounts receivable (as those terms are defined under the Uniform Commercial Code), which are now or hereafter located or stored on, or otherwise do now or hereafter pertain to, the Premises, and which are subject to a security interest or lease agreement granted or entered into by Tenant in favor of any creditor of Tenant (collectively, such items are referred to as the "Collateral").. Landlord shall not take custody or possession of the Collateral, or distrain or remove any of the Collateral from the Premises, or interfere with the shipment, removal or delivery of any Collateral to or from the Premises by Tenant (or any third party acting with Tenant's permission), without having first provided thirty (30) days written notice of such proposed action to any such creditor of Tenant to whom Landlord shall have previously delivered a waiver or similar writing.

ARTICLE FOURTEEN

<u>Option to Renew Lease</u>

Section 14.01. <u>Option to Renew</u>. Provided that this Lease has not been sooner terminated or expired as provided for herein and that no Event of Default shall have occurred and

142650.7.

be continuing on the date of the exercise of the option to renew, Tenant shall have two consecutive options to extend the term (the "Renewal Options") of this Lease beyond the initial term for five year periods each. Such option shall be exercised by Tenant giving its written notice to Landlord at least one hundred and eighty (180) days prior to the expiration of the then current term of this Lease (collectively, the "Renewal Terms" and in the case of the first five year renewal term, the "First Renewal Term" and in the case of the second five year renewal term, the "Second Renewal Term").

Section 14.02. Adjustment to Fixed Basic Rent. In the event Tenant elects to exercise such option to extend the term of this Lease, the Fixed Basic Rent during the Renewal Terms shall be as follows: (a) during the First Renewal Term, the Fixed Basic Rent shall be $930,000.00 per annum, payable in equal monthly installments of $77,500.00 each (the "First Renewal Fixed Basic Rent") and (b) during the Second Renewal Term, the Fixed Basic Rent shall be as follows:

| Year | Yearly Payments | Monthly Payments |
|------|-----------------|------------------|
| Lease Year 21 | $957,900.00 | $79,825.00 |
| Lease Year 22 | $986,637.00 | $82,219.75 |
| Lease Year 23 | $1,016,236.11 | $84,686.35 |
| Lease Year 24 | $1,046,723.19 | $87,226.93 |
| Lease Year 25 | $1,078,124.89 | $89,843.74 |

All other terms of the Lease shall remain the same.

ARTICLE FIFTEEN

Option to Purchase and Right of First Refusal

Section 15.01. Tenant's Option to Purchase. In consideration of Tenant's acceptance of this Lease, Tenant is hereby granted the exclusive right and option to purchase the Building, together with all of all those certain parcels and tracts of land on which the Building is situate, and all of Landlord's estate, right, title and interest thereto, including all easements and appurtenances thereto (collectively, the "Real Estate"), at any time prior to Lease Year 3, provided the Lease is then in full force and effect (the "Option"). The Option is to be exercised by Tenant's giving written notice of its intention to purchase the Real Estate to Landlord not less than sixty (60) days prior to Lease Year 3. This Lease and the aforesaid notice of Tenant's exercise of the Option shall constitute an agreement of sale between the parties, whereby Landlord agrees to sell and Tenant agrees to purchase the Real Estate upon the following terms and conditions:

(a)    Settlement for the purchase of the Real Estate shall be on the earlier of (i) the date designated in Tenant's notice, which date shall be not less than thirty (30) days after the date such notice is delivered to Landlord, or (ii) the commencement date of Lease Year 3. Settlement shall occur in the office of Tenant's title insurance company, on such date as shall be designated in the aforesaid notice from Tenant to Landlord.

(b)    In the event that Tenant effectively exercises the Option, the purchase price for the Real Estate shall be equal to the sum of $6,500,000.00, plus $21,000.00 multiplied by the number of full calendar months occurring after the first full calendar month of Lease Year 1 and before the calendar month during which settlement occurs, but including a pro rated portion of the $21,000 for the calendar month during which settlement occurs; provided however, that in the

19

event that settlement is delayed through no fault of Tenant, the purchase price shall be calculated as if settlement had occurred on the date designated in Tenant's notice; and provided further that in no event shall the purchase price exceed the sum of $7,000,000.00.

(c)     The purchase price, computed as above provided, shall be payable by Tenant to Landlord, or to Landlord's mortgage lender if required by such lender, at the time of settlement, by title company check, cashier's check, certified check, or other immediately available funds.

(d)     Tenant and Landlord shall each pay fifty percent (50%) of all realty transfer taxes, documentary stamp taxes or other taxes and charges imposed by the federal, state or local authorities upon the conveyance.

(e)     Landlord shall convey to Tenant a good and marketable fee simple title to the Real Estate, free and clear of all liens, encumbrances, easements, restrictions or other exceptions or objections, except for the Permitted Exceptions, and except as have been created or consented to by Tenant during the term of this Lease. Tenant's title shall be insurable as such at ordinary rates by Commonwealth Land Title Insurance Company or such other title insurance company selected by Tenant. Except for Landlord's special warranty contained in the deed conveying the Real Estate to Tenant, which warranty shall be subject to the aforesaid permitted exceptions, Landlord shall make no representations or warranties regarding the Real Estate.

(f)     Tenant acknowledges that Tenant's obligation to purchase the Real estate following the effective exercise of the Option shall not be subject to Tenant's ability to obtain purchase money financing or any other contingency, except for Landlord's obligation to deliver title to the Real estate as aforesaid. In the event Tenant fails to complete settlement for any reason whatsoever, this Lease shall remain in full force and effect in accordance with its terms, including the right to exercise the Renewal Options. In the event that Tenant is in default of its obligation to purchase the Real Estate, when and as required hereunder, and such default is not cured within ten (10) days of the date of such default, Tenant shall reimburse Landlord for Landlord's reasonable costs and expenses actually incurred by Landlord in anticipation of completing settlement, but in no event shall Tenant be obligated to reimburse Landlord for more than $5,000.00.

Section 15.02. Tenant's Right of First Refusal. Landlord hereby grants to Tenant an exclusive right of first refusal to purchase the Real Estate on the terms set forth in this Section 15.02. In the event that at any time during the Term, and provided the Lease is then in full force and effect, Landlord shall receive a bona fide offer to purchase all or any part of the Real Estate, and desires to accept such offer, then Landlord shall promptly notify Tenant in writing of such offer, such notice to specify the price, payment and other material terms of such offer, and Landlord shall first offer to sell the Real Estate or such portion of the Real Estate which is the subject of such offer to Tenant on the same such terms. Tenant may accept such offer by written notice to Landlord within fifteen (15) business days following the receipt of Landlord's notice to Tenant. Upon Tenant's acceptance of such offer, closing shall occur in accordance with the terms of the offer provided to Tenant by Landlord. If Tenant does not agree to purchase the Real Estate or the subject portion thereof, Landlord shall have the right to proceed to sell the Real Estate, or the subject portion thereof, pursuant to the terms of such offer or on other terms no more favorable to the purchaser than were presented to Tenant, subject to this Lease, the Option, and the other rights of Tenant hereunder, and provided such sale is completed within the later of (i) 120 days from the date Tenant gives notice that it does not elect to purchase the Real Estate,

20

or (ii) the period of time set forth in such offer. Notwithstanding anything set forth herein to the contrary, Landlord shall not be permitted to sell or convey the Real Estate during the first two years of the Term to anyone but Tenant, except for a conveyance to a partnership, trust, or other legal entity in which Brian O'Neill, an individual who presently owns an interest in Landlord, shall continue to own a legal or beneficial interest, and with respect to such conveyance Tenant's right of first refusal granted under this Section shall not be deemed to be extinguished and the deed or other writing evidencing such conveyance shall expressly provide that the conveyance and the grantee's rights with respect thereto are and shall be subject to this Lease.

Section 15.03.  Memorandum of Lease and Option to Purchase.  Concurrently with the execution hereof, the parties hereto shall execute and deliver a memorandum of this lease and option to purchase in the form attached hereto as Exhibit "D," which memorandum shall thereafter be promptly recorded in the Office of the Recorder of Deeds of Montgomery County, Pennsylvania. The memorandum shall indicate the terms by which the lease and option to purchase granted herein shall expire.

ARTICLE SIXTEEN

Miscellaneous

Section 16.01.  Assignment; Sublease.

(a)     Except as provided in paragraph (b) below, Tenant shall not assign or sublet the Premises or any part thereof without Landlord's prior written approval, which approval shall not be unreasonably withheld, conditioned or delayed. If Tenant desires to assign this Lease or sublet any or all of the Premises, Tenant shall give Landlord written notice prior to the anticipated effective date of the assignment or sublease, and shall provide Landlord with a written sublease or assignment, signed by each of Tenant and Tenant's assignee or subtenant, and a copy of the most recently available financial statement for such assignee or subtenant. Landlord shall then have a period of ten (10) days following receipt of such notice to notify Tenant in writing that Landlord elects either (1) to terminate this Lease as to the space so affected as of the date so requested by Tenant, or (2) to permit Tenant to assign this Lease or sublet such space. If Landlord shall fail to notify Tenant in writing of such election within such period, Landlord shall be deemed to have approved such assignment or sublease.

(b)     Notwithstanding anything to the contrary contained in paragraph (a) above, Tenant may assign or sublet all or any portion of the Premises if either (A) (1) Tenant is not in default of any its obligations under this Lease, (2) Tenant remains obligated hereunder, (3) the proposed use of the Premises is in compliance with all applicable Laws pertaining to the Premises, and does not violate any restrictive covenant to which the Landlord may be bound, and (4) the prospective assignee or subtenant has signed a written sublease or assignment with Tenant and therein agrees to be bound by all the terms and conditions of the Lease respecting the portion of the Premises that is the subject of the assignment or sublease, or (B) (1) such assignee or subtenant is a subsidiary or an affiliate of Tenant, or owns or controls Tenant, (2) acquires all or substantially all of the assets of Tenant, or (3) acquires all or a majority of the capital stock of Tenant, Landlord shall consent and approve the proposed assignment or sublease within ten (10) days of Tenant's notice and shall not be permitted to withhold or condition such approval and consent.

142650.7.

(c)    Any rent or other consideration realized by Tenant under any such sublease or assignment in excess of Fixed Basic Rent payable hereunder, net of the reasonable cost of any improvements which Tenant has made for the purpose of assigning or subletting all or a part of the Premises and other expenses incurred by Tenant associated with such assignment or subletting, including, without limitation, brokerage commissions and legal fees, shall be divided and paid, ten percent (10%) to Tenant, and ninety percent (90%) to Landlord.

(d)    No assignment or subletting by Tenant shall relieve Tenant of any obligations under this Lease. Any assignment of subletting which conflicts with the provisions hereof shall be void.

Section 16.02.  Notice.  All notices, requests and other communications under this Lease shall be in writing and shall either be sent by registered or certified mail, return receipt requested, postage prepaid, by an overnight courier guaranteeing next day delivery (e.g., Federal Express, Purolator, UPS), in each instance addressed, as follows:

To Landlord:    525 VIRGINIA DRIVE ASSOCIATES LIMITED PARTNERSHIP
                443 South Gulph Road
                King of Prussia, Pennsylvania 19406
                        Attention:

With Copy to:   Kevin W. Walsh, Esquire
                Adelman, Lavine, Gold & Levin
                1900 Two Penn Center Plaza
                Philadelphia, PA  19102

To Tenant:      BIO-PHARM PHARMACEUTICS SERVICES, INC.
                425 Delaware Drive
                Fort Washington, Pennsylvania 19034-2703
                        Attention: John Santoro – 2)5 - 6 4b - ]ccb

With Copy to:   Linda Ann Galante, Esquire
                Stradley, Ronon, Stevens & Young. LLP
                30 Valley Stream Parkway
                Malvern, PA. 19355

or at such other address of which Seller or Purchaser shall have given notice as herein provided. All such notices, requests and other communications shall be deemed to have been sufficiently given for all purposes hereon on the second (2nd) day after the date of mailing thereof, or one day after overnight delivery, and may be given on behalf of any party by its counsel.

Section 16.03  Signage.  During the last nine (9) months of the term, Landlord may place and maintain a "For Rent" or "For Sale" sign in or on the Premises, subject to Upper Dublin Township regulations.

Section 16.04.  Survival of Valid Terms. If any term or provision of this Lease or the application thereof to any person or circumstances, shall to any extent be invalid or unenforceable, the remainder of this Lease, or the application of such term or provision to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby, and each term and provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

22

Section 16.05.  Covenants to Bind and Benefit Respective Parties. The terms, conditions, covenants, provisions and agreements herein contained shall be binding upon and inure to the benefit of Landlord and Tenant, their successors and assigns.

Section 16.06.  Captions and Headings. The captions and headings throughout this Lease are for convenience and reference only and the words contained therein shall in no way be held or deemed to define, limit, describe, or add to the interpretation, construction or meaning of any provision of or the scope or intent of this Lease.

Section 16.07.  Governing Law. This Lease and the relative rights, privileges, duties and obligations of the parties hereunder shall be governed by the Laws of the Commonwealth of Pennsylvania.

Section 16.08  Confidentiality.
(a)    Landlord acknowledges that in the course of managing the Building Landlord may gain access to information or materials that are confidential or proprietary to Tenant, including information or materials pertaining to Tenant's business operations or information or materials with respect to which Tenant may be under an obligation of confidentiality to third parties ("Confidential Information"). Additionally the names, terms, conditions, facts, or other information pertaining to this Lease shall be deemed Confidential Information. Landlord shall keep all Confidential Information in strict confidence under appropriate safeguards. Except as may be required by judicial process, neither Landlord nor any employee, officer, director, agent or attorney of Landlord shall (i) disclose or reveal any Confidential Information, except with respect to the terms and conditions of this Lease, which may be disclosed to a limited group of the Landlords' officers, agents, and attorneys, who are actively participating in the negotiation, approval and execution of the Lease ("Party Representatives"), each of whom shall be informed of the confidential nature of the Lease; or (b) use any confidential Information in any way that could be detrimental to Tenant. This Section 16.08 shall be binding upon and inure to the benefit of all parties hereto and to each of their respective Party Representatives.

Section 16.09  Lease Guaranty. Contemporaneously with the execution of this Lease by Tenant, Guarantor shall execute and deliver to Landlord a guaranty in the form attached hereto as Exhibit "E".

Section 16.10  Counterparts. This Lease may be executed by the parties in any number of counterparts, each of which so executed shall be deemed an original; and such counterparts shall together constitute but one and the same Lease.

23

142660.7

Section 16.05.  <u>Covenants to Bind and Benefit Respective Parties</u>. The terms, conditions, covenants, provisions and agreements herein contained shall be binding upon and inure to the benefit of Landlord and Tenant, their successors and assigns.

Section 16.06.  <u>Captions and Headings</u>. The captions and headings throughout this Lease are for convenience and reference only and the words contained therein shall in no way be held or deemed to define, limit, describe, or add to the interpretation, construction or meaning of any provision of or the scope or intent of this Lease.

Section 16.07.  <u>Governing Law</u>. This Lease and the relative rights, privileges, duties and obligations of the parties hereunder shall be governed by the Laws of the Commonwealth of Pennsylvania.

Section 16.08  <u>Confidentiality</u>.

(a)  Landlord acknowledges that in the course of managing the Building Landlord may gain access to information or materials that are confidential or proprietary to Tenant, including information or materials pertaining to Tenant's business operations or information or materials with respect to which Tenant may be under an obligation of confidentiality to third parties ("Confidential Information"). Additionally the names, terms, conditions, facts, or other information pertaining to this Lease shall be deemed Confidential Information. Landlord shall keep all Confidential Information in strict confidence under appropriate safeguards. Except as may be required by judicial process, neither Landlord nor any employee, officer, director, agent or attorney of Landlord shall (i) disclose or reveal any Confidential Information, except with respect to the terms and conditions of this Lease, which may be disclosed to a limited group of the Landlords' officers, agents, and attorneys, who are actively participating in the negotiation, approval and execution of the Lease ("Party Representatives"), each of whom shall be informed of the confidential nature of the Lease; or (b) use any confidential Information in any way that could be detrimental to Tenant. This Section 16.08 shall be binding upon and inure to the benefit of all parties hereto and to each of their respective Party Representatives.

Section 16.09   <u>Lease Guaranty</u>. Contemporaneously with the execution of this Lease by Tenant, Guarantor shall execute and deliver to Landlord a guaranty in the form attached hereto as Exhibit "E".

Section 16.10  <u>Counterparts</u>. This Lease may be executed by the parties in any number of counterparts, each of which so executed shall be deemed an original; and such counterparts shall together constitute but one and the same Lease.

23

142590.7

IN WITNESS WHEREOF, the parties hereto have caused this Lease to be duly executed as of the day and year first above written.

> 525 VIRGINIA DRIVE ASSOCIATES
> LIMITED PARTNERSHIP, a Pennsylvania
> limited partnership, by its sole general partner
> 525 VIRGINIA DRIVE ASSOCIATES
> ACQUISITION CORPORATION, a
> Pennsylvania corporation
>
> By: _____
> President
>
> BIO-PHARM PHARMACEUTICS
> SERVICES, INC., a Delaware corporation
>
> By: _____
> Vice President
>
> Joseph S. Terpio

24

EXHIBIT "A"

## LEGAL DESCRIPTION/LOCATION OF THE PREMISES

EXHIBIT "B-1"

### PLANS AND SPECIFICATIONS FOR LANDLORD IMPROVEMENTS
(Comprised of the HSC Work Letter, as amended, the roofing contractor's letter, the landscaping plan, and the parking plan, all to be attached hereto).

EXHIBIT "B-2"

### PLANS AND SPECIFICATIONS FOR TENANT WORK
(Comprised of any available plans and specifications that may have been approved by Tenant prior to the execution of the Lease, if any, to be attached hereto).

EXHIBIT "C"

### PERMITTED EXCEPTIONS

EXHIBIT "D"

### MEMORANDUM OF LEASE

EXHIBIT "E"

### FORM OF LEASE GUARANTY

141650.7

EXHIBIT "A"

## LEGAL DESCRIPTION OF THE PREMISES

142650.7

PARCEL 1

ALL THAT CERTAIN lot or piece of ground with the buildings and improvements thereon erected, Situate in Upper Dublin Township, Montgomery County, Commonwealth of Pennsylvania, bounded and described according to an As-Built Survey, made by Frank A. Tebo, Professional Engineer, dated November 21, 1975, as follows, to wit:

BEGINNING at a point at the intersection of the center lines of Delaware Drive and Virginia Drive and following the center line of Virginia Drive, North 37 degrees 24 minutes 53 seconds East, a distance of 470.00 feet to a point and the place of beginning; thence continuing along the center line of a Virginia Drive north 37 degrees 24 minutes 53 seconds East, a distance of 372.85 feet to a point; thence along a curve to the right with a central angle of 90 degrees, radius of 150 feet and an arc of 235.62 feet to a point; thence south 52 degrees 35 minutes 07 seconds East a distance of 720.00 feet thence south 52 degrees 35 minutes 07 seconds East a distance of 720.00 feet to a point; thence along a curve to the left with a central angle of 21 degrees, a radius of 200 feet and an arc of 73.30 feet in a point; thence south 36 degrees 37 minutes 06 seconds West, a distance of 469.90 feet to a point; thence south 85 degrees 44 minutes 06 seconds west, a distance of 98.00 feet to a point; thence north 52 degrees 35 minutes 07 seconds West, a distance of 874.00 feet to a point and the place of beginning.

SUBJECT TO;

1. Covenants, easements, restrictions and encumbrances of record; and
2. State of facts shown on survey made by Frank A. Tebo, dated November 21, 1975 and any state of facts an updated survey would disclose.

TOGETHER with all right, title and interest, if any, of the said Grantor in and to the following described premises:

Parcel 2

BEGINNING at a spike on the centerline of Virginia Drive (60.00 feet Wide) a corner of this and land now or formerly of Kie Zin Associates, said point being at the distance of 470.00 feet measured north 37 degrees 24 minutes 53 seconds East along the centerline of Virginia Drive from a point marking its intersection with the centerline of Delaware Drive; thence from said beginning point extending along the

# EXHIBIT A

Page 1 of 2

centerline of Virginia Drive the four following courses and distances; (1) north 37 degrees 24 minutes 53 seconds East 372.85 feet to a spike a point of curve; (2) along a line curving to the right with a radius of 150.00 feet the arc distance of 235.62 feet to a spike a point of tangency; (3) south 52 degrees 35 minutes 07 seconds East 720.00 feet to a spike a point of curve; (4) along a line curving to the left with a radius of 200.00 feet the arc distance of 73.30 feet to a spike; thence leaving Virginia Drive along the centerline of a 40 foot wide drainage easement by land of Upper Hanover Township Industrial Development passing over a drill hole at the distance of 24.50 feet a drill hole in a head wall at the further distance of 8.98 feet, south 36 degrees 37 minutes 06 seconds West 470.18 feet to a point in Pine Run Creek easement 60.00 feet wide; thence through Pine Run Creek, aforesaid, by land now or formerly of Great Atlantic & Pacific Tea Company said Pine Run Creek easement extending 35.00 feet northerly from and parallel to and 25.00 feet southerly from and parallel to herein described line south 85 degrees 44 minutes 06 seconds West 99.36 feet to a point; thence leaving Pine Run Creek by land of Kie Zin Associates (along the centerline of a drainage ditch) crossing an iron pin at the distance of 10 feet and crossing a drill hole in a concrete head wall 30 feet from the terminus of herein described line, north 52 degrees 35 minutes 07 seconds West 874.00 feet to the first mentioned point and place of beginning.

THE aforementioned described Parcel 2 is purportedly described according to an "As Built Survey" plan made for Juda Diener Foundation, made by Yerkes Associates, Inc., consulting engineers and surveyors dated October 5, 1979.

BEING known as 525 VIRGINIA DRIVE

BEING Parcel 54-00-16390-00-8

BEING the same premises which LOOMIS J. GROSSMAN by deed dated 10/16/79 and recorded 10/19/79 in the County of Montgomery in Deed Book 4464 page 402 conveyed unto JUDA DIENER FOUNDATION, A NEW JERSEY CORPORATION, in fee.

# EXHIBIT A

Page 2 of 2

EXHIBIT "B-1"


## PLANS AND SPECIFICATIONS FOR LANDLORD IMPROVEMENTS
(Comprised of the HSC Work Letter, as amended, the roofing contractor's letter, the artist's rendering, landscaping plan, and the parking plan, all to be attached hereto).

142650.7



HEALTH SCIENCES CONSTRUCTION GROUP LTD

1 Great Valley Parkway, Suite 4
Malvern, Pennsylvania 19355

(610) 889-9911    (610) 889-0747 fax

Bio-Pharm
525 Virginia Drive
Fort Washington, PA

November 18, 1996

## SCOPE OF INTERIOR SELECTIVE DEMOLITION
## TO BE PROVIDED BY LANDLORD

I.    Office Wing
      Two Stories Bounded by Columns 7.1 to 16 and Columns A.5 to Q

    A.    General Construction

        1.    Remove all interior partitions and related construction with the exception of stairwells, elevator shaft, toilet rooms and mechanical/electrical rooms.

        2.    Remove hung ceilings throughout including hangers.

        3.    Remove all floor coverings to original concrete slab.

        4.    Remove all kitchen and serving equipment associated with existing lunch room.

        5.    Remove all built-in casework and millwork.

        6.    All interior faces of exterior walls to remain, including perimeter fin-tube radiation heating system.

    B.    Mechanical

        1.    Remove existing roof-top and interior air handling units including controls. Provide roof infill of roof penetrations with framing, metal deck and roofing.

        2.    Remove existing roof-top mounted exhaust fans. Patch roof deck and roofing.

        3.    Remove all plumbing and service piping associated with existing lunch room and work areas. Cap all work below floor or behind walls and patch same.

        4.    Remove all air devices associated with removal of hung ceilings back to reheat coils, including all hangers. Duct mains and branch ducts to reheat coils to remain.

EXHIBIT B-1

Bio-Pharm
Landlord Demolition
November 18, 1996
Page Two

5.  Hot water boiler, including all perimeter heat and reheat piping, to remain.

6.  Domestic hot water heater, storage tank and loop piping to remain; cut and cap all abandoned drops.

7.  Domestic cold water piping to remain; cut and cap all abandoned drops.

8.  Existing sprinkler system to remain, including all drops and heads.

9.  Remove Ansul fire protection system in kitchen.

10. Existing gas piping distribution to remain; cap at equipment being removed.

C.  Electrical

1.  Remove all interior lighting with the exception of rooms to remain. This includes removal of wiring back to lighting distribution panels. Provide or maintain minimum lighting for safety and exiting from building.

2.  Exit lighting to remain at stairwells and exterior doors.

3.  Remove all general purpose wiring and devices back to distribution panels.

4.  Remove all power and control wiring back to source from all removed equipment. Include removal of HVAC panelboards A to H and the two (2) panelboards serving the kitchen/lunchroom in the 1st Floor Electrical Room.

5.  All telephone and data wiring to be removed in its entirety, except the incoming feeders to the building.

6.  Maintain central panel in lobby for ADT fire alarm system. Wiring to remote devices can be removed as part of demolition. Devices shall be turned over to the Tenant.

7.  Remove master clock system in its entirety.

Bio-Pharm
Landlord Demolition
November 18, 1996
Page Three

II.   Warehouse/Manufacturing Wing
      One - Story Bounded by Columns 1.0 to 7.0 and Columns A to S

   A.   General Construction

      1.   Remove all interior partitions.

      2.   Remove hung ceilings throughout, including hangers.

      3.   Remove all floor covering to original concrete slab.

      4.   Remove all hung miscellaneous iron, abandoned as a result of the removal of previous fitouts.

      5.   Remove previous Owner's abandoned equipment and appurtenances.

   B.   Mechanical

      1.   Remove all original roof-top AC units including controls and provide roof infill of roof penetrations with framing, metal deck and roofing.

      2.   Unit heaters in the loading dock area are to remain in operating condition.

      3.   Remove existing exhaust fans and gravity vents; patch roof deck and roofing.

      4.   Remove all ductwork distribution, including air devices and hangers.

      5.   Remove all plumbing and service piping associated with previous fitouts. Cap all work below floor or behind walls and patch same.

      6.   All systems related to Test Cells #1 and #2 to remain.

      7.   Gas distribution piping to remain. Cap same at equipment being removed.

      8.   The HVAC units that are to remain are located above the two (2) test cells and hung below the roof between Columns #2 and #3.

Bio-Pharm
Landlord Demolition
November 18, 1996
Page Four

    C.    Electrical

        1.    Remove all interior lighting. This includes removal of wiring back to distribution panels. Provide or maintain minimum lighting for safety and for exiting from the building.

        2.    Exit lighting to remain at exterior doors.

        3.    Remove all equipment power and control wiring from equipment back to source.

        4.    Remove all bus duct distribution back to source, including all hangers and branch wiring.

        5.    Remove all general purpose wiring, including all devices, back to distribution panels.

        6.    Remove all telephone and data wiring in its entirety.

III.    GENERAL ITEMS

    A.    Tenant to identify any specific items to remain prior to start of demolition work by Landlord.

    B.    Landlord to remove all of previous occupant's equipment not identified by tenant to remain.

    C.    All PCB transformers/ballasts to be removed as part of the electrical demolition being performed by the Landlord. All non-PCB transformers are to remain.

    D.    All hazardous materials to be removed as part of the demolition performed by the Landlord.

    E.    Test Cells #1 and #2 along Column 1 are to remain, including all services and air conditioning.

Bio-Pharm
Landlord Demolition
November 18, 1996
Page Six

F.  Existing emergency generator and its distribution should remain to provide power for the minimal light levels required, exit lighting and ADT system.

G.  The entire wet sprinkler system is to remain in operating condition, including all alarm systems.

H.  Remove abandoned metal shed in the parking lot.

# LANDLORD IMPROVEMENTS

### November 18, 1996

1.  **Exterior Lighting**

    - Parking lot lighting to be provided to meet Township Ordinance

    - Replace exterior lighting fixtures on building, including egress fixtures at exit doors

2.  **Landscaping**

    - Landscaping around the entire building

    - Drainage from roof drains to swale

    - Pipe roof drain outlets on the east side of building to swale

    - Improve drainage swale along Virginia Drive

3.  **Building Entrance**

    - Glass and entrance by Tenant

4.  **Roofing**

# PARKING LOT SPECIFICATIONS
## EXHIBIT "B"

Revised October 28, 1996

1.  Remove crumbled existing paving where required prior to resurfacing

2.  Remove existing vegetation

3.  Clean off silt and sweep, pushing off earth and debris

4.  Run leveling course as required to fill depressions and smooth out existing irregularities

5.  Remove precast concrete wheel stops

6.  Tack coat existing surface for proper adhesion

7.  Resurface existing parking lot and driveway with 2 inch ID-2 Asphalt Wearing Course

8.  Cut transition keys at street entrances and seal joints

9.  Remove existing surface at concrete walks for flush joints

10. Re-stripe parking stalls and handicap aisles as required by codes

11. Reinstall wheel stops (including new pins)

# STUCCO REPAIR SPECIFICATIONS
## EXHIBIT "C"

Revised October 28, 1996

- Remove the loose stucco down to firm substrate

- Re-coat the areas that were removed with the same finish to match existing stucco

- Paint all the stucco with painting system recommended by paint manufacturer

# WALKWAY SPECIFICATIONS
## EXHIBIT "D"

Revised October 28, 1996

- Remove all existing concrete in the main entrance courtyard

- Replace with 4 inches of new 3500 PSI concrete to match existing layout

- Walkway along the Virginia Drive entrance will be completely removed

- Replace concrete with 4 inches of concrete to match existing layout

- Areas to be replaced are cross-hatched on attached plan

- Replace/repair any sidewalks as required by the Township inspector

- Walkways shall be laid out and constructed to meet the current L & I and ADA requirements

- Replace any damaged sections of the walkway along road

# PAINTING SPECIFICATIONS
## EXHIBIT "E"

Revised October 29, 1996

To provide labor, material and supervision to furnish and install paint system which includes the following Items:

- Existing stucco

- Metal siding

- Exterior metal doors

- Warehouse siding

- Paint systems shall be selected and applied in accordance with paint manufacturers' recommendations and specifications. Systems shall be submitted to Tenant for approval.

- Preparation work shall be in accordance with paint manufacturers' guidelines

- Patch penetrations in metal siding prior to painting

- Accent stripe to be painted in accordance with rendering



**DDP**
Contracting Co., Inc.

TEL: (610) 430-1992
FAX: (610) 429-9387

O'Neil Properties
C/O Drew Wolfington

Dec. 3, 1996

Phone: 610 878-7441
Fax:    610 878-7487

RE: 525 Virginia Ave.
    Fort Washington, PA

We propose to furnish the necessary labor, materials, equipment, and supervision to perform the following scope of work:

Entire roof area.

1.  We shall vacuum all existing slag gravel from the existing roof area.
2.  We shall remove the existing built up roof down to the corregated steel decking.
3.  We shall loose lay a new 1" polyisocanurate insulation board over to the steel deck over the entire roof area.
***We shall replace any deteriorated steel decking at a cost of $ 6.75 per square foot.
4.  We shall install a new Firestone 045 LSFR EPDM roof system loose laid over the insulation board to the entire roof area.
5.  We shall install tapered insulation crickets where necessary to improve drainage.
6.  We shall flash all pipe protrusions, hvac units, and any other misc. protrusions through the roof. If a return trip is required to flash in any additional HVAC units they will be billed at a cost of $ 875.00/ unit.
7.  We shall fabricate and install new heavy gauge white aluminum scuppers to properly drain the new roof system.
8.  We shall reuse the existing copper counter flashing.
9.  We shall install new aluminum coping edge flashing to the perimeter edge of the entire building.
10. We shall flash all drains, seams, and parapet walls.
11. We shall install the recommended ballast (river rocks) over the EPDM to secure the entire roof system.
12. We shall remove any job related debris upon completion of the job.

Upon completion of the project, you shall receive a fifteen (15) year labor and materials warranty from Firestone corporation.





PAINT EXISTG METAL PANEL & STUCCO PANELS TO MATCH.

PAINT DARKER ACCENT TONE VERTICLE & HORIZONTAL.

EXISTG BRICK TO REMAIN

NEW LANDSCAPING AT COURTYARD

## 525 VIRGINIA DRIVE
### FACADE STUDY @ COURTYARD ENTRANCE



525 VIRGINIA DRIVE

FORT WASHINGTON INDUSTRIAL PARK    UPPER DUBLIN TOWNSHIP, PENNSYLVANIA

EXHIBIT "B-2"

## PLANS AND SPECIFICATIONS FOR TENANT WORK

(Comprised of any available plans and specifications that may have been approved by Tenant prior to the execution of the Lease, if any, to be attached hereto).

142660.7

EXHIBIT "C"

PERMITTED EXCEPTIONS

EXHIBIT "C"

## PERMITTED TITLE EXCEPTIONS

1. Possible additional assessments for taxes for new construction or for any major improvements pursuant to provisions of facts of acts of assembly relating thereto, which are not yet due and payable.

2. Title to that portion of the premises within the bed of Virginia Drive is subject to the public and private rights therein.

3. Rights granted to the Philadelphia Suburban Gas & Electric Company as in deed book 900 page 536.

4. Rights granted to Philadelphia Electric Company as in deed book 3183 page 544 and deed book 3385 page 92.

5. Rights granted to Philadelphia Electric Company and the Bell Telephone Company of Pennsylvania as in deed book 3213 page 382.

6. Sanitary sewer easement agreement as in deed book 4749 page 799.

7. Easement of 40 feet wide drainage easement through premises.

8. Stream of water (Pine Run Creek) flows through premises, subject to the riparian rights of owners of ground abutting same.

145267

EXHIBIT "D"

MEMORANDUM OF LEASE

1142630.7

## MEMORANDUM OF LEASE AND OPTION AGREEMENT

THIS MEMORANDUM OF LEASE AND OPTION AGREEMENT, made as of _____, 1996, between 525 VIRGINIA DRIVE ASSOCIATES LIMITED PARTNERSHIP, a Pennsylvania limited partnership, whose address is 443 South Gulph Road, King of Prussia, Pennsylvania 19406 ("Owner"), and BIO-PHARM PHARMACEUTICS SERVICES, INC., a Delaware corporation, whose address is Four Valley Square, 512 Township Line Road, Blue Bell, Pennsylvania 19422 ("Purchaser").

NOW, THEREFORE, the parties hereto, in consideration of the premises and mutual covenants, promises and undertakings herein set forth, and intending to be legally bound hereby, agree as follows:

1.    Owner is the legal and record owner of certain real estate, including an office building and other improvements, known as 525 Virginia Drive, Fort Washington, Upper Dublin Township, Montgomery County, Pennsylvania, as more fully described on Exhibit "A" attached hereto, together with all appurtenances thereto (the "Property").

2.    Owner, as "Landlord" and Purchaser as "Tenant" have entered into a certain Lease Agreement, dated the date hereof ("Agreement"), respecting the Property for an initial term of fifteen (15) years, with two (2) consecutive options to extend the term for five (5) year periods each.

3.    Pursuant to the Agreement, Purchaser was also granted an exclusive option to purchase the Property.

4.    This Memorandum is intended for recording purposes only, and does not supersede, diminish, add to or change the terms of the Agreement.

IN WITNESS WHEREOF, the parties hereto have set their hands and seals as of the day and year first above written.

525 VIRGINIA DRIVE ASSOCIATES       BIO-PHARM PHARMACEUTICS
LIMITED PARTNERSHIP                 SERVICES, INC.

By:_____        By:_____
      President                           President

EXHIBIT D

COMMONWEALTH OF PENNSYLVANIA                    :
                                                : SS.
COUNTY OF                                       :


On this _____ day of _____, 1996, before me, the undersigned officer, a notary public in and for the state and county aforesaid, personally appeared _____, who acknowledged that he is a duly appointed and acting President of 525 VIRGINIA DRIVE ASSOCIATES LIMITED PARTNERSHIP, a Pennsylvania limited partnership, and that he, in such capacity, executed the foregoing instrument on behalf of the corporation, for the purposes therein contained, by signing the name of the corporation by himself as such officer.


IN WITNESS WHEREOF, I hereunto set my hand and official seal.


(SEAL)                          _____
                                Notary Public

                                My Commission Expires:


COMMONWEALTH OF PENNSYLVANIA                    :
                                                : SS.
COUNTY OF                                       :


On this _____ day of _____, 1996, before me, the undersigned officer, a notary public in and for the state and county aforesaid, personally appeared _____, who acknowledged that he is a duly appointed and acting President of BIO-PHARM PHARMACEUTICS SERVICES, INC., a Delaware corporation, and that he, in such capacity, executed the foregoing instrument on behalf of the corporation, for the purposes therein contained, by signing the name of the corporation by himself as such officer.


IN WITNESS WHEREOF, I hereunto set my hand and official seal.


(SEAL)                          _____
                                Notary Public

                                My Commission Expires:


145139

EXHIBIT D

EXHIBIT "A"

145139

EXHIBIT A

EXHIBIT "E"

FORM OF LEASE GUARANTY

142650.7

<u>LEASE GUARANTY</u>

In consideration of and as an inducement for the granting, execution and delivery of the foregoing Lease Agreement, dated December 3, 1996 (hereinafter called the "Lease"), by and between 525 VIRGINIA DRIVE ASSOCIATES LIMITED PARTNERSHIP, a Pennsylvania limited partnership, the landlord therein named (hereinafter called the "Landlord") and BIO-PHARM PHARMACEUTICS SERVICES, INC., a Delaware corporation, its tenant therein named (hereinafter called "Tenant"), and in further consideration of the sum of One Dollar ($1.00), and other good and valuable consideration paid by Landlord to the undersigned, I.B.A.H., INC. a Delaware corporation (hereinafter called the "Guarantor"), hereby guarantees to Landlord, its successors and assigns, the full and prompt payment of all Fixed Basic Rent and Additional Rent (as those terms are defined in the Lease) payable by Tenant under the Lease and the full, faithful and prompt performance and observance of all the covenants, terms, conditions and agreements therein provided to be performed and observed by Tenant; and Guarantor does hereby become guarantor to Landlord, its successors and assigns, for and with respect to all of the aforesaid obligations of Tenant under the Lease. Guarantor hereby covenants and agrees to and with Landlord, its successors and assigns, that if default shall at any time be made by Tenant which is not cured within the applicable cure periods under the Lease, in the payment of any Fixed Basic Rent or Additional Rent payable by Tenant under the Lease, and such sums are not paid by Tenant or otherwise recovered by Landlord within the time provided under the Lease, Guarantor shall forthwith pay such rent or other sums or charges to Landlord, its successors and assigns. Landlord shall provide Guarantor with a copy of any and all notices of default which are given to Tenant as required under the terms of the Lease.

1.    This Guaranty is an agreement of suretyship as well as an absolute guaranty of payment. Guarantor's liability hereunder is unconditional and Landlord shall not be obligated to proceed against Tenant before commencing an action against Guarantor to recover such payment.

2.    This Guaranty shall be a continuing Guaranty and (whether or not Guarantor shall have notice or knowledge of any of the following) the liability and obligation of Guarantor hereunder shall be absolute and shall remain in full force and effect and shall not be released, discharged or in any way impaired by: (a) any amendment or modification of, or supplement to, or extension or renewal of, or termination of, the Lease or any assignment or transfer thereof; (b) any exercise or non-exercise of any right, power, remedy or privilege under or in respect of the Lease or this Guaranty or any waiver, consent or approval by Landlord with respect to any of the covenants, terms, conditions or agreements contained in the Lease or any indulgence, forebearances or extensions of time; (c) any bankruptcy, insolvency, reorganization, arrangement, readjustment, composition, liquidation or similar proceedings relating to Tenant, its successors and assigns, or its properties or creditors; (d) any limitation on the liability or obligation of Tenant under the Lease or its estate in bankruptcy or of any remedy for the enforcement thereof, resulting from the operation of any present or future provision of the United States Bankruptcy Code, as amended, or any other statute or from the decision of any court; (e) any transfer or assignment of its interests under the Lease or any subleasing of the Premises (as defined in the Lease); or (f) any release of any other guarantor of the Lease.

3. Until all of Tenant's obligations under the Lease are fully performed, Guarantor:

(a) waives any right of subrogation against Tenant by reason of any payments or acts of performance by Guarantor, in compliance with the obligations of Guarantor under this Guaranty;

(b) waives any other right that Guarantor may have against Tenant by reason of any one or more payments or acts in compliance with the obligations of Guarantor under this Guaranty; and

(c) subordinates any liability or indebtedness of Tenant held by Guarantor to the obligations of Tenant to Landlord under the Lease.

4. Guarantor's liability hereunder shall cease upon the payment by Tenant of all Fixed Basic Rent and Additional Rent due under the terms of the Lease, provided that Tenant is not then in default under the terms of the Lease.

5. This Guaranty shall be legally binding upon Guarantor, its successors and assigns, and shall inure to the benefit of Landlord, and its successors and assigns.

6. The word "Landlord" shall mean all parties to Landlord, regardless of number and the word "he" shall be synonymous with "she", "it" and "they"; and the word "his" shall be synonymous with "her", "its" and "their". Where appropriate, the singular shall include the plural.

IN WITNESS WHEREOF, Guarantor, intending to be legally bound hereby, has executed this Guaranty this 3rd day of December, 1996.

I.B.A.H., INC.

By:_____
    Vice President

EXHIBIT "E"
2

144875

# EXHIBIT B

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 10:00 AM 09/19/1997
971313835 ~ 2354675

1 415 065 7773   P.02-02

# CERTIFICATE OF AMENDMENT

## OF

## CERTIFICATE OF INCORPORATION

. . . . .

Bio-Pharm Pharmaceutics Services, Inc., a corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware, DOES HEREBY CERTIFY:

FIRST:    That at a meeting of the Board of Directors of Bio-Pharm Pharmaceutics Services, Inc. resolutions were duly adopted setting forth a proposed amendment to the Certificate of Incorporation of said corporation, declaring said amendment to be advisable and calling a meeting of the stockholders of said corporation for consideration thereof. The resolution setting forth the proposed amendment is as follows:

RESOLVED, that the Certificate of Incorporation of Bio-Pharm Pharmaceutics Services, Inc. be amended by changing the First Article thereof so that, as amended, said Article shall be and read as follows:

The name of the corporation is: IBAH Pharmaceutics Services, Inc.

SECOND:  That thereafter, pursuant to resolution of its Board of Directors, a special meeting of the stockholders of said corporation was duly called and held, upon at which meeting the necessary number of shares as required by statute were voted in favor of the amendment.

THIRD:    That said amendment was duly adopted in accordance with the provisions of Section 242 of the General Corporation Law of the State of Delaware.

IN WITNESS WHEREOF, said Bio-Pharm Pharmaceutics Services, Inc. has caused this certificate to be signed by Geraldine Henwood, its CEO          , this 19th day of September, 1997

Bio-Pharm Pharmaceutics Services, Inc

By _____
Geraldine A. Henwood

(DE - 0263 - 6/15/94)

# STATE of DELAWARE
## CERTIFICATE of AMENDMENT of
## CERTIFICATE of INCORPORATION

**First:** That the Board of Directors of IBAH PHARMACEUTICS SERVICES, INC. (the "Corporation"), has duly adopted resolutions by written consent proposing this amendment of the Certificate of Incorporation of the Corporation, declaring said amendment to be advisable and calling a meeting of the stockholders of the Corporation for consideration thereof. The resolution setting forth the proposed amendment is as follows:

**Resolved,** that the Certificate of Incorporation of the Corporation be amended by changing the Article thereof numbered "FIRST" so that, as amended, said Article shall be and read as follows:

"The name of the Corporation is OMNICARE PHARMACEUTICS, INC."

**Second:** This Amendment to the Certificate of Incorporation has been duly adopted by the written consent of the holder of all of the outstanding shares of stock of the Corporation in accordance with the provisions of Sections 228 and 242 of the General Corporation Law of the State of Delaware.

**Third:** That the capital of said corporation shall not be reduced under or by reason of said amendment.

IBAH PHARMACEUTICS SERVICES, INC.

BY: _____
(Authorized Officer)
NAME: Bradley S. Abbott, Treasurer

256303

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 04:00 PM 06/15/2000
001305392 — 2354675

# EXHIBIT C

02/28/02  THU 14:17 FAX 617796  .3                    REIT ACCOUNTING                    ☒002
FEB-28-02  13:58 FROM:SULLIVAN&WORCESTER LLP 22   ID:6173382880                    PAGE    2

## LEASE GUARANTY

In consideration of and as an inducement for the granting, execution and delivery of the foregoing Lease Agreement, dated December 3, 1996 (hereinafter called the "Lease"), by and between 525 VIRGINIA DRIVE ASSOCIATES LIMITED PARTNERSHIP, a Pennsylvania limited partnership, the landlord therein named (hereinafter called the "Landlord") and BIO-PHARM PHARMACEUTICS SERVICES, INC., a Delaware corporation, its tenant therein named (hereinafter called "Tenant"), and in further consideration of the sum of One Dollar ($1.00), and other good and valuable consideration paid by Landlord to the undersigned, I.B.A.H., INC. a Delaware corporation (hereinafter called the "Guarantor"), hereby guarantees to Landlord, its successors and assigns, including without limitation, Landlord's mortgage lender with rights to enforce Landlord's rights under the Lease, the full and prompt payment of all Fixed Basic Rent and Additional Rent (as those terms are defined in the Lease) payable by Tenant under the Lease and the full, faithful and prompt performance and observance of all the covenants, terms, conditions and agreements therein provided to be performed and observed by Tenant; and Guarantor does hereby become guarantor to Landlord, its successors and assigns, including without limitation, Landlord's mortgage lender with rights to enforce Landlord's rights under the Lease, for and with respect to all of the aforesaid obligations of Tenant under the Lease. Guarantor hereby covenants and agrees to and with Landlord, its successors and assigns, that if default shall at any time be made by Tenant which is not cured within the applicable cure periods under the Lease, in the payment of any Fixed Basic Rent or Additional Rent payable by Tenant under the Lease, and such sums are not paid by Tenant or otherwise recovered by Landlord within the time provided under the Lease, Guarantor shall forthwith pay such rent or other sums or charges to Landlord, its successors and assigns. Landlord shall provide Guarantor with a copy of any and all notices of default which are given to Tenant as required under the terms of the Lease.

1.    This Guaranty is an agreement of suretyship as well as an absolute guaranty of payment. Guarantor's liability hereunder is unconditional and Landlord shall not be obligated to proceed against Tenant before commencing an action against Guarantor to recover such payment.

2.    This Guaranty shall be a continuing Guaranty and (whether or not Guarantor shall have notice or knowledge of any of the following) the liability and obligation of Guarantor hereunder shall be absolute and shall remain in full force and effect and shall not be released, discharged or in any way impaired by: (a) any amendment or modification of, or supplement to, or extension or renewal of, or termination of, the Lease or any assignment or transfer thereof; (b) any exercise or non-exercise of any right, power, remedy or privilege under or in respect of the Lease or this Guaranty or any waiver, consent or approval by Landlord with respect to any of the covenants, terms, conditions or agreements contained in the Lease or any indulgence, forebearances or extensions of time; (c) any bankruptcy, insolvency, reorganization, arrangement, readjustment, composition, liquidation or similar proceedings relating to Tenant, its successors and assigns, or its properties or creditors; (d) any limitation on the liability or obligation of Tenant under the Lease or its estate in bankruptcy or of any remedy for the enforcement thereof, resulting from the operation of any present or future provision of the United States Bankruptcy Code, as amended, or any other stature or from the decision of any court; (e) any transfer or assignment of

02/28/02   THU 14:19 FAX 617796  43          REIT ACCOUNTING
22-28-02  19:55  FROM:SULLIVAN&WORCESTER LLP 22  ID:6173382880          ☐003
PAGE  ☐  3

its interests under the Lease or any subleasing of the Premises (as defined in the Lease); or (f) any release of any other guarantor of the Lease.

  3.  Until all of Tenant's obligations under the Lease are fully performed, Guarantor:

    (a)  waives any right of subrogation against Tenant by reason of any payments or acts of performance by Guarantor, in compliance with the obligations of Guarantor under this Guaranty;

    (b)  waives any other right that Guarantor may have against Tenant by reason of any one or more payments or acts in compliance with the obligations of Guarantor under this Guaranty; and

    (c)  subordinates any liability or indebtedness of Tenant held by Guarantor to the obligations of Tenant to Landlord under the Lease.

  4.  Guarantor's liability hereunder shall cease upon the payment by Tenant of all Fixed Basic Rent and Additional Rent due under the terms of the Lease, provided that Tenant is not then in default under the terms of the Lease.

  5.  This Guaranty shall be legally binding upon Guarantor, its successors and assigns, and shall inure to the benefit of Landlord, and its successors and assigns, including without limitation, Landlord's mortgage lender with rights to enforce Landlord's rights under the Lease.

  6.  The word "Landlord" shall mean all parties to Landlord, regardless of number and the word "he" shall be synonymous with "she", "it" and "they"; and the word "his" shall be synonymous with "her", "its" and "their". Where appropriate, the singular shall include the plural.

  IN WITNESS WHEREOF, Guarantor, intending to be legally bound hereby, has executed this Guaranty this 3rd day of December, 1996.

          I.B.A.H., INC.

          By: _____
            Vice President

2

144825

# EXHIBIT D

# STATE of DELAWARE
## CERTIFICATE of AMENDMENT of
## CERTIFICATE of INCORPORATION

First: That the Board of Directors of IBAH, INC. (the "Corporation"), has duly adopted resolutions by written consent proposing this amendment of the Certificate of Incorporation of the Corporation, declaring said amendment to be advisable and calling a meeting of the stockholders of the Corporation for consideration thereof.  The resolution setting forth the proposed amendment is as follows:

Resolved, that the Certificate of Incorporation of the Corporation be amended by changing the Article thereof numbered "FIRST" so that, as amended, said Article shall be and read as follows:

"The name of the Corporation is OMNICARE CLINICAL RESEARCH, INC."

Second: This Amendment to the Certificate of Incorporation has been duly adopted by the written consent of the holder of all of the outstanding shares of stock of the Corporation in accordance with the provisions of Sections 228 and 242 of the General Corporation Law of the State of Delaware.

Third: That the capital of said corporation shall not be reduced under or by reason of said amendment.

IBAH, INC..


BY: _____
        (Authorized Officer)
NAME: Bradley S. Abbott, Treasurer

237032

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 03:30 PM 06/21/2000
001316050 - 2268310

# EXHIBIT E

LAWYERS TITLE INSURANCE CORPORATION
Two Penn Center Plaza, Suite 1230
Philadelphia, PA 19102

[525 Virginia Drive]

## ASSIGNMENT AND ASSUMPTION OF
## LEASES, CONTRACTS AND AGREEMENTS

THIS ASSIGNMENT AND ASSUMPTION OF LEASES, CONTRACTS AND AGREEMENTS (this "Assignment") dated as of this 19th day of September, 1997 by 525 VIRGINIA DRIVE ASSOCIATES LIMITED PARTNERSHIP, a Pennsylvania limited partnership with its principal office c/o O'Neill Properties Group, L.P., 210 Mall Boulevard, Suite 200, King of Prussia, PA 19406 ("Assignor"), to and in favor of HUB PROPERTIES TRUST, a Maryland real estate investment trust with its principal office at 400 Centre Street, Newton, Massachusetts 02158 ("Assignee").

### WITNESSETH:

In connection with the sale by Assignor to Assignee of the real property and improvements thereon, located in Fort Washington, Pennsylvania, as more particularly described in Exhibit A, attached hereto and made a part hereof (the "Premises"), and for other good and valuable consideration paid by Assignee to Assignor, the receipt and sufficiency of which are hereby acknowledged, Assignor does hereby grant, bargain, sell, set over, assign, transfer and deliver unto Assignee and its successors and assigns all of its right, title and interest in and to the following described leases, contracts and agreements with respect to the Premises:

1.  All of Assignor's right, title and interest in and to any and all leases, rental agreements or other agreements (including all amendments or modifications thereto) affecting any portion of the Premises and described in Exhibit B, attached hereto and made a part hereof (collectively, the "Leases");

2.  All of Assignor's right, title and interest in and to any and all service contracts, equipment leases and other agreements affecting the ownership, repair, maintenance, management, leasing or operation of any or all of the Premises and described on Exhibit C, attached hereto and made a part hereof (the "Contracts"); and

3.  All of Assignor's right, title and interest in and to any and all agreements with any governmental authority or any third party with respect to all or any portion of the Premises, to the extent assignable (the "Agreements").

In connection with the foregoing, Assignor and Assignee hereby agree as follows:

1.  Assignor shall indemnify and hold harmless Assignee from and against all liabilities, cost, loss and damage arising

-2-

under the Leases, Contracts and Agreements prior to the date
hereof.

2.    Assignee hereby assumes and agrees to be bound by all
of Assignor's liabilities and obligations under the Leases,
Contracts and Agreements and agrees to perform and observe all of
the covenants and agreements set forth therein.  Assignee shall
indemnify and hold harmless Assignor from and against all
liabilities, cost, loss and damage arising under the Leases,
Contracts and Agreements from and after the date hereof.

3.    This Assignment shall inure to the benefit of and shall
be binding upon the parties hereto and their respective
successors and assigns.

4.    This Assignment may be executed in two or more
counterparts, each of which shall be deemed an original, but all
of which together will constitute one and the same instrument.

5.    This Assignment shall be governed by and construed in
accordance with the laws of the Commonwealth of Pennsylvania.

IN WITNESS WHEREOF, Assignor and Assignee have executed his
Assignment under seal as of the date above first written.

ASSIGNOR:

525 VIRGINIA DRIVE ASSOCIATES LIMITED
PARTNERSHIP

By:  525 Virginia Drive Associates
     Acquisition Corp., its general
     partner

ATTEST:

By: _____
Its (Vice) President
Stephen Sneeder

(Assistant) Secretary

[Corporate Seal]

| REALTY TRANS. TAX PAID | |
|---|---|
| STATE | |
| LOCAL | |
| PER | |

ASSIGNEE:

HUB PROPERTIES TRUST

ATTEST:

By: _____
Its (Vice) President

_____
(Assistant) Secretary

MONTGOMERY COUNTY COMMISSIONERS REGISTRY
54-00-16390-00-8  UPPER DUBLIN
525 VIRGINIA DR
525 VIRGINIA DRIVE ASSOCIATES
B 050   U 046 L       3441   DATE: 10/07/97

5.00

[Corporate Seal]

085203PG0965

-2-

under the Leases, Contracts and Agreements prior to the date hereof.

2.    Assignee hereby assumes and agrees to be bound by all of Assignor's liabilities and obligations under the Leases, Contracts and Agreements and agrees to perform and observe all of the covenants and agreements set forth therein.    Assignee shall indemnify and hold harmless Assignor from and against all liabilities, cost, loss and damage arising under the Leases, Contracts and Agreements from and after the date hereof.

3.    This Assignment shall inure to the benefit of and shall be binding upon the parties hereto and their respective successors and assigns.

4.    This Assignment may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together will constitute one and the same instrument.

5.    This Assignment shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania.

IN WITNESS WHEREOF, Assignor and Assignee have executed his Assignment under seal as of the date above first written.

ASSIGNOR:

525 VIRGINIA DRIVE ASSOCIATES LIMITED PARTNERSHIP

By:    525 Virginia Drive Associates Acquisition Corp., its general partner

ATTEST:

By:_____
Its (Vice) President

_____
(Assistant) Secretary

[Corporate Seal]

ASSIGNEE:

HUB PROPERTIES TRUST

ATTEST:

_Jennifer J. Clark_
(Assistant) Secretary

By:  _David J. Hegarty_
Its (Vice) President
David J. Hegarty
[Corporate Seal]

COMMONWEALTH OF PENNSYLVANIA
COUNTY OF *Philadelphia*

On this ___*19th*___ day of September, 1997, before me
personally appeared *Stephen Sneider*, (Vice) President of 525
Virginia Drive Associates Acquisition Corp., the general partner
of 525 Virginia Drive Associates Limited Partnership to be known
and known by me to be the party executing the foregoing
instrument for and on behalf of said corporation and he/she
acknowledged said instrument by him/her executed, to be his/her
free act and deed in his/her capacity as (Vice) President
aforesaid, and the free act and deed of said corporation.

_____
Notary Public
My commission expires:

```
        NOTARIAL SEAL
ROSEMARIE E. MALCOLM, Notary Public
  City of Philadelphia, Phila. County
My Commission Expires Oct. 5, 1998
```

COMMONWEALTH OF MASSACHUSETTS
COUNTY OF _____

On this _____ day of September, 1997, before me
personally appeared _____, (Vice) President of Hub
Properties Trust to be known and known by me to be the party
executing the foregoing instrument for and on behalf of said
corporation and he/she acknowledged said instrument by him/her
executed, to be his/her free act and deed in his/her capacity as
(Vice) President aforesaid, and the free act and deed of said
corporation.

_____
Notary Public
My commission expires:

-3-

COMMONWEALTH OF PENNSYLVANIA
COUNTY OF _____

      On this _____ day of September, 1997, before me
personally appeared _____, (Vice) President of 525
Virginia Drive Associates Acquisition Corp., the general partner
of 525 Virginia Drive Associates Limited Partnership to be known
and known by me to be the party executing the foregoing
instrument for and on behalf of said corporation and he/she
acknowledged said instrument by him/her executed, to be his/her
free act and deed in his/her capacity as (Vice) President
aforesaid, and the free act and deed of said corporation.


                              _____
                              Notary Public
                              My commission expires:


COMMONWEALTH OF MASSACHUSETTS
COUNTY OF Suffolk

      On this ___19ᵗʰ___ day of September, 1997, before me
personally appeared David J. Hegarty, (Vice) President of Hub
Properties Trust to be known and/known by me to be the party
executing the foregoing instrument for and on behalf of said
corporation and he/she acknowledged said instrument by him/her
executed, to be his/her free act and deed in his/her capacity as
(Vice) President aforesaid, and the free act and deed of said
corporation.

                              Nancy L. Sholes
                              _____
                              Notary Public
                              My commission expires:
                                    3/30/01

Exhibit A

The Premises

[See attached copy.]

# Lawyers Title
## Insurance Corporation

### NATIONAL HEADQUARTERS
#### RICHMOND, VIRGINIA

Case No.: LTI-97-M-14823H

LEGAL DESCRIPTION

ALL THAT CERTAIN tract of land, Situate in Upper Dublin Township, Montgomery County, Pennsylvania, bounded and described in accordance with a Survey made by Momenee Survey Group, Inc., Bryn Mawr, PA., dated July 18, 1996 and last revised September 8, 1997.

BEGINNING at a point on the center line of Virginia Drive, said point marking the southwesterly corner of the about to be described parcel of land and located North 37 degrees 24 minutes 53 seconds East 470.00 feet measured along said center line from its intersection with the center line of Delaware Drive. Thence from said beginning point along the center line of Virginia Drive (60 feet wide) North 37 degrees 24 minutes 53 seconds East 372.85 feet to a point of curve; thence still by the same along a line curving to the right in an easterly direction, said curve having a radius of 150.00 feet an arc distance of 235.62 feet and a delta angle of 90 degrees 00 minutes 00 seconds to a point of tangency; thence still along the center line of Virginia Drive South 52 degrees 35 minutes 07 seconds East 720.00 feet to a point of curve; thence on a line curving to the left in an easterly direction having a radius of 200.00 feet an arc distance of 73.30 feet and a delta angle of 21 degrees 00 minutes 00 seconds to a point; thence leaving Virginia Drive by land now or formerly of Gary H. Kramer and along the center line of a 40 feet wide drainage easement and passing over a drill hole in a headwall South 36 degrees 37 minutes 06 seconds West 469.90 feet to a point in Pine Run Creek channel (70 feet wide); thence by land of Montgomery County Industrial Development Authority and along the 70 feet wide Pine Run Channel South 85 degrees 44 minutes 06 seconds West 98.00 feet to a point; thence by land now or formerly Kai-Zin Associates and along the center of a drainage ditch North 52 degrees 35 minutes 07 seconds West 874.00 feet crossing as drill hole in a headwall to the first mentioned point and place of beginning.

BEING KNOWN AS 525 VIRGINIA DRIVE.

BEING County Parcel 54-00-16390-00-8

BEING THE SAME PREMISES WHICH JUDA DIENER FOUNDATION, A NEW JERSEY CORPORATION, BY DEED DATED 12/11/1996 AND RECORDED 12/13/1996 IN THE OFFICE FOR THE RECORDING OF DEEDS, IN AND FOR THE COUNTY OF MONTGOMERY, COMMONWEALTH OF PENNSYLVANIA, IN DEED BOOK 5170 PAGE 2028, GRANTED AND CONVEYED UNTO 525 VIRGINIA DRIVE ASSOCIATES, LIMITED PARTNERSHIP, ITS SUCCESSORS AND ASSIGNS, IN FEE.

00
00-0011

Litho in U.S.A.

<u>Exhibit B</u>

<u>The Leases</u>

Lease, dated December 3, 1996 by and between Assignor and Bio-Pharm Pharmaceutics Services, Inc., a Delaware corporation.

<u>Exhibit C</u>

<u>The Contracts</u>

None.

F:\NLS\HRPT100\525ASSIG.DOC9/17/97



# EXHIBIT F

# FLOOD INSURANCE STUDY





# TOWNSHIP OF UPPER DUBLIN, PENNSYLVANIA
## MONTGOMERY COUNTY

REVISED:
JANUARY 16, 1992



Federal Emergency Management Agency

**COMMUNITY NUMBER · 420708**

HUB 00644

NOTICE TO
FLOOD INSURANCE STUDY USERS

Communities participating in the National Flood Insurance Program (NFIP) have
established repositories of flood hazard data for floodplain management and
flood insurance purposes.  This Flood Insurance Study (FIS) may not contain
all data available within the repository.  It is advisable to contact the
community repository for any additional data.

Part or all of this FIS may be revised and republished at any time.  In
addition, part of this FIS may be revised by the Letter of Map Revision (LOMR)
process, which does not involve republication or redistribution of the FIS.
It is, therefore, the responsibility of the user to consult with community
officials and to check the community repository to obtain the most current FIS
components.

Initial FIS Effective Date:  January 3, 1979

Revised FIS Dates:  January 16, 1992

HUB 00645

TABLE OF CONTENTS

| | | Page |
|---|---|---|
| 1.0 | INTRODUCTION | 1 |
| | 1.1  Purpose of Study | 1 |
| | 1.2  Authority and Acknowledgments | 1 |
| | 1.3  Coordination | 1 |
| 2.0 | AREA STUDIED | 2 |
| | 2.1  Scope of Study | 2 |
| | 2.2  Community Description | 2 |
| | 2.3  Principal Flood Problems | 4 |
| | 2.4  Flood Protection Measures | 4 |
| 3.0 | ENGINEERING METHODS | 5 |
| | 3.1  Hydrologic Analyses | 5 |
| | 3.2  Hydraulic Analyses | 6 |
| 4.0 | FLOODPLAIN MANAGEMENT APPLICATIONS | 8 |
| | 4.1  Floodplain Boundaries | 8 |
| | 4.2  Floodways | 9 |
| 5.0 | INSURANCE APPLICATIONS | 13 |
| 6.0 | FLOOD INSURANCE RATE MAP | 15 |
| 7.0 | OTHER STUDIES | 15 |
| 8.0 | LOCATION OF DATA | 16 |
| 9.0 | BIBLIOGRAPHY AND REFERENCES | 16 |

i

TABLE OF CONTENTS - continued

                                                                Page

## FIGURES

Figure 1 - Vicinity Map                                           3

Figure 2 - Floodway Schematic                                    13


## TABLES

Table 1 - Summary of Discharges                                   6

Table 2 - Floodway Data                                        10-12


## EXHIBITS

Exhibit 1 - Flood Profiles
            Pine Run                    Panel  01P
            Rapp Run                    Panels 02P - 07P
            Sandy Run                   Panels 08P - 09P
            Wissahickon Creek           Panel  10P

Exhibit 2 - Flood Insurance Rate Map and Street Index

HUB 00647

FLOOD INSURANCE STUDY
TOWNSHIP OF UPPER DUBLIN, MONTGOMERY COUNTY, PENNSYLVANIA

1.0  INTRODUCTION

    1.1  Purpose of Study

        This Flood Insurance Study revises and updates a previous Flood
        Insurance Study/Flood Insurance Rate Map for the Township of Upper
        Dublin, Montgomery County, Pennsylvania.  This information will be
        used by the Township of Upper Dublin to update existing floodplain
        regulations as part of the Regular Phase of the National Flood
        Insurance Program (NFIP).  The information will also be used by
        local and regional planners to further promote sound land use and
        floodplain development.

        In some states or communities, floodplain management criteria or
        regulations may exist that are more restrictive or comprehensive
        than the minimum Federal requirements.  In such cases, the more
        restrictive criteria take precedence and the state (or other
        jurisdictional agency) will be able to explain them.

    1.2  Authority and Acknowledgments

        The sources of authority for this Flood Insurance Study are the
        National Flood Insurance Act of 1968 and the Flood Disaster
        Protection Act of 1973.

        The hydrologic and hydraulic analyses for the original study were
        prepared by Gannett, Fleming, Corddry, and Carpenter, Inc (GFCC),
        for the Federal Emergency Management Agency (FEMA), under Contract
        No. H-3813.  That work was completed in March 1977.  In this
        revision, the hydrologic and hydraulic analyses for Sandy Run were
        prepared by the U. S. Army Corps of Engineers (COE), Philadelphia
        District, for FEMA, under Inter-Agency Agreement No. EMW-88-E-2768,
        Project Order No. 2, Task Letter No. 88-3.  The work for this
        revision was completed in August 1990.

    1.3  Coordination

        The identification of streams requiring detailed study was done at a
        meeting attended by representatives of GFCC, FEMA, and the community
        in February 1975.  Study areas for the original study were finalized
        at a Consultation Coordination Officer's (CCO) meeting in November
        1975.

        On May 11, 1977, the results of the original study were reviewed at
        a final CCO meeting attended by representatives of GFCC, FEMA, and
        the community.

## 2.0 AREA STUDIED

### 2.1 Scope of Study

This Flood Insurance Study covers the incorporated area of the Township of Upper Dublin, Montgomery County, Pennsylvania. The area of study is shown on the Vicinity Map (Figure 1).

In the original study, the following streams were studied by detailed methods: Wissahickon Creek, Rapp Run, Sandy Run and Pine Run. This revision incorporates updated topographic information and updated hydrologic and hydraulic analyses for Sandy Run. Sandy Run was restudied by detailed methods for its entire length within the community. Limits of detailed study are indicated on the Flood Profiles (Exhibit 1) and on the Flood Insurance Rate Map (Exhibit 2). The areas studied by detailed methods were selected with priority given to all known flood hazard areas and areas of projected development and proposed construction.

Tributary 1 and a portion of Pine Run were studied by approximate methods. Approximate analyses were used to study those areas having a low development potential or minimal flood hazards. The scope and methods of study were proposed to, and agreed upon by, FEMA and the Township of Upper Dublin.

### 2.2 Community Description

The Township of Upper Dublin is located in southeastern Pennsylvania, in eastern Montgomery County. The township is bordered by the Townships of Horsham and Upper Moreland to the northeast; the Township of Abington to the southeast; the Townships of Springfield and Whitemarsh to the southwest; and the Townships of Whitpain and Lower Gwynedd and the Borough of Ambler to the northwest.

The total area within the township is 13.3 square miles. According to U. S. Census Bureau figures, the population within the township was 19,449 in 1970 (Reference 1).

The township is characterized by low, gently rolling terrain and is located in the Piedmont Province of Pennsylvania. The range in local elevation varies from approximately 170 to 380 feet. This particular region of the Piedmont Province is occupied by lower Paleozic and Precambrian granites, gneisses, and schists. At the southernmost portion of this basin, a thin veneer of Pleistocene and recent river gravels mask this complex metamorphic region. The soil

HUB 00649



APPROXIMATE SCALE

**VICINITY MAP**

FEDERAL EMERGENCY MANAGEMENT AGENCY

**TOWNSHIP OF UPPER DUBLIN, PA**
(MONTGOMERY CO.)

**FIGURE 1**

is of average permeability and supports varied vegetation with hard and soft wood trees prevalent in the surrounding woodlands (Reference 2).

An estimated 85 percent of the township has been developed with either residential, commercial, or industrial development. This dense development increases runoff rates and increases the flooding potential in the township. Much of the commercial and industrial development is located within the Fort Washington Industrial Park, which is partially within the floodplain of Rapp and Pine Runs. Development along Wissahickon Creek within the corporate limits is mostly commercial, while development along Sandy Run is primarily residential. Development along Pine Run within the township is residential in its upper reaches and primarily open land in its lower reaches. Residential development is dispersed throughout the township with a limited number of homes affected by flood waters.

The climate in southeastern Pennsylvania has the characteristics of being humid continental. Summer and winter temperatures average 73.2 degrees Fahrenheit ($^{\circ}$F) and 32.2$^{\circ}$F, respectively. Annual average precipitation in the region is 41.6 inches (Reference 3).

## 2.3 Principal Flood Problems

The past history of flooding of the streams in the community indicates that flooding may occur during any season of the year. The worst flooding conditions are normally a result of spring rains, combined with snowmelt, or summer storms resulting from tropical storms moving north along the east coast of the United States.

A number of noteworthy floods have occurred in recent history. Storms in 1955, 1969, 1972, and 1973 have caused flood damage. Most of this damage has occurred in the Fort Washington Industrial Park area from flooding of Rapp Run and Pine Run.

## 2.4 Flood Protection Measures

Presently, there are no flood protection measures within the study area. Two single-purpose floodwater retarding structures, PA-634 on Rapp Run and PA-635 on Pine Run, were planned for construction in 1980 in the Sandy Run watershed. These structures were never built, however, and there are presently no plans to build them.

There are non-structural measures being utilized to aid in the prevention of future flood damage. Local land use regulations, adopted from the Code of Federal Regulations, Title 24, Chapter 10, Parts 1910.3A and 1910.3B, control building within areas that have a high risk of flooding.

4

HUB 00651

## 3.0 ENGINEERING METHODS

For the flooding sources studied in detail in the community, standard hydrologic and hydraulic study methods were used to determine the flood hazard data required for this study. Flood events of a magnitude which are expected to be equaled or exceeded once on the average during any 10-, 50-, 100-, or 500-year period (recurrence interval) have been selected as having special significance for floodplain management and for flood insurance rates. These events, commonly termed the 10-, 50-, 100-, and 500-year floods, have a 10, 2, 1, and 0.2 percent chance, respectively, of being equaled or exceeded during any year. Although the recurrence interval represents the long term <u>average</u> period between floods of a specific magnitude, rare floods could occur at short intervals or even within the same year. The risk of experiencing a rare flood increases when periods greater than 1 year are considered. For example, the risk of having a flood which equals or exceeds the 100-year flood (1 percent chance of annual exceedence) in any 50-year period is approximately 40 percent (4 in 10), and, for any 90-year period, the risk increases to approximately 60 percent (6 in 10). The analyses reported herein reflect flooding potentials based on conditions existing in the community at the time of completion of this study. Maps and flood elevations will be amended periodically to reflect future changes.

### 3.1 Hydrologic Analyses

Hydrologic analyses were carried out to establish the peak discharge-frequency relationships for each flooding source studied in detail affecting the community.

In the original study, the hydrologic analysis of Pine Run and Rapp Run was a modification of Soil Conservation Service (SCS) procedure "Kirpich Tc, Condition III", which relates basin characteristics to stream flow characteristics (References 4 and 5).

Rainfall data were calculated using the Pennsylvania State University's design procedures as prepared in August 1970 for the Department of Forests and Waters (Reference 6). These data were combined with basin characteristics such as drainage area, stream slope, vegetation, soil cover, and land use characteristics to estimate the resulting discharge values, considering a time lapse to the peak discharge calculated by empirical equations.

In this revision, a regional regression model was used to determine flood flows for Sandy Run. The methodology used for this analysis was PSU-IV (Reference 7).

Flood discharges for Wissahickon Creek were determined using a

5

HUB 00652

modification of SCS procedure "McSparran Tp, Condition III", which also relates basin characteristics to stream flow characteristics (Reference 8).

A summary of the drainage area-peak discharge relationships for the streams studied by detailed methods is shown in Table 1, "Summary of Discharges."

## TABLE 1 - SUMMARY OF DISCHARGES

| FLOODING SOURCE AND LOCATION | DRAINAGE AREA (sq. miles) | PEAK DISCHARGES (cfs) | | | |
|---|---|---|---|---|---|
| | | 10-YEAR | 50-YEAR | 100-YEAR | 500-YEAR |
| PINE RUN | | | | | |
| At corporate limits | 6.20 | 2,910 | 4,250 | 4,810 | 6,100 |
| At confluence of Rapp Run | 5.58 | 2,610 | 3,840 | 4,360 | 5,460 |
| RAPP RUN | | | | | |
| At confluence of Pine Run | 2.05 | 1,240 | 1,830 | 2,100 | 2,700 |
| At Limekiln Pike | 0.63 | 560 | 865 | 1,010 | 1,360 |
| SANDY RUN | | | | | |
| Upstream of Pine Run confluence | 5.59 | 2,690 | 4,045 | 4,865 | 6,500 |
| Downstream corporate limits of Township of Abington | 3.01 | 2,000 | 2,985 | 3,540 | 4,750 |
| WISSAHICKON CREEK | | | | | |
| Downstream corporate limits | 24.10 | 4,980 | 6,830 | 7,650 | 9,900 |
| Upstream corporate limits | 20.60 | 3,840 | 5,310 | 6,120 | 7,700 |

### 3.2  Hydraulic Analyses

Analyses of the hydraulic characteristics of flooding from the sources studied were carried out to provide estimates of the elevations of floods of the selected recurrence intervals.

Cross sections for the backwater analyses of the streams studied by detailed methods in the original study were obtained from field

6

HUB 00653

surveys, using third order leveling methods and standards of accuracy. All bridges, dams, and culverts were field surveyed to obtain elevation data and structural geometry. All survey work was done by, or under the direction of, the study contractor, or was obtained from the SCS (Reference 9).

In this revision, cross sections for Sandy Run were obtained by photogrammetry using recent aerial photography (Reference 10). The ground control for the photogrammetry was acquired using conventional surveying techniques. Bridges and culverts were field surveyed (Reference 11). Cross sections were located at close intervals above and below bridges and culverts in order to compute the significant backwater effects of these structures.

Locations of selected cross sections used in the hydraulic analyses are shown on the Flood Profiles (Exhibit 1). For stream segments for which a floodway was computed (Section 4.2), selected cross-section locations are also shown on the Flood Insurance Rate Map (Exhibit 2).

Water-surface elevations of floods of the selected recurrence intervals were computed using the COE HEC-2 step-backwater computer program (Reference 12). Flood profiles were drawn showing computed water-surface elevations for floods of the selected recurrence intervals.

Channel roughness factors (Manning's "n") used in the hydraulic computations were chosen by enginering judgment and based on field observations of the streams and floodplain areas. Roughness values for Pine Run range from 0.030 to 0.045 for the channel, and from 0.060 to 0.090 for the overbank. For Rapp Run, the channel values range from 0.030 to 0.035 and the overbank values range from 0.065 to 0.080. For Wissahickon Creek, channel values range from 0.025 to 0.040 and overbank values range from 0.048 to 0.085. In this revision, Sandy Run's values range from 0.020 to 0.040 for the channel and from 0.030 to 0.090 for the overbank (Reference 13).

Starting water-surface elevations for Pine Run and Wissahickon Creek were obtained from the Wissahickon Creek water-surface profiles developed for the Flood Insurance Study for the Township of Whitemarsh (Reference 14). Rapp Run starting water-surface elevations were obtained from the Pine Run profiles. Staring water-surface elevations for Sandy Run were determined by the slope/area method.

The hydraulic analyses for this study were based on unobstructed flow. The flood elevations shown on the profiles are thus

7

considered valid only if hydraulic structures remain unobstructed, operate properly, and do not fail.

All elevations are referenced to the National Geodetic Vertical Datum of 1929 (NGVD). Elevation reference marks used in this study, and their descriptions, are shown on the maps.

## 4.0  FLOODPLAIN MANAGEMENT APPLICATIONS

The NFIP encourages State and local governments to adopt sound floodplain management programs. Therefore, each Flood Insurance Study provides 100-year flood elevations and delineations of the 100- and 500-year floodplain boundaries and 100-year floodway to assist in developing floodplain management measures.

### 4.1  Floodplain Boundaries

To provide a national standard without regional discrimination, the 1 percent annual chance (100-year) flood has been adopted by FEMA as the base flood for floodplain management purposes. The 0.2 percent annual chance (500-year) flood is employed to indicate additional areas of flood risk in the community. For the streams studied in detail, the 100- and 500-year floodplain boundaries have been delineated using the flood elevations determined at each cross section. Between cross sections, the boundaries were interpolated using topographic maps at a scale of 1:24,000, enlarged to a scale of 1"=800', with a contour interval of 10 feet (Reference 15). In this revision, the floodplain boundaries for Sandy Run were interpolated using topographic maps at a scale of 1"=400', with a contour interval of 4 feet (Reference 10).

For the streams studied by approximate methods, the 100-year floodplain boudaries were delineated using the previous Flood Insurance Study for the Township of Upper Dublin (Reference 16).

The 100- and 500-year floodplain boundaries are shown on the Flood Insurance Rate Map (Exhibit 2). On this map, the 100-year floodplain boundaries correspond to the boundaries of the areas of special flood hazards (Zones A and AE), and the 500-year floodplain boundaries correspond to the boundaries of areas of moderate flood hazards. In cases where the 100- and 500-year floodplain boundaries are close together, only the 100-year floodplain boundaries have been shown. Small areas within the floodplain boundaries may lie above the flood elevations but cannot be shown due to limitations of the map scale and/or lack of detailed topographic data.

8

HUB 00655

For the streams studied by approximate methods, only the 100-year floodplain boundaries are shown on the Flood Insurance Rate Map (Exhibit 2).

4.2    Floodways

Encroachment on floodplains, such as structures and fill, reduces flood-carrying capacity, increases flood heights and velocities, and increases flood hazards in areas beyond the encroachment itself. One aspect of floodplain management involves balancing the economic gain from floodplain development against the resulting increase in flood hazard.  For purposes of the National Flood Insurance Program, a floodway is used as a tool to assist local communities in this aspect of floodplain management.  Under this concept, the area of the 100-year floodplain is divided into a floodway and a floodway fringe.  The floodway is the channel of a stream, plus any adjacent floodplain areas, that must be kept free of encroachment so that the 100-year flood can be carried without substantial increases in flood heights.  Minimum federal standards limit such increases to 1.0 foot, provided that hazardous velocities are not produced.  The floodways in this study are presented to local agencies as a minimum standard that can be adopted directly or that can be used as a basis for additional floodway studies.

The floodways presented in this study were computed for certain stream segments on the basis of equal conveyance reduction from each side of the floodplain.  Floodway widths were computed at cross sections.  Between cross sections, the floodway boundaries were interpolated.  The results of the floodway computations are tabulated for selected cross sections (Table 2).  The computed floodways are shown on the Flood Insurance Rate Map (Exhibit 2).  In cases where the floodway and 100-year floodplain boundaries are either close together or collinear, only the floodway boundary is shown.

The area between the floodway and 100-year floodplain boundaries is termed the floodway fringe.  The floodway fringe encompasses the portion of the floodplain that could be completely obstructed without increasing the water-surface elevation of the 100-year flood by more than 1.0 foot at any point.  Typical relationships between the floodway and the floodway fringe and their significance to floodplain development are shown in Figure 2.

Near the mouths of streams studied in detail, floodway computations are made without regard to flood elevations on the receiving water body.  Therefore, "Without Floodway" elevations presented in Table 2 for certain downstream cross sections of Rapp Run are lower than the regulatory flood elevations in that area, which must take into account the 100-year flooding due to backwater from other sources.

9

| FLOODING SOURCE | | FLOODWAY | | | WATER SURFACE ELEVATION BASE FLOOD | | |
|---|---|---|---|---|---|---|---|
| CROSS SECTION | DISTANCE | WIDTH (FT.) | SECTION AREA (SQ. FT.) | MEAN VELOCITY (F.P.S.) | WITH FLOODWAY (NGVD) | WITHOUT FLOODWAY (NGVD) | DIFFERENCE (FT.) |
| **Pine Run** | | | | | | | |
| A | 0[1] | 50[3] | 849 | 5.7 | 175.6 | 174.6 | 1.0 |
| B | 1,560[1] | 191 | 2,765 | 1.7 | 177.5 | 176.7 | 0.8 |
| C | 3,470[1] | 210 | 2,100 | 2.1 | 179.5 | 178.6 | 0.9 |
| D | 4,200[1] | 105 | 717 | 4.2 | 179.6 | 178.6 | 1.0 |
| **Rapp Run** | | | | | | | |
| A | 1,095[2] | 300 | 1,617 | 1.3 | 178.1 | 177.5[4] | 0.6 |
| B | 2,045[2] | 230 | 685 | 2.9 | 178.6 | 177.7[4] | 0.9 |
| C | 2,780[2] | 242 | 528 | 3.8 | 182.6 | 182.4 | 0.2 |
| D | 3,445[2] | 200 | 646 | 2.9 | 185.6 | 185.4 | 0.2 |
| E | 4,625[2] | 70 | 285 | 6.5 | 191.8 | 191.7 | 0.1 |
| F | 5,045[2] | 60 | 279 | 5.1 | 196.9 | 195.9 | 1.0 |
| G | 5,780[2] | 15 | 141 | 9.4 | 205.9 | 205.8 | 0.1 |
| H | 6,755[2] | 100 | 240 | 4.8 | 214.4 | 214.1 | 0.3 |
| I | 7,995[2] | 137 | 233 | 4.3 | 236.7 | 236.7 | 0.0 |
| J | 8,550[2] | 28 | 309 | 3.3 | 254.0 | 254.0 | 0.0 |
| K | 9,715[2] | 137 | 246 | 4.1 | 264.3 | 264.3 | 0.0 |
| L | 10,105[2] | 199 | 234 | 4.3 | 267.6 | 267.6 | 0.0 |
| M | 10,695[2] | 106 | 105 | 9.6 | 278.7 | 278.7 | 0.0 |

[1] FEET FROM CORPORATE LIMITS    [2] FEET ABOVE CONFLUENCE WITH PINE RUN
[3] THIS WIDTH EXTENDS BEYOND THE CORPORATE LIMIT
[4] WITHOUT CONSIDERATION OF BACKWATER EFFECTS OF PINE RUN

FEDERAL EMERGENCY MANAGEMENT AGENCY

FLOODWAY DATA

**TOWNSHIP OF UPPER DUBLIN, PA**
(MONTGOMERY CO.)

**PINE RUN AND RAPP RUN**

TABLE 2

HUB 00657

| FLOODING SOURCE | | FLOODWAY | | | BASE FLOOD WATER SURFACE ELEVATION | | | |
| CROSS SECTION | DISTANCE | WIDTH (FEET) | SECTION AREA (SQUARE FEET) | MEAN VELOCITY (FEET PER SECOND) | REGULATORY | WITHOUT FLOODWAY | WITH FLOODWAY (FEET NGVD) | INCREASE |
|---|---|---|---|---|---|---|---|---|
| Rapp Run (continued) | | | | | | | | |
| N | 11,575[1] | 173 | 122 | 8.3 | 308.4 | 308.4 | 308.4 | 0.0 |
| O | 12,315[1] | 88 | 169 | 6.0 | 331.2 | 331.2 | 331.2 | 0.0 |
| P | 13,105[1] | 96 | 214 | 4.7 | 354.4 | 354.4 | 354.4 | 0.0 |
| Sandy Run | | | | | | | | |
| A | 15,300[2] | 185 | 1,029 | 4.7 | 187.8 | 187.8 | 188.8 | 1.0 |
| B | 15,960[2] | 196 | 948 | 5.1 | 189.6 | 189.6 | 190.4 | 0.8 |
| C | 17,250[2] | 220 | 991 | 4.9 | 192.5 | 192.5 | 193.5 | 1.0 |
| D | 20,795[2] | 242 | 1,403 | 3.5 | 208.3 | 208.3 | 209.1 | 0.8 |
| E | 21,800[2] | 343 | 1,495 | 3.3 | 210.1 | 210.1 | 211.1 | 1.0 |
| F | 22,355[2] | 230 | 1,065 | 4.6 | 212.2 | 212.2 | 212.4 | 0.2 |
| G | 23,245[2] | 60 | 406 | 12.0 | 215.4 | 215.4 | 215.5 | 0.1 |
| H | 24,425[2] | 206 | 1,665 | 2.1 | 222.2 | 222.2 | 223.2 | 1.0 |
| Wissahickon Creek | | | | | | | | |
| A | 380[3] | 421 | 3,674 | 2.1 | 165.7 | 165.7 | 166.7 | 1.0 |
| B | 1,340[3] | 355 | 2,917 | 2.6 | 166.3 | 166.3 | 167.2 | 0.9 |
| C | 2,280[3] | 425 | 3,037 | 2.5 | 167.0 | 167.0 | 167.8 | 0.8 |

[1]Feet above confluence with Pine Run
[2]Feet above confluence with Wissahickon Creek
[3]Feet above corporate limits

FEDERAL EMERGENCY MANAGEMENT AGENCY

**TOWNSHIP OF UPPER DUBLIN, PA**
**(MONTGOMERY CO.)**

FLOODWAY DATA

RAPP RUN - SANDY RUN - WISSAHICKON CREEK

TABLE 2

HUB 00658

| FLOODING SOURCE | | FLOODWAY | | | WATER SURFACE ELEVATION BASE FLOOD | | |
|---|---|---|---|---|---|---|---|
| CROSS SECTION | DISTANCE[1] | WIDTH (FT.) | SECTION AREA (SQ. FT.) | MEAN VELOCITY (F.P.S.) | WITH FLOODWAY (NGVD) | WITHOUT FLOODWAY (NGVD) | DIFFERENCE (FT.) |
| Wissahickon Creek (continued) | | | | | | | |
| D | 3,270 | 336 | 1,397 | 5.6 | 168.8 | 167.9 | 0.9 |
| E | 4,230 | 300 | 1,937 | 3.8 | 172.1 | 171.6 | 0.5 |
| F | 5,210 | 240 | 1,018 | 7.2 | 174.3 | 173.6 | 0.7 |
| G | 6,330 | 226 | 1,160 | 5.7 | 179.8 | 179.8 | 0.0 |

[1]FEET ABOVE CORPORATE LIMITS

FEDERAL EMERGENCY MANAGEMENT AGENCY

**TOWNSHIP OF UPPER DUBLIN, PA**

FLOODWAY DATA

WISSAHICKON CREEK

HUB 00659

TABLE 2



**FLOODWAY SCHEMATIC** – Figure 2

## 5.0   INSURANCE APPLICATIONS

For flood insurance rating purposes, flood insurance zone designations are assigned to a community based on the results of the engineering analyses.  The zones are as follows:

Zone A

Zone A is the flood insurance rate zone that corresponds to the 100-year floodplains that are determined in the Flood Insurance Study by approximate methods.  Because detailed hydraulic analyses are not performed for such areas, no base flood elevations or depths are shown within this zone.

Zone AE

13

HUB 00660

Zone AE is the flood insurance rate zone that corresponds to the 100-year floodplains that are determined in the Flood Insurance Study by detailed methods. In most instances, whole-foot base flood elevations derived from the detailed hydraulic analyses are shown at selected intervals within this zone.

Zone AH

Zone AH is the flood insurance rate zone that corresponds to the areas of 100-year shallow flooding (usually areas of ponding) where average depths are between 1 and 3 feet. Whole-foot base flood elevations derived from the detailed hydraulic analyses are shown at selected intervals within this zone.

Zone AO

Zone AO is the flood insurance rate zone that corresponds to the areas of 100-year shallow flooding (usually sheet flow on sloping terrain) where average depths are between 1 and 3 feet. Average whole-depths derived from the detailed hydraulic analyses are shown within this zone.

Zone A99

Zone A99 is the flood insurance rate zone that corresponds to areas of the 100-year floodplain that will be protected by a Federal flood protection system where construction has reached specified statutory milestones. No base flood elevations or depths are shown within this zone.

Zone V

Zone V is the flood insurance rate zone that corresponds to the 100-year coastal floodplains that have additional hazards associated with storm waves. Because approximate hydraulic analyses are performed for such areas, no base flood elevations are shown within this zone.

Zone VE

Zone VE is the flood insurance rate zone that corresponds to the 100-year coastal floodplains that have additional hazards associated with storm waves. Whole-foot base flood elevations derived from the detailed hydraulic analyses are shown at selected intervals within this zone.

Zone X

Zone X is the flood insurance rate zone that corresponds to areas

14

HUB 00661

outside the 500-year floodplain, areas within the 500-year
floodplain, and to areas of 100-year flooding where average depths
are less than 1 foot, areas of 100-year flooding where the
contributing drainage area is less than 1 square mile, and areas
protected from the 100-year flood by levees.  No base flood
elevations or depths are shown within this zone.

Zone D

Zone D is the flood insurance rate zone that corresponds to
unstudied areas where flood hazards are undetermined, but possible.

## 6.0  FLOOD INSURANCE RATE MAP

The Flood Insurance Rate Map (FIRM) is designed for flood insurance and
floodplain management applications.

For flood insurance applications, the map designates flood insurance rate
zones as described in Section 5.0 and, in the 100-year floodplains that
were studied by detailed methods, shows selected whole-foot base flood
elevations or average depths.  Insurance agents use the zones and base
flood elevations in conjunction with information on structures and their
contents to assign premium rates for flood insurance policies.

For floodplain management applications, the map shows by tints, screens,
and symbols, the 100- and 500-year floodplains.  Floodways and the
locations of selected cross sections used in the hydraulic analyses and
floodway computations are shown where applicable.  The FIRM includes
flood hazard information that was presented separately on the Flood
Boundary and Floodway Map in the previously printed Flood Insurance Study
for the Township of Upper Dublin.

## 7.0  OTHER STUDIES

Flood Insurance Studies have been prepared for the Townships of Horsham,
Upper Moreland, Abington, Springfield, Whitemarsh, Whitpain, and Lower
Gwynedd; and the Borough of Ambler (References 17, 18, 19, 20, 14, 21,
22, and 23).

Because it is based on more up-to-date analyses, this Flood Insurance
Study supersedes the previously printed Flood Insurance Study for the
Township of Upper Dublin (Reference 16).  Please note that this Flood
Insurance Study also supersedes the Flood Boundary and Floodway Map for
the Township of Upper Dublin, which was published as part of the
previously printed Flood Insurance Study.  The information on the Flood
Boundary and Floodway Map has been added to the Flood Insurance Rate Map
accompanying this Flood Insurance Study.

A COE Flood Plain Information (FPI) report for Wissahickon Creek presents
flood water-surface profiles with associated flood discharges for the
10-, 50-, and 100-year frequency floods (Reference 24).  The discharge-

HUB 00662

frequency relationships were estimated using synthetic regionalized methods and the water-surface elevations for the selected flood frequencies were determined using a simplified step-backwater procedure, based on information available on existing contour maps. The effects of man-made obstructions on the water-surface elevations were estimated. A comparison of the water-surface profiles developed for the specific frequency floods contained herein and those contained in the FPI report reveals that irreconcilable differences exist between these studies. These differences are attributed to the difference in the selected frequency discharge values and the data and methods used in performing the hydraulic computations.

A report entitled "Watershed Plan, Pine Run Watershed", prepared in May 1975 by the Montgomery County Commissioners, Conservation District, with the assistance of the SCS and the U. S. Forest Service, presents water-surface profiles and floodplain delineations of Pine Creek and portions of Rapp Run for natural conditions and conditions which would exist after the implementation of 2 proposed floodwater retarding structures (Section 2.4) (Reference 9). The 100-year flood discharges for natural conditions adopted in this study agree, within 4 percent, with those values used in the Pine Run watershed report. Cross section data which were surveyed by the SCS were made available and used in the preparation of this study. Water surface profiles as presented in the Pine Run watershed report agree, within approximately 0.5 foot, with the information presented in this study, with the exception of the reach of Pine Run between the U. S. Route 309 bridge and the Pennsylvania Turnpike access ramp bridge. An irreconcilable difference in water-surface elevations of approximately 2.0 feet exists at the downstream limit of this reach. The difference in estimated water-surface elevations is attributed to computational differences of the bridge routines for estimating losses through structures in the separate computer programs used for each analysis. Inundation boundaries of the estimated 100-year flood as presented in the Pine Run watershed report could not be verified; therefore, existing topographic maps were used to identify the flood boundaries presented in this report (Section 4.1).

8.0   LOCATION OF DATA

Information concerning the pertinent data used in preparation of this study can be obtained by contacting FEMA, the Natural and Technological Hazards Division, Liberty Square Building (Second Floor), 105 South Seventh Street, Philadelphia, Pennsylvania  19106.

9.0   BIBLIOGRAPHY AND REFERENCES

1.   U. S. Deprtment of Commerce, Bureau of the Census, 1970 Census of Population, Number of Inhabitants, Pennsylvania, 1971.

16

HUB 00663

2.    Commonwealth of Pennsylvania, Department of Environmental Resources, "Water Resources Survey, the Schuylkill River, Pennsylvania", Water Resources Bulletin No. 4, 1968.

3.    U. S. Department of Commerce, National Oceanic and Atmospheric Administration, Environmental Data Service, Climatic Division, Monthly Averages of Temperature and Precipitation for State (Pennsylvania), 1941-1970.

4.    Ven Te Chow, ed., Handbook of Applied Hydrology, New York, McGraw-Hill, 1964.

5.    U. S. Department of the Interior, Bureau of Reclamation, Design of Small Dams, 1973.

6.    Commonwealth of Pennsylvania, Department of Forests and Waters, Design Procedures for Rainfall-Duration-Frequency in Pennsylvania, by B. M. Reich, B. M. McGinnis, and R. L. Kerr, August 1970.

7.    Commonwealth of Pennsylvania, Department of Transportation, and Federal Highway Administration, Field Manual of Procedure PSU-IV for Estimating Design Flood Peaks on Ungaged Pennsylvania Watersheds, 1981.

8.    American Society of Civil Engineers, "Design Hydrographs for Pennsylvania Watersheds, John McSparrens's Equations for Calculating Time to Peak, Tp", Journal of Hydraulics Division, pp. 937-960, July 1968.

9.    U. S. Department of Agriculture, Soil Conservation Service, Pine Run Watershed Plan, May 1975.

10.   Buchart-Horn, Inc., Aerial Photogrammetric Surveying and Mapping, York, Pennsylvania, November 1987.

11.   Buchart-Horn, Inc., Field Surveys, York, Pennsylvania, 1989.

12.   U. S. Army Corps of Engineers, Hydrologic Engineering Center, HEC-2 Water Surface Profiles, Generalized Computer Program, Davis, California, April 1984.

13.   Ven Te Chow, Open-Channel Hydraulics, New York, McGraw-Hill, 1959.

14.   Federal Emergency Management Agency, Flood Insurance Study, Township of Whitemarsh, Montgomery County, Pennsylvania, Washington, D. C., January 2, 1992.

HUB 00664

15.  U. S. Department of the Interior, Geological Survey, 7.5-Minute Series Topographic Maps, Scale 1:24,000, Contour Interval 10 Feet: Ambler, Pennsylvania, 1973; Germantown, Pennsylvania, 1973.

16.  U. S. Department of Housing and Urban Development, Federal Insurance Administration, Flood Insurance Study, Township of Upper Dublin, Montgomery County, Pennsylvania, Washington, D. C., Flood Insurance Study report dated July 1978, Flood Insurance Rate Map dated January 3, 1979.

17.  Federal Emergency Management Agency, Flood Insurance Study, Township of Horsham, Montgomery County, Washington, D. C., June 17, 1991.

18.  Federal Emergency Management Agency, Flood Insurance Study, Township of Upper Moreland, Montgomery County, Pennsylvania, Washington, D. C., September 28, 1990.

19.  Federal Emergency Management Agency, Flood Insurance Study, Township of Abington, Montgomery County, Pennsylvania, Washington, D. C., January 2, 1991.

20.  U. S. Department of Housing and Urban Development, Federal Insurance Administration, Flood Insurance Study, Township of Springfield, Montgomery County, Pennsylvania, Washington, D. C., January 2, 1976 (currently being revised).

21.  Federal Emergency Management Agency, Flood Insurance Study, Township of Whitpain, Montgomery County, Pennsylvania, Washington, D. C., February 4, 1987.

22.  U. S. Department of Housing and Urban Development, Federal Insurance Administration, Flood Insurance Study, Township of Lower Gwynedd, Montgomery County, Pennsylvania, Washington, D. C., October 14, 1977.

23.  U. S. Department of Housing and Urban Development, Federal Insurance Administration, Flood Insurance Study, Borough of Ambler, Montgomery County, Pennsylvania, Washington, D. C., November 2, 1977 (currently being revised).

24.  U. S. Army Corps of Engineers, Flood Plain Information, Wissahickon Creek, Montgomery County, Pennsylvania, 1965.

Commonwealth of Pennsylvania, Department of Environmental Resources, Water Resources Survey, "The Schuylkill River, Pennsylvania", Water Resources Bulletin No. 4, 1968.

18

HUB 00665

King, H. W., and E. F. Barter, Handbook of Hydraulics, 5th Edition, McGraw-Hill Book Company, 1963.

U. S. Department of Agriculture, Soil Conservation Service, National Engineering Method, Section 4, 1964.

U. S. Department of Agriculture, Soil Conservation Service, Soil Survey, Montgomery County, Pennsylvania, 1967.

19

HUB 00666

FEDERAL EMERGENCY MANAGEMENT AGENCY

TOWNSHIP OF UPPER DUBLIN, PA
(MONTGOMERY CO.)

FLOOD PROFILES

PINE RUN

01P

HUB 00667



FEDERAL EMERGENCY MANAGEMENT AGENCY

TOWNSHIP OF UPPER DUBLIN, PA
(MONTGOMERY CO.)

FLOOD PROFILES

RAPP RUN

02P

HUB 00668

ELEVATION IN FEET (NGVD)

SUSQUEHANNA ROAD

LEGEND

500 YEAR FLOOD
100 YEAR FLOOD
50 YEAR FLOOD
10 YEAR FLOOD
STREAM BED
CROSS SECTION
LOCATION

| FEDERAL EMERGENCY MANAGEMENT AGENCY | FLOOD PROFILES |
| TOWNSHIP OF UPPER DUBLIN, PA (MONTGOMERY CO.) | RAPP RUN |

03P

HUB 00669

ELEVATION IN FEET (NGVD)

STREAM DISTANCE IN THOUSANDS OF FEET ABOVE CONFLUENCE WITH PINE RUN

MUNDOCK ROAD SPUR

LIMEKILN ROAD DAM

JARRETTOWN ROAD

LEGEND

500 YEAR FLOOD
100 YEAR FLOOD
50 YEAR FLOOD
10 YEAR FLOOD
STREAM BED

(A) CROSS SECTION
LOCATION

| FEDERAL EMERGENCY MANAGEMENT AGENCY | FLOOD PROFILES |
|---|---|
| 04P  TOWNSHIP OF UPPER DUBLIN, PA (MONTGOMERY CO.) | RAPP RUN |

HUB 00670

FLOOD PROFILES

FEDERAL EMERGENCY MANAGEMENT AGENCY

TOWNSHIP OF UPPER DUBLIN, PA
(MONTGOMERY CO.)

RAPP RUN

05P

HUB 00671



LEGEND

500 YEAR FLOOD
100 YEAR FLOOD
50 YEAR FLOOD
10 YEAR FLOOD
STREAM BED
CROSS SECTION
LOCATION

FEDERAL EMERGENCY MANAGEMENT AGENCY

TOWNSHIP OF UPPER DUBLIN, PA
[MONTGOMERY CO.]

FLOOD PROFILES

RAPP RUN

06P

HUB 00672



FEDERAL EMERGENCY MANAGEMENT AGENCY

TOWNSHIP OF UPPER DUBLIN, PA
(MONTGOMERY CO.)

FLOOD PROFILES

RAPP RUN

07P

HUB 00673

FLOOD PROFILES

SANDY RUN

FEDERAL EMERGENCY MANAGEMENT AGENCY

TOWNSHIP OF UPPER DUBLIN, PA
[MONTGOMERY CO.]

08P

LEGEND

500 YEAR FLOOD
100 YEAR FLOOD
50 YEAR FLOOD
10 YEAR FLOOD
STREAM BED
CROSS SECTION LOCATION

HUB 00674

FEDERAL EMERGENCY MANAGEMENT AGENCY

TOWNSHIP OF UPPER DUBLIN, PA
(MONTGOMERY CO.)

FLOOD PROFILES

SANDY RUN

09P

HUB 00675

FLOOD PROFILES

WISSAHICKON CREEK

FEDERAL EMERGENCY MANAGEMENT AGENCY

TOWNSHIP OF UPPER DUBLIN, PA
(MONTGOMERY CO.)

10P

HUB 00676

# EXHIBIT G

NATIONAL FLOOD INSURANCE PROGRAM

# FIRM
## FLOOD INSURANCE RATE MAP

TOWNSHIP OF
## UPPER DUBLIN,
## PENNSYLVANIA
MONTGOMERY COUNTY

## ONLY PANEL PRINTED

COMMUNITY-PANEL NUMBER
420708 0005 B

EFFECTIVE DATE:
JANUARY 3, 1979



U.S. DEPARTMENT OF HOUSING
AND URBAN DEVELOPMENT
FEDERAL INSURANCE ADMINISTRATION

HUB 01077

## ELEVATION REFERENCE MARKS

| REFERENCE MARK | ELEVATION IN FT. (NGVD) [1] | DESCRIPTION OF LOCATION |
|---|---|---|
| RM 1* | 301.523 | Ambler, 0.4 mile northeast of; at intersection of Tennis Avenue and Susquehanna Road; 400 feet south of creek; 35 feet north of Susquehanna Road; 15 feet east of Tennis Avenue, 15 feet north and 2 feet east of hedge row; in concrete post; standard tablet stamped "24 WSM 1947 301." |
| RM 2* | 289.45 | Ambler, at intersection of Bethlehem Pike and Tennis Avenue; 20 feet north of Bethlehem Pike; 20 feet west of Tennis Avenue; in center of L-shaped head wall of concrete culvert; chiseled square. |
| RM 3* | 201.765 | Y 106. About 0.3 mile northwest along the CONRAIL from the station at Ambler, Montgomery County, at bridge 17.54, in the top of the northwest corner, and near the Ambler Building and Supply Company. A standard disk, stamped "Ambler Y 106 1935." |
| RM 4* | 214.032 | Ambler. At Ambler, Montgomery County, at the Girard Bank, at the main entrance, and in the top of the concrete door sill. A standard disk, stamped "Ambler 1935." |
| RM 5* | 173.179 | RV 4 (R.Co.). About 0.6 mile southeast along the CONRAIL from the station at Ambler, Montgomery County, about |

HUB 01078

# KEY TO MAP

500-Year Flood Boundary

100-Year Flood Boundary

ZONE

Zone Designations* With
Date of Identification
e.g., 12/2/74

100-Year Flood Boundary

500-Year Flood Boundary

Base Flood Elevation Line
With Elevation In Feet**                    513

Base Flood Elevation in Feet
Where Uniform Within Zone**               (EL 987)

Elevation Reference Mark                   RM7×

River Mile                                 •M1.5

**Referenced to the National Geodetic Vertical Datum of 1929

# *EXPLANATION OF ZONE DESIGNATIONS

| ZONE | EXPLANATION |
|------|-------------|
| A | Areas of 100-year flood, base flood elevations and flood hazard factors not determined. |
| AO | Areas of 100-year shallow flooding where depths are between one (1) and three (3) feet; average depths of inundation are shown, but no flood hazard factors are determined. |
| AH | Areas of 100-year shallow flooding where depths are between one (1) and three (3) feet; base flood elevations are shown, but no flood hazard factors are determined. |
| A1-A30 | Areas of 100-year flood; base flood elevations and flood hazard factors determined. |
| A99 | Areas of 100-year flood to be protected by flood protection system under construction; base flood elevations and flood hazard factors not determined. |
| B | Areas between limits of the 100-year flood and 500-year flood, or certain areas subject to 100-year flooding with average depths less than one (1) foot or where the contributing drainage area is less than one square mile; or areas protected by levees from the base flood. (Medium Shading) |
| C | Areas of minimal flooding. (No shading) |
| D | Areas of undetermined, but possible, flood hazards. |
| V | Areas of 100-year coastal flood with velocity (wave action); base flood elevations and flood hazard factors not determined. |
| V1-V30 | Areas of 100-year coastal flood with velocity (wave action); base flood elevations and flood hazard factors determined. |

HUB 01079



HUB 01081

This map is for use in administering the National Flood Insurance Program; it does not necessarily identify all areas subject to flooding, particularly from local drainage sources of small size, or all planimetric features outside Special Flood Hazard Areas. The community map repository should be consulted for possible updated flood hazard information prior to use of this map for property purchase or construction purposes.

Coastal base flood elevations apply only landward of 0.0 NGVD, and include the effects of wave action; these elevations may also differ significantly from those developed by the National Weather Service for hurricane evacuation planning.

Areas of special flood hazard (100-year flood) include Zones A, AE, AH, AO, A99, V, and VE.

Certain areas not in Special Flood Hazard Areas may be protected by flood control structures.

Boundaries of the floodways were computed at cross sections and interpolated between cross sections. The floodways were based on hydraulic considerations with regard to requirements of the Federal Emergency Management Agency.

Floodway widths in some areas may be too narrow to show to scale. Floodway widths are provided in the Flood Insurance Study Report.

### MAP REPOSITORY

Code Enforcement Office/Upper Dublin Township Building, 801 Loch Alsh Avenue, Fort Washington, Pennsylvania 19034 (Maps available for reference only, not for distribution)

INITIAL IDENTIFICATION:
APRIL 27, 1973

FLOOD HAZARD BOUNDARY MAP REVISIONS:
NONE

FLOOD INSURANCE RATE MAP EFFECTIVE:
JANUARY 3, 1979

FLOOD INSURANCE RATE MAP REVISIONS:
January 16, 1992 - to change base flood elevations, to add base flood elevations, to change special flood hazard areas, to change zone designations, to update map format, to reflect updated topographic information and to change floodway.

February 16, 1995 - to change base flood elevations, to add base flood elevations, to change special flood hazard areas, and to change zone designations.

To determine if flood insurance is available in this community, contact your insurance agent or call the National Flood Insurance Program at (800) 638-6620.

APPROXIMATE SCALE
800    0    800 FEET

## NATIONAL FLOOD INSURANCE PROGRAM

# FIRM
## FLOOD INSURANCE RATE MAP
## and
## STREET INDEX

TOWNSHIP OF
UPPER DUBLIN,
PENNSYLVANIA
MONTGOMERY COUNTY

ONLY PANEL PRINTED

COMMUNITY-PANEL NUMBER
420708 0005 D

MAP REVISED:
FEBRUARY 16, 1995

Federal Emergency Management Agency

HUB 00677

# LEGEND

**SPECIAL FLOOD HAZARD AREAS INUNDATED BY 100-YEAR FLOOD**

**ZONE A**   No base flood elevations determined.

**ZONE AE**   Base flood elevations determined.

**ZONE AH**   Flood depths of 1 to 3 feet (usually areas of ponding); base flood elevations determined.

**ZONE AO**   Flood depths of 1 to 3 feet (usually sheet flow on sloping terrain); average depths determined. For areas of alluvial fan flooding, velocities also determined.

**ZONE A99**   To be protected from 100-year flood by Federal flood protection system under construction; no base flood elevations determined.

**ZONE V**   Coastal flood with velocity hazard (wave action); no base flood elevations determined.

**ZONE VE**   Coastal flood with velocity hazard (wave action); base flood elevations determined.

**FLOODWAY AREAS IN ZONE AE**

**OTHER FLOOD AREAS**

**ZONE X**   Areas of 500-year flood; areas of 100-year flood with average depths of less than 1 foot or with drainage areas less than 1 square mile; and areas protected by levees from 100-year flood.

**OTHER AREAS**

**ZONE X**   Areas determined to be outside 500-year floodplain.

**ZONE D**   Areas in which flood hazards are undetermined.

**UNDEVELOPED COASTAL BARRIER(S)**

| Identified 1983 | Identified 1990 or later | Otherwise Protected Areas (identified 1991 or Later) |

*Coastal barrier areas are normally located within or adjacent to special flood hazard areas.

————————   Floodplain Boundary

— · · — · · —   Floodway Boundary

— — — —   Zone D Boundary

   Boundary Dividing Special Flood Hazard Zones, and Boundary Dividing Areas of Different Coastal Base Flood Elevations Within Special Flood Hazard Zones.

——513——   Base Flood Elevation Line; Elevation in Feet*

Ⓓ———Ⓓ   Cross Section Line

(EL 987)   Base Flood Elevation in Feet Where Uniform Within Zone*

HUB 00678



HUB 00680

# EXHIBIT H

1

1

2                    UNITED STATES DISTRICT COURT

3                 EASTERN DISTRICT OF PENNSYLVANIA

4

5     - - - - - - - - - - - - - - - - - - - - - - - - -
                                          :
6     BARRY M. PORTNOY and GERARD M.      :
      MARTIN, trustees for HUB            :
7     Properties Trust,                   :
                                          :
8              Plaintiffs,                :
                                          :
9          vs.                            :      CASE NO.
                                          :      02-CV-2905
10    OMNICARE PHARMACEUTICS, INC., and   :
      OMNICARE CLINICAL RESEARCH, INC.,   :
11                                        :
               Defendants.               :
12                                        :
      - - - - - - - - - - - - - - - - - - - - - - - - -
13

14

15         Deposition of:    JANICE M. RICE

16         Taken:            By the Plaintiffs
                             Pursuant to Agreement
17
           Date:             March 11, 2003
18
           Time:             Commencing at 10:13 a.m.
19
           Place:            Thompson Hine, LLP
20                           312 Walnut Street
                             Suite 1400
21                           Cincinnati, Ohio  45202-4029

22         Before:           Wendy L. Raymer, RPR
                             Notary Public - State of Ohio
23

24

      Ace Reporting Services (513)241-3200 / (800)277-7165

67

1    Q.    Are you sure about that?

2    A.    Yes.

3    Q.    Well, what happened in the year 2000 that

4    caused Marsh to provide that information to you regarding

5    the properties in Flood Zone A?

6    A.    Marsh advised us that the first million dollars

7    in property coverage had to be purchased through FEMA.

8    That it was no longer covered by the primary insurer.

9    Q.    Prior to that year, is it your understanding

10    that the first million dollars in property coverage as a

11    result of flood would have been covered by your primary

12    policies?

13    A.    Yes.

14    Q.    So there was some change in the insurance

15    policies that you were purchasing as of the year 2000?

16    A.    That's correct.

17    Q.    Were you provided with any information about

18    that change?

19    A.    Yes, we were.

20    Q.    What kind of information were you provided?

21    A.    We were provided with various pieces of

22    information, the first of which was a schedule that Marsh

23    provided at the 12/21/99 renewal -- for purposes of the

24    12/21/99 renewal, which identified that there would be a

Ace Reporting Services (513)241-3200 / (800)277-7165

1     Q.    What did it do?

2     A.    Marsh simply added those facilities to

3    Omnicare's policies of coverage, without identifying to

4    Omnicare that the exposure exceeded the amount of insurance

5    Omnicare had in place at the time.

6     Q.    How much flood coverage did you have in 2001 on

7    those facilities?

8     A.    In 2001, we had FEMA policies placed for each

9    of those two facilities.  And in addition to the FEMA

10   policy, a $2 1/2 million supplement on the primary policy.

11    Q.    The $2 1/2 million was, in effect, an umbrella

12   over the FEMA policies?

13    A.    All FEMA policies, correct.

14    Q.    So you had a million dollars each in FEMA

15   coverage for both properties?

16    A.    In Fort Washington, correct.

17    Q.    So there was a total of $4 1/2 million in

18   coverage that Marsh acquired for you?

19    A.    True.

20    Q.    Prior to purchasing the insurance for those

21   facilities through Marsh, is it your testimony that there

22   was less insurance coverage than there was in 2001?

23    A.    Prior to placing the coverage with Marsh,

24   that's my understanding, although I wasn't involved

1    directly in those placements.

2         Q.    Well, how did you come to that understanding?

3         A.    In preparation for this deposition.

4         Q.    Did your attorneys tell you?

5              MS. FILIATRAUT:  Objection.  You're not to

6         disclose any conversations with counsel.

7    BY MR. HABER:

8         Q.    Did you learn from a source other than your

9    attorneys?

10        A.    I don't recall.

11        Q.    When did you learn of the prior coverage

12   amounts?

13        A.    I don't remember.

14        Q.    Well, how long have you been preparing for this

15   deposition?

16        A.    Maybe three weeks.

17        Q.    So is it fair to say that you learned of the

18   coverage amounts in place prior to Marsh within the past

19   three weeks?

20        A.    I don't recall whether I was aware of the

21   coverage amounts at the time we were looking at other

22   flood-related issues or not.  I honestly don't remember.

23        Q.    I misunderstood an earlier answer then.  I

24   thought you had told me that you learned of the coverage

92

1        Q.    That's the question I --

2        A.    -- do we have a Flood Zone A sublimit?

3        Q.    That's the question I would like to have an

4    answer to as well.  What was the answer?

5        A.    No answer.  There is no -- there is no answer.

6        Q.    They didn't provide an explanation as to why

7    you only have a $2 1/2 million sublimit for Flood Zone A?

8        A.    No.  They were able to point out to me when the

9    sublimit on the Zone A flood came into existence on the

10   policy, but have not provided any explanation as to why

11   additional limits weren't offered to Omnicare, recommended

12   to Omnicare.

13       Q.    When did the $2 1/2 million limit come into

14   place?

15       A.    The $2 1/2 million sublimit was definitely on

16   the policy effective with the 12/21, 1999, 2000 policy

17   period.

18       Q.    Was that when your insurance policies renewed

19   every year, 12/21?

20       A.    That's when the property insurance policies

21   renewed each year, yes.

22       Q.    And would that also include the flood policies?

23       A.    Well, there weren't flood policies prior to

24   that renewal period.

Ace Reporting Services (513)241-3200 / (800)277-7165

1       Q.    Okay.

2       A.    Okay.  So --

3       Q.    So 12/21/99, is that when you bought your first

4    FEMA policy?

5       A.    No.  That was the first time we found out that

6    FEMA policies were required because the coverage under the

7    policy -- coverage under the primary property policy did

8    not cover the first million dollars.  That's the issue we

9    discussed a little earlier.

10      Q.    Right.  When did you buy your first FEMA policy

11   if it wasn't 12/21/99?

12      A.    It was during the spring of 2001.

13      Q.    You learned that they were required on

14   12/21/99, but you didn't buy one until 2001?

15      A.    Let me back up.  It wasn't that we learned that

16   they were required.  We understood that the primary policy

17   had a million dollar deductible which could only be filled

18   by a FEMA policy, okay.

19      Q.    You learned that in '99?

20      A.    We learned that immediately prior to the

21   renewal in 1999.

22      Q.    Okay.

23      A.    At that point in time, Marsh was unable to

24   identify for Omnicare what policy -- what properties it

Ace Reporting Services (513)241-3200 / (800)277-7165

109

1   St. Paul policies themselves.  I -- I don't -- I don't know

2   what coverages were or were not available under the St.

3   Paul policies.

4         Q.    So it's possible then you were wrong when you

5   told me earlier that you had less coverage before 2001 for

6   flood than you did during the 2001 period?

7         A.    It's possible that I have -- I don't want to

8   make any affirmative statement about my knowledge of the

9   flood coverage at these two locations prior to 2000.

10  During the 2000 year, sometime in May or April, when

11  Omnicare, Inc. assumed the insurance responsibilities for

12  the CRO, at that point I can tell you what the insurances

13  were with respect to flood at these two locations.

14        Q.    And that was the million dollar FEMA policy on

15  both properties and the $2 1/2 million above that?

16        A.    That's correct.

17        Q.    So any information prior to when those policies

18  were put into place, you're not --

19        A.    I'm not sure of.

20        Q.    You're not very comfortable about?

21        A.    I'm not very comfortable about.

22        Q.    So you gave me a number earlier, but it may not

23  be right?

24        A.    It may not be right.

# EXHIBIT I

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BARRY M. PORTNOY and | : | |
| GERARD M. MARTIN, as Trustees for | : | |
| HUB PROPERTIES TRUST | : | |
| 400 Center Street | : | |
| Newton, MA 02458, | : | Civil Action No. 02-CV-2905 |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| OMNICARE PHARMACEUTICS, INC. | : | |
| 630 Allendale Road | : | |
| King of Prussia, PA 19406 | : | |
| | : | |
| and | : | |
| | : | |
| OMNICARE CLINICAL RESEARCH, INC. | : | |
| 630 Allendale Road | : | |
| King of Prussia, PA 19406, | : | |
| | : | |
| Defendants. | : | |

## DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES

Defendants Omnicare Pharmaceutics, Inc. ("Omnicare" or "Tenant") and Omnicare

Clinical Research, Inc. ("OCR" or "Guarantor") by their attorneys, for their answer to plaintiffs'

complaint, state as follows. Each averment not explicitly admitted below is denied. Defendants'

answers correspond to the like numbered paragraphs in the complaint.

1.      Defendants admit only that plaintiffs purport to bring this action for accelerated

rent and for damages. Defendants deny that defendants have failed to fulfill any obligations due

and owing under the terms of the Lease and that plaintiffs are entitled to accelerated rent or

damages. Defendants further deny that Omnicare has advised that it intends to "abandon" the

Premises by the end of August 2002. Rather, Omnicare has advised that it intends to vacate the

Premises by the end of August 2002. It is further denied that the Lease expires in February, 2012.

2.      Denied. Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments contained in paragraph 2 of the complaint.

3.      Denied. Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments contained in paragraph 3 of the complaint.

4.      Admitted.

5.      Admitted.

6.      Admitted.

7.      Admitted.

8.      Admitted.

9.      The averments of paragraph 9 refer to the terms of a written document which speaks for itself and as to which no answer is required.

10.     The averments of paragraph 10 refer to the terms of a written document which speaks for itself and to which no answer is required. To the extent an answer is required, defendants deny that the Lease expires on February 16, 2012.

11.     The averments of paragraph 11 refer to the terms of a written document which speaks for itself and as to which no answer is required. To the extent an answer is required, defendants deny that the Lease is a "triple-net lease."

12.     The averments of paragraph 12 refer to the terms of a written document which speaks for itself and as to which no answer is required.

115304.00401/21032895v2

13.    The averments of paragraph 13 refer to the terms of a written document which speaks for itself and as to which no answer is required.

14.    The averments of paragraph 14 refer to the terms of a written document which speaks for itself and as to which no answer is required. To the extent an answer is required, defendants deny that the Lease requires Omnicare to procure and maintain flood insurance.

15.    The averments of paragraph 15 refer to the terms of a written document which speaks for itself and as to which no answer is required.

16.    The averments of paragraph 16 refer to the terms of a written document which speaks for itself and as to which no answer is required.

17.    Admitted.

18.    Admitted.

19.    Defendants admit that tropical storm Allison was the primary cause of flood damage to the Premises, but aver that the siting and condition of the Premises were additional causes of flood damage to the Premises.

20.    Defendants admit only that Landlord agreed to abate rent after the flood. Defendants deny the remaining averments of paragraph 20.

21.    The averments of paragraph 21 refer to the terms of a written document which speaks for itself and as to which no answer is required. To the extent an answer is required, defendants deny the averments of paragraph 21.

22.    Denied.

3

23.   Defendants admit only that Omnicare made repairs to the interior of the building and that Omnicare had resumed limited operations in a portion of the building. Defendants deny that Omnicare is responsible for additional repairs to the interior of the building.

24.   Defendants admit only that Omnicare had resumed limited operations in a portion of the Premises, but deny that Omnicare is responsible for the payment of rent.

25.   Defendants admit only that the Premises are not in as good a condition as that which existed immediately prior to the flood, but deny that Omnicare is responsible for completing repairs.

26.   Admitted.

27.   Denied.

28.   Denied. Omnicare has not notified HUB of its intention to "abandon" the Premises at any time; Omnicare has notified HUB of its intention to vacate the Premises no later than August 31, 2002.

29.   Admitted.

30.   The averments of paragraph 30 refer to the contents of a written document which speaks for itself and as to which no answer is required. To the extent an answer is required, defendants deny that Omnicare is in default and that Landlord has any right to accelerate Omnicare's rental obligations, including additional rent, and that Omnicare or OCR are liable to Landlord in any way.

31.   Defendants deny that Omnicare or OCR is in default, that they had any obligation to cure, that any rent is due or overdue and that they had any obligation to repair.

4

115304.00401/21032895v2

32.    Defendants deny that full accelerated rent or any amount is due and owing under the Lease.

33.    Defendants deny that they have any obligation to restore the Premises to as good a condition as it was prior to the flood.

## Count I
### Breach of Contract Landlord v. Tenant

34.    Defendants incorporate by reference thereto its responses to paragraphs 1 through 33 above as though fully set forth.

35.    Denied.

36.    Denied.

37.    Denied.

WHEREFORE, Defendant Omnicare Pharmaceutics, Inc. demands judgment in its favor and against plaintiffs as to Count I and that Count I of plaintiffs' complaint be dismissed with prejudice.

## Count II
### Landlord v. Guarantor

38.    Defendants incorporate by reference thereto responses to paragraphs 1 through 37 above as though fully set forth.

39.    Defendants admit that Guarantor received a notice of default, but deny that they are in default.

40.    Defendants deny that rent is owed by Omnicare or OCR to the Landlord.

41.    Denied.

5

115304.00401/21032895v2

42.    Denied.

43.    Denied.

WHEREFORE, Defendant Omnicare Clinical Research, Inc. demands judgment in its

favor and against plaintiffs as to Count II and that Count II of plaintiffs' complaint be dismissed

with prejudice.

### Count III
### Unjust Enrichment

44.    Defendants incorporate by reference thereto their responses to paragraphs 1

through 43 above as though fully set forth.

45.    Denied.

46.    Denied.

WHEREFORE, Defendants demand judgment in their favor and against plaintiffs as to

Count III and that Count III of plaintiffs' complaint be dismissed with prejudice.

### AFFIRMATIVE DEFENSES
### First Affirmative Defense

Plaintiffs' complaint is barred by plaintiffs' breach of the covenant of quiet enjoyment.

### Second Affirmative Defense

Plaintiffs' claims are barred by the doctrine of impossibility and/or impracticality of

performance.

### Third Affirmative Defense

Plaintiffs' claims are barred by the doctrine of frustration of purpose.

6

115304.00401/21032895v2

### Fourth Affirmative Defense

Plaintiffs' claims are barred by a breach of the covenant of good faith and fair dealing.

### Fifth Affirmative Defense

Plaintiffs' claims are barred under the doctrine of mutual mistake.

### Sixth Affirmative Defense

Defendants are not in breach of the Lease.

### Seventh Affirmative Defense

Plaintiffs' complaint fails to state a claim for which relief may be granted.

### Eighth Affirmative Defense

Plaintiffs are not entitled to accelerate additional rent.

### Ninth Affirmative Defense

Defendants' obligations under the terms of the Lease and the Guaranty are terminated.

### Tenth Affirmative Defense

Defendants' obligations under the terms of the Lease and the Guaranty are terminated due to a shortfall of insurance coverage for the Premises.

BLANK ROME COMISKY & McCAULEY LLP

Dated: 7/10/02

By: _____

Richard P. McElroy, Esquire
Attorney I.D. No. 03599
Adam M. Share, Esquire
Attorney I.D. No. 47158
Joseph Profy, Esquire
Attorney I.D. No. 77141

Attorneys for Defendants

7

<u>CERTIFICATE OF SERVICE</u>

I, Adam M. Share, hereby certify that on this __10__ day of July, 2002, I served

Defendants' Answer and Affirmative Defenses upon the following counsel by first class United

States Mail:

Paul S. Diamond, Esquire
Steven A. Haber, Esquire
Stephen W.W. Ching, Esquire
William K. Pelosi, Esquire
OBERMAYER REBMANN MAXWELL & HIPPEL LLP
One Penn Center Plaza, 19th Floor
1617 John F. Kennedy Boulevard
Philadelphia, PA 19103

_____
ADAM M. SHARE

115304.00401/21032895v2

# EXHIBIT J

1

```
 1            IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2
                              NO. 02-CV-2905
 3

 4

 5
     BARRY M. PORTNOY and GERARD ) DEPOSITION UPON
 6   M. MARTIN, as Trustees for
     HUB PROPERTIES TRUST,        ) ORAL EXAMINATION
 7
                     Plaintiffs,  )        OF
 8
                    - vs -        )    DAVID MORRA
 9
     OMNICARE PHARMACEUTICS, INC.)
10   and OMNICARE CLINICAL
     RESEARCH, INC.,              )
11
                     Defendants.  )
12   - - - - - - - - - - - - - -

13

14

15                TRANSCRIPT OF DEPOSITION,

16   taken by and before F. DAVID DAMIANI, Registered

17   Professional Reporter and Notary Public, at the LAW

18   OFFICES OF OBERMAYER, REBMANN, MAXWELL & HIPPEL,

19   LLP, 19th Floor, One Penn Center, 1617 JFK

20   Boulevard, Philadelphia, Pennsylvania, on Tuesday,

21   October 29, 2002, commencing at 10:07 a.m.

22                       - - -

23         REPORTING SERVICE ASSOCIATES (RSA)

24
```

1    provided for abatement of the rent under certain

2    conditions.

3    Q.        When did that occur?

4    A.        After the flood.

5    Q.        Pharmaceutics stopped paying rent when it

6    became apparent that the abatement clause of the

7    lease allowed it to stop paying rent?

8    A.        Yes.

9    Q.        And what were the conditions that would

10   allow for abatement?

11   A.        Well, my understanding is, certainly the

12   day after the flood the site was no longer -- the

13   facility was no longer suitable for the purpose for

14   which it was intended.  The business was completely

15   100 percent down.  There was nothing happening

16   there, except cleanup activities.

17   Q.        Is it fair to say then you stopped paying

18   rent some time in July of 2001?

19   A.        It would make sense from a timing

20   standpoint post flood, but I don't have the

21   documents to look at.

22   Q.        I don't, either.  But is it fair to say

23   after the flood you stopped paying rent?

24   A.        Yes.

1   Q.      Did there ever come a time when you

2   started to pay rent again to the landlord?

3   A.      Not to the best of my knowledge.

4   Q.      Why is that?

5   A.      The business never got up and running

6   again.  The site in our opinion was never suitable

7   for the use for which it was intended.

8   Q.      And who made the decision to stop paying

9   rent?

10  A.      Well, again, I don't know that I can name

11  a specific individual, but it came to a decision

12  point, I think looking at the contract, it became

13  pretty apparent that we had the right to terminate

14  payments, based on the fact that the site was no

15  longer available to us.  That would have been made

16  certainly in conjunction with legal counsel and

17  corporate, you know, managers in Covington,

18  Omnicare, Inc.

19  Q.      Can you name some names for me who

20  participated in that decision making process?

21  A.      I couldn't give you specifics.  I don't

22  know.  I was not -- it was not a telephone call or

23  a memo that came out.  Again, I believe based on

24  what I would know, I know that would have been made

1    take any efforts to floodproof the facility?

2    A.        We did an engineering survey to determine

3    how we might make the site less -- the building

4    actually less prone to flooding.

5                        MR. HABER:  Can you read the

6            answer back, please?

7                        (At this time, the court

8            reporter read back from the record as was

9            requested.)

10   BY MR. HABER:

11   Q.        Did you take any other action other than

12   the engineering survey to floodproof the building?

13   A.        No.

14   Q.        Prior to the flood in June of 2001, did

15   your company take any efforts to protect the

16   facility from the possibility of flood?

17   A.        No.

18   Q.        Prior to September -- prior to June of

19   2001, did Pharmaceutics or CRO have any

20   communications with the township regarding

21   requirements to maintain a building in the location

22   where it was?

23   A.        Not to my knowledge.

24   Q.        And forgive me if I asked you this before,

1   but have you restored the building to the condition

2   it was in prior to the flood, but for the equipment

3   which is no longer in there?

4   A.       No, not entirely.

5   Q.       What have you not done?

6   A.       We have not replaced, for instance, all of

7   the wall board that has been removed, so some

8   sections a wall might be half a wall because the

9   bottom half of the wall board was removed.

10           We have not put carpeting back on certain

11  parts of the floor.

12           We have not refurbished the offices or any

13  of that area.

14  Q.       For example, when the wall got wet, a

15  contractor would have come in and cut half the wall

16  board out, at least the wet part, and left the dry

17  part still on the wall?

18  A.       Yes.

19  Q.       And you haven't yet replaced the wall

20  board that had been removed?

21  A.       That's correct.  In some areas.

22  Q.       And you haven't recarpeted in certain

23  areas.

24           What other items remain to be done if the

178

1    building were to be put back in the condition it

2    was in prior to the flood?

3    A.        Just what I just mentioned.  We would have

4    to put some wall board in and floor coverings.

5    Probably those are the major -- painting and that

6    sort of thing would need to be done.

7    Q.        Do you still have employees in the

8    building?  In the 525 building?

9    A.        There's one employee, a facilities manager

10   who is there to watch over things.

11   Q.        Who is that?

12   A.        Dave MacAllister.  David MacAllister.

13   Q.        He's an employee of Pharmaceutics?

14   A.        Pharmaceutics.

15   Q.        Is he the last one?

16   A.        I believe he is.

17   Q.        How long is he going to be an employee of

18   Pharmaceutics?

19   A.        Until such time -- he's there more for

20   security reasons at this point.  He's there to

21   secure the building, and then he will be leaving.

22   Q.        Have you undertaken any efforts to restore

23   the building to the condition it was in prior to

24   entering into the lease?

179

1    A.        I don't know what condition it was prior

2    to entering into the lease.

3    Q.        Are you aware that upon termination of the

4    lease, there is a provision that would require it

5    to be returned to the landlord in the same

6    condition it was in prior to the tenant making

7    whatever changes it made?

8    A.        I'm not aware of that clause.

9    Q.        Okay.  So then not being aware of that

10   clause, is it fair to assume that no efforts are

11   being made to return the building to a condition it

12   was in prior to your use of it?

13   A.        Again, I don't know what condition it was

14   in.  How would I measure against -- I don't know

15   what condition it was before Omnicare or Bio-Pharm

16   actually moved in.  If it was gutted or if it was

17   just one big open space, so I really don't know.

18   I would tell you no further actions have been

19   taken.

20   Q.        And I assume there are no plans in place

21   now to replace the wall board that is half torn off

22   or replace the floor coverings that are no longer

23   there?

24   A.        That's correct.

184

```
 1   floor.

 2   Q.      Did you need equipment to do that?

 3   A.      Yes.

 4   Q.      Did you use the equipment that you owned

 5   prior to the flood to perform that work?

 6   A.      No.  We didn't use it.

 7   Q.      Did you buy new equipment?

 8   A.      We did.

 9   Q.      And you put the new equipment in 525 on

10   the first floor?

11   A.      Yes.

12   Q.      Was this the Virbac --

13   A.      Virbac.

14   Q.      Virbac project?

15   A.      Yes.

16   Q.      V-I-R-B-A-C?

17   A.      V-I-R-B-A-C.

18   Q.      When did you do this work for Virbac in

19   525 Virginia?

20   A.      I believe that started up again -- again,

21   it would have actually started up -- it never

22   started up prior to that.  It started up in

23   September, I believe, sometime in September of

24   2001.
```

185

1  Q.        It started in September of 2001, and when

2  did it end?

3  A.        It ended probably some time in April or

4  May of this year.

5  Q.        How many employees did you have working on

6  the Virbac manufacturing project in 525 Virginia?

7  A.        Rough guess, about 40.  Thirty to forty

8  people.

9  Q.        Did any of those employees report any

10 medical problems as a result of working in the

11 building during that time period?

12 A.        Not to my knowledge.  .

13 Q.        Is Virbac a name of a company?

14 A.        Yes, it is.

15 Q.        If we look back at DD No. 10, Virbac had

16 provided you with, or you had backlog for Virbac in

17 the amount of two point eight million dollars.

18 Would you agree with me?

19 A.        I remember that.  Yeah, I remember that.

20 Q.        Had you done some of the work for Virbac

21 prior to the flood?

22 A.        No.

23 Q.        So Virbac was a new project that you had

24 contracted for prior to the flood, but were unable

186

1    to realize any of the revenue until after the

2    flood?

3    A.      Yes.   That's correct.

4                      MR. HABER:   Let's go off the

5            record.

6                      (At this time, a discussion was

7            held off the record.)

8    BY MR. HABER:

9    Q.      So you had 30 to 40 employees in the

10   building performing a manufacturing job for Virbac

11   between September of 2001 and May of 2002?

12   A.      That's correct.

13   Q.      Did you pay any rent to the landlord for

14   your use of the building during that time period?

15   A.      We did not.

16   Q.      Is the Virbac manufacturing project

17   completed?

18   A.      It been moved to another site.

19   Q.      Okay.   So you haven't --

20   A.      It's an ongoing relationship.

21   Q.      But the two point eight million dollars in

22   backlog, have you realized all that revenue now?

23   A.      I believe we've recognized most of it.

24   Q.      Is there a reason why that work had to be

1   manufacturing.  There was some associated

2   analytical stability work.  I'm assuming it was

3   reflected in the backlog report, so that would have

4   been -- that particular would have been contingent

5   upon moving the Virbac manufacturing work and

6   getting FDA approval, also.

7   Q.      So it's possible then that the analytical

8   activities actually went beyond June of 2002?  They

9   actually might have gone as far as July?

10  A.      Well, yeah, I believe this said it assumed

11  that all studies with the exception of Virbac would

12  be transferred by the end of June, on this report.

13  (Indicating.)

14  Q.      You are referring to --

15  A.      DD-15.

16  Q.      Okay.

17  A.      Under stability, it says:  This assumes

18  that all studies with the exception of Virbac will

19  be transferred by the end of June.

20  Q.      Okay.  So after June of 2002, the Virbac

21  analytical activities remained in 525 Virginia?

22  A.      It would appear that they -- again, as

23  this indicated, went beyond the end of June,

24  possibly to mid-July.

# EXHIBIT K

1

```
 1              IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 2                              NO. 02-CV-2905

 3

 4

 5
    BARRY M. PORTNOY and GERARD ) DEPOSITION UPON
 6  M. MARTIN, as Trustees for
    HUB PROPERTIES TRUST,       ) ORAL EXAMINATION
 7
                   Plaintiffs,  )       OF
 8
               - vs -           ) RONALD L. GREENSPAN
 9
    OMNICARE PHARMACEUTICS, INC.)
10  and OMNICARE CLINICAL
    RESEARCH, INC.,             )
11
                   Defendants.  )
12  - - - - - - - - - - - - - -

13

14

15              TRANSCRIPT OF DEPOSITION,

16  taken by and before F. DAVID DAMIANI, Registered

17  Professional Reporter and Notary Public, at the LAW

18  OFFICES OF OBERMAYER, REBMANN, MAXWELL & HIPPEL,

19  LLP, 19th Floor, One Penn Center, 1617 JFK

20  Boulevard, Philadelphia, Pennsylvania, on

21  Wednesday, October 30, 2002, commencing at 10:04

22  a.m.

23                  - - -

24      REPORTING SERVICE ASSOCIATES (RSA)
```

68

1   A.      Right.

2   Q.      Did Ken know that?

3   A.      I assume he knew that, yes.

4   Q.      Do you know when Pharmaceutics last paid

5  rent to the landlord for the 525 Virginia property?

6   A.      June of 2001.

7   Q.      Has Pharmaceutics made any payment for

8  rent to the landlord since that time?

9   A.      No.

10  Q.      Why not?

11  A.      Well, initially after the flood, we looked

12  at the lease, and had determined that we could stop

13  making payments under the circumstances.  We

14  communicated that, and I think everybody concurred

15  that that was appropriate.  The lease payments

16  stopped.

17  Q.      Are you familiar with the term abatement?

18  A.      Yes.

19  Q.      What does that mean to you?

20  A.      Under certain circumstances you can stop

21  paying rent.

22  Q.      And is it your belief that immediately

23  after the flood there was an abatement period that

24  would allow the Pharmaceutics company not to pay

71

1    restore the premises to at least as good a

2    condition as that which existed immediately prior

3    to such fire or other casualty, and during such

4    repair period, there shall be an abatement of rent.

5            There's another sentence which I'm not

6    going to read right now.  That's the language that

7    you relied upon for the rent abatement?

8    A.        I believe so.

9    Q.        Now, did the Pharmaceutics company repair

10   or restore the premises to at least as good a

11   condition as to that which existed immediately

12   prior to the flood?

13   A.        No.

14   Q.        Why not?

15   A.        Because we were trying to determine what

16   was the appropriate level to improve the building

17   after the flood.

18   Q.        And did you eventually come to some

19   conclusion?

20   A.        Yeah.  We eventually decided not to make

21   the improvements, the improvements necessary to get

22   it back to the level it was prior to the flood.

23                    MR. SHARE:  You have to keep

24            your voice up.

74

1           But I have a question pending that I'd

2           like to have answered.

3                   THE WITNESS:  Could he repeat

4           the question?

5                   MR. HABER:  Absolutely.

6                   (At this time, the court

7           reporter read back from the record as was

8           requested.)

9                   MR. SHARE:  I object to the

10          question.  I'm going to let you answer it

11          if you can.  Read it back again.

12                  (At this time, the court

13          reporter read back from the record as was

14          requested.)

15                  THE WITNESS:  I guess when the

16          building becomes functional back to the

17          level that it was before.

18  BY MR. HABER:

19  Q.      You would agree with me that you continued

20  operations in the building after the flood, right?

21  A.      Some operations, yes.

22  Q.      I understand, from what I heard from you

23  and Dave Morra, that the operations were

24  significantly reduced from the operations -- from

75

1    the level of operations prior to the flood,

2    right?

3    A.        Yes.

4    Q.        But you did actually do some business in

5    the building after the flood, right?

6    A.        Yes.

7    Q.        In fact, you had some 20 to 40 employees

8    working on the Virbac project for a period of six

9    months after the flood, right?

10    A.        I don't know the exact numbers, but they

11    were working on that project.

12    Q.        You were making money out of the work that

13    you were performing in our building, right?

14    A.        Well, I wouldn't say we were making money.

15    We generated revenue, yes.

16    Q.        Were you generating revenue out of work

17    performed in the 525 Virginia Drive building

18    subsequent to the flood?

19    A.        Yes.

20    Q.        And, in fact, you generated in excess of a

21    million dollars in revenue during that time period,

22    right?

23    A.        Yes.

24    Q.        You paid no rent for your use of the

1   building at all during that time period, right?

2   A.      Right.

3   Q.      Have you sought to turn over the keys and

4   tender the control of the building back to the

5   landlord?

6               MR. SHARE:  Same objection as

7               before, but I'll let you answer the

8               question, if you can.

9               THE WITNESS:  I'm sorry.  Would

10              you repeat the question?

11              (At this time, the court

12              reporter read back from the record as was

13              requested.)

14              THE WITNESS:  That's the intent

15              as I understand it, yes.

16  BY MR. HABER:

17  Q.      Has that happened yet?

18  A.      No.

19  Q.      You plan on doing that at some time in the

20  future?

21  A.      Yes.

22  Q.      Do you know when?

23  A.      Once the equipment is removed from the

24  building.

# EXHIBIT L



Phone:      (215) 569-5631
Fax:        (215) 832-5631
Email:      mcelroy@blankrome.com

January 22, 2003

Paul Diamond, Esquire
Obermayer Rebmann Maxwell & Hippel, LLP
One Penn Center
1617 John F. Kennedy Boulevard
Suite 1620
Philadelphia, PA  19107

         Re:    525 Virginia Drive, Fort Washington, Upper Dublin
                Montgomery County, PA

Dear Paul:

      This will update you on the status of the property.

      As we told you, we have engaged the brokerage firm of Rubenstein Brokerage Group, Inc. in an attempt to assess what interest there may be in renting the property. Unfortunately, there has been very little interest shown so far.

      Meanwhile, our client has vacated the property completely and is in the process of removing some of the remaining trade fixtures, equipment and other items which were installed at the start of the lease. We anticipate that as of the end of this month, all of those items will have been removed. In light of that, it is now appropriate for your client to take control of the property and to maintain it, including heating, utility service, insurance, and security, as well as any other items that it deems necessary.

      Our client is prepared to turn over the property to your client's representative at your convenience, but we would request that access be kept available to the real estate agents and any prospective tenants.

One Logan Square  18th & Cherry Streets  Philadelphia, PA 19103-6998
www.BlankRome.com

Delaware   •   Florida   •   Maryland   •   New Jersey   •   New York   •   Ohio   •   Pennsylvania   •   Washington, DC

115304.00401/11181443v1



Obermayer Rebmann Maxwell & Hippel, LLP
January 22, 2003
Page 2

      Please call us after you have had a chance to discuss this with your clients so that we can arrange to implement this.

                              Very truly yours,

                              Richard P. McElroy

# EXHIBIT M

## SCHNADER HARRISON
## SEGAL & LEWIS LLP

ATTORNEYS AT LAW

SUITE 3600 ▪ 1600 MARKET STREET ▪ PHILADELPHIA, PENNSYLVANIA 19103-7286

215-751-2000 ▪ FAX: 215-751-2205

http://www.schnader.com

March 12, 2002

William J. Maffucci
Direct Dial 215-751-2210
Internet Address: wjmaffucci@schnader.com

**VIA FAX AND**
**VIA CERTIFIED MAIL**
**(Return Receipt Requested)**

Mr. David Morra
Chief Executive Officer
OmniCare Clinical Research, Inc.
630 Allendale Road
King of Prussia, Pennsylvania 19406
(Fax No. 484-679-2410)
(7000 0600 0023 7955 2817)

Kenneth Feld, Ph.D., President
OmniCare Pharmaceutics, Inc.
525 Virginia Drive
Fort Washington, Pennsylvania 19034
(Fax No. 484-679-2410)
(7000 0600 0023 7955 2800)

## SUPPLEMENTAL NOTICE OF DEFAULT;
## NOTICE OF ACCELERATION

Re:   Lease ("Lease") dated December 3, 1996, by OmniCare Pharmaceutics, Inc. ("Tenant"), Formerly Known as Bio-Pharm Pharmaceutics Services, Inc., of Commercial Real Estate ("Leased Property") Owned by HUB Properties Trust ("Landlord") and Located at and Known as 525 Virginia Drive, Fort Washington (Upper Dublin Township), Pennsylvania; Guaranty and Suretyship Agreement (the "Guaranty") dated December 3, 1996, by I.B.A.H., Inc (a/k/a IBAH, Inc.), Now Known as OmniCare Clinical Research, Inc. ("Guarantor"), for the Benefit of Landlord, with Regard to Tenant's Obligations Under the Lease

Gentlemen:

We represent the Landlord in connection with the above-referenced matter.

Under Lease §§ 12.01(d) & 12.01(f), Tenant is in default of its obligations of the Lease because (i) Tenant has failed to comply with its obligations under Lease §§ 4.02, 8.01, 10.02(a), and 10.02(c) to maintain the Leased Property in good working order and condition and to take prompt and diligent action to restore the Leased Property after the damage caused by flood conditions in June 2001, and (ii) Tenant has failed to pay all rent that has come due since October 1, 2001, that being the date by which, as determined by Landlord (and as Landlord so advised Tenant by letter dated September 26, 2001), Tenant's compliance with the aforesaid obligations would have restored the Leased Property to its condition before the flood.


Mr. David Morra
Dr. Kenneth Feld
March 12, 2002
Page 2

Tenant's obligation to resume rental payments following the period of time reasonably required to restore the Leased Property would have been clear even if Tenant had elected not to resume occupancy of the Leased Premises. Landlord has recently confirmed however, that — contrary to Tenant's representations that it cannot use the Leased Property and that it intends to abandon it permanently (an abandonment that Landlord has never and does not now accept) — Tenant has actually and continuously occupied substantial portions of the Property throughout much or most of the post-flood period.

In light of the above, Landlord hereby exercises its right under Lease § 12.02 to accelerate Tenant's rental obligations, such that all rent scheduled to come due under the Lease is now immediately due and payable. Attached hereto is Landlord's calculation of the "Accelerated Rent," as contemplated by Lease § 12.02(a): $8,333,267, to be discounted to present value on the basis of a discount rate "equal to the prime rate offered by CoreStates Bank, N.A., applied and calculated on the date of receipt by Landlord . . . ."

The attachment hereto also includes projections for other amounts, totaling $4,658,016, for which Tenant is responsible as "Additional Rent" through the end of the lease term. Landlord demands payment thereof and reserves its rights with regard thereto.

Demand is hereby made under the Lease and Guaranty for immediate payment by Tenant and/or by Guarantor of the full Accelerated Rent. If Landlord does not actually receive that payment in full within ten (10) days from the date of this notice, Landlord shall have the right to exercise any, some, or all of its remedies under the Lease and the Guaranty, immediately and without further notice (except such notice, if any, required by law).

Landlord's letter of February 12, 2002, is hereby superseded as to the amount required by Landlord to release Tenant of its obligations under the Lease. Nothing less than payment in full of the Accelerated Rent, calculated as aforesaid, will release Tenant of its obligations under the Lease. Moreover, Landlord accepts no obligation to mitigate Landlord's

**SCHNADER HARRISON
SEGAL & LEWIS LLP**

Mr. David Morra
Dr. Kenneth Feld
March 12, 2002
Page 3


damages in any way. By way of illustration and not by way of limitation, Landlord assumes no obligation to attempt to find a new tenant or tenants for the Leased Property or for any portion of it.


Sincerely,

William J. Maffucci

For SCHNADER HARRISON SEGAL & LEWIS LLP

cc: Harris Ominsky, Esq.
    (via fax and certified mail (return receipt requested))
    *Blank Rome Comisky & McCauley, LLP*
    *One Logan Square*
    *Philadelphia, Pennsylvania 19103-6998*
    *(Fax No. 215-832-5668)*
    *(7000 0600 0023 7955 2794)*
Addressee at alternate address:
    *(via certified mail (return receipt requested))*
    *425 Delaware Drive*
    *Fort Washington, Pennsylvania 19034-2703*
    *(Z 367 121 478))*
Linda Ann Galante, Esquire
    *(via certified mail (return receipt requested))*
    *Stradley Ronan Stevens & Young, LLP*
    *30 Valley Stream Parkway*
    *Malvern, PA 19355*
    *(P 582 150 433)*
John A. Mannix
David J. Campoli

| Period | Monthly Rental Income | Annual Rent Per SF | Total Rent for Period | Total Obligation |
|---|---|---|---|---|
| October 1, 2001 - Feb. 28, 2003 | 72,333 | 7.00 | 1,229,667 | |
| March 1, 2003 - Feb 16, 2012 | 77,500 | 7.50 | 8,333,267 | |
| *Total Rent over remaining term* | | | | 9,562,934 |

Management Fee paid to Landlord per the Lease:

| Period | Monthly Mgt Fee Income | Annual Mgt Fee Inc. Per SF | Total MF Inc. for Period | |
|---|---|---|---|---|
| October 1, 2001 - Feb. 16, 2012 | 400 | 0.04 | 49,810 | |
| *Total Mgt Fee Income over remaining term* | | | | 49,810 |

Operating Expenses & Taxes (Tenant Responsible):

| Period | | Annual Estimated Per SF | Total Opex & Tax Exp. for Period | |
|---|---|---|---|---|
| *$2.00 Fixed Operating & $1.07 Taxes (3% annual inflation rate)* | | | | |
| Oct. 1 - December 31 | 2001 | 3.07 | 95,170 | |
| Jan.1 - December 31 | 2002 | 3.16 | 392,100 | |
| " " | 2003 | 3.26 | 403,863 | |
| " " | 2004 | 3.35 | 415,979 | |
| " " | 2005 | 3.46 | 428,459 | |
| " " | 2006 | 3.56 | 441,312 | |
| " " | 2007 | 3.67 | 454,552 | |
| " " | 2008 | 3.78 | 468,188 | |
| " " | 2009 | 3.89 | 482,234 | |
| " " | 2010 | 4.01 | 496,701 | |
| " " | 2011 | 4.13 | 511,602 | |
| Jan. 1 - February 16 | 2012 | 4.25 | 67,854 | |
| *Total Estimated Operating & Taxes over remaining term* | | | | 4,658,016 |

Total Remaining Lease Value                                            14,270,760

Discounted Total Remaining Lease Value