**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **BARRY M. PORTNOY and** | : | |
| **GERARD M. MARTIN, as Trustees for** | : | |
| **HUB PROPERTIES TRUST** | : | |
| **Plaintiffs,** | : | **NO. 02-CV-2905** |
| | : | |
| **v.** | : | **HONORABLE CLIFFORD** |
| | : | **SCOTT GREEN** |
| **OMNICARE PHARMACEUTICS, INC.** | : | |
| **and** | : | |
| **OMNICARE CLINICAL RESEARCH, INC. ,** | : | |
| **Defendants.** | : | |
| | : | |

### O R D E R

AND NOW, this _____ day of _____, 2003, upon consideration of the Plaintiffs' response to Defendants' Motion for Summary Judgment, it is hereby ORDERED:

1.      Defendants' Motion for Summary Judgment is DENIED;

2.      Plaintiffs' Motion for Summary Judgment is GRANTED;

3.      Judgment is ENTERED in Plaintiffs' favor and against Defendants, Omnicare Pharmaceutics, Inc. and Omnicare Clinical Research, Inc., as to the Defendants' liability under the Lease and Lease Guaranty; and

4.      Within 14 days of the date of this Order, the parties shall provide the Court with those materials necessary to determine the amount of damages to which Plaintiffs are entitled.

**BY THE COURT:**


_____
**THE HONORABLE CLIFFORD SCOTT GREEN**
**UNITED STATES DISTRICT JUDGE**

488439

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **BARRY M. PORTNOY and** | : | |
| **GERARD M. MARTIN, as Trustees for** | : | |
| **HUB PROPERTIES TRUST** | : | |
| **Plaintiffs,** | : | **NO. 02-CV-2905** |
| | : | |
| **v.** | : | **HONORABLE CLIFFORD** |
| | : | **SCOTT GREEN** |
| **OMNICARE PHARMACEUTICS, INC.** | : | |
| **and** | : | |
| **OMNICARE CLINICAL RESEARCH, INC. ,** | : | |
| **Defendants.** | : | |
| | : | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiffs Barry M. Portnoy and Gerard M. Martin as Trustees for HUB Properties Trust (collectively "HUB"), by and through their attorneys, Obermayer Rebmann Maxwell & Hippel LLP, hereby file their Memorandum of Law in opposition to the Motion for Summary Judgment of Defendants Omnicare Pharmaceutics, Inc.("OPI") and Omnicare Clinical Research, Inc. ("OCR") (collectively "Omnicare").

**INTRODUCTORY STATEMENT**

As HUB predicted, to create confusion, Omnicare has submitted its opposition to HUB's Summary Judgment Motion in the guise of an affirmative motion for Summary Judgment. As HUB also predicted, Omnicare has deluged the Court with a mass of factual irrelevancies to create factual disputes where none exist. Regardless of the form of Omnicare's submissions or the bulk of its exhibits, the most important facts remain undisputed: Omnicare is a sophisticated commercial tenant, that refuses to pay rent for property it has occupied and used, even though the controlling 15-year Lease and the law require such payment. It is also undisputed that Omnicare

488439

knew the Property was located in a Federal flood zone, that the Lease allocates the risk of flood loss between the parties, and that Omnicare purchased flood insurance to help alleviate that risk.

Accordingly, as set forth in HUB's own Summary Judgment Motion, this Court need look no further than the four corners of the Lease for conclusive evidence that the parties anticipated the possibility of a casualty, such as flood, and agreed to a protocol for responsibility for restoration of the Property and continuation of the tenancy in the event of a flood.  In these circumstances, the doctrines of impossibility, frustration, and mutual mistake necessarily fail. The Record before this Court not only precludes Defendants' motion for summary judgment, it compels summary judgment in HUB's favor.

## FACTUAL AND PROCEDURAL BACKGROUND

HUB incorporates by reference the uncontested facts set forth in its Memorandum of Law in support of its own Summary Judgment Motion.  To the extent that it relies on additional facts in opposing Omnicare's Summary Judgment Motion, HUB sets forth those facts in the arguments below.

## ARGUMENT

This Court should deny Omnicare's summary judgment motion because even if Omnicare's factual allegations are undisputed (which they are not), the law and the controlling Lease bar Omnicare's legal defenses.   The provisions of the Lease, requiring Omnicare to continue paying rent and otherwise perform under the Lease in the event of a casualty, bar Omnicare's defenses of commercial impossibility and frustration.  Similarly, the allocation of risk of casualty loss in the Lease negates any possible defense of mutual mistake.

**I.    THE LEASE IS THE BEST EVIDENCE THAT THE PARTIES FORESAW THE RISK OF FLOOD AND ALLOCATED THE RISK ACCORDINGLY**

All of Omnicare's legal defenses are premised on the contention that the Lease is void because the parties never contemplated the occurrence of a casualty such as flood. The Lease's explicit language proves just the opposite. Under the Lease, Omnicare agreed to continue to meet its contractual obligations in the event of a casualty, and to repair, restore, and reconstruct the interior of the Property "with reasonable promptness." (Lease, reproduced in the accompanying Appendix at Exhibit "A," §10.02). The Lease obligates the landlord to repair the exterior of the Property, and to abate rent during the reasonable time needed to repair the Property. (Id.).

As significant, the Lease contemplates and allocates among the parties the risk of damage from casualties such as flood. First, Omnicare is responsible under the Lease for insuring the Property from damage due to casualties such as flood. (Id., § 10.01). Accordingly, upon assuming the Lease in 2000, Omnicare maintained flood insurance, and, in fact, purchased additional flood insurance from FEMA in the Spring of 2001 before the Flood. (March 11, 2003 Deposition of Janice Rice, Omnicare's risk management representative, the pertinent pages of which are reproduced in the accompanying Appendix at Exhibit "B," pp. 76:2-19, 92:13-95:12, 109:7-16).

These undisputed facts bar Omnicare's defenses of impossibility, frustration, and mutual mistake. In Pennsylvania, these defenses "are to be applied sparingly" and only in "exceptional circumstances." Dorn v. Stanhope Steel, Inc., 368 Pa. Super. 557, 586, 534 A.2d 798, 812 (1987); Spatz v. Nascone, 283 Pa. Super. 517, 531, 424 A.2d 929, 936 (1981). "Otherwise, every agreement that becomes disadvantageous to a party. . . would entitle that party to be excused from performing under the agreement." Dorn, 368 Pa. Super. at 558, 534 A.2d at 813. These doctrines will not excuse a party's non-performance where the party had expressly or

impliedly agreed to perform in spite of the alleged impracticability or impossibility or the risk of mistake. Albert M. Greenfield & Co. v. Kolea, 475 Pa. 351, 357, 380 A.2d 758, 760-61 (1977) (impossibility and frustration doctrines); Aluminum Co. of America v. Essex Group, Inc., 499 F.Supp. 53, 67 (W.D.Pa. 1980) (mutual mistake doctrine). Accord United States v. Winstar Corp., 518 U.S. 839, 907-908 (1996) (rejecting an impossibility defense based on a regulatory change where the contract allocated the risk of its occurrence); Seaboard Lumber Co. v. United States, 308 F.3d 1283, 1295 (Fed. Cir. 2002) (rejecting impossibility/ impracticability and frustration defenses where the "language or the circumstances indicate allocation of the risk to the party seeking discharge"); Loyal Christian Ben. Ass'n v. Bender, 342 Pa. Super. 614, 618, 493 A.2d 760, 763 (1985) (mistake "must not be one as to which the injured party bears the risk").

With regard to the doctrine of commercial impossibility and frustration, Pennsylvania has adopted § 261 of the Restatement (Second) of Contract, which provides:

> Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, *unless the language [of the contract] or the circumstances indicate to the contrary.*

Olbum v Old Home Manor, Inc., 313 Pa. Super. 99, 111, 459 A2d 757, 763 (1983) (defense of impracticability is available only "[i]n the absence of special language or circumstances indicating the a party has assumed the risk"). See Luber v. Luber, 418 Pa. Super. 542, 548-49, 614 A.2d 771, 774 (1992), *appeal denied*, 631 A.2d 1008 (Pa. 1993) (citing §261 of the Restatement (Second) of Contracts).

Further, with regard to the mutual mistake doctrine, Pennsylvania has adopted § 152 of

the Restatement (Second) of Contracts, which provides:

> Where a mistake of both parties at the time a contract was made as
> to the basic assumption on which the contract was made has a
> material effect on the agreed exchange of performances, the
> contract is voidable by the adversely affected party unless he bears
> the risk of the mistake under the rule stated in section 154.

Spatz, 283 Pa. Super. at 531, 424 A.2d at 936 (referring to earlier version of §152); Wheelabrator

Frackville Energy Co v. Morea Culm Services, Inc., Civil Action No. 90-2962, 1990 U.S. Dist.

LEXIS 7192, *74 (E.D.Pa. June 12, 1990) (Honorable Daniel H. Huyett, 3rd).  Pennsylvania has

also adopted § 154 of the Restatement (Second) of Contracts, which provides:

> A party bears the risk of a mistake when (a) the risk is allocated to
> him by agreement of the parties, or (b) he is aware, at the time of
> the contract is made, that he has only limited knowledge with
> respect to the facts to which the mistakes related but treats his
> limited knowledge as sufficient, or (c) the risk is allocated to him
> by the court on the ground that it is reasonable in the circumstances
> to do so.

Restatement (Second) of Contracts, § 154.

Accordingly, courts in Pennsylvania and elsewhere have repeatedly rejected

impossibility, frustration, and mutual mistake claims where there were risk assignment or

allocation provisions in the parties' contracts.  See e.g., Wheelabrator Franckville Energy Co.,

1990 U.S. Dist. LEXIS at *73 (impracticability defense rejected because of risk assumption

provisions in contract); General Electric Capital Corp. v. Charleston, 1989 U.S. Dist. 6521, *8-

*9 (E.D.Pa. June 12, 1989) (Honorable Clarence C. Newcomer); F.J. Busse, Inc. v. Department

of General Services 47 Pa. Commw. 539, 544, 408 A.2d 578, 580-81 (1979) (rejecting

impracticability defense in connection with flood damage because of risk allocation clause in

contract); see Butler Manufacturing Co. v. Americold Corp., 850 F.Supp. 952, 956-58 (D. Kan.

1994) (rejecting impracticability and frustration defenses due to provisions in lease dealing "with parties' respective obligations in the event the premises become untenable as a result of fire or other casualty"); Barnes v. Ford Motor Co., 95 N.C. App. 367, 371-72, 382 S.E.2d 842, 844-45 (N.C. Ct. App. 1989) (same).

As shown above, Omnicare explicitly agreed to perform in the event of a flood or other casualty. (Lease, Exhibit A, §10.02). Indeed, the Lease specifically provides for a temporary abatement period while the Property is being restored. Upon completion of the restoration work, the abatement period end, and the obligation to pay rent resumes. (Id., §10.02).

Further, Omnicare was responsible under the Lease for procuring and maintaining casualty insurance, and had, in fact, maintained flood insurance. (Id., §10.01) ("Tenant, at Tenant's sole cost …shall keep…the Premises to be kept continuously insured… such casualty policy shall name Landlord as the loss payee"); Rice Deposition, Exhibit B, pp. 76:2-19, 92:13-95:12, 109:7-16).

Not surprisingly, none of the cases cited in Omnicare's summary judgment motion involve leases containing the type of risk allocation and insurance provisions present here, and thus, unlike the Lease here, did not require the tenant to perform in the event of a casualty such as flood. Indeed, there is no reference at all to these critical Lease provisions in Omnicare's summary judgment motion.

Therefore, the plain language of the Lease bars Defendants' claims of impossibility, frustration, and mutual mistake as a matter of law. Accordingly, this Court should deny Omnicare's summary judgment motion and should enter judgment in HUB's favor.

## II.    OMNICARE'S IMPOSSIBILITY, FRUSTRATION, AND MUTUAL MISTAKE DEFENSES ARE BARRED AS A RESULT OF ITS KNOWLEDGE OF THE RISK OF FLOOD

It is well-settled that the doctrines of impossibility, frustration, and mutual mistake are not applicable where the risk of the event upon which the party seeking to excuse non-performance could have been foreseen and guarded against in the party's contract. United States v. Winstar Corp., 518 U.S. 839, 907 (U.S. 1996); Fast, Inc. v. Shaner, 183 F.2d 504, 506 (3d Cir. 1950); Shepard-Patterson & Assocs. v. Shepard, No. 95-CV-3669, 1996 U.S. Dist. LEXIS 5327, *2-*3 (E.D.Pa. April 19, 1996) (Honorable James McGirth Kelly) (citing Luber, 418 Pa. Super. at 548-49, 614 A.2d at 774; Wheelabrator Frackville Energy Co., 1990 U.S. Dist. LEXIS at *82 (mutual mistake). See Bank of N.Y. v. Tri Polyta Fin. B.V., No. 01 Civ. 9104, 2003 U.S. Dist. LEXIS 6981, *12 (S.D.N.Y. April 28, 2003) (impossibility); Butler Mfg. Co., 850 F. Supp. at 957 (frustration); Iodice v. Bradco Cleaners, Inc., 1993 Mass. App. Div. 54, 58 (Mass. App. Div. 1993); McNamara Constr. of Manitoba, Ltd. v. United States, 206 Ct. Cl. 1, 5-6 (U.S. Ct. Cl., 1975) (mutual mistake).

In the case at bar, Omnicare not only foresaw the risk of flooding, it took measures to protect itself from the risk. As Omnicare states in its motion papers, as early as 1992 (almost five years before Omnicare's predecessor first leased the Property on December 3, 1996), publicly available flood records indicated that the Property was located in a flood hazard zone, and that the Fort Washington Industrial Park, where the Property is located, has had a "long history of flooding." (Omnicare Brief, pp. 5-6; see February 11, 2003 Deposition of Upper Dublin Township Manager Paul Leonard, the pertinent pages of which are reproduced in the accompanying Appendix at Exhibit "C," pp. 18:3-19:18, 118:1-119:10). Indeed, OPI's Chief Executive Officer, David Morra, admitted that its employees "were all aware that [the Property was in] an area prone to flooding because of

previous history." (March 4, 2003 Deposition of David Morra, the pertinent pages of which are reproduced in

the accompanying Appendix at Exhibit "D," pp. 37:22-23; <u>see</u> October 29, 2002 Deposition of Omnicare

Corporate Designee David Morra, the pertinent pages of which are reproduced in  the accompanying Appendix

at Exhibit "E," p. 45:3-17; October 30, 2002 Deposition of Omnicare Corporate Designee, Ronald Greenspan, the

pertinent pages of which are reproduced in  the accompanying Appendix at Exhibit "F," p. 43:6-13; Morra

Deposition, Exhibit D, pp. 38:6-11; March 3, 2003 Deposition of OPI President, Kenneth Feld, the pertinent pages

of which are reproduced in  the accompanying Appendix at Exhibit "G," pp. 27:2-32:14; April 22, 2003

Deposition of OPI Controller, James McDevitt, the pertinent pages of which are reproduced in  the accompanying

Appendix at Exhibit "H" p. 35:5-15).  In fact, Omnicare's other pharmaceutical facility located "a

stone's throw" from the Property suffered considerable flood damage in 1999.  (Morra Deposition,

Exhibit E, p. 26:20-21; November 20, 2002 Deposition of OPI Head of Project Management, Steve Purdy, the

pertinent pages of which are reproduced in  the accompanying Appendix at Exhibit "I," pp. 34:9-13, 36:2-10;

November 11, 2002 Deposition of OPI's Head of Quality Assurance Department, Christopher Cichon, the

pertinent pages of which are reproduced in  the accompanying Appendix at Exhibit "J," pp. 58:1-59:6).

Further, Omnicare (and its predecessor IBAH) took measures to protect itself from flood

risk.  In accordance with §10.01 of the Lease, requiring the tenant to maintain casualty insurance,

upon occupying the Property in April 1997, IBAH purchased flood insurance for the Property.

<u>See</u> flood coverage page from IBAH's insurance policy effective April 1997, reproduced in  the accompanying

Appendix at Exhibit "K."   Upon assuming the Lease from IBAH in 2000, Omnicare maintained

flood insurance, and, in fact, purchased additional flood insurance from FEMA in the Spring of

2001 before the Flood.  (Rice Deposition, Exhibit B, pp. 76:2-19, 92:13-95:2, 109:7-16; <u>see</u> Morra Deposition,

Exhibit E, p. 47:1-9).

Further, at the time of the flood, Omnicare had in place a Business Recovery Plan that "detailed what would be done in the event of a catastrophe, such as a fire, a flood." (Purdy Deposition, Exhibit I, p. 56:4-8). Thus, there is no question that Omnicare (as well as its predecessor IBAH) foresaw, knew of, and accepted the risk of flooding at the Property.

Consistent with caselaw cited above, Omnicare's impossibility, frustration, and mutual mistake defenses therefore fail as a matter of law. Accordingly, this Court should deny Omnicare's summary judgment motion and enter summary judgment in HUB's favor.

## III.    OMNICARE'S ADMITTED FAILURE TO PURCHASE ADEQUATE FLOOD INSURANCE BARS ITS IMPOSSIBILITY AND FRUSTRATION DEFENSES

It is well settled that the doctrines of impossibility and frustration do not apply when the party who seeks to take advantage of the doctrines contributed to the impossibility or frustration. Pan American Realty Trust v. Twenty One Kings, Inc., 408 F.2d 937, 939 (3d. Cir. 1969) (citing Restatement (Second) of Contracts, §§ 458-461); General Electric Capital Corp., 1989 U.S. Dist. LEXIS at *9 ("the defense of frustration can only be invoked if the frustration is without the fault of the party who seeks to take advantage of the rule "); Dorn, 368 Pa. Super. at 588, 534 A.2d at 813-14; Aluminum Co. of America, 499 F. Supp. at 73 (citing Restatement (Second) of Contracts §§ 281, 285) ("the frustration or impracticability must not be the fault of the party who seeks relief").

In the case at bar, Omnicare, by its admission, contributed to its "inability" to resume operations at the Property. Omnicare admitted that its corporate parent, Omnicare, Inc., failed to procure adequate flood insurance, and that "[t]he insurance proceeds were critical to the decision process in terms of whether to restart the business or not." (March 12, 2003 Deposition of Omnicare, Inc.'s Senior Vice President and Chief Financial Officer, David W. Froesel, Jr., the pertinent pages of which are

reproduced in the accompanying Appendix at Exhibit "L," pp. 28:2-29:9, 96:20-22; see May 6, 2003 Deposition of OPI Controller, James McDevitt, the pertinent pages of which are reproduced in the accompanying Appendix at Exhibit "M," p. 109:16-21 and Exhibit McDevitt-44; Morra Deposition, Exhibit D, p. 12:24-13:22, 91:19-92:4; Rice Deposition, Exhibit B, pp. 74:20-23).  Omnicare admitted that if it had "received adequate insurance proceeds . . . , then [it] most likely would have continued to stay in the business." (Froesel Deposition, Exhibit L, p. 96:2-4 and 96:23- 97:7; see Feld Deposition, Exhibit G, pp. 78:3-16, 78:23-79:6). In these circumstances, where Omnicare itself created the circumstances on which it bases its impossibility and frustration defenses, these defenses are not available.  See General Electric Capital Corp., 1989 U.S. Dist. LEXIS at *9-*10 (rejecting a tenant's impossibility and frustration defense due to fire damage where the tenant "had it within their power to renovate the hotel and to reopen;" "[h]e who prevents a thing from being done may not avail himself of the non-performance which he himself has occasioned").

## IV.    THE DOCTRINE OF MUTUAL MISTAKE DOES NOT APPLY TO "MISTAKES" RELATING TO PREDICTIONS OF FUTURE EVENTS

The mutual mistake doctrine is not applicable where the purported mistake relates to a prediction of future events.  Conrail v. Portlight, Inc., 188 F.3d 93 (3d Cir. 1999); Haas v. Pittsburgh Nat'l Bank, 495 F. Supp. 815, 817 (W.D.Pa. 1980) (mutual mistake doctrine does not apply to mistakes relating to a "party's prediction or judgment as to events to occur in the future, even if erroneous").  See Heido v. S. Waste Servs., 181 F. Supp. 2d 711 (E.D. Mich. 2001); Mooney v. GR & Assocs., 746 P.2d 1174, 1178 (Utah App. 1987).

Here, Omnicare attempts to base its mutual mistake argument on the parties' purported mutual misunderstanding at the time the Lease was signed respecting the probability that a flood would occur at the Property in the future, as well as the likely severity of such a future flood.

(Omnicare Brief, pp. 5 and n. 3, 30).   Under with the cases cited above, this purported "mistake" does

not make out a cognizable claim for mutual mistake.  See McNamara Constr. of Manitoba, Ltd.,

509 F.2d at 1168-69 (rejecting a mutual mistake defense based on the parties' purported mistake

as to the severity of a labor strike in the future, because, although the parties may have not

planned for a strike of such severity, they were aware of the risk of labor strife).  Accordingly,

this Court should deny Omnicare's summary judgment motion and enter summary judgment in

HUB's favor.

**V.    OMNICARE'S PURPORTED INABILITY TO GENERATE THE LEVEL OF PROFITS IT WAS MAKING PRIOR TO THE FLOOD DOES NOT MAKE OUT A CLAIM FOR IMPOSSIBILITY OR FRUSTRATION**

It is well-settled that the doctrines of impossibility and frustration will not excuse a

party's non-performance, where performance, although rendered more difficult and costly, is

possible.  West v. Peoples First Nat'l Bank & Trust Co., 378 Pa. 275, 282-83, 106 A.2d 427, 432

(Pa. 1954); Luber, 418 Pa. Super. at 549, 614 A.2d at 774 (citing comment b to Section 261 of

the Restatement (Second) of Contracts); General Electric Capital Corp., 1989 U.S. Dist. LEXIS

at *9; Dorn, 368 Pa. Super. at 585, 534 A.2d at 812 (quoting W.R. Grace & Co. v. Local Union

759, 461 U.S. 757, 768 n. 12 (1983)).  See Wooldridge v. Exxon Corp., 39 Conn. Supp. 190,

194, 473 A.2d 1254, 1257 (Conn. Super. 1984) ("Disappointment at the level of income

produced is a far cry from an utter defeat of a party's objectives"); 407 East 61st Garage, Inc. v.

Savoy Fifth Ave. Corp., 23 N.Y.2d 275, 282, 244 N.E.2d 37, 41 (N.Y. 1968) (impossibility

doctrine "do[es] not permit a party to abrogate a contract, unilaterally, merely upon a showing

that it would be financially disadvantageous to perform it; were the rules otherwise, they would

place in jeopardy all commercial contracts"); Megan v. Updike Grain Corp., 94 F.2d 551, 553-

555 (8th Cir. 1938) (The doctrine of frustration or impossibility does not apply to a situation so as

to excuse performance "where performance is not practically cut off, but only rendered more difficult or costly").

Indeed, in rejecting similar impossibility and frustration defenses, the Eastern District of Pennsylvania has cited with approval the following illustration from the Restatement (2d) of Contracts:

> 6. X leases a gasoline station to Y. A change in traffic regulations so reduces Y's business that he is unable to operate the station except at a substantial loss. Y refuses to make further payments of rent. If Y can still operate the station, even though at such a loss, his principal purpose of operating a gasoline station is not substantially frustrated. Y's duty to pay rent is not discharged, and Y is liable to X for breach of contract.

General Electric Capital Corp. 1989 U.S. Dist. LEXIS at *7-*8 (rejecting a tenant's frustration defense due to fire damage where the tenant was still physically able to operate the Premises but where the tenant's financial difficulties have made it burdensome to keep the Premises operational and, thus, profitable).

As another court held:

> [A] tenant is not relieved from the obligation to pay rent if there is a serviceable use still available consistent with the use provision in the lease. The fact that the use is less valuable or less profitable or even unprofitable does not mean the tenant's use has been substantially frustrated.

Mel Frank Tool & Supply v. Di-Chem Co., 580 N.W.2d 802, 808 (Iowa Sup. 1998). See Port Chester Central Corp. v. Leibert, 179 Misc. 839, 840, 39 N.Y.S.2d 41,42 (N.Y. Misc. 1943) ("where a tenant can still continue in the business at the premises within the confines of the lease, although not as profitably, or at least by a substantial diminution of the volume of business, nevertheless he is responsible under the lease").

Omnicare asks the Court to grant summary judgment in its favor based on the doctrines of impossibility, frustration, and mutual mistake because somehow "it cannot use the [P]roperty to conduct its pharmaceutical business to the unforeseen competitive flooding." (Omnicare Brief, p. 2). Amazingly, Omnicare makes these claims despite admitting:

(1)     There was no "question that it could resume or...get operations back up" after the Flood (Morra Deposition, Exhibit E, pp. 96:3-5);

(2)     It did, in fact, perform millions of dollars of pharmaceutical services from the Property, including for Astra Zeneca and Novartis, who Omnicare claims would not come back to the Property after the Flood (Morra Deposition, Exhibit E, pp. 185:20-186:23; Greenspan Deposition, Exhibit F, pp. 30:23-31:7; Feld Deposition, Exhibit G, pp. 133:8-135:5; Purdy Deposition, Exhibit I, pp. 156:19-157:19; October 31, 2003 Deposition of Novartis Animal Health representative, Jeff Moore, the pertinent pages of which are reproduced in the accompanying Appendix at Exhibit "N," pp. 39:7-40:1); and

(3)     It was able to perform, and did perform, each of the four pharmaceutical services listed in the so-called "Special Purpose" clause of the Lease, including manufacturing. (Omnicare Brief, p. 11; Cichon Deposition, Exhibit J, pp. 178:6-188:10; Morra Deposition, Exhibit E, p. 180:1-185:4).

In these circumstances, Omnicare cannot show that the Property became "wholly unusable for its intended purpose." Rather, the Record shows just the opposite: because of the flooding and the underinsurance, continued operations on the Property would have cost Omnicare money. That Omnicare did not want to incur those restoration costs hardly makes out a claim for impossibility or frustration. Accordingly, this Court should deny Omnicare's summary judgment motion and enter judgment in HUB's favor.

## VI.    DISPUTED MATERIAL FACTUAL ISSUES PRECLUDE
## THE ENTRY OF SUMMARY JUDGMENT IN OMNICARE'S FAVOR

In essence, Omnicare contends that the Court should conclude as a matter of law that because flooding purportedly discouraged large customers from sending new work to Omnicare, the Lease is void under the doctrines of impossibility, frustration, and mutual mistake. As shown above, exactly the opposite is true: those defenses are based on a multitude of facts, almost all of which HUB disputes. The record is replete with evidence that Omnicare could easily have restored the Property after the Flood (as was its obligation), that the great bulk of Omnicare customers wanted to continue to send work to Omnicare, and that Omnicare could have restored and even exceeded the flow of business it engaged before the Flood.

Attached to this Memorandum is a chart setting out Record references to just a few of these factual disputes. Obviously, the existence of these disputes precludes the grant of summary judgment in Omnicare's favor. Bray v. Marriott Hotels, 110 F.3d 986, 990 (3d Cir. 1997) (Honorable Clifford Scott Green sitting by designation); Chisholm v. National Corp. for Hous. Pshp., Civil Action No. 99-3602, 2001 U.S. Dist. LEXIS 1137, *17 (E.D.Pa. January 31, 2001) (Honorable Clifford Scott Green); Point-Du-Jour v. County of Bucks, Civil Action No. 99-583, 2000 U.S. Dist. LEXIS 3061, *11 (E.D.Pa. May 7, 2000) (Honorable Clifford Scott Green).

Accordingly, should the Court deny HUB's Summary Judgment Motion, it must, at the very least, allow HUB to present its case to a fact finder.

**CONCLUSION**

For all the foregoing reasons, Plaintiffs Barry M. Portnoy and Gerard M. Martin as

Trustees for HUB Properties Trust respectfully request that this Court deny Defendants' Motion

for Summary Judgment and grant judgment in Plaintiffs' favor.

Respectfully submitted,

OBERMAYER REBMANN MAXWELL & HIPPEL LLP

By: _Paul S. Diamond_ _____

PAUL S. DIAMOND
STEVEN A. HABER
STEPHEN W.W. CHING, JR.
Obermayer Rebmann Maxwell & Hippel LLP
One Penn Center, 19th Floor
1617 John F. Kennedy Boulevard
Philadelphia, PA 19103-1895
(215) 665-3000

Attorneys for Plaintiffs Barry M. Portnoy and
Gerard M. Martin as Trustees for HUB Properties
Trust

Date: October 14, 2003

**CHART OF DISPUTED MATERIAL FACTUAL ALLEGATIONS IN OMNICARE'S SUMMARY JUDGMENT MOTION**

| OMNICARE FACTUAL ASSERTATIONS | PORTIONS OF RECORD DEMONSTRATING FACTUAL DISPUTE |
|---|---|
| Omnicare "cannot use the property to conduct its pharmaceutical business due to the unforeseen repetitive flooding." (Omnicare Brief, p. 2, 11). | There was no "question that [Omnicare] could resume or…get operations back up" after the Flood. (Morra Deposition, Exhibit E, pp. 96:3-5).

After the Flood, Omnicare performed pharmaceutical services (including analytical, stability, manufacturing, and warehousing) for, *inter alia*, Astra Zeneca, Novartis, Virbac, Tularik, Biomedicines, and Emisphere. (Cirbon Deposition, Exhibit J, pp. 178:6-188:10; Morra Deposition, Exhibit E, p. 180:1-185:4, 185:20-186:23; Greenspan Deposition, Exhibit F, pp. 37:14-38:14; Feld Deposition, Exhibit G, pp. 133:8-135:5; Purdy Deposition, Exhibit I, pp. 156:19-157:19; Moore Deposition, Exhibit N, pp. 39:7-40:1).

After the Flood, Omnicare generated millions of dollars from its clients, including over $2.8 million from Virbac alone. (Morra Deposition, Exhibit E, pp. 185:20-186:23; Greenspan Deposition, Exhibit F, pp. 30-31; Feld Deposition, Exhibit G, pp. 133:8-135:5).

At the end of July 2001, OPI President Kenneth Feld was "optimistic that OPI could store the revenue flow [it] had had before the flood." (Feld Deposition, Exhibit G, p. 130:13-16). Indeed, Feld testified that OPI could have generated larger revenues and profit than before the Flood. (Feld Deposition, Exhibit G, p. 169:3-9). |

488891

| OMNICARE FACTUAL ASSERTATIONS | PORTIONS OF RECORD DEMONSTRATING FACTUAL DISPUTE |
|---|---|
| Omnicare's customers "would not send significant future work to OPI at 525 due to the risk of future flooding." (Omnicare Brief, p. 19). | OPI President Feld, whom Omnicare relied upon in closing OPI, testified that that he was not aware of any statement by any decision maker or any of Omnicare's clients that "they were never going to send you work again because you had had two floods in two years." (Feld Deposition, Exhibit G, p. 153:18-24; Morra Deposition, Exhibit E, pp. 83:1-14, 89:2-12, 113:18-114:5). See Cichon Deposition, Exhibit J, pp. 162:12-171:16). |
| | "[M]ost of [the customers]," including Novartis Animal Health and Astra Zeneca, "wanted to know when [Omnicare] was going to be up and running" and "wanted [Omnicare] to take on new work." (Feld Deposition, Exhibit G, pp. 91:1-19, 134:5-23, 152:20-153:24, 175:4-24, 178:20-179:4; April 9, 2003 Deposition of Ken Feld, Exhibit O, pp. 193:3-194:5, 218:16-20; May 6, 2003 Deposition of OPI Controller James McDevitt, Exhibit M, pp. 84:5-85:4; 110:12-111:5). |
| | Omnicare simply turned this work away. (Feld Deposition, Exhibit G, pp. 152:20-153:24, 175:4-24; McDevitt Deposition, Exhibit H, pp. 167:18-169:7; Purdy Deposition, Exhibit I, p. 157:7-14; Moore Deposition, Exhibit N, pp. 39:7-40:1). Indeed, OPI was instructed by its corporate parent to "hold up construction" needed to "put the building back together." (July 22, 2003 Deposition of OPI Controller James McDevitt, Exhibit P, pp. 38:2-40:15 and Exhibit 34 (Bates-Stamped Document McDevitt 1118)). |

| OMNICARE FACTUAL ASSERTATIONS | PORTIONS OF RECORD DEMONSTRATING FACTUAL DISPUTE |
|---|---|
| Three of Omnicare's key customers, Astra Zeneca, Novartis, and Sanofi, would never send it "significant future work due to the risk of future flooding." (Omnicare Brief, p. 19). | Each of those customers' designees testified that the Flood did not automatically "disqualify" or "completely rule out" Omnicare from future work at the Property. (Crowther Deposition, Exhibit Q, pp. 107:24-108:10; December 12, 2002 Deposition of David L. Font, attached hereto as Exhibit R, p. 51:1-24). Indeed, Astra Zeneca's corporate designee testified that she was not aware of "anyone at Astra [Zeneca] telling anyone at Omnicare Pharmaceutics that Astra [Zeneca] was not interested in doing further business with Omnicare Pharmaceutics as long as it was going to be at the 525 Virginia Drive building after the flood." (Crowther Deposition, Exhibit Q, p. 86: 11-17). |
| | Rather, those clients' corporate designees testified that their companies never got to the point where it had to make a decision whether to sent Omnicare significant future work because Omnicare never was able to show them that it was willing to rebuild its facility at the Property. (Crowther Deposition, Exhibit Q, pp. 54:15-19, 59:16-60:5, 69:6-70:13, 99:3-100:12, 106:4-24; Moore Deposition, Exhibit N, p. 27:9-11, 39:7-40:1). |
| | Significantly, Novartis moved the work Omnicare wanted to a manufacturing site in Puerto Rico, which was "very vulnerable to hurricanes." (Moore Deposition, Exhibit N, pp. 46:19-47:25). |

488891

| OMNICARE FACTUAL ASSERTATIONS | PORTIONS OF RECORD DEMONSTRATING FACTUAL DISPUTE |
|---|---|
| The risk of repetitive flooding was not foreseeable. (Omnicare Brief, pp. 2, 17, 26). | As early as 1992, publicly available flood records indicated that the Property was located in a flood hazard zone, and that the Fort Washington Industrial Park, where the Property is located, has had a "long history of flooding." (Omnicare Brief, pp. 5-6; Leonard Deposition, Exhibit C, pp. 18:3-19:18, 118:1-119:10). Indeed, Omnicare admitted that its employees "were all aware that [the Property was in] an area prone to flooding because of previous history." (Morra Deposition, Exhibit D, pp. 37:22-23; Morra Deposition, Exhibit E, p. 45:3-17; Morra Deposition, Exhibit D, pp. 38:6-11; Feld Deposition, Exhibit G, pp. 27:2-32:14; McDevitt Deposition, Exhibit H, p. 35:5-15).<br><br>Upon assuming the Lease from IBAH in 2000, Omnicare maintained flood insurance, and, in fact, purchased additional flood insurance from FEMA in the Spring of 2001 before the Flood. (Rice Deposition, Exhibit B, pp. 76:2-19, 92:13-95:2, 109:7-16; see Morra Deposition, Exhibit E, p. 47:1-9). Further at the time of the Flood, Omnicare had in place a Business Recovery Plan that "detailed what would be done in the event of a catastrophe, such as a fire, a flood." (Purdy Deposition, Exhibit I, p. 56:4-8). |

488891

| OMNICARE FACTUAL ASSERTATIONS | PORTIONS OF RECORD DEMONSTRATING FACTUAL DISPUTE |
|---|---|
| Omnicare's inability to conduct its business in 525 became impracticable . . . through no fault of its own." (Omnicare Brief, p. 27). | Omnicare failed to procure adequate flood insurance. (Froesel Deposition, Exhibit L, pp. 28:2-29:9, 96:20-22; McDevitt Deposition, Exhibit M, p. 109:16-21 and Exhibit McDevitt-44; Morra Deposition, Exhibit D, p. 12:24-13:22, 91:19-92:4; Rice Deposition, Exhibit B, pp. 74:20-23). Had Omnicare "received adequate insurance proceeds . . . , then [it] most likely would have continued to stay in the business." (Froesel Deposition, Exhibit L, p. 96:2-4 and 96:23- 97:7; Feld Deposition, Exhibit G, pp. 78:3-16). |
| | Omnicare failed to implement alternative risk management measures that would have significantly reduced the impact of flood damage. (Feld Deposition, Exhibit G, pp. 74:2-75:4; McDevitt Deposition, Exhibit H, pp. 51:1-15, 66:8-67:9). Omnicare stored its customers' pharmaceutical drugs on pallets and shelves located on the bottom floor of its warehouse at the Property, in violation of the 1992 Federal Flood-Proofing Regulations, requiring all drugs stored in a facility located in a floodplain to be placed at least one floor above the base flood level. (Cichon Deposition, Exhibit I, p. 115:8-116:14; Morra Deposition, Exhibit E, p. 122:18-123:15; §§ 1101.1(2) and 1101.3.2 (reference to "Drugs in Quality"), U.S. Army Corps of Engineers Flood-Proofing Regulations, EP 1165-2-314 (June 1972, amended March 31, 1992, Exhibit S). |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BARRY M. PORTNOY and<br>GERARD M. MARTIN, as Trustees for<br>HUB PROPERTIES TRUST<br>        Plaintiffs,<br><br>      v.<br><br>OMNICARE PHARMACEUTICS, INC.<br>      and<br>OMNICARE CLINICAL RESEARCH, INC.,<br>      Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | NO. 02-CV-2905 |

I, STEPHEN W. W. CHING, JR., ESQUIRE, hereby certify that on this 14th day of October, 2003, I caused a true and correct copy of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment (accompanied by proposed order and Appendix of Exhibits) to be forwarded, via HAND DELIVERY, to all parties, addressed as follows:

Richard P. McElroy, Esquire
Adam M. Share, Esquire
Todd A. Schoenhaus, Esquire
Blank Rome Comisky & McCauley LLP
One Logan Square
Philadelphia, PA 19103-6998

_____
STEPHEN W. W. CHING, JR.

488439