**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **BARRY M. PORTNOY and** : | |
| **GERARD M. MARTIN, as Trustees for** : | |
| **HUB PROPERTIES TRUST** : | |
| **Plaintiffs,** : | **NO. 02-CV-2905** |
| : | |
| **v.** : | **HONORABLE CLIFFORD** |
| : | **SCOTT GREEN** |
| **OMNICARE PHARMACEUTICS, INC.** : | |
| **and** : | |
| **OMNICARE CLINICAL RESEARCH, INC. ,** : | |
| **Defendants.** : | |
| : | |

**APPENDIX OF EXHIBITS**
**IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION**
**TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**PAUL S. DIAMOND**
**STEVEN A. HABER**
**STEPHEN W.W. CHING, JR.**
**OBERMAYER REBMANN MAXWELL & HIPPEL LLP**
**One Penn Center, 19th Floor**
**1617 John F. Kennedy Boulevard**
**Philadelphia, PA 19103**
**(215) 665-3000**

**Attorneys for Plaintiffs Barry M. Portnoy and Gerard M.**
**Martin, as Trustees for HUB PROPERTIES TRUST**

483869

## TABLE OF CONTENTS

| EXHIBIT TAB | ITEM |
|---|---|
| A | 12/3/96 Lease between 525 Virginia Drive Associates Limited Partnership and Bio-Pharmaceutics Services, Inc.<br><br>*(Previously attached to the Complaint at Exhibit A and to Defendants' Motion for Summary Judgment at Exhibit A)* |
| B | Selected Pages from the March 11, 2003 Deposition of Janice Rice |
| C | Selected Pages from the February 11, 2003 Deposition of Paul Leonard |
| D | Selected Pages from the March 4, 2003 Deposition of David Morra |
| E | Selected Pages from the October 29, 2002 Deposition of David Morra |
| F | Selected Pages from the October 30, 2002 Deposition of Ronald Greenspan |
| G | Selected Pages from the March 3, 2003 Deposition of Kenneth Feld |
| H | Selected Pages from the April 22, 2003 Deposition of James McDevitt |
| I | Selected Pages from the November 20, 2002 Deposition of Steve Purdy |
| J | Selected Pages from the November 11, 2002 Deposition of Christopher Cichon |
| K | Flood coverage page of IBAH, Inc.'s Insurance Policy effective April 1997 |
| L | Selected Pages from the March 12 2003 Deposition of David Froesel |
| M | Selected Pages from the May 6, 2003 Deposition of James McDevitt |
| N | Selected Pages from the October 31, 2002 Deposition of Jeff Moore |
| O | Selected Pages from the April 9, 2003 Deposition of Kenneth Feld |
| P | Selected Pages from the July 22, 2003 Deposition of James McDevitt |
| Q | Selected Pages from the December 4, 2002 Deposition of Olga Crowther |

483869

| R | Selected Pages from the December 12, 2002 Deposition of David Fant |
|---|---|
| S | Section 11.01 of the U.S. Army Corps of Engineers Flood-Proofing Regulations, EP 1165-2-314 (June 1972, amended March 31, 1992) |

483869

Exhibit A

RECYCLED

# LEASE AGREEMENT

**LANDLORD:**  525 VIRGINIA DRIVE ASSOCIATES LIMITED PARTNERSHIP
a Pennsylvania limited partnership
443 South Gulph Road
King of Prussia, Pennsylvania 19406

**TENANT:**  BIO-PHARM PHARMACEUTICS SERVICES, INC.
a Delaware corporation
425 Delaware Drive
Fort Washington, Pennsylvania 19034-2703

**PREMISES:**  525 Virginia Drive
Fort Washington, Upper Dublin Township
Montgomery County, Pennsylvania

**DATE OF LEASE:**  December 3, 1996

142650.7

# TABLE OF CONTENTS

PREAMBLE ....................................................................................................... 1

   BASIC LEASE PROVISIONS AND DEFINITIONS ................................................ 1

ARTICLE ONE ................................................................................................... 2

   PREMISES AND TERM ...................................................................................... 2
      Section 1.01.  Grant of Lease ..................................................................... 2
      Section 1.02.  Term of Lease ...................................................................... 2

ARTICLE TWO .................................................................................................. 3

   RENT ............................................................................................................... 3
      Section 2.01.  Fixed Basic Rent ................................................................. 3
      Section 2.02.  Additional Rent ................................................................... 4
      Section 2.03.  Manner of Payment ............................................................. 4
      Section 2.04.  Partial Months .................................................................... 4
      Section 2.05.  Late Charge ......................................................................... 4

ARTICLE THREE ............................................................................................... 4

   EXPENSES AND TAXES .................................................................................... 4
      Section 3.01.  Tenant's Obligations ............................................................ 4
      Section 3.02.  Installment Payment ........................................................... 4
      Section 3.03.  Apportionment of Taxes; Tenant's Proportionate Share of Taxes ..... 5
      Section 3.04.  Receipts ............................................................................... 5
      Section 3.05.  Right to Contest Taxes ........................................................ 5
      Section 3.06.  Taxes and Impositions Payable by Landlord ........................ 5
      Section 3.07.  Utilities ............................................................................... 5
      Section 3.08.  Insurance ............................................................................ 6

ARTICLE FOUR ................................................................................................ 6

   CONSTRUCTION OF IMPROVEMENTS ................................................................ 6
      Section 4.01.  Landlord Improvements ...................................................... 6
      Section 4.02.  Tenant Work ....................................................................... 7
      Section 4.03.  Time for Completion ........................................................... 7
      Section 4.04  Delays in Substantial Completion ......................................... 8
      Section 4.05.  Signs ................................................................................... 8

ARTICLE FIVE .................................................................................................. 8

   USE AND COMPLIANCE WITH LAWS; ENVIRONMENTAL COVENANTS .............. 8
      Section 5.01.  Use of Premises ................................................................... 8
      Section 5.02.  Compliance with Law .......................................................... 8
      Section 5.03.  Right to Contest .................................................................. 9

ARTICLE SIX .................................................................................................... 9

   REPRESENTATIONS AND WARRANTIES ............................................................. 9
      Section 6.01.  Landlord's Representations and Warranties .......................... 10
      Section 6.02.  Brokerage Commissions ...................................................... 10

ARTICLE SEVEN ............................................................................................... 10

   INDEMNIFICATION .......................................................................................... 10
      Section 7.01.  Tenant's Indemnity ............................................................. 11
      Section 7.02.  Landlord's Indemnity .......................................................... 11

i

ARTICLE EIGHT .................................................................................................................. 11

   MAINTENANCE AND REPAIRS .................................................................................... 11
     Section 8.01.  Tenant's Obligations .......................................................................... 11
     Section 8.02.  Landlord's Obligations ....................................................................... 12
     Section 8.04  Access to Premises ............................................................................. 12
     Section 8.05.  Landlord as Building Manager; Manager's Fee ................................. 12

ARTICLE NINE .................................................................................................................. 12

   ALTERATIONS ............................................................................................................. 12
     Section 9.01  Structural Alterations .......................................................................... 12
     Section 9.02.  Non-Structural Alterations ................................................................. 13
     Section 9.03  Mechanics' Liens ................................................................................ 13
     Section 9.04.  Status of Improvements; "As Built" Drawings ................................... 13

ARTICLE TEN ................................................................................................................... 13

   INSURANCE AND DAMAGE ........................................................................................ 13
     Section 10.01.  Insurance ......................................................................................... 13
     Section 10.02.  Damage or Casualty ........................................................................ 14
     Section 10.03.  Cooperation in Actions ................................................................... 14
     Section 10.04.  Notice of Casualty ........................................................................... 15
     Section 10.05.  Waiver of Subrogation; Rights Under Insurance Policies ................ 15

ARTICLE ELEVEN .............................................................................................................. 15

   CONDEMNATION ....................................................................................................... 15
     Section 11.01.  Condemnation .................................................................................. 15
     Section 11.02.  Total Condemnation ........................................................................ 15
     Section 11.03.  Partial Condemnation ...................................................................... 16

ARTICLE TWELVE ............................................................................................................. 16

   DEFAULT .................................................................................................................... 16
     Section 12.01.  Events of Default Termination ......................................................... 16
     Section 12.02.  Remedies ......................................................................................... 17
     Section 12.03.  Non-Waiver ..................................................................................... 18
     Section 12.04.  Rights and Remedies Cumulative .................................................... 18
     Section 12.05.  Waiver of Trial by Jury ................................................................... 18

ARTICLE THIRTEEN ......................................................................................................... 18

   QUIET ENJOYMENT; SUBORDINATION ..................................................................... 18
     Section 13.01.  Quiet Enjoyment ............................................................................. 18
     Section 13.02.  Subordination, Non-Disturbance and Attornment ........................... 18
     Section 13.03.  Tenant Estoppel Certificate ............................................................. 19
     Section 13.04.  Landlord's Lien Waiver ................................................................... 19

ARTICLE FOURTEEN ........................................................................................................ 19

   OPTION TO RENEW LEASE ........................................................................................ 19
     Section 14.01.  Option to Renew .............................................................................. 19
     Section 14.02.  Adjustment to Fixed Basic Rent ...................................................... 19

ARTICLE FIFTEEN ............................................................................................................ 20

   OPTION TO PURCHASE AND RIGHT OF FIRST REFUSAL .......................................... 20
     Section 15.01.  Tenant's Option to Purchase ............................................................ 20
     Section 15.02.  Tenant's Right of First Refusal ........................................................ 21
     Section 15.03.  Memorandum of Lease and Option to Purchase ............................... 22

142650.7

ARTICLE SIXTEEN .......................................................................................................... 22

MISCELLANEOUS .......................................................................................................... 22
    Section 16.01.  Assignment Sublease .......................................................................... 22
    Section 16.02.  Notice .................................................................................................. 23
    Section 16.03  Signage ................................................................................................ 23
    Section 16.04.  Survival of Valid Terms .................................................................... 23
    Section 16.05.  Covenants to Bind and Benefit Respective Parties ............................ 23
    Section 16.06.  Captions and Headings ...................................................................... 24
    Section 16.07.  Governing Law ................................................................................... 24
    Section 16.08  Confidentiality ..................................................................................... 24
    Section 16.09  Lease Guaranty .................................................................................... 24
    Section 16.10  Counterparts ......................................................................................... 24

142650.7

## LEASE AGREEMENT

THIS LEASE (the "Lease") is made as of the 3rd day of December, 1996 between 525 VIRGINIA DRIVE ASSOCIATES LIMITED PARTNERSHIP, a Pennsylvania limited partnership (herein referred to as "Landlord") whose address is 443 South Gulph Road, King of Prussia, Pennsylvania 19406 and BIO-PHARM PHARMACEUTICS SERVICES, INC., a Delaware corporation (herein referred to as "Tenant") whose address is Four Valley Square, 512 Township Line Road, Blue Bell, PA 19422.

### PREAMBLE

### Basic Lease Provisions and Definitions

In addition to other terms elsewhere defined in this Lease, the following terms whenever used in this lease shall have only the meanings set forth in this section, unless such meanings are expressly modified, limited or expanded herein.

A.     Additional Rent shall mean any and all sums other than Fixed Basic Rent which may be due from time to time from Tenant to Landlord pursuant to the terms of the Lease.

B.     Brokers shall mean Preferred Real Estate Advisors, Inc. and Julien J. Studley, Inc.

C.     Building shall mean the commercial building situate at 525 Virginia Drive, Fort Washington, Upper Dublin Township, Montgomery County, Pennsylvania, consisting of approximately 124,000 gross rentable square feet as shown on Exhibit "A" attached hereto.

D.     Demised Premises or Premises shall mean for Lease Year 1: approximately 40,000 square feet of the Building, as described in Exhibit "A" and for Lease Year 2: approximately 80,000 square feet of the Building, as described in Exhibit "A" and for the balance of the Term and any Renewal Term, the entire Building.

E.     Exhibits shall be the following, attached to this Lease, incorporated herein and made a part hereof:

| | |
|---|---|
| Exhibit A | Description of Building |
| Exhibit B-1 | Plans and Specifications for Landlord Improvements |
| Exhibit B-2 | Plans and Specifications for Tenant Work |
| Exhibit C | Permitted Exceptions |
| Exhibit D | Memorandum of Lease |
| Exhibit E | Form of Lease Guaranty |

1

142630.7

F.    Fixed Basic Rent shall mean:  Twelve Million Three Hundred Seventy Eight Thousand and 00/100 Dollars ($12,378,000.00), for the Term, payable as follows:

| Year | Yearly Payments | Equal Monthly Payments |
|------|------|------|
| Lease Year 1 | $220,000.00 | $18,333.34 |
| Lease Year 2 | $440,000.00 | $36,666.67 |
| Lease Year 3 - 4 | $806,000.00 | $67,166.67 |
| Lease Year 5 - 6 | $868,000.00 | $72,333.34 |
| Lease Year 7 - 15 | $930,000.00 | $77,500.00 |

G.    Rent Commencement Date is as defined in Section 1.02 hereof.

H.    Permitted Uses is as defined in Section 5.01

I.    Purchase Option is as defined in Article 15 hereof.

J.    Renewal Option is as defined in Article 14 hereof.

K.    Security Deposit shall be Zero and 00/100 Dollars ($0.00)

L.    Term is as defined in Section 1.02 hereof.

M.    Guarantor shall mean I.B.A.H., INC., a Delaware corporation.

For and in consideration of the covenants and mutual promises contained herein, and upon the terms and conditions set forth herein, and intending to be legally bound hereby, the parties hereby covenant and agree as follows:

ARTICLE ONE

Premises and Term

Section 1.01.  Grant of Lease.  Landlord does hereby demise, lease and let to Tenant and Tenant does hereby let from Landlord, upon and subject to all terms, covenants and conditions herein contained, the Premises.  Notwithstanding that the Tenant shall not be occupying the entire Building until Lease Year 3, Landlord shall have no right to use or occupy, or lease to any third party, any portion of the Building, without Tenant's prior written consent in each instance.  In addition to the Premises, Tenant shall have the right and license, to place or install temporary modular office and laboratory space on the grounds surrounding the Building, at a location reasonably satisfactory to Landlord, and provided that (i) Tenant has provided notice to Landlord of Tenant's intention and identified the proposed location of such modular office and laboratory space, and (ii) such temporary modular office and laboratory space is permitted under and complies with all applicable federal, state and local laws, regulations and code requirements and all of the terms of this Lease.  Tenant and its contractors shall have access to the entire Premises during Lease Year 1, at Tenant's sole risk, for the purposes of commencing construction of improvements in anticipation of Tenant's occupancy and in accordance with Section 4.02 hereof.

2

142650.7

Section 1.02, <u>Term of Lease</u>. The term of this Lease ("Term") shall include a preliminary term, as described in Section 1.02 (a) (the "Preliminary Term"); an initial term, as described in Section 1.02(b) (the "Initial Term") and certain Renewal Terms, as described in Article 14 hereof.

(a)   <u>Preliminary Term</u>. The Preliminary Term shall commence on the date this Lease is executed by all parties hereto, and shall terminate on the day prior to the commencement of the Initial Term. All of the terms and conditions set forth in this Lease shall apply during the Preliminary Term except for the provisions of Articles 2 and 3, it being the intention of the parties that during the Preliminary Term, Tenant shall have no obligation to pay Fixed Basic Rent, Additional Rent or any other rent to Landlord. During the Preliminary Term, Tenant shall be permitted to enter the Demised Premises solely for the purpose of performing the Tenant Work (as defined below).

(b)   <u>Initial Term</u>. The Initial Term of this Lease shall commence on the later to occur of the following: (i) January 15, 1997 or (ii) a date which is ten (10) days after the Landlord Improvements (as herein defined) have been substantially completed in accordance with Article 4 hereof. The Initial Term as determined above shall be set forth on a written notice from Landlord to Tenant, and the Initial Term of this Lease shall continue for a period of fifteen years, unless this Lease shall be renewed by the Tenant in accordance with Article 14 hereof or sooner terminated as hereinafter provided. (The date upon which the Initial Term commences is referred to hereinafter as the "Rent Commencement Date").

(c)   <u>Renewal Terms</u>. Tenant shall have two consecutive options to extend the Initial Term of this Lease, in accordance with the provisions of Article 14 hereof.

(d)   <u>Lease Year</u>. The Lease Year 1 of the Term shall commence on the Rent Commencement Date and shall end (i) on the day immediately preceding the first anniversary of the Rent Commencement Date, if the Rent Commencement Date is the first day of the month, or (ii) on the last day of the month in which the first anniversary of the Rent Commencement Date occurs, if the Rent Commencement Date is any day other than the first day of a calendar month. Each subsequent lease year shall be a period of twelve (12) months commencing on the day immediately following the expiration of the prior lease year and expiring on the day immediately preceding the anniversary of the commencement of such lease year.

## ARTICLE TWO

### Rent

Section 2.01, <u>Fixed Basic Rent</u>. Except as hereinafter provided, the minimum annual rent for such Lease Years is in the amounts set forth in the Preamble as "Fixed Basic Rent." The Fixed Basic Rent shall be payable during the Initial Term, in advance, without notice or demand, in equal monthly installments of one-twelfth of the annual amount, on the first day of each month during the Initial Term.

Section 2.02, <u>Additional Rent</u>. All other amounts payable by Tenant hereunder, whether payable to Landlord or to third parties, including without limitation, Taxes pursuant to Section 3.01, insurance premiums, and utility charges, shall be considered additional rent ("Additional Rent") payable by Tenant hereunder. Tenant's obligation for the payment of Additional Rent shall commence upon the Rent Commencement Date.

3

142650.7

Section 2.03. <u>Manner of Payment</u>. All amounts payable under Section 2.01 of this Lease, as well as all other amounts payable by Tenant to Landlord under the terms of this Lease, shall be paid, at the office of Landlord set forth above, or at such other place as Landlord shall from time to time designate by notice to Tenant. Tenant's obligation to pay the Fixed Basic Rent and Additional Rent shall survive the expiration of the Term.

Section 2.04. <u>Partial Months</u>. In the event that the Rent Commencement Date is a day other than the first day of a calendar month, Fixed Basic Rent for the month in which the first anniversary of the Rent Commencement Date occurs shall be prorated such that the monthly payment of Fixed Basic Rent for such month shall be equal to the sum of (i) the monthly installment payment that is due during Lease Year 1, as set forth in Section F of the Preamble hereof divided by thirty (30) and multiplied by the number of days in such month prior to the anniversary of the Rent Commencement Date, plus (ii) the monthly installment payment that is due during Lease Year 2, as set forth in Section F of the Preamble hereof, divided by thirty (30) and multiplied by the number of days remaining in such month on and after the Rent Commencement Date..

Section 2.05. <u>Late Charge</u>. Landlord shall be entitled to receive from Tenant a late charge equal to five percent (5%) of the amount of any payment or installment of Fixed Basic Rent and Additional Rent, or any portion thereof, if not received within ten (10) days of the date when due. The acceptance of any such payment by Landlord shall not be deemed to be a waiver of any other rights which Landlord may have under the provisions of this Lease or as provided by law.

ARTICLE THREE

<u>Taxes; Utility Charges</u>

Section 3.01. <u>Tenant's Obligations</u>. Tenant will pay and discharge, punctually as and when the same shall become due and payable, but in any event not later than five (5) business days before any fine, penalty, interest or cost may be added thereto for nonpayment, all real estate taxes water charges and sewer charges (each such tax, water charge and sewer charge hereinafter sometimes called a "Tax").

Section 3.02. <u>Installment Payment</u>. If by law any Tax is payable, or may at the option of the taxpayer be paid, in installments, Tenant may, whether or not interest shall accrue on the unpaid balance thereof, pay the same, and any accrued interest or any unpaid balance thereof, in installments as each installment becomes due and payable, but in any event not later than five (5) business days before any fine, penalty, interest or cost may be added thereto for nonpayment of any installment or interest.

Section 3.03. <u>Apportionment of Taxes; Tenant's Proportionate Share of Taxes</u>. Any Tax, a part of which is within the Term and a part of which is subsequent to the Term, shall be apportioned and adjusted between Landlord and Tenant as of the expiration of the Term so that Landlord shall pay the amount of the Tax due after the expiration of the Term, and Tenant shall pay the remainder thereof. With respect to any Tax for public improvements or benefits which by law is payable in installments, a part of which is within the Term and a part of which is subsequent to the Term, Landlord shall pay the installments thereof which become due and payable with respect to periods of time subsequent to the expiration of the Term, and Tenant shall pay all such installments which become due and payable with respect to periods of time prior to the expiration of the Term.

4

Section 3.04. <u>Receipts</u>. Tenant shall furnish to Landlord reasonable evidence of payment of any Tax, including official receipts from the appropriate taxing authority evidencing payment or other proof satisfactory to Landlord, not later than five (5) business days prior to the date that such Tax would have become delinquent or within ten (10) days after receipt by Tenant of such receipt or other evidence from the tax authority, whichever is earlier.

Section 3.05. <u>Right to Contest Taxes</u>. Notwithstanding anything to the contrary herein contained, if Tenant deems any Tax excessive or illegal, Tenant, upon prior written notice to Landlord, may defer payment thereof so long as (a) the validity or the amount thereof is contested by Tenant with diligence and in good faith, and (b) no tax sale or other action in connection therewith against the Premises or Landlord is threatened. So long as Tenant is not in default under this Lease, and in good faith and by appropriate legal action shall contest the validity of any Tax, and shall have established by deposit of cash with Landlord, or other securities satisfactory to Landlord, a reserve for the payment thereof in such amount as shall be subject to such contest, the Tenant shall not be required to pay the contested Tax or produce the required receipt while the reserve is maintained and so long as the contest that operates to prevent collection is maintained and prosecuted with diligence, and shall not have been terminated or discontinued adversely to Tenant. Any such cash held in reserve with Landlord shall be deposited by Landlord with a federally insured financial institution in a separate escrow or trust account, and such funds shall not be co-mingled with other monies of the Landlord.

Section 3.06. <u>Taxes and Impositions Payable by Landlord</u>. Tenant shall not be required to pay any of the following Taxes which shall be imposed against Landlord by any governmental authority, whether federal, state, county, city, municipal, or otherwise:

(a)     any estate, inheritance, succession, transfer, legacy or gift tax which may be imposed upon or with respect to any transfer of Landlord's interest in the Premises;

(b)     any capital stock tax or other tax imposed against Landlord for the privilege or franchise of doing business; and

(c)     any federal, state or local income tax levied upon or against the income of Landlord.

Section 3.07. <u>Utilities</u>. Tenant shall timely pay or cause to be paid all charges for gas, electricity, light, heat, power, water, telephone or other communication service or other utility or service used, rendered or supplied to, upon or in connection with the Premises throughout the Term.

Section 3.08. <u>Insurance</u>. Tenant shall pay or cause to be paid all insurance premiums for the coverages required to be purchased and maintained by Tenant in accordance with Article 10 of this Lease.

ARTICLE FOUR

Construction of Improvements

Section 4.01. <u>Landlord Improvements</u>. Landlord, at Landlord's sole cost and expense, shall cause to be completed upon the Premises in accordance with all applicable federal, state and local laws, regulations, and code requirements, including all applicable zoning, building, electrical, health, safety, or fire code requirements, the code requirements and standards established in the most recent

142650.7

editions of "The BOCA National Building Code," and the federal law known as The Americans with Disabilities Act ("ADA")(collectively, the "Laws") affecting the Premises, and in a good and workmanlike manner, the following work (collectively, the "Landlord Improvements"), all in accordance with the plans and specifications attached hereto as Exhibit "B-2" (the "Plans and Specifications for Landlord Improvements" or the "Plans and Specifications"):

(a)     demolition of all interior improvements currently existing in the Premises, including but not limited to, the removal of any asbestos containing materials, polychlorinated biphenyls, underground storage tanks, and any "Hazardous Substances" or "Hazardous Waste" as defined under any "Environmental Laws" (defined below), and all partitions, ceiling and floor coverings, walls (except for structural or load bearing walls), and the removal of the rooftop HVAC units;

(b)     installation of new asphalt paving and striping of the existing parking lot, entrances and exits resulting in a total of 360 parking spaces on the Premises;

(c)     installation of new exterior lighting;

(d)     landscaping around the entire Building;

(e)     painting and stucco repair and/or replacement of the entire exterior of the Building; and

(f)     replacement of the entire roof on the Building; and

Section 4.02. <u>Tenant Work</u>. Tenant shall cause to be completed upon the Premises in accordance with applicable Laws, those improvements, other than the Landlord improvements, which are necessary or desirable to Tenant in order to make the Premises suitable for Tenant's use and occupancy ("Tenant Work"). Tenant Work shall be subject to the following conditions:

(a)     Not later than ten (10) days prior to commencing the Tenant Work, Tenant shall provide Landlord with plans and specifications of the Tenant Work, and the identity of the general contractor engaged by Tenant to perform the Tenant Work. Attached to this Lease as Exhibit "B-2" are any plans and specifications of the Tenant Work that Tenant has completed prior to the date hereof.

(b)     Tenant or Tenant's contractor shall, throughout the period of construction, procure and maintain builder's risk insurance coverage in an amount sufficient to cover the cost of Tenant Work, and naming the Tenant and Landlord as additional insureds, as their interests may appear.

(c)     Tenant shall promptly pay and discharge all costs, expenses, damages and other liabilities which may arise in connection with or by reason of the Tenant Work.

(d)     Tenant shall not permit the filing of any mechanic's lien and, within thirty (30) days after written notice of its existence thereof from Landlord shall discharge or bond over any mechanic's lien for material or labor claimed to have been furnished to the Premises on Tenant's behalf (except for work contracted for by Landlord). Prior to commencing any of the Tenant Work, Tenant shall (i) file waivers on behalf of each contractor waiving such contractor's right to file for or claim a mechanic's lien under Pennsylvania's Mechanic's Lien Law, and (ii) provide to Landlord a time-stamped copy of such filings.

142650.7

(e)     The Tenant Work shall be completed in accordance with a the plans and specifications and construction schedule prepared by Tenant and attached hereto or provided to Landlord, subject to changes as may be approved by Tenant pursuant to a written change order signed by Tenant. Tenant shall provide Landlord with a copy of any change orders approved by Tenant, and any modification or revision to the plans and specifications resulting therefrom prior to commencing any change in the Tenant Work pursuant thereto, unless the change is of an urgent nature or if the prior delivery of such documentation to Landlord is otherwise not reasonably practicable under the circumstances and in such cases Tenant shall provide a copy of any such change orders, and any such modifications to plans and specifications to the Landlord, promptly following the execution of any such change orders or the completion of any such revised plans and specifications.

(f)     The Tenant Work will not weaken or impair the structural integrity or lessen the value of the Premises or any part thereof.

(g)     Not later than two (2) business days prior to commencement of the Tenant Work, Tenant shall obtain, at Tenant's sole cost and expense, all permits and approvals necessary for construction of the Tenant Work and shall provide a copy of same to Landlord promptly upon receipt.

Section 4.03.   Time for Completion.   Subject only to delays caused by Tenant's actions, or delays caused by events wholly beyond the control of Landlord, the Landlord Improvements described in clauses (a) and (f) (except with respect to the portion of the roof above the office spaces in the Building) of Section 4.01 shall be substantially completed on or before the January 15, 1997. The Landlord Improvements pertaining to the removal and replacement of the roof above the office spaces in the Building shall be finally completed by no later than January 31, 1997. The Landlord Improvements described in clauses (b), (c), (d) and (e) of Section 4.01, and any minor or cosmetic repairs that have not been completed by January 15, 1997, shall be finally completed by no later than May 31, 1997.
For purposes of Section 1.02 (b), and the last sentence of Section 4.04, the Landlord Improvements shall be deemed "substantially completed" when the Landlord Improvements described in clauses (a) and (f) (except with respect to the portion of the roof above the office spaces in the Building) have been completed, except for any minor or cosmetic repairs.

Section 4.04   Delays in Substantial Completion.   If the Landlord is delayed for reasons other than those described in this Section 4.03, and fails to achieve substantial completion of the Landlord Improvements, or final completion of the Landlord Improvements, within the times provided herein, then the Tenant's sole and exclusive remedy for such failure shall be to recover from the Landlord the sum of $150.00 for each such calendar day substantial completion or final completion, as the case may be, is so delayed by Landlord and provided that such delay continues for five (5) business days following written notice by Tenant of such failure. The parties acknowledge and agree that it would be extremely difficult and impracticable under the presently known and anticipated circumstances to ascertain and fix the actual damages that the Tenant would incur should Landlord delay in achieving completion of the Landlord Improvements within the times provided herein, and that the aforesaid stipulated liquidated damages is not punitive, but represents an acceptable sum to compensate Tenant for all such damages and losses. In accordance with Section 1.02(b), Tenant shall have no obligation to pay Fixed Basic Rent and Additional Rent or other charges payable by Tenant hereunder, and all such rent and other charges shall be abated, and the Rent Commencement Date shall not occur, until the Landlord Improvements have been substantially completed.

7

142650.7

Section 4.05.  Signs. Tenant shall not place, erect, construct, or install any signs on the exterior of the Premises or Building, except in accordance with applicable Laws. Tenant shall provide Landlord with a copy of all plans and specifications pertaining to any such exterior signs. Tenant shall be solely responsible for all costs and expenses associated with the construction or installation of any signs installed by Tenant. Any signs erected by Tenant shall remain the property of Tenant, who shall have the right to remove same upon the expiration of the Term, provided that the Premises shall be restored to its present condition, reasonable wear and tear excepted.

ARTICLE FIVE

Use and Compliance With Laws; Environmental Covenants

Section 5.01.  Use of Premises. Tenant shall use and occupy the Premises as space for its offices, laboratories, and warehouse use in connection with the conduct of Tenant's business of manufacturing, testing and analyzing, packaging, and distribution of pharmaceutical products, and in support of Tenant's clinical research divisions, in accordance with Section 5.02 hereof, and for no other purpose. Tenant shall not place any weights in any portion of the Premises in excess of the floor load limits, as estimated by Tenant's engineer.

Section 5.02.  Compliance with Law. Tenant shall comply in all material aspects with all Laws respecting the occupancy, use, enjoyment, maintenance, management, improvement, repair, or alteration of the Premises, provided, however, that such obligation shall not include making any structural or system repairs to the Building, except for the Tenant Work or structural or system repairs to the Building required to correct damage caused by Tenant or Tenant's invitees. Tenant shall not be deemed to have violated this covenant solely because of non-compliance or alleged non-compliance with any regulation, order, direction or rule issued by the U.S. Food and Drug Administration, or any state agency or department with jurisdiction over Tenant's business operations, provided any such non-compliance does not impair or affect, in Landlord's reasonable judgment, in any material aspect, Tenant's ability to perform its other obligations under this Lease.

Section 5.03.  Right to Contest. Tenant shall have the right, upon prior written notice to Landlord, to contest by appropriate legal proceedings, without cost or expense to Landlord, the validity of any Laws so long as (a) such contest is prosecuted in good faith, and (b) no sale or other action in connection therewith is threatened against the Premises or Landlord. If at any time, such a sale or other action against the Premises or Landlord is threatened, then Tenant either (i) shall comply with the Laws, or (ii) post such bonds or other security with the court or appropriate governmental authority in either event in sufficient time and amount to prevent such threat. Tenant agrees to indemnify and hold harmless Landlord against any and all liability, loss, damage, cost and expense which Landlord may sustain during the Term by reason of Tenant's contest, including but not limited to any penalties which may be levied or assessed against the Landlord or the Premises. In the event that any such contest by Tenant involves the dispute over the payment of any fine, penalty, or other charge, and so long as Tenant is not in default under this Lease, and in good faith and by appropriate legal action shall contest the validity of any such fine, penalty or charge, and shall have established by deposit of cash with Landlord, or other securities satisfactory to Landlord, a reserve for the payment thereof in such amount shall be subject to such contest , the Tenant shall not be required to pay the contested item or produce the required receipt while the reserve is maintained and so long as the contest that operates to prevent collection is maintained and prosecuted with diligence, and shall not have been terminated or discontinued adversely to Tenant. Any such cash held in reserve with Landlord shall be

8

142650.7

deposited by Landlord with a federally insured financial institution in a separate escrow or trust account, and such funds shall not be co-mingled with other monies of the Landlord.

ARTICLE SIX

Representations and Warranties

Section 6.01.  Landlord's Representations and Warranties.  Landlord hereby represents and warrants to Tenant as follows:

(a)    Landlord has or shall obtain good and indefeasible fee title to the Premises, subject only to those matters set forth on Exhibit "C" attached hereto (the "Permitted Exceptions") which matters do not adversely interfere with or prohibit Tenant's proposed use of the Premises. Tenant's obligations under this Lease are contingent upon Landlord first acquiring such title to the Premises with thirty (30) days of the date of this Lease.  In the event that Landlord fails to obtain such title within such thirty (30) day period Tenant may elect to terminate this Lease upon written notice to Landlord of such election.  Notwithstanding whether Tenant elects to terminate, Landlord shall indemnify, defend, and hold Tenant harmless from and against any liability, loss, cost and expense incurred by Tenant as a result of Landlord failing to acquire such title as aforesaid.

(b)    There is no claim, litigation, proceeding or governmental investigation pending, or, so far as is known to you, threatened, against or relating to the Premises, nor is there any basis known to Landlord for any such action.

(c)    The Premises comply, and upon completion the Landlord Improvements and Tenant Work, will comply, with all Laws, and are not in violation of any covenants, conditions or restrictions affecting the Premises.

(d)    There are no outstanding violations of any Laws respecting the Premises. Landlord covenants that it shall be solely responsible for alterations, construction, and improvements to the Landlord Improvements, as may be required by any applicable Laws.

(e)    The Leased Premises shall be ready for use and occupancy by Tenant, and all systems and improvements, including, but not limited to the roof, exterior walls, foundation, structural frame, water supply system, sewage disposal system, and electrical system shall be in good operating condition and repair at the Rent Commencement Date, except to the extent that any such systems or improvements are altered or modified by the Tenant Work.

(f)    To the best of Landlord's knowledge, based on the following environmental reports: (i) "Facility Closure Assessment and Remediation Activities Report Tele-Dynamics Division of Hamilton Standard Fort Washington, Pennsylvania," submitted by Baker Environmental, Inc., dated February, 1993," (ii) "Environmental Site Assessment Update of the Tele-Dynamics Facility Fort Washington, Pennsylvania," prepared by Baker Environmental, Inc., dated April, 1995," (iii) "(Draft) Phase I Environmental Site Assessment of the former Tele-Dynamics Facility Fort Washington, PA, TSD Job No. CRW96003" prepared by TSD Environmental Services, Inc., dated April, 1996, and (iv) "Underground Storage Tank Closure Assessment at the Hamilton Standard Division of UTC Tele-Dynamics Facility Ft. Washington, Pennsylvania," prepared by Baker Environmental, Inc., dated February, 1993," (collectively, the reports described in clauses (i) through (iv) are referred to herein as the "Environmental

9

Assessment Reports"), and without any further investigation by Landlord, (A) neither Landlord, nor any prior owner, tenant, or operator of the Building has performed any activities which would subject the Building to liability under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. 9601 et seq. ("CERCLA"), or any other environmental or quasi-environmental law, statute, act, rule, regulation or ordinance enacted by a municipal, county, state or federal governmental entity or agency (all of the foregoing along with any and all amendments thereof and supplements thereto, are hereinafter referred to individually as an "Environmental Law" and collectively as the "Environmental Laws"); (B) the Building is not now and has never been in violation of any Environmental Law; and (C) neither Landlord, nor any prior owner, tenant, or operator of the Building have used the Building to refine, produce, store, handle, transfer, process, transport or dispose of any "Hazardous Substances" or "Hazardous Waste" as defined under any Environmental Laws, except strictly in accordance with all such Environmental Laws. Landlord acknowledges that Tenant has not undertaken any independent environmental assessment of the Premises, and has executed and accepted the Lease in reliance upon the Environmental Assessment Reports provided by Landlord and above representations and warranty of Landlord.

Section 6.02. Brokerage Commissions. Landlord and Tenant warrant to each other that neither has dealt with any broker or other intermediary with respect to this transaction or the Premises in any manner which would create a right to a commission other than with the Brokers, whose compensation Landlord has separately agreed to pay. Landlord authorizes and directs Preferred Real Estate Advisors, Inc. to share its commissions on the rent paid by Tenant to Landlord with Julien J. Studley, Inc., acting as agent for Tenant.

ARTICLE SEVEN

Indemnification

Section 7.01. Tenant's Indemnity. Subject to Section 10.05 hereof, Tenant will protect, indemnify and hold harmless Landlord and its agents, affiliates, subsidiaries, parent companies and the officers and directors thereof, from and against any and all claims, actions, damages, liability and expense (including fees of attorneys, investigators and experts) in connection with loss of life, personal injury or damage to property in or about the Premises or arising out of the occupancy or use of the Premises by Tenant or its Agents or occasioned wholly or in part by any act or omission of Tenant or its Agents, whether during the Term, except to the extent such loss, injury or damage was caused by the negligence or willful misconduct of Landlord or its agents. In case any action or proceeding is brought against Landlord and/or its agents, affiliates, parent companies, officers, directors by reason of the foregoing, Tenant, at its expense, shall resist and defend such action or proceeding, or cause the same to be resisted and defended by counsel (reasonably acceptable to Landlord and its Agents) designated by the insurer whose policy covers such occurrence or by counsel designated by Tenant and approved by Landlord. Tenant's obligations pursuant to this Section 7.01 shall survive the expiration or termination of this Lease.

Section 7.02. Landlord's Indemnity. Subject to Section 10.05 hereof, Landlord will protect, indemnify and hold harmless Tenant and its agents, affiliates, subsidiaries, parent companies, and the officers and directors thereof, from and against any and all claims, actions, damages, liability and expense (including fees of attorneys, investigators and experts) in connection with loss of life, personal injury or damage to property in or about the Premises occasioned wholly or in part by any act or omission of Landlord or its agents, during the Term,

10

except to the extent such loss, injury or damage was caused by the negligence or willful misconduct of Tenant or its agents. In case any action or proceeding is brought against Tenant and/or its agents, affiliates, parent companies, officers, directors by reason of the foregoing, Landlord, at its expense, shall resist and defend such action or proceeding, or cause the same to be resisted and defended by counsel (reasonably acceptable to Tenant and its agents) designated by the insurer whose policy covers such occurrence or by counsel designated by Landlord and approved by Tenant. Landlord's obligations pursuant to this Section 7.02 shall survive the expiration or termination of this Lease. Landlord agrees that Landlord shall be solely responsible for and shall indemnify and defend and save Tenant harmless from any loss, damage, or liability caused by the presence of any asbestos containing materials, polychlorinated biphenyls, underground storage tanks, or any "Hazardous Substances" or "Hazardous Waste" that were refined, produced, stored, handled, transferred, processed, transported or disposed of on the Premises prior to the Rent Commencement Date.

## ARTICLE EIGHT

### Maintenance and Repairs

Section 8.01. Tenant's Obligations. Subject to Landlord's obligations set forth in this Lease, Tenant shall, throughout the Term, keep the Premises in good working order and condition, at Tenant's sole cost and expense, including all driveways, parking areas, curbs, landscaped areas, and sidewalks, and other improvements now or hereafter erected thereon, including but not limited to the roof, HVAC equipment, finishes, plumbing, lighting and other improvements now or hereafter located upon the Building, or any part of the Premises. Tenant shall, at Tenant's sole cost and expense, during the entire Term, engage a reputable and licensed mechanical contractor to provide routine preventive maintenance service on the heating, ventilation and air conditioning equipment ("HVAC") pursuant to a written service contract, and shall provide a copy of same to Landlord promptly following receipt of same. Tenant shall also provide Landlord with a list of contractors whom Tenant has engaged pursuant to a written agreement for scheduled maintenance or routine repairs of the Premises, or the systems or equipment therein. At the expiration of the Term, Tenant shall deliver the Premises in broom clean condition, reasonable wear and tear excepted.

Section 8.02. Landlord's Obligations. Landlord shall be responsible for and covenants and agrees to maintain in good condition all structural and weight bearing elements of the Building, and shall make all structural repairs to the Building, including but not limited to the external walls, weight-bearing elements and base flooring (below floor covering). Notwithstanding anything to the contrary contained in this Section 8.02, Landlord shall not be responsible for repairs or replacements necessary to correct damage caused by Tenant or Tenant's invitees.

Section 8.03 Access to Premises. Landlord may enter upon the Premises during normal business hours, upon 48 hours prior verbal notice to Tenant's designated representative (except no notice shall be required in the case of emergency), and accompanied by an employee of Tenant, and further provided that the individual or individuals seeking access on behalf of Landlord shall have executed a confidentiality agreement satisfactory to Tenant, for the following purposes:

(a) to inspect the condition of the Premises;

11

(b)    to make repairs to the Building or Premises pursuant to the terms of the Lease, provided that Landlord shall make every reasonable effort to minimize any interference with Tenant's use of the Premises, and so long as Landlord is using reasonable efforts to minimize interference, there will be no liability or abatement of Fixed Basic Rent or Additional Rent while such repairs are being undertaken, and

(c)    to show the Premises to prospective purchasers, mortgagees, or other persons having a legitimate interest in viewing the same, and, at any time within nine (9) months prior to the expiration of the Term for the Premises, to brokers or persons wishing to rent the Premises;

Section 8.04.  Landlord as Building Manager; Manager's Fee.  Tenant shall pay Landlord, or at Landlord's direction, to Landlord's agent, a fee of $400.00 per month, as Additional Rent in accordance with Section 2.02 hereof (the "Manager's Fee").

ARTICLE NINE

Alterations

Section 9.01.  Structural Alterations.  Except as provided in Section 9.02 hereof, and other than the Tenant Work, Tenant will make no other structural alterations to the Premises or any part thereof, without the prior written consent of Landlord, which consent will not be unreasonably withheld, conditioned, or delayed.  Landlord shall not withhold, its consent unless such structural alterations would materially change the character, appearance or use of the Premises, or would weaken or impair the structural integrity or lessen the value of the Premises or any part thereof.  Any such permitted alterations shall be performed in accordance with plans and specifications, and a construction schedule, previously approved in writing Landlord.  Nevertheless, Tenant shall be permitted to install roof top HVAC units in accordance with plans and specifications previously approved in writing by Landlord.  The location of such roof top HVAC units shall be subject to Landlord's reasonable discretion, and such installation shall be performed by a licensed mechanical contractor, which contractor shall be subject to Landlord's approval, which approval shall not be unreasonably withheld, conditioned or delayed.  Any such structural alterations to the Premises shall be subject to the same conditions as apply to the Tenant Work pursuant to Section 4.02 hereof.

Section 9.02.  Non-Structural Alterations.  Tenant may, at its sole cost, and without the prior written consent of Landlord, make such interior nonstructural alterations, additions, and improvements in and to the Premises as it may deem desirable for its use, provided that Tenant notifies Landlord of Tenant's intention to perform such alterations, additions and improvements and provides Landlord with a copy of any plans and specifications relating thereto.  Any such non-structural alterations to the Premises shall be subject to the same conditions as apply to the Tenant Work pursuant to Section 4.02 hereof.

Section 9.03  Mechanics' Liens.  Tenant shall not, in the making of any repairs or alterations pursuant to the provision of this Lease, suffer or permit any mechanic's, laborer's or materialmen's lien to be filed against the Premises, Building, or any part thereof by reason of labor or materials supplied or claimed to have been supplied to Tenant; and if any such lien shall be filed, Tenant, within forty-five days after notice of filing, shall cause it to be discharged of record.  In the event that Tenant fails to discharge any such lien as aforesaid, then Landlord may, but shall not be required to, cause such lien to be discharged.  Any such payments or expenses incurred by

12

Landlord in connection therewith, shall constitute Additional Rent hereunder and shall be due and payable with the next monthly installment of Fixed Basic Rent. Tenant shall provide Landlord with copies of the praecipe or other record evidencing the discharge of such lien promptly following receipt of same.

Section 9.04.  Status of Improvements: "As Built" Drawings.  Any alterations or improvements made pursuant to this Lease shall remain on the Premises at the expiration of the Term, unless Landlord and Tenant shall agree otherwise in writing; provided, however, that Tenant shall, at its option, have the right to remove Tenant's trade fixtures, equipment, furnishings or personal property, provided that if damage is caused by such removal, the damage shall be repaired by Tenant by the expiration of the Term.

## ARTICLE TEN

### Insurance and Damage

Section 10.01.  Insurance.  Tenant, at Tenant's sole cost and expense, shall keep or cause the Premises to be kept continuously insured during the Term, under policies providing the following insurance coverages: (i) commercial general liability insurance on an occurring basis with a combined single limit for bodily injury and property damage of not less than $2,000,000.00, including the broad form general liability endorsement, contract liability, and products liability coverage; and (ii) a policy of standard fire, extended coverage and special extended coverage insurance (all risks), including a vandalism and malicious mischief endorsement, in an amount equal to the full replacement value of the Premises, new and without deduction for depreciation of fixtures, furniture and improvements.  On or before the Rent Commencement Date, Tenant shall provide Landlord with satisfactory evidence that such insurance is in full force and effect or effectively renewed and that the insurance premiums for such insurance have been paid for the first year of the term.  Tenant's obligation to carry or maintain any insurance required to be maintained by Tenant under the Lease may be satisfied by Tenant by providing such coverages under Tenant's existing blanket insurance policy. Such liability policy shall name Landlord as an additional insured, and such casualty policy shall name Landlord as the loss payee, and shall provide for at least thirty (30) days' prior notice of cancellation or modification to Landlord. Upon the execution of this Lease, Tenant shall deposit certificates evidencing such insurance coverages with Landlord, and thereafter shall deposit with Landlord certificates evidencing renewal of such coverages at least fifteen (15) days prior to the expiration thereof.  In the event that Tenant shall fail to maintain any such required insurance coverages during the Term, Landlord may, but shall not be obligated to, procure and obtain such insurance coverages and Landlord's costs for such insurance shall constitute Additional Rent hereunder and shall be due and payable with the next monthly installment of Fixed Basic Rent.

Section 10.02.  Damage or Casualty.

(a)     In case the Premises or any portion thereof shall be totally or partially damaged or destroyed by fire or by any other casualty whatsoever, then Landlord and Tenant shall proceed with reasonable promptness, and in accordance with paragraph (c) below, to repair and restore the Premises to at least as good a condition as that which existed immediately prior to such fire or other casualty and during such repair period, there shall be an abatement of rent.  In the event Landlord receives any insurance proceeds from the property insurance maintained by

13

Tenant pursuant to Section 10.01, Landlord shall turn such proceeds over to Tenant for the purpose of making such repairs.

(b)    In the event that any of the insurance monies paid by the insurance companies to Tenant shall remain after the completion of such repairs, restoration or reconstruction, the excess shall be paid to or retained by Tenant, as Tenant's property. In the event that the proceeds of any insurance policies are insufficient to restore the Premises to the condition that they were in prior to the occurrence of the casualty, either party hereto may terminate this Lease upon ten (10) days prior written notice to the other party of such election, and the Lease shall terminate on the date set forth in such notice unless the other party shall elect and agree to pay any short fall necessary to effect the required repairs, restoration or reconstruction, and in which case the insurance proceeds shall be apportioned between the parties hereto in the same proportion as the cost of the Tenant Work bears to the aggregate of the cost of the Landlord Improvements plus (i) the actual cost to Landlord to acquire the Building (exclusive of the land and appurtenances) or (ii) $1,800,000, whichever is less.

(c)    All repairs, restoration and reconstruction to the interior of the Building, or other portions of the Premises comprising the Tenant Work shall be performed by Tenant subject to the conditions set forth in Section 4.02 and Section 9.01 hereof. All repairs, restoration and reconstruction to the exterior of the Building, or other exterior improvements to the Premises shall be performed by Landlord. The parties shall cooperate with one another and shall have mutual responsibility for the adjustment of all insurance claims.

Section 10.03.    <u>Cooperation in Actions</u>. Landlord and Tenant each will cooperate with the other, to such extent as such other party may reasonably require, in connection with the prosecution or defense of any action or proceeding arising out of, or for the collection of any insurance monies that may be due in the event of, any loss or damage, and each will execute and deliver to such other party such instruments as may be required to facilitate the recovery of any insurance monies.

Section 10.04.    <u>Notice of Casualty</u>. Tenant shall give prompt written and verbal notice to Landlord with respect to all fires or other casualties occurring upon the Premises.

Section 10.05.    <u>Waiver of Subrogation; Rights Under Insurance Policies</u>. Each of the parties hereto hereby release the other, to the extent of the releasing party's insurance coverage, from any and all liability for any loss or damage which may be inflicted upon the Premises of such party even if such loss or damage shall be brought about by the fault or negligence of the other party, its agents or employees; provided, however, that this release shall be effective only with respect to loss or damage occurring during such time as the appropriate policy of insurance shall contain a clause to the effect that this release shall not affect said policy or the right of the insured to recover thereunder. If any policy does not permit such a waiver, and if the party to benefit therefrom requests that such a waiver be obtained, the other party agrees to obtain an endorsement to its insurance policies permitting such waiver of subrogation if it is available and if such policies do not provide therefor. If an additional premium is charged for such waiver, the party benefiting therefrom, if it desires to have the waiver, agrees to pay to the other the amount of such additional premium promptly upon being billed therefor.

14

## ARTICLE ELEVEN

### Condemnation

Section 11.01. Condemnation. In the event that the Premises, or any part thereof, shall be taken in condemnation proceedings or by exercise of any right of eminent domain or by agreement between Landlord, Tenant and those authorized to exercise such right (hereinafter collectively called "Condemnation Proceedings"), Tenant shall have the right to make a claim against the condemnor for moving expenses, business dislocation damages or damages to Tenant's business and personal property owned by Tenant, including but not limited to those items constituting Tenant Work. The parties agree to execute any and all further documents that may be required in order to facilitate collection of any such award or awards.

Section 11.02. Total Condemnation. If title to the fee of the whole or materially all of the Premises shall be taken by Condemnation Proceedings, for any public or quasi-public use, this Lease shall cease and terminate, and all Fixed Basic Rent, Additional Rent and other charges paid or payable by Tenant hereunder shall be apportioned, as of the date possession of the Premises must be delivered to the condemning authority, and the total award, except for any award specifically to Tenant as described in Section 11.01 above, shall be retained by Landlord. For the purposes of this Section, a taking of the whole or materially all of the Premises shall be deemed to have occurred if the portion of the Premises not so taken, in Landlord's reasonable, good faith judgment, cannot be reconstructed or repaired so as to constitute a facility usable by Tenant for the purposes which the Premises were being used by Tenant immediately prior to such taking.

Section 11.03. Partial Condemnation. Unless otherwise required by any mortgage lender of Landlord, if at any time during the term of this Lease, title to less than the whole or materially all of the Premises shall be taken in Condemnation Proceedings, all the award or proceeds collected by Landlord pursuant to Section 11.01 hereof shall be held by Landlord and applied and paid over toward the cost of demolition, repair and restoration, substantially in the same manner and subject to the same conditions as those provided in Section 10.03 hereof with respect to insurance and other monies and provided no Event of Default shall have occurred. Any balance remaining in the hands of Landlord after payment of such costs of demolition, repair and restoration as aforementioned shall be the sole property of Landlord. This Lease shall continue in full force and effect, provided however, the Fixed Basic Rent shall be reduced by the proportion that the square footage of the Building taken in condemnation bears to the total square footage of the Building.

## ARTICLE TWELVE

### Default

Section 12.01. Events of Default; Termination. The occurrence of each of the following shall be an "Event of Default" hereunder:

(a)    if Tenant shall make an assignment of a material portion of its assets for the benefit of its creditors, or if a material portion of Tenant's assets shall become subject to a levy or attachment by any judgment creditors or governmental authorities and such attachment or levy is not discharged or dissolved within forty-five (45) days after the date of such attachment or levy; or

(b)    if Tenant indicates an intention to file a petition or if any petition shall be filed by or against Tenant in any court, whether or not pursuant to any statute of the United States or of any

142860.7

State, in any bankruptcy, reorganization, composition, extension, arrangement or insolvency proceedings, and in the case of an involuntary bankruptcy petition such proceedings shall not be dismissed within ninety (90) days after the institution of the same; or

(c)     if, in any proceeding, a receiver or trustee be appointed for all or any portion of Tenant's property, and such receivership or trustee shall not be vacated or set aside within ninety (90) days after the appointment of such receiver or trustee; or

(d)     if Tenant shall fail to pay any installment of Fixed Basic Rent or Additional Rent, or any part thereof, when the same shall become due and payable for a period of ten (10) business days after written notice to Tenant from Landlord; or

(e)     if Tenant shall abandon the Premises, without the prior consent of Landlord, by removing all or substantially all of Tenant's furniture, equipment and personal property from the Premises, provided that Tenant shall also be delinquent in the payment of Fixed Basic Rent or fail to obtain any additional insurance coverage that may be required by Tenant's insurance carrier in order to insure a vacant building; or

(f)     if Tenant shall fail to perform or observe any other material provision, condition or requirement of this Lease (not hereinbefore in this Section 12.01 specifically referred to) on the part of Tenant to be performed or observed, and such failure shall continue for thirty (30) days after notice thereof from Landlord to Tenant, or, if such Event of Default is of such a nature that it cannot, with due diligence, be cured within a period of thirty (30) days, if Tenant shall have failed to commence the curing of such default within the period of thirty (30) days referred to above and shall thereafter fail to continue with all due diligence to complete the curing of such default and completes such cure in any event within ninety (90) days after notice thereof.

Section 12.02.   Remedies.  Upon the occurrence of an Event of Default, and at any time thereafter, Landlord shall have the following rights and may elect any one or more of the following remedies:

(a)     To accelerate the whole or any part of the Fixed Basic Rent for the remainder of the Term (the "Accelerated Rent"), which Accelerated Rent shall be discounted to present value on the basis of a discount rate equal to the prime rate offered by CoreStates Bank, N.A., applied and calculated on the date of receipt by Landlord of such Accelerated Rent; and shall be deemed due and payable as if, by the terms and provisions of this Lease, such Accelerated Rent was on that date payable in advance.

(b)     Without waiving Landlord's right to recover the Accelerated Rent as herein provided, Landlord may re-enter the Premises, and, at the option of Landlord, remove all persons and all or any property therefrom, either by summary dispossess proceedings or by any suitable action or proceeding at law or by force or otherwise, without being liable for prosecution or damages therefor, and repossess and enjoy the Premises.  Upon recovering possession of the Premises by reason of an Event of Default, Landlord may, at Landlord's option, either terminate this Lease or make such alterations and repairs as may be necessary in order to relet the Premises and relet the Premises or any part or parts thereof, either in Landlord's name or otherwise, for a term or terms which may, at Landlord's option, be less than or exceed the period which would otherwise have constituted the balance of the Term of and at such rent or rents and upon such other term and conditions as in Landlord's sole discretion may seem advisable and to such person or persons as may in Landlord's discretion seem best; upon each such reletting all rents received by Landlord from such reletting shall

16

be applied: first, to the payment of any costs and expenses of such reletting, including brokerage fees and attorney's fees and all costs of such alterations and repairs; second, to the payment of any indebtedness other than Fixed Basic Rent due hereunder from Tenant to Landlord; third, to the payment of Additional Rent due and unpaid hereunder; and the residue, if any, shall be held by Landlord and applied in payment of future rent as it may become due and payable hereunder. If such rentals received from such reletting during any month shall be less than that to be paid during that month by Tenant, Tenant shall pay any such deficiency to Landlord. Such deficiency shall be calculated and paid monthly. No such re-entry or taking possession of the Premises or the making of alterations or improvements thereto or the reletting thereof shall be construed as an election on the part of Landlord to terminate this Lease unless written notice of such intention be given to Tenant. Landlord shall in no event be liable in any way whatsoever for failure to relet the Premises, or in the event that the Premises or any portion thereof is relet, for failure to collect the rent thereof under such reletting. Notwithstanding any such reletting without termination, Landlord may at any time thereafter elect to terminate this Lease for such previous breach.

(c)    Without waiving Landlord's right to recover the Accelerated Rent as herein provided, Landlord may terminate the Lease and thereupon all rights of Tenant under this Lease shall expire and terminate and Tenant shall forthwith quit and surrender possession of the Premises in the condition specified in Section 8.01 hereof.

Section 12.03. Non-Waiver. No waiver by Landlord of any breach by Tenant or any of Tenant's obligations, agreements or covenants herein shall be a waiver of any subsequent breach, nor shall any forbearance by Landlord to seek a remedy for any breach by Tenant be a waiver by Landlord of any rights and remedies with respect to any subsequent breach.

Section 12.04. Rights and Remedies Cumulative. No right or remedy herein conferred upon or reserved to Landlord is intended to be exclusive of any other right or remedy provided herein or by law, but each shall be cumulative and in addition to every other right or remedy given herein or now or hereafter existing at law or in equity or by statute.

Section 12.05. Waiver of Trial by Jury. LANDLORD AND TENANT HEREBY IRREVOCABLY AGREE TO WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER ON ANY MATTER WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT, TENANT'S USE OF OR OCCUPANCY OF THE PREMISES AND/OR ANY CLAIM OF INJURY OR DAMAGE OR REMEDY.

ARTICLE THIRTEEN

Quiet Enjoyment; Subordination

Section 13.01. Quiet Enjoyment. Tenant, upon paying the rent herein reserved, and performing and observing the covenants, conditions and agreements hereof upon the part of Tenant to be performed and observed, shall and may peaceably hold and enjoy the said Premises during the term hereof, without any interruption or disturbance from Landlord or anyone claiming by, through or under Landlord, subject, however, to the terms of this Lease and subject to all matters which now affect the Premises and subject to the rights of Landlord's mortgage lenders under all present and future mortgages of Landlord covering the Premises. This covenant shall be construed as running with the

17

land to and against subsequent owners and successors in interest, and is not, nor shall it operate or be construed as, a personal covenant of Landlord, except to the extent of Landlord's interest in said Premises and only so long as such interest shall continue, and thereafter this covenant shall be binding only upon such subsequent owners and successors in interest, to the extent of their respective interests, as and when they shall acquire the same, and only so long as they shall retain such interest.

Section 13.02.  Subordination, Non-Disturbance and Attornment.  This Lease, and Tenant's rights hereunder, including, without limitation the Option granted pursuant to Article 15 hereof, shall not be subject or subordinate to the lien of any mortgage, ground lease, or other encumbrance, encumbering the Premises, unless Tenant and such encumbrancer execute an agreement, certificate or other writing, which contains a provision that so long as Tenant shall not be in default under the terms of the Lease, the Lease, the Option and all of Tenant's other rights hereunder, and Tenant attorns to such encumbrancer, the Lease shall remain in full force and effect regardless of any event of foreclosure or termination upon any such mortgage, ground lease or other encumbrance. Such agreement shall also contain a provision, which obligates Tenant, notwithstanding any claim, defense or right of setoff that otherwise may be available to Tenant in the event that Landlord is in default under the terms of this Lease, to make payments of Fixed Basic Rent to such encumbrancer, and provides any claim, defense or right of setoff that Tenant may have under applicable law would only apply to such portion of the Fixed Basic Rent that exceeds the amount of Landlord's regular monthly installment payment of debt service to such encumbrancer.

Section 13.03.  Tenant Estoppel Certificate.    Tenant shall, within ten (10) days following request of Landlord, execute an estoppel certificate or similar writing, certifying to Landlord's mortgagee or purchaser such facts, if true, and agreeing to such notice provisions and other matters as such mortgagee or purchaser may reasonably require in connection with Landlord's present or future financing or sale of the Building.

Section 13.04.  Landlord's Lien Waiver.  Within thirty (30) days following the written request of Tenant, Landlord shall execute a waiver or similar writing, as may be reasonably required in connection with any present or future financing provided to Tenant by any creditor, in order to evidence that Landlord waives, releases and relinquishes any and all rights (including the right to a landlord's lien), interest, or claim, if any, in or to all equipment, trade fixtures, goods, inventory, accounts, or accounts receivable (as those terms are defined under the Uniform Commercial Code), which are now or hereafter located or stored on, or otherwise do now or hereafter pertain to, the Premises, and which are subject to a security interest or lease agreement granted or entered into by Tenant in favor of any creditor of Tenant (collectively, such items are referred to as the "Collateral")..  Landlord shall not take custody or possession of the Collateral or distrain or remove any of the Collateral from the Premises, or interfere with the shipment, removal or delivery of any Collateral to or from the Premises by Tenant (or any third party acting with Tenant's permission), without having first provided thirty (30) days written notice of such proposed action to any such creditor of Tenant to whom Landlord shall have previously delivered a waiver or similar writing.

ARTICLE FOURTEEN

Option to Renew Lease

Section 14.01.  Option to Renew.  Provided that this Lease has not been sooner terminated or expired as provided for herein and that no Event of Default shall have occurred and

142660.7.

be continuing on the date of the exercise of the option to renew, Tenant shall have two consecutive options to extend the term (the "Renewal Options") of this Lease beyond the initial term for five year periods each. Such option shall be exercised by Tenant giving its written notice to Landlord at least one hundred and eighty (180) days prior to the expiration of the then current term of this Lease (collectively, the "Renewal Terms" and in the case of the first five year renewal term, the "First Renewal Term" and in the case of the second five year renewal term, the "Second Renewal Term").

Section 14.02.  Adjustment to Fixed Basic Rent.  In the event Tenant elects to exercise such option to extend the term of this Lease, the Fixed Basic Rent during the Renewal Terms shall be as follows: (a) during the First Renewal Term, the Fixed Basic Rent shall be $930,000.00 per annum, payable in equal monthly installments of $77,500.00 each (the "First Renewal Fixed Basic Rent") and (b) during the Second Renewal Term, the Fixed Basic Rent shall be as follows:

| Year | Yearly Payments | Monthly Payments |
|------|------|------|
| Lease Year 21 | $957,900.00 | $79,825.00 |
| Lease Year 22 | $986,637.00 | $82,219.75 |
| Lease Year 23 | $1,016,236.11 | $84,686.35 |
| Lease Year 24 | $1,046,723.19 | $87,226.93 |
| Lease Year 25 | $1,078,124.89 | $89,843.74 |

All other terms of the Lease shall remain the same.

ARTICLE FIFTEEN

Option to Purchase and Right of First Refusal

Section 15.01.  Tenant's Option to Purchase.  In consideration of Tenant's acceptance of this Lease, Tenant is hereby granted the exclusive right and option to purchase the Building, together with all of all those certain parcels and tracts of land on which the Building is situate, and all of Landlord's estate, right, title and interest thereto, including all easements and appurtenances thereto (collectively, the "Real Estate"), at any time prior to Lease Year 3, provided the Lease is then in full force and effect (the "Option").  The Option is to be exercised by Tenant's giving written notice of its intention to purchase the Real Estate to Landlord not less than sixty (60) days prior to Lease Year 3:  This Lease and the aforesaid notice of Tenant's exercise of the Option shall constitute an agreement of sale between the parties, whereby Landlord agrees to sell and Tenant agrees to purchase the Real Estate upon the following terms and conditions:

(a)    Settlement for the purchase of the Real Estate shall be on the earlier of (i) the date designated in Tenant's notice, which date shall be not less than thirty (30) days after the date such notice is delivered to Landlord, or (ii)  the commencement date of Lease Year 3. Settlement shall occur in the office of Tenant's title insurance company, on such date as shall be designated in the aforesaid notice from Tenant to Landlord.

(b)    In the event that Tenant effectively exercises the Option, the purchase price for the Real Estate shall be equal to the sum of $6,500,000.00, plus $21,000.00 multiplied by the number of full calendar months occurring after the first full calendar month of Lease Year 1 and before the calendar month during which settlement occurs, but including a pro rated portion of the $21,000 for the calendar month during which settlement occurs; provided however, that in the

19

142650.7

event that settlement is delayed through no fault of Tenant, the purchase price shall be calculated as if settlement had occurred on the date designated in Tenant's notice; and provided further that in no event shall the purchase price exceed the sum of $7,000,000.00.

(c)     The purchase price, computed as above provided, shall be payable by Tenant to Landlord, or to Landlord's mortgage lender if required by such lender, at the time of settlement, by title company check, cashier's check, certified check, or other immediately available funds.

(d)     Tenant and Landlord shall each pay fifty percent (50%) of all realty transfer taxes, documentary stamp taxes or other taxes and charges imposed by the federal, state or local authorities upon the conveyance.

(e)     Landlord shall convey to Tenant a good and marketable fee simple title to the Real Estate, free and clear of all liens, encumbrances, easements, restrictions or other exceptions or objections, except for the Permitted Exceptions, and except as have been created or consented to by Tenant during the term of this Lease. Tenant's title shall be insurable as such at ordinary rates by Commonwealth Land Title Insurance Company or such other title insurance company selected by Tenant. Except for Landlord's special warranty contained in the deed conveying the Real Estate to Tenant, which warranty shall be subject to the aforesaid permitted exceptions, Landlord shall make no representations or warranties regarding the Real Estate.

(f)     Tenant acknowledges that Tenant's obligation to purchase the Real estate following the effective exercise of the Option shall not be subject to Tenant's ability to obtain purchase money financing or any other contingency, except for Landlord's obligation to deliver title to the Real estate as aforesaid. In the event Tenant fails to complete settlement for any reason whatsoever, this Lease shall remain in full force and effect in accordance with its terms, including the right to exercise the Renewal Options. In the event that Tenant is in default of its obligation to purchase the Real Estate, when and as required hereunder, and such default is not cured within ten (10) days of the date of such default, Tenant shall reimburse Landlord for Landlord's reasonable costs and expenses actually incurred by Landlord in anticipation of completing settlement, but in no event shall Tenant be obligated to reimburse Landlord for more than $5,000.00.

Section 15.02. Tenant's Right of First Refusal. Landlord hereby grants to Tenant an exclusive right of first refusal to purchase the Real Estate on the terms set forth in this Section 15.02. In the event that at any time during the Term, and provided the Lease is then in full force and effect, Landlord shall receive a bona fide offer to purchase all or any part of the Real Estate, and desires to accept such offer, then Landlord shall promptly notify Tenant in writing of such offer, such notice to specify the price, payment and other material terms of such offer, and Landlord shall first offer to sell the Real Estate or such portion of the Real Estate which is the subject of such offer to Tenant on the same such terms. Tenant may accept such offer by written notice to Landlord within fifteen (15) business days following the receipt of Landlord's notice to Tenant. Upon Tenant's acceptance of such offer, closing shall occur in accordance with the terms of the offer provided to Tenant by Landlord. If Tenant does not agree to purchase the Real Estate or the subject portion thereof, Landlord shall have the right to proceed to sell the Real Estate, or the subject portion thereof, pursuant to the terms of such offer or on other terms no more favorable to the purchaser than were presented to Tenant, subject to this Lease, the Option, and the other rights of Tenant hereunder, and provided such sale is completed within the later of (i) 120 days from the date Tenant gives notice that it does not elect to purchase the Real Estate,

142656.7

or (ii) the period of time set forth in such offer. Notwithstanding anything set forth herein to the contrary, Landlord shall not be permitted to sell or convey the Real Estate during the first two years of the Term to anyone but Tenant, except for a conveyance to a partnership, trust, or other legal entity in which Brian O'Neill, an individual who presently owns an interest in Landlord, shall continue to own a legal or beneficial interest, and with respect to such conveyance Tenant's right of first refusal granted under this Section shall not be deemed to be extinguished and the deed or other writing evidencing such conveyance shall expressly provide that the conveyance and the grantee's rights with respect thereto are and shall be subject to this Lease.

Section 15.03. <u>Memorandum of Lease and Option to Purchase</u>. Concurrently with the execution hereof, the parties hereto shall execute and deliver a memorandum of this lease and option to purchase in the form attached hereto as Exhibit "D," which memorandum shall thereafter be promptly recorded in the Office of the Recorder of Deeds of Montgomery County, Pennsylvania. The memorandum shall indicate the terms by which the lease and option to purchase granted herein shall expire.

ARTICLE SIXTEEN

<u>Miscellaneous</u>

Section 16.01. <u>Assignment: Sublease</u>.

(a)    Except as provided in paragraph (b) below, Tenant shall not assign or sublet the Premises or any part thereof without Landlord's prior written approval, which approval shall not be unreasonably withheld, conditioned or delayed. If Tenant desires to assign this Lease or sublet any or all of the Premises, Tenant shall give Landlord written notice prior to the anticipated effective date of the assignment or sublease, and shall provide Landlord with a written sublease or assignment, signed by each of Tenant and Tenant's assignee or subtenant, and a copy of the most recently available financial statement for such assignee or subtenant. Landlord shall then have a period of ten (10) days following receipt of such notice to notify Tenant in writing that Landlord elects either (1) to terminate this Lease as to the space so affected as of the date so requested by Tenant, or (2) to permit Tenant to assign this Lease or sublet such space. If Landlord shall fail to notify Tenant in writing of such election within such period, Landlord shall be deemed to have approved such assignment or sublease.

(b)    Notwithstanding anything to the contrary contained in paragraph (a) above, Tenant may assign or sublet all or any portion of the Premises if either (A) (1) Tenant is not in default of any its obligations under this Lease, (2) Tenant remains obligated hereunder, (3) the proposed use of the Premises is in compliance with all applicable Laws pertaining to the Premises, and does not violate any restrictive covenant to which the Landlord may be bound, and (4) the prospective assignee or subtenant has signed a written sublease or assignment with Tenant and therein agrees to be bound by all the terms and conditions of the Lease respecting the portion of the Premises that is the subject of the assignment or sublease, or (B) (1) such assignee or subtenant is a subsidiary or an affiliate of Tenant, or owns or controls Tenant, (2) acquires all or substantially all of the assets of Tenant, or (3) acquires all or a majority of the capital stock of Tenant, Landlord shall consent and approve the proposed assignment or sublease within ten (10) days of Tenant's notice and shall not be permitted to withhold or condition such approval and consent.

21

(c)    Any rent or other consideration realized by Tenant under any such sublease or assignment in excess of Fixed Basic Rent payable hereunder, net of the reasonable cost of any improvements which Tenant has made for the purpose of assigning or subletting all or a part of the Premises and other expenses incurred by Tenant associated with such assignment or subletting, including, without limitation, brokerage commissions and legal fees, shall be divided and paid, ten percent (10%) to Tenant, and ninety percent (90%) to Landlord.

(d)    No assignment or subletting by Tenant shall relieve Tenant of any obligations under this Lease. Any assignment of subletting which conflicts with the provisions hereof shall be void.

Section 16.02.  Notice.  All notices, requests and other communications under this Lease shall be in writing and shall either be sent by registered or certified mail, return receipt requested, postage prepaid, by an overnight courier guaranteeing next day delivery (e.g., Federal Express, Purolator, UPS), in each instance addressed, as follows:

To Landlord:    525 VIRGINIA DRIVE ASSOCIATES LIMITED PARTNERSHIP
443 South Gulph Road
King of Prussia, Pennsylvania 19406
Attention:

With Copy to:    Kevin W. Walsh, Esquire
Adelman, Lavine, Gold & Levin
1900 Two Penn Center Plaza
Philadelphia, PA  19102

To Tenant:    BIO-PHARM PHARMACEUTICS SERVICES, INC.
425 Delaware Drive
Fort Washington, Pennsylvania 19034-2703
Attention: John Santoro – 215 - 646 - 1226

With Copy to:    Linda Ann Galante, Esquire
Stradley, Ronon, Stevens & Young, LLP
30 Valley Stream Parkway
Malvern, PA  19355

or at such other address of which Seller or Purchaser shall have given notice as herein provided. All such notices, requests and other communications shall be deemed to have been sufficiently given for all purposes hereon on the second (2nd) day after the date of mailing thereof, or one day after overnight delivery, and may be given on behalf of any party by its counsel.

Section 16.03  Signage.  During the last nine (9) months of the term, Landlord may place and maintain a "For Rent" or "For Sale" sign in or on the Premises, subject to Upper Dublin Township regulations.

Section 16.04.  Survival of Valid Terms.  If any term or provision of this Lease or the application thereof to any person or circumstances, shall to any extent be invalid or unenforceable, the remainder of this Lease, or the application of such term or provision to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby, and each term and provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

22

142650.7.

Section 16.05. Covenants to Bind and Benefit Respective Parties. The terms, conditions, covenants, provisions and agreements herein contained shall be binding upon and inure to the benefit of Landlord and Tenant, their successors and assigns.

Section 16.06. Captions and Headings. The captions and headings throughout this Lease are for convenience and reference only and the words contained therein shall in no way be held or deemed to define, limit, describe, or add to the interpretation, construction or meaning of any provision of or the scope or intent of this Lease.

Section 16.07. Governing Law. This Lease and the relative rights, privileges, duties and obligations of the parties hereunder shall be governed by the Laws of the Commonwealth of Pennsylvania.

Section 16.08 Confidentiality.
    (a)    Landlord acknowledges that in the course of managing the Building Landlord may gain access to information or materials that are confidential or proprietary to Tenant, including information or materials pertaining to Tenant's business operations or information or materials with respect to which Tenant may be under an obligation of confidentiality to third parties ("Confidential Information"). Additionally the names, terms, conditions, facts, or other information pertaining to this Lease shall be deemed Confidential Information. Landlord shall keep all Confidential Information in strict confidence under appropriate safeguards. Except as may be required by judicial process, neither Landlord nor any employee, officer, director, agent or attorney of Landlord shall (i) disclose or reveal any Confidential Information, except with respect to the terms and conditions of this Lease, which may be disclosed to a limited group of the Landlords' officers, agents, and attorneys, who are actively participating in the negotiation, approval and execution of the Lease ("Party Representatives"), each of whom shall be informed of the confidential nature of the Lease; or (b) use any confidential Information in any way that could be detrimental to Tenant. This Section 16.08 shall be binding upon and inure to the benefit of all parties hereto and to each of their respective Party Representatives.

Section 16.09 Lease Guaranty. Contemporaneously with the execution of this Lease by Tenant, Guarantor shall execute and deliver to Landlord a guaranty in the form attached hereto as Exhibit "E".

Section 16.10 Counterparts. This Lease may be executed by the parties in any number of counterparts, each of which so executed shall be deemed an original; and such counterparts shall together constitute but one and the same Lease.

Section 16.05.  <u>Covenants to Bind and Benefit Respective Parties</u>.  The terms, conditions, covenants, provisions and agreements herein contained shall be binding upon and inure to the benefit of Landlord and Tenant, their successors and assigns.

Section 16.06.  <u>Captions and Headings</u>.  The captions and headings throughout this Lease are for convenience and reference only and the words contained therein shall in no way be held or deemed to define, limit, describe, or add to the interpretation, construction or meaning of any provision of or the scope or intent of this Lease.

Section 16.07.  <u>Governing Law</u>.  This Lease and the relative rights, privileges, duties and obligations of the parties hereunder shall be governed by the Laws of the Commonwealth of Pennsylvania.

Section 16.08  <u>Confidentiality</u>.

(a)    Landlord acknowledges that in the course of managing the Building Landlord may gain access to information or materials that are confidential or proprietary to Tenant, including information or materials pertaining to Tenant's business operations or information or materials with respect to which Tenant may be under an obligation of confidentiality to third parties ("Confidential Information").  Additionally the names, terms, conditions, facts, or other information pertaining to this Lease shall be deemed Confidential Information.  Landlord shall keep all Confidential Information in strict confidence under appropriate safeguards.  Except as may be required by judicial process, neither Landlord nor any employee, officer, director, agent or attorney of Landlord shall (i) disclose or reveal any Confidential Information, except with respect to the terms and conditions of this Lease, which may be disclosed to a limited group of the Landlords' officers, agents, and attorneys, who are actively participating in the negotiation, approval and execution of the Lease ("Party Representatives"), each of whom shall be informed of the confidential nature of the Lease; or (b) use any confidential Information in any way that could be detrimental to Tenant.  This Section 16.08 shall be binding upon and inure to the benefit of all parties hereto and to each of their respective Party Representatives.

Section 16.09  <u>Lease Guaranty</u>.  Contemporaneously with the execution of this Lease by Tenant, Guarantor shall execute and deliver to Landlord a guaranty in the form attached hereto as Exhibit "E".

Section 16.10  <u>Counterparts</u>.  This Lease may be executed by the parties in any number of counterparts, each of which so executed shall be deemed an original; and such counterparts shall together constitute but one and the same Lease.

142650.7

IN WITNESS WHEREOF, the parties hereto have caused this Lease to be duly executed as of the day and year first above written.

525 VIRGINIA DRIVE ASSOCIATES
LIMITED PARTNERSHIP, a Pennsylvania
limited partnership, by its sole general partner
525 VIRGINIA DRIVE ASSOCIATES
ACQUISITION CORPORATION, a
Pennsylvania corporation

By: _____
President

BIO-PHARM PHARMACEUTICS
SERVICES, INC., a Delaware corporation

By: _____
Vice President

Joseph S. Terpsio

EXHIBIT "A"

## LEGAL DESCRIPTION/LOCATION OF THE PREMISES

EXHIBIT "B-1"

## PLANS AND SPECIFICATIONS FOR LANDLORD IMPROVEMENTS
(Comprised of the HSC Work Letter, as amended, the roofing contractor's letter, the landscaping plan, and the parking plan, all to be attached hereto).

EXHIBIT "B-2"

## PLANS AND SPECIFICATIONS FOR TENANT WORK
(Comprised of any available plans and specifications that may have been approved by Tenant prior to the execution of the Lease, if any, to be attached hereto).

EXHIBIT "C"

## PERMITTED EXCEPTIONS

EXHIBIT "D"

## MEMORANDUM OF LEASE

EXHIBIT "E"

## FORM OF LEASE GUARANTY

142550.7

EXHIBIT "A"

LEGAL DESCRIPTION OF THE PREMISES

142650.7

PARCEL I

ALL THAT CERTAIN lot or piece of ground with the buildings and improvements thereon erected, Situate in Upper Dublin Township, Montgomery County, Commonwealth of Pennsylvania, bounded and described according to an As-Built Survey, made by Frank A. Tebo, Professional Engineer, dated November 21, 1975, as follows, to wit:

BEGINNING at a point at the intersection of the center lines of Delaware Drive and Virginia Drive and following the center line of Virginia Drive, North 37 degrees 24 minutes 53 seconds East, a distance of 470.00 feet to a point and the place of beginning; thence continuing along the center line of a Virginia Drive north 37 degrees 24 minutes 53 seconds East, a distance of 372.85 feet to a point; thence along a curve to the right with a central angle of 90 degrees, radius of 150 feet and an arc of 235.62 feet to a point; thence south 52 degrees 35 minutes 07 seconds East a distance of 720.00 feet thence south 52 degrees 35 minutes 07 seconds East a distance of 720.00 feet to a point thence along a curve to the left with a central angle of 21 degrees, a radius of 200 feet and an arc of 73.30 feet to a point; thence south 36 degrees 37 minutes 06 seconds West, a distance of 469.90 feet to a point; thence south 85 degrees 44 minutes 06 seconds west, a distance of 98.00 feet to a point; thence north 52 degrees 35 minutes 07 seconds West, a distance of 874.00 feet to a point and the place of beginning.

SUBJECT TO;

1. Covenants, easements, restrictions and encumbrances of record; and
2. State of facts shown on survey made by Frank A. Tebo, dated November 21, 1975 and any state of facts an updated survey would disclose.

TOGETHER with all right, title and interest, if any, of the said Grantor in and to the following described premises:

Parcel 2

BEGINNING at a spike on the centerline of Virginia Drive (60.00 feet Wide) a corner of this and land now or formerly of Kie Zin Associates, said point being at the distance of 470.00 feet measured north 37 degrees 24 minutes 53 seconds East along the centerline of Virginia Drive from a point marking its intersection with the centerline of Delaware Drive; thence from said beginning point extending along the

EXHIBIT A

Page 1 of 2

centerline of Virginia Drive the four following courses and distances; (1) north 37 degrees 24 minutes 53 seconds East 372.85 feet to a spike a point of curve; (2) along a line curving to the right with a radius of 150.00 feet the arc distance of 235.62 feet to a spike a point of tangency; (3) south 52 degrees 35 minutes 07 seconds East 720.00 feet to a spike a point of curve; (4) along a line curving to the left with a radius of 200.00 feet the arc distance of 73.30 feet to a spike; thence leaving Virginia Drive along the centerline of a 40 foot wide drainage easement by land of Upper Hanover Township Industrial Development passing over a drill hole at the distance of 24.50 feet a drill hole in a head wall at the further distance of 8.98 feet, south 36 degrees 37 minutes 06 seconds West 470.35 feet to a point in Pine Run Creek easement 60.00 feet wide; thence through Pine Run Creek, aforesaid, by land now or formerly of Great Atlantic & Pacific Tea Company said Pine Run Creek easement extending 35.00 feet northerly from and parallel to and 25.00 feet southerly from and parallel to herein described line south 85 degrees 44 minutes 06 seconds West 99.36 feet to a point; thence leaving Pine Run Creek by land of Kie Zin Associates (along the centerline of a drainage ditch) crossing an iron pin at the distance of 10 feet and crossing a drill hole in a concrete head wall 30 feet from the terminus of herein described line, north 52 degrees 35 minutes 07 seconds West 874.00 feet to the first mentioned point and place of beginning.

THE aforementioned described Parcel 2 is purportedly described according to an "As Built Survey" plan made for Juda Diener Foundation, made by Yerkes Associates, Inc., consulting engineers and surveyors dated October 5, 1979.

BEING known as 525 VIRGINIA DRIVE

BEING Parcel 54-00-16390-00-8

BEING the same premises which LOOMIS J. GROSSMAN by deed dated 10/16/79 and recorded 10/19/79 in the County of Montgomery in Deed Book 4464 page 402 conveyed unto JUDA DIENER FOUNDATION, A NEW JERSEY CORPORATION , in fee.

# EXHIBIT A

Page 2 of 2

EXHIBIT "B-1"


## PLANS AND SPECIFICATIONS FOR LANDLORD IMPROVEMENTS
(Comprised of the HSC Work Letter, as amended, the roofing contractor's letter, the artist's rendering, landscaping plan, and the parking plan, all to be attached hereto).

142650.7

HSC

HEALTH SCIENCES CONSTRUCTION GROUP LTD

1 Great Valley Parkway, Suite 4
Malvern, Pennsylvania 19355

(610) 889-9911    (610) 889-9747 fax

Bio-Pharm
525 Virginia Drive
Fort Washington, PA

November 18, 1996

## SCOPE OF INTERIOR SELECTIVE DEMOLITION
## TO BE PROVIDED BY LANDLORD

I.    Office Wing
      Two Stories Bounded by Columns 7.1 to 16 and Columns A.5 to Q

      A.    General Construction

            1.    Remove all interior partitions and related construction with the exception of
                  stairwells, elevator shaft, toilet rooms and mechanical/electrical rooms.

            2.    Remove hung ceilings throughout including hangers.

            3.    Remove all floor coverings to original concrete slab.

            4.    Remove all kitchen and serving equipment associated with existing lunch room.

            5.    Remove all built-in casework and millwork.

            6.    All interior faces of exterior walls to remain, including perimeter fin-tube
                  radiation heating system.

      B.    Mechanical

            1.    Remove existing roof-top and interior air handling units including controls.
                  Provide roof infill of roof penetrations with framing, metal deck and roofing.

            2.    Remove existing roof-top mounted exhaust fans. Patch roof deck and roofing.

            3.    Remove all plumbing and service piping associated with existing lunch room
                  and work areas. Cap all work below floor or behind walls and patch same.

            4.    Remove all air devices associated with removal of hung ceilings back to reheat
                  coils, including all hangers. Duct mains and branch ducts to reheat coils to
                  remain.

EXHIBIT B-1

Bio-Pharm
Landlord Demolition
November 18, 1996
Page Two

5.   Hot water boiler, including all perimeter heat and reheat piping, to remain.

6.   Domestic hot water heater, storage tank and loop piping to remain; cut and cap all abandoned drops.

7.   Domestic cold water piping to remain; cut and cap all abandoned drops.

8.   Existing sprinkler system to remain, including all drops and heads.

9.   Remove Ansul fire protection system in kitchen.

10.  Existing gas piping distribution to remain; cap at equipment being removed.

C.   Electrical

1.   Remove all interior lighting with the exception of rooms to remain. This includes removal of wiring back to lighting distribution panels. Provide or maintain minimum lighting for safety and exiting from building.

2.   Exit lighting to remain at stairwells and exterior doors.

3.   Remove all general purpose wiring and devices back to distribution panels.

4.   Remove all power and control wiring back to source from all removed equipment. Include removal of HVAC panelboards A to H and the two (2) panelboards serving the kitchen/lunchroom in the 1st Floor Electrical Room.

5.   All telephone and data wiring to be removed in its entirety, except the incoming feeders to the building.

6.   Maintain central panel in lobby for ADT fire alarm system. Wiring to remote devices can be removed as part of demolition. Devices shall be turned over to the Tenant.

7.   Remove master clock system in its entirety.

Bio-Pharm
Landlord Demolition
November 18, 1996
Page Three

II.  Warehouse/Manufacturing Wing
     One - Story Bounded by Columns 1.0 to 7.0 and Columns A to S

     A.  General Construction

         1.  Remove all interior partitions.

         2.  Remove hung ceilings throughout, including hangers.

         3.  Remove all floor covering to original concrete slab.

         4.  Remove all hung miscellaneous iron, abandoned as a result of the removal of
             previous fitouts.

         5.  Remove previous Owner's abandoned equipment and appurtenances.

     B.  Mechanical

         1.  Remove all original roof-top AC units including controls and provide roof infill
             of roof penetrations with framing, metal deck and roofing.

         2.  Unit heaters in the loading dock area are to remain in operating condition.

         3.  Remove existing exhaust fans and gravity vents; patch roof deck and roofing.

         4.  Remove all ductwork distribution, including air devices and hangers.

         5.  Remove all plumbing and service piping associated with previous fitouts.  Cap
             all work below floor or behind walls and patch same.

         6.  All systems related to Test Cells #1 and #2 to remain.

         7.  Gas distribution piping to remain.  Cap same at equipment being removed.

         8.  The HVAC units that are to remain are located above the two (2) test cells and
             hung below the roof between Columns #2 and #3.

Bio-Pharm
Landlord Demolition
November 18, 1996
Page Four

C.  Electrical

1.  Remove all interior lighting.  This includes removal of wiring back to distribution panels.  Provide or maintain minimum lighting for safety and for exiting from the building.

2.  Exit lighting to remain at exterior doors.

3.  Remove all equipment power and control wiring from equipment back to source.

4.  Remove all bus duct distribution back to source, including all hangers and branch wiring.

5.  Remove all general purpose wiring, including all devices, back to distribution panels.

6.  Remove all telephone and data wiring in its entirety.

III.  GENERAL ITEMS

A.  Tenant to identify any specific items to remain prior to start of demolition work by Landlord.

B.  Landlord to remove all of previous occupant's equipment not identified by tenant to remain.

C.  All PCB transformers/ballasts to be removed as part of the electrical demolition being performed by the Landlord.  All non-PCB transformers are to remain.

D.  All hazardous materials to be removed as part of the demolition performed by the Landlord.

E.  Test Cells #1 and #2 along Column I are to remain, including all services and air conditioning.

Bio-Pharm
Landlord Demolition
November 18, 1996
Page Six

F.    Existing emergency generator and its distribution should remain to provide power for the minimal light levels required, exit lighting and ADT system.

G.    The entire wet sprinkler system is to remain in operating condition, including all alarm systems.

H.    Remove abandoned metal shed in the parking lot.

# LANDLORD IMPROVEMENTS

November 18, 1996

1.    Exterior Lighting

- Parking lot lighting to be provided to meet Township Ordinance

- Replace exterior lighting fixtures on building, including egress fixtures at exit doors

2.    Landscaping

- Landscaping around the entire building

- Drainage from roof drains to swale

- Pipe roof drain outlets on the east side of building to swale

- Improve drainage swale along Virginia Drive

3.    Building Entrance

- Glass and entrance by Tenant

4.    Roofing

# PARKING LOT SPECIFICATIONS
## EXHIBIT "B"

Revised October 28, 1996

1.    Remove crumbled existing paving where required prior to resurfacing

2.    Remove existing vegetation

3.    Clean off silt and sweep, pushing off earth and debris

4.    Run leveling course as required to fill depressions and smooth out existing irregularities

5.    Remove precast concrete wheel stops

6.    Tack coat existing surface for proper adhesion

7.    Resurface existing parking lot and driveway with 2 inch ID-2 Asphalt Wearing Course

8.    Cut transition keys at street entrances and seal joints

9.    Remove existing surface at concrete walks for flush joints

10.   Re-stripe parking stalls and handicap aisles as required by codes

11.   Reinstall wheel stops (including new pins)

# STUCCO REPAIR SPECIFICATIONS
## EXHIBIT "C"

Revised October 28, 1996

- Remove the loose stucco down to firm substrate

- Re-coat the areas that were removed with the same finish to match existing stucco

- Paint all the stucco with painting system recommended by paint manufacturer

# WALKWAY SPECIFICATIONS
## EXHIBIT "D"

Revised October 28, 1996

- Remove all existing concrete in the main entrance courtyard

- Replace with 4 inches of new 3500 PSI concrete to match existing layout

- Walkway along the Virginia Drive entrance will be completely removed

- Replace concrete with 4 inches of concrete to match existing layout

- Areas to be replaced are cross-hatched on attached plan

- Replace/repair any sidewalks as required by the Township inspector

- Walkways shall be laid out and constructed to meet the current L & I and ADA requirements

- Replace any damaged sections of the walkway along road

# PAINTING SPECIFICATIONS
## EXHIBIT "E"

Revised October 29, 1996

To provide labor, material and supervision to furnish and install paint system which includes the following Items:

- Existing stucco

- Metal siding

- Exterior metal doors

- Warehouse siding

- Paint systems shall be selected and applied in accordance with paint manufacturers' recommendations and specifications. Systems shall be submitted to Tenant for approval.

- Preparation work shall be in accordance with paint manufacturers' guidelines

- Patch penetrations in metal siding prior to painting

- Accent stripe to be painted in accordance with rendering



TEL: (610) 430-1993
FAX: (610) 429-9387

O'Neil Properties
C/O Drew Wolfington

Dec. 3, 1996

Phone: 610 878-7441
Fax:   610 878-7487

RE: 525 Virginia Ave.
    Fort Washington, PA

We propose to furnish the necessary labor, materials, equipment, and supervision to perform the following scope of work:

Entire roof area.

1. We shall vacuum all existing slag gravel from the existing roof area.
2. We shall remove the existing built up roof down to the corregated steel decking.
3. We shall loose lay a new 1" polyisosanurate insulation board over to the steel deck over the entire roof area.
   ***We shall replace any deteriorated steel decking at a cost of $ 6.75 per square foot.
4. We shall install a new Firestone 045 LSFR EPDM roof system loose laid over the insulation board to the entire roof area.
5. We shall install tapered insulation crickets where necessary to improve drainage.
6. We shall flash all pipe protrusions, hvac units, and any other misc. protrusions through the roof. If a return trip is required to flash in any additional HVAC units they will be billed at a cost of $ 875.00/ unit.
7. We shall fabricate and install new heavy gauge white aluminum scuppers to properly drain the new roof system.
8. We shall reuse the existing copper counter flashing.
9. We shall install new aluminum coping edge flashing to the perimeter edge of the entire building.
10. We shall flash all drains, seams, and parapet walls.
11. We shall install the recommended ballast (river rocks) over the EPDM to secure the entire roof system.
12. We shall remove any job related debris upon completion of the job.

Upon completion of the project, you shall receive a fifteen (15) year labor and materials warranty from Firestone corporation.

WEST CHESTER PA 19382



PAINT EXISTG METAL PANELS & STUCCO
PANELS TO MATCH.

PAINT DARKER ACCENT TONE
VERTICLE & HORIZONTAL.

EXISTG BRICK TO REMAIN

NEW LANDSCAPING AT COURTYARD



ARCHITECT

Architecture
Planning
Interiors

Thomas C. Hack, architect
757 Wildwood Lane
Morristown, PA 19.
phone no: 262.3

Revisions

| | |
|---|---|
| Job No. | Drawn |
| Date | |
| Scale | |
| Drawing Title | |

## 525 VIRGINIA DRIVE
FACADE STUDY @ COURTYARD ENTRANCE



PLANT LIST

NOTES:

525 VIRGINIA DRIVE
FORT WASHINGTON INDUSTRIAL PARK  UPPER DUBLIN TOWNSHIP, PENNSYLVANIA

EXHIBIT "B-2"

## PLANS AND SPECIFICATIONS FOR TENANT WORK

(Comprised of any available plans and specifications that may have been approved by Tenant prior to the execution of the Lease, if any, to be attached hereto).

142650.7

EXHIBIT "C"

PERMITTED EXCEPTIONS

142650.7

# EXHIBIT "C"

## PERMITTED TITLE EXCEPTIONS

1. Possible additional assessments for taxes for new construction or for any major improvements pursuant to provisions of facts of acts of assembly relating thereto, which are not yet due and payable.

2. Title to that portion of the premises within the bed of Virginia Drive is subject to the public and private rights therein.

3. Rights granted to the Philadelphia Suburban Gas & Electric Company as in deed book 900 page 536.

4. Rights granted to Philadelphia Electric Company as in deed book 3183 page 544 and deed book 3385 page 92.

5. Rights granted to Philadelphia Electric Company and the Bell Telephone Company of Pennsylvania as in deed book 3213 page 382.

6. Sanitary sewer easement agreement as in deed book 4749 page 799.

7. Easement of 40 feet wide drainage easement through premises.

8. Stream of water (Pine Run Creek) flows through premises, subject to the riparian rights of owners of ground abutting same.

145267

EXHIBIT "D"

MEMORANDUM OF LEASE

1142650.7

## MEMORANDUM OF LEASE AND OPTION AGREEMENT

THIS MEMORANDUM OF LEASE AND OPTION AGREEMENT, made as of _____, 1996, between 525 VIRGINIA DRIVE ASSOCIATES LIMITED PARTNERSHIP, a Pennsylvania limited partnership, whose address is 443 South Gulph Road, King of Prussia, Pennsylvania 19406 ("Owner"), and BIO-PHARM PHARMACEUTICS SERVICES, INC., a Delaware corporation, whose address is Four Valley Square, 512 Township Line Road, Blue Bell, Pennsylvania 19422 ("Purchaser").

NOW, THEREFORE, the parties hereto, in consideration of the premises and mutual covenants, promises and undertakings herein set forth, and intending to be legally bound hereby, agree as follows:

1.    Owner is the legal and record owner of certain real estate, including an office building and other improvements, known as 525 Virginia Drive, Fort Washington, Upper Dublin Township, Montgomery County, Pennsylvania, as more fully described on Exhibit "A" attached hereto, together with all appurtenances thereto (the "Property").

2.    Owner, as "Landlord" and Purchaser as "Tenant" have entered into a certain Lease Agreement, dated the date hereof ("Agreement"), respecting the Property for an initial term of fifteen (15) years, with two (2) consecutive options to extend the term for five (5) year periods each.

3.    Pursuant to the Agreement, Purchaser was also granted an exclusive option to purchase the Property.

4.    This Memorandum is intended for recording purposes only, and does not supersede, diminish, add to or change the terms of the Agreement.

IN WITNESS WHEREOF, the parties hereto have set their hands and seals as of the day and year first above written.

525 VIRGINIA DRIVE ASSOCIATES            BIO-PHARM PHARMACEUTICS
LIMITED PARTNERSHIP                       SERVICES, INC.


By:_____             By:_____
    President                                President

145139

## EXHIBIT D

COMMONWEALTH OF PENNSYLVANIA          :
                                      : SS.
COUNTY OF                             :


On this _____ day of _____, 1996, before me, the undersigned officer, a notary public in and for the state and county aforesaid, personally appeared _____, who acknowledged that he is a duly appointed and acting President of 525 VIRGINIA DRIVE ASSOCIATES LIMITED PARTNERSHIP, a Pennsylvania limited partnership, and that he, in such capacity, executed the foregoing instrument on behalf of the corporation, for the purposes therein contained, by signing the name of the corporation by himself as such officer.


IN WITNESS WHEREOF, I hereunto set my hand and official seal.


(SEAL)                          _____
                                Notary Public

                                My Commission Expires:


COMMONWEALTH OF PENNSYLVANIA          :
                                      : SS.
COUNTY OF                             :


On this _____ day of _____, 1996, before me, the undersigned officer, a notary public in and for the state and county aforesaid, personally appeared _____, who acknowledged that he is a duly appointed and acting President of BIO-PHARM PHARMACEUTICS SERVICES, INC., a Delaware corporation, and that he, in such capacity, executed the foregoing instrument on behalf of the corporation, for the purposes therein contained, by signing the name of the corporation by himself as such officer.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.


(SEAL)                          _____
                                Notary Public

                                My Commission Expires:

EXHIBIT D

EXHIBIT "A"

145139

EXHIBIT D

EXHIBIT "E"

FORM OF LEASE GUARANTY

## LEASE GUARANTY

In consideration of and as an inducement for the granting, execution and delivery of the foregoing Lease Agreement, dated December 3, 1996 (hereinafter called the "Lease"), by and between 525 VIRGINIA DRIVE ASSOCIATES LIMITED PARTNERSHIP, a Pennsylvania limited partnership, the landlord therein named (hereinafter called the "Landlord") and BIO-PHARM PHARMACEUTICS SERVICES, INC., a Delaware corporation, its tenant therein named (hereinafter called "Tenant"), and in further consideration of the sum of One Dollar ($1.00), and other good and valuable consideration paid by Landlord to the undersigned, I.B.A.H., INC. a Delaware corporation (hereinafter called the "Guarantor"), hereby guarantees to Landlord, its successors and assigns, the full and prompt payment of all Fixed Basic Rent and Additional Rent (as those terms are defined in the Lease) payable by Tenant under the Lease and the full, faithful and prompt performance and observance of all the covenants, terms, conditions and agreements therein provided to be performed and observed by Tenant; and Guarantor does hereby become guarantor to Landlord, its successors and assigns, for and with respect to all of the aforesaid obligations of Tenant under the Lease. Guarantor hereby covenants and agrees to and with Landlord, its successors and assigns, that if default shall at any time be made by Tenant which is not cured within the applicable cure periods under the Lease, in the payment of any Fixed Basic Rent or Additional Rent payable by Tenant under the Lease, and such sums are not paid by Tenant or otherwise recovered by Landlord within the time provided under the Lease, Guarantor shall forthwith pay such rent or other sums or charges to Landlord, its successors and assigns. Landlord shall provide Guarantor with a copy of any and all notices of default which are given to Tenant as required under the terms of the Lease.

1.      This Guaranty is an agreement of suretyship as well as an absolute guaranty of payment. Guarantor's liability hereunder is unconditional and Landlord shall not be obligated to proceed against Tenant before commencing an action against Guarantor to recover such payment.

2.      This Guaranty shall be a continuing Guaranty and (whether or not Guarantor shall have notice or knowledge of any of the following) the liability and obligation of Guarantor hereunder shall be absolute and shall remain in full force and effect and shall not be released, discharged or in any way impaired by: (a) any amendment or modification of, or supplement to, or extension or renewal of, or termination of, the Lease or any assignment or transfer thereof; (b) any exercise or non-exercise of any right, power, remedy or privilege under or in respect of the Lease or this Guaranty or any waiver, consent or approval by Landlord with respect to any of the covenants, terms, conditions or agreements contained in the Lease or any indulgence, forebearances or extensions of time; (c) any bankruptcy, insolvency, reorganization, arrangement, readjustment, composition, liquidation or similar proceedings relating to Tenant, its successors and assigns, or its properties or creditors; (d) any limitation on the liability or obligation of Tenant under the Lease or its estate in bankruptcy or of any remedy for the enforcement thereof, resulting from the operation of any present or future provision of the United States Bankruptcy Code, as amended, or any other statute or from the decision of any court; (e) any transfer or assignment of its interests under the Lease or any subleasing of the Premises (as defined in the Lease); or (f) any release of any other guarantor of the Lease.

3.    Until all of Tenant's obligations under the Lease are fully performed, Guarantor:

(a)    waives any right of subrogation against Tenant by reason of any payments or acts of performance by Guarantor, in compliance with the obligations of Guarantor under this Guaranty;

(b)    waives any other right that Guarantor may have against Tenant by reason of any one or more payments or acts in compliance with the obligations of Guarantor under this Guaranty; and

(c)    subordinates any liability or indebtedness of Tenant held by Guarantor to the obligations of Tenant to Landlord under the Lease.

4.    Guarantor's liability hereunder shall cease upon the payment by Tenant of all Fixed Basic Rent and Additional Rent due under the terms of the Lease, provided that Tenant is not then in default under the terms of the Lease.

5.    This Guaranty shall be legally binding upon Guarantor, its successors and assigns, and shall inure to the benefit of Landlord, and its successors and assigns.

6.    The word "Landlord" shall mean all parties to Landlord, regardless of number and the word "he" shall be synonymous with "she", "it" and "they"; and the word "his" shall be synonymous with "her", "its" and "their". Where appropriate, the singular shall include the plural.

IN WITNESS WHEREOF, Guarantor, intending to be legally bound hereby, has executed this Guaranty this 3rd day of December, 1996.

L.B.A.H., INC.

By:_____
    Vice President

EXHIBIT "E"
2

144821

Exhibit B

RECYCLED

```
 1                UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF PENNSYLVANIA
 3
 4
 5  ---------------------------------------
                                          :
 6  BARRY M. PORTNOY and GERARD M.        :
    MARTIN, trustees for HUB              :
 7  Properties Trust,                     :
                                          :
 8          Plaintiffs,                   :
                                          :
 9      vs.                               :     CASE NO.
                                          :     02-CV-2905
10  OMNICARE PHARMACEUTICS, INC., and     :
    OMNICARE CLINICAL RESEARCH, INC.,     :
11                                        :
            Defendants.                   :
12                                        :
    ---------------------------------------
13
14
15      Deposition of:    JANICE M. RICE
16      Taken:            By the Plaintiffs
                          Pursuant to Agreement
17
        Date:             March 11, 2003
18
        Time:             Commencing at 10:13 a.m.
19
        Place:            Thompson Hine, LLP
20                        312 Walnut Street
                          Suite 1400
21                        Cincinnati, Ohio  45202-4029
22      Before:           Wendy L. Raymer, RPR
                          Notary Public - State of Ohio
23
24
```

COPY

Page 74

1    A.    I don't know.
2    Q.    You don't?
3    A.    I don't.
4    Q.    Have you ever had any problems with Marsh and
5    the services that they provided for your company?
6    A.    Other than with respect to this flood, no.
7    Q.    What flood are you referring to?
8    A.    The flood in 2001.
9    Q.    Other than that, you have not had any problems
10   with them?
11   A.    Not any significant issues, no.
12   Q.    Would you characterize the problem you had as a
13   result of the 2001 flood as a significant issue?
14   A.    I would.
15   Q.    What was the problem you had with Marsh as a
16   result of the 2001 flood?
17   A.    Marsh had the responsibility of identifying to
18   Omnicare exposures, particularly exposures that were not
19   insured, and this exposure was not identified to us.
20   Q.    You were underinsured as a result of -- for the
21   damage that you suffered as a result of the 2001 flood,
22   right?
23   A.    We were.
24   Q.    Do you know how much insurance was in place for

Page 75

1    the Fort Washington facilities prior to switching the
2    insurance coverage to Marsh?
3    A.    I have become aware of the insurance that was
4    in place.
5    Q.    How much was in place prior to running the
6    business through Marsh?
7    A.    For the risk of --
8    Q.    Flood.
9    A.    -- flood.  During what period of time?
10   Q.    How about 2000?
11   A.    It's my understanding that there was a half a
12   million dollars in flood coverage for one facility and no
13   flood insurance for the other, possibly.
14   Q.    That was prior to writing the business through
15   Marsh?
16   A.    Correct.
17   Q.    So are you testifying then that -- well, strike
18   that. How much coverage did Marsh suggest that you buy for
19   those properties?
20   MS. FILIATRAUT:  I'm going to object to the
21   form.
22   A.    Marsh didn't make a suggestion as to the amount
23   of coverage Omnicare should purchase for those facilities.
24   BY MR. HABER:

Page 76

1    Q.    What did it do?
2    A.    Marsh simply added those facilities to
3    Omnicare's policies of coverage, without identifying to
4    Omnicare that the exposure exceeded the amount of insurance
5    Omnicare had in place at the time.
6    Q.    How much flood coverage did you have in 2001 on
7    those facilities?
8    A.    In 2001, we had FEMA policies placed for each
9    of those two facilities.  And in addition to the FEMA
10   policy, a $2 1/2 million supplement on the primary policy.
11   Q.    The $2 1/2 million was, in effect, an umbrella
12   over the FEMA policies?
13   A.    All FEMA policies, correct.
14   Q.    So you had a million dollars each in FEMA
15   coverage for both properties?
16   A.    In Fort Washington, correct.
17   Q.    So there was a total of $4 1/2 million in
18   coverage that Marsh acquired for you?
19   A.    True.
20   Q.    Prior to purchasing the insurance for those
21   facilities through Marsh, is it your testimony that there
22   was less insurance coverage than there was in 2001?
23   A.    Prior to placing the coverage with Marsh,
24   that's my understanding, although I wasn't involved

Page 77

1    directly in those placements.
2    Q.    Well, how did you come to that understanding?
3    A.    In preparation for this deposition.
4    Q.    Did your attorneys tell you?
5    MS. FILIATRAUT:  Objection.  You're not to
6    disclose any conversations with counsel.
7    BY MR. HABER:
8    Q.    Did you learn from a source other than your
9    attorneys?
10   A.    I don't recall.
11   Q.    When did you learn of the prior coverage
12   amounts?
13   A.    I don't remember.
14   Q.    Well, how long have you been preparing for this
15   deposition?
16   A.    Maybe three weeks.
17   Q.    So is it fair to say that you learned of the
18   coverage amounts in place prior to Marsh within the past
19   three weeks?
20   A.    I don't recall whether I was aware of the
21   coverage amounts at the time we were looking at other
22   flood-related issues or not.  I honestly don't remember.
23   Q.    I misunderstood an earlier answer then.  I
24   thought you had told me that you learned of the coverage

20 (Pages 74 to 77)

Page 90

1    A.   I don't know what his position with Marsh is
2  right now.  At the time of that conversation, he was the
3  account executive assigned to Omnicare's account, and I
4  believe he had the title of managing director.
5    Q.   Do you believe he's no longer in that position?
6    A.   I don't know that he -- he's no longer my
7  account executive.
8    Q.   You know that for a fact?
9    A.   I know that for a fact.  I don't know what
10  position he holds at Marsh right now.
11    Q.   Where is he located?
12    A.   I don't know whether his office is currently
13  housed out of the Morristown, New Jersey office or the New
14  York, New York office.
15    Q.   What did Rick Thoennesen tell you regarding how
16  it came about that you were underinsured?
17    A.   I don't recall the specific conversation, and I
18  have a feeling that there were pieces of information that
19  evolved over a period of maybe days or weeks following.
20    Q.   Well, why don't you tell me generally then what
21  you were told and what you learned from those conversations
22  with Rick.
23    A.   The day immediately following the flood, I
24  reported the flood to Rick in an effort to have a Marsh

Page 91

1  representative present at the scene to help with the claim
2  stuff at the time of the loss.  I believe that I received a
3  return phone call from Rick, and I don't know whether or
4  not Mark Cantalamessa was on the same call.
5    Q.   You believe Mark Cantalamessa was on the call?
6    A.   He may have been on the call, I don't remember.
7    Q.   Okay.
8    A.   I remember Rick was on the call, and I remember
9  them saying to me that they would send someone.  That Mark
10  would be able to be there the next day or the day after to
11  work with the adjusters on the claim.  And I asked the
12  question, just confirm for me that the FEMA policy was in
13  place at least 30 days prior to the flood.  They said,
14  we've already pulled it, and we understand that the FEMA
15  policy was in place in May, but the coverage is limited
16  after the FEMA policy to 2 1/2 million in coverage.
17    Q.   They provided that information unsolicited to
18  you in response to your question about the FEMA policy?
19    A.   Correct.
20    Q.   How did you react?
21    A.   I said -- I was shocked.
22    Q.   What happened next?
23    A.   I said, well, it's -- we have a sublimit on
24  Flood Zone A.  And I said, why --

Page 92

1    Q.   That's the question I --
2    A.   -- do we have a Flood Zone A sublimit?
3    Q.   That's the question I would like to have an
4  answer to as well.  What was the answer?
5    A.   No answer.  There is no -- there is no answer.
6    Q.   They didn't provide an explanation as to why
7  you only have a $2 1/2 million sublimit for Flood Zone A?
8    A.   No.  They were able to point out to me when the
9  sublimit on the Zone A flood came into existence on the
10  policy, but have not provided any explanation as to why
11  additional limits weren't offered to Omnicare, recommended
12  to Omnicare.
13    Q.   When did the $2 1/2 million limit come into
14  place?
15    A.   The $2 1/2 million sublimit was definitely on
16  the policy effective with the 12/21, 1999, 2000 policy
17  period.
18    Q.   Was that when your insurance policies renewed
19  every year, 12/21?
20    A.   That's when the property insurance policies
21  renewed each year, yes.
22    Q.   And would that also include the flood policies?
23    A.   Well, there weren't flood policies prior to
24  that renewal period.

Page 93

1    Q.   Okay.
2    A.   Okay.  So --
3    Q.   So 12/21/99, is that when you bought your first
4  FEMA policy?
5    A.   No.  That was the first time we found out that
6  FEMA policies were required because the coverage under the
7  policy -- coverage under the primary property policy did
8  not cover the first million dollars.  That's the issue we
9  discussed a little earlier.
10    Q.   Right.  When did you buy your first FEMA policy
11  if it wasn't 12/21/99?
12    A.   It was during the spring of 2001.
13    Q.   You learned that they were required to
14  12/21/99, but you didn't buy one until 2001?
15    A.   Let me back up.  It wasn't that we learned that
16  they were required.  We understood that the primary policy
17  had a million dollar deductible which could only be filled
18  by a FEMA policy, okay.
19    Q.   You learned that in '99?
20    A.   We learned that immediately prior to the
21  renewal in 1999.
22    Q.   Okay.
23    A.   At that point in time, Marsh was unable to
24  identify for Omnicare what policy -- what properties it

24 (Pages 90 to 93)

Page 94

1  owned that were in Flood Zone A. The issue of identifying
2  Flood Zone A had never been a topic of any conversation
3  earlier than that.
4      Q.  All right. So how long did it take them to
5  identify the properties in Flood Zone A?
6      A.  They continued to identify Flood Zone A
7  properties throughout the year 2000.
8      Q.  When did they identify 425 Delaware and 525
9  Virginia Avenue in Fort Washington, Pennsylvania as
10 properties located in Flood Zone A?
11     A.  During 2000, but I don't know specifically
12 when.
13     Q.  So after Marsh would identify these properties
14 for you in a continuing process, would you then purchase
15 flood policies as they were identified?
16     A.  We were unable to purchase a flood policy
17 immediately after identifying that a property was in Flood
18 Zone A. The process was that once a property was
19 identified as being in Flood Zone A and subject to the
20 million dollar deductible, that we would connect Marsh with
21 the controller of that particular site in order for them to
22 work together and to complete the FEMA applications. The
23 applications were then submitted. We would receive quotes
24 back, and that was the process. It was in the early part

Page 95

1  of 2001 that we purchased FEMA policies for generally all
2  of our Flood Zone A properties.
3      Q.  So Marsh identified the Fort Washington
4  properties as Flood Zone A properties sometime in 2000, and
5  then a process was undertaken to acquire the FEMA policies
6  to cover the million dollar deductible on your main policy?
7      A.  Correct.
8      Q.  And that process took a few months, six months,
9  something like that?
10     A.  Correct. And Marsh would not have identified
11 these properties in Fort Washington as Flood Zone A until
12 sometime after April or May of 2000, at the earliest.
13     Q.  So Marsh never provided you with an explanation
14 regarding the underinsurance as to how it came about?
15     A.  You say an explanation "as to how it came
16 about." They were able to identify when the supplement
17 first became part of the policy. They have not offered any
18 explanation, that I'm aware of, as to why additional limits
19 weren't offered.
20     Q.  Is it your testimony that Marsh didn't offer
21 additional coverage, other than the $2 1/2 million?
22     A.  Marsh never presented Omnicare with a quote for
23 coverage for Flood Zone A properties excess of 2 1/2
24 million.

Page 96

1      Q.  Have you -- what was management's reaction to
2  your report regarding your investigation into how it came
3  about that you were underinsured for these properties?
4          MS. FILIATRAUT: Objection to the form.
5      A.  When you say management's reaction to my
6  report, what are you referring to?
7  BY MR. HABER:
8      Q.  Well, perhaps I'm assuming something that I
9  shouldn't. Did you report to anybody the results of your
10 findings regarding how the issue came about?
11     A.  On Sunday, when I found out that the coverage
12 was limited to 2 1/2 million, I immediately reported that
13 information to Dave Froesel, but there wasn't anything more
14 formal than that that was presented to Mr. Froesel.
15     Q.  I'm not looking for something formal. I just
16 want to know -- let me explain.
17     A.  Okay.
18     Q.  Hypothetically, I own a company. I don't have
19 enough insurance on it. And I'm scratching my head
20 thinking, why is that? And so one of my employees goes and
21 finds out and hopefully tells me about it so that I could
22 avoid the problem in the future. Did something like that
23 happen here?
24          MS. FILIATRAUT: I'm going to object to the

Page 97

1  form of the question.
2      A.  I think that they were equally as surprised as
3  I was to find out that the coverage was limited to 2 1/2
4  million.
5  BY MR. HABER:
6      Q.  Right.
7      A.  I'm unaware of any formal investigation
8  undertaken by the company to determine why Marsh didn't
9  offer us additional limits particularly.
10     Q.  Well, you characterized something as a formal
11 investigation. What is it -- how would you characterize
12 what you did when you called Marsh to find out what it is
13 they did and why they didn't offer you more coverage?
14     A.  It was that. That's what I did, and that's
15 what I repeated to management.
16     Q.  So you passed that information on to Mr.
17 Froesel?
18     A.  Correct.
19     Q.  Did you pass it on to anyone else?
20     A.  Not that I recall.
21     Q.  What was Mr. Froesel's reaction to your report?
22     A.  As I suggested, he was equally as surprised as
23 I was.
24     Q.  So he was surprised that you were underinsured,

25 (Pages 94 to 97)

Page 106

1  there is anything I need to be aware of or doing with
2  respect to the Marsh issue.
3      Q.  What has he told you in response to those
4  questions?
5      A.  No, I haven't been asked to do anything
6  particularly.
7      Q.  So basically he has told you that he doesn't
8  need any assistance from you dealing with Marsh?
9      A.  Yes.
10     Q.  However, you continue to deal with Marsh on a
11 day-to-day basis to do the routine work that is part of
12 your job description, right?
13     A.  Correct.
14     Q.  Have you been told that the relationship with
15 the company -- between the company and Marsh has changed in
16 some way as a result of the underinsurance incident?
17     A.  No.
18     Q.  Have you seen certain conduct or activity that
19 would lead you to believe that the relationship has been
20 changed?
21     A.  Conduct or activity by whom?
22     Q.  Anyone.
23     A.  No.  Our working relationship ongoing with
24 Marsh has been uninterrupted.

Page 107

1      MR. HABER:  Please mark this as Exhibit Rice 2.
2      (Plaintiffs' Exhibit 2 was marked for
3      identification.)
4  BY MR. HABER:
5      Q.  I'm showing you a document I have marked as
6  Exhibit Rice 2.  It was previously marked as Exhibit Morra
7  2.  Take a minute and read it, please.
8      Have you had an opportunity to read it?
9      A.  I have.
10     Q.  Have you ever seen this document before?
11     A.  I did.  I have.
12     Q.  When did you see it before?
13     A.  In preparation for this deposition.
14     Q.  When did you see it?
15     A.  Within the last three weeks.
16     Q.  Who provided you with the document?
17     A.  Ms. Filiatraut.
18     Q.  Was that the first time you saw it?
19     A.  It's my recollection of the first time seeing
20 it, yes.
21     Q.  Do you know where this document came from?
22     A.  I don't.
23     Q.  Other than from your counsel?
24     A.  No.

Page 108

1      Q.  Why don't you take a look at the third
2  paragraph of the document in Section B.  B-3 provides, "It
3  appears the Umbrella Liability coverage level ($75 million)
4  and property insurance coverage level ($50 million primary
5  and $30 million flood and earthquake) were sufficient in
6  1999 and 2000, but reduced to the $2.5 million level in
7  2001 under a new policy.  Possibly, this coverage reduction
8  may have been part of the initiative to consolidate like
9  purchases to leverage discounts under the PWC purchasing
10 initiative."  Does that refresh your memory regarding what
11 the flood insurance limits were prior to 2001?
12     MS. FILIATRAUT:  Objection.
13     A.  I can't speak to what the flood insurance
14 levels were prior to 2000.
15 BY MR. HABER:
16     Q.  Well, I think you were earlier --
17     MS. FILIATRAUT:  For these properties, is
18     that --
19     A.  For these properties?
20 BY MR. HABER:
21     Q.  I thought you earlier told me that you thought
22 you learned that the coverage -- the flood coverage for
23 these properties was less prior to the year 2001?
24     A.  It may have been.  I'm not familiar with the

Page 109

1  St. Paul policies themselves.  I -- I don't -- I don't know
2  what coverages were or were not available under the St.
3  Paul policies.
4      Q.  So it's possible then you were wrong when you
5  told me earlier that you had less coverage before 2001 for
6  flood than you did during the 2001 period?
7      A.  It's possible that I have -- I don't want to
8  make any affirmative statement about my knowledge of the
9  flood coverage at these two locations prior to 2000.
10 During the 2000 year, sometime in May or April, when
11 Omnicare, Inc. assumed the insurance responsibilities for
12 the CRO, at that point I can tell you what the insurances
13 were with respect to flood at these two locations.
14     Q.  And that was the million dollar FEMA policy on
15 both properties and the $2 1/2 million above that?
16     A.  That's correct.
17     Q.  So any information prior to when those policies
18 were put into place, you're not --
19     A.  I'm not sure of.
20     Q.  You're not very comfortable about?
21     A.  I'm not very comfortable about.
22     Q.  So you gave me a number earlier, but it may not
23 be right?
24     A.  It may not be right.

28 (Pages 106 to 109)

Exhibit C

RECYCLED

1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

— — —

BARRY M. PORTNOY and        : NO. 02-CV-2905

GERARD M. MARTIN, as Trustees   :

for HUB PROPERTIES TRUST

                               :

         V.                 :

                               :

OMNICARE PHARMACEUTICS, INC.    :

                               :

       and              :

                               :

OMNICARE CLINICAL RESERACH, INC. :

— — —

TUESDAY, FEBRUARY 11, 2003

— — —

        Oral deposition of PAUL A. LEONARD,
held at the Upper Dublin Township Municipal
Building, 801 Loch Alsh Avenue, Fort Washington,
Pennsylvania, commencing at 2:07 p.m., on the
above date, before Deborah L. Schildkraut, a
Professional Court Reporter and a Notary Public
in the Commonwealth of Pennsylvania.

— — —

ESQUIRE DEPOSITION SERVICES

1880 John F. Kennedy Boulevard, 15th Floor

Philadelphia, Pennsylvania 19103

(215) 988-9191

ESQUIRE DEPOSITION SERVICES

PAUL A. LEONARD

18

1  Virginia Drive was vacant?
2  A.    I wouldn't know.
3  Q.    Was there any flooding that you recall
4  after Fran in September of 1996 of that area, any
5  time between then and today?
6  A.    There's been three federally declared
7  flood disasters in Upper Dublin in my tenure.
8  The first was Fran. The second was Floyd. The
9  third was Allison. You can check the dates. You
10 know, those are very well-documented storm
11 events.
12 Q.    Well, my information is that Floyd was
13 September of '99. Does that sound familiar to
14 you?
15 A.    Yes.
16 Q.    My information is that Allison was June
17 of 2001. Does that sound familiar to you?
18 A.    Yes.
19 Q.    Were there any other floods that were not
20 federally declared disasters during that time?
21 A.    There was flooding, yes.
22 Q.    On how many occasions?
23 A.    My estimate?
24 Q.    Well, your best -- everything I'm asking

19

1  you is what you know.
2  A.    In between these very large flood events
3  would be minor -- less severe flood events that
4  probably occurred on a -- at least a couple times
5  a year there would be flooding events in various
6  parts of the Township.
7  Q.    I'm trying to limit my question to the
8  office park, though, as opposed to the Township
9  overall.
10 A.    Would there be others? Yes. Their exact
11 dates and the frequency I can't be specific on.
12 Q.    Does the Township keep records of those
13 flooding events?
14 A.    In some cases we do. We've also begun to
15 do that. At several locations in the office park
16 we've placed marker posts with elevations so that
17 we can start to record that. I believe they went
18 in sometime in the last two years.
19 Q.    After Allison or before?
20 A.    I can't be specific.
21 Q.    And when you say elevations, are you
22 talking about above-sea-level elevations?
23 A.    Yes.
24 Q.    And how were they helpful?

20

1  A.    Mostly for emergency responders so that
2  they know whether it's safe to drive a vehicle
3  into the water or not. We also use it for making
4  decisions about closing roadways.
5  Q.    And what do those markers look like?
6  A.    They're 6-inch PVC pipe that are white
7  with red letters on it and circles for the
8  various elevations.
9  Q.    Are any of those markers on Virginia
10 Drive?
11 A.    Yes, at the intersection with Delaware.
12 Q.    Is that the closest marker that you're
13 aware of to 525 Virginia Drive?
14 A.    I believe so.
15 Q.    Are there any others that are further up
16 Virginia Drive, further north of Virginia Drive?
17 A.    I don't think so. I think the other one
18 is located on Highland Avenue at Camp Hill, which
19 would be --
20 Q.    Virginia and Camp Hill?
21 A.    No, Highland and Camp Hill, which would
22 be one intersection away from the subject
23 property.
24 Q.    Who would I ask at Upper Dublin about any

21

1  records that the Township has about those floods
2  that are not federal disaster floods? Are you
3  the person to ask?
4  A.    Yes.
5  Q.    Would you agree to look for any of those
6  records and produce them to your counsel?
7  A.    Yes, but I think they're going to be
8  skimpy. We are generally tied up doing other
9  things during these floods other than keeping
10 records on them.
11 Q.    Are you a fire fighter?
12 A.    Yes.
13 Q.    Are you with any particular company?
14 A.    Right now I'm a volunteer with the Fort
15 Washington Volunteer Fire Company.
16 Q.    Does the Fort Washington Volunteer Fire
17 Company get involved in responding to flood
18 situations?
19 A.    Yes.
20 Q.    Do they keep records of their own about
21 when they do that?
22 A.    They keep records of all their calls. I
23 am not the custodian of those records.
24 Q.    Who is?

ESQUIRE DEPOSITION SERVICES

PAUL A. LEONARD

---

118

1    A.    They would look at the maps. Many of
2    them engage engineers to verify the exact
3    location of a flood zone to their property. The
4    maps are generally at a very large scale. So a
5    lot of property owners will specifically look at
6    a property related to elevation.
7    Q.    I guess as an owner it's probably the
8    kind of thing that might turn up in a title
9    search or something like that?
10   A.    I guess you would guess that. I don't do
11   a lot of title searches.
12   Q.    Is there any way for a tenant to know
13   that a property is in a flood zone, somebody who
14   doesn't actually own the property?
15        MR. FLENNER:  Do you want to
16   phrase that to where it's Township
17   specific?
18        MR. HABER:  Yes, within the
19   Township.
20   A.    When inquiries are made to the Township
21   about whether a property is in a flood zone or
22   not, we refer them to the flood maps and also, on
23   a routine basis, suggest that they verify it
24   themselves through an engineering study, that

---

119

1    sort of thing.
2    Q.    You make that information available to
3    anybody who makes inquiries; right?
4    A.    We give out the maps on a regular basis,
5    yes.
6    Q.    It's not the kind of information you
7    would want to keep from a tenant, for example,
8    before they make a decision whether or not they
9    want to move in?
10   A.    No, we don't keep it from anybody.
11        MR. HABER:  Thank you.
12            - - -
13        (Whereupon, this deposition
14   was concluded at 4:50 p.m.)
15            - - -
16
17
18
19
20
21
22
23
24

---

120

CERTIFICATION

1
2
3        I, DEBORAH L. SCHILDKRAUT, a
4    Certified Court Reporter and Notary Public for
5    the Commonwealth of Pennsylvania, do hereby
6    certify the foregoing to be a true and accurate
7    transcript of my original stenographic notes
8    taken at the time and place hereinbefore set
9    forth.
10
11
12
13
                    _____
14   Deborah L. Schildkraut
     Certified Reporter
15   Notary Public
16
17    DATED:  _____
18        (The foregoing certification of
19   this transcript does not apply to any
20   reproduction of the same by any means,
21   unless under the direct control and/or
22   supervision of the certifying reporter.)
23
24

---

121

ACKNOWLEDGEMENT OF DEPONENT

1
2
3
4
5        I, _____, do
6    hereby certify that I have read the foregoing
7    pages of this transcript; and that the same is a
8    correct transcription of the answers given by me
9    to the questions therein propounded, except for
10   the corrections or changes in form or substance
11   if any, noted in the attached Errata Sheet.
12
13   _____    _____
14   DATE            PAUL A. LEONARD
15
16
17
18
19
20
21
22
23
24

---

Exhibit D

RECYCLED

DAVID MORRA

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

NO. 02-CV-2905

BARRY M. PORTNOY and GERARD )   DEPOSITION UPON

M. MARTINAS, trustees for

HUB PROPERTIES TRUST,            )   ORAL EXAMINATION

            Plaintiffs,)            OF

      - vs -            )       DAVID MORRA

OMNICARE PHARMACEUTICS,INC.,)

and OMNICARE CLINICAL

RESEARCH, INC.,                  )

          Defendants.)

- - - - - - - - - - - - - -       **ORIGINAL**

      TRANSCRIPT OF DEPOSITION, taken by and

before ELISABETTA L. MAADDI, Professional Reporter and

Notary Public, at the Law Offices of OBERMAYER,

REBMANN, MAXWELL & HIPPEL, One Penn Center, 1617 JFK

Boulevard, 19th Floor, Philadelphia, Pennsylvania, on

Tuesday, March 4, 2003, commencing at 10:30 a.m.

REPORTING SERVICE ASSOCIATES (RSA)

A VERITEXT COMPANY

1845 Walnut Street - 15th Floor

Philadelphia, Pennsylvania  19103

(215) 241-1000

DAVID MORRA

12

1           person in the business, so he would have

2           communicated up to the corporation.

3    BY MR. HABER:

4    Q.      Would he have communicated to you first on the

5    issue?

6    A.      To make me aware of it, yes.

7    Q.      Okay.  And who would he have then spoken to at

8    the corporation?

9    A.      Janice Rice would have been the person at

10   Omnicare that would have -- that that would have been

11   communicated to, and then she would have taken that to

12   Omnicare's broker to review that, that whole issue, to

13   determine if there was enough insurance, you know,

14   based on their knowledge of insurance.

15   Q.      Okay.  After that information was passed on,

16   what response was given to Mr. McDevitt?

17   A.      Well, ultimately my understanding is that we

18   concluded, the company concluded, the corporation

19   concluded, there was adequate insurance for that

20   business and that information would have been

21   communicated.

22   Q.      Back to Mr. McDevitt?

23   A.      Yes.

24   Q.      Would you agree with me that after the flood of

DAVID MORRA

13

1   2001 that the conclusion that the company was

2   adequately insured was an inaccurate one?

3   A.     Post-flood, yes.

4   Q.     All else being equal, I imagine you would have

5   preferred having greater insurance coverage to cover

6   your losses?

7          MR. SHARE:  Object to form.  Object to the

8          question.  You can answer the question.

9          THE WITNESS:  The question being would I have

10         desired to have had insurance that was adequate?

11         Is that the question?

12         MR. HABER:  I'll have her read it back to

13         you.

14         THE COURT REPORTER:  QUESTION:  "All else

15         being equal, I imagine you would have preferred

16         having greater insurance coverage to cover your

17         losses?"

18         THE WITNESS:  I imagine I would have

19         preferred to have insurance covering my losses.

20  BY MR. HABER:

21  Q.     So you agree with my statement?

22  A.     As stated, yes.

23  Q.     Okay.  Do you know whether or not the insurance

24  year that covered the June 2001 flood, was that your

DAVID MORRA

37

1    Q.      I didn't hear what you said there at the end.

2    A.      I said I wouldn't ignore it.

3    Q.      Okay.

4    A.      An issue was brought up.  I don't know when the

5    meeting took place.  It was brought up.  It sounds like

6    a reasonable response that we would vetted it up

7    through the system and have a response come back.

8    Q.      Well, he said the meeting took place in January

9    of 2001.

10    A.      Okay.  I don't have --

11    Q.      He also said at the meeting that flood

12    insurance was discussed at the meeting and that at the

13    time he talked with you about the fact that both

14    facilities that he was running this business in were

15    located in a flood plain.  Does that refresh your

16    memory of the meeting?

17    A.      No, it does not.

18    Q.      Do you recall Dr. Feld ever telling you that

19    these two facilities were located in a flood plain

20    pre-tropical storm Allison?

21    A.      No, I'm not aware of -- don't recall the flood

22    plain designation.  I think we were all aware that was

23    an area prone to flooding because of previous history.

24    The more germane issue really is it's prone to flooding

DAVID MORRA

38

1    whether it's a flood plain or not.  I don't recall that

2    specific terminology.

3    Q.      Well, do you remember having any meetings prior

4    to tropical storm Allison with Dr. Feld discussing the

5    proclivity of flooding at the 525 or 425 facilities?

6    A.      Well, again, we know the history of the site,

7    that was well-known.  We knew that the previous

8    building, 425, had been under some level of water with

9    the flood that occurred in 1999, I believe.  And so we

10   knew the whole issue of the propensity for flooding to

11   occur in that site at that site.  We also knew that 525

12   had never been breached by water.  It had come up close

13   but never quite, you know, breached the building

14   itself.

15   Q.      Prior to tropical storm Allison?

16   A.      Yes.

17   Q.      What is the PSI executive committee?

18   A.      That would have been Dr. Feld and his staff,

19   his direct reports.

20   Q.      Paragraph six of section B reads "The only

21   response the division received from these numerous

22   inquiries was a very general E-Mail from Kirit Patel."

23   K-I-R-I-T, P-A-T-E-L.  "The message was a verbal relay

24   from Tim Sullivan with inaccurate information stating

DAVID MORRA

91

1    insurance to protect them from a flood of the nature

2    that occurred?

3    A.        Okay.  Let's back up a little bit here.

4    Information as again was reviewed here had been

5    requested and supplied, requested by Omnicare, Inc.

6    from Pharmaceutics, and that information was provided,

7    to the best of my knowledge, it was provided so that

8    Omnicare along with its broker could determine what

9    level of insurance was adequate, appropriate.  Upon

10   questioning what level of insurance we had, the answer

11   we got back was $50 million.

12           So your question doesn't make sense to me, if I

13   can be candid, because you're asking me why we didn't

14   have enough insurance.  I'm saying, as far as I knew,

15   we had enough insurance until after the fact, unless

16   I'm misinterpreting the question.

17   Q.        I'm obviously not making myself clear enough

18   for you.  Let me try a different way.

19           It is a fact that you did not have sufficient

20   insurance to cover you for the flood loss you suffered

21   as a result of the tropical storm Allison, right?

22   A.        In retrospect, yes.

23   Q.        Not only in retrospect, it's a fact that at the

24   time you didn't have enough insurance?  You just didn't

DAVID MORRA

92

1     have it?  It didn't cover all your losses, right?

2     A.      Okay.

3     Q.      No qualification, right?

4     A.      Yes.

5     Q.      Okay.  I'm trying to understand why it was that

6     more insurance coverage for flood risks was not

7     purchased than was actually purchased?  Now, I

8     understand that you thought you had $50 million and you

9     were covered, but now you've had --

10    A.      I understand the question.

11    Q.      You've had a year or two since this has

12    occurred to try to figure out what really went on here

13    and what happened.  Do you have any further information

14    for me than what you've already provided?

15    A.      No.  I would say I don't know still why it

16    didn't happen.

17    Q.      You don't have any information to suggest that,

18    for example, the insurance broker could not purchase or

19    make available for you more flood coverage than was

20    provided?

21    A.      No, I don't.

22    Q.      So nobody's ever said to you, all we could

23    offer you is two-and-a-half million dollars in flood

24    coverage --

RECYCLED

Exhibit E

DAVID MORRA

1

1            IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2
                              NO. 02-CV-2905

3

4

5

     BARRY M. PORTNOY and GERARD ) DEPOSITION UPON
6    M. MARTIN, as Trustees for
     HUB PROPERTIES TRUST,        ) ORAL EXAMINATION

7
                 Plaintiffs,  )        OF

8
                 - vs -       )   DAVID MORRA

9
     OMNICARE PHARMACEUTICS, INC.)
10   and OMNICARE CLINICAL
     RESEARCH, INC.,             )

11
                 Defendants.  )
12   - - - - - - - - - - - - - - - -

13

14        -

15                TRANSCRIPT OF DEPOSITION,
16   taken by and before F. DAVID DAMIANI, Registered
17   Professional Reporter and Notary Public, at the LAW
18   OFFICES OF OBERMAYER, REBMANN, MAXWELL & HIPPEL,
19   LLP, 19th Floor, One Penn Center, 1617 JFK
20   Boulevard, Philadelphia, Pennsylvania, on Tuesday,
21   October 29, 2002, commencing at 10:07 a.m.
22                - - -
23        REPORTING SERVICE ASSOCIATES (RSA)
24

DAVID MORRA

26

1    A.        Yes, we did.

2    Q.        Okay.  Where was -- where were the

3    facilities of pharmaceutical located in March of

4    2000?

5                    MR. SHARE:  Pharmaceutics, you

6            mean?

7    BY MR. HABER:

8    Q.        Pharmaceutics.

9    A.        Well, there were two buildings in Fort

10   Washington.  One was designated as 525 Virginia,

11   and the other one was 425.

12   Q.        525 Virginia?

13   A.        Yes.

14   Q.        And 425?

15   A.        425, I think -- I don't think it was

16   Virginia.

17   Q.        Delaware?

18   A.        Delaware, maybe.

19   Q.        Maybe 415?

20   A.        Whatever.  Two buildings within a stone's

21   throw of each other.

22   Q.        Okay.  What functions were performed in

23   525 Virginia?

24   A.        Just about everything.  Analytical,

DAVID MORRA

45

1    A.        I'm not aware of anyone that knew that it

2    was in a flood plane.

3    Q.        Did anyone at the company have any

4    information regarding the propensity for flooding

5    in that location?

6    A.        Yes.

7    Q.        What information are you aware of?

8    A.        Well, I was aware that there had been a

9    flood in, I believe, 1996, and again in 1999, prior

10    to my joining the company.

11    Q.        How did you become aware of that?

12    A.        Well, my first visit to Fort Washington

13    was actually prior to my official employment.   I

14    toured the 425 building, which had had some flood

15    damage in the last flood, so that's how I became

16    aware that there had been a flood, at least in

17    1999.

18    Q.        Did you -- when did you learn about the

19    1996 flood that you talked about?

20    A.        You know, I'm not sure if it was then or

21    if it was after the third flood..   I honestly don't

22    recall when I knew about that one.

23    Q.        Is that something that was of concern to

24    you as the new CEO of the Pharmaceutics company?

DAVID MORRA

47

1    Q.        Did your company have flood insurance?

2    A.        The business was insured.

3    Q.        Did it have flood insurance?

4                    MR. SHARE:  Which business are

5            you referring to?

6                    MR. HABER:  Pharmaceutics.  The

7            tenant.

8                    THE WITNESS:  I believe we had

9            flood insurance in effect.

10   BY MR. HABER:

11   Q.        And that was -- my question was directed

12   to the 2001 flood.  Do you know whether or not

13   there was flood insurance in place for the earlier

14   floods that you mentioned?

15   A.        No, I don't know that there was.

16   Q.        Do you know that there wasn't?

17   A.        No, I don't know that there wasn't.

18   Q.        Who would I ask at the company to find out

19   that information?

20   A.        Well, we would probably go back to

21   Omnicare, Inc.  Someone there to see if it was in

22   place back then.

23   Q.        Who would you ask at Omnicare, Inc.?

24   A.        Janice Rice.

DAVID MORRA

83

1   Q.        And how were you aware that those four

2   customers refused to do business with

3   Pharmaceutics, if it remained in 525 Virginia?

4   A.        Well, with Astra Zeneca, which was a

5   current customer, and Novartis, essentially it was

6   just verbal communication with Dr. Feld primarily.

7   He was my conduit, you know, for most of the

8   information, virtually all of the information.

9   Q.        Dr. Feld had an oral communication with

10  Astra Zeneca and Novartis, and he told you what it

11  is you told me?

12  A.        That they -- yes, that those companies did

13  not wish to do business with us in an area that was

14  prone to flooding.

15  Q.        Is there any written communication between

16  your company and these customers reflecting that

17  concern?

18  A.        I'm aware of a written communication from

19  Astra Zeneca to that effect.

20  Q.        Any other written communication about

21  which you're aware of?

22  A.        I'm not aware of other written

23  communications.

24  Q.        Did you, yourself, have any conversations

DAVID MORRA

89

1    conduit for that kind of information.

2    Q.        Now, you identified four companies, Astra

3    Zeneca, Sanofi, Durect and Novartis as companies

4    who said that they would not come back.  Do you

5    have any information regarding any of your other

6    customers who said that they would not come back if

7    you were to continue operations in 525 Virginia?

8    A.        I do not.

9    Q.        Who would I ask that question to, who

10   might have further information?

11   A.        Well, again, my primary conduit would have

12   been Dr. Feld.

13   Q.        Are you aware of any of the customers

14   identified on DD No. 10 who wanted you to continue

15   operations in 525 Virginia Avenue after the flood?

16   A.        Who specifically wanted us to?  No, I'm

17   not.  I never heard anyone who specifically wanted

18   us to continue.

19   Q.        Again, if I wanted to get that information

20   and get some information beyond what you are aware

21   of, would that be Dr. Feld as the person to whom

22   you would go?

23   A.        Yes.

24   Q.        Prior to the flood, was the Pharmaceutics

DAVID MORRA

96

1    you to return and resume operations in 525

2    Virginia?

3    A.      I don't think there's any question that we

4    could resume or at least get the operation back up

5    and cleaned up and all, but in terms of customers

6    being attracted, when 40 percent -- let's say 40

7    percent or so, a big piece of that was Astra

8    Zeneca, 38 to 40 percent, something like that, of

9    revenues is pulled out from under you, you know,

10   you're not going to have a viable business.

11   Q.      Astra Zeneca was -- what did you say, it

12   was about a third of your business there?

13   A.      It's here somewhere.  Of the Pharmaceutics

14   business, it was about 39 percent of revenues.

15   Q.      So almost 40 percent of your revenue for

16   the --

17   A.      Yes.

18   Q.      That's for the second quarter of 2001?

19   A.      Yes.  Um-hum.  Yes.

20   Q.      And Astra Zeneca said absolutely no way,

21   no how will we return to 525 Virginia?

22   A.      Yes.

23   Q.      You made reference to a document that you

24   were aware of.  I'm not sure I'm familiar with

DAVID MORRA

113

1    A.        I believe somewhere about 18 to 24 months.

2    Q.        Okay.  Before him, who was serving in his

3    role?

4    A.        Let's see.  There was a lady by the name

5    of -- I can't remember.  I'm trying to think of it.

6    I just don't remember her name.

7    Q.        Maybe after lunch if you think of it, you

8    can tell me.

9    A.        Um-hum.

10                     MR. HABER:  Let's go off the

11             record.

12                     (At this time, a discussion was

13             held off the record.)

14                     (At this time, 1:03 p.m., a

15             luncheon recess was taken, resuming at

16             1:54 p.m.)

17   BY MR. HABER:

18   Q.        Before our lunch break, you were telling

19   me about anecdotal information regarding other

20   customers who you thought might not return.  Tell

21   me about that.

22   A.        Well, as quite a number of people were

23   making customer contacts to inform them about the

24   flood, the status of their project, in the course

DAVID MORRA

114

1    of that, I can't name specifically, but what I was

2    told we were hearing was a high level of reluctance

3    to go back to the site.

4    Q.        And who reported that to you?

5    A.        Dr. Feld would have.

6    Q.        The people who were in contact with the

7    customers, who would have relayed that information

8    to Dr. Feld, would that have been the names

9    identified on DD No. 9?  I'm referring to the

10   assigned to column.

11   A.        Yes.  Those -- yes.  A number of them.  I

12   don't know if it's complete, but certainly many of

13   these people were making calls and taking feedback

14   from customers.

15   Q.        And can you tell me a little bit more

16   about who these employees are, the full names?

17   A.        Those that I recognize -- I recognize them

18   all, but some of them I had very little contact

19   with.  Do you want me to just go down the list?

20   Q.        Yes, please.

21   A.        Okay.  Braden, Bob Braden was a

22   salesperson.

23   Q.        Is he still an employee of Omnicare --

24   A.        No.

DAVID MORRA

122

1    product.

2    Q.    Okay.  The warehouse portion on the first

3    floor, was that the largest part of the first

4    floor?

5    A.    The largest single area would have been

6    the warehouse.

7    Q.    And you said product was stored in the

8    warehouse?

9    A.    Yes.

10   Q.    Could you tell me what it looked like in

11   the warehouse?

12   A.    It had shelving, racks, shelving where

13   product was stacked on those -- on those shelves.

14   Q.    Along the walls or throughout the space?

15   A.    Well, throughout the space.  You know, you

16   have rows of shelves and racks that you put product

17   on.

18   Q.    Was any of the product on the floor?

19   A.    I believe most of the product was -- you

20   can't put it on the floor.  It would have to be on

21   pallets first.  But I believe that most of the

22   finished product would have been on the shelves,

23   actually up, you know, a couple of feet at least

24   over the floor.

DAVID MORRA

123

1    Q.        A couple feet?

2    A.        Yeah.  A couple feet.

3    Q.        So the bottom shelf would have been, say,

4    two feet off the floor?

5    A.        Yeah.  Probably at least two to three feet

6    off the floor, yeah.

7    Q.        And the pallets that you said that were

8    there on the floor, was that not finished product?

9    If something was on a pallet?

10   A.        Well, if it was ready to be shipped, it

11   could be.  More likely it would be components that

12   were, you know, like cardboard boxes -- corrugated

13   boxes that are flat, you know, just stacked in

14   bundles.  The vials, bottles, closers or whatever,

15   you name it, labels.

16   Q.        What was the floor like in the warehouse?

17   A.        Concrete floor.  Non-descript, I guess.

18   Q.        Nothing on top of the concrete floor?

19   Nothing built on top of it?

20   A.        Nothing built on top or covering it, like

21   linoleum?

22   Q.        Right.

23   A.        No, no, just bare -- bare concrete.

24   Q.        There was no floor built on top of the

DAVID MORRA

180

1    Q.        Can you tell me what kind of business

2    services was provided by Pharmaceutics in 525

3    Virginia post June 2001?

4    A.        Immediately post June 2001 no services.

5    It was strictly a recovery effort.

6              Post September, maybe, the September time

7    frame, we talked about it, there was some

8    analytical services being done there, and some

9    stability or storage work being done there.  Later

10   in the year, one -- manufacturing for one product,

11   one customer.

12                   MR. HABER:  Can you read back

13             the answer, please?

14                   (At this time, the court

15             reporter read back from the record as was

16             requested.)

17   BY MR. HABER:

18   Q.        Who was Pharmaceutics performing

19   analytical services for in 525 Virginia post June

20   2001?

21   A.        I don't know the specific customers.

22   Q.        Why did Pharmaceutics perform analytical

23   services in 525 Virginia post June 2001?

24   A.        The equipment was operational and

DAVID MORRA

181

1    available to do that work.

2    Q.    Analytical services was up on the second

3    floor, right?

4    A.    Yes, up on the second floor.

5    Q.    So after you got the equipment

6    recalibrated, so long as your customers would

7    allow, you could perform the services on the second

8    floor?

9    A.    That's correct, yes.

10    Q.    You don't remember which customers,

11    though, that you performed that services for?

12    A.    No, I wouldn't know that.

13    Q.    That was not something that you --

14    analytical services you didn't move to King of

15    Prussia, right?

16    A.    That's correct, we did not move that to

17    King of Prussia.

18    Q.    Did you have some other location where you

19    were doing analytical services post flood?

20    A.    No.

21    Q.    And stability services, again, that's

22    determining how well the drugs hold up under

23    certain circumstances over a certain period of

24    time, right?

DAVID MORRA

182

1    A.        General description, yes.

2    Q.        And do you know what customers asked you

3    to continue to do stability testing in 525 Virginia

4    post June 2001?

5    A.        Not specifically.

6    Q.        Do you know generally?

7    A.        It's a specific question.  For me to

8    answer who, I would have to name names, and I

9    don't know who specifically we were doing business

10   with.

11   Q.        Who would know the answer to those

12   questions regarding the entities for whom you

13   performed services in the building post flood?

14   A.        That would be a matter of record.  I'm

15   sure within our finance group, the people who

16   document the revenues that we generate in the

17   company.

18   Q.        Are you telling me this fellow will know

19   tomorrow?

20   A.        Well, I'm telling you that someone in his

21   department might know.  I doubt that Ron

22   specifically would know.

23   Q.        You said you were also doing storage work

24   on the premises.

DAVID MORRA

183

```
 1    A.       Well, stability -- that was -- that

 2    comment was related to stability storage, not

 3    general storage.

 4    Q.       Not warehouse?

 5    A.       Not warehouse.  No warehousing done there.

 6    Q.       So you never did any further warehousing

 7    after the flood?

 8    A.       Not in 525.

 9    Q.       Where did you do warehousing?

10    A.       We did some very minimal light warehousing

11    in King of Prussia.

12    Q.       You also mentioned that you did one

13    manufacturing project in the building at some point

14    after the flood.

15    A.       Yes.

16    Q.       Where was that?  On the first floor or

17    second?

18    A.       On the first floor.

19    Q.       What sort of manufacturing did you do post

20    flood?

21    A.       We were running a packaging -- what we

22    call primary packaging.  That's taking an actual

23    tablet, in this case putting it into a foil -- a

24    foil pack.  We were doing that on the first
```

DAVID MORRA

184

1    floor.

2    Q.       Did you need equipment to do that?

3    A.       Yes.

4    Q.       Did you use the equipment that you owned

5    prior to the flood to perform that work?

6    A.       No.  We didn't use it.

7    Q.       Did you buy new equipment?

8    A.       We did.

9    Q.       And you put the new equipment in 525 on

10   the first floor?

11   A.       Yes.

12   Q.       Was this the Virbac --

13   A.       Virbac.

14   Q.       Virbac project?

15   A.       Yes.

16   Q.       V-I-R-B-A-C?

17   A.       V-I-R-B-A-C.

18   Q.       When did you do this work for Virbac in

19   525 Virginia?

20   A.       I believe that started up again -- again,

21   it would have actually started up -- it never

22   started up prior to that.  It started up in

23   September, I believe, sometime in September of

24   2001.

DAVID MORRA

185

1    Q.        It started in September of 2001, and when

2    did it end?

3    A.        It ended probably some time in April or

4    May of this year.

5    Q.        How many employees did you have working on

6    the Virbac manufacturing project in 525 Virginia?

7    A.        Rough guess, about 40.  Thirty to forty

8    people.

9    Q.        Did any of those employees report any

10   medical problems as a result of working in the

11   building during that time period?

12   A.        Not to my knowledge.

13   Q.        Is Virbac a name of a company?

14   A.        Yes, it is.

15   Q.        If we look back at DD No. 10, Virbac had

16   provided you with, or you had backlog for Virbac in

17   the amount of two point eight million dollars.

18   Would you agree with me?

19   A.        I remember that.  Yeah, I remember that.

20   Q.        Had you done some of the work for Virbac

21   prior to the flood?

22   A.        No.

23   Q.        So Virbac was a new project that you had

24   contracted for prior to the flood, but were unable

DAVID MORRA

186

1    to realize any of the revenue until after the

2    flood?

3    A.        Yes.  That's correct.

4                   MR. HABER:  Let's go off the

5          record.

6                   (At this time, a discussion was

7          held off the record.)

8    BY MR. HABER:

9    Q.        So you had 30 to 40 employees in the

10   building performing a manufacturing job for Virbac

11   between September of 2001 and May of 2002?

12   A.        That's correct.

13   Q.        Did you pay any rent to the landlord for

14   your use of the building during that time period?

15   A.        We did not.

16   Q.        Is the Virbac manufacturing project

17   completed?

18   A.        It been moved to another site.

19   Q.        Okay.  So you haven't --

20   A.        It's an ongoing relationship.

21   Q.        But the two point eight million dollars in

22   backlog, have you realized all that revenue now?

23   A.        I believe we've recognized most of it.

24   Q.        Is there a reason why that work had to be

Exhibit F

RECYCLED

RONALD L. GREENSPAN

1

```
1            IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2
                             NO. 02-CV-2905

3

4

5

     BARRY M. PORTNOY and GERARD ) DEPOSITION UPON
6    M. MARTIN, as Trustees for
     HUB PROPERTIES TRUST,         ) ORAL EXAMINATION

7
                  Plaintiffs,  )        OF

8
                  - vs -        ) RONALD L. GREENSPAN

9
     OMNICARE PHARMACEUTICS, INC.)
10   and OMNICARE CLINICAL
     RESEARCH, INC.,            )

11
                  Defendants.  )

12   - - - - - - - - - - - - - -

13

14

15                    TRANSCRIPT OF DEPOSITION,
16   taken by and before F. DAVID DAMIANI, Registered
17   Professional Reporter and Notary Public, at the LAW
18   OFFICES OF OBERMAYER, REBMANN, MAXWELL & HIPPEL,
19   LLP, 19th Floor, One Penn Center, 1617 JFK
20   Boulevard, Philadelphia, Pennsylvania, on
21   Wednesday, October 30, 2002, commencing at 10:04
22   a.m.

23                    - - -

24            REPORTING SERVICE ASSOCIATES (RSA)
```

RONALD L. GREENSPAN

34

1   was restored to the condition it was in prior to
2   the flood?
3   A.      No, it was not.
4   Q.      What was the difference in the condition
5   after the cleanup was finished as compared to the
6   condition the building was in prior to the flood?
7   A.      The most significant thing is the fact
8   that the drywall probably four or five feet up from
9   the floor was removed in certain sections of the
10  building -- I guess in all sections of the
11  building, and ceiling tiles and other things I
12  think were removed that were there previous to the
13  flood.
14  Q.      Yesterday Mr. Morra told me a little bit
15  about drywall and the bottom of the wall being wet
16  and, therefore, the bottom was removed, and then
17  the top was left on the studs.  Is that what you
18  are referring to?
19  A.      Right.
20  Q.      So you never replaced the drywall that was
21  removed?
22  A.      We replaced some of the drywall that was
23  removed.
24  Q.      How did you decide what drywall to replace

35

1   and what not to replace?
2   A.      We have this one customer, Virbac, that we
3   were performing work for in the building, and
4   whatever was necessary to do that work was
5   refurbished.
6   Q.      You said there were ceilings that were
7   damaged as well?
8   A.      I don't know if they were damaged.  Some
9   of the tiles were taken out of the ceiling.
10  Q.      Why were the tiles taken out of the
11  ceiling?
12  A.      Because it was determined they needed to
13  be taken out.
14  Q.      By whom?
15  A.      Whoever was involved at the time.  I mean,
16  I don't know if it would have been Belfor or TGI.
17  I have no idea who would have recommended it.
18  Q.      And do you know why the ceiling tiles were
19  not replaced after the cleanup?
20  A.      Well, there are certain parts of the
21  building we didn't do anything other than cleaning
22  the building, and we took out the drywall.  Took
23  out ceiling tiles and I think floor tiles.
24  Q.      You took out floor tiles as well?

36

1   A.      I think so.
2   Q.      What did you do with the ceiling tiles
3   that you took out?
4   A.      I have no idea.  I assume they threw them
5   away, but I don't know.
6   Q.      Well, the flood didn't get up on the
7   second floor, did it?
8   A.      No.
9   Q.      And the ceiling presumably was above the
10  flood, right?
11  A.      Right.
12  Q.      Do you have any explanation as to why they
13  would have removed ceiling tile?
14  A.      No.
15  Q.      You just know that they did?
16  A.      Right.
17  Q.      And you know that how?
18  A.      Well, I know now because they're not
19  there, but I was told they were taking them out.
20  Q.      How do you know they're not there?
21  A.      Because I've been to the building.
22  Q.      Oh, I was under the impression that you
23  hadn't been back to the building after the flood.
24  A.      No, not really after the flood, but after

37

1   the -- several months later I was there.
2   Q.      Oh, okay.  How many times have you been in
3   the building after the flood?
4   A.      Probably three to six times.  I don't
5   know.
6   Q.      So the things that you noticed that are
7   different are the walls haven't been replaced,
8   ceiling tiles are gone and some of the flooring is
9   gone?
10  A.      Right.
11  Q.      Anything else that's different?
12  A.      Well, the equipment is not where it used
13  to be.
14  Q.      Much of the equipment is not there, right?
15  A.      Right.
16  Q.      In fact, it's out in trailers in the
17  parking lot?
18  A.      Well, not any longer, but, yes.
19  Q.      Not any --
20  A.      Not any longer.
21  Q.      Where is the equipment now?
22  A.      In the building.
23  Q.      Oh, the equipment has been moved back into
24  the building from the trailers?

10 (Pages 34 to 37)

RONALD L. GREENSPAN

Page 38

1 A. Yes.
2 Q. Why is that?
3 A. Well, there was a concern about a
4 hurricane or a storm that was coming up through the
5 area just recently, and we were informed by the
6 fire marshal or the building -- whoever came by and
7 said they didn't want those out there full of our
8 equipment in case the rain waters came and took
9 them away.
10 So we were required within 48 hours to
11 move them, to remove the -- whatever you call the
12 trailers. So the only way to do that was to take
13 the equipment and put it back in the building so
14 the trailers were empty.
15 Q. And then you removed the trailers from the
16 premises?
17 A. I think the trailers were removed. I have
18 not been back since that occurred.
19 Q. So somebody recently emptied all of the
20 trailers of all of the old equipment and put them
21 back -- put the equipment back into the building?
22 A. Yeah.
23 Q. The equipment that was in the trailers,
24 had that ever been cleaned?

Page 39

1 A. Yeah, I think it was cleaned by TGI to the
2 extent of making it, you know, safe, for lack of a
3 better term. Mud or whatever was taken off of it.
4 Q. But it was equipment that you didn't
5 intend to reuse in the business, right?
6 A. Well, I don't think that had ever been
7 finalized, what was going to happen to that
8 equipment.
9 Q. Were you planning on selling it?
10 A. That was one of the options.
11 Q. Was it a feasible option?
12 A. Yes, I think it's a feasible option.
13 Q. Is there a market for the used equipment?
14 A. Well, I had people who were interested in
15 all the equipment, and they were interested in that
16 included.
17 Q. For use other than scrap?
18 A. I can't tell you what they were going to
19 use it for.
20 Q. Were you selling it at a price that would
21 indicate it would be used for something other than
22 scrap?
23 A. It's hard to answer that question.
24 Q. Okay. Well, let's do it this way then.

Page 40

1 Are you familiar with your equipment schedule that
2 would indicate the value of the equipment owned by
3 the Pharmaceutics company?
4 A. I would have information in terms of what
5 we paid for it.
6 Q. Okay. How much did you pay for all the
7 equipment in the building?
8 A. I don't know.
9 Q. Can you approximate?
10 A. No, I'm sorry, I can't.
11 Q. Well, is it fair to say that the
12 equipment, you paid in excess of a million dollars
13 for all the equipment?
14 A. Yes.
15 Q. Is it also fair to say that you paid in
16 excess of three million dollars for all the
17 equipment?
18 A. Yes.
19 Q. Okay. What price were you talking about
20 selling the equipment for?
21 A. Somewhere around $350,000.00.
22 MR. SHARE: Can we take a
23 one-minute bathroom break?
24 MR. HABER: Sure.

Page 41

1 (At this time, a short break was
2 taken.)
3 BY MR. HABER:
4 Q. How did the flood impact on the profit of
5 the Pharmaceutics company?
6 A. They disappeared.
7 Q. Well, you told me that you had profits of
8 two million dollars the year before, and then the
9 year of the flood you told me you lost money, but
10 you don't know how much. Is that the entire
11 picture?
12 A. Yeah, I think that's the entire picture.
13 Q. Is that all I'm going to get from you
14 today?
15 MR. SHARE: Off the record.
16 (At this time, a discussion was
17 held off the record.)
18 MR. HABER: Let's go back on the
19 record.
20 BY MR. HABER:
21 Q. So it's also fair to say that you don't
22 have -- you don't have knowledge of prior years
23 performance of the Pharmaceutics company to compare
24 the losses that you suffered in the year 2001? Is

11 (Pages 38 to 41)

Veritext PA Reporting Services

RONALD L. GREENSPAN

42

1 that right?
2 A. I don't have that information with me.
3 Q. Do you have any idea whether or not the
4 Pharmaceutics company was profitable in each and
5 every year prior to the year 2000?
6 A. No, I don't know.
7 Q. Do you have any idea whether or not the
8 Pharmaceutics company lost money in any year prior
9 to the year 2000?
10 A. I don't know.
11 Q. Do you know what efforts were made to
12 resume operations in 525 Virginia after the flood?
13 A. As I mentioned earlier, they cleaned up
14 the building, the analytical operations, which are
15 on the second floor, were continued to operate in
16 some form or fashion. We put the Virbac business
17 back in there at some point. Those are the only
18 things that I'm aware of that we did to the
19 building to make it be able to generate revenue.
20 Q. Is there any reason why you didn't try to
21 put the building back in the same condition it was
22 in prior to the flood so that you could resume full
23 service operations?
24 A. There was concern that because of the

43

1 nature of what had gone in there over the past
2 number of years, that it probably would not help us
3 to do that unless we could demonstrate to our
4 customers that something had changed the situation,
5 that it wasn't prone to flooding in the future.
6 Q. Well, you told me about a flood in the
7 year 2001. Are you aware of -- what happened prior
8 to 2001 that would cause the concern?
9 A. It's my understanding that that general
10 area, the office park or whatever you want to call
11 that, that location was prone to flooding, and
12 there had been floods there in '99, obviously the
13 one in 2001, and I've been told that there was a
14 third one that had taken place there at some
15 point.
16 Q. What do you know about the 1999 flood?
17 A. It occurred. We generated some -- we loss
18 -- we had some losses. I don't know what the
19 details of them are.
20 Q. The losses were the -- was the damage to
21 the Delaware property that you told me about
22 earlier?
23 A. That's my understanding.
24 Q. Do you know the building was located in a

44

1 flood plane?
2 A. Do I know that? Yes.
3 Q. When did you first know that?
4 A. Probably sometime after the flood.
5 Q. As part of your duties as CFO, are you
6 also responsible for insurance?
7 A. Not directly, no.
8 Q. Does somebody work for you -- is somebody
9 who worked for you responsible for the insurance
10 for the business?
11 A. No. The insurance -- what happens within
12 Omnicare, Inc. is they utilize a company called
13 Marsh to handle all their insurance. So what they
14 send out to us are questionnaires, various
15 questions about different kinds of things that they
16 want to know in order to determine coverage. We
17 would prepare those annually.
18 Q. Who would fill out the questionnaire on
19 behalf of Pharmaceutics?
20 A. I would think the last time it was done
21 was probably Jim McDevitt.
22 Q. Do you know whether or not you carried
23 flood insurance for 525 Virginia?
24 A. Yes, we did receive proceeds.

45

1 Q. So then you did have a flood insurance
2 policy?
3 A. Yes.
4 Q. Did you know that you can't buy a flood
5 insurance policy unless you're in a flood plane?
6 A. I know that now, yes.
7 Q. You didn't know that before?
8 A. No.
9 Q. Did anybody at the company know that the
10 building was located in a flood plane prior to the
11 2001 flood?
12 A. I don't know.
13 Q. Do you know what the insurance proceeds
14 that were available to the company as a result of
15 the flood?
16 A. Yes.
17 Q. How much?
18 A. We had a one million dollar policy on 525,
19 and a two and a half million dollar, I'm not sure
20 what it's called, excess policy.
21 Q. Anything else?
22 A. The excess was for both 425 and 525.
23 Q. Were there any other policies?
24 A. There was a policy on 425, a million

Exhibit G

RECYCLED

KENNETH FELD

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

NO. 02-CV-2905

BARRY M. PORTNOY and GERARD ) DEPOSITION UPON
M. MARTIN, as Trustees for )
HUB PROPERTIES TRUST, ) ORAL EXAMINATION
)
      Plaintiffs, ) OF
)
)
    - vs - ) KENNETH FELD
)
)
OMNICARE PHARMACEUTICS, )
INC. and OMNICARE CLINICAL )
RESEARCH, INC., )
)
      Defendants. )
- - - - - - - - - - - - - - -

      TRANSCRIPT OF DEPOSITION, taken by and
before JENNIFER WEARNE, Professional Reporter
and Notary Public, at the offices of OBERMAYER,
REBMANN, MAXWELL & HIPPEL, LLP, One Penn Center,
19th Floor, 1617 J.F. Kennedy Boulevard,
Philadelphia, Pennsylvania, on Monday,
March 3, 2003, commencing at 11:25 a.m.


    REPORTING SERVICE ASSOCIATES (RSA)
      A VERITEXT COMPANY
   1845 Walnut Street - 15th Floor
   Philadelphia, Pennsylvania  19103
      (215) 241-1000

COPY

VERITEXT PA

KENNETH FELD

27

1      Chalfont, Pennsylvania.

2   BY MR. DIAMOND:

3   Q.      Were you familiar with the fact that

4   the Fort Washington Industrial Park was in a

5   flood zone?

6   A.      Yes.

7   Q.      Would you say that that was common

8   knowledge for all the people who were

9   working at -- or the people that you worked with

10  at Omnicare, that they all knew that it was in a

11  flood zone?

12  A.      Yes.

13  Q.      How did you know it was in a flood

14  zone?

15  A.      I started working in that office park

16  in 1983, and there were periods of rain that

17  came through where intersections would flood.

18  Q.      Was that when you were working for

19  Ciba Geigy?

20  A.      No, that's when I was working for

21  Rorer Pharmaceutics.

22  Q.      They were in that park?

23  A.      Yes, they were at that time.

24  Q.      At that time?  Were you an officer of

4ee7f5a1-4e25-11d7-88e5-009027a6908f

KENNETH FELD

28

```
1    Omnicare Clinical at any time?
2    A.          Not that I recall.
3    Q.          Were you an officer of Omnicare
4    Corporate at any time?
5    A.          No.
6    Q.          Did you ever discuss with anybody at
7    Omnicare Clinical or Omnicare Corporate the fact
8    that 525 and 425 were located in a flood zone?
9    A.          Yes.
10   Q.          Do you remember the earliest, if you
11   can -- and I'll take you through some documents
12   that may help you, but do you remember the
13   earliest time that you first had such a
14   discussion and with whom you had the discussion?
15   A.          Yeah.  As I recall, it was early in
16   2001 January, February, March, we had some
17   meetings with John Hamill and Dave Morra.
18   Q.          Who was John Hamill?
19   A.          John Hamill was the -- I believe
20   John's title was either director or
21   vice-president of finance for Omnicare Clinical
22   Research.
23   Q.          What was the discussion, as best as
24   you can recall?
```

VERITEXT PA

KENNETH FELD

29

1    A.        As best as we could recall -- as best

2    as I can recall, the discussion primarily

3    centered around issues related to insurance

4    coverage.

5    Q.        And what were those issues?

6    A.        I had noticed and Jim McDevitt had

7    noticed that in our P.&L.s, profit and loss

8    statements, in early 2001, that the line for

9    insurance had significantly dropped in terms of

10   the premiums from prior years, and that raised

11   flags in both of our minds as to what had

12   changed with our coverage, insurance in general,

13   property, liability, and anything else that

14   would relate to insurance coverage.

15   Q.        So you spoke to Mr. Hamill and

16   Mr. Morra about it?

17   A.        Spoke to both of them.

18   Q.        Was this on the phone or at a meeting?

19   A.        No, we had a meeting.

20   Q.        Do you remember where?

21   A.        In the Fort Washington offices at 525

22   Virginia Drive.

23   Q.        This was in early 2001?

24   A.        Yes.

4ee7f5a1-4e25-11d7-88e5-009027a6908f

KENNETH FELD

30

1  Q.        And you and Mr. McDevitt expressed

2  your concern?

3  A.        Yes, we did.

4  Q.        And what were you told?

5  A.        At that time we were told that it

6  would be looked into and we would be provided

7  with a response.

8  Q.        Was the idea of flood insurance

9  discussed at all at that meeting?

10  A.        Only in its most general terms.

11  Q.        What do you mean by that?

12  A.        Well, again, our conversations at that

13  meeting were very inclusive of insurance.  We

14  did raise the point in those discussions that,

15  you know, the facilities, both facilities, were,

16  indeed, in the Fort Washington flood plain, and

17  Jim and I wanted to make sure that we had

18  appropriate coverages regardless of what might

19  occur, property loss, liability, you know, due

20  to whatever cost.

21  Q.        I'm sorry.  If I interrupt you, I

22  don't mean to.  At that time in early 2001, at

23  the time of that meeting, were you aware of any

24  prior flooding of the 425 or 525 properties that

VERITEXT PA

4ee7f5a1-4e25-11d7-88e5-009027a6908f

KENNETH FELD

31

1    might have occurred?

2    A.       Yes.

3    Q.       Could you tell me what you were aware

4    of?

5    A.       Tropical storm Floyd came through that

6    area in the fall of '99, I believe it was, and

7    during that storm there was, I was told, a foot,

8    foot and a half of water within the 425 Delaware

9    Road facility, and I was told that there was no

10   water in the 525 Virginia Drive facility.

11            But the water did lap up to the front

12   door, and I believe someone else had told me

13   that it rose almost to the height of the loading

14   dock in the back of the building.

15                    MR. DIAMOND:  Excuse me just

16            a second.

17                    (Discussion off the record.)

18   BY MR. DIAMOND:

19   Q.       If Mr. Morra testified that he knew

20   nothing about the flood plain, the property

21   being in a flood plain, until after tropical

22   storm Allison in June of 2001, as far as you're

23   concerned, that would be untrue, wouldn't it?

24                    MR. McELROY:  Objection to

4ee7f5a1-4e25-11d7-88e5-009027a6908f

KENNETH FELD

32

1                    the form of the question.

2    BY MR. DIAMOND:

3    Q.        You can answer.

4    A.        Yes, that would not be true.

5    Q.        Because you told him?

6    A.        Yes.

7    Q.        Was he surprised when you told him?

8    Did he say I didn't know we were in a flood

9    plain?

10                   MR. McELROY:   Objection.

11   BY MR. DIAMOND:

12   Q.        You can answer.

13   A.        From what I recall; he did not seem to

14   be surprised.

15                   MR. DIAMOND:   Let's mark

16           this Feld-4.

17                   (Entry form marked for

18           identification as Exhibit Feld-4.)

19   BY MR. DIAMOND:

20   Q.        Take a look through those documents.

21   I note for the record that none of these pages

22   appears to have your name on them, and so you

23   may be completely unfamiliar with them, but I

24   just wanted to ask you about them.

4ee7f5a1-4e25-11d7-88e5-009027a6908f

KENNETH FELD

74

1    put into effect by the division.

2              Possibly, the division could have

3    evaluated alternative risk management action

4    plans, including the purchase of flood insurance

5    implementing the recommendations of an insurance

6    underwriter or a risk management consultant

7    investigating the relocation of consigned

8    inventory to a warehouse removed from flood

9    zone, renegotiating the lease, modifying the

10   facility, et cetera.

11             Was that a correct and accurate

12   statement as far as you were concerned?

13                  MR. McELROY:  Objection to

14             the form of the question.

15   BY MR. DIAMOND:

16   Q.        You can answer.

17   A.        As far as I was concerned, yes.

18   Q.        So, in other words, if you had known

19   the true state of affairs regarding the

20   insurance, you could have taken action to try to

21   mitigate or prevent possible flood damage to

22   Omnicare Pharmaceutics?

23                  MR. McELROY:  Objection to

24             the form of the question.

VERITEXT PA

KENNETH FELD

75

1                    MR. PARRY:  You can answer.

2                    THE WITNESS:  Yes, yes, we

3            could have made alternate plans and

4            tried to evaluate other options.

5    BY MR. DIAMOND:

6    Q.        Do you see number three, it appears

7    the umbrella liability coverage level,

8    75 million in property insurance coverage level,

9    50 million primary and 30 million flood and

10   earthquake were sufficient in 1999 and 2000, but

11   reduced to the 2.5-million-dollar level in 2001

12   under a new policy.

13           Does that refresh your recollection

14   about what you knew regarding any change in

15   flood insurance that Pharmaceutics had?

16   A.        Yes, it does.

17   Q.        Was this accurate, you originally had

18   $30 million, and it was reduced for 2000, 2001

19   to $2.5 million in flood insurance?

20   A.        At this point I do not recall the

21   specific numbers.  I do recall there was a

22   significant reduction as we moved into 2001, a

23   significant reduction in the premiums that we

24   were being charged.

VERITEXT PA

4ee7f5a1-4e25-11d7-88e5-009027a6908f

KENNETH FELD

78

1    2.5 million?

2    A.        I honestly don't recall.

3    Q.        Okay.  If you would have

4    $30 million -- if you had had the same flood

5    insurance in 2000, December of 2000 to December

6    of 2001 that you had had from December of 1999

7    to December of 2000, the flood insurance had

8    been the same, which was $30 million, would that

9    have covered all the damage that Pharmaceutics

10   sustained in tropical storm Allison?

11                  MR. McELROY:  Objection to

12        the form of the question.

13                  MR. PARRY:  You can answer.

14                  THE WITNESS:  At the time

15        when this was written, I believed it

16        would have.

17   BY MR. DIAMOND:

18   Q.        Have you changed your mind since then?

19   A.        No, I haven't, but I'm not privy to

20   certain information that relates to the actual

21   costs of, if you will, closing the business up

22   and how they accounted for all that.

23   Q.        Well, as far as you understood, as

24   long as you were present in Pharmaceutics, if

4ee7f5a1-4e25-11d7-88e5-009027a6908f

KENNETH FELD

79

1   you had $30 million in flood insurance coverage,

2   would that have been sufficient to restore the

3   business facilities to what they were before the

4   flood and to pay whatever claims the company had

5   to pay for damage caused by the flood?

6   A.        I believe it would, yes.

7   Q.        What do you think the total would have

8   been?  How much of that insurance money would

9   you have had to spend to bring the business

10  back, the physical facility back, and to pay for

11  whatever damage to inventory or property had

12  occurred?

13                  MR. McELROY:  Objection to

14          the form of the question.

15                  THE WITNESS:  Recovering the

16          facility and equipment to the way the

17          business was just prior to the flood,

18          $10 million, $8 to $10, maybe as high

19          as $12 million.  I don't recall what

20          the payments to clients would have

21          been.

22  BY MR. DIAMOND:

23  Q.        You had testified previously that the

24  $10 million in consigned inventory was probably

VERITEXT PA

4ee7f5a1-4e25-11d7-88e5-009027a6908f

KENNETH FELD

80

1    a little low?

2    A.        That's what we believed, yes, that's

3    what I believed.

4    Q.        What did you think it was on

5    June 25th, 2001 approximately?

6                    MR. McELROY:  Objection to

7              the form of the question.

8                    THE WITNESS:  Well, on our

9              review of what was in our warehouse

10             was more on the order of $18 to

11             $20 million.

12   BY MR. DIAMOND:

13   Q.        Do you know, was all the consigned

14   inventory damaged in the flood?

15   A.        Physically damaged, I --

16                   MR. PARRY:  One moment.

17                   MR. DIAMOND:  All right.

18                   (Discussion off the record.)

19                   THE WITNESS:  Could you

20             repeat the question so I answer the

21             right one?

22   BY MR. DIAMOND:

23   Q.        Was all the consigned inventory at the

24   525 facility, at the 525 and 425 facilities, was

VERITEXT PA

KENNETH FELD

91

1    Q.        Do you remember the name of the

2    client?

3    A.        Novartis Animal Health.

4    Q.        Did they approach you with this

5    proposal after hurricane Floyd?

6    A.        I believe the original contact was

7    prior, slightly prior to -- I'm sorry.

8    Hurricane Floyd?

9    Q.        I'm sorry.  Tropical storm Allison?

10   A.        I believe it was just prior to

11   tropical storm Allison.

12   Q.        And did they indicate whether they

13   were or weren't interested in pursuing that

14   particular endeavor after tropical storm

15   Allison?

16   A.        Oh, yes, they definitely continued to

17   dialogue with us.

18   Q.        They were interested?

19   A.        They were very interested, yes.

20              MR. DIAMOND:  Feld-12.

21              (Email dated 9/21/99 marked

22        for identification as Exhibit

23        Feld-12.)

24              (Discussion off the record.)

4ee7f5a1-4e25-11d7-88e5-009027a6908f

KENNETH FELD

130

1    situation, some had said tell us when you're

2    back up and running, we'll send you new

3    material, we'll ask you to remake product.

4              Others said, you know, okay, it's

5    destroyed, let's get the insurance squared away,

6    and then we'll evaluate what we want to do next

7    for those particular products.  So there was a

8    variety of things between the customer.

9    Q.         Were you reporting these contacts with

10   customers back to Clinical and Corporate, giving

11   them an idea of what customers were saying?

12   A.         Yes.

13   Q.         Were you optimistic or pessimistic at

14   the end of July 2001 that you could restore the

15   revenue flow you had had before the flood?

16   A.         I was optimistic that we could do it.

17   Q.         Why?

18   A.         We were booking revenue at the end of

19   July, six weeks after the flood occurred.  There

20   was no place else to go but up.

21             Now, the time frame, you know, was

22   discussed in terms of how quickly we could begin

23   to book revenue at the level on a monthly basis

24   prior to the flood.

4ee7f5a1-4e25-11d7-88e5-009027a6908f

KENNETH FELD

133

```
1              identification as Exhibit Feld-20.)

2   BY MR. DIAMOND:

3   Q.       I'm just going to ask you about the

4   top page, maybe the top two pages.  So why don't

5   you take a look at the top two pages, if you

6   would, top three pages.

7   A.       Okay.

8   Q.       What does Exhibit-20 indicate was

9   Omnicare's revenues for the second half of 2001?

10                  MR. PARRY:  You mean

11          Pharmaceutics?

12                  MR. DIAMOND:  Omnicare

13          Pharmaceutics, yes, right.

14                  THE WITNESS:  What does it

15          indicate the revenues were?

16  BY MR. DIAMOND:

17  Q.       Yeah.

18  A.       Do you want me to add it all up?

19  Q.       Well, does this comport with your

20  recollection?  As I read this, in July the

21  revenues were $195,000?

22  A.       Yes.

23  Q.       In August, $364,000, which was more

24  than what you projected?  I think you projected
```

VERITEXT PA

4ee7f5a1-4e25-11d7-88e5-009027a6908f

KENNETH FELD

134

1    325, I think it was?  Is that what it was?

2                         MR. PARRY:  310.

3                         THE WITNESS:  310.

4    BY MR. DIAMOND:

5    Q.        So you were over what you projected?

6    A.        Uh-huh.

7    Q.        They were 377,000 in September,

8    511,000 in October, 615,000 in November, and

9    404,000 in December?

10   A.        (Witness nods head.)

11   Q.        Where were you -- who was sending you

12   business?

13   A.        Several of our clients, many of our

14   clients, people we've been doing business with,

15   companies we've been doing business with prior

16   to the flood.

17   Q.        It's been suggested in this litigation

18   that after the flood, very few of your clients

19   wanted to continue to do business with you,

20   certainly very few of your significant clients

21   wanted to do business with you; is that an

22   accurate statement?

23   A.        No, it's not.

24   Q.        Do you know if you were paying any

VERITEXT PA

KENNETH FELD

135

1    rent at all during the second half of 2001?

2    A.        My understanding, and what I was told,

3    is no, we were not paying any rent on the 525

4    Virginia Drive nor the 425 Delaware Drive

5    facility.

6    Q.        These activities that you resumed, how

7    did you resume them?  First of all, what was the

8    level of cooperation you received from the

9    landlord regarding restoration of the property

10   and any other help you might need?

11   A.        As I recall, in order to reestablish

12   the business itself, we did not need any direct

13   support from the landlord as we were bringing

14   the business back.  It was effectively all

15   internal Omnicare needs and input to bring the

16   business back.

17   Q.        Did you speak to any other landlord

18   representatives in the immediate aftermath of

19   the flood, say, the first month?

20   A.        Certainly, yes.

21   Q.        Do you remember who you spoke to?

22   A.        I remember Dave Campolli and there

23   were other people from Dave's office who we

24   would talk to periodically.  The main contact

KENNETH FELD

152

```
1    A.        Cichon.
2    Q.        Were their offices on the first or
3    second floor before the flood?
4    A.        First floor.
5    Q.        Now, as you look down this client
6    list, the people that we just discussed who
7    reported to Cichon and Downs, they were calling
8    these clients?  They were making contact with
9    them?
10   A.        They were making contact with these
11   clients and probably several others that don't
12   appear on this list, because they're probably
13   lumped in the general statement at the bottom.
14   Q.        And what were the Cichon, slash, Downs
15   people, I'll call them that for shorthand
16   purposes, what were they reporting to you about
17   what client intentions were respecting sending
18   any new business or continuing any business with
19   Pharmaceutics?
20   A.        Most of them wanted to know what our
21   recovery plan was.  They wanted to know when we
22   were going to be back up and operational and how
23   and where, and they -- you know, they wanted to
24   know that because they wanted us to do work for
```

VERITEXT PA

4ee7f5a1-4e25-11d7-88e5-009027a6908f

KENNETH FELD

153

1    them.

2    Q.         Was there -- and I think I've asked

3    you this before.  And if I have, forgive me.

4    Was there any suggestion that clients were never

5    going to send you work again because you had had

6    two floods in two years?

7    A.         Not that I ever heard directly.  There

8    may have been statements like that I heard

9    second or third-hand from some of my staff that

10   was on-site immediately after the flood when

11   they were coming to pick up their material where

12   some of the individuals who were sent it was

13   reported to me indicated that if we reopen

14   business here, they would most likely not do

15   work with us.  However, that was stated by

16   individuals that were not decision-makers in

17   their company at all.

18   Q.         Were you aware of any statements by

19   any decision-makers in those companies, your

20   client companies, that they would not send any

21   more work to the Fort Washington facility if it

22   reopened?

23   A.         I was not aware of any comments like

24   that.

4ee7f5a1-4e25-11d7-88e5-009027a6908f

KENNETH FELD

169

1    A.        No, I honestly don't.

2    Q.        Why not?

3    A.        Because I felt then, and I still feel

4    today, that that business unit could have been

5    brought back, could have been a larger --

6    generating a larger revenue, generating larger

7    profit, generating business unit that would have

8    fed more business into the Clinical Research

9    business unit.

10   Q.        Mr. Campolli testified that

11   Mr. McDevitt had said to him -- follow me here.

12   I don't want Mr. McElroy to ask what the basis

13   of my question is.  That's why I'm going through

14   this.

15            Mr. Campolli testified at his

16   deposition that Mr. McDevitt had said to him --

17   Mr. McDevitt had said to him that a lot of your

18   customers wanted Pharmaceutics to start back up

19   at 525 because there wasn't any other facility

20   in the area that they could send their work to.

21   Does that sound accurate to you?

22                    MR. McELROY:  Objection.

23   BY MR. DIAMOND:

24   Q.        Is that true?

4ee7f5a1-4e25-11d7-88e5-009027a6908f

KENNETH FELD

175

1    A.        Yes.

2    Q.        Barry Rostholder.  Who is Steve Purdy?

3    A.        Steve was one of our project managers.

4    Q.        And you see where it says packaging

5    operations, with the exception of Virbac, all

6    packaging operations have been completed, no

7    additional work is being accepted; was that your

8    understanding, that no additional work was going

9    to be accepted as of the time you left?

10   A.        As of February '02, they had made a

11   decision to close down the business unit.  So

12   from that point on, no new work was being

13   accepted except the production schedule for

14   Virbac.

15             They were just to close out anything

16   that was going on.  That was the plan up

17   until -- that was the plan I knew of up until

18   the time I left on March 31st.

19   Q.        So you were turning customers away?

20   A.        Again, up until March 31st, yes, we

21   were not accepting any new work.

22   Q.        And there was no work to accept?

23   People wanted you to take on new work?

24   A.        Yes.

4ee7f5a1-4e25-11d7-88e5-009027a6908f

KENNETH FELD

178

1    tested.

2           And what this is indicating, I

3    believe, is they wanted us to complete that

4    testing and then work to transfer the remaining

5    part of the study either back to them or to

6    another laboratory.

7    Q.        When were the customers of Omnicare

8    Pharmaceutics told that the business was going

9    to be phased out?

10   A.        We started doing that within a day or

11   two after I learned of that decision.

12   Q.        And did you convey any -- did you

13   convey that information yourself to any of your

14   customers?

15   A.        I spoke to some customers about it.

16   Some of our clients, after they learned of the

17   decision, they called me directly and wanted to

18   know more information, if I could share it with

19   them.

20   Q.        Did any of them express any

21   disappointment?

22   A.        Yes, many of them did.

23   Q.        What kinds of things did they say?

24   A.        We can't believe that's the decision,

4ee7f5a1-4e25-11d7-88e5-009027a6908f

KENNETH FELD

179

1    you know, you guys always did a great job for

2    us, we were really hoping that you would be back

3    up and running, you know, we don't know who

4    we're going to use now.

5    Q.        The other documents, I think I now

6    understand what they are, these other documents

7    that are part of this exhibit, are these all --

8    if I can summarize them -- instructions from the

9    client in what to do with the remaining work

10   once they were informed that the company was

11   going to be phased out?

12   A.        Well, they're client contact reports

13   in some cases, maybe in most, I'm sure it is, as

14   you'd say, it was we have programs running, how

15   do you want us to close down those programs, and

16   it was their instructions as to how to go about

17   doing that and what they wanted to do.

18                    MR. DIAMOND:  That's 28, I

19            guess.

20                    (Business plan marked for

21            identification as Exhibit Feld-28.)

22   BY MR. DIAMOND:

23   Q.        Do you recognize what's been marked

24   Feld-28?

VERITEXT PA

Exhibit H

JAMES MCDEVITT

```
 1            IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2
 3                               NO.  02-CV-2905
 4   BARRY M. PORTNOY and GERARD ) DEPOSITION UPON
     M. MARTIN, as Trustees for  )
 5   HUB PROPERTIES TRUST         ) ORAL EXAMINATION
                                  )
 6       - vs -                   )      OF
                                  )
 7   ONMICARE PHARMACEUTICS, INC. ) JAMES McDEVITT
     and OMNICARE CLINICAL        )
 8   RESEARCH, INC.               )
     - - - - - - - - - - - - - - - -
 9
10
11
                    TRANSCRIPT OF DEPOSITION, taken
12
     by and before KRISTIN N. LAFTY, Professional
13
     Reporter and Notary Public, at the Law Offices
14
     of OBERMAYER, REBMAN, MAXWELL & HIPPEL, LLP,
15
     19th Floor, One Penn Center, 1617 JFK Boulevard,
16
     Philadelphia, PA, on Tuesday, April 22, 2003,
17
     commencing at 10:05 a.m.
18
19
20                      -   -   -
21
22          REPORTING SERVICE ASSOCIATES (RSA)
                    A Veritext Company
23          1845 Walnut Street - 15th Floor
              Philadelphia, Pennsylvania 19103
24                   (215) 241-1000
```

454193

JAMES MCDEVITT

34

1  Q.      Never received any money at all?
2  A.      No.
3  Q.      Why not; do you know?
4  A.      Well, I think it boiled down to
5  resources. Saint Paul is a much more -- is a
6  much more substantial company than Omnicare.
7  They have 40 billion dollars in assets. And
8  they probably felt that their offer was
9  bonafide. And they weren't about to be bullied
10 or hustled. So they just said, you know, take
11 it or leave it. And then when they find out
12 that we hired CAPS, they withdrew their offer.
13 They took it down to zero.
14 Q.      Just so I'm clear, this is taking
15 place -- the cover page here, it says, received
16 Marsh, USA. It's addressed to someone named
17 Mark.
18 A.      Mark Cantalamessa.
19 Q.      CAPS is Marsh, right?
20 A.      No. Mark Cantalamessa worked at Marsh
21 & McClennan, which is a large insurance broker.
22 Q.      I see.
23 A.      And CAPS is a small CPA consulting
24 firm that tries to expedite or increase

35

1  insurance claims.
2  Q.      Gotcha. So you generated this
3  document, give or take, in August of 2000?
4  A.      Yes.
5  Q.      And so there's no doubt in your mind
6  that in August of 2000, Omnicare Clinical
7  Research knew that the Fort Washington
8  industrial park might be subject to flooding?
9  A.      Well, yes. I mean, you know, the idea
10 of instructing people to go maximize an
11 insurance claim, one would think that they knew
12 there were floods.
13 Q.      Well, they knew there was a flood,
14 didn't they?
15 A.      Yes.
16 Q.      You discussed the flood with
17 Mr. Froesel, didn't you?
18 A.      No. I worked with John Hamill. And
19 John Hamill talked to Dave Froesel.
20 Q.      What was Mr. Hamill's position?
21 A.      He was the controller of Omnicare
22 Clinical Research.
23 Q.      And you discussed the flood with
24 Mr. Hamill?

36

1  A.      Yes. And John said that I was to work
2  with this company appointed by Dave Froesel.
3  Q.      Could you take a look at next to the
4  last page of this document? Do you see the
5  handwriting at the bottom of it?
6         MR. SHARE: Is that
7  0003549?
8         MR. DIAMOND: It is.
9         THE WITNESS: With the 525
10 building?
11 BY MR. DIAMOND:
12 Q.      Yes. Where it says that. Do you see
13 that handwriting?
14 A.      Yeah.
15 Q.      Do you recognize whose handwriting it
16 is?
17 A.      It's not mine. I think it's John
18 Colligan's.
19 Q.      John Colligan's?
20 A.      Colligan, C-O-L-L-I-G-A-N. He was my
21 predecessor. Yeah. There's his name at the
22 top.
23 Q.      And it says, as I read it, 525
24 building landlord has 500K, need minimum

37

1  coverage of 6.6 million provided. We need
2  coverage on improvements and contents.
3  A.      Yes.
4  Q.      Biohazard cleanup, not going for
5  this. And then it has, lost signed contracts,
6  lost pending contracts, lost customers, et
7  cetera, downstream, impact on business
8  interruption claim.
9  A.      Right.
10 Q.      So as I read this, there are two
11 separate subjects being addressed in the
12 handwritten comments?
13 A.      Right.
14 Q.      One is the adequacy of insurance, the
15 other is the nature, the components of the
16 business interruption claim?
17 A.      Right. The second part is the part
18 that I worked on, which was basically pulling
19 sales order reports, backlog reports, production
20 reports, order cancellations to figure out the
21 impact and the measurement of the business
22 interruption value. And what I basically
23 learned is, business interruption insurance is a
24 proxy for your payroll and contractual

10 (Pages 34 to 37)

JAMES MCDEVITT

50

1  A.    Yeah.
2  Q.    So that as I understand it, Exhibit-5,
3  it says, "John, Janice Rice asked me to forward
4  to you the attached federal flood application."
5  Janice Rice from corporate is telling John
6  Hamill, and, as you put it, is telling
7  Mr. Colligan to fill out the federal flood
8  insurance application because the buildings are
9  in a flood zone?
10  A.    It's a federal requirement.
11  Q.    But because the buildings were in a
12  flood zone?
13  A.    Yes, yes.
14  Q.    So when you say on page -- the second
15  page of your memo, which is Omnicare 11058,
16  finding one, "The federal flood insurance forms
17  were completed and submitted in May of 2000,"
18  you are talking about the Exhibit-6 document,
19  correct?
20  A.    Yes.
21  Q.    Okay.  Number two, "No other risk
22  management took place other than completing this
23  flood insurance application form.  Pharmaceutics
24  division managers were actively trained in

51

1  disaster recovery plans.  If this flood zone
2  information had been forwarded to Pharmaceutics
3  management, a flood loss mitigation plan along
4  the lines of other disaster recovery plans could
5  have been put into effect by the division.
6  Possibly, the division could have evaluated
7  alternative risk management action plans,
8  including the purchase of flood insurance,
9  implementing the recommendations of an insurance
10  underwriter or risk management consultant,
11  investigating the relocation of consigned
12  inventory to a warehouse removed from the flood
13  zone, renegotiating the lease, modifying the
14  facility, et cetera."
15  A.    Right.
16  Q.    What were you criticizing here?  That
17  Pharmaceutics wasn't told enough?
18  A.    Yeah.  The information stayed within
19  the finance organization.
20  Q.    You mean within corporate?
21  A.    Yes.  Well, John Colligan left, and
22  then I took his place.  But we were a contract
23  manufacturer.  We had, let's say, 30 million
24  dollars -- 20 to 30 million dollars of consigned

52

1  inventory, 15 million dollars in invested
2  capital.  If we didn't get flooded, cleanup or
3  remediation would cost 4 to 5 million dollars,
4  and business interruption claims could have
5  easily been 12 to 20 million dollars.  So when
6  you add all those numbers up, I asked for a 60
7  to 75 million dollar insurance policy.
8  Q.    When did you do that?
9  A.    At the end of 2000.  Susan Nelson and
10  I completed forms that went to Janice Rice.  And
11  I asked her 60 to 70 million dollars in
12  insurance.  And apparently they thought it was
13  an aberration.  Now, our --
14  Q.    What was an aberration?  Who is they?
15  A.    The 60 to 70 million dollar
16  requirement.
17  Q.    And who thought it was an aberration?
18  Corporate?
19  A.    Yes.
20        MR. DIAMOND:  Now, there's
21  one other thing -- on the record,
22  we've never been provided with those
23  documents, Mr. Share.  And we'd like
24  them immediately.

53

1        MR. SHARE:  That's the first
2  I'm hearing of it.
3        MR. DIAMOND:  Okay.  But
4  it's not the first request you've
5  gotten for everything related to
6  insurance and floods and
7  Mr. McDevitt.  And we've never seen
8  these documents.  These are documents
9  you provided to corporate?
10        THE WITNESS:  Right.  It was
11  a survey.  Apparently -- and I didn't
12  know this at the time -- they were in
13  the midst of switching carriers.  So
14  we filled out Excel work papers.  And
15  we characterized our property, the
16  square footage, its usage,
17  manufacturing, admin, clerical,
18  general office, utility.  And also we
19  had to characterize the assets in that
20  building.
21        And I did a quick
22  calculation on business requirements,
23  and I came up easily with 70 million
24  dollars.  But I also started asking

14 (Pages 50 to 53)

JAMES MCDEVITT

66

1  talking about in this memo?
2  A.    Yes.
3  Q.    If Pharmaceutics had been told, here
4  is what your insurance is down to, your flood
5  insurance is down to, and you're in a flood zone
6  -- well, you knew you were in a flood zone?
7  A.    Right.
8  Q.    What steps do you think Pharmaceutics
9  would have taken?
10       MR. SHARE: Object to form.
11 BY MR. DIAMOND:
12 Q.    You can answer.
13 A.    Well, what I would have done is -- and
14 this goes back to -- I would have written a
15 paper signed by all the managers of the division
16 and escalated it through the chain of command
17 and say we are at risk. We have potential
18 liabilities here of untold millions. What do we
19 do? And I would have come up with another
20 background statement, another list of
21 alternatives. I would have priced and cost them
22 all.
23 Q.    Alternatives that you are describing
24 in paragraph two?

67

1  A.    Right. What do we do here? We're in
2  a flood plane. We're doing drug trials. All
3  our clients and projects which take five to ten
4  years to complete are at risk. We have to fix
5  the problem. And I would have worked with
6  management and also worked with the landlord,
7  which was an issue. We could have communicated
8  with the landlord. What do we do to alter the
9  building? It would have taken money and time.
10 Q.    Take a look at Exhibit-7, if you
11 would.
12 A.    And the other thing is that --
13 Q.    I'm sorry.
14 A.    We did have disaster recovery plans
15 for IT.
16 Q.    What's IT?
17 A.    Information technology department.
18 Q.    Right.
19 A.    All the companies have that now. You
20 do computer backups, you do off-site storage of
21 records and electronic files. What I was
22 alluding to was, we had a formal IT disaster
23 recovery plan, a book that was signed by all the
24 division managers. Curiously, we didn't have

68

1  anything for this.
2  Q.    For flood?
3  A.    For a flood or, you know, for the
4  plant location or the economic exposure.
5  Q.    So you are saying that corporate
6  management -- corporate in Cincinnati
7  underinsured you, didn't tell you about it and
8  never developed any kind of plan for the flood
9  that you weren't insured for?
10       MR. SHARE: Object to form.
11 BY MR. DIAMOND:
12 Q.    You can answer that.
13 A.    Well, let's put it this way. The
14 information, that would have been a collective
15 usefulness and benefit to the entire Omnicare
16 company. In the back, you'll see that I say, it
17 wasn't disseminated laterally or horizontally.
18 So we all suffered. It would have been a
19 collective solution. It wouldn't have just been
20 Omnicare Pharmaceutics solving their flood
21 problem. It would have been to the benefit of
22 Omnicare, its business reputation and its
23 clients and its employees. You know, the old
24 three-legged stool.

69

1  Q.    In his deposition of -- or his
2  questions of Dr. Feld, Mr. Share got a little
3  worked up over your use of the word "deliberate
4  deceit."
5  A.    Yes. It's an alternative.
6  Q.    Why do you use those words, deliberate
7  deceit?
8  A.    Well, you know, if you go back to
9  ethics, if you withhold information or you give
10 false information, that's called a lie or
11 deceit. And the information -- what happened
12 here is, as I said earlier, this information was
13 either deliberately withheld, which is deceit,
14 or the person was incompetent. They had all
15 this information, all this data and all these
16 facts, and they couldn't read it and digest it
17 and find out it was imperil, which is
18 incompetence. I go back to a controller or CFO,
19 his job is to protect the company assets.
20 Q.    So you are saying this is a
21 possibility?
22 A.    Yes. And it's my opinion, too.
23 Q.    Would you take a look at Exhibit-7,
24 please, which is, as I read it, a package of

18 (Pages 66 to 69)

JAMES MCDEVITT

166

1    instructions -- there's an E-mail in between -18
2    and -19, I think, that I wrote. And I wrote to
3    Ron about those instructions that were on number
4    -18. And I said, more or less, they didn't
5    make sense. And then I wrote a letter to Ron,
6    you know, and Ken. And then Ken jumped in and
7    said, I see what Jim's confusion is. We will be
8    boxing ourselves into scenarios which are not
9    achievable.
10              (At this time, McDevitt-20
11          was marked for identification.)
12   BY MR. DIAMOND:
13   Q.      I will show you some documents now,
14   Mr. McDevitt, that deal with the level of
15   business that Pharmaceutics did after the June
16   2001 flood. You see Exhibit-20?
17   A.      Yes.
18   Q.      This appears to me to be an E-mail
19   from somebody named Steve Purdy to you, among
20   others.
21   A.      Yes.
22   Q.      Who is Steve Purdy?
23   A.      He was a fellow employee who during
24   the final days of the business, he became the

167

1    project management director. And basically the
2    management team that was left was myself, Chris
3    Cichon, Steve Purdy, Dave MacAllister and John
4    Morrison. And, you know, we realized the
5    business was going to be closed. So we used to
6    have -- we wanted to, you know, complete these
7    final acts and in a rather professional manner,
8    so we could have weekly meetings what was left
9    of the management team. This was something I
10   proposed.
11              And basically I just wanted
12   to have an orderly withdraw from the business.
13   And what you see here is a litany of tasks and
14   responsibilities regarding the closeout.
15   Q.      Take a look at the paragraph, if you
16   would, that says, "Packaging Operations."
17   A.      Uh-huh.
18   Q.      "With the exception of Virbac, all
19   packaging operations have been completed. No
20   additional work is being accepted." Was
21   additional work being offered?
22   A.      Oh, yeah. You know, in the transition
23   stage, we were selling and booking new orders, I
24   believe, until December or January, December

168

1    2001, January 2002. Because we didn't really
2    know whether we were going to close or reopen
3    the business. So the salespeople were still
4    selling.
5    Q.      Clients were still coming to you?
6    A.      Yes.
7    Q.      When did you inform clients that no
8    additional work was being accepted?
9    A.      Well, that was the -- that was part of
10   the closeout. We had to go to the clients in
11   January, February and tell them that's it no
12   more orders. And then what we did was, we
13   helped them identify competitors and reassign
14   their projects to companies, such as PCI, Fisher
15   Scientific.
16   Q.      What was the reaction of the clients
17   when you told them you were closing?
18              MR. SHARE: Object to form.
19   BY MR. DIAMOND:
20   Q.      You can answer.
21   A.      There was disappointment. You know,
22   it was a type of a thing, we had excellent
23   relationships with our clients. And the
24   disappointment was on a personal level. And

169

1    then what happened was, it turned into a job
2    hunting type environment, where our clients
3    started trying to hire our employees, or
4    competitors started trying to hire our
5    employees. So, you know, the whole environment
6    and circumstances changed. But our clients were
7    disappointed.
8              (At this time, McDevitt-21
9          was marked for identification.)
10   BY MR. DIAMOND:
11   Q.      Do you recognize this series of
12   E-mails?
13   A.      Yes.
14   Q.      Could you summarize it for us?
15   A.      Okay. Susan Dorsey was our sales rep
16   in California. And we were -- she was
17   entertaining a business opportunity with Genome
18   Therapeutics. The potential client was looking
19   at our standard terms and conditions and was
20   trying to make some modifications. It was a
21   negotiating point. And basically she was asking
22   for staff assistance from myself, Ron Greenspan,
23   Albert McCormick to address the topic of an
24   insurance coverage on the consigned inventory.

43 (Pages 166 to 169)

RECYCLED

Exhibit I

1          IN THE UNITED STATES DISTRICT COURT

2      FOR THE EASTERN DISTRICT OF PENNSYLVANIA

3                              NO.  02-CV-2905

4    BARRY M. PORTNOY and GERARD  )   DEPOSITION UPON

5    M. MARTIN, as Trustees for   )   ORAL EXAMINATION

6    HUB PROPERTIES TRUST,        )          OF

7                    Plaintiffs, )   STEVE PURDY

8           - vs -               )

9    OMNICARE PHARMACEUTICS, INC. )

10   and OMNICARE CLINICAL        )

11   RESEARCH, INC.,              )

12                   Defendants. )

13   - - - - - - - - - - - - - -

14

15          TRANSCRIPT OF DEPOSITION, taken by and

16   before DEBRA R. WILHELM, Professional Reporter

17   and Notary Public, at the law offices of

18   OBERMAYER, REBMANN, MAXWELL & HIPPEL, LLP, 19th

19   Floor, One Penn Center, 1617 JFK Boulevard,

20   Philadelphia, Pennsylvania, on Wednesday,

21   November 20, 2002, commencing at 10:15 a.m.

22
              REPORTING SERVICE ASSOCIATES (RSA)
23                A Veritext Company
              15th Floor - 1845 Walnut Street
24            Philadelphia, Pennsylvania   19103
                   (215) 241-1000


                RSA Court Reporters

Steve Purdy

34

1    took place in June of 2001?

2    A        No, there was a flood in the 425

3    building.  It was Hurricane Floyd.  I don't

4    remember.  It was the fall of 1999 or 2000.

5    Q        April of 1999 was Hurricane Floyd?

6              MR. SHARE:  September 16th.

7              To the extent that it's significant,

8              hurricanes don't happen in April.

9              THE WITNESS:  At that time,

10             Hurricane Floyd flooded 425

11             considerably and I believe a small

12             amount of water entered 525.

13   BY MR. HABER:

14   Q        When did you learn that 425 was

15   flooded considerably by Hurricane Floyd?

16   A        I believe it happened over a weekend.

17   The storm itself was on Friday, so I would have

18   learned on Monday upon my arrival to work.

19   Q        Did you also --

20             MR. SHARE:  Which one are

21             you talking about now?

22             THE WITNESS:  This is

23             Hurricane Floyd I'm referring to.

24   BY MR. HABER:

Steve Purdy

36

1   A        At that time, no.

2   Q        How about the damage in 425 during the

3   September '99 flood, did that impact on your

4   business?

5   A        I believe that there was considerable

6   damage in that building.  It did not impact on

7   my particular clients.  My recollection is that

8   there weren't any clients that I was project

9   manager for that had any product or operations

10  going on in 425.

11  Q.       So at the time, the clients for which

12  you were responsible had their work being

13  performed in the 525 facility?

14  A        Yes.

15  Q        Do you have any idea the impact that

16  the flood damage in September of 1999 had on the

17  business itself?

18  A    _   I couldn't quantify it in dollar

19  figures if that's what you are asking.  I do

20  know there were clients affected and that there

21  were possibly issues with continued business or

22  issues with dealing with the aftermath.

23  Q        Such as?

24  A        Well, when you lose product, if you

Steve Purdy

56

1    to do that, and when we were going to do that.

2    Q        What's the business recovery plan?

3    A        The plan itself?

4    Q        What is a business recovery plan?  You

5    said you had one in your desk.

6    A        It detailed what would be done in the

7    event of a catastrophe, such as a fire, a

8    flood.  Honestly, I never read my copy.

9    Q        Did everyone have a copy?

10   A        I don't think everyone had a copy.  I

11   think the managers, directors and maybe a select

12   few other people.  I was given a copy by Jim

13   Kessler, who was my manager at the time, because

14   we were helping to put together what we would do

15   from a project management standpoint.  I was

16   involved with him, so that's the reason I had a

17   copy.  My copy was at a level where it was wet

18   at my_desk.  A lesson was learned.

19   Q        Who authored the business recovery

20   plan?

21   A        I'm not sure who the author of that

22   would be.  It was every individual department

23   had input, but it was for our division

24   specifically, Omnicare Pharmaceutics.

Steve Purdy

156

1    this.

2    Q        Can you describe what this material

3    is?

4    A        This material is a collection of

5    client contact letters and forms that were

6    accumulated after the decision to close the

7    business.  They were relating to contacting

8    clients and the comments back from the clients.

9    And also there's a letter that went out from Ken

10   Feld to the individual clients detailing the

11   closure and the possible transfer of work to

12   Omnicare's Toledo facility.

13   Q        For example, the page that's bait

14   numbered Omnicare 168, which I believe is the

15   fourth page in this package, is a letter

16   addressed to Carmen Molina who you already told

17   me about.

18   A    _    Yes.

19   Q        In March of 2002, what sort of work

20   was Omnicare Pharmaceutics performing for

21   AstraZeneca?

22   A        At this point, I believe everything

23   that we were doing with them was analytical in

24   nature.  All manufacturing, packaging had been

Steve Purdy

157

1    sent to another facility.

2    Q          If you take a look at the last

3    paragraph of the letter, maybe that will help

4    you.

5    A          (Witness complies.)  Yes, that's

6    analytical work.

7    Q          So you were actually performing

8    analytical work for AstraZeneca in March of

9    2002.  When the decision came to close the

10   business, this work was turned away?

11   A.         This work was in the process of being

12   transferred to other laboratories while we were

13   doing it.  So the answer to your question would

14   be, yes, it was turned away.  We probably just

15   expedited the removal of that work from our

16   facility to another facility.

17             They were in the process of

18   transferring the analytical methods to another

19   lab to move the work out.  I think I mentioned

20   earlier in my deposition that they were moving

21   everything back to their Swedish facility and

22   that was ongoing.  So this was really just a

23   boost to give them an official, we are closing,

24   you need to expedite your efforts to move things

RECYCLED

Exhibit J

CHRISTOPHER CICHON

1              IN THE UNITED STATES DISTRICT COURT
       FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2
3                                    NO.  02-CV-2905

4  BARRY M. PORTNOY and GERARD )  DEPOSITION UPON
   M. MARTIN, as Trustees for  )
5  HUB PROPERTIES TRUST         )  ORAL EXAMINATION
                                )
6      - vs -                   )       OF
                                )
7  OMNICARE PHARMACEUTICS, INC.)  CHRISTOPHER CICHON
   and OMNICARE CLINICAL        )
8  RESEARCH, INC.               )
   - - - - - - - - - - - - - - -

9
10
11              TRANSCRIPT OF DEPOSITION, taken
12 by and before KRISTIN N. LAFTY, Professional
13 Reporter and Notary Public, at the Law Offices
14 of OBERMAYER, REBMANN, MAXWELL & HIPPEL, LLP,
15 19th Floor, One Penn Center, 1617 JFK Boulevard,
16 Philadelphia, PA, on Monday, November 11, 2002,
17 commencing at 10:25 a.m.
18
19

20
21
22          REPORTING SERVICE ASSOCIATES (RSA)
               A Veritext Company
23         1845 Walnut Street - 15th Floor
            Philadelphia, Pennsylvania 19103
24                (215) 241-1000

CHRISTOPHER CICHON

58

1    Q.      And for how long were they
2    interrupted?
3    A.      Oh, I don't recall the entire period
4    of how long.
5    Q.      Was it more than a day?
6    A.      Oh, certainly.  Certainly it was more
7    than months, because of the amount of clean up.
8    I mean, the building had to be renovated as a
9    result.
10   Q.      The 425 building?
11   A.      Yes.
12   Q.      So it was months of renovations,
13   repairs?
14   A.      I would say at least cleanup and
15   renovations were in the months.  I couldn't tell
16   you the total time period.
17   Q.      Sticking with the 425 building -- do
18   you want to take a break?
19           MR. SHARE:  I could use two
20      minutes.
21           (A brief recess was taken at
22      this time.)
23   BY MR. CHING:
24   Q.      We were talking about the 1999 flood

59

1    and the damage that occurred as a result of the
2    1999 flood at both the 525 Delaware Avenue
3    facility and the 525 Virginia Drive facility.
4    And you had mentioned that the damage at the 425
5    facility was quite extensive?
6    A.      Yes.
7    Q.      Was there any concern that the company
8    had as a result of the damage suffered in 1999
9    at the 425 building?
10   A.      I'm not sure what you mean.
11   Q.      Was there any concern that there would
12   be -- that another flood would occur at the 425
13   building?
14   A.      I don't know the general consensus
15   within the organization as to what -- who
16   thought there was another flood possibility or
17   not.  I don't remember it ever being discussed.
18   I was probably not privileged to any
19   conversations in that regard.
20   Q.      Let me start back.  Thank you for
21   that.  Did you have any discussions within the
22   company about the flood risk and flood damage
23   after the 425 1999 flood damage?
24   A.      I remember talking about the damage.

60

1    I don't remember ever discussing risk to the --
2    Q.      How about the damage, the flood
3    damage?
4    A.      I'm sure we discussed it, what
5    happened in that building and the repercussions
6    with clients and that sort of thing.  Go ahead.
7    Q.      And who would you have that discussion
8    with?
9    A.      I believe we had it with project
10   management, within the project management team.
11   Q.      And who were the individuals you had
12   those discussions with?  Again, just to give
13   you -- this is the 1999 flood?
14   A.      Yes.  Steve Purdy, myself, the
15   director, Jim Kessler.  I don't recall if -- I
16   don't recall if Jim Bannister was in that role
17   at the time or not.
18   Q.      Who was Jim Bannister?
19   A.      He was another project coordinator,
20   but he may have been subsequent to that.
21   Q.      How about --
22   A.      I'm trying to remember the time frame.
23   Q.      Dr. Feld, did you have any discussions
24   with Dr. Feld?

61

1    A.      No, I don't recall having any
2    discussions with Dr. Feld regarding that.
3    Q.      And what was discussed with these
4    individuals?
5    A.      Well, I guess discussing client
6    issues, who was affected.
7    Q.      Client issues means who was affected?
8    A.      Well, who was affected.  I'm trying to
9    remember what clients of mine were indirectly
10   affected.  I don't recall anybody being directly
11   affected.  But we did do manufacturing for one
12   of my clients in that building.  But I can't
13   remember if we had completed that exercise prior
14   to then or not.
15   Q.      Do you remember who that client was?
16   This is 1999.
17   A.      1999, we had -- Kanke was the company
18   that I dealt with.
19   Q.      And this was manufacturing, Chris?
20   A.      Yes, primarily.  Formulation
21   development manufacturing for that client.
22           MR. SHARE:  What's the
23      spelling?
24           THE WITNESS:  K-A-N-K-E.

Pages 58 to 61

CHRISTOPHER CICHON

114

1  Q.    On pallets?
2  A.    On pallets.
3  Q.    Was there any concern that flood
4  damage would contaminate the products on the
5  floor or at the lower levels?
6  A.    No, not that I'm aware of.
7  Q.    Why was that?
8  A.    Like I said earlier, we didn't -- we
9  didn't think -- or I didn't think that there was
10  a potential for a flood in the 525 facility.
11  Q.    And the same is true for the 425
12  building after the flood, the 1999 flood?
13  A.    No.  I assumed the concern was more
14  for the 425 facility.  That's why materials were
15  basically not stored in the 425 facility.  They
16  were only storing materials they were using for
17  a particular project at that time.
18  Q.    Okay.  After the 1999 flood, you were
19  still involved with operations at the 425
20  building, right?
21  A.    Yes.
22  Q.    But you are not -- you don't know
23  if -- if product was stored at a higher level at
24  the 425 building after the 1999 flood?

115

1  A.    I don't recall going into the
2  warehousing room in 425 after that and recall
3  whether it was stored up above, on the floor.
4  Q.    There would be no occasion for you to
5  go into the warehousing section?
6  A.    Not many, no, no.  Being in project
7  management, no.
8  Q.    Is there any documentation at the
9  company that would indicate how things were
10  stored and whether they were on pallets on the
11  floor or at a certain height?
12  A.    In the 425 facility?
13  Q.    Anywhere.
14  A.    There's certainly documentation in the
15  525 facility of locations of where items were
16  stored.
17  Q.    And just to make clear, at the 525
18  building?
19  A.    Yes.
20  Q.    After the 1999 flood, there were no
21  special precautions taken to store product at a
22  higher height?
23  A.    Correct.
24  Q.    Are there any requirements that you

116

1  know of by the FDA under, you know, the GMP
2  regulations that we've been talking about that
3  relate to facilities in the flood plane or flood
4  zone?
5  A.    Not that I'm aware of.
6  Q.    You don't know of any requirements by
7  the FDA or from the FDA that require drugs to be
8  stored at a higher level than a flood plane?
9  A.    Not that I'm aware of.
10  Q.    Are you aware of any other -- are you
11  aware of any regulations by any other government
12  agency that require drugs to be stored at a
13  higher level in the flood plane zone?
14  A.    Not that I'm aware of.
15  Q.    Would you think that it would be --
16  that it would be one of your responsibilities to
17  know if there were such requirements?
18        MR. SHARE:  Objection.  I
19        don't think that's technically a
20        proper question.  You can answer it,
21        if you can.
22        THE WITNESS:  It might be
23        the organization's responsibility.
24        Because if you are governed by that

117

1        regulation, you should be aware of
2        that regulation.  So --
3  BY MR. CHING:
4  Q.    But weren't you a member of the
5  quality assurance program department?
6  A.    Yes.  At one time, yes.
7  Q.    And at one point.  So you didn't think
8  that it was incumbent upon you to know all the
9  relevant regulations?
10        MR. SHARE:  Objection to
11        form.
12  BY MR. CHING:
13  Q.    That had to deal with the safety of
14  the product?
15        MR. SHARE:  Object to form.
16  BY MR. CHING:
17  Q.    You can answer.
18  A.    That's a tough question to answer.  In
19  one regard, yes, I should be aware of the
20  regulations that govern the products.  But
21  there's no way I could know every regulation
22  myself.
23  Q.    Being that you have worked in the Fort
24  Washington area for like 12, 13 years, probably

db3c51a1-0086-11d7-88e8-9f2721ceef31

CHRISTOPHER CICHON

158

1   to them?
2   A.      Concerned.
3   Q.      Concerned?
4   A.      Our clients had product and studies
5   ongoing that could have been impacted.
6   Q.      Was there any reaction -- did any
7   clients react sort of like that E-mail that we
8   had -- that we had saw before, how could this
9   happen? How could a GMP facility be flooded?
10  A.      No. More of the reaction was, we
11  understand. It was a major catastrophe. We
12  will basically want to know the status of our
13  materials. And, you know, what can we do, one,
14  to help us; and, two, you know, to -- I can't
15  think of the word.
16  Q.      Did any of the clients express a
17  dissatisfaction about not being told that the
18  525 facility was in a flood plane?
19  A.      Not to my knowledge.
20  Q.      Let's go back to this exhibit.
21  A.      Okay.
22  Q.      If we look at -- let me just ask you
23  another general question. The clients that you
24  spoke to, did any of them indicate to you that

159

1   if OPI continued to do operations at 525, that
2   they would refuse to do business with OPI?
3   A.      I had clients that showed concern.
4   They were definitely concerned about continuing
5   business operations in that facility.
6   Q.      But did they indicate to you that they
7   would absolutely refuse to continue their
8   contract with OPI?
9   A.      That was not the statement. What they
10  said is that they had concerns or reservations
11  about continuing to do business in that
12  facility, in the 525 facility.
13  Q.      Okay. Can you tell me -- can you
14  identify those clients for me?
15  A.      Tularik.
16  Q.      Any others?
17  A.      I know BioMedicines had concerns.
18  Q.      BioMedicines?
19  A.      Yeah, BioMedicines.
20  Q.      Is that one word?
21  A.      Yes.
22  Q.      Any other clients?
23  A.      Not that I recall.
24  Q.      So it was just BioMedicines and

160

1   Tularik?
2   A.      Tularik.
3   Q.      They expressed a concern to you, but
4   they didn't state categorically that they would
5   not return to 525?
6   A.      Correct.
7   Q.      Who else contacted the clients at OPI
8   beside yourself?
9   A.      Steve Purdy, Jim Bannister, the sales
10  department, and then even some of the directors
11  were in on the calls depending on the client.
12  Q.      When would a director be involved in a
13  call?
14  A.      It depended on the client and how much
15  involvement they had with that client. Many of
16  our clients, the director was, you know, always
17  involved due to either the volume of the
18  business or the relationship that might have
19  been formed with that director. So he or she
20  may have been in direct contact.
21  Q.      Whose client -- whose responsibility
22  was it to contact AstraZeneca?
23  A.      That would have been Steve Purdy. And
24  I'm trying to think of the business -- it's

161

1   probably on the sheet. Business development
2   person, I believe, would be Bob Braden.
3   Q.      And were you involved or participate
4   in any discussion with AstraZeneca with those
5   individuals?
6   A.      No, I was not.
7   Q.      How about same question for Durect?
8   A.      No.
9   Q.      And same question for Novartis Animal
10  Health?
11  A.      No.
12  Q.      Sanofi?
13  A.      No.
14  Q.      Are you aware of any other customer,
15  whether they are -- it was your responsibility
16  or not, that refused to do business at 525 after
17  the flood?
18  A.      Bristol Myers Squibb, I do recall as
19  being one of those clients.
20  Q.      Could you explain?
21  A.      Just from --
22  Q.      Was that your client?
23  A.      No, it was not. It was Steve Purdy's
24  client.

Pages 158 to 161

CHRISTOPHER CICHON

162

1  Q.    Are you aware of any documentation
2  where -- Bristol --
3  A.    Meyers Squibb.
4  Q.    -- Meyers Squibb indicated that they
5  would refuse to do business if operations
6  resumed at 525?
7  A.    No, I am not aware of any
8  documentation.
9  Q.    Well, how did you come -- how did you
10 come to know that?
11 A.    Just from conversations with Steve.
12 Q.    Now, going back to this exhibit,
13 Chris. If we went down the list of customers
14 that this document indicates that you were
15 assigned to, for example, like on page 9886,
16 Omnicare 9886, you talked about BioMed, right?
17 Was that BioMedicine?
18 A.    I don't see a page number, but I see
19 BioMedicines.
20 Q.    I mean the Bates stamp numbers. It
21 says Omnicare 9886.
22 A.    It's not on my copy.
23 Q.    In the middle of the page.
24       MR. SHARE:  Right in the

163

1        middle. I'm sorry.
2        THE WITNESS:  Okay. Sorry.
3  BY MR. CHING:
4  Q.    I got confused.
5  A.    86, yes.
6  Q.    BioMed, right. We talked about
7  BioMed?
8  A.    BioMed is BioMedicines.
9  Q.    BioMedicines, right. And it mentions
10 a person named Hana Burger?
11 A.    Yes.
12 Q.    Did you speak to her after the flood?
13 A.    Yes, I did.
14 Q.    And did she indicate to you that she
15 would refuse to do business with OPI?
16 A.    No.
17 Q.    How about Blue Ridge -- Blue Ridge --
18 I can't read the reference to the contact
19 there. It looks like Jody?
20 A.    Jody.
21 Q.    Jody. Do you know her last name?
22 A.    It's him. Lockhart.
23 Q.    Lockhart?
24 A.    Lockhart, L-O-C-K-H-A-R-T.

164

1  Q.    And did you contact him after the
2  flood?
3  A.    Yes, I did.
4  Q.    It mentions that this client was
5  assigned to both you and an individual named
6  Aggostini?
7  A.    Aggostinelli.
8  Q.    Sorry. But was it you who contacted
9  the client?
10 A.    I initiated the call, yes.
11 Q.    During this discussion with your
12 client, did the client indicate that they would
13 refuse to come back?
14 A.    No, they did not.
15 Q.    Going down the list, Chris, I think
16 the next one I see with your name is Ganes,
17 G-A-N-E-S?
18 A.    Yes.
19 Q.    Do you see where I am?
20 A.    Yes, I do.
21 Q.    And the contact is Susan Yates,
22 Y-A-T-E-S?
23 A.    Yes.
24 Q.    Did you make the contact there?

165

1  A.    Yes, I believe I did.
2  Q.    And the same question. Did the client
3  indicate that they would refuse to come back and
4  do work?
5  A.    I don't remember if I talked to her on
6  the initial contact. I might have left a voice
7  mail. I don't recall whether anything was
8  stated whether they would still do business with
9  us.
10 Q.    Fair enough. If you would turn to the
11 next page.
12 A.    Okay.
13 Q.    And go down to client whose initials
14 are RWJ PRI. Do you see where I am?
15 A.    Yes.
16 Q.    What does that stand for?
17 A.    That's RW Johnson.
18 Q.    What's PRI; do you know?
19 A.    Pharmaceutical Research Institute.
20 Q.    And it lists various contacts
21 including Angela Falzone, Maxine Berman and
22 Maria Grista, G-R-I-S-T-A?
23 A.    Yes.
24 Q.    Did you make the contact there?

Pages 162 to 165

# CHRISTOPHER CICHON

166

1  A.    I believe I contacted both Angela and
2  Maxine. Maria I did not contact.
3  Q.    And during those discussions, did they
4  indicate that they would refuse to come back to
5  the 525 building?
6  A.    I do not believe so. I don't know if
7  it was ever discussed. But they did discontinue
8  operations after the flood.
9  Q.    Going down to -- I don't know if it's
10  Taiho, TALHO or T-A-I-H-O?
11  A.    T-A-I-H-O, yeah. Taiho.
12  Q.    Taiho. And the contact is Don Clodey,
13  C-L-O-D-E-Y?
14  A.    Yes.
15  Q.    Did you make the contact there, Chris?
16  A.    I believe I did.
17  Q.    And the same question. Did this
18  person indicate that they refused to do work at
19  525?
20  A.    No.
21  Q.    All right. Tularik. I guess that's
22  what we talked about before?
23  A.    Yes.
24  Q.    Contact is Bert Ho. Do you see where

167

1  I am?
2  A.    Yes.
3  Q.    And the question is, did Mr. Ho
4  indicate that he would refuse or the company
5  would refuse to continue work with OPI if they
6  remained at 525?
7  A.    He did not state that, but he is the
8  one that said he had concerns about going back
9  into that facility.
10  Q.    Virbac. I think you mentioned that?
11  A.    Yes.    ̄
12  Q.    Going down the list. And the contact,
13  Michael Elder, E-L-D-E-R, and Lou Demorka,
14  D-E-M-O-R-K-A?
15  A.    That's incorrect. It's Del'Orco.
16  Q.    Del'Orco?
17  A.    D-E-L apostrophe Orco.
18  Q.    Did you reach one of them?
19  A.    Yes, I did.
20  Q.    And who did you reach? Which one of
21  them did you reach?
22  A.    I know I spoke to Lou. I can't
23  remember on the initial contact whether I spoke
24  to Mike. I believe I did speak to both

168

1  gentlemen. They are at two different locations.
2  Q.    And during that conversation, did they
3  indicate that they would refuse to continue to
4  do work with OPI?
5  A.    No, they did not.
6  Q.    Going down the list to -- it looks
7  like a client called A-P-O-T-E-X, Apotex?
8  A.    Apotex, yes.
9  Q.    And the contact is Linda Biava,
10  B-I-A-V-A?
11  A.    Yes.
12  Q.    Did you contact -- did you reach this
13  woman?
14  A.    I don't recall if I reached her
15  specifically. But I either left her a voice
16  mail or did speak to her. I don't recall which
17  it was.
18  Q.    Did you receive any indication from
19  her or anyone else at the company that they
20  would refuse to do -- continue to do work with
21  OPI?
22  A.    No, I did not.
23  Q.    Okay. Let's go to the next page,
24  which is Omnicare 9888.

169

1  A.    Okay.
2  Q.    Client is Emisphere,
3  E-M-I-S-P-H-E-R-E. There's no contacts there.
4  Did you contact someone?
5  A.    Yes, I did. I can't remember if it
6  was Elso. I can't remember the quality
7  assurance gentleman's name. But I did contact
8  them.
9  Q.    And was there any indication from that
10  contact or anyone else at the company that they
11  would refuse to continue to do work with OPI?
12  A.    No, there was not.
13  Q.    Going down the list, a company called
14  HMS. Again, there's no contact on that side.
15  Do you see where I am?
16  A.    Yes.
17  Q.    Did you reach someone at that company?
18  A.    Yes, I did.
19  Q.    Do you remember who?
20  A.    David Terni was the president. He was
21  contacted. And then there was -- King was her
22  last name. Rene King, maybe. And then there
23  was another gentleman.
24  Q.    Did any of those individuals or any

Pages 166 to 169

CHRISTOPHER CICHON

170

1  other representative from that company indicate
2  that they would refuse to continue to do work
3  with OPI if they remained at 525?
4  A.      They may have. They were very upset
5  about the whole situation. I don't recall if
6  they stated they would never come back or not.
7  Q.      You are not sure?
8  A.      But I'm not sure. I'm not sure.
9  Q.      Wouldn't you recall if one of your
10 clients said that they wouldn't -- would never
11 come back? You don't recall?
12 A.      I don't recall.
13 Q.      Going down the list to -- it looks
14 like the last one on this chart, Searle,
15 S-E-A-R-L-E?
16 A.      Yes.
17 Q.      I can't read the handwriting for the
18 contact. Do you have some understanding of who
19 the contact was at that company?
20 A.      I believe that's Val.
21 Q.      Val?
22 A.      Val would have been -- Vanpril is the
23 drug and Placebo.
24 Q.      So this individual and the product

171

1  there?
2  A.      Yeah. No. I think they are all
3  products. The V-O-L might be volume, Placebo
4  and Valvarton. They are all drugs.
5  Q.      Do you recall reaching someone at that
6  company?
7  A.      Yes. Valerie Kidwell.
8  Q.      And did she indicate or anyone else at
9  the company indicate that they would refuse to
10 continue to do business with OPI?
11 A.      No.     -
12 Q.      Other than these clients, do you
13 recall any other client who you contacted who
14 indicated to OPI that they refused to continue
15 to do business at 525?
16 A.      No.
17 Q.      When you contacted someone, a client,
18 did you make any written record of that
19 communication?
20 A.      I believe I did, yes.
21 Q.      Was there a protocol or procedure that
22 the company -- that OPI established for
23 recording --
24 A.      Eventually there was. When we first

172

1  started out, I don't believe we had a written
2  procedure. But to start to keep track, we
3  started to write down on a form who you
4  contacted.
5  Q.      There was a form made?
6  A.      I believe.
7          MR. SHARE: Let him finish
8          the question before you answer it,
9          even if you know what the question is.
10         THE WITNESS: Okay.
11 BY MR. CHING:
12 Q.      And so that once the form was made,
13 you would record what was discussed with a
14 client in the normal course of that business?
15 A.      I don't know if it was everything that
16 was discussed. It was more of did you contact a
17 client and when.
18 Q.      Did you --
19 A.      It was more a record that we contacted
20 that client.
21 Q.      Did it indicate what the client said
22 to you?
23 A.      I don't recall if that was part of the
24 form or if that was written.

173

1  Q.      We'll get back to that in a minute. I
2  want to show you some -- what I think are some
3  of these reports. Okay?
4  A.      Okay.
5  Q.      But just some general questions
6  first. After the flood, the June 2001 flood,
7  are you aware of the company at OPI doing any
8  analysis on whether operations at 525 could be
9  restarted?
10 A.      I'm not sure what you mean.
11 Q.      At some point, there was a decision to
12 discontinue operations at 525, correct?
13 A.      That was the decision to close the
14 facility?
15 Q.      Right.
16 A.      In February.
17 Q.      Right. Was there any analysis or
18 study done to -- upon which that decision was
19 based?
20 A.      I believe there were business plans
21 written to restart the business elsewhere.
22 Q.      But was that -- were those studies --
23 was that analysis based purely on business
24 reasons? I guess let me try to rephrase this.

Pages 170 to 173

CHRISTOPHER CICHON

178

1   and packaging. So the initial start-up of the
2   525 facility was analytically driven.
3   Q.      Okay. Well, let's break it down
4   then.
5   A.      Okay.
6   Q.      In terms of analytical services, which
7   of the clients continued to have analytical
8   services performed at the 525 facility after the
9   June 2001 flood?
10  A.      Virbac was one. Tularik was another.
11  These are my clients now. I'm trying to think
12  of the -- BioMedicines. These would all be
13  clients that had stability ongoing that we had
14  to continue.
15  Q.      Okay. Now, forgive me. We talked
16  about analytical and we talked about stability.
17  Are they synonymous?
18  A.      They are related. Stability is the
19  storage of a study of drug at a certain
20  condition.
21  Q.      Analytical services -- let's break
22  this down.
23  A.      Okay.
24  Q.      Forgive me, Chris.

179

1   A.      It's all right.
2   Q.      Analytical occurred on the second
3   floor at 525?
4   A.      Correct.
5   Q.      Stability occurred on which floor?
6   A.      On the first floor.
7   Q.      On the first floor?
8   A.      The storage was the first floor.
9   Q.      So at some point after the June 2001
10  flood, operations were being done for clients on
11  the first floor?
12  A.      Only in the capacity of stability
13  storage. The stability units themselves
14  continued to run throughout the flood. It was
15  the only part of the building that continued to
16  run on backup generator.
17  Q.      What other activities on the first
18  floor at 525 were conducted for clients after
19  the June 2001 flood?
20  A.      In what time frame are we speaking?
21  Q.      From the date of the flood, you know,
22  until present.
23  A.      Okay. After we renovated the piece of
24  the building, we started to do primary packaging

180

1   for Virbac.
2   Q.      Primary packaging?
3   A.      Yes.
4   Q.      For Virbac?
5   A.      And secondary packaging for Virbac.
6   Q.      And that was on the first floor?
7   A.      Correct.
8   Q.      Any other type services that OPI was
9   conducting for Virbac after the flood?
10  A.      Analytical services.
11  Q.      Analytical. But analytical was on the
12  second floor?
13  A.      Yes.
14  Q.      Any other services on the first floor?
15  A.      The storage of stability.
16  Q.      Let me just get this right, Chris.
17  Primary packaging, secondary packaging and
18  stability storage?
19  A.      All on the first floor.
20  Q.      On the first floor. And this all
21  occurred after the June 2001 flood?
22  A.      Yes.
23  Q.      And this was for Virbac?
24  A.      Yes.

181

1   Q.      Any other services for Virbac?
2   A.      For Virbac?
3   Q.      Yes. Same time frame, after the June
4   2001 flood.
5   A.      I don't believe so.
6   Q.      Any other services on the second floor
7   for Virbac besides analytical?
8   A.      No.
9   Q.      During this time, did OPI receive
10  revenues for the services that they provided to
11  Virbac?
12  A.      Yes.
13  Q.      Do you have any -- do you know how
14  much?
15  A.      Not offhand, no.
16  Q.      Do you have an impression whether it
17  was significant?
18  A.      I don't know what you mean by
19  significant.
20  Q.      Fair enough. How about clients other
21  than Virbac? And, again, we're talking about
22  services after the June 2001 flood at the 525
23  facility.
24  A.      Emisphere.

Pages 178 to 181

CHRISTOPHER CICHON

182

1  Q.     Emisphere. And what type of services
2  did OPI provide to Emisphere after the flood?
3  A.     That was secondary packaging in the
4  laboratory.
5  Q.     Secondary packaging in a laboratory?
6  A.     It was a process where you had to dip
7  biles, and it had to be in a hood. So it had to
8  be done in a laboratory, in a hooded ventilated
9  area.
10 Q.     And this occurred at the 525 building?
11 A.     On the second floor.
12 Q.     On the second floor?
13 A.     On the second floor. That's the only
14 place that --
15 Q.     Any other clients?
16 A.     Not that I recall.
17 Q.     You talked about Tularik?
18 A.     Yes.
19 Q.     What kind of services did OPI provide
20 to Tularik after the June 2001 flood?
21 A.     In 525?
22 Q.     Yes.
23 A.     Stability storage and analytical
24 testing.

183

1  Q.     And this was after the June 2001
2  flood?
3  A.     These were continuations of what was
4  in the facility prior to and after the flood.
5  Q.     I'm sorry. Stability storage?
6  A.     Right.
7  Q.     And what else?
8  A.     It was prior to -- these were ongoing
9  studies that were in the stability chambers at
10 the time of the flood. And then we continued to
11 do the testing ōn those storage.
12 Q.     You mentioned stability storage and
13 something else?
14 A.     Testing.
15 Q.     Testing?
16 A.     Analytical testing.
17 Q.     And which floors did that -- stability
18 storage occurred on the first floor of 525?
19 A.     Correct.
20 Q.     And analytical testing occurred on the
21 second floor?
22 A.     Correct.
23 Q.     Any other services provided to Tularik
24 at 525?

184

1  A.     No.
2  Q.     I think you mentioned BioMedicines,
3  too?
4  A.     Yes.
5  Q.     What type of services did OPI provide
6  to BioMedicines after the June 2001 flood at
7  525?
8  A.     Similar to --
9  Q.     Tularik?
10 A.     Tularik. Stability storage and
11 analytical testing.
12 Q.     So stability storage also took place
13 on the first floor?
14 A.     Yes.
15 Q.     And analytical testing on the second
16 floor?
17 A.     Correct.
18 Q.     Were there any other services that
19 were provided to BioMedicines?
20 A.     Not at the 525 facility, no.
21 Q.     Any other clients that you recall?
22 A.     There's probably a few other clients
23 that we did stability testing for that we
24 continue to do stability testing for.

185

1  Q.     Okay. Now, these were only -- you are
2  only talking about the clients that were
3  assigned to you?
4  A.     Correct.
5  Q.     There were other clients assigned to
6  other members of your project management team?
7  A.     Correct.
8  Q.     You don't know whether those clients
9  continue to do -- continue to have services
10 provided for them at the 525 building?
11 A.     Not specifically, no.
12 Q.     Who would know that information?
13 A.     The project managers would have some
14 idea as to what continued in operation and what
15 didn't.
16 Q.     Now, we mentioned Steve Purdy. Was
17 Steve Purdy one of those project managers?
18 A.     Yes.
19 Q.     Who else besides Steve Purdy?
20 A.     Jim Bannister.
21 Q.     Jim Bannister. Who else beside Jim
22 Bannister and Steve Purdy?
23 A.     John Morrison.
24 Q.     John Morrison. These are all project

Pages 182 to 185

CHRISTOPHER CICHON

186

1   managers?
2   A.      Yes.
3   Q.      John Morrison. Anyone else?
4   A.      The directors may have some knowledge
5   at the time, but that would probably be about
6   it.
7   Q.      By directors, you are talking about
8   Dr. Feld?
9   A.      I don't know if Dr. Feld would know
10  specifically what was or was not being conducted
11  by a client. More the analytical -- the
12  directors, the assistant directors of analytical
13  would know what was continuing to develop.
14  Q.      Can you identify those?
15  A.      That would be David Aggostinelli.
16  Q.      Anyone else?
17  A.      And Larry Pachla.
18  Q.      And these two individuals would know
19  whether other clients had work done for them at
20  the 525 building after --
21  A.      They would know analytically what was
22  done, yes.
23  Q.      Now, you talk about, they would know
24  analytically. Are you talking about analytical

187

1   services?
2   A.      Services, correct.
3   Q.      What about other types of services
4   besides analytical? Would different individuals
5   know about those type of services after the
6   flood at the 525 building?
7   A.      Yeah. The directors would possibly
8   know what was done and not done.
9   Q.      Okay. Let's talk about primary
10  packaging. Who would that be?
11  A.      Fred Restaino. That would be the
12  director of packaging.
13  Q.      Anyone else?
14  A.      Manufacturing, Alan Wood.
15  Q.      Would that also include secondary
16  packaging?
17  A.      Fred would be primary and secondary.
18  Secondary would not have been conducted in 525.
19  That was why the King of Prussia site was
20  brought on to do secondary packaging.
21  Q.      So there was no secondary packaging
22  done at 525 after the June 2001 flood?
23  A.      To my knowledge, no.
24  Q.      I thought you said Virbac?

188

1   A.      No. Well, that's -- I'm thinking
2   clinically. You are correct. Virbac was done,
3   and then also Emisphere would be considered
4   secondary packaging.
5   Q.      And obviously with respect to each of
6   these clients that continue to have work done
7   for them at the 525 building after the June 2001
8   flood, OPI generated revenues from these
9   clients?
10  A.      Yes.
11  Q.      These clients that we talked about,
12  did they have any concerns either like from a
13  bio contaminant point of view about resuming
14  services at 525 after the flood?
15  A.      I would assume that they did. But we
16  did testing to show that there was no airborne
17  contamination in the facility.
18  Q.      So they elected to continue to -- they
19  made a decision to continue services at 525?
20  A.      Yes.
21  Q.      Did OPI take any precautions after the
22  June 2001 flood regarding these clients that
23  resumed operations at 525 to make sure that they
24  wouldn't be damaged by another flood?

189

1   A.      I guess the only precaution that was
2   undertaken was to store things in the King of
3   Prussia facility as much as possible. So all
4   your inventory items were stored in King of
5   Prussia and not in the 525 facility.
6   Q.      Okay. Generally when did these --
7   when did the resumption of services at 525 take
8   place, over what time period?
9   A.      Of all services, some services --
10  Q.      With these clients that continued to
11  do business, the ones we just talked about.
12  A.      Well, analytically from the
13  documentation you see that some of it resumed in
14  the July, August time frame. The --
15  Q.      When did they end?
16  A.      When did the --
17  Q.      Did these services at some point -- at
18  some point, the 525 facility was shut down,
19  correct?
20  A.      Yes.
21  Q.      So services at 525 were terminated?
22  A.      Yes.
23  Q.      For example, let's talk about Virbac.
24  When was the last services provided to Virbac at

Pages 186 to 189

RECYCLED

DIFFERENCE IN CONDITIONS COVERAGE SUMMARY                                    The St.Paul

This Summary shows the limits and extent of
your Difference in Conditions Protection.

| | Property Covered | Valuation |
|---|---|---|
| | ☒ Real property | |
| | ☒ Business Personal Property | |
| | ☒ Business Income | |
| **Additional Perils Covered** | ☒ Earthquake | ☒ Flood |

| | | Deductibles |
|---|---|---|
| Limit Of Coverage (Excluding Flood and Earthquake) | $ | $ |
| Flood Limit | $ 5,000,000 | $ 25,000 |
| Earthquake Limit | $ 5,000,000 | $ 25,000 |
| Catastrophe Limit | $ | |

### Locations Insured

| | |
|---|---|
| 001 | FOUR VALLEY SQUARE, BLUE BELL PA  19422 |
| 002 | 425 DELAWARE DRIVE, FORT WASHINGTON PA  19034 |
| 003 | 525 VIRGINIA DRIVE, FORT WASHINGTON PA  19034 |

CONFIDENTIAL                                         MAR 0001150

| Name of Insured | Policy Number TE02900924 | Effective Date 04/23/97 |
|---|---|---|
| IBAH, INC. | Processing Date 05/13/97  12:53  001 | |

©St.Paul Fire and Marine Insurance Co. 1987 All Rights Reserved                Page 1 of 1

Exhibit L

1

```
 1

 2                    UNITED STATES DISTRICT COURT

 3                  EASTERN DISTRICT OF PENNSYLVANIA

 4

 5    ----------------------------------------
                                             :
 6    BARRY M. PORTNOY and GERARD M.         :
      MARTIN, Trustees for HUB              :
 7    Properties Trust,                      :
                                             :
 8             Plaintiffs,                   :
                                             :
 9        vs.                                :      CASE NO.
                                             :      02-CV-2905
10    OMNICARE PHARMACEUTICS, INC., and     :
      OMNICARE CLINICAL RESEARCH, INC.,     :
11                                           :
               Defendants.                   :
12    ----------------------------------------
13

14

15             Deposition of:    DAVID W. FROESEL, JR.

16             Taken:            By the Plaintiffs
                                 Pursuant to Agreement
17
               Date:             March 12, 2003
18
               Time:             Commencing at 10:18 a.m.
19
               Place:            Thompson Hine, LLP
20                               312 Walnut Street
                                 Suite 1400
21                               Cincinnati, Ohio  45202-4029

22             Before:           Wendy L. Raymer, RPR
                                 Notary Public - State of Ohio
23

24
```

Ace Reporting Services (513)241-3200 / (800)277-7165

28

1    if there's any information that I would request with

2    respect to the risk management area, the typical operating

3    mode is I pick up the phone and I call Janice Rice.

4    BY MR. HABER:

5        Q.    Jumping ahead then to the flood of June 2001,

6    are you aware that you were underinsured for the losses

7    suffered?

8            MR. WILKINSON:  Object to the form.

9        A.    I'm not sure I understand the question.

10    BY MR. HABER:

11        Q.    Did you have enough insurance to cover your

12    losses as a result of the June 2001 flood?

13            MR. WILKINSON:  "Cover" meaning pay for?

14            MR. HABER:  Yes.

15        A.    I was aware of a flood in June of 2001, and at

16    that time I was not aware of whether we were underinsured,

17    adequately insured, or overinsured.

18    BY MR. HABER:

19        Q.    My question is directed towards the time period

20    after the flood.

21        A.    I'm sorry?

22        Q.    My question wasn't directed to what you knew at

23    the time of the flood, it was directed to the facts after

24    the flood.  Are you aware that you had insufficient

29

1    insurance to pay all of the losses you suffered as a result

2    of the flood?

3              MR. WILKINSON:  Are you today aware, I think he

4         is asking.

5              MR. HABER:  Yes.

6              MR. WILKINSON:  Okay.

7    A.    Today I am aware of the fact that the insurance

8    coverage provided was insufficient or less than the damages

9    that were incurred.

10   BY MR. HABER:

11        Q.    Was that a matter of concern to you?

12             MR. WILKINSON:  Today, again?

13   BY MR. HABER:

14        Q.    When you learned it?

15        A.    I'm not sure what you mean by "concern."

16        Q.    Well, do you care that you were underinsured?

17        A.    Yes.

18        Q.    Were you surprised when you learned that you

19   were underinsured?

20        A.    Yes.

21        Q.    Do you typically, as a business strategy,

22   intend to make sure that you have sufficient insurance

23   coverage to cover all conceivable losses?

24        A.    Typically, as I indicated earlier, we at

Ace Reporting Services (513)241-3200 / (800)277-7165

96

1    as opposed to move it elsewhere?

2        A.    If we had received adequate insurance proceeds

3    from Marsh, then we most likely would have continued to

4    stay in the business.

5              (Plaintiffs' Exhibit 13 was marked for

6              identification.)

7    BY MR. HABER:

8        Q.    Before you look at the new document I just

9    marked, if you had received adequate insurance proceeds

10   from Marsh, that would have made it less expensive for the

11   company to restart your operations, and, therefore, make it

12   a more worthwhile investment; is that correct?

13       A.    What I was saying is if Marsh had provided

14   Omnicare with the correct recommendation in terms of the

15   amount of insurance that the CRO or Omnicare should have

16   had in place with respect to that business, then the

17   decision would have been a lot easier for Omnicare to

18   continue the business.  Without the adequate insurance

19   funding, it became a very difficult decision, from a

20   financial perspective, to justify.  The insurance proceeds

21   were critical to the decision process in terms of whether

22   to restart the business or not.

23       Q.    Without the insurance proceeds, Omnicare would

24   have had to obtain or contribute its own funds to start the

97

1    business up again?

2          A.    Yes.

3          Q.    Which would have reduced the financial

4    attractiveness of such an investment?

5          A.    Yes.

6          Q.    Is that right?

7          A.    Yes.

8          Q.    Let's look at the next exhibit.  Froesel 13 is

9    a February 22nd, 2002 memo to Joel Gemunder from David

10   Morra, upon which you are copied, regarding "Pharmaceutics

11   transition."  Do you recall receiving this interoffice

12   memo?

13         A.    No.

14         Q.    The memo reads, "The following actions were

15   taken this week:  Informed Ken Feld on Thursday of the

16   decision to move operations to Toledo.

17                "Ken Feld met with employees on Friday to

18   inform them of the decision."  And it goes on.  What was

19   moved to Toledo?

20         A.    The only thing I recall is at about the time of

21   the flood, or shortly thereafter, sometime, I believe, in

22   2001, the Pharmaceutics business either had or was working

23   on some sort of contract with an animal health-care

24   company, I think called Virbac, and we were working on an

Exhibit M

JAMES MCDEVITT

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

NO. 02-CV-2905

BARRY M. PORTNOY AND GERARD ) DEPOSITION UPON
M. MARTIN, as Trustees for )
HUB PROPERTIES TRUST, ) ORAL EXAMINATION
)
                    Plaintiffs, )     OF
)
           - vs - ) JAMES McDEVITT
)
OMNICARE PHARMACEUTICS, INC., )
and OMNICARE CLINICAL )
RESEARCH, INC., )
)
                    Defendants. )
- - - - - - - - - - - - - - - -

          TRANSCRIPT OF DEPOSITION, taken by and
before ELISABETTA L. MAADDI, Professional Reporter and
Notary Public, at the offices of OBERMAYER, REBMANN,
MAXWELL & HIPPEL, LLP, 19th Floor, One Penn Center,
1617 John F. Kennedy Boulevard, Philadelphia,
Pennsylvania, on Tuesday, May 6, 2003, commencing at
10:10 a.m.

          REPORTING SERVICE ASSOCIATES (RSA)
          A VERITEXT COMPANY
          1845 Walnut Street - 15th Floor
          Philadelphia, Pennsylvania  19103
          (215) 241-1000

JAMES MCDEVITT

82

1 identify any of the clients who said, "I will double
2 your business," if you --
3 A.   No.
4 Q.   If you remember?
5 A.   No. There were clients who admired our
6 heroics. That was the way to describe it.
7 Q.   Dr. Feld testified that the amount of money
8 that would have been required to get 525 back up and
9 running was something north of 10 million dollars. You
10 testified last time that that figure was about six
11 million dollars.
12 A.   Yes.
13 Q.   Can you explain the discrepancy?
14 A.   Yes. If we were to have -- just refit the
15 building and put machinery in with base level
16 operations, we would have needed capital of three to
17 four million dollars. If we were to have completed
18 that build out, the 1.9 million on the RCA, the number
19 goes up to six million, and this is the 525 building.
20 The 12 to 13 million dollars was evacuating 525 and
21 swapping properties within the HUB Real Estate
22 portfolio, so it meant a new building.
23 Q.   Last time you were shown a document that had
24 financial performance from June to December of '01, six

83

1 months after the flood.
2 A.   Yes, five months.
3 Q.   And the August number, you said, exceeded the
4 revenue projection for August?
5 A.   Right.
6 Q.   Do you remember that?
7 A.   Yes.
8 Q.   Was that revenue projection a pre-flood
9 projection or a post-flood projection?
10 A.   Post-flood. We were on track for record
11 revenues, record profits, record sales orders. We were
12 having a banner year in 2001 prior to the flood.
13 Problem was we got flooded; the whole nature of our
14 business changed. So, as I mentioned, it jerry-rigged
15 an operation.
16 Q.   You said a moment ago that you and Dr. Feld had
17 worked up some projections and you calculated erosion
18 of clients.
19 A.   Yes.
20 Q.   Actually, erosion was the word you used last
21 time. How did you do that specific calculation? What
22 was the process?
23 A.   Well, at the time, we tabulated or surveyed the
24 sales reps. The driver on it was the remaining backlog

84

1 and sales orders. We would have budgeted by client and
2 by territory sales orders and techniques and just came
3 up with an estimate by client, and then just -- we
4 assume we'd lose half of our business the first year.
5 Q.   You also last time talked about additional
6 business that was being offered post-flood --
7 A.   Right.
8 Q.   -- and prior to the decision to terminate the
9 business. Can you characterize what type of work that
10 was that was being offered?
11 A.   Is this the Nevardis agreement?
12 Q.   Well, in general.
13 A.   Nevardis was our -- let's put it this way. Our
14 core business was clinical manufacturing, packaging,
15 distribution, and analytical services. Those are drugs
16 manufactured for use in clinical trial. That's it. We
17 had many large pharmaceutical firms approaching us.
18 They wanted to outsource manufacturing for,
19 let's say, less critical products that had attained FDA
20 approval. And that's a common event right now in the
21 market where a lot of your large pharmaceutical
22 companies, all they want to do is drug discovery and R
23 and D and marketing.
24 Manufacturing they will outsource on all these

85

1 products. Or if a product is at the end of its
2 lifeline, we had calls for an Italian company to do
3 some manufacturing. So that was the business Ken was
4 alluding to that he would live to have approached.
5 Q.   You talked last time about a study that David
6 Campoli told you the landlord was doing --
7 A.   Yes.
8 Q.   -- engineering study for the building. When
9 did he tell you that?
10 A.   I would say that was in April or May of 2002.
11 Q.   That's when you first learned?
12 A.   Well, we had two studies going on. The
13 engineer -- when you talk about the water table study,
14 let's say, the impact of the construction on the flood
15 plain, that's when I first learned of that study.
16 There was a previous study going on where they were
17 doing building modifications, you know. There were
18 actually two studies going on.
19 Q.   Let me ask you about both of those.
20 A.   Yes.
21 Q.   What are you referring to when you say water
22 table studies?
23 A.   The army core of engineering study.
24 Q.   Okay.

22 (Pages 82 to 85)

JAMES MCDEVITT

106

1  sales order analysis.
2  Q.    What did you mean by service area definition?
3  These are all the things you were going to -- you
4  anticipated the company, that is to say Omnicare
5  Pharmaceutics, performing?
6  A.    Yes. This is Ken's description of the actual
7  pharmaceutical services and the products we were
8  manufacturing.
9  Q.    So on page -- it looks to me to be ten, the
10  tenth page of the presentation, it says options
11  considered. You say, Manufacturing, stands alone; as
12  defined, not viable --
13  A.    Right.
14  Q.    -- because it's tightly aligned with packaging
15  distribution. This is the synergy you were talking
16  about?
17  A.    Yes. You would be manufacturing with the
18  finishing department, and finishing means packaging and
19  distribution, so it wouldn't be a very lucrative
20  option.
21  Q.    Taking a look at the -- what is the 13th page.
22  It says Financial Analysis Packaging Distribution.
23  There appear to be handwritten notes on it.
24  A.    Yeah.

107

1  Q.    Whose are they?
2  A.    Those are mine. I was verifying that this
3  presentation tyed into my Excel work papers.
4  Q.    I see. And then two pages later, it's McDevitt
5  page 43, I see -- was that the same thing, your notes
6  that tie into your Excel work papers?
7  A.    Yes, with the check -- yeah, the check mark
8  means that. The one at the bottom, that's Ken's
9  handwriting.    -
10  Q.    What were you doing here, comparing new
11  locations to 525 Virginia Drive?
12  A.    Right.
13  Q.    What were you doing?
14  A.    We were looking at a building swap with the
15  landlord. That's what we were trying to -- that's what
16  the new location is. And what you see is we could go
17  into a new building for $12,222,000, and achieve
18  revenue and operating income figures as shown, 13.8
19  million dollars and 3.7 million dollars. Then you
20  would show the payback period of 4.5 with an IRR of 25
21  percent, and the net present value, which is the
22  discounted value of the wealth, close to 14 million
23  dollars.
24      And then the other one is the 525 building, and

108

1  what I was asking were for was 5.3 million dollars
2  including the two million dollar build out to go back
3  into 525.
4  Q.    What is IRR, by the way?
5  A.    Internal rate of return.
6  Q.    And what would the total payback have been,
7  that's $4,350,000?
8  A.    Yes. Yes.
9  Q.    Over a 4.7 year period?
10  A.    No. You would have gotten your capital back in
11  4.7 years.
12  Q.    I see.
13  A.    And you would have generated wealth of 4.4
14  million dollars. Now, these projections are very
15  aggressive. I've always told George that your IRR or
16  your pay back -- your IRR would go to infinity,
17  because, theoretically, there should be no capital
18  invested on this provided you had insurance for your
19  fixed assets at least on improvement replacement. So
20  we conducted this analysis as if this was a new company
21  start-up, and it made the analysis more in favor.
22  Q.    It would have been better than this?
23  A.    Yeah. The IRR would have gone to infinity, and
24  then that, you know -- because it would have been no

109

1  cause capital investment.
2  Q.    Next page. First, it says -- what does it say?
3  Something excellent Dave, excellent Mike, or something
4  excellent Mike, Gary? I can't read it.
5  A.    Dave -- Ron -- now, I did not do this. This
6  was Ron Greenspan's analysis. Prior to this
7  presentation, that was the only -- those were the only
8  options we considered, then Ron independently put
9  together an exit strategy. So these are Ron's numbers.
10  Q.    Whose handwriting is that on top?
11  A.    Ken's.
12  Q.    What does it say?
13  A.    Dave, excellent slide.
14  Q.    Who is Dave? Morra?
15  A.    Morra.
16  Q.    So it was Ron Greenspan who said inadequate
17  flooding insurance coverage has complicated and delayed
18  decisions regarding building and equipment restoration?
19  A.    Yes.
20  Q.    And that was a true statement?
21  A.    Yes.
22  Q.    He also said seven months post-flood clients
23  are increasingly reluctant to commit new projects
24  without a clear understanding of Omnicare's long-term

28 (Pages 106 to 109)

JAMES MCDEVITT

110

1 intentions?
2 A.   Correct.
3 Q.   And that was a true statement?
4 A.   Yeah.  That was the jerry-rigged operation.  We
5 had a third party manufacturer, which we were
6 subcontracted to.  We had some packaging and
7 distribution on the fourth floor of 630 Allendale Road
8 site and some limited production in the 525 building,
9 and we had analytical services in the 525 building, so
10 our operations were scattered all over the Delaware
11 Valley.
12 Q.   This suggests to me that clients were prepared
13 to commit if they did have a clear understanding of
14 Omnicare's long-term intentions?
15    MR. SHARE:  Object to form.
16 BY MR. DIAMOND:
17 Q.   Is that correct?
18    MR. SHARE:  Object to form.
19 BY MR. DIAMOND:
20 Q.   You can answer.
21 A.   Yes.  It was getting to the point we had to get
22 off the dime.  The clients' projects were very
23 important to them, and we had to come up with a
24 decision, close the building or --

111

1 Q.   I understand.  But just --
2 A.   Yes.
3 Q.   Again, this suggests to me that had Omnicare
4 made the long-term commitment, the clients were there?
5 A.   Yes, they were.
6 Q.   What is the last page?
7 A.   That is Ron's estimate of closing the
8 building -- closing the business.
9 Q.   What it would cost?
10 A.   Yes.
11 Q.   And the insurance recovery is 4.5 million
12 dollars?
13 A.   Yes.  And I think you have to add those two
14 columns together, the 13.3 million and 1.9 million.
15 Q.   Was this presentation made, this power point
16 presentation, ever made?  Do you know?
17 A.   No, I don't know.  I think it was e-mailed to
18 Joel Germunder and Dave Froesel, and at that point
19 there may have been phone calls, but I wasn't part of
20 this communication.
21 Q.   Okay.  Let's take a look at the next page,
22 which unfortunately does not have any kind of marking.
23 It appears to be a handwritten document that says
24 2/28/01, Thursday.  Is this your handwriting?

112

1 A.   Yes.
2 Q.   What is this?
3 A.   This is out of my copybook.
4 Q.   This is out of those logbooks --
5 A.   Right.
6 Q.   -- that you referred to?
7    What is it?
8 A.   Well, that was a good day per John Hamill, do
9 not -- this was witnessed by Ken Feld and Mark
10 Cantalamessa --
11 Q.   Whoa.  Whoa.  Whoa.  I'm sorry to interrupt
12 you, but what is -- this is -- these were
13 contemporaneous notes you kept --
14 A.   Yes.
15 Q.   -- on that day?
16 A.   Yes.
17 Q.   And it says, Sue Duff, and then what does it
18 say?
19 A.   Sue Duff was -- apparently, I called Sue Duff
20 about dental insurance.
21 Q.   I see.
22 A.   And then I had to call AstraZenica.  I sent
23 them an e-mail.
24 Q.   Right.

113

1 A.   Probably about the product contamination.
2 Q.   Yeah.
3 A.   Then I did a February/March revenue or P and L
4 forecast by department.
5 Q.   Right.
6 A.   And then I worked on the business interruption
7 claim analysis for the Hurricane Floyd.
8 Q.   Then you have arrows here to AstraZenica file,
9 to Ken Feld, to Eric, to Jim McDevitt.
10 A.   Right.
11 Q.   What was that?
12 A.   I don't know.
13 Q.   Okay.  Then payroll adjustment, Karen Gregory,
14 remove three-day accrual?
15 A.   Right.
16 Q.   Was that something to do with your own --
17 A.   This was accounting gymnastics dictated by
18 corporate.
19 Q.   And what is the next word?
20 A.   Wire.
21 Q.   No idea?
22 A.   Well, we did accounts receivable collections,
23 and I used to wire the funds from our bank account to
24 corporate.

29 (Pages 110 to 113)

# Options Considered

## Exit

- Post-flood business was established as a temporary measure.

- Inadequate flood insurance coverage has complicated and delayed decisions regarding building and equipment restoration.

- Seven months post-flood, clients are increasingly reluctant to commit new projects without a clear understanding of Omnicare's long term intentions.

- Unabated employee attrition is negatively impacting the ability to support projects as well as employee morale.

- An exit strategy must be well planned and executed over 3-4 months in order to smoothly transition customers to other suppliers



**Omnicare**
Clinical Research

Exhibit N

RECYCLED

Portnoy vs. Omnicare Pharmaceutics, Inc. -

Depo of: JEFF MOORE

Page 1 to Page 62

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

RUSSELL COURT REPORTING INC.
Post Office Box 507

Yadkinville, NC  27055
Phone:  336-961-6057

Portnoy vs. Omnicare Pharmaceutics, Inc. -
**Depo of: JEFF MOORE**

BSA                                                                                                                XMAX(7/7)

## Page 25

(1) could have taken the risk for a short period of time maybe,
(2) but we didn't want to then deal with moving the equipment.
(3) Q.    Did you ever communicate that opinion to anyone at
(4) Omnicare?
(5) A.    Yes.
(6) Q.    To whom?
(7) A.    At least to Steve Purdy and I believe William Scultheis
(8) was involved. I know there was a Steven Downs that phased
(9) out at one point. I am still not sure. He was initially
(10) involved in the process but I am not sure post the flood
(11) whether he was still involved.
(12) Q.    Did the Chewy project ultimately go to another
(13) competitor of Omnicare?
(14) A.    Yes.
(15) Q.    Are you allowed to tell me who that was?
(16) A.    PCI Services, who was a subsidiary of Cardinal Health?
(17) Q.    Where are they located?
(18) A.    Can you rephrase that?
(19) Q.    Where was with work being done geographically?
(20) A.    The current work is being done in Puerto Rico, Humaco,
(21) Puerto Rico.
(22) Q.    What would the, if you know, what would the revenue to
(23) Omnicare had been had the Chewy project gone to Omnicare?
(24) A.    I'm guessing that their margins are probably around 30
(25) percent, so I can maybe guess 5 or 10 million a year.

## Page 26

(1) Q.    That would be the amount that Novartis would pay to
(2) Omnicare, is that your understanding?
(3) A.    No, I was trying to guess what their profit would be.
(4) Q.    My question was revenue, not profit. What was Novartis
(5) going to pay to Omnicare for that work?
(6) A.    On an annual basis?
(7) Q.    Yes.
(8) A.    Probably would have been somewhere in the neighborhood
(9) of 20 to 30 million.
(10) Q.    Does Mr. Paulsen still work for Novartis?
(11) A.    No.
(12) Q.    Do you know where he is today, employed today?
(13) A.    He is a consultant and his company name is Neptech
(14) Research, N-E-P-T-E-C-H.
(15) Q.    Where is he located now, do you know?
(16) A.    I believe he lives and resides in Charlotte, North
(17) Carolina.
(18) Q.    When was the decision made to send the Chewy project
(19) elsewhere; do you recall?
(20) A.    Around December 2001 to January 2002.
(21) Q.    Was the time of that decision effected by the flood at
(22) Omnicare?
(23) A.    Perhaps indirectly.
(24) Q.    Can you explain how indirectly?
(25) A.    It is in and around the time of the flood. We had

## Page 27

(1) narrowed our decision down to two companies, Omnicare and
(2) CVM. And post the flood and giving all of the other
(3) factors, we decided to look for up to three additional
(4) companies. We identified two additional companies.
(5) Q.    What was the reason for determining after the flood to
(6) find three additional companies?
(7) A.    Based on the concerns that I discussed earlier like the
(8) experience that Omnicare possessed as well as the necessity
(9) that we would have to move the equipment. And we were also
(10) against the clock, so we were looking at timing and had to
(11) act quickly, whatever we decided. I would say that Omnicare
(12) was our leading choice but we weren't really comfortable
(13) with making that decision unless we were left with no other
(14) choice.
(15) Q.    Was there anyone else besides Steve Purdy that you
(16) dealt with am Omnicare?
(17) A.    Ken Feld, I believe is the President, Vice President of
(18) that pharmaceutical division, and again Steven Downs. I
(19) think his business is involved. William Scultheis business
(20) development, I think he replaced Steven Downs.
(21) Q.    And?
(22) A.    And then every once in a while we would talk to an
(23) analyst. Let's see there was Larry, I can't remember his
(24) last name. He was like the director of analytical. But
(25) most of my main contact was with Purdy, Steve Purdy, on

## Page 28

(1) project management issues. And then Bill and Steve for new
(2) business.
(3) Q.    You said that there was several things in the decision
(4) making process with regard to the Chewy project, one of
(5) which was that you didn't want that work to take place in
(6) the Fort Washington facility. Would there have been any
(7) possibility of Novartis going ahead with the Chewy project
(8) with Omnicare at the Fort Washington facility regardless of
(9) the other factors in the decision making process?
(10)        MR. HUBER:    Objection to the form of the
(11) question.
(12)        MR. SHARE:    Do you understand what I am
(13) asking?
(14)        THE WITNESS:    (Nodding.)
(15)        MR. SHARE:    Once the flood occurred and you
(16) had decided that you didn't want to Chewy project to be
(17) performed long term at the Fort Washington facility, was
(18) there anything else -- was there at that point any
(19) possibility of the Chewy project going to Omnicare at the
(20) Fort Washington facility from Novartis' standpoint?
(21)        THE WITNESS:    For the commercial products
(22) no, for the development and the batches, it was being
(23) considered.
(24) BY MR. SHARE:
(25) Q.    What percentage of the $20 to $30 million figure was

Portnoy vs. Omnicare Pharmaceutics, Inc. -
Depo of: JEFF MOORE

BSA                                                                                              XMAX(10/10)

### Page 37

(1) A.    Right.  They were proposing facilities and if awarded
(2) the contract would have purchased it.
(3) Q.    So you opened the bids up again to two new companies,
(4) DSM and PCI?
(5) A.    Correct.
(6) Q.    Did they have their own facilities?
(7) A.    Yes.
(8) Q.    Did they also have experience in the field of
(9) commercial drug distribution?
(10) A.    Can you rephrase that, the distribution word is
(11) uncertain.
(12) Q.    Did they also have experience in the field of
(13) commercial drug manufacturing?
(14) A.    DSM has extensive experience.  PCI or the division we
(15) were dealing with has a lot of package experience but very
(16) little to no direct manufacturing experience.
(17) Q.    Why were DSM and PCI excluded from the initial request
(18) for proposal?
(19) A.    Actually I think, DSM was considered early, but they
(20) had rejected our offer the first time or two.  PCI was
(21) excluded because I was unaware that they could manufacture
(22) products or had a facility in which to do that.
(23) Q.    You later found out that they could?
(24) A.    Yes.  And we later asked DSM once again, would you
(25) please consider bidding on this project because we don't

### Page 38

(1) have anyone who has experience doing it.
(2) Q.    The bid that you eventually accepted, how did that
(3) compare to the bid that Omnicare made on the project?
(4) A.    In what respect?
(5) Q.    Price.
(6) A.    For development or commercial?
(7) Q.    Both.
(8) A.    Omnicare's development cost were much less than PCIs
(9) and DSMs but Omnicare's commercial pricing was significantly
(10) more than PCI's or DSM's.
(11) Q.    The majority of this work would have been the
(12) commercial work, right?
(13) A.    Correct.
(14) Q.    The $20 million a year figure that you suggested was
(15) all commercial dollars right, none of that was development?
(16) A.    Correct.
(17) Q.    Did you ever compare DSM to Omnicare?
(18) A.    Yes.
(19) Q.    Which bid would have been preferable?
(20)        MR. SHARE:    Objection.  You can answer.
(21)        MS. CLARK:    You can answer.
(22)        THE WITNESS:    Just price was just, I think,
(23) a small factor in the overall decision.  So again there
(24) were pros and -- the development costs were attractive from
(25) Omnicare; and however, the commercial costs were less

### Page 39

(1) attractive.
(2) BY MR. HUBER:
(3) Q.    But you never made the comparison of the two bids to
(4) decide which you liked better?
(5) A.    We compared costs of between Omnicare and DSM but cost
(6) was not the major decision maker.
(7) Q.    After the flood in June of 2001, did you continue to
(8) have services performed for you in the Omnicare facility in
(9) Fort Washington?
(10) A.    Yes.
(11) Q.    Can you describe the services that you continued to
(12) have performed for you there?
(13) A.    Omnicare continued to do analysis on the stability
(14) samples of the Econor project and the Praziquantal product.
(15) Q.    How long did that work continue in that facility?
(16) A.    We moved those products out and in March-April time
(17) frame so that was roughly eight months.
(18) Q.    March or April of 2002?
(19) A.    2002, yes.
(20) Q.    Why did you move those products – those projects out
(21) of that facility?
(22) A.    Because they, Omnicare, informed us that they would be
(23) discontinuing work in that facility.
(24) Q.    If Omnicare hadn't chosen to shut down that facility,
(25) would you have left your work there?

### Page 40

(1) A.    Yes, that particular work, yes.
(2) Q.    You said that Omnicare sent you some photographs of
(3) your product after the flood?
(4) A.    Yes.
(5) Q.    Do you have those somewhere?
(6) A.    I believe so.
(7) Q.    Do you also have a file that would contain notes or
(8) communications between you and Omnicare regarding the Chewy
(9) project and the events arising out of the – the events
(10) occurring after the flood?
(11) A.    Not as it pertains to the Chewy project, no direct
(12) communications about the flooding issue and project.  I
(13) don't know that I have any notes on that.
(14) Q.    Nothing in writing?
(15) A.    Right.  No written communications because it had no
(16) direct impact on that product, only an impact on the
(17) decision making.
(18)        MR. HUBER:    I would, I guess this is
(19) directed to your counsel.  I guess I would like if you
(20) would make available the file with the documents that you
(21) have related to the Omnicare decision making issues and
(22) communications with Omnicare relating to the work that they
(23) did at the facility post-flood?
(24)        MS. CLARK:    I don't think it is necessary as
(25) long as he has independent recollection of what those

Portnoy vs. Omnicare Pharmaceutics, Inc. -
Depo of: JEFF MOORE

BSA                                                                                                    XMAX(12/12)

## Page 45

(1)         THE WITNESS:    I am certain that we would not
(2)  have done the commercial work at that facility.
(3)  Development work was a small possibility, again we were
(4)  concerned with the development work and then having to move
(5)  it to a commercial facility.
(6)  BY MR. HUBER:
(7)  Q.    If steps could have been taken to provide you with
(8)  comfort that the facility was protected from future floods,
(9)  would that have impacted on your decision making process?
(10)  A.    It may have influenced it.  I am not sure the result
(11)  would have been different but, I mean we are alerted that
(12)  the Corp of Engineers were making changes and that it
(13)  shouldn't happen again.  But until you get a deluge like
(14)  they had, you are never quite sure.  So it is -- the chances
(15)  are one in a million.  Maybe that is more risk than we were
(16)  willing to take.
(17)  Q.    Did any of the other entities that you considered for
(18)  this project have facilities that had their own geographic
(19)  risks?
(20)  A.    Yes, I would say that all manufacturers are subject to
(21)  geological risks in one way or another.
(22)  Q.    And you considered all of those risks as a part of the
(23)  decision making process?
(24)  A.    Yes.
(25)  Q.    At the time you were considering the Fort Washington

## Page 46

(1)  facility for the Chewy project, did you know who your
(2)  customers for this new product was going to be?
(3)  A.    Yes.
(4)  Q.    In general, who were they?
(5)  A.    Dog owners in the US.
(6)  Q.    And the product would have been sold through pharmacys
(7)  or veterinarians?
(8)  A.    Through veterinarians.
(9)  Q.    And you get input from veterinarians regarding the
(10)  location or the facility at which your drugs are
(11)  manufactured?
(12)  A.    No.
(13)  Q.    So are the concerns of the veterinarians regarding
(14)  where the facility at which the drugs are manufactured not
(15)  considered as far as your decision making process?
(16)  A.    They are not considered.
(17)         EXAMINATION
(18)  BY MR. SHARE:
(19)  Q.    Where were the other manufacturing sites for the
(20)  Chewy project located, potential manufacturing sites?
(21)  A.    DSM Catalyica is located in Greenville, North Carolina
(22)  and a proposed manufacturing site by PCI services was
(23)  located in Humaco in Puerto Rico.
(24)  Q.    Were there any specific geologic risks associated with
(25)  those other sites that you were made aware of during the

## Page 47

(1)  selection process?
(2)  A.    Intuitively, I knew of risks, no one brought
(3)  specifically to my attention those risks.  Plus I had worked
(4)  at Catalyica, and I knew of geological risks there.
(5)  Q.    In Greenville?
(6)  A.    Yes.
(7)  Q.    What risks?
(8)  A.    DSM and the Greenville area of North Carolina sustained
(9)  significant damage due to the floods during Hurricane Floyd.
(10)  However, the DSM site was unaffected by that particular
(11)  flood with the exception of being shut down because people
(12)  couldn't physically get there.
(13)  Q.    But no manufacturing was adversely effected?
(14)  A.    Other than interruption of production, no direct damage
(15)  to any of the products.
(16)  Q.    What about the Puerto Rico site?
(17)  A.    I would think that Puerto Rico is very vulnerable to
(18)  hurricanes.
(19)  Q.    Do you have any specific information about the Puerto
(20)  Rico site having been damages or flooded by a hurricane?
(21)  A.    I don't have any specific information but I am not
(22)  aware that they were ever flooded or walls knocked down or
(23)  anything because of a hurricane.
(24)  Q.    And that is where the project ultimately went?
(25)  A.    Yes.

## Page 48

(1)         EXAMINATION
(2)  BY MR. HUBER:
(3)  Q.    In reference to Hurricane Floyd, that was the hurricane
(4)  that took place in 1999?
(5)  A.    That -- I believe is correct.
(6)  Q.    Do you know whether or not the Fort Washington facility
(7)  of Omnicare suffered any flood damage as a result of
(8)  Hurricane Floyd?
(9)  A.    I believe that they had, the area, the Fort Washington
(10)  area had been impacted by flash flooding.  But I don't know
(11)  if it was due to Floyd or just some other storm.  I don't
(12)  think that facility sustained any damage but I think
(13)  neighboring facilities had.
(14)  Q.    Did you know that Omnicare had another facility in the
(15)  some corporate park, right across the street from the one in
(16)  which you were considering the Chewy project?
(17)  A.    Now that you mentioned it.  They had informed me that
(18)  there was another facility.  And I believe maybe it had been
(19)  impacted by previous water, but maybe the main facility
(20)  where we were doing work had not.
(21)  Q.    Did you ever go into that second facility?
(22)  A.    No...
(23)  Q.    I am told that the second facility is less than 100
(24)  yards from the first one.  That would jive with your
(25)  understanding?

Exhibit O

RECYCLED

```
1              IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2

3                                    NO.  02-CV-2905

4    BARRY M. PORTNOY and GERARD  ) DEPOSITION UPON
     M. MARTIN, as Trustees for   )
5    HUB PROPERTIES TRUST          ) ORAL EXAMINATION
                                   )
6        - vs -                    )       OF
                                   )
7    OMNICARE PHARMACEUTICS, INC.  ) KEN FELD
     and OMNICARE CLINICAL         )
8    RESEARCH, INC.                )
     - - - - - - - - - - - - - - -

9

10

11                   TRANSCRIPT OF DEPOSITION, taken

12   by and before KRISTIN N. LAFTY, Professional

13   Reporter and Notary Public, at the Law Offices

14   of OBERMAYER, REBMANN, MAXWELL & HIPPEL, LLP,

15   19th Floor, One Penn Center, 1617 JFK Boulevard,

16   Philadelphia, PA, on Wednesday, April 9, 2003,

17   commencing at 10:15 a.m.

18

19                        -  -  -

20

21

22             REPORTING SERVICE ASSOCIATES (RSA)
                       A Veritext Company
23               1845 Walnut Street - 15th Floor
                 Philadelphia, Pennsylvania 19103
24                      (215) 241-1000
```

KEN FELD

193

1   work to be done on the first floor of 525?

2   A.        No.  Because we weren't manufacturing

3   on the first floor of 525.  But they were

4   sending packaging work, some secondary packaging

5   work, which they knew would have to go back into

6   that building.  And they were questioning us and

7   wanting to know as time ran on and our planning

8   and our discussions internally and with clients

9   externally was that we were planning now to

10  reestablish the business back in Fort Washington

11  at 525 Virginia Drive.  All they wanted to know

12  was when you are going to be up and running.  We

13  have more work for you to do.

14  Q.        Did AstraZenica ever tell you anything

15  about doing more work at 525 as opposed to

16  another location?

17  A.        Immediately after the flood?

18  Q.        At any time.

19  A.        No.  I'm just saying, immediately

20  after the flood, AstraZenica, the people that

21  came from AstraZenica -- again, these were not

22  the decision makers -- made a statement that

23  they probably would not do further business if

24  Omnicare Pharmaceutics relocated at 525 Virginia

KEN FELD

194

1    Drive.  As time wore on and we were making plans

2    ourselves to reestablish the business in 525

3    Virginia Drive, AstraZenica wanted to know when

4    we would be up and running in that facility.

5    They were going to send us more work.

6    Q.        Who told you that?

7    A.        Who told me that?

8    Q.        Who at AstraZenica told you that?

9    A.        I spoke to a couple people at

10   AstraZenica.  I don't remember their names.

11   Q.        I'm sorry.  Can you please try to

12   remember their names?

13                    MR. PARRY:  Can you try?

14                    THE WITNESS:  I don't

15            remember their names.

16   BY MR. SHARE:

17   Q.        Was AstraZenica a large customer of

18   OPI or a small customer?

19   A.        No.  They were a large customer.

20   Q.        Were they the largest customer?

21   A.        Yeah.

22   Q.        And who interacted with AstraZenica on

23   a regular basis?

24   A.        Primarily the business development and

KEN FELD

218

1   the effect of the impact of the flood and

2   continued work in that area.  Again, I was using

3   this as an opportunity to try to do something

4   better for the business.  Because in order to

5   rebuild the business, one way or another, there

6   was going to have to be capital monies approved.

7   Q.        You are talking about August of 2001

8   on this document, right?

9   A.        Right.

10  Q.        That's two months after the flood?

11  A.        That's right.

12  Q.        Were there client concerns about flood

13  issues in August of 2001 when this was put to

14  paper?

15  A.        I don't know.  I don't know what was

16  in the client's mind at that point in time.  Our

17  ongoing conversations was that they wanted to

18  know when we were going to recover our business,

19  what the timing was.  They wanted to send us .

20  more work.

21  Q.        Okay.  Let's look at scenario four.

22  Do you see on the left-hand column, second

23  bullet point talks about going to a different

24  building there, too, right, replacement

Exhibit P

RECYCLED

JAMES McDEVITT

1              IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2

3                                      NO. 02-CV-2905
4    BARRY M. PORTNOY and GERARD  ) DEPOSITION UPON
     M. MARTIN, as Trustees for   )
5    HUB PROPERTIES TRUST          ) ORAL EXAMINATION
                                   )
6        - vs -                    )        OF
                                   )
7    OMNICARE PHARMACEUTICS, INC.  ) JAMES McDEVITT
     and OMNICARE CLINICAL         )
8    RESEARCH, INC.                )
     - - - - - - - - - - - - - - - -

9
10
11
                     TRANSCRIPT OF DEPOSITION, taken
12
     by and before KRISTIN N. LAFTY, Professional
13
     Reporter and Notary Public, at the Law Offices
14
     of OBERMAYER, REBMAN, MAXWELL & HIPPEL, LLP,
15
     19th Floor, One Penn Center, 1617 JFK Boulevard,
16
     Philadelphia, PA, on Tuesday, July 22, 2003,
17
     commencing at 9:05 a.m.
18
19
20                   -   -   -
21
22         REPORTING SERVICE ASSOCIATES (RSA)
                  A Veritext Company
23         1845 Walnut Street - 15th Floor
              Philadelphia, Pennsylvania 19103
24                    (215) 241-1000

JAMES MCDEVITT

**38**

1   A.      Nothing.
2   Q.      Let me direct your attention back to
3   McDevitt 1118. At the very bottom of the page,
4   it's an entry for August 31st, 2001, Tuesday,
5   the very bottom of the page. It says, Greenspan
6   hold up construction.
7   A.      Yes.
8   Q.      Do you see that?
9   A.      Yes.
10  Q.      What were you referring to in that
11  entry?
12  A.      Again, we were ready to start putting
13  the building back together.
14  Q.      As of the date of that entry?
15  A.      Yes. And put machinery in it. And
16  Ron was under a lot of heat to freeze capital.
17  As I mentioned before, the annual report shows
18  $25 million cap X for the whole company, and we
19  needed 6 to 13. Well, somebody called up Ron,
20  and Ron read me the riot act. The very -- he
21  very sulfurously and angrily told me not to
22  spend another dime on capital, because he was in
23  hot water, I believe, with Dave Froezel. And we
24  needed 3 to 500 K to put that building back

**39**

1   together. 300 to 500 thousand dollars. And he
2   said, don't do anything.
3          And we had a workforce --
4   you know, you have to imagine my position. I'm
5   walking into a building, and they are saying,
6   what are you going to do? Where is the
7   capital? And I called Ron back and I said, I
8   will go to Home Depot and buy my own drywall,
9   and I will have the workers install the drywall
10  and the rugs and the ceiling tiles at night.
11  And he told us no.
12  Q.      First of all, when did you have the
13  discussion with -- did you have this discussion
14  with Mr. Greenspan on or about August 31st,
15  2001?
16  A.      Yeah. Within a couple days, I came up
17  with that idea and I went to Ken about it. And
18  I said, Ken, if we can't hire contractors to
19  rebuild the building, I have a lot of guys here
20  that -- I myself can hang drywall and put rugs
21  in. And I thought it would be a good motivating
22  tool for the employees.
23  Q.      When did Mr. Greenspan have that
24  discussion with Mr. Froezel about basically not

**40**

1   putting any more money into the construction
2   efforts?
3   A.      It was within that time frame.
4   Q.      Did anyone else at Omnicare, whether
5   it was the parent corporation or clinical
6   research organization, ever make any similar
7   types of statements?
8   A.      Not that I'm aware of. The point is
9   that there was -- the capital required to
10  rebuild the building was frozen. And that's
11  when we -- the only operation we brought back
12  was the Virbac packaging, which was a
13  contractual obligation. And then we just
14  retrofitted a few primary packaging rooms and
15  put a Mack machine there. And that was it.
16  Q.      Mr. McDevitt, if you could turn to
17  page McDevitt 1127, towards the middle of the
18  page -- I know the copy is a little light. But
19  there appears to be an entry date of August
20  10th. Do you see that on the right-hand side?
21  A.      Uh-huh.
22  Q.      Right below the entry date it says,
23  Per Mark Cantalamessa.
24  A.      Uh-huh.

**41**

1   Q.      And right below that, I can't quite
2   make your handwriting out. If you could just
3   read that for the record.
4   A.      It's, Lisa present. Lisa was the
5   accounting manager in the CRO. She was trying
6   to get a handle on the losses associated with
7   the flood.
8   Q.      And right below that line it says, no
9   insurance?
10  A.      Yes.
11  Q.      Let me just refer to the rest of the
12  entry, if you don't mind. To the right of the
13  entry date 8/10, it says, AE. Do you see that?
14  A.      Yes.
15  Q.      All in caps. With an arrow to A.
16  A.      Yeah.
17  Q.      And then it says, limit 2.5 million
18  dollars?
19  A.      Uh-huh.
20  Q.      Right below it, it says 50 million
21  dollars. Is that blanket limit?
22  A.      Uh-huh. Yes, sir.
23  Q.      Coma flood included?
24  A.      Yes.

11 (Pages 38 to 41)

PM
8/27/01    Budget    8/3/01 (OD Meeting)

→ Celebrex → Hamill → 315 431 6918
IK 030007 LL6

Comm Rctrn → Payroll

MON → Campoli    Drawings, civil + structural?    ✓
8/30/01    1 - 215 - 979 - 8067

→ ALLIANCE    Allianz    ✓

{ Billings + INVOICING, AR's } June
→ June

McCann { Space requirements { Def deal list due.
35 - 40 buildings    444 530 2284
Space agreements }

Relocation

(TEVA) → Renkard contracted TEVA
on what to do w/ inventory

Tues
8/31/01    Presentation    (MR's)

- BURNS - called
Ron Granger    hold up construction

RECYCLED

Exhibit Q

OLGA CROWITHER

```
 1            IN THE UNITED STATES DISTRICT COURT
       FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 2

 3                                   NO.  02-CV-2905

 4   BARRY M. PORTNOY and GERARD   )  DEPOSITION UPON
     M. MARTIN, as Trustees for    )
 5   HUB PROPERTIES TRUST          )  ORAL EXAMINATION
                                   )
 6        - vs -                   )        OF
                                   )
 7   OMNICARE PHARMACEUTICS, INC.  )  OLGA CROWTHER
     and OMNICARE CLINICAL         )
 8   RESEARCH, INC.                )
     - - - - - - - - - - - - - -

 9
10
11            TRANSCRIPT OF DEPOSITION, taken
12   by and before KRISTIN N. LAFTY, Professional
13   Reporter and Notary Public, at the Law Offices
14   of OBERMAYER, REBMANN, MAXWELL & HIPPEL, LLP,
15   19th Floor, One Penn Center, 1617 JFK Boulevard,
16   Philadelphia, PA, on Wednesday, December 4,
17   2002, commencing at 10:20 a.m.
18
19


20
21
            REPORTING SERVICE ASSOCIATES (RSA)
22              A Veritext Company
            1845 Walnut Street - 15th Floor
23          Philadelphia, Pennsylvania 19103
                  (215) 241-1000
24
```

OLGA CROWITHER

54

1  Q.    They weren't manufacturing or
2  packaging drugs there for quite a while?
3  A.    That's correct.
4  Q.    That I assume was not acceptable to a
5  company such as yours that had ongoing needs and
6  needed the drugs right away to perform your
7  clinical research projects; isn't that right?
8  A.    That's correct.
9  Q.    So is it fair to say under those
10 circumstances, AstraZeneca had to go and find
11 alternate sources of manufacturing of its drugs
12 so that it could continue its clinical research
13 projects?
14 A.    Absolutely.  It was crucial.
15 Q.    You were on a time line.  And if it
16 couldn't be done at Omnicare Pharmaceutics in
17 Fort Washington, you had to find a place that
18 could do it for you and meet your deadlines?
19 A.    Correct.
20 Q.    How long did it take for you to find
21 an alternative source of manufacturing for the
22 drugs that were being made in the Omnicare
23 facility in Fort Washington?
24 A.    Within a month.

55

1  Q.    So by July 17, 2001, you had a new
2  facility up and running?
3  A.    That's correct.
4  Q.    Did you have a role in choosing the
5  new facility for these projects?
6  A.    Yes, I did.
7  Q.    And what role was that?
8  A.    Of an auditor again.  Audited a couple
9  of facilities for the validity of the
10 manufacturing of the Coumadin.  That was the
11 crucial thing.
12 Q.    Is there a big investment required by
13 AstraZeneca in shifting manufacturing
14 facilities?
15 A.    Yes, there is.
16 Q.    Can you tell me about that?
17 A.    We have to re-qualify or qualify a
18 vendor.  We have to transfer techniques and
19 knowledge to the new vendor.  We have to monitor
20 and assure that the new vendor is meeting the
21 AstraZeneca needs.  Yes, tremendous.
22 Q.    So it's not the kind of thing where if
23 you decided one day, you know, I want to switch
24 from this facility to the next, you would just

56

1  do it on a whim?
2  A.    No.
3  Q.    There would be significant expense
4  involved in changing facilities?
5  A.    Correct.
6  Q.    When you performed these projects,
7  such as the Exanta project or the Candesartan
8  project, do you ever have the drugs used for
9  those projects made in more than one facility?
10 A.    Not to my knowledge.
11 Q.    They are always done in one facility?
12 A.    That's correct.
13 Q.    And I assume that's for cost purposes?
14 A.    Not entirely cost.  It has to do with
15 the vioquince of the drugs and the way that the
16 raw materials are brought in.  And that is the
17 way the people are trained to do the job.  And
18 we want each batch to be as controlled as
19 possible, one the same as the other.
20 Q.    So there's a danger that if you are
21 manufacturing the drug in two separate
22 facilities that there might be some subtle
23 differences?
24 A.    Could be.

57

1  Q.    So it's preferable to have them all
2  manufactured in the same facility?
3  A.    Right.  If you want to manufacture in
4  two different facilities, you would have to run
5  many more studies to compare the two facilities,
6  not only analytically wise, but with patients.
7  Q.    So once the decision was made to move
8  these two -- these six studies from the Omnicare
9  facility to a different facility, it would have
10 been very expensive to switch back to the
11 Omnicare facility; is that true?
12 A.    Yes, it would have been.  Because the
13 Omnicare facility will have to be re-qualified,
14 all the equipment will have to be re-qualified
15 for the use for AstraZeneca.  Everything will
16 have to be new.
17 Q.    And whose expense is that?
18 A.    Both AstraZeneca and Omnicare.
19 Q.    Immediately after the flood, were you
20 advised by Omnicare when it was -- what it is
21 they intended to do about getting their facility
22 at 525 Virginia Drive up and running again?
23 A.    Yes.  Soon after the flood -- we had
24 contact with them every day.  I mean, it was an

15 (Pages 54 to 57)

OLGA CROWITHER

58

1  open contract. They were very helpful. And,
2  yes, they wanted to get their facility up and
3  running. They knew it was going to take a while
4  to get it back up and running in Virginia
5  Drive. But to my knowledge, they had intent to
6  do business there or continue the business.
7  Q.     Why do you say that?
8  A.     They didn't want to lose AstraZeneca
9  as a business partner.
10  Q.     If they were able the get that
11  facility up and running within the month, then
12  there would have been no need to switch the
13  program over to your -- to this new facility; is
14  that right?
15  A.     In my opinion, they could not do
16  the -- have the facility up and running within a
17  month because all of the manufacturing and
18  packaging equipment was destroyed by the flood.
19  Q.     So you think it would have been
20  physically impossible to get up and running
21  within a month?
22  A.     In my opinion, yes.
23  Q.     How long do you think it would have
24  taken them to get the facility up and running?

59

1  A.     Many months. Because -- oh, yes.
2  They had to disinfect all the area. They cut
3  walls out. They had to prove that there were no
4  micros anywhere, extensive.
5  Q.     Three months?
6  A.     I can't say. But, yeah.
7  Q.     I'm looking for an approximation from
8  you since you seem to have some knowledge of
9  this area.
10  A.     Perhaps three months with extensive
11  microbio testing, and if they could get their
12  machines made from someplace else.
13  Q.     Because they would have had to get all
14  new machines as well?
15  A.     In my opinion, yes.
16  Q.     So if the investment was made to fix
17  the facility, disinfect it, run all the
18  appropriate tests and get machinery that was not
19  impacted by the flood, you think they possibly
20  could have done that in approximately three
21  months?
22  A.     Perhaps. It's extensive.
23  Q.     Three months. However, it didn't fit
24  AstraZeneca time line, right?

60

1  A.     Absolutely not.
2  Q.     You couldn't go three months without a
3  supply of the drugs for the tests that you were
4  running?
5  A.     Absolutely not.
6  Q.     Where did you send the Exanta and
7  Candesartan drug tests after you took them from
8  Omnicare Pharmaceutics?
9  A.     Can you please define tests?
10  Q.     Actually, let me change that to, where
11  did you send the packaging and manufacturing
12  operations of those six studies after you took
13  them from Omnicare Pharmaceutics?
14  A.     To two different sites -- three
15  different sites. The manufacturing went to one
16  site and the -- and the primary packaging was in
17  the same place and the labeling in another
18  place. The Candesartan went, I believe, back to
19  Newark, our own facility.
20  Q.     The Exanta, where did that go?
21  A.     The Exanta was packaged at one
22  facility, yes.
23  Q.     What facility?
24  A.     Fisher Pharmaceuticals.

61

1  Q.     Is that similar to Fisher Scientific?
2  A.     Fisher Scientific, yes.
3  Q.     So it went to one of Omnicare's
4  competitors?
5  A.     Correct.
6  Q.     Had you been doing business with
7  Fisher Scientific as of July 2001?
8  A.     Yes.
9  Q.     They were packaging and manufacturing
10  drugs for AstraZeneca?
11  A.     Yes.
12  Q.     Were they a preferred vendor?
13  A.     I'm not sure if they were a preferred
14  vendor in 2001. But they are a preferred vendor
15  now.
16  Q.     Do you know what volume of work was
17  being performed by Fisher Scientific in 2001?
18  A.     No, I don't know that.
19  Q.     Can you compare them to Omnicare as
20  far as volume of work?
21  A.     Perhaps more, because the Zeneca side
22  used Fisher and did not use Omnicare.
23  Q.     The Zeneca side of the business. And
24  by Zeneca side, are you referring to the United

16 (Pages 58 to 61)

OLGA CROWITHER

66

1 boxes and warehouse them and send them away for
2 distribution.
3 Q.    Did they do anything else for you
4 after the flood?
5 A.    They continue, I believe, with the
6 analytical work that had previously been done.
7 They had stability studies and other things
8 going on for AstraZeneca.
9 Q.    So the stability studies were taking
10 place in the 525 Virginia Drive facility, right?
11 A.    Correct.
12 Q.    So those studies continued after the
13 flood in the Virginia Drive facility?
14 A.    As far as I know, they continued
15 testing for us. Because the analytical labs
16 were not affected by the flood. They were on
17 the second floor.
18 Q.    Was there ever any conversations with
19 Omnicare regarding such as, okay, we suffered
20 this flood, but we want to get back to where we
21 were? What is it that we need to do to get
22 this -- to get this done with AstraZeneca?
23 A.    My opinion was not asked of what is it
24 that we need to do to get back with

67

1 AstraZeneca. But it is my belief that there
2 were communications, and we do want to get back
3 on our feet and we want to continue doing
4 business.
5 Q.    And who were those communications
6 with?
7 A.    With Bob Braden and with the — with
8 Mr. Bob Weston, which was QA. They all
9 reassured us that they did want to continue
10 doing business with AstraZeneca.
11 Q.    Who was Bob Braden?
12 A.    He was our contact person, like our
13 salesperson, coordinator. Carmen will be able
14 to tell you more who he is.
15 Q.    So these are Omnicare employees?
16 A.    Yes.
17 Q.    Who were they talking with at
18 AstraZeneca?
19 A.    With quite a few of us. I was part of
20 some of these conversations.
21 Q.    Well, put yourself in the shoes of
22 Omnicare for the moment. Just suffered a flood,
23 AstraZeneca was a big customer, perhaps our
24 biggest customer, and you want to get yourself

68

1 back in the business. I'm trying to determine
2 what conversations, if any, took place between
3 AstraZeneca and Omnicare about getting back
4 into, you know, doing the work that they were
5 doing for you before the flood. Are you aware
6 of any such conversations?
7 A.    Yes. In my opinion, they wanted to
8 get back on their feet. They wanted to keep
9 AstraZeneca as a customer. They wanted to be
10 very cooperating with AstraZeneca as much as
11 they could. But my opinion was not asked or how
12 or when they were going to be back on track.
13 Q.    Okay. And I'm not looking for your
14 opinion. I am looking for your knowledge right
15 now. Are you aware of any such conversations
16 between Omnicare and AstraZeneca regarding
17 continuing their business relationship?
18 A.    Yes.
19 Q.    Who at AstraZeneca participated in
20 such conversations?
21 A.    I'm not sure of the extent of the
22 people. But I do know that probably Ove was one
23 of those people, because the contract had been
24 with him and the stability studies. Probably a

69

1 man named Larc Karlsson, who was an analyst, had
2 conversations with them, as well as Ingela
3 Abelin, being the QA person. And definitely the
4 IPS people who were dealing with them had
5 conversations with them.
6 Q.    And whose decision would it have been
7 to continue that working relationship?
8 A.    All of our decisions.
9 Q.    Was there a vote?
10 A.    There was never a decision point,
11 because Omnicare never was able to show us --
12 build the facility again.
13 Q.    Omnicare never renovated the 525
14 Virginia facility back into the condition it was
15 in prior to the flood, right?
16 A.    Not to my knowledge.
17 Q.    And they never opened another facility
18 in some other location that could perform the
19 same functions as they were performing at the
20 525 Virginia facility?
21 A.    Not to my knowledge.
22 Q.    You would have needed Omnicare to do
23 that before you could agree to send them the
24 work that you were sending prior to the flood?

18 (Pages 66 to 69)

OLGA CROWITHER

**70**

1 A.  That's correct.
2 Q.  So because Omnicare never offered you
3 such facilities to manufacture your drugs, you
4 never had to decide whether or not you were
5 going to send them business again, right?
6 A.  Correct.
7 Q.  Did you ever have conversations with
8 them saying that -- Omnicare ever say to you, we
9 want to open up a facility again, we want to
10 make sure you are going to send us your business
11 before we invest in a new facility or repairing
12 our old facility?
13 A.  Not to my knowledge.
14 Q.  Who was responsible for the dollars
15 that you lost as a result of the flood?
16 A.  I'm not sure who is responsible.
17 Q.  Well, for example, did Omnicare
18 reimburse you for the drugs that were lost as a
19 result of the flood?
20 A.  I wasn't privy with that.
21 Q.  You mentioned that you toured the
22 facility with an insurance adjustor?
23 A.  That's correct.
24 Q.  Did you have insurance that would --

**71**

1 that covered some of the losses as a result of
2 the flood?
3 A.  It is my understanding that
4 AstraZeneca had an insurance company, policy.
5 And the investigator came to look at that.
6 Q.  Do you know whether or not any of the
7 losses were covered by insurance?
8 A.  No, I do not know that.
9 Q.  Have you had any conversations at all
10 with anyone at Omnicare regarding the lawsuit
11 that we're involved with?
12 A.  No, I have not.
13 Q.  When did you first become aware that
14 Omnicare was involved in a lawsuit with its
15 landlord?
16 A.  When I was requested to come to a
17 meeting due to this. I was unaware of why I was
18 being requested. And as a matter of fact, I
19 missed the first meeting. So I had a recap
20 given to me by Carmen Molina. And that was the
21 first time I knew that we were in this
22 situation.
23 Q.  When were you requested -- when was
24 the first meeting that you were referring to?

**72**

1 A.  You know, I don't know that. Not long
2 ago. But I cannot tell you a specific date.
3 Q.  Are you talking about a meeting that
4 would have taken place after we would have sent
5 our subpoena to AstraZeneca?
6 A.  Sure. Because we knew that there was
7 such a request and request for documentation and
8 that kind of thing.
9 Q.  Who participated in that meeting?
10 A.  People that were involved with these
11 drugs.
12 Q.  Can you give me some names, please?
13 A.  Jim Thomas who is a TA for Exanta.
14 Carmen Molina. Murray Ecker who is another
15 product manager for Exanta. Ann Kesier, I
16 believe, from the Candesartan side.
17 Q.  Ann Kezer?
18 A.  Was Ann Kezer? I'm not sure if Ann
19 was there or not. I don't have my notes from
20 the meeting per se. But there were quite a few
21 people involved. Because we needed to gather
22 documents for you.
23 Q.  Were there any attorneys there?
24 A.  At the meeting, yes.

**73**

1 Q.  Who was there?
2 A.  Chris was there.
3 Q.  And anyone else?
4 A.  No, not to my knowledge.
5 Q.  And the purpose of the meeting was
6 simply to talk about what documents you had
7 available responsive to our subpoena?
8 A.  First to inform us that this had
9 happened, and then to -- since the subpoena
10 needed some documents or assurance of some of
11 the things that went on, for us to be starting
12 to gather these documents out of our files and
13 out of our computers.
14 Q.  You said there was a second meeting
15 which you did attend?
16 A.  Yes. It was a telephone conference
17 meeting.
18 Q.  And what happened at the second
19 meeting?
20 A.  It was more or less talked of who will
21 be the people that could come over here and do
22 the deposition.
23 Q.  How was it determined that you were
24 the lucky one?

19 (Pages 70 to 73)

Veritext PA Reporting Services

OLGA CROWITHER

86

1  on track.
2  A.    Okay.  It was a group of people,
3  including myself and Carmen Molina, and Ove for
4  the contract of the manufacturing and Ingela
5  Abelin.  And all the TAs involved in the -- in
6  the -- with the drugs and the people monitoring
7  the studies to let us know what the critical
8  point was in which we had to have drugs sent
9  back to the sites.  It was very extensive and a
10  lot of people involved.
11  Q.    Do you know whether anyone at Astra
12  told anyone at Omnicare Pharmaceutics that Astra
13  was not interested in doing further business
14  with Omnicare Pharmaceutics as long as it was
15  going to be at the 525 Virginia Drive building
16  after the flood?
17  A.    No, I am not aware of that.
18  Q.    Flood risk, you say, is now part of
19  the policy and procedures for selecting
20  contractors, correct?
21         MR. CARLTON:  Objection to
22  form.  You can answer.
23         THE WITNESS:  Not flood risk
24  per se.  But questioning the different

87

1         vendors about their site and their
2         flood plane and their contingency
3         plans.
4  BY MR. SHARE:
5  Q.    Why is flooding now part of the
6  questioning that goes on for perspective
7  contractors?
8  A.    Because we experienced a massive
9  amount of work and money and trauma trying to
10  re-supply our studies of drug.  Having drug
11  destroyed by flood or fire is devastating to the
12  studies that goes on.
13  Q.    Who is Ronald Halenback?
14  A.    Ron Halenback was the head of IPS.  He
15  no longer has that role.
16  Q.    Is he still with the company?
17  A.    Yes, he's still with the company.
18  Q.    I want to show you a document.  First
19  I'll -- take a look at that, and tell me if
20  you've had a chance to review it.  And I'm
21  particularly interested in the top E-mail dated
22  June 21st, 2001.
23         MR. HABER:  Are you going to
24  mark this?

88

1         MR. SHARE:  Once she tells
2  me.
3         THE WITNESS:  What do you
4  want to know about this document?
5  BY MR. SHARE:
6  Q.    Have you reviewed it?
7  A.    Yes, I received it.  And I have
8  reviewed it, yes.
9  Q.    Do you recognize it?
10  A.    Yes.
11  Q.    Okay.  Could you please hand it to the
12  reporter so she can mark it?
13         (At this time, AZ-1 and AZ-2
14         were marked for identification.)
15  BY MR. SHARE:
16  Q.    I'd like to focus your attention on
17  what we've marked AZ-2.  And we're just looking
18  really at the top -- top half of that page.  Can
19  you tell me what that is?  Is that an E-mail, a
20  printout of an E-mail?
21  A.    This is a printout of an E-mail that
22  Ron sent after we have discussed some of the
23  impact of the flood on our product.
24  Q.    And what's the date on that E-mail?

89

1  A.    That is June 21st, 2001.
2  Q.    Do you recall receiving this E-mail?
3  A.    Yes, I do.
4  Q.    Is this E-mail one of the documents
5  that was gathered for -- to respond to
6  Mr. Haber's subpoena for today's deposition?
7  A.    That is correct.
8  Q.    Did you actually review this as part
9  of gathering of those documents?
10  A.    Yes, I did.
11  Q.    Looking at the second paragraph
12  beginning with "To Carmen's point."  I will just
13  read that paragraph.  "To Carmen's point, we
14  should look at alternative CROs to accomplish
15  those activities currently scheduled at
16  Omnicare.  Their Fort Washington facility is in
17  a very bad condition at this time, and it is my
18  view that it would be months, paren, if at all,
19  end paren, before that specific facility would
20  be in condition for us to use it for our
21  clinical packaging activities.  If we are to
22  remain with Omnicare, it would have to be at
23  another facility other than the one in Fort
24  Washington."  Do you recall reading that message

23 (Pages 86 to 89)

OLGA CROWTHER

98

1  document.
2  A.    Okay.  What page?
3  Q.    The second page, there appears to be
4  an E-mail dated June 20th, 2001, from Carmen
5  Molina to Agneta Svenheden, S-V-E-N-H-E-D-E-N.
6         MR. SHARE:  You are looking
7         at June 20th?
8  BY MR. HABER:
9  Q.    On page two of the exhibit, the E-mail
10 from Carmen Molina to Agneta Svenheden.  It
11 says, Dear Agneta, I just visited Omnicare along
12 with Ron Hollenbeck, et cetera, et cetera, et
13 cetera.  Do you see that?
14 A.    Yes, I do.
15 Q.    Did you receive that E-mail?
16 A.    Yes, I did.
17 Q.    And if you take a look at the third
18 paragraph of the E-mail, it says, "Agneta, the
19 team in US would like to move forward with
20 looking for a new manufacturer to encapsulate
21 the Coumadin supplies.  I am thinking Omnicare
22 will not be up and running soon enough to help
23 us.  How would you like to handle this?  US
24 could come up for a contract for US fairly

99

1  quickly."
2  A.    That's right.
3  Q.    Tell me, does that relate to what you
4  and I discussed earlier that you needed to get
5  your drugs out to your clinical tests quickly,
6  and you felt or Carmen felt that they were --
7  Omnicare was going to be unable to accommodate
8  your needs?
9  A.    Okay.  Remember that there are two
10 parts to getting the studies to the drug -- to
11 the sites.  One is the manufacturer of the
12 over-encapsulation of the competitor's drug and
13 the placebos for that; and the other one is the
14 packaging and labeling and distribution of it.
15 This paragraph refers only to the manufacturing
16 part that Omnicare was performing for
17 AstraZeneca.
18 Q.    Okay.  And there was some concern that
19 you needed somebody to encapsulate the Coumadin
20 supplies?
21 A.    Absolutely.  That was crucial.
22 Q.    And there was a concern that Omnicare
23 couldn't do that five days after the flood?
24 A.    That's correct.  Carmen had visited

100

1  the site and had seen that -- they were not
2  allowed in the site, because it was unsafe at
3  the time, but had seen the devastation of the
4  area.  And based on that observation, she knew
5  that we could not continue manufacturing the
6  supplies there.  And that was a crucial need for
7  our studies.
8  Q.    Is it fair to say that she knew that
9  they couldn't continue manufacturing supplies
10 there until a time which would have been too
11 late for your needs?
12 A.    It was too late, yes.
13 Q.    So in response to that E-mail, there's
14 an E-mail that appears -- that starts on page
15 one and continues on page two from Agneta to
16 Carmen, right?
17 A.    That's right.
18 Q.    And it looks like Agneta suggests
19 regarding a new manufacturer, spontaneously I am
20 hesitant to contact a new manufacturer, but I
21 will bring it up with my team.  From my point of
22 view, the first option must still be to keep to
23 Omnicare since we have worked up a lot of
24 working experience with them regarding working

101

1  processes, analyses and data, et cetera, and
2  also we have the legal agreement which took
3  enormous efforts and long time to establish.
4  A.    That's correct.
5  Q.    "The bioequivalence study has been made
6  comparing material manufactured at Omnicare --
7  if we start up with a new CRO there is a risk
8  we need to do an additional BE study.  I am not
9  convinced that a new CRO contact would be able
10 to supply quicker.  However, to keep all options
11 open - please let me know what CROs you had in
12 mind for this work."  Again, Agneta seems to
13 say, I understand your concern, but, you know,
14 timing is the key element here, right?
15 A.    That's right.
16 Q.    And I'm not convinced that you can go
17 get somebody new to do anything faster than you
18 could if Omnicare got back up and running.  Is
19 that the position she was taking?
20 A.    Let me tell you how I interpret this.
21 Q.    Please.  That's what I'm asking for.
22 A.    Agneta was not here.
23 Q.    She was in Sweden?
24 A.    The Swedish people had only knowledge

26 (Pages 98 to 101)

OLGA CROWITHER

106

1  would be in condition for us to use it for our
2  clinical packaging activities?
3  A.    That's right.
4  Q.    So he made the determination that, you
5  know, maybe his opinion was similar to yours,
6  that it would take three months or so to get
7  this facility back up and running. And you
8  didn't have three months?
9         MR. SHARE: Object to form.
10  BY MR. HABER:
11  Q.    Is that right?
12  A.    Yes, that's correct. We did not have
13  the time.
14  Q.    Hence the sentence that — the
15  ultimate sentence of that paragraph, if we are
16  to remain with Omnicare, it would have to be at
17  another facility other than the one at Fort
18  Washington. Is it fair to say that that is
19  because you couldn't wait for Fort Washington to
20  be put back into condition for manufacturing?
21  A.    Yes, I could assume that. Because we
22  needed the drug now. So if we need to
23  manufacture now, we have to go to another
24  facility, if Omnicare has such a facility.

107

1  Q.    You mentioned in your conversations
2  with Mr. Share enhancements to the policies and
3  procedures used to select vendors?
4  A.    Yes.
5  Q.    And you also mentioned that now armed
6  with the knowledge of what occurred in Fort
7  Washington, one of the things that you ask is
8  whether or not the facility was in a flood
9  plane?
10        MR. SHARE: Object to form.
11  BY MR. HABER:
12  Q.    Is that right?
13  A.    To qualify a facility now, we do ask
14  those questions. And if the — in my
15  experience, no one has said yes. But if the
16  answer was, yes, we're in a flood plane, then
17  the next question is, what are your plans if
18  such a thing will happen.
19  Q.    So you answered two of my next
20  questions for me already. And it's your
21  testimony that none of your vendors have
22  answered, yes, we're in a flood plane?
23  A.    That's correct.
24  Q.    Is it your understanding that if a

108

1  vendor had answered the question, yes, we are in
2  a flood plane, does that disqualify the vendor
3  from the possibility of doing work for you?
4  A.    In my opinion, no, it will not
5  immediately disqualify the vendor. We will have
6  to — we will have to explore it further and
7  find out what the contingency plans are, what
8  they are doing about safeguarding their facility
9  from such a flood. I don't know, digging a
10  trench around the facility. I don't know.
11  Q.    Well, do you also consider other than
12  the possibility of flood damage other
13  environmental hazards that might impact on the
14  facility's ability to perform the functions you
15  need?
16  A.    Yes, we do.
17  Q.    Such as, is the facility built on the
18  San Andreas Fault, and, therefore, it's subject
19  to earthquake damage? Is that the kind of thing
20  that you would also consider?
21  A.    Not to that extreme. But we consider
22  fire, we consider electrical, power outages, we
23  consider things like that.
24  Q.    Do you consider, for example, the

109

1  location of the facility and the access to the
2  kinds of employees that you believe are
3  necessary to do the work that you need for your
4  studies?
5  A.    Yes. We assess employee qualification
6  at their facility as training programs.
7  Q.    Was that something that you did not
8  consider prior to the flood?
9  A.    No. We did it prior to the flood.
10  Q.    Okay. So after the flood, you started
11  to consider environmental considerations?
12  A.    After the flood, we were more diligent
13  in asking environmental questions.
14  Q.    Prior to the flood, you did consider
15  certain things about the location of the
16  facility, but didn't concentrate so much on
17  natural disaster risks?
18  A.    That's correct. This was my first
19  experience with flooding.
20  Q.    No one kind of filled you in on the
21  1999 flood and its impact on the business of
22  AstraZeneca?
23  A.    To the point that we did not
24  discontinue work with them, I don't think the

28 (Pages 106 to 109)

RECYCLED

Exhibit R

1

```
 1        IN  THE  UNITED  STATES  DISTRICT  COURT
        FOR  THE  EASTERN  DISTRICT  OF  PENNSYLVANIA
 2                      -    -    -
        BARRY M. PORTNOY and GERARD  :   NO.
 3      M. MARTIN, as Trustees for   :   02-CV-2905
        HUB PROPERTIES TRUST,        :
 4            Plaintiffs,            :
                                     :
 5        vs.                        :
                                     :
 6      OMNICARE PHARMACEUTICS, INC.:
        and OMNICARE CLINICAL        :
 7      RESEARCH, INC.,              :
              Defendants.            :
 8
 9                      -    -    -
10            December 12, 2002
11                      -    -    -
12               Oral deposition of DAVID L.
13      FANT, held in the offices of Stevens &
14      Lee, 111 North 6th Street, Reading,
15      Pennsylvania 19602, at 11:02 a.m., on the
16      above date, before Margaret Peoples, a
17      Federally Approved Registered
18      Professional Reporter and Notary Public
19      of the Commonwealth of Pennsylvania.
20                      -    -    -
21          ESQUIRE DEPOSITION SERVICES
                    15th Floor
22        1880 John F. Kennedy Boulevard
          Philadelphia, Pennsylvania 19103
23              (215) 988-9191
24
```

DAVID L. FANT

**50**

1  letter he's looking at. It's been
2  marked Bates stamped Omnicare
3  00211.
4  THE WITNESS: Yes. This is
5  the letter that I received
6  indicating that they would not be
7  doing manufacturing at the Fort
8  Washington facility, March of
9  2002. It was later than I
10  thought.
11 BY MR. HABER:
12 Q.  So up until March of 2002
13 was it your belief that Omnicare intended
14 to resume operations in the Fort
15 Washington facility?
16 A.  I really didn't have any
17 feeling one way or the other on it
18 because at that time we had already had
19 to move into other directions and had
20 stopped any operations with Omnicare.
21 Q.  If Omnicare had gotten the
22 525 facility cleaned up and rebuilt to
23 your satisfaction, would you have
24 considered them for future work?

**51**

1  A.  They would have had to go
2  back through a requalification of the
3  facility for us. It's hard to say. It's
4  speculation. I don't know.
5  Q.  Okay. Well, all right. Let
6  me ask the question from the opposite
7  direction. Assuming they did all of the
8  revalidation and cleanup that you
9  described earlier, would you have ruled
10 out the use of that facility because of
11 the prior flood experience?
12 MS. FORD: Objection to
13 form. Calls for speculation. You
14 can answer.
15 THE WITNESS: I probably
16 would not have ruled them out
17 completely if it were for a single
18 campaign, for a single run. If it
19 had been a long-term run, knowing
20 the possibility of another flood
21 and what the impact that it could
22 have on a clinical study, I
23 probably would have used other
24 facilities.

**52**

1  BY MR. HABER:
2  Q.  Did you do any business in
3  that facility after June of 2001?
4  A.  No.
5  Q.  Do you know --
6  A.  The only business we did was
7  in getting the materials back, their
8  paperwork.
9  Q.  Do you know whether or not
10 any product being manufactured for Sanofi
11 was damaged by flood prior to June 2001
12 at an Omnicare facility?
13 A.  Not that I'm aware of.
14 Q.  Did you know that two years
15 prior in 1999 there was another flood
16 that impacted the Omnicare facilities in
17 Fort Washington?
18 MR. SHARE: Object to form.
19 MS. FORD: You can answer.
20 THE WITNESS: No, I am not
21 aware of that.
22 BY MR. HABER:
23 Q.  Were you contacted by anyone
24 at Omnicare about the fact that they were

**53**

1  in a dispute with their landlord?
2  A.  No, I was not.
3  Q.  How did you come to learn
4  about the fact that your deposition was
5  going to be taken?
6  A.  The attorney for Omnicare
7  contacted me.
8  Q.  Who called you?
9  A.  Adam Share.
10 Q.  When did he call you?
11 A.  I believe it was late summer
12 of 2002. I don't know for sure. I know
13 I was still working at Sanofi.
14 Q.  How many conversations did
15 you have?
16 A.  Two or three.
17 Q.  Were they all by telephone?
18 A.  Yes.
19 Q.  Were they substantive in
20 nature?
21 A.  Can you explain?
22 Q.  Did you discuss anything
23 other than the fact that Adam Share
24 wanted to arrange your deposition?

14 (Pages 50 to 53)

RECYCLED

Exhibit S

| CECW-PF | Department of the Army | EP 1165-2-314 |
|---|---|---|
| Engineer Pamphlet 1165-2-314 | U.S. Army Corps of Engineers<br>Washington, DC 20314-1000 | 15 December 1995 |
| | FLOOD PROOFING | |
| | **Distribution Restriction Statement**<br>Approved for public release; distribution is unlimited. | |

# Preface

The original EP 1165-2-314, *Flood-Proofing Regulations*, was published in June of 1972. It has been distributed worldwide as an administrative and technical model for code design and enforcement. Over the years, it has been adopted by direct reference in thousands of local building codes across the United States. It also has served as the framework for the preparation of numerous other flood proofing publications, the flood resistant design criteria of the National Flood Insurance Program, and the development of similar design standards within the major national building code organizations.

The U. S. Army Corps of Engineers National Flood Proofing Committee completely revised the original 1972 document to reflect almost 20 years of field experience, research, and advances in engineering and building practices. The revision, EP 1165-2-314, *Flood Proofing Regulations*, dated 31 March 1992, made numerous technical and editorial changes to most of the original chapters, updated the terminology, and addressed the minimum flood plain management requirements of the National Flood Insurance Program (NFIP) in relation to flood proofing regulations, particularly with respect to NFIP policy on residential flood proofing and wet flood proofing.

This publication supersedes the revised edition. However, with the exception of some clarifying changes to Chapter 2, Section 210, Classification and Posting of Buildings and Structures, it is the same as the superseded document. Changes have been made to the FP2 and FP4 space classification in Table 1 of Section 210.1 General on page 2-8 and to the classification descriptions in Sec. 210.3.1 FP3 and Sec. 210.3.2 FP4 on pages 2-8 and 2-9, respectively. These were needed to correct unclear statements on the classification of partially flood proofed structures. They distinguish between those structures that require "human intervention" to implement a contingency plan in order to achieve protection (FP4) and those that do not (FP3).

NOTICE: *States and local governments that have used Table 1 and/or the FP3 and FP4 classification descriptions from Section 210 of the superseded 31 March 1992 document in their building codes and regulations should take appropriate actions to correct them.*

As with its predecessor, this publication retains the format of the original 1972 document as model code language which can continue to be used by direct reference in local codes. It specifies the flood proofing measures and techniques that can be followed to regulate private and public building construction in riverine flood hazard areas. It contains implications for changes in existing building and housing codes and provides for a diversity of flood proofing methods and techniques. Chapters 2 through 13 have been prepared in a form that can be used to supplement existing building codes and regulations. If, on the other hand, a separate "flood proofing code" for direct adoption by States and local governments is desired, the flood proofing information contained herein also is sufficient for that purpose.

The Corps of Engineers is distributing this publication to continue the interest and application of flood proofing that, together with other flood plain management tools, will assist in reducing the threat to life, health, and property of users of flood hazard areas.


ROBERT H. GRIFFIN
Colonel, Corps of Engineers
Chief of Staff

This publication supersedes EP 1165-2-314 dated 31 March 1992. As with its predecessors, it was drafted for the Chief of Engineers by the U. S. Army Engineer District, Pittsburgh, PA.

# Table of Contents

Chapter 1-Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1-1
Section 100.0 Flood Proofing and Building Codes . . . . . . . . . . . . . . . . . . . . .1-1
Chapter 2-Administration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2-1
Section 200.0 Purpose . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2-1
   201.0 Scope . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2-1
   202.0 Alternate Materials and Methods of Construction . . . . . . . . . . .2-2
   203.0 Tests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2-2
   204.0 Organization and Enforcement . . . . . . . . . . . . . . . . . . . . .2-2
   205.0 Permits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2-3
   206.0 Inspections . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2-6
   207.0 Certificate of Use and Occupancy . . . . . . . . . . . . . . . . . . . .2-6
   208.0 Public Notice of Flood Hazard . . . . . . . . . . . . . . . . . . . . .2-7
   209.0 Provision of Safe Refuge . . . . . . . . . . . . . . . . . . . . . . . .2-7
   210.0 Classification and Posting of Buildings and Structures . . . . . . . . . . .2-8
Chapter 3-Definitions of Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3-1
Section 300.0 Scope . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3-1
   301.0 Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3-1
Chapter 4-Flood Proofing Classification of Spaces
Below the Regulatory Flood Datum . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4-1
Section 400.0 Scope . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4-1
   401.0 Descriptions of Flood Proofing Classes . . . . . . . . . . . . . . . .4-1
   402.0 The Space Classification Chart . . . . . . . . . . . . . . . . . . . .4-2
Chapter 5-Waterproofing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5-1
Section 500.0 Scope . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5-1
   501.0 Type A Constructions . . . . . . . . . . . . . . . . . . . . . . . . . .5-1
   502.0 Type B Constructions . . . . . . . . . . . . . . . . . . . . . . . . . .5-5
   503.0 Type C Constructions . . . . . . . . . . . . . . . . . . . . . . . . . .5-6
Chapter 6-Structural Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . .6-1
Section 600.0 Scope . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6-1
   601.0 Classes of Loads . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6-1
   602.0 Water Loads . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6-1
   603.0 Impact Loads . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6-3
   604.0 Soil Loads . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6-3
   605.0 Hurricane and Tidal Wave Loads . . . . . . . . . . . . . . . . . . . .6-3
   606.0 Loading Conditions . . . . . . . . . . . . . . . . . . . . . . . . . . .6-4
   607.0 Combined Loads . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6-4
   608.0 Allowable Stresses . . . . . . . . . . . . . . . . . . . . . . . . . . . .6-4
   609.0 Allowable Soil Pressures . . . . . . . . . . . . . . . . . . . . . . . .6-4
   610.0 Stability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6-4
   611.0 Reduction of Uplift Pressures . . . . . . . . . . . . . . . . . . . . .6-5
   612.0 Requirements for Other Flood Proofing Methods . . . . . . . . . . . . . . .6-6

EP 1165-2-314
15 Dec 1995



CLOSURE PANEL FOR BASEMENT WINDOW
FOR SMALL WINDOWS AND SHALLOW DEPTH OF FLOODING





# Flood Proofing
# Regulations







**US Army Corps
of Engineers**

**Washington, D.C. 20314 – 1000**

Chapter 3

# Definitions of Terms

## Section 300.0 Scope

Sec. 300.1 Purpose: For the purpose of these Regulations, certain abbreviations, words, and their derivatives shall be construed as set forth in this Chapter.

## Section 301.0 Definitions

Sec. 301.1 Accessory Use or Structure - a use or structure on the same lot with, and of a nature customarily incidental and subordinate to, the principal use or structure.

Sec. 301.2 Artificial Obstruction - artificial obstruction shall mean any obstruction which is not a natural obstruction.

Sec. 301.3 Base Flood - a flood which is representative of large floods known to have occurred generally in the area or reasonably characteristic of what can be expected to occur on a particular stream or other body of water. This flood is generally being recognized and accepted nationally by Federal and non-Federal interests as one with an average frequency of occurrence on the order of once in 100 years (see 100-Year Frequency Flood and Figure 3).

Sec. 301.4 Building Code - the regulations adopted by a local governing body setting forth standards for the construction, addition, modification, and repair of buildings and other structures for the purpose of protecting the health, safety, and general welfare of the public.

Sec. 301.5 Building Official - the officer charged with the administration and enforcement of the Building Code and these Flood Proofing Regulations or a regularly authorized deputy.

Sec. 301.6 Channel - a natural or artificial watercourse of perceptible extent, with definite bed and banks to confine and conduct continuously or periodically flowing water. Channel flow thus is that water which is flowing within the limits of the defined channel (see Figure 3).

Sec. 301.7 Encroachment Lines - the lateral limits or line drawn along each side and generally parallel to a watercourse or body of water, to preserve the flood carrying capacity of the stream or other body of water and its flood plain, and to assure attainment of the basic objective of improvement plans that may be considered or proposed. Their location should be such that the floodway between them will effectively carry and discharge the base flood, or 100-year frequency flood (see Figure 3).

Sec. 301.8 Fill - the placing, storing, or dumping of any material, such as (by way of illustration but not of limitation) earth, clay, sand, concrete, rubble, or waste of any kind upon the surface of the ground which results in increasing the natural ground surface elevation.

Sec. 301.9 Flood - an overflow of lands adjacent to a river, stream, ocean, lake, etc., not normally covered by water. Otherwise it is normally considered as any temporary rise in stream flow or stage that results in significant adverse effects in the vicinity. Adverse effects may include damages from overflow of land areas, backwater effects in sewers and local drainage channels, creation of unsanitary conditions, soil erosion, deposition of materials during flood recessions, rise of groundwater coincident with increased streamflow, contamination of domestic water supplies, subsidence or collapse of land along a body of water, and other problems.

Sec. 301.10 Flood Crest - the maximum stage or elevation reached by the waters of a flood at a given location.

Sec. 301.11 Flood Plain - the area, usually low lands, adjoining the channel of a river, stream or watercourse or ocean, lake, or other body of standing water, which has been or may be covered by floodwater.

Sec. 301.12 Flood Plain Management - a term applied to the full range of public policy and action for ensuring wise use of flood plains. It includes the operation of an overall program of corrective and preventative measures for reducing flood damage, including, but not limited to emergency preparedness, plans flood control works and flood plain management.

**Sec. 301.13 Flood Plain Regulations** - a general term applied to the full range of codes, ordinances, and other regulations relating to the use of land and construction within flood plain limits. The term encompasses zoning ordinances, subdivision regulations, building and housing codes, encroachment laws, open area (space) and health regulations, grading and erosion control ordinances for purposes of reducing or preventing flood damage.

**Sec. 301.14 Flood Profile** - a graph or a longitudinal profile showing the relationship of the water surface elevation of a flood to location along a stream.

**Sec. 301.15 Flood Proofing** - a combination of structural changes and/or adjustments incorporated in the design and/or construction and alteration of individual buildings, structures or properties subject to flooding primarily for the reduction or elimination of flood damages.

> **Sec. 301.15.1 Permanent Flood Proofing** - permanent protection would be provided against flooding which does not depend upon any judgment, flood forecast, or action to put flood protection measures into effect.
>
> **Sec. 301.15.2 Contingent (Partial) Flood Proofing** - contingent measures would not be effective unless, upon receipt of a warning or forecast, some minimal action would be required to make the flood proofing measures operational.
>
> **Sec. 301.15.3 Emergency (Temporary) Flood Proofing** - emergency measures would be, upon receipt of a warning or forecast, either improvised just prior to or during an actual flood or carried out according to an established emergency plan of action.

**Sec. 301.16 Floodway** - the channel of the stream or body of water and those portions of the flood plain which are reasonably required to carry and discharge floodwater or flood flow of the base flood or 100-year frequency flood (see Figure 3).

**Sec. 301.17 Floodway Fringe** - the area of the flood plain not lying within a floodway which may hereafter be covered by floodwaters up to the Base Flood (see Figure 3).

**Sec. 301.18 Freeboard** - a factor of safety usually expressed in feet above a design flood level for flood protection or control works. Freeboard tends to compensate for the many unknown factors that could contribute to flood heights greater than the height calculated for a selected size flood and floodway conditions such as wave action, bridge opening and floodway obstructions, and the hydrological effects of urbanization of the watershed (see figure 1).

**Sec. 301.19 Habitable Room** - a space used for living, sleeping, eating or cooking, or a combination thereof, but not including bathrooms, toilet compartments, closets, halls, storage rooms, laundry and utility rooms, basement recreation rooms and similar spaces.

**Sec. 301.20 Natural Obstruction** - natural obstruction shall mean any rock, tree, gravel, or analogous natural matter that is an obstruction and has been located within the floodway by a nonhuman cause.

**Sec. 301.21 Nonconforming Use** - a building or structure, or the use thereof, which was lawful before the passage or amendment of the (ordinance, resolution, act) but which is not in conformance with the provisions of these Regulations.

**Sec. 301.22 100-Year Frequency Flood** - a flood having an average frequency of occurrence on the order of once in 100 years although the flood may occur in any year (a one percent chance of being exceeded in any year). It is based on statistical analyses of streamflow records available for the watershed and analyses of rainfall and runoff characteristics in the general region of the watershed and is a statistical means of estimating the probability of flooding for insurance and land use planning. Over the life of a 30-year mortgage, there is approximately a 25- percent chance that this flood or one of a greater magnitude will occur. For these and NFIP regulations the base flood is the 100-year frequency flood.

**Sec. 301.23 Owner** - owner shall mean any person who has dominion over, control of, or title to land and improvements.

**Sec. 301.24 Reach** - a hydraulic engineering term to describe longitudinal segments of a stream or river. A reach will generally include the segment of the flood plain where flood heights are primarily controlled by

man-made or natural flood plain obstructions or restrictions. In an urban area, the segment of a stream or river between two physically identifiable points on the stream center line would most likely be designated as a reach.

Sec. 301.25 Regulatory Flood Datum (RFD) - established plane of reference from which elevation and depth of flooding may be determined for specific locations in the flood plain. It is the Base Flood plus a freeboard factor of safety established for each particular area which tends to compensate for the many unknown and incalculable factors that could contribute to greater flood heights than that computed for a Base Flood. (See Base Flood and Freeboard definitions for clarification of cumulative definition of Regulatory Flood Datum, and Figure 3.)

Sec. 301.26 Special Flood Hazard Areas: The lands adjoining the channel of a river, stream, or watercourse which would be covered by flood water during a base flood (100-year Flood). Flood Hazard Boundary Maps or Flood Insurance Rate Maps published by the Federal Insurance Administration of the Federal Emergency Management Agency identify Special Flood Hazard Areas. These can also be determined from flood hazard studies performed by agencies such as the U. S. Army Corps of Engineers, U.S. Geological Survey, Tennessee Valley Authority, Soil Conservation Service and from qualified professional engineer firms. Elevation differences should be clarified for community use and referenced to appropriate agency.

Sec. 301.27 Subdivision - the partitioning or dividing of a parcel or tract of land.

Sec. 301.28 Subdivision Regulations - regulations and standards established by a local unit of government with authority granted under a state enabling law, for the subdivision of land in order to secure coordinated land development, including adequate building sites and land for vital community services and facilities such as streets, utilities, schools, and parks.

Sec. 301.29 Underclearance - the lowest point of a bridge or other structure over or across a river, stream, or watercourse that limits the opening through which water flows. This is referred to as "low steel" in some regions.

Sec. 301.30 Watercourse - any natural or man-made depression with a bed and well-defined banks below the surrounding land serving to give direction to a current of water or pattern of runoff from a drainage area of any size.

# Chapter 11
# Contents of Buildings and Structures

## Section 1100.0 Scope

**Sec. 1100.1 General:** This chapter shall govern the types of contents permitted and protection requirements for contents of spaces in buildings or structures located in Special Flood Hazard Areas.

> **Sec. 1100.1.1:** The contents of an improvement consist of all items situated or placed within the confines of a space not permanently and structurally integral with the improvement. Electrical and mechanical equipment that is installed as a building services feature and/or required to be in operation during a flood is covered in Chapters 12 and 13. Contents are restricted by these Regulations whenever they are or potentially may be:
>
> (1) Hazardous to the general public welfare due to the possibility of spreading highly flammable, explosive, corrosive, or otherwise harmful substances in the event of a flood-induced spill.
>
> (2) Hazardous to the welfare of other Owners due to the creation of projectiles which could cause damage by impact.
>
> (3) Hazardous as in (1) or (2) above when stockpiled in quantity, although such items may be permitted if stored in lesser amounts for isolated or occasional use.
>
> (4) Hazardous to the health or safety of the Owner or to other persons occupying or in the vicinity of the improvement due to the possibility of explosion or electric shock caused by floodwater contact with operating mechanical or electrical equipment.
>
> (5) Vulnerable as a loss to the Owner, necessitating replacement, extensive repair, and/or excessive period of inoperation resulting from prolonged exposure to moisture, clean water, floodwater, or the unmitigated effects of flooding.

## Section 1101.0 Classes of Contents

**Sec. 1101.1 Applicability:** Contents are divided into seven classes according to the degree of flood proofing required to protect them from becoming hazards or losses as defined above.

> (1) Class XX items are extremely hazardous or vulnerable to flood conditions and require their prohibition in Special Flood Hazard Areas at all times.
>
> (2) Class X items are sufficiently hazardous or vulnerable to require their prohibition in all spaces below the RFD, i.e., requiring their placement at least one floor level above the RFD.
>
> (3) Class 1 items require the protection assured by W1 spaces.
>
> (4) Class 2 items require the protection assured by W2 spaces.
>
> (5) Class 3 items require only the protection assured by W3 spaces.
>
> (6) Class 4 items are generally not damageable by floodwaters moving at low velocities and require the minimum protection given by W4 spaces.
>
> (7) Class 5 items are sufficiently non-hazardous and non- vulnerable to permit their placement in spaces exposed to unmitigated flooding conditions.

Sec. 1101.2 Waiver of Restriction:  Upon approval of the Owner's Contingency Plan, which shall include plans for temporary movement of items to a place of safe refuge above the RFD or in spaces below the RFD where these items are permitted, the Building Official may waive specific content restrictions for non-W1 spaces on non-hazardous items that are movable or for which the degree of waterproofing required by the flood proofing class can be achieved upon receipt of a flood warning or alert. This waiver of restriction, however, shall not apply to residences and their ancillary spaces; to firms, businesses, or institutions with fewer than 10 permanent employees and their ancillary spaces; or to any spaces which are or would be unoccupied and unattended in their foreseeable normal yearly operation for periods greater than 72 hours; and in no case shall a waiver of restriction be construed to permit the creation of spaces for human habitation.

Sec. 1101.3 Contents Classes for Typical Items:  The following chart is intended as an aid to the Owner, Architect/Engineer, and the Building Official in assessing the hazard potential and vulnerability to loss of typical contents of an improvement with respect to criteria listed in 1100.1.1(1-5).  In disputes arising over the classification of particular items or of items not listed below, the Building Official shall be guided by and decide on the basis of those criteria.  In no case, however, shall changes of classification for items listed in Classes X and XX be permitted.

Sec. 1101.3.1:  Contents of a given class may be situated or placed in any space for which a lower-numbered class is permitted by these Regulations. For example, items which are listed in Class 3 may also be placed in any spaces in which Class 1 or Class 2 contents are permitted.

Sec. 1101.3.2:  Temporary placement of items of a given contents class in a space with a higher-numbered flood proofing class may be permitted in those cases where contingent removal is approved by the Building Official, and in conformance with 1101.2. Temporary placement may be permitted for certain items, subject further to the restrictions of 1101.2 as indicated by numbers in parenthesis in the list; in each case, the number in parenthesis is that of the highest-numbered flood proofing class in which temporary placement may be considered.

| | Class |
|---|---|
| Acetone | XX |
| Acetylene gas containers | X |
| Ammonia | XX |
| Animals (pets, livestock, laboratory specimens) | X(5) |
| Appliances, electrical | |
|    Washers, dryers, unit air conditioners, lamps, | |
|     refrigerators, sewing machines, electric clocks, etc. | 2 |
| Art works (paintings, sculpture, etc.) | 1 |
| Barrels, buoyant (empty or non-hazardous contents | 2 |
|    Constrained and/or without tops or lids | 4 |
| Benzene | XX |
| Books, magazines, publications | 1(3) |
| Cabinets | |
|    Solid wood or veneer | 2 |
|    Metal | 4 |
| Calcium carbide | XX |
| Carbon disulfide | XX |
| Cardboard boxes | 1 |
| Carpeting and floor rugs | 1(3) |
| Celluloid | XX |
| Chlorine | XX |
| Clothing | 2(3) |
| Cotton (loose) wadding or waste | 2 |
| Curtains and drapes | |
|    Fabric (Nonfast dyes) | 2 |

Flood Proofing Regulations

|  | Class |
|---|---|
| Fabric (Fast dyes) | 3 |
| Plastics | 4 |
| Drugs - in quantity | X |
| Electrical distribution equipment (Storage only) | |
| Waterproof or submersible types | 4 |
| Nonwaterproof | 2 |
| Protected contingently (B) | 4 |
| Electronic equipment (Storage only) | |
| Television, stereo equipment, radios | 2(3) |
| Computers, etc. | 1 |
| Fabrics (Textile Raw Materials) | |
| Non water-soluble dyes | 3 |
| Otherwise | 2 |
| Food Products | X |
| Furniture | |
| Upholstered | 1 |
| Unupholstered | |
| Wood construction (A) | 2 |
| Metal construction, painted | 4 |
| Gasoline | X |
| Hydrochloric acid | XX |
| Hydrocyanic (Prussic) acid | XX |
| Magnesium | XX |
| Matches and sulfur products (in quantity) | X |
| Mattresses & box springs | 1(2) |
| Musical instruments | |
| Pianos, organs, violins, etc. | 1 |
| All other types | 2(3) |
| Nitric acid, oxides of nitrogen | XX |
| Oxygen | 2(3) |
| Paints, enamels, varnishes (in quantity) | 2 |
| Paper or paper products1 | |
| Petroleum products storage | |
| (unless buried and constrained) | X |
| Phosphorous | XX |
| Potassium | XX |
| Recreation equipment | |
| Sports gear, toys | 2(3) |
| Pool tables | 1 |
| Scrap metal, constrained | 5 |
| Soaps, detergents (in quantity) | X |
| Sodium | XX |
| Sulphur | XX |
| Tires | |
| (Open storage) | X |
| constrained | 4 |
| Wood products, raw or finished (in quantity) | X |

Notes: (A) Solid wood construction with pinned joints, reinforced corners, and lacquered or factory-baked finishes.
(B) Contingent protection shall be protection equal to that of 6 mils of polyethylene sealed to be watertight or "moth-balled."

Sec. 1101.4 Underground Storage Tanks: The exclusion of Class X and XX contents from interior spaces of buildings below the RFD recognizes that residual flood hazards may exist when a structure is only protected to the RFD. However, a properly designed and constructed underground storage tank and dispensing system

for Class X contents can be developed in a Special Flood Hazard Area, if such development is the only practicable alternative and it is not contained within a flood proofed structure. In addition to design criteria required by the tank manufacturers and applicable fire and safety codes, the tank assemblies should be designed assuming groundwater levels fully at the ground surface, buoyant soils above the tanks, and the tanks empty. They should also be designed assuming the tanks full with groundwater below the tanks. The tanks should be set on and anchored to reinforced concrete pads. All vents should be above all possible floodwater entry levels. The filling stack piping caps should be equipped with watertight seals if below the RFD and the dispensers should be placed above the RFD.