IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BARRY M. PORTNOY and                                    :
GERARD M. MARTIN, as Trustees for                       :
HUB PROPERTIES TRUST                                    :
400 Center Street                                       :
Newton, MA  02458,                                      :          Civil Action No. 02-CV-2905
                  Plaintiffs,     :
          v.                             :
OMNICARE PHARMACEUTICS, INC.                            :
630 Allendale Road                                      :
King of Prussia, PA  19406                              :
         and                            :
OMNICARE CLINICAL RESEARCH, INC.                        :
630 Allendale Road                                      :
King of Prussia, PA  19406,                             :
                       :
            Defendants.       :

## **ORDER**

      AND NOW, on this _____ day of _____, 2003, upon consideration of

Plaintiffs' Motion for Summary Judgment and Defendants' Memorandum of Law in Opposition

thereto, it is hereby ORDERED and DECREED that Plaintiffs' Motion is DENIED.

                                    **BY THE COURT**:


                                _____
                                CLIFFORD SCOTT GREEN,      Sr.J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BARRY M. PORTNOY and :
GERARD M. MARTIN, as Trustees for :
HUB PROPERTIES TRUST :
:
         Plaintiffs, :      Civil Action No. 02-CV-2905
:
         v. :
:
OMNICARE PHARMACEUTICS, INC. :
:
         and :
:
OMNICARE CLINICAL RESEARCH, INC. :
:
         Defendants. :

## MEMORANDUM OF LAW IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT OF PLAINTIFFS BARRY M. PORTNOY AND GERARD M. MARTIN AS TRUSTEES FOR HUB PROPERTIES TRUST

Defendants Omnicare Clinical Research, Inc. ("OCR") and Omnicare Pharmaceutics, Inc.

("OPI") oppose Plaintiffs' ("HUB's") Motion for Summary Judgment on the grounds that the

purpose of the Special Purpose Lease had been frustrated as a result of persistent, severe flooding

and therefore the parties' obligations to perform under the Special Purpose Lease terminated.[1]

While HUB is correct that there is no genuine issue of material fact, it conscientiously avoids

any discussion of the undisputed evidence showing that OPI cannot conduct the clinical

pharmaceutical business specified in the Special Purpose Lease.  As Defendants show herein, as

well as in Defendants' Memorandum, the documentary and testimonial evidence supports the

affirmative defenses asserted by Defendants and warrants summary judgment in their favor.

---

[1] In this Memorandum, Defendants use the terms defined in the Memorandum of Law in Support of their Motion for Summary Judgment ("Defendants' Memorandum"), incorporated by reference herein and made part of this Memorandum.

## I.    COUNTERSTATEMENT OF FACTS

HUB mistakenly asserts that the Special Purpose Lease explicitly provides that OPI is obligated to continue paying rent, even in the event of the most severe flood damage. The Special Purpose Lease says nothing of flood damage – in fact, the word "flood" does not appear anywhere in the Special Purpose Lease. Nor does the Special Purpose Lease say anything about an obligation to continue paying rent in the event of a severe casualty. The Special Purpose Lease, however, does anticipate the possibility of a casualty, providing for an abatement of the rent obligation. See Special Purpose Lease at §10.02(b) (Exhibit "A" to HUB's Appendix).

Moreover, HUB argues that because OPI did not immediately and completely shut down all operations at 525, the marginal operations that remained temporarily there through necessity somehow show that 525 could be used for clinical trial manufacturing and testing operations. But, Defendants have clearly articulated the evidence that shows beyond cavil that OPI conducted meager operations in 525 on a drastically reduced basis after the 2001 Flood, and, then only due in large measure to the necessities of one customer, Virbac, who could not use any other facility. Indeed, scant revenue was generated after the flood from work performed in 525. Most of OPI's post-flood revenue, which itself was a fraction of its pre-flood revenue, was generated by operations conducted at off-site locations hastily set up after the 2001 Flood. Compare McDevitt Dep. (April 22, 2003) at 172-74 (Exhibit "L" to Defendants' Memorandum); Feld Dep. (March 3, 2003) at 125 (Exhibit "H" to Defendants' Memorandum).[2]

HUB also states that OPI has not restored 525 to the condition it was in when OPI assumed the Special Purpose Lease. This allegation is an irrelevant half-truth. After the 2001 Flood, OPI did conduct extensive cleaning and demolition at 525, at a cost in excess of $1.5

---

[2] Other operations were simply performed as a short term courtesy to those customers who could not flee 525 immediately.

million.  When it became apparent that the purpose of the Special Purpose Lease was no longer achievable at 525, it made no sense to continue to outfit the interior to bring 525 back to its original condition, when it would be of no use even in such condition.  OPI determined not to waste money reinstalling drywall and ceiling tiles which had been removed as part of the cleaning process, when they will surely be demolished and reconfigured, if and when 525 is ever leased to a different tenant.

Further, HUB mischaracterizes OPI's declaration of termination of the Special Purpose Lease as an intention to "abandon" 525.  Of course, OPI never "abandoned" 525.  See Exhibit "L" to HUB's Appendix.  OPI communicated to HUB its intention to leave 525 within a few months of the June 2001 Flood, not, as HUB contends, in mid-2002.  Indeed, by November 2001, HUB was actively offering OPI a substitute building from its portfolio of properties because of 525's unsuitability for the clinical trial manufacturing and testing operations mandated by the Special Purpose Lease.  See Defendants' Memorandum at 11 n.8.  HUB's implication that OPI hid its intention is flatly contradicted by the fact that HUB was offering OPI different buildings from its portfolio in November 2001 and as late as February 2002, to substitute for 525.

Moreover, HUB professes to find OPI's defenses "especially offensive" because OPI continued to occupy 525 "well after the flood."  But, HUB's supposed state of mind is clearly contrived.  For, if HUB truly was offended, why would it still offer OPI an alternative building from its portfolio of properties as late as February 2002?  See letter from HUB's President, John Mannix (attached to his deposition as Mannix-1 and attached hereto as Exhibit "A").  In fact, HUB made no demand for accelerated rent payments under the Special Purpose Lease until February 2002; this lawsuit followed shortly thereafter.  Furthermore, at no time prior to or since

3

filing this lawsuit has HUB sought possession of 525, despite being "offended" that OPI did not completely vacate 525 until after suit was filed.

Finally, HUB attempts to belittle the affirmative defenses, describing OPI's predicament as of its own making because OPI "no longer finds [525] commercially desirable." Commercial desirability has nothing to do with this dispute; commercial frustration and impracticability resulted from the 2001 Flood and released OPI from the Special Purpose Lease.[3]

## II.    ARGUMENT

### A.    HUB Has Not Shown it is Entitled to Summary Judgment

As the moving party, HUB bears the burden of showing that no genuine issue of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). A genuine issue exists when the evidence is such that a reasonable fact finder could return a verdict for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). When deciding HUB's motion, the Court must draw all reasonable inferences in the light most favorable to Defendants. See Big Apple BMW v. BMW of N. Amer., Inc., 974 F.2d 1358 (3d Cir. 1992).

For the reasons previously stated in Defendants' Memorandum, HUB falls well short of demonstrating that the Special Purpose Lease could not reasonably be construed to have been terminated by the events surrounding the 2001 Flood. HUB has known since the 2001 Flood occurred that OPI's business operations at 525 were ruined and that 525 was no longer suitable for further clinical manufacturing and analytical services because of customer reactions and concerns described in Defendants' Memorandum. HUB basically ignores what this case is all about, claiming that it is entitled to summary judgment simply because OPI ceased rent

---

[3]As for OCR, HUB states that the company guaranteed OPI's performance under the Special Purpose Lease. See Exhibit "C" to HUB's Appendix. OCR's potential obligations under the Lease Guaranty, however, are subject to the same defenses available to OPI under the Special Purpose Lease. See, e.g., Hyster Credit Corp. v. O'Neill, 582 F. Supp. 414 (E.D. Pa. 1983); Ford Motor Co. v. Lototsky, 549 F. Supp. 996 (E.D. Pa. 1982).

4

payments. That approach is particularly unhelpful to the Court in reviewing the evidence that

shows the serious, irreversible consequences of flooding at 525.

Nor is HUB entitled to summary judgment based on an unjust enrichment argument. By

HUB's own admission, it must prove as a threshold matter that Defendants received some

benefit. See HUB's Memorandum at 9. HUB does not, and cannot, assert any facts to show that

OPI was actually enriched in any way. In fact, HUB ignores the voluminous evidence showing

that, far from being enriched, OPI lost money between the time of the flood and the closing of its

business. See McDevitt Dep. (April 22, 2003) at 160-61, 172-74; Feld Dep. (March 3, 2003) at

141 (attached hereto as Exhibit "B"). [4]  Moreover, to the extent OPI was enriched in any way,

which it vehemently disputes, HUB is certainly not entitled to summary judgment because it

must show that any such enrichment is unjust, a showing it has not even attempted to make. See

Wiernak v. PHH U.S. Mort. Corp., 736 A.2d 616 (Pa. Super. 1999) (cited by HUB on page 9 of

its Memorandum).

### B.    HUB Has Not Disproved Impracticability and Frustration of Purpose

HUB argues that the doctrines of impracticability of performance and frustration of

purpose are barred because the Special Purpose Lease somehow requires OPI to continue

performing in the event of a flood. Not only is HUB's argument wrong, it misses the point.

First, although the Special Purpose Lease addresses the possibility of a casualty to 525, it

is completely silent as to the specific risk of flooding. As for casualties in general, the Special

Purpose Lease provides for repairs to 525 in the event of physical damage, with HUB essentially

bearing responsibility for the exterior and OPI for the interior. The Special Purpose Lease does

not, however, bind the parties to continued performance in the event of a casualty (i.e. obligating

---

[4] HUB also neglects to mention that it unilaterally determined that a rent abatement was appropriate between June and October, 2001. Accordingly, HUB knows full well that the period of alleged enrichment is less than 18 months.

OPI to continue paying rent). Moreover, to the extent that the Special Purpose Lease does delineate obligations of the parties for repair of 525 following a casualty, those provisions are intended by HUB to protect HUB's interest in 525, not OPI's business. See Campoli Dep. at 96 (attached hereto as Exhibit "C").

Second, HUB misapprehends OPI's defense. The purpose of the Special Purpose Lease was obviously frustrated in the short term by the 2001 Flood, but also in the long term and indefinitely by the events which followed – after suffering serious time delays and loss of drugs, OPI's customers would no longer send the contract manufacturing work anticipated by the Special Purpose Lease to OPI at 525. The casualty clause of the Special Purpose Lease makes no provision for the ruination of OPI's business at 525. By providing explicitly that 525 was to be used under the Special Purpose Lease for the "special purpose" of the clinical pharmaceutical business, it was clearly in the contemplation of the parties that 525 was suitable for that purpose. It turned out, unexpectedly, not to be the case.[5]

### C.    HUB Has Not Disproved Mutual Mistake

HUB's argument against Defendants' mutual mistake defense is similarly flawed. According to HUB, the parties were not mistaken about the risk of flooding and Defendants assumed the risk under the Special Purpose Lease. Once again, HUB attempts to mislead this Court about the true risk at issue – that flooding at 525 would occur to such an extent that customers would refrain from sending OPI work necessary to maintain the contract manufacturing business stated in the Special Purpose Lease. It is this risk, much greater than

---

[5] The cases cited by HUB on pages 12 and 13 of its Memorandum do not support its position because they are either factually distinguishable from the instant matter or actually point in favor of the defenses of frustration of purpose and impracticability of performance. See, e.g., Dorn v. Stanhope Steel, Inc., 534 A.2d 798 (Pa. Super. 1988) (defendant's losses not "well beyond the normal range" or even related to contract at issue); Luber v. Luber, 614 A.2d 771 (Pa. Super. 1992) (defendant's own financial inability, due to other obligations, not an un-assumed supervening event); Olbum v. Old Home Manor, Inc., 459 A.2d 757 (Pa. Super. 1983) (defendant did not assume risk of un-mineable coal); Albert M. Greenfield & Co. v. Kolea, 380 A.2d 758 (Pa. 1977) (defendant relieved from rent for reasons discussed on pages 14 and 15 of Defendants' Memorandum).

6

mere physical damage to 525 as a result of a casualty, about which the parties were clearly

mistaken, and which did Defendants did not assume under the Special Purpose Lease.

As evinced by the Use of Premises section of the Special Purpose Lease, at the time of

contracting the parties thought that 525 was a suitable site for OPI's long-term clinical

pharmaceutical manufacturing, testing, analyzing, packaging, and distribution business. See

Special Purpose Lease at § 5.01. Indeed, the Special Purpose Lease did not just permit such use,

it mandated the tenant to use 525 for this purpose and "for no other purpose." Id. Even

assuming, *arguendo*, that flooding was one of the casualties contemplated in the Damage or

Casualty section of the Special Purpose Lease, see §10.02(b), the only risk allocated in that

provision was that of physical damage to 525, not that severe and repeated flooding would render

the premises unsuitable for the express purpose of the Special Purpose Lease.[6]

Notably, the assumption of risk argument now raised by HUB was wholly unsuccessful

in one of the cases upon which it relies, Fiat Motors of North America, Inc. v. Mayor and

Council of City of Wilmington, Civ. A. No. 82-691 CMW, 1987 WL 12265 (D. Del. Aug. 20,

1987) (see pages 10-12 of HUB's Memorandum). In Fiat Motors, the court denied the lessor's

motion for summary judgment because it could not say as a matter of law that Fiat knew of and

assumed the risk of flood damage. 1987 WL 12265, at *3. Despite the lessor's claim that Fiat

knew the property was in a 100-year flood plain, the court relied upon testimony stating that Fiat

representatives "did not understand the extensiveness of the potential flooding." Id. Similarly,

in the instant matter, Defendants did not assume the risk related to the 2001 Flood, and the

mutual mistake doctrine precludes this Court from granting HUB summary judgment. See

---

[6] Whether the parties even contemplated flooding as a Section 10.02 casualty is in serious doubt. See Defendants' Memorandum at 31(quoting the testimony of HUB's expert Dr. Budzinski).

Aluminum Co. of America v. Essex Group, Inc., 499 F. Supp. 53 (W.D. Pa. 1980) (discussed on

pages 26 and 29 of Defendants' Memorandum and cited on page 16 of HUB's Memorandum).

### D.    HUB Has Not Disproved Breach of the Covenant of Quiet Enjoyment

HUB argues that Defendants are barred from asserting the defense of breach of the

covenant of quiet enjoyment because HUB played no role in events surrounding the 2001 Flood.

HUB's argument, however, is undermined by the testimony of its corporate representatives that

modifications to 525, proposed by an engineering firm retained by HUB after the 2001 Flood,

would have reduced the risk of flood damage to 525.  See Defendants' Memorandum at 10-11.

To the extent that these structural modifications could have ameliorated or even prevented the

events which frustrated Defendants' use of 525, then HUB committed nonfeasance by not

making them. There can be no question that, pursuant to the Special Purpose Lease, 525's

structure and its exterior were purely the responsibility of HUB.  See Special Purpose Lease at §

8.02 (Landlord's Obligations) (obligating HUB to maintain 525's structure in good condition and

to make all structural repairs to 525); § 10.02(b) (Damage or Casualty) (obligating HUB to repair

525's exterior in the event of casualty damage); § 6.01(e) (Landlord's Representations and

Warranties) (warranting that 525's systems, including its structural frame, were in "good

operating condition").

While the proposed engineering changes would not prevent flood water from entering

525 in another rain storm as severe as the 2001 Flood, see Mannix Dep. at 94:11-17 (Exhibit "G"

to Defendants' Memorandum), to the extent that HUB relies upon the engineer reports to show

that modifications would do so, then HUB breached the covenant expressly stated in the Special

Purpose Lease, see § 13.01 (Quiet Enjoyment), by not making such changes.

8

III.    **CONCLUSION**

For these reasons and for the reasons set forth in Defendants' Memorandum of Law in support of their motion for summary judgment, this Court should deny Plaintiffs' motion for summary judgment.

Respectfully submitted,

**BLANK ROME LLP**

BY: _____

Richard P. McElroy
Adam M. Share
Todd A. Schoenhaus
One Logan Square
Philadelphia, PA 19103-6998
(215) 569-5500

Attorneys for Defendants

Dated:  October 14, 2003

115304.00401/21201794v1

**Exhibit A**

/01/02   15:14 FAX 617 332 2261        HRPT                                    002/004



400 Centre Street, Newton, MA 02458-2076      tel: (617) 332-3990      fax: (617) 332-2261

**HRPT**
**PROPERTIES TRUST**

*VIA FACSIMILE AND U.S. MAIL*

February 1, 2002

Mr. David Morra
Chief Executive Officer
Omnicare Clinical Research, Inc.
630 Allendale Road
King of Prussia, PA 19406



RE: 525 Virginia Avenue, Fort Washington, Pennsylvania

Dear David:

The following is a response to your working proposal of November 13, 2001. As you are aware, we have undertaken an engineering study to determine how we can prevent future flooding, and we have been trying to gather the necessary information to determine the legal responsibility of the parties with respect to insurance proceeds and shortfalls. We believe we have our studies complete and are prepared to respond to the three alternatives in your proposal as follows:

   *First Alternative - Move to another location:*

Acceptable if Omnicare relocates to 145 University Avenue, Westwood, Massachusetts. The rent would be the same as Omnicare's current obligation ($868,000/year), increasing to $930,000/year in 2003. All other terms and conditions will apply through January 31, 2012. The building will be delivered as is. HRPT will release Omnicare from its obligations at 525 Virginia Drive and waive any claims against Omnicare for rent through 6/30/02. Rent will commence on 7/1/02.

   *Second Alternative - Release of lease for one year's rent.*

This is <u>not</u> acceptable. Our suggested counterproposal is that Omnicare offer this property for sublease. HRPT will assist in the subleasing efforts, but Omnicare will remain liable for sublease costs and for any rent shortfall.

   *Third Alternative - HRPT to pay restorations costs.*

This proposal is acceptable provided Omnicare and HRPT enter into a restructured 15-year lease commencing on July 1, 2002 whereby the site improvements detailed in the Infrastructure, Inc. Stormwater Management Improvement plan will be completed. These site improvements will protect the site and the first floor of the premises from the current 100-year flood plain. Minimal parking spaces will be lost; however, the project will remain in compliance with the Township

*A Maryland Real Estate Trust with transferable shares of beneficial interest listed on the New York Stock Exchange.*
*No shareholder, Trustee or officer is personally liable for any act or obligation of the Trust.*

HUB 00590

Page 2
Mr. David Morra
February 1, 2002

parking requirements. An approximate 35-space adjustment will be required to insure that the landlord and Omnicare are within stated terms of the existing lease.

The production/warehouse will be elevated twelve (12) inches above the 500-year flood plain level or five (5) feet. This will involve raising the roof and providing a 150 lb per square foot floor load for Omnicare's equipment. The cost includes the removal of existing tenant equipment. All mechanical and electrical base building work, as well as loading, roof structure and interior partition construction inside the warehouse would be included. Omnicare would be responsible for the installation of their proprietary equipment. Ramping from the first floor office area will be designed and incorporated in the reconstruction. Details of the reconstruction are available in the January 31, 2002 engineering report compiled by IntraStructure, Inc.

In addition, HRPT will provide a $200,000 improvement allowance for Omnicare to reconstruct the office area on either the first floor or unoccupied second floor. The second floor is above the 500-year flood plain and with the proposed site work; the first floor will be protected in the current 100-year flood plain.

Estimated construction would be 90-days from plan approval. The substantial completion date under a fast-track approval process is anticipated being on or about July 1, 2002. The commencement of the new 15-year lease would commence upon substantial completion.

The proposed rental rates and key terms are as follows:

|  |  |
|---|---|
| Year 1: | $11.86/sf NNN |
| Years 2-5: | $12.11/sf NNN |
| Years 6-10: | $13.36/sf NNN |
| Years 11-15: | $14.61/sf NNN |

*Omnicare would continue to be responsible for all operating expenses and taxes.*

*The lease would be guaranteed by Omnicare, Inc. (NYSE: OCR).*

This letter is part of ongoing discussions between HRPT and Omnicare regarding ways in which the parties may attempt to settle and resolve the issues and disputes arising from the flood conditions last June. The statements in this letter (as with all other statements made as part of that discussion), therefore, may not be considered as admissions that in any way prejudice HRPT's existing rights and remedies under and with regard to the lease. Likewise, Omnicare's acceptance of one proposal or the other shall not constitute a binding contract (or an "agreement to agree") to a binding contract. Instead, Omnicare's acceptance of one of HRPT's proposals would merely advance the discussions to the next step, which would be the determination (through further discussion and negotiation) of whether the parties are able to reach complete agreement as to all of the terms of such a binding contract.

HUB 00591

Page 3
Mr. David Morra
February 1, 2002


Thank you for your consideration. We look forward to a timely response.

Sincerely,

John A. Mannix
President and Chief Operating Officer


JAM:nc

cc:    David J. Campoli, REIT Management & Research LLC
       William J.  Maffucci, Esq., Schnader Harrison Segal & Lewis llp

**Exhibit B**

KENNETH FELD

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

NO. 02-CV-2905

BARRY M. PORTNOY and GERARD )   DEPOSITION UPON
M. MARTIN, as Trustees for )
HUB PROPERTIES TRUST, )   ORAL EXAMINATION
                       )
          Plaintiffs, )     OF
                       )
                       )
     - vs - )   KENNETH FELD
                       )
                       )
OMNICARE PHARMACEUTICS, )
INC. and OMNICARE CLINICAL )
RESEARCH, INC., )
                       )
         Defendants. )
- - - - - - - - - - - - - - - -

       TRANSCRIPT OF DEPOSITION, taken by and
before JENNIFER WEARNE, Professional Reporter
and Notary Public, at the offices of OBERMAYER,
REBMANN, MAXWELL & HIPPEL, LLP, One Penn Center,
19th Floor, 1617 J.F. Kennedy Boulevard,
Philadelphia, Pennsylvania, on Monday,
March 3, 2003, commencing at 11:25 a.m.

      REPORTING SERVICE ASSOCIATES (RSA)
          A VERITEXT COMPANY
     1845 Walnut Street - 15th Floor
    Philadelphia, Pennsylvania  19103
         (215) 241-1000

VERITEXT PA



4ee7f5a1-4e25-11d7-88e5-009027a6908f

KENNETH FELD

141

           MR. McELROY:  Sure.

BY MR. DIAMOND:

Q.        Just a few on Exhibit-20.  Does it
also indicate that Pharmaceutics was operating
at a loss for the second half of 2001, as I read
this?

A.        Yes.

Q.        And did you have any sense of when
that situation might change so that you were
making money, not losing money?

A.        That situation was not going to change
until we consolidated our operation back in a
single site or -- yeah, a single site, or at
least in two sites that were fairly close to
each other as we had prior to the flood.

Q.        Let me put the question another way.
If all the recovery and restoration activities
that you envisioned had been performed, as best
as you can determine, when do you think
Pharmaceutics would have been in the black,
would have started operating in the black?

                 MR. McELROY:  I have an
          objection to the question because I
          don't think it specifies all the

VERITEXT PA

**Exhibit C**

# ORIGINAL

1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

* * *

BARRY M. PORTNOY and            :    CIVIL ACTION

GERARD M. MARTIN, as Trustees for :

HUB PROPERTIES TRUST            :

                               :

     vs.                       :

                               :

OMNICARE PHARMACEUTICS, INC.    :

     and                       :

OMNICARE CLINICAL RESEARCH, INC. :   NO. 02-CV-2905

* * *

JANUARY 14, 2003

* * *

     Rule 30(b)(6) deposition of BARRY M.
PORTNOY and GERARD M. MARTIN, as Trustees for HUB
PROPERTIES TRUST, taken through their representative
DAVID J. CAMPOLI pursuant to notice, was held at the
law offices of BLANK ROME COMISKY & McCAULEY LLP,
One Logan Square, Philadelphia, Pennsylvania 19103,
beginning at 10:00 a.m., before McKinley Wise, a
Registered Professional Reporter and an approved
Reporter of the United States District Court.

* * *

ESQUIRE DEPOSITION SERVICES

1880 John F. Kennedy Boulevard

15th Floor

Philadelphia, Pennsylvania 19103

(215) 988-9191

DAVID J. CAMPOLI - 1/14/03

96

1  for changing of policies or whatever.  As soon as

2  the insurance company -- they will notify us, and

3  that to my knowledge did not occur, because I

4  never saw any notice of a change from '99 through

5  and including the flood.

6  BY MR. SHARE:

7          Q.        Did you ask for such a notice?

8          A.        No.

9          Q.        What is HRPT seeking to protect when

10  it checks to see that its tenant has flood

11  insurance?

12          A.        In general, it is any of the

13  required insurance.  If the tenant -- all leases

14  allow that if a tenant who is responsible for

15  insurance does not provide evidence of such, the

16  landlord can step in as -- just to -- as a

17  protective measurement on the asset, that

18  something -- that some umbrella is there to catch,

19  you know, a casualty.

20          Q.        Casualty to the building?

21          A.        Yes.  The landlord always has its

22  own rental interruption insurance.  The tenants

23  generally do have their own, too, as well.

24          Q.        Does HRPT have a minimum requirement

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of October, 2003, I caused a true and correct copy of

Defendants' Omnicare Pharmaceutics, Inc. and Omnicare Clinical Research, Inc. Memorandum

of Law in Opposition to Plaintiffs' Motion for Summary Judgment and proposed Order to be

served upon the following counsel by Hand-Delivery:

Stephen W.W. Ching, Esquire
OBERMAYER REBMANN MAXWELL & HIPPEL LLP
One Penn Center Plaza, 19th Floor
1617 John F. Kennedy Boulevard
Philadelphia, PA  19103

TODD A. SCHOENHAUS