IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BARRY M. PORTNOY and                          :
GERARD M. MARTIN, as Trustees for             :
HUB PROPERTIES TRUST                          :
                                              :
                     Plaintiffs,              :        Civil Action No. 02-CV-2905
                                              :
          v.                                  :
                                              :
OMNICARE PHARMACEUTICS, INC.                  :
                                              :
          and                                 :
                                              :
OMNICARE CLINICAL RESEARCH, INC.              :
                                              :
                     Defendants.              :

**REPLY BRIEF OF DEFENDANTS OMNICARE PHARMACEUTICS, INC.
AND OMNICARE CLINICAL RESEARCH, INC.
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Defendants Omnicare Clinical Research, Inc. and Omnicare Pharmaceutics, Inc.

(collectively "OPI") submit this reply brief in further support of their Motion for Summary

Judgment.  HUB's memorandum of law is the paradigm example of the tactic of changing the

other side's defenses and contentions so that they more readily accommodate ones own

misguided arguments.

**I.    The Special Purpose Lease Did Not Allocate The Risk That 525 Would Become
       Unsuitable For Its Intended Use**

HUB argues that the Special Purpose Lease allocated the risk of casualty loss, including

by flooding, and therefore the doctrines of frustration or impracticability of performance do not

apply.  OPI, of course, is not arguing that it has no obligation to fix damage caused by a casualty

loss.  Knowing that, HUB instead identifies the wrong risk giving rise to the frustration of

purpose of the Special Purpose Lease.  The risk was not flood damage to 525.  Rather, OPI's

defense is that repeated flooding at 525 had the unexpected consequence of driving OPI's customers away and making it impractical, if not impossible, to conduct clinical pharmaceutical operations there, which was the express purpose of the Special Purpose Lease.[1]

Equally misleading is HUB's argument that OPI unilaterally assumed the risk of a casualty and agreed to continue paying rent should one occur. However, HUB has not pointed and cannot point to one provision of the Special Purpose Lease which even remotely provides for such continued performance on OPI's part. HUB instead relies upon unrelated provisions which solely address physical damage to 525 itself. See Special Purpose Lease § 10.02(c) (allocating the risk of interior damage to OPI and the risk of exterior damage to HUB); §§ 10.01 and 10.02(b) (requiring insurance coverage for the repair and restoration of 525).[2] HUB obfuscates the distinction between physical damage to 525 and its lack of viability as a contract clinical manufacturing site. It makes sense that the Special Purpose Lease does not require OPI to continue paying rent in the event that 525 could not be used for its intended purpose – such a requirement would render meaningless the Use of Premises provision, § 5.01. The parties bargained for an abatement of rent if a casualty loss prevents the premises from being capable of use for the purpose intended. The evidence shows that the consequences of flooding frustrates that purpose and HUB simply fails to come to grips with that fact.

The cases HUB cites on pages 5-6 of its opposing memorandum are readily distinguishable from this case, because contract provisions in those cases expressly allocated the

---

[1] In any event, Defendants do not concede that the parties foresaw the risk that 525 would flood -- the Special Purpose Lease never mentions the word "flood," presumably, because no one contemplated the flooding of 525 prior to this litigation, including HUB's own expert Dr. Budzinski. See Defendants' Memorandum of Law in Support of their Motion for Summary Judgment ("Defendants' Memorandum") at 31.

[2] HUB's statement that OPI purchased additional flood insurance from FEMA before the 2001 Flood is pointless; OPI did so because insurance marketplace conditions created a coverage gap necessitating the purchase of FEMA policies, see Rice Dep. at 67, 71 (attached hereto as Exhibit "A"), not because it assumed the risk that 525 would become unfit for its intended purpose.

2

risk of commercial impracticability. See, e.g., Wheelabrator Franckville Energy Co. v. Morea Culm Serv. Inc., Civ. A. No. 90-2962, 1990 WL 83340, *22 (E.D. Pa. June 12, 1990) ("the obligations created and assumed hereunder are not premised upon any underlying assumptions or any contingencies, the non-occurrence of which was a basic assumption on which this Agreement was made"); F.J. Busse, Inc. v. Department of General Servs., 408 A.2d 578, 580 (Pa. Cmwlth. 1979) ("contractor assumes all risks resulting from any changes in conditions which may occur during the progress of the work . . .and no claims for [construction work] loss or damage shall be recognized by the Authority, nor will such loss or damage excuse the complete and satisfactory performance of the contact by the Contractor"). These cases actually undercut HUB's position because they exemplify situations where parties unequivocally assume certain risks at the time of contract. Here, there is no factual issue that OPI did not assume the risk of property damage from a flood in particular, let alone the risk that OPI would not be able to operate a clinical pharmaceutical business because its customers would leave 525 after the 2001 Flood.

More worthy of note than the cases HUB cites are the ones it does not: HUB completely ignores the dispositive cases discussed on pages 14-17 of Defendants' Memorandum (e.g. Greenfield & Co. v. Kolea, 380 A.2d 758 (Pa. 1977); 801 South Fulton Ave. Corp. v. Radin, 526 N.Y.S.2d 143 (N.Y. App. Div. 1988)), which stand for the proposition that a commercial tenant is relieved of rent obligations where the leased premises could no longer be used for its intended purpose. HUB has provided no reason whatsoever for this Court to depart from the holding and rationale of Greenfield & Co. and its progeny. Accordingly, this Court should grant Defendants' motion for summary judgment.

II.    **OPI's Purported Knowledge Of The Risk Of Flood Does Not Bar Its Defenses**

HUB also attacks OPI's affirmative defenses based on the erroneous notion that OPI foresaw the risk of flooding and took measures to protect against such risk. This assertion is flawed and inaccurate in numerous respects. First, it does not follow from either the existence of flood records showing that 525 was located in a 100-year flood plain, or from the Office Park's history of flooding, that OPI foresaw, at the time it succeeded to the Special Purpose Lease in 1998, the risk that 525 itself would flood and become unsuitable for the use mandated by the Special Purpose Lease. Indeed, the testimony establishes that OPI did not even know 525 was prone to flooding until after it succeeded to the Special Purpose Lease. See Feld Dep. (March 3, 2003) at 27-32 (Exhibit "G" to HUB's Appendix) (admitting he did not know of water coming into 525 and did not discuss 525's location in a flood zone until early 2001); McDevitt Dep. (April 22, 2003) at 35:5-15 (Exhibit "H" to HUB's Appendix) (stating OCR knew, in August of 2000, that the Office Park might be subject to flooding). There is no testimony of flood water entering 525 until the 1999 flood at the earliest -- well after the parties' predecessors negotiated the Special Purpose Lease in 1996, and well after OPI succeeded to Bio Pharm's rights and obligations thereunder.

Second, OPI's actions do not demonstrate any knowledge or assumption of risk regarding the events surrounding the 2001 Flood. In accordance with the Special Purpose Lease, OPI did maintain flood insurance, which it supplemented from FEMA in 2001, but did so only to insure against physical damage to 525. Further, OPI did ultimately adopt a Business Recovery Plan to account for potential catastrophes, but over a year after OPI succeeded to the Special Purpose Lease, see Purdy Dep. at 56-58 (attached hereto as Exhibit "B"), and in reaction to unexpected flooding in the Office Park. Thus, contrary to what HUB would have this Court believe, the

4

above actions are not tantamount to a belated admission, tacit or otherwise, that OPI had

assumed any risk that its customers would reject 525 after the 2001 Flood.

The ramifications of the 2001 Flood were unforeseeable. But, even assuming, *arguendo*,

that the risk was foreseeable, HUB is incorrect in its contention on page 7 of its memorandum

that the defenses of impracticability, frustration and mutual mistake are not applicable if OPI

could have foreseen the risk. Foreseeability has been labeled an improper test for allocation of

risk because "[a]nyone can foresee, in some general sense, a whole variety of potential

calamities, but that does not mean that he or she will deem them worth bargaining over."

Specialty Tires of America, Inc. v. CIT Group/Equip. Financing, Inc., 82 F.Supp.2d 434, 438-39

(W.D. Pa. 2000). As the court stated:

> Foreseeability or even recognition of a risk does not necessarily
> prove its allocation. Parties to a contract are not always able to
> provide for all the possibilities of which they are aware, sometimes
> because they cannot agree, often because they are too busy.
> Moreover, that some abnormal risk was contemplated is probative
> but does not necessarily establish an allocation of the risk of the
> contingency which actually occurs.

Id. (emphasis added). Impracticability, frustration, and mutual mistake are the heart of this

dispute. Accordingly, this Court should grant Defendants' motion for summary judgment.

### III.    OPI's Purchase Of Flood Insurance Does Not Bar Its Defenses

HUB's argument that OPI cannot invoke the contractual doctrines of frustration and

impracticability, because it somehow contributed to the frustration, is equally groundless. HUB

badly mischaracterizes the testimony in the record to suggest that OPI failed to obtain adequate

insurance to enable it to restart its business. To the contrary, the indisputable evidence shows

that OPI purchased a level of insurance consistent with its obligation under the Special Purpose

Lease, see McDevitt Dep. (May 6, 2003) at 61-62 (attached hereto as Exhibit "C"), for the

purpose of protecting the building, see Campóli Dep. at 96 (Exhibit "C" to Defendants' Opposition Memorandum). Even if additional insurance proceeds may have increased the possibility that OPI would restart its business after the 2001 Flood, there is no evidence whatsoever that OPI would have restarted its business at 525. Indeed, the evidence is to the contrary. HUB is again wrong to assert that OPI had insufficient insurance to restore 525. The $4.5 million of insurance in place at the time of the 2001 Flood far exceeded the amount necessary to repair and restore 525 to its pre-flood condition. Renovating 525 was inconsequential to OPI's customers, who, in the face of future flooding, would not send significant clinical trial work to OPI at 525. See Defendants' Memorandum at 7-8; see also Molina Dep. at 42, 57 (Exhibit "O" to Defendants' Memorandum); Froesel Dep. at 91, 93, 95 (attached hereto as Exhibit "D").

Under these circumstances, the case at bar is a far cry from those relied upon by HUB, in which defendants could not avail themselves of the frustration doctrine because their own decisions to discontinue business for financial reasons contributed to the frustration. See General Electric Capital Corp. v. Charleston, Civ. A. No. 88-6132, 1989 WL 63213, *4 (E.D. Pa. June 12, 1989) ("Furthermore, the defendants had defaulted on the lease payments prior to the fire. For the defendants to be excused from the contract by the mere fortuitous event of a fire would be inequitable"), aff'd without opinion, 898 F.2d 140 (3d Cir. 1990); Dorn v. Stanhope Steel, Inc., 534 A.2d 798, 812 (Pa. Super. 1987) (recognizing impracticability where performance would result in "severe and unreasonable" loss).

HUB's confusion aside, OPI did not vacate 525 because of a shortfall in insurance proceeds; OPI vacated 525 because, through no fault of its own, its customers viewed 525 as an unacceptable site for the manufacturing and testing of their clinical pharmaceuticals. See

6

Defendants' Memorandum at 19 (quoting Molina Dep. at 42, 57). Moreover, there is not a

scintilla of evidence showing that OPI in any way contributed to this frustration, or that, as in

General Electric, it defaulted on lease payments prior to the frustrating event. Accordingly, this

Court should grant Defendants' motion for summary judgment.

IV.    **The Parties' Mutual Mistake Of Fact Is Not A Prediction Of Future Events**

Without disputing that the parties mutually misunderstood that 525 was suitable for its

intended use, HUB attempts to label the misunderstanding as a prediction of future events rather

than a mutual mistake of fact. But HUB's characterization is belied by the factual record.

At the time the Special Purpose Lease was executed, all parties believed that 525 was a

suitable location for pharmaceutical manufacturing, testing, analyzing, packaging, and

distribution, at least through the year 2012. The Court need look no further than the Use of

Premises provision, mandating that 525 be used in such a manner. See Special Purpose Lease §

5.01. At that time, no one comprehended the history of flooding in the Office Park in general,

and certainly no one knew that 525 had a greater propensity to flood than a typical 100-year

flood plain property. See Defendants' Memorandum at 5. After the 2001 flood, the second

flood to affect 525 in two years and the third in the Office Park in five years, the parties'

mistaken assumption regarding 525's suitability resulted in a severe imbalance to the agreed

upon exchange between the parties justifying equitable relief in favor of OPI.

Although the facts underlying the mistake were not discoverable until after execution of

the Special Purpose Lease, the misunderstanding at issue is not related to a prediction of future

events, such as the fluctuation of an interest rate, see Haas v. Pittsburgh Nat'l Bank, 495 F. Supp.

815 (W.D. Pa. 1980) (cited on page 10 of HUB's memorandum). Instead, the mistake stems

from the assumption both parties made at the time of contracting that 525 was and would

7

continue to be suitable for its intended purpose – a scenario entitling Defendants to relief under the law.  See, e.g., Aluminum Co. of America v. Essex Group, Inc., 499 F. Supp. 53, 63 (W.D. Pa. 1980) (finding the mistake at issue to be one of fact rather than prediction but noting "the mistake is not wholly isolated from predictions of the future or from the searching illuminations of painful hindsight"); Reilly v. Richards, 632 N.E.2d 507 (Ohio 1994) (rescinding contract where parties' mutual mistake concerned "the character of the [flood plain] property such that it severely frustrate[d]" buyer's ability to use said property as intended).  Accordingly, this Court should grant Defendants' motion for summary judgment.

## V.    The Aftermath Of The 2001 Flood Amounted To Frustration And Impracticability

HUB argues that the 2001 Flood and its aftermath did not amount to frustration and impracticability because OPI could still perform, albeit at a loss.  Nowhere has OPI argued that it should be relieved of its obligations under the Special Purpose Lease because it would be harder to make a profit in the business conducted at 525.  HUB grossly misstates OPI's argument and understates OPI's loss.

In quoting, for example, the deposition testimony of OPI's corporate designee, David Morra, that OPI "could resume or … get the operation back up" after the 2001 Flood, see HUB's memorandum at 13, HUB conveniently omits the important balance of Mr. Morra's answer: "but in terms of customers being attracted, when 40 percent – let's say 40 percent or so, a big piece of that was Astra Zeneca . . . of revenues is pulled out from under you, you know, you're not going to have a viable business."  Morra Dep. (October 29, 2002) at 96:5-10 (Exhibit "E" to HUB's Appendix).

Likewise, HUB's reliance on severely limited post-flood operations is wholly misplaced.  OPI did generate some post-flood revenue from work performed at 525, but as explained that

8

was predominantly for one customer, Virbac, who was compelled to use 525 or suffer extreme

losses. This post-flood revenue represented a small fraction of OPI's pre-flood revenue.

Compare McDevitt Dep. (April 22, 2003) at 172-74 (Exhibit "L" to Defendants' Memorandum);

Feld Dep. (March 3, 2003) at 125 (Exhibit "H" to Defendants' Memorandum).

Further, the testimony to which HUB cites on page 13 of its memorandum (see, e.g.,

Cichon Dep. at 178-88) clearly establishes that, due to the extenuating circumstances noted

above, Virbac was the only customer for whom OPI was able to perform "bundled services."

OPI's work for other customers was limited to analytical services -- services representing 5% of

OPI's business. See Defendants' Memorandum at 21-22. According to the representatives of

these companies, OPI would never get manufacturing work so long as it remained in 525. See

Molina Dep. at 32, 42, 54, 57; Moore Dep. at 23, 45 (Exhibit "P" to Defendants' Memorandum).

Disregarding the mountain of evidence establishing that 525 could not be used for its

intended purpose, HUB asks this Court to enforce the Special Purpose Lease on the purported

grounds that 525 could be used for some purpose. As discussed in more detail in Defendants'

Memorandum, performance is excused under the law where it creates extreme and unreasonable

expense or difficulty. Unlike the cases upon which HUB relies, OPI does not look to be excused

simply because staying at 525 would be less profitable than leaving. Rather, staying at 525

without customers would be tantamount to paying rent for no business at all. Indeed, as HUB

itself acknowledges, a tenant is relieved from its obligation to pay rent where there is no

"serviceable use still available consistent with the use provision in the lease." See HUB's

Memorandum at 12 (quoting Mel Frank Tool & Supply v. Di-Chem Co., 580 N.W.2d 802, 808

(Iowa 1998)). Accordingly, this Court should grant Defendants' motion for summary judgment.

9

**VI.    There Are No Factual Issues Precluding Summary Judgment For Defendants**

In an effort to create the appearance of a genuine issue of material fact, HUB has attached

to its memorandum a chart setting forth portions of deposition testimony from various witnesses

which, when taken together, supposedly contradict Defendants' factual assertions.  This chart is a

red herring, as there is nothing in the deposition portions cited by HUB which actually meets the

substance of Defendants' assertions.  To the extent that the issues raised therein are not

addressed above, the portions of depositions cited by HUB are addressed below in the order in

which they appear in the chart:

- As noted above, the second part of the statement from OPI's corporate designee David

   Morra differentiates between restoring operations at 525, and receiving sufficient work

   from customers to sustain a viable business there.

- OPI performed pharmaceutical services after the 2001 Flood, but primarily at locations

   other than 525.  See Defendants' Memorandum at 8.

- OPI generated revenue after the 2001 Flood, but from operations primarily at locations

   other than 525.

- OPI President Feld admitted that OPI's business development and project management

   staff had better knowledge of customer concerns about future flooding at 525 than he did.

   Feld Dep. (April 9, 2003) at 206-07 (attached hereto as Exhibit "E").  Therefore, the fact

   that Feld testified that he was not aware of statements by customers that they were not

   going to send work to 525 does not contradict the assertions in the record from OPI's

   former employees, Cichon and Purdy, or from OPI's customers that such statements were

   made.

10

- The fact that Feld testified that some of OPI's customers wanted to know when OPI was going to be up and running does not address the question of whether those customers were willing to send work to OPI <u>at 525</u>.

- The fact that there has been testimony about OPI's decision not to completely restore 525 is irrelevant to the question of whether customers were willing to send work to OPI <u>at 525</u>.

- Astra Zeneca's corporate designee Olga Crowther was not involved in the decision about whether to send future work to OPI. However, she testified that her colleague, Astra Zeneca's other corporate designee Carmen Molina, did make that decision on behalf of Astra Zeneca. <u>See</u> Crowther Dep. at 21, 23-25 (attached hereto as Exhibit "F"). Molina testified that she was not going to send future work to OPI if it reopened at 525. <u>See</u> Defendants' Memorandum at 19.

- The fact that Novartis selected a location in Puerto Rico for work that it would otherwise have sent to OPI at 525 is irrelevant. Novartis testified that it would not send long-term manufacturing work to OPI <u>at 525</u>. <u>See</u> Defendants' Memorandum at 21.

- OPI stored its customers' pharmaceuticals on the ground floor of 525 because that is where the warehouse was located when HUB's predecessor executed the Special Purpose Lease. As HUB is well aware, the second floor of 525 was much smaller than the first and not structurally designed for manufacturing and/or warehousing. HUB's cite to the U.S. Army Corps of Engineers Flood-Proofing Regulations is so irrelevant as to be absurd.

Notwithstanding HUB's unsuccessful attempt to spin the evidence, the fact remains that, through no fault of OPI, OPI's customers rejected 525 after the 2001 Flood as a site for their

11

clinical pharmaceutical work. Every customer on record has unequivocally stated that it would not send OPI such work if it remained at 525. Notably, HUB has failed to present testimony from a single customer stating anything to the contrary. In addition, HUB mounts no challenge to the conclusions of OPI's expert, Dr. Hensler, based on the recorded customer testimony.

## VII.    Conclusion

For the foregoing reasons, and for the reasons stated in Defendants' Memorandum of Law in Support of their Motion for Summary Judgment, this Court should grant Defendants' motion for summary judgment and dismiss Plaintiffs' complaint against them with prejudice in its entirety.

Respectfully submitted,

**BLANK ROME LLP**

BY: _____
Richard P. McElroy
Adam M. Share
Todd A. Schoenhaus
One Logan Square
Philadelphia, PA 19103-6998
(215) 569-5500

Attorneys for Defendants

Dated: October 21, 2003

115304.00401/21205700v1

# EXHIBIT "A"

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA


------------------------------------
                                      :
BARRY M. PORTNOY and GERARD M.        :
MARTIN, trustees for HUB              :
Properties Trust,                     :
                                      :
          Plaintiffs,                 :
                                      :
     vs.                              :    CASE NO.
                                      :    02-CV-2905
OMNICARE PHARMACEUTICS, INC., and     :
OMNICARE CLINICAL RESEARCH, INC.,     :
                                      :
          Defendants.                 :
                                      :
------------------------------------


         Deposition of:    JANICE M. RICE

         Taken:            By the Plaintiffs
                           Pursuant to Agreement

         Date:             March 11, 2003

         Time:             Commencing at 10:13 a.m.

         Place:            Thompson Hine, LLP
                           312 Walnut Street
                           Suite 1400
                           Cincinnati, Ohio  45202-4029

         Before:           Wendy L. Raymer, RPR
                           Notary Public - State of Ohio

COPY

1      Q.    Are you sure about that?

2      A.    Yes.

3      Q.    Well, what happened in the year 2000 that

4   caused Marsh to provide that information to you regarding

5   the properties in Flood Zone A?

6      A.    Marsh advised us that the first million dollars

7   in property coverage had to be purchased through FEMA.

8   That it was no longer covered by the primary insurer.

9      Q.    Prior to that year, is it your understanding

10   that the first million dollars in property coverage as a

11   result of flood would have been covered by your primary

12   policies?

13      A.    Yes.

14      Q.    So there was some change in the insurance

15   policies that you were purchasing as of the year 2000?

16      A.    That's correct.

17      Q.    Were you provided with any information about

18   that change?

19      A.    Yes, we were.

20      Q.    What kind of information were you provided?

21      A.    We were provided with various pieces of

22   information, the first of which was a schedule that Marsh

23   provided at the 12/21/99 renewal -- for purposes of the

24   12/21/99 renewal, which identified that there would be a

1    renewal, they subsequently identified over the course of

2    2000 various properties of ours that were located in Flood

3    Zone A which would require the FEMA policy in order to

4    insure the first million dollars of coverage.

5        Q.    Any other documentation provided to you by

6    Marsh for that purpose?

7        A.    Not other than a series of pieces of

8    correspondence identifying an individual property or a

9    couple of new properties that they had identified in Zone

10   A.

11       Q.    For example, did Marsh explain to you in any

12   correspondence or perhaps in conversations regarding why

13   this change was taking place in the year 2000?

14       A.    I don't recall what they provided in writing.

15   I remember that when we discussed the change in the first

16   million dollars of coverage, that it was a hardening of the

17   marketplace, and that the primary insurer was no longer

18   able to write the first million dollars of coverage.

19       Q.    Who told you that?

20       A.    I don't recall.

21       Q.    Somebody from Marsh?

22       A.    Yes.

23             MR. HABER: Could you read back the last two

24       questions and answers?

# EXHIBIT "B"

STEVE PURDY

1          IN THE UNITED STATES DISTRICT COURT

2      FOR THE EASTERN DISTRICT OF PENNSYLVANIA

3                            NO.  02-CV-2905

4   BARRY M. PORTNOY and GERARD  )  DEPOSITION UPON

5   M. MARTIN, as Trustees for   )  ORAL EXAMINATION

6   HUB PROPERTIES TRUST,        )        OF

7                Plaintiffs, )   STEVE PURDY

8          - vs -                )

9   OMNICARE PHARMACEUTICS, INC. )

10   and OMNICARE CLINICAL         )

11   RESEARCH, INC.,              )

12                Defendants. )

13   - - - - - - - - - - - - - - - -

14

15          TRANSCRIPT OF DEPOSITION, taken by and

16   before DEBRA R. WILHELM, Professional Reporter

17   and Notary Public, at the law offices of

18   OBERMAYER, REBMANN, MAXWELL & HIPPEL, LLP, 19th

19   Floor, One Penn Center, 1617 JFK Boulevard,

20   Philadelphia, Pennsylvania, on Wednesday,

21   November 20, 2002, commencing at 10:15 a.m.

22

          REPORTING SERVICE ASSOCIATES (RSA)

23            A Veritext Company

          15th Floor - 1845 Walnut Street

24        Philadelphia, Pennsylvania   19103

               (215) 241-1000

RSA Court Reporters



d9bb116b-0cd2-11d7-88e4-009027a6908f

STEVE PURDY

56

1  to do that, and when we were going to do that.

2  Q          What's the business recovery plan?

3  A          The plan itself?

4  Q          What is a business recovery plan?  You

5  said you had one in your desk.

6  A          It detailed what would be done in the

7  event of a catastrophe, such as a fire, a

8  flood.  Honestly, I never read my copy.

9  Q          Did everyone have a copy?

10  A          I don't think everyone had a copy.  I

11  think the managers, directors and maybe a select

12  few other people.  I was given a copy by Jim

13  Kessler, who was my manager at the time, because

14  we were helping to put together what we would do

15  from a project management standpoint.  I was

16  involved with him, so that's the reason I had a

17  copy.  My copy was at a level where it was wet

18  at my desk.  A lesson was learned.

19  Q          Who authored the business recovery

20  plan?

21  A          I'm not sure who the author of that

22  would be.  It was every individual department

23  had input, but it was for our division

24  specifically, Omnicare Pharmaceutics.

RSA Court Reporters

d9bb116b-0cd2-11d7-88e4-009027a6908f

STEVE PURDY

57

1   Q        Do you know when the business recovery

2   plan was prepared?

3   A        In that version it had been prepared

4   at least three years prior to the flood.  There

5   might have been one that existed prior to that.

6   I'm not aware of it if it was.  I didn't have a

7   copy of it.

8   Q        So the business recovery plan you were

9   looking at in June of 1999 --

10              MR. SHARE:  2001.

11  BY MR. HABER:

12  Q        Thank you.  In June of 2001, was

13  prepared sometime in 1998?

14  A        I can't say for certain.  It was

15  probably later than that.  It was probably 1999

16  because I know I was working with Jim Kessler.

17  He didn't come aboard until spring of '99, so it

18  had to be in 1999.

19  Q        Is it possible that the business

20  recovery plan was prepared sometime after the

21  flood that occurred from Hurricane Floyd?

22  A        Yes, it's very possible.

23  Q        Do you know if a business recovery

24  plan existed prior to 1999 for use at the

d9bb116b-0cd2-11d7-88e4-009027a6908f

STEVE PURDY

58

1    pharmaceutics company?

2    A        Not that I'm aware of.

3    Q        You talked about the version you were

4    looking at, and I thought you mentioned that

5    there might have been a prior incarnation of

6    it.  What was that?

7    A        There might have been.  I'm not aware

8    of one.  That is the only incarnation of it that

9    I'm aware of.

10   Q        Do you have a copy of the business

11   recovery plan?

12   A        I do not.

13   Q        Can you describe the document to me?

14   A        It was a binder with sections labeled

15   departmentally, I believe what would be done

16   from a manufacturing standpoint, a packaging

17   standpoint, a facilities standpoint.  And each

18   group had their, you know, input into developing

19   that, information management standpoint.

20   Q        Do you know who was in charge of

21   compiling the document?

22   A        I do not, no.

23   Q        Well, you said you had some input to

24   the section that was relevant to your area;

RSA Court Reporters

# EXHIBIT "C"

JAMES MCDEVITT

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

NO. 02-CV-2905

BARRY M. PORTNOY AND GERARD   )   DEPOSITION UPON
M. MARTIN, as Trustees for   )
HUB PROPERTIES TRUST,   )   ORAL EXAMINATION
   )
          Plaintiffs,   )     OF
   )
    - vs -   )   JAMES McDEVITT
   )
OMNICARE PHARMACEUTICS, INC.,   )
and OMNICARE CLINICAL   )
RESEARCH, INC.,   )
   )
          Defendants.   )
- - - - - - - - - - - - - - - - -

TRANSCRIPT OF DEPOSITION, taken by and before ELISABETTA L. MAADDI, Professional Reporter and Notary Public, at the offices of OBERMAYER, REBMANN, MAXWELL & HIPPEL, LLP, 19th Floor, One Penn Center, 1617 John F. Kennedy Boulevard, Philadelphia, Pennsylvania, on Tuesday, May 6, 2003, commencing at 10:10 a.m.

REPORTING SERVICE ASSOCIATES (RSA)
A VERITEXT COMPANY
1845 Walnut Street - 15th Floor
Philadelphia, Pennsylvania  19103
(215) 241-1000



JAMES MCDEVITT

61

1    Q.      Now, you also explained that the insurance

2    premiums were --

3    A.      Intercompany --

4    Q.      -- handled at the corporate level and allocated

5    to the different sites.

6    A.      Yes.  And again, to tell you the way I was

7    thinking, we could have had intercompany charges at

8    $4,000 a month and possibly had more insurance based on

9    how it was allocated.  So that's why I wanted somebody

10   to read the policy to me.

11   Q.      But you didn't understand the relationship

12   between the $4,000 a month figure and the level of

13   insurance?

14   A.      Right.  I had no way.  I didn't have the

15   information.

16   Q.      Okay.  Do you know how much insurance would

17   have been required to restore the 525 building after

18   the June flood, not including equipment, not including

19   the business issues, just the building?  Do you know

20   how much it would have cost to do that?

21   A.      In terms of insurance policy charge?

22   Q.      Well, no.  No.  In terms of money?

23   A.      Just to refit the building?

24   Q.      Put the building back to the way it was before

JAMES MCDEVITT

62

1   the flood, not including equipment?  Dry wall,

2   ceiling --

3   A.      Right.  I'm thinking.  Between half million --

4   a half million dollars would have been a good estimate.

5   Q.      And what are you basing that number on?

6   A.      We went out and got quotes.

7   Q.      Was there a range on that figure, or was there

8   a quote that you're thinking of that was --

9   A.      There was a specific quote, but when you get

10  into the subcontractors and the labor market and the,

11  you know, the types of tiles we use and the type of

12  rug, we could have done that for a half million bucks.

13  We could have done it for two million, if you want top

14  shelf, if I tried to make it look like here.

15          MR. HABER:  Does your question also consider

16      the remediation required, or is that also excluded

17      in your -- from your question?

18          MR. SHARE:  Off the record.

19          (At this time, a brief discussion was held

20      off the record.)

21          THE WITNESS:  This is just a thought.  We did

22      volunteer our own services to go out and get dry

23      wall and rugs and ceiling tiles and do it

24      ourselves, and that would have covered the cost.

# EXHIBIT "D"

**1**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

```
----------------------------------
                                   :
BARRY M. PORTNOY and GERARD M.     :
MARTIN, Trustees for HUB           :
Properties Trust,                  :
                                   :
        Plaintiffs,                :
                                   :
    vs.                            :     CASE NO.
                                   :     02-CV-2905
OMNICARE PHARMACEUTICS, INC., and  :
OMNICARE CLINICAL RESEARCH, INC.,  :
                                   :
        Defendants.                :
                                   :
----------------------------------
```

Deposition of:    DAVID W. FROESEL, JR.

Taken:            By the Plaintiffs
                  Pursuant to Agreement

Date:             March 12, 2003

Time:             Commencing at 10:18 a.m.

Place:            Thompson Hine, LLP
                  312 Walnut Street
                  Suite 1400
                  Cincinnati, Ohio  45202-4029

Before:           Wendy L. Raymer, RPR
                  Notary Public - State of Ohio

COPY

1    flood insurance coverage has complicated and delayed

2    decisions regarding building and equipment restoration."

3    Do you agree with that?

4         A.    I'm not sure what that means either.

5         Q.    Next line says, "Seven months post-flood,

6    clients are increasingly reluctant to commit new projects

7    without a clear understanding of Omnicare's long term

8    intentions."  Do you agree with that?

9         A.    What I do know is prior to the flood, Omnicare

10   had a good business with respect to the Pharmaceutics

11   business.  And what I do know is that post-flood, our

12   customers with respect to the Pharmaceutics business had no

13   interest in continuing to do business with us if we moved

14   back into that Virginia building.

15        Q.    You told me you know that because Morra and

16   Greenspan told you that?

17        A.    Yes, as representatives of senior management of

18   Omnicare Critical Care.  And in our business, customers

19   come first.

20             (Attorney-client discussion.)

21             MR. WILKINSON:  Mr. Froesel just wanted to

22        clarify the record.  He said -- he identified there

23        "Omnicare Clinical Care" as the business unit to

24        which Mr. Greenspan and Morra are affiliated, and I

"Restructuring."  Was there some consideration of leaving

the King of Prussia facility as well as the Fort Washington

facilities?

     A.    Not that I'm aware of.

     Q.    Are you aware that after the flood, some of the

Pharmaceutics operations moved to the King of Prussia

facility where the Clinical Research people were located?

     A.    I'm aware of the fact that after the flood, we

had a whole series of issues with very, very unhappy

customers.  And with the customer coming first, we had to

do anything and everything to try to salvage our existing

customer base.  And I'm aware of the fact that on a

temporary basis, our Band-Aid approach, some, I believe,

light packaging operations had to be moved over to Class A

space at King of Prussia on the fourth and/or third floors.

     Q.    The final decision to close down operations at

525 Virginia, were they made after a presentation similar

to a Power Point like this?

     A.    No -- I can't recall.  Again, as I said, it was

basically as a result of a series of discussions, meetings,

and consensus amongst the people I previously identified in

terms of what we needed to do.

     Q.    Ron Greenspan testified that the final decision

was made at a meeting at which you were in attendance and

1    recall a meeting in Florida, and I don't have any evidence

2    that there was such a meeting, but let's talk about a

3    meeting that wasn't in Florida.  Do you know anything about

4    that?

5         A.    Do I know anything about a meeting in Florida?

6         Q.    No.

7         A.    Repeat the question.

8         Q.    Yeah, sure.  Ron Greenspan recently testified

9    that the final decision was made to close down the

10   Pharmaceutics business and leave the premises at 525

11   Virginia Drive at a meeting in which you participated,

12   along with the other senior executives I mentioned, and

13   that the various members or participants in the meeting

14   took the opportunity to give their own opinions and

15   recommendations about what should be done.  My question to

16   you is, do you recall such a meeting?

17        A.    I remember the conclusion.  I do not remember

18   the specific meeting.  And I remember the conclusion was

19   that if the CRO, specifically meaning the Pharmaceutics

20   business, stayed in the Virginia Drive facility, we would

21   have no customers.  That's what I vividly remember.  So it

22   became a pretty simple decision in terms of why we could no

23   longer remain in the facility.

24        Q.    Well, why did you decide to close the business

# EXHIBIT "E"

KEN FELD

```
 1            IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2
 3                              NO.  02-CV-2905
 4  BARRY M. PORTNOY and GERARD  )  DEPOSITION UPON
    M. MARTIN, as Trustees for   )
 5  HUB PROPERTIES TRUST         )  ORAL EXAMINATION
                                 )
 6      - vs -                   )       OF
                                 )
 7  OMNICARE PHARMACEUTICS, INC. )  KEN FELD
    and OMNICARE CLINICAL        )
 8  RESEARCH, INC.               )
    - - - - - - - - - - - - - - -
 9                                        COPY
10
11                TRANSCRIPT OF DEPOSITION, taken
12  by and before KRISTIN N. LAFTY, Professional
13  Reporter and Notary Public, at the Law Offices
14  of OBERMAYER, REBMANN, MAXWELL & HIPPEL, LLP,
15  19th Floor, One Penn Center, 1617 JFK Boulevard,
16  Philadelphia, PA, on Wednesday, April 9, 2003,
17  commencing at 10:15 a.m.
18
19
                     -   -   -
20
21
22        REPORTING SERVICE ASSOCIATES (RSA)
              A Veritext Company
23        1845 Walnut Street - 15th Floor
          Philadelphia, Pennsylvania 19103
24                (215) 241-1000
```

KEN FELD

206

1    were well aware in the latter part of '01 that

2    the option that was in play was only to go back

3    into 525 Virginia Drive.   And they just wanted

4    to know when we were going to be back up fully

5    operational.

6    Q.        So you don't think the flood issue was

7    a material issue going forward after the flood?

8    A.        As time passed post flood, as more and

9    more time developed from the time of the flood

10   until later in '01 into '02, I think it became

11   less of a factor.  Because they were asking us,

12   when are you going to be up and running and we

13   want too give you more work.

14   Q.        Can you give me names of people

15   sitting here today who asked you that?

16   A.        No, I can't.  Because my business

17   development and my project management people

18   were having those contacts.  And that's what

19   they were telling me.

20   Q.        So if they said that that wasn't

21   happening, hypothetically -- I mean, if -- are

22   you telling me that the business development

23   people are the better people to ask than

24   yourself in terms of what the clients were

KEN FELD

207

1    saying about concern about future floods?

2    A.        They were the ones that had the

3    majority of the contact, project management and

4    business development.

5    Q.        So is that a yes?

6    A.        Yes.

7    Q.        Do you know when Omnicare purchased

8    IBAH Pharmaceutics?

9    A.        It was before I joined in '99.  I

10   believe it was in '98.  Some time in '98.

11   Q.        And did you have an understanding --

12   well, you knew that Omnicare or that OPI had a

13   lease, which is what we're talking about today,

14   right?

15   A.        Well, I knew that IBAH, Omnicare did

16   not own the building.  So, yes, I knew it -- we

17   were making lease payments or rent payments.

18   So, yes, it was leased.

19   Q.        Did you have an understanding as to

20   who entered into that lease, whether it was IBAH

21   or Omnicare?

22   A.        Oh, it had to be IBAH.

23   Q.        Do you know who negotiated the

24   purchase of IBAH, who at Omnicare negotiated the

# EXHIBIT "F"

OLGA CROWITHER

```
 1          IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2

 3                              NO.  02-CV-2905
 4   BARRY M. PORTNOY and GERARD   )  DEPOSITION UPON
     M. MARTIN, as Trustees for    )
 5   HUB PROPERTIES TRUST          )  ORAL EXAMINATION
                                   )
 6      - vs -                     )      OF
                                   )
 7   OMNICARE PHARMACEUTICS, INC.  )  OLGA CROWTHER
     and OMNICARE CLINICAL         )
 8   RESEARCH, INC.                )
     - - - - - - - - - - - - - - - -

 9
10
11              TRANSCRIPT OF DEPOSITION, taken
12   by and before KRISTIN N. LAFTY, Professional
13   Reporter and Notary Public, at the Law Offices
14   of OBERMAYER, REBMANN, MAXWELL & HIPPEL, LLP,
15   19th Floor, One Penn Center, 1617 JFK Boulevard,
16   Philadelphia, PA, on Wednesday, December 4,
17   2002, commencing at 10:20 a.m.
18
19
                          -   -   -
20
21
             REPORTING SERVICE ASSOCIATES (RSA)
22                A Veritext Company
             1845 Walnut Street - 15th Floor
23           Philadelphia, Pennsylvania 19103
                    (215) 241-1000
24
```

OLGA CROWITHER

21

1    to Virginia Drive.

2    Q.        When was the first time that you were

3    at the 525 Virginia Drive facility?

4    A.        I cannot remember exactly.

5    Q.        Can you approximate?

6    A.        1997.

7    Q.        Soon after you started working for

8    AstraMerck?

9    A.        That's correct.

10   Q.        And why were you there?

11   A.        To do audits and to do the paperwork.

12   At that time, Omnicare was called IBAH

13   Pharmaceuticals.

14   Q.        I-B-A-H?

15   A.        I-B-A-H, correct.

16   Q.        Did you have any role in sending

17   business to Omnicare Pharmaceutics?

18   A.        No.

19   Q.        Whose decision at the company was it

20   to send business there?

21   A.        Branch called product operations,

22   which now is called IPS, investigational product

23   services.

24   Q.        Employees of the company who worked

OLGA CROWITHER

23

1          answer.

2                    MR. HABER:   Is there

3          something about the form of the

4          question that you want me to

5          rephrase?

6                    MR. CARLTON:

7          Decision-makers.  Decisions on what

8          issue?  I mean, she's a decision-maker

9          on some issues.  I mean, what issues

10         are they making decisions about?

11  BY MR. HABER:

12  Q.        I'll clarify the question.  Who at the

13  IPS group had decision-making authority

14  regarding doing business with Omnicare

15  Pharmaceutics?

16  A.        That question is a twofold answer.

17  Drugs have a life process.  And they go from

18  phase one to phase four, clinical drugs.  At the

19  early stages, there is work to be done as far as

20  stability of the product.  And that comes from

21  the analytical side of the business.  So in this

22  case, our Swedish company had the contract with

23  Omnicare to do stability and analytical work.

24                    The actual physical

OLGA CROWITHER

24

1    manufacturing and packaging was also divided in

2    two.  The manufacturing contract and side of it

3    was also part of the Swedish side.  And they

4    made the decision to contract Omnicare.  And the

5    packaging of the product was then the IPS

6    people's decision.

7    Q.        I want some names.

8    A.        Some names.  The stability and

9    analytical contracts are from Ove Armstrong.

10                  MR. SHARE:  O --

11                  THE WITNESS:  O-V-E.  And

12              then Armstrong.  I think he holds the

13              main contract.  And her name is

14              Agnetta Svenheden and Ingela Abelin.

15                  MR. SHARE:  H --

16                  THE WITNESS:  Her name,

17              A-G-N-E-T-T-A.  And I don't know how

18              to spell her last name.

19    BY MR. HABER:

20    Q.        S-V-E-N-H-E-D-E-N.

21    A.        There you go.  And the QA contact

22    there is Ingela Abelin, A-B-E-L-I-N.  So then

23    the packaging and distribution of the drug is

24    then sourced from the United States.  And I

OLGA CROWITHER

1    guess the main contact is Carmen Molina.

2    Q.          Did AstraZeneca have more than one

3    business that manufactured drugs for them in the

4    United States?

5    A.          What do you mean by business?

6    Q.          Omnicare Pharmaceutics, Inc. is a

7    business, a company.  Did you have more than --

8    did you have other suppliers who did similar

9    work for AstraZeneca?

10   A.          I believe so, yes.

11   Q.          Did you have any dealings with the

12   other companies?

13   A.          We deal with quite a few different

14   contractors.  And, yes, my role, as I told you,

15   is to audit and qualify these contractors.  So I

16   have been to quite a few of these contractors

17   within the United States to be able to qualify

18   them to do drugs, manufacture and package drugs

19   for us.

20   Q.          Do you have any knowledge as to

21   whether or not any of those other companies

22   actually do the manufacturing and packaging of

23   the drugs after you've qualified them?

24   A.          Of this particular drugs or any

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of October, 2003, I caused a true and correct copy of

Defendants' Omnicare Pharmaceutics, Inc. and Omnicare Clinical Research, Inc. Reply Brief in

Support of their Motion for Summary Judgment to be served upon the following counsel by

Hand-Delivery:

Stephen W.W. Ching, Esquire
OBERMAYER REBMANN MAXWELL & HIPPEL LLP
One Penn Center Plaza, 19th Floor
1617 John F. Kennedy Boulevard
Philadelphia, PA  19103

TODD A. SCHOENHAUS