IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BARRY M. PORTNOY and | : |
| GERARD M. MARTIN, as Trustees for | : |
| HUB PROPERTIES TRUST | : |
| Plaintiffs, | : NO. 02-CV-2905 |
| | : |
| v. | : HONORABLE CLIFFORD |
| | : SCOTT GREEN |
| OMNICARE PHARMACEUTICS, INC. | : |
| and | : |
| OMNICARE CLINICAL RESEARCH, INC., | : |
| Defendants. | : |
| | : |

## PLAINTIFFS' REPLY MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

In both its opposition to HUB's summary judgment motion and affirmative motion for summary judgment, Omnicare has inundated the Court with a mass of factual irrelevancies. This strategy is understandable, given that the Lease's explicit terms render Omnicare's defenses meritless as a matter of law.

When compelled to focus on the Lease itself, Omnicare is reduced to offering desperate and even absurd arguments. For instance, Omnicare argues that a flood is not a casualty, and that an abatement of rent is the same as a cancellation of rent. To state these contentions is to refute them. Like any other party to a contract, Omnicare is bound by the Lease's unambiguous provisions showing that the parties anticipated the possibility of a flood, and agreed to a protocol of responsibility for restoring the Property and continuing the tenancy after a flood. Omnicare cannot manufacture non-existent factual disputes to escape these controlling provisions. A clearer case for entry of summary judgment in HUB's favor would be difficult to conceive.

490113v5

## I.    THE LEASE'S "CASUALTY" PROVISION OBVIOUSLY INCLUDES FLOOD

Although admitting that the Lease "anticipate[s] the possibility of a casualty," Omnicare argues that a flood is not a casualty, because §10.02 of Lease, requiring Omnicare to perform in the event of a casualty, does not specifically identify flood (or for that matter any other casualty except fire). (Omnicare October 14, 2003 Memorandum of Law in Opposition to HUB's Summary Judgment Motion, hereinafter referred to as "Omnicare's 10/14 Opposition Brief", pp. 2, 5).

This argument defies the law, common sense, and Omnicare's own prior interpretation of the Lease. Flood is obviously a casualty, as the Pennsylvania Supreme Court has held in connection with lease provisions virtually identical to those at issue here. Prudential Insurance Co. of America v. Goodman & Theise, Inc., 396 Pa. 366, 371, 152 A.2d 664, 666 (1959) (lease provisions requiring a tenant to "pay rent if the premises are rendered untenantable by reason of damage or destruction by fire or any casualty . . . of course includes floods"); F.J. Busse, Inc. v. Department of General Services, 47 Pa. Commw. 539, 543, 408 A.2d 578, 580 (1979) (rejecting impossibility defense due to flood damage because the subject agreement placed the risk on the defendant of damage due to "fire as well as any other hazard").

Even more significant, Omnicare's own corporate designee testified that he relied on the casualty provision of the Lease to justify his claim for a rent abatement under §10.02 of the Lease:

> **[HUB'S COUNSEL]:  What provision of the lease led you to believe that you were entitled to an abatement after the flood?**

[OMNICARE'S CORPORATE DESIGNEE]: Ten point
02 A.

[HUB'S COUNSEL]: Ten point 02 is entitled damage or
casualty, right?

[OMNICARE'S CORPORATE DESIGNEE]: Yes.

[HUB'S COUNSEL]: And section A provides: In case
the premises, or any portion thereof, shall be totally
or partially damaged or destroyed by fire or by any
other casualty whatsoever, then landlord and tenant
shall proceed with reasonable promptness, and in
accordance with paragraph (c) below, to repair and
restore the premises to at least as good a
condition as that which existed immediately prior
to such fire or other casualty, and during such
repair period, there shall be an abatement of rent.
There's another sentence which I'm not
going to read right now. That's the language that
you relied upon for the rent abatement?

[OMNICARE'S CORPORATE DESIGNEE]: I believe
so.

(October 30, 2002 Deposition of Omnicare Corporate Designee Ronald Greenspan, the pertinent pages

of which are attached hereto as Exhibit "A," pp. 70:12-71:8).

Obviously, Omnicare cannot have it both ways. If the "casualties" justifying

Omnicare's abatement of rent included flood, then that same "casualty" clause in the

Lease obligated Omnicare to restore the Property and then continue to pay rent after the

Flood.

## II. THE LANGUAGE OF THE LEASE ITSELF REFUTES OMNICARE'S ARGUMENT THAT IT IS ENTITLED TO STOP PAYING RENT INDEFINITELY

Omnicare also maintains that the Lease does not "say anything about an

obligation to continue paying rent in the event of a severe casualty," and "does not . . .

bind the parties to continued performance in the event of a casualty (i.e., obligating

Omnicare to continue paying rent)." (Omnicare 10/14 Opposition Brief, pp. 2, 5). The language of the Lease refutes this, as does the testimony of Omnicare's corporate designee.

The Lease itself provides that in the event of a casualty, Omnicare was obligated to complete repairs to the Premises with "reasonable promptness":

> **...during such repair period [restoring the Property following a casualty], there shall be a rent abatement...**

(Lease, § 10.02(a)).

Amazingly, Omnicare would have the Court read this provision as cancelling (not abating) all rental obligations in the event of a flood. The law obligates the Court to enforce the contract as written. It does not allow a party to rewrite those contractual provisions it finds burdensome or unattractive. Seven Springs Farm v. Croker, 569 Pa. 202, 215, 801 A.2d 1212, 1220 (2002); Ruzzi v. Butler Petroleum Co., 527 Pa. 1, 25, 588 A.2d 1, 12-13 (1991); Triangle Publications, Inc. v. Liberty Mut. Ins. Co., 703 F. Supp. 367, 371 (E.D.Pa. 1989) (Honorable Clifford Scott Green); Amoco Oil Co. v. Snyder, 505 Pa. 214, 222, 478 A.2d 795, 799 (1984); Philadelphia v. Lieberman, 112 F.2d 424, 429 (3d Cir. 1940), cert. denied, 311 U.S. 679 (1940).

Further, Omnicare corporate designee Ronald Greenspan admitted that any rent abatement was not "indefinite" but only "temporary," and that at some point Omnicare would have to start paying rent again. (Greenspan Deposition, Exhibit A, pp. 72:2-6; 72:20-74:17).

In these circumstances, the Court should reject Omnicare's twisted interpretation of the plain language of the Lease and enter summary judgment in HUB's favor.

### III.    OMNICARE CANNOT, AS A MATTER OF LAW, MAKE OUT A BREACH OF THE COVENANT OF QUIET ENJOYMENT

Omnicare alleges that HUB "failed" to make certain structural modifications to the Property that "could have ameliorated" the flood damage that occurred in June 2001, and that this constitutes a breach of the covenant of quiet enjoyment, requiring the dismissal of HUB's Complaint. (Omnicare's 10/14 Opposition Brief, p. 8). This "defense" fails as a matter of law.

As HUB previously set forth on pages 10-12 of its September 22nd Memorandum of Law, allegations that a landlord "negligently" failed to take precautions to protect the Property from the risk of casualties such as floods, do not make out a breach of the covenant of quiet enjoyment; rather the tenant must demonstrate that landlord has committed any willful, arbitrary, or affirmative wrongful act resulting in an actual or constructive eviction. No. 14 Coal Co. v. Pennsylvania Coal Co., 416 Pa. 218, 220-21, 206 A.2d 57, 58 (1965) (allegations that a landlord negligently caused flood damage does not "constitute[] a breach of implied warranty of quiet enjoyment"), Fiat Motors of North America, Inc. v. Mayor and Council for City of Wilmington, Civil Action No. 82-691, 1987 U.S. Dist. LEXIS 7529, *16-*18 (D. Del. August 20, 1987) (dismissing a claim arising from flood damage to an automobile dealership that landlord breached the covenant of quiet enjoyment by failing to disclose parking lot was within a flood hazard area and by failing to design, build, and maintain the property to prevent flood damage); see other cases cited on pages 10-12 of HUB's September 22nd Memorandum of Law.

In these circumstances, Omnicare cannot make out a breach of the covenant of quiet enjoyment. Accordingly, the Court should enter summary judgment in HUB's favor.

## IV.    THE DOCTRINE OF MUTUAL MISTAKE DOES NOT APPLY WHERE AN ASSUMED RISK TURNS OUT TO BE MORE SEVERE THAN OMNICARE EXPECTED

Omnicare concedes that although it may have foreseen the risk of flood, because it was "mistaken" about the severity of potential flood damage, it is excused from performing under the Lease. (Omnicare 10/14 Brief, pp. 6-8). The doctrine of mutual mistake, however, will not excuse contractual obligations where the parties were aware of a risk but the risk turned out to be more severe than expected. McNamara Constr. of Manitoba, Ltd. v. United States, 509 F.2d 1166, 1168-69 (U.S. Cl. Ct. 1975) (rejecting a mutual mistake defense based on the parties' purported mistake as to the severity of a labor strike in the future, because, although the parties may have not planned for a strike of such severity, they were aware of the risk of labor strife). Cf. Raie v. City of Philadelphia, Civil Action No. 99-1291, 2003 U.S. Dist. LEXIS 6602, *12-*13 (E.D.Pa. April 3, 2003) (Honorable Herbert J. Hutton) (a misjudgment as to the precise extent of a known injury does not qualify as a mutual mistake sufficient to negate a settlement agreement); Klein v. Cissone, 297 Pa. Super. 207, 216, 443 A.2d 799, 804 (Pa. Super. 1982) (same); Kennedy v. Bateman, 217 Ga. 458, 461, 123 S.E.2d 656, 658 (Ga. 1961) (a party "cannot, upon learning that her injuries are more severe than she originally believed them to be, obtain cancellation of this release on the ground of mutual mistake"). Accordingly, even if Omnicare did not foresee how "severe" a flood might be, this cannot make out a defense of mutual mistake.

V.    OMNICARE'S FAILURE TO GENERATE THE PROFITS IT WAS
      MAKING BEFORE THE FLOOD DOES NOT ABSOLVE IT FROM THE
      LEASE

Although admitting that it generated, *rent-free*, millions of dollars from the

Property after the Flood (see page 6 of HUB's September 22nd Memorandum and page 13 and Chart

of HUB's October 14th Memorandum), Omnicare maintains in defense of HUB's unjust

enrichment claim that "it did not actually profit from the resumption of operations

because the amount of flood insurance coverage it had purchased was inadequate to cover

the money needed to continue operations after the Flood. (Omnicare's 10/14 Opposition Brief,

p. 5). As a result, Omnicare maintains that it was not required "to waste money" restoring

the Property back to its original condition, as required by the Lease. (Id., p. 3).

As HUB sets forth on pages 11-13 in its October 14th Memorandum of Law, the

failure to make profits does not create an impossibility or frustration excusing a party's

non-performance. To the contrary, a tenant must continue to pay rent if it can still

continue to operate within the confines of the lease. (See caselaw cited on pages 11-13 in

HUB's October 14th Memorandum of Law).

In the case at bar, there is no dispute that Omnicare was able to perform, and did

perform, pharmaceutical services from the Property after the Flood. (see page 13 and Chart

of HUB's October 14th Memorandum). Indeed, as demonstrated in HUB's prior memoranda,

Omnicare admits that it performed each of the four pharmaceutical services listed in the

so-called "Special Purpose" clause of the Lease (i.e., manufacturing, packaging,

analytical testing, stability storage, and storage). (Id.). Contrary to Omnicare's assertion

that these pharmaceutical services were performed off-site (Omnicare's 10/14 Opposition

Brief, p. 2), Omnicare's representatives and customers admitted that Omnicare performed

from the Property manufacturing, packaging, analytical testing, and stability storage services for customers, including Virbac, Novartis Animal Health, Astra Zeneca, Tularik, BioMedicines, and Emisphere. (Id.).

In these circumstances, Omnicare was required to pay rent and otherwise perform under the Lease after the Flood.  Accordingly, the Court should enter summary judgment in HUB's favor.

## VII.    CONCLUSION

For all the foregoing reasons, Plaintiffs Barry M. Portnoy and Gerard M. Martin as Trustees for HUB Properties Trust respectfully request that this Court grant its Motion for Summary Judgment.

Respectfully submitted,

OBERMAYER REBMANN MAXWELL &  HIPPEL LLP

BY: _____
PAUL S. DIAMOND
STEVEN A. HABER
STEPHEN W.W. CHING, JR.
One Penn Center, 19th Floor
1617 John F. Kennedy Boulevard
Philadelphia, PA 19103-1895
(215) 665-3000

Attorneys for Plaintiffs Barry M. Portnoy and
Gerard M. Martin as Trustees for HUB Properties
Trust

Date: October 21, 2003

# *EXHIBIT A*

RONALD L. GREENSPAN

1
            IN THE UNITED STATES DISTRICT COURT

         FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2

                            NO. 02-CV-2905

3

4

5

   BARRY M. PORTNOY and GERARD ) DEPOSITION UPON

6  M. MARTIN, as Trustees for

   HUB PROPERTIES TRUST,        ) ORAL EXAMINATION

7

               Plaintiffs,  )        OF

8

               - vs -        ) RONALD L. GREENSPAN

9

   OMNICARE PHARMACEUTICS, INC.)

10 and OMNICARE CLINICAL

   RESEARCH, INC.,             )

11

               Defendants.  )

12 - - - - - - - - - - - - - - -

13

14

15              TRANSCRIPT OF DEPOSITION,

16 taken by and before F. DAVID DAMIANI, Registered

17 Professional Reporter and Notary Public, at the LAW

18 OFFICES OF OBERMAYER, REBMANN, MAXWELL & HIPPEL,

19 LLP, 19th Floor, One Penn Center, 1617 JFK

20 Boulevard, Philadelphia, Pennsylvania, on

21 Wednesday, October 30, 2002, commencing at 10:04

22 a.m.

23              - - -

24         REPORTING SERVICE ASSOCIATES (RSA)

RONALD L. GREENSPAN

70

1          (At this time, the witness
2 complies with request.)
3          MR. SHARE: Before you answer
4 that question, I'll be right back.
5          (At this time, a short break was
6 taken.)
7          MR. SHARE: Off the record.
8          (At this time, a discussion was
9 held off the record.)
10          THE WITNESS: Yes.
11 BY MR. HABER:
12 Q.     What provision of the lease led you to
13 believe that you were entitled to an abatement
14 after the flood?
15 A.     Ten point 02 A.
16 Q.     Ten point 02 is entitled damage or
17 casualty, right?
18 A.     Yes.
19 Q.     And section A provides: In case the
20 premises, or any portion thereof, shall be totally
21 or partially damaged or destroyed by fire or by any
22 other casualty whatsoever, then landlord and tenant
23 shall proceed with reasonable promptness, and in
24 accordance with paragraph (c) below, to repair and

71

1 restore the premises to at least as good a
2 condition as that which existed immediately prior
3 to such fire or other casualty, and during such
4 repair period, there shall be an abatement of rent.
5          There's another sentence which I'm not
6 going to read right now. That's the language that
7 you relied upon for the rent abatement?
8 A.     I believe so.
9 Q.     Now, did the Pharmaceutics company repair
10 or restore the premises to at least as good a
11 condition as to that which existed immediately
12 prior to the flood?
13 A.     No.
14 Q     Why not?
15 A.     Because we were trying to determine what
16 was the appropriate level to improve the building
17 after the flood.
18 Q.     And did you eventually come to some
19 conclusion?
20 A.     Yeah. We eventually decided not to make
21 the improvements, the improvements necessary to get
22 it back to the level it was prior to the flood.
23          MR. SHARE: You have to keep
24     your voice up.

72

1 BY MR. HABER:
2 Q.     The abatement of rent provided for by that
3 provision, was it your understanding that that rent
4 abatement would continue indefinitely?
5 A.     I knew it would become an issue at some
6 point.
7 Q.     Well, why have you not resumed paying rent
8 to the landlord?
9 A.     I think the belief was that there was not
10 a need to reinstate the rent payment.
11 Q.     That was your belief?
12 A.     That was my understanding.
13 Q.     And from where did you reach that
14 understanding?
15 A.     Well, after we had determined that we can
16 stop paying rent, we informed Omnicare, Inc. of our
17 findings, and they concurred with those findings,
18 and as a result of that we stopped paying rent.
19 And we never reinstated paying rent.
20 Q.     Well, you understand what an abatement
21 means?
22 A.     I think I do.
23 Q.     And an abatement, is it fair to say, is a
24 temporary excuse from performing a certain action

73

1 while something else is being done; does that kind
2 of jibe with what your understanding is?
3 A.     Yep.
4 Q.     I guess the operative term there is
5 temporary, isn't it?
6 A.     I would assume that's a correct statement.
7          MR. SHARE: Objection to the
8 form.
9 BY MR. HABER:
10 Q.     Well, when do you think you have to start
11 paying rent again?
12 A.     That really wasn't my decision.
13 Q.     Well, I'm asking -- you're the
14 representative here testifying on behalf of the
15 Pharmaceutics company and CRO on the issue, so I'd
16 like to get your statement on the issue.
17          MR. SHARE: Wait a minute.
18 Don't answer that question. The witness
19 has not been designated to testify as to
20 the decision process of resuming to pay
21 rent, and indeed that particular topic is
22 not designated on the notice.
23          MR. HABER: Okay. Well, we can
24 agree to disagree in what the notice says.

19 (Pages 70 to 73)

RONALD L. GREENSPAN

74

1  But I have a question pending that I'd
2  like to have answered.
3      THE WITNESS: Could he repeat
4  the question?
5      MR. HABER: Absolutely.
6      (At this time, the court
7  reporter read back from the record as was
8  requested.)
9      MR. SHARE: I object to the
10  question. I'm going to let you answer it
11  if you can. Read it back again.
12      (At this time, the court
13  reporter read back from the record as was
14  requested.)
15      THE WITNESS: I guess when the
16  building becomes functional back to the
17  level that it was before.
18  BY MR. HABER:
19  Q.    You would agree with me that you continued
20  operations in the building after the flood, right?
21  A.    Some operations, yes.
22  Q.    I understand, from what I heard from you
23  and Dave Morra, that the operations were
24  significantly reduced from the operations -- from

75

1  the level of operations prior to the flood,
2  right?
3  A.    Yes.
4  Q.    But you did actually do some business in
5  the building after the flood, right?
6  A.    Yes.
7  Q.    In fact, you had some 20 to 40 employees
8  working on the Virbac project for a period of six
9  months after the flood, right?
10  A.    I don't know the exact numbers, but they
11  were working on that project.
12  Q.    You were making money out of the work that
13  you were performing in our building, right?
14  A.    Well, I wouldn't say we were making money.
15  We generated revenue, yes.
16  Q.    Were you generating revenue out of work
17  performed in the 525 Virginia Drive building
18  subsequent to the flood?
19  A.    Yes.
20  Q.    And, in fact, you generated in excess of a
21  million dollars in revenue during that time period,
22  right?
23  A.    Yes.
24  Q.    You paid no rent for your use of the

76

1  building at all during that time period, right?
2  A.    Right.
3  Q.    Have you sought to turn over the keys and
4  tender the control of the building back to the
5  landlord?
6      MR. SHARE: Same objection as
7  before, but I'll let you answer the
8  question, if you can.
9      THE WITNESS: I'm sorry. Would
10  you repeat the question?
11      (At this time, the court
12  reporter read back from the record as was
13  requested.)
14      THE WITNESS: That's the intent
15  as I understand it, yes.
16  BY MR. HABER:
17  Q.    Has that happened yet?
18  A.    No.
19  Q.    You plan on doing that at some time in the
20  future?
21  A.    Yes.
22  Q.    Do you know when?
23  A.    Once the equipment is removed from the
24  building.

77

1  Q.    The equipment that you just put back into
2  the building that was in the trailers?
3  A.    Well, no, there was equipment in the
4  building. We brought in that equipment that you're
5  talking about. But there was already equipment in
6  the building. All the equipment that was in the
7  building originally is now in the building. But
8  there was always equipment in the building.
9  Q.    So you don't intend to turn over control
10  of the building back to the landlord until you
11  remove all of your equipment from the building,
12  right?
13  A.    Yes.
14  Q.    Do you have any idea when you plan on
15  getting your equipment out of the building?
16  A.    I hope very soon.
17  Q.    Can you be a little bit more specific than
18  that?
19  A.    No, not really.
20  Q.    Is there a plan in place to remove the
21  equipment?
22  A.    There has been a proposal presented, yes.
23  Q.    Tell me about the proposal.
24  A.    There was a recommendation made to remove

20 (Pages 74 to 77)

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BARRY M. PORTNOY and<br>GERARD M. MARTIN, as Trustees for<br>HUB PROPERTIES TRUST<br>                    Plaintiffs, | :<br>:<br>:<br>:<br>: | NO. 02-CV-2905 |
|                    v. | :<br>: | |
| OMNICARE PHARMACEUTICS, INC.<br>          and<br>OMNICARE CLINICAL RESEARCH, INC. ,<br>                    Defendants. | :<br>:<br>:<br>:<br>: | |

I, STEPHEN W. W. CHING, JR., ESQUIRE, hereby certify that on this 21st day of

October, 2003, I caused a true and correct copy of Plaintiffs' Reply Memorandum of Law in

Support of Their Motion for Summary Judgment to be forwarded, via HAND DELIVERY, to all

parties, addressed as follows:

Richard P. McElroy, Esquire
Adam M. Share, Esquire
Todd A. Schoenhaus, Esquire
Blank Rome Comisky & McCauley LLP
One Logan Square
Philadelphia, PA 19103-6998

STEPHEN W. W. CHING, JR.

490113