IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BARRY M. PORTNOY and<br>GERARD M. MARTIN, as Trustees for<br>HUB PROPERTIES TRUST<br>　　　　　　Plaintiffs, | :<br>:<br>:<br>: NO. 02-CV-2905<br>: |
| v. | : HONORABLE CLIFFORD<br>: SCOTT GREEN |
| OMNICARE PHARMACEUTICS, INC.<br>　　and<br>OMNICARE CLINICAL RESEARCH, INC. ,<br>　　　　Defendants. | :<br>:<br>:<br>:<br>: |

**THE PARTIES'**
**STIPULATED AND CONTESTED FACTS**
**PURSUANT TO THE COURT'S FEBRUARY 8, 2005 PRE-TRIAL ORDER**

JOSEPH J. MCGOVERN
STEPHEN W.W. CHING, JR.
**OBERMAYER REBMANN MAXWELL**
**& HIPPEL LLP**
One Penn Center, 19th Floor
1617 John F. Kennedy Boulevard
Philadelphia, PA 19103-1895
(215) 665-3000

Attorneys for Plaintiffs

Date: March 8, 2005

RICHARD P. MCELROY
ADAM M. SHARE
TODD A. SCHOENHAUS
**BLANK ROME, LLP**
One Logan Square
18th & Cherry Streets
Philadelphia, PA 19103-6998
(215) 569-5500

Attorneys for Defendants

604320

In accordance with the Court's Pre-Trial Order dated February 8, 2005, the parties hereby jointly submit their Stipulated and Contested Facts.

# THE PARTIES' STIPULATED FACTS

## I.    FACTUAL BACKGROUND & PARTIES

S1.    On December 3, 1996, Bio-Pharm Pharmaceutics Services, Inc. entered into a lease with 525 Virginia Drive Associates Limited Partnership for commercial property located at 525 Virginia Drive, Fort Washington, Pennsylvania (hereinafter referred to as the "Lease").

S2.    The document attached hereto as Exhibit "1" is a true and correct and authentic copy of the Lease.

S3.    On September 19, 1997, Bio-Pharm Pharmaceutics Services, Inc. changed its name to IBAH Pharmaceutics Services, Inc.

S4.    On September 19, 1997, Bio-Pharm Pharmaceutics Services, Inc. filed a Certificate of Amendment of Certificate of Incorporation dated September 18, 1997, indicating that by resolution of its board of directors, it was changing its name to IBAH Pharmaceutics Services, Inc.

S5.    The document attached hereto as Exhibit "2" is a true and correct and authentic copy of the Certificate of Amendment of Certificate of Incorporation dated September 18, 1997, reflecting Bio-Pharm Pharmaceutics Services, Inc's corporate name change to IBAH Pharmaceutics Services, Inc.

S6.    On June 15, 2000, IBAH Pharmaceutics Services, Inc. changed its name to Omnicare Pharmaceutics, Inc.

S7.    On June 15, 2000, IBAH Pharmaceutics Services, Inc. filed a State of Delaware Certificate of Amendment of Certificate of Incorporation, indicating that by resolution of its board of directors, it was changing its name to Omnicare Pharmaceutics, Inc.

S8.    The document attached hereto as Exhibit "3" is a true and correct and authentic copy of the Certificate of Amendment of Certificate of Incorporation filed on June 15, 2000, reflecting IBAH Pharmaceutics Services, Inc.'s corporate name change to Omnicare Pharmaceutics, Inc.

S9.    On or about December 3, 1996, VDA and I.B.A.H., Inc. executed a Lease Guaranty with respect to the Lease (hereinafter referred to as the "Lease Guaranty").

S10.    The document attached hereto as Exhibit "4" is a true and correct and authentic copy of the December 3, 1996 Lease Guaranty between VDA and I.B.A.H., Inc.

S11.    The December 3, 1996 Lease Guaranty between VDA and I.B.A.H., Inc. provides that I.B.A.H., Inc. "guarantees to Landlord [at the time of the execution of the Lease Guaranty, VDA], its successors and assigns, including without limitation, Landlord's mortgage lender with rights to enforce Landlord's rights under the Lease, the full and prompt payment of all Fixed Basic Rent and Additional Rent (as those terms are defined in the Lease) payable by Tenant under the Lease and the full, faithful and prompt performance and observance of all the covenants, terms, conditions and agreements therein provided to be performed and observed by Tenant; and Guarantor [at the time of the execution of the Lease Guaranty, I.B.A.H., Inc.] does hereby become guarantor to Landlord, its successors and assigns, including without limitation, landlord's mortgage lender with rights to enforce landlord's rights under the Lease, for and with respect to all of the aforesaid obligations of Tenant under the Lease."

S12.    The December 3, 1996 Lease Guaranty between VDA and I.B.A.H., Inc. provides that I.B.A.H., Inc. as Guarantor "hereby covenants and agrees to and with Landlord, its successors and assigns, that if default shall at any time be made by Tenant which is not cured within the applicable cure periods under the Lease, in the payment of any Fixed Basic Rent or Additional Rent payable by Tenant under the Lease, and such sums are not paid by Tenant or otherwise recovered by Landlord within the time provided under the Lease, Guarantor shall forthwith pay such rent or other sums or charges to Landlord, its successors and assigns."

S13.    The December 3, 1996 Lease Guaranty between VDA and I.B.A.H., Inc. provides that "[t]his Guaranty shall be legally binding upon Guarantor, its successors and assigns, and shall inure to the benefit of Landlord, and its successors and assigns, including without limitation, Landlord's mortgage lender with rights to enforce Landlord's rights under this Lease."

S14.    On June 21, 2000, I.B.A.H., Inc. changed its name to Omnicare Clinical Research, Inc.

S15.    On June 21, 2000, I.B.A.H., Inc.(noted also as "IBAH, Inc.") filed a State of Delaware Certificate of Amendment of Certificate of Incorporation, indicating that by resolution of its board of directors, it was changing its name to Omnicare Clinical Research, Inc.

S16.    The document attached hereto as Exhibit 5 is a true and correct and authentic copy of the Certificate of Amendment of Certificate of Incorporation filed on June 21, 2000, reflecting I.B.A.H., Inc.'s corporate name change to Omnicare Clinical Research, Inc.

S17.    On September 19, 1997, VDA sold the Property, and assigned its rights under the Lease and Lease Guaranty, to HUB.

S18.    On or about September 19, 1997, VDA and HUB Properties Trust executed an Assignment and Assumption of Leases, Contracts and Agreements.

S19.    The September 19, 1997 Assignment and Assumption of Leases, Contracts and

Agreements between VDA and HUB provides that VDA as Assignor shall "grant, bargain, sell,

set over, assign, transfer and deliver unto" HUB Properties Trust as Assignee all of VDA's right,

title and interest in and to the leases, contracts and agreements with respect to the Property,

including, but not limited to, VDA's "right, title and interest in and to any and all leases, rental

agreements or other agreements (including all amendments or modifications thereto) affecting

any portion" of the Property and described in the Lease.

S20.    The document attached hereto as Exhibit "6" is a true and correct and authentic

copy of the September 19, 1997 Assignment and Assumption of Leases, Contracts and

Agreements between VDA and HUB.

## II.    TERM OF THE LEASE

S21.    The Lease at § 1.02(b) provides that "the Initial Term of this Lease shall continue

for a period of fifteen years, unless this Lease shall be renewed by the Tenant in accordance with

Article 14 hereof or sooner terminated as hereinafter provided."

S22.    The Lease at §1.02 (b) provides that "[t]he Initial Term of this Lease shall

commence on the later to occur of the following: (i) January 15, 1997 or (ii) a date which is ten

(10) days after the Landlord Improvements (as herein defined) have been substantially completed

in accordance with Article 4 hereof."

S23.    On or about September 15, 1997, Bio-Pharm Pharmaceutics Services, Inc.

executed a Lease Estoppel Certificate (the "Lease Estoppel Certificate").

S24.    The document attached hereto as Exhibit "7" is a true and correct and authentic

copy of the Lease Estoppel Certificate.

S25.    In the Lease Estoppel Certificate, the tenant, Bio-Pharm Pharmaceutics Services, Inc., certified:

> 4.    That any work and all other improvements to the Leased Premises required to be furnished or constructed by the Landlord pursuant to the terms of the Lease have been completed, that Tenant has accepted the Leased Premises, and that the term of the Lease commenced on February 17, 1997.

S26.    Fifteen years from February 17, 1997 is February 16, 2012.

S27.    Under §1.02(b) of the Lease, the initial term of the Lease expires on February 16, 2012.

## III.    FIXED BASIC RENT

S28.    The Lease at §2.01 provides that "[t]he Fixed Basic Rent shall be payable during the Initial Term, in advance, without notice or demand, in equal monthly installments of one-twelfth of the annual amount, on first day of each month during the Initial Term."

S29.    The Lease at § 2.01 provides that "[e]xcept as hereinafter provided, the minimum annual rent for such Lease Years is in the amounts set forth in the Preamble as 'Fixed Basic Rent.'"

S30.    The Lease at Preamble, §F provides that the fixed basic rent for the entire term of the Lease shall be $12,378,000.00, payable as follows:

| YEAR | YEARLY PAYMENTS | EQUAL MONTLY PAYMENTS |
|---|---|---|
| Lease Year 1 | $222,000.00 | $18,333.34 |
| Lease Year 2 | $444,000.00 | $36,666.67 |
| Lease Year 3-4 | $806,000.00 | $67,166.67 |
| Lease Year 5-6 | $868,000.00 | $72,333.34 |

| Lease Year 7-15 | $930,000.00 | $77,500.00 |
|---|---|---|

S31.    No money was forwarded towards Fixed Basic Rent with respect to the Property by Defendants to Plaintiffs after the June 2001 flood nor after October 1, 2001. (October 29, 2002 Deposition of Defendants' corporate designee, David Morra, at 129-130 and October 30, 2002 Deposition of Defendants' corporate designee, Ronald Greenspan, at 68).

S32.    The Lease at § 10.02 (a) provides, *inter alia*, that "[I]n case the Premises or any portion thereof shall be totally or partially damaged or destroyed by fire or by any other casualty whatsoever, then Landlord and Tenant shall proceed with reasonable promptness, and in accordance with paragraph (c) below, to repair and restore the Premises to at least as good condition as that which existed immediately prior to such fire and other casualty and during such repair period, there shall be an abatement of rent."

S33.    The Lease at §10.02 (c) provides, *inter alia*, that "[a]ll repairs, restoration and reconstruction to the interior of the Building, or other portions of the Premises comprising the Tenant Work shall be performed by Tenant subject to the conditions set forth in Section 4.02 and Section 9.01 hereof."

S34.    When asked at deposition, "[a]nd when was the building put back in the condition when you could have continued operation?", Defendants' corporate designee, David Morra, stated that "probably late September 2001." (October 29, 2002 Deposition of Defendants' corporate designee, David Morra, at 159).

S35.    Defendants' facilities coordinator, David MacAllister, stated at deposition that it would have taken "possibly three months, give or take a few weeks" to the get the Property back into the condition that it was prior to the 2001 flood. (MacAllister November 21, 2002 Deposition at 53).

S36.    Defendants have not fully restored and repaired the interior of the Building, or other portions of the Premises comprising the Tenant Work to the condition which existed immediately prior to the June 2001 flood.

S37.    While making certain restorations to the interior of the building after the June 2001 flood, Defendants have not fully restored the building to the condition it was in prior to the June 2001 flood. (October 29, 2002 Deposition of Defendants' corporate designee, David Morra, at 176-78; October 30, 2002 Deposition of Defendants' corporate designee, Ronald Greenspan, at 33-34).

S38.    On September 26, 2001, the regional manager for HUB's property manager, David J. Campoli, sent Mr. Ken Feld of Omnicare Pharmaceuticals, Inc. a letter, stating that "Omnicare has yet to commence reconstruction at its own direction"; the time period from the June 2001 to October 1, 2001 was "a fair estimate of the time required to plan and reconstruct the property interiors by Omnicare for occupancy as required in the lease"; and "rental obligation will recommence at 525 Virginia" as of October 1, 2001.

S39.    A true and correct and authentic copy of Campoli's September 26, 2001 letter to Feld is attached hereto as Exhibit "8".

S40.    On October 16, 2001, John Mannix of HUB sent David Morra of Omnicare Clinical Research, Inc. a letter stating that "David Campoli has advised me that he has had numerous conversations with members of your staff to coordinate restoration of the premises, but Omnicare has taken no action."

S41.    A true and correct and authentic copy of Mannix's October 16, 2001 letter to Morra is attached hereto as Exhibit "9".

S42.    With regard to restoring the Property to the condition it was in prior to the June

2001 flood, David MacAllister, Defendants' facilities coordinator, stated at deposition:

```
 7   Q.        Were you asked to try to get the building

 8   back into the condition it was in prior to the

 9   flood?

10   A.         No.

11   Q.        Well, you were only asked to try to get

12   the building back into a condition so that you

13   could accommodate the Virbac project?

14   A.         Yes.
```

(MacAllister November 21, 2002 Deposition at 47).

S43.    James McDevitt, Omnicare Pharmaceutics' Controller, stated at deposition that

despite offering to buy drywall himself, and to install drywall and lay carpet at night by himself

and with other workers, he was instructed by his superiors prior to October 1, 2001 to hold off

commencing the construction needed to restore the Property to the condition the Property was

prior to the June 2001 flood.  (McDevitt April 22, 2003 Deposition at 190-191; McDevitt July

22, 2003 Deposition at 38-40 and Exhibit 34 at McDevitt 1118).

S44.    On March 12, 2002, HUB's former counsel then, William J. Maffucci, sent a

"supplemental notice of default; notice of acceleration" to David Morra of Omnicare Clinical

Research, Inc. and Kenneth Feld of Omnicare Pharmaceuticals, Inc., stating as a result of

Defendants' defaults under the Lease, HUB "hereby exercises its right under Lease § 12.02 to

accelerate Tenant's rental obligation, such that all rent scheduled to come due under the Lease is

now immediately due and payable" (emphasis in original) and stating that "[d]emand is hereby

made under the Lease and Guaranty for immediate payment by Tenant and/or by Guarantor of the full Accelerated Rent."

S45.    A true and correct and authentic copy of Maffucci's March 12, 2002 Supplemental Notice of Default; Notice of Acceleration is attached hereto as Exhibit "10".

S46.    Maintaining that the obligation to pay rent is in dispute, Defendants have not paid the fixed basic rent for the time period from October 1, 2001 to March 31, 2002.

S47.    Under the terms of the Lease, the amount of fixed basic rent during the time period from October 1, 2001 to March 31, 2002 is $434,000.04.

S48.    The Lease at §2.05 provides that the "Landlord shall be entitled to receive from Tenant a late charge equal to five percent (5%) of the amount of any payment or installment of Fixed Basic Rent and Additional Rent, or any portion thereof, if not received within ten (10) days of the date when due."

S49.    5% x $434,000 = $21,700.

S50.    Under §2.05 of the Lease, the late charge with respect to the amount of fixed basic rent for the time period from October 1, 2001 to March 30, 2002 is $21,700.00.

S51.    $434,000.04 + $21,700 = $455,700.04.

S52.    Under the Lease, the amount of fixed basic rent during the time period from October 1, 2001 to March 30, 2002 ($434,000), when combined with the late charge under §2.05 of the Lease ($21,700) is $455,700.04.

S53.    The Lease at §12.02(a) provides that upon the occurrence of an Event of Default by the Tenant, the Landlord may "accelerate the whole or any part of the Fixed Basic Rent for the remainder of the Term (the "Accelerated Rent"), which Accelerated Rent shall be discounted to present value on the basis of a discount rate equal to the prime rate offered by Corestates

Bank, N.A., applied and calculated on the date of receipt by Landlord of such Accelerated Rent;
and shall be deemed due and payable as if, by the terms and provisions of this Lease, such
Accelerated Rent was on that date payable in advance."

S54.    In his March 12, 2002 Supplemental Notice of Default; Notice of Acceleration
attached hereto as Exhibit "10", HUB's former counsel, William Maffuci, stated:

> Landlord hereby exercises its right under Lease § 12.02 to
> accelerate Tenant's rental obligations, such that all rent scheduled
> to come due under the Lease is now immediately due and payable.
> (emphasis in original).

S55.    Due to mergers and acquisitions, CoreStates Bank, N.A. is currently doing
business as Wachovia Bank.

S56.    As of the date of these Stipulations, the prime rate offered by Wachovia Bank is
5.50%.

S57.    The time period from April 1, 2002 to February 16, 2012 is 118 months and 16
days.

S58.    Under the Lease, the Fixed Basic Rent during the time period from April 1, 2002
to February 1, 2003 is $72,333.34 per month; the Fixed Basic Rent during the time period from
March 1, 2003 to February 16, 2012 is $77,500 per month.

**ADDITIONAL RENT**

S59.    The Lease at §2.02 provides that the Tenant shall pay as "Additional Rent" "[a]ll
other amounts payable by Tenant hereunder, whether payable to Landlord or to third parties,
including, without limitation, Taxes pursuant to Section 3.01, insurance premiums, and utility
charges."

S60.    The Lease at §3.01 provides that the "Tenant will pay and discharge, punctually as and when the same shall become due and payable, but in any event not later than five (5) business days before any fine, penalty, interest or costs may be added thereto for nonpayment, all real estate taxes[,] water charges and sewer charges."

S61.    The Lease at §3.07 provides that the "Tenant shall timely pay or cause to be paid all charges for gas, electricity, light, heat, power, water, telephone or other communication service or other utility or service used, rendered or supplied to, upon or in connection with the Premises throughout the Term [of the Lease]."

S62.    The Lease at §3.08 provides that the "Tenant shall pay or cause to be paid all insurance premiums for the coverages required to be purchased and maintained by Tenant in accordance with Article 10 of th[e] Lease."

S63.    The Lease at §10.01 provides that the "Tenant, at Tenant's sole cost and expense, shall keep or cause the Premises to be kept continuously insured during the Term, under policies providing the following insurance coverages: (i) commercial general liability insurance on an occurring basis with a combined single limit for bodily injury and property damage of not less than $2,000,000.00, including the broad form general liability endorsement, contract liability, and products liability coverage; and (ii) a policy of standard fire, extended coverage, and special extended coverage insurance (all risks), including a vandalism and malicious mischief endorsement, in an amount equal to the full replacement value of the Premises, new and without deduction for depreciation of fixtures, furniture and improvements."

S64.    The Lease at §10.01 provides that "[I]n the event that Tenant shall fail to maintain any such insurance coverages during the Term, Landlord may, but shall not be obligated to, procure and obtain such insurance coverages and Landlord's costs for such insurance shall

constitute Additional Rent hereunder and shall be due and payable within the next monthly

installment of Fixed Basic Rent."

S65.    The Lease at §8.04 provides that "Tenant shall pay Landlord, or at Landlord's

direction, to Landlord's agent, a fee of $400.00 per month, as Additional Rent in accordance

with Section 2.02 hereof (the 'Manager's Fee')".

S66.    The number of months between October 1, 2001 and March 31, 2005 is 42

months.

S67.    $400/month x 42 months = $16,800.00.

S68.    Under the Lease, the management fees during the time period from October 1,

2001 to March 31, 2005 amounts to $16,800.00.

S69.    Defendants have not completely paid all of the Additional Rent under the Lease

since the 2001 flood.

S70.    Section 2.05 of the Lease provides that "Landlord shall be entitled to receive from

Tenant a late charge equal to five percent (5%) of the amount of any payment or installment of

Fixed Basic Rent and Additional Rent, or any portion thereof, if not received within ten (10)

days of the date when due."


**RESTORATION COSTS**

S71.    The Lease at § 8.01 provides that "Tenant shall, throughout the Term [of the

Lease], keep the Premises in good working order and condition, at Tenant's sole cost and

expense, including all driveways, parking areas, curbs, landscaped areas, and sidewalks, and

other improvements now or hereafter erected thereon, including but not limited to the roof,

HVAC equipment, finishes, plumbing, lighting and other improvements now or hereinafter located upon the Building, or any part of the Premises."

S72. The Lease at § 8.01 provides that "[a]t the expiration of the Term [of the Lease], Tenant shall deliver the Premises in broom clean condition, reasonable wear and tear excepted."

S73. The Lease at § 10.02 (a) provides that "in case the Premises or any portion thereof shall be totally or partially damaged or destroyed by fire or by any other casualty whatsoever, then Landlord and Tenant shall proceed with reasonable promptness, and in accordance with paragraph (c) below, to repair and restore the Premises to at least as good a condition as that which existed immediately prior to such fire or other casualty and during such repair period, there shall be an abatement of rent."

S74. The Lease at §10.02(c) provides, *inter alia*, that "[a]ll repairs, restoration and reconstruction to the interior of the Building, or other portions of the Premises comprising the Tenant Work shall be performed by Tenant subject to the conditions set forth in Section 4.02 and Section 9.01 hereof."

S75. The "Coordination Drawing," which was marked at Mr. MacAllister's December 9, 2004 deposition as "Exhibit MacAllister-4," and which was Bates-Stamped "HUB 4796," reflects the condition of the second floor of the Property immediately prior to the 2001 flood.

S76. On page 85 of his December 9, 2004 deposition, Mr. MacAllister stated:

```
7     Q.       Where is the floor plan of the second
8     floor?  I think we probably marked it.  Okay.
9     It's 4.
10                    Just walk me through this,
11    please.  First of all, I ask you to consider this
12    Exhibit 4.  Tell me if that is a fair and accurate
13    representation of the configuration in use of the
```

```
14      second floor of this building immediately prior to

15      the flood.  You can take your time to study it.

16      A.      Yes.
```

(December 9, 2004 Deposition of Defendants' corporate designee, David MacAllister, at 85).

S77.   While making certain repairs to the interior of the building,  Defendants did not

completely restore the Property to the condition that which existed immediately prior to the June

2001 flood. *See* October 29, 2002 Deposition of Defendants' corporate designee, David Morra,

at 176-80 and October 30, 2002 Deposition of Defendants' corporate designee, Ronald

Greenspan, at 33-34, 70-71); Defendants' Answer to the Complaint at ¶25.

S78.   Defendants' corporate designee, David Morra, stated at deposition that Defendants

"have not replaced all of the wall board that has been removed"; "have not put carpeting back on

certain parts of the floor"; and "have not refurbished the offices or any of that area." (October

29, 2002 Deposition of Defendants' corporate designee, David Morra, at 177).

S79.   Defendants' Head of Quality Assurance Department, Christopher Cichon, stated at

deposition that "three-quarters of the building is still not sheet rocked"; the "warehousing is still

all open"; and "the administration is all open." (Cichon November 11, 2002 Deposition at 142).

S80.   In December 2004, Plaintiffs noticed the deposition of Defendants' corporate

designee with respect to the condition of the Property immediately prior to the 2001 flood.

S81.   At a deposition on December 9, 2004 at the Property, Defendants  produced their

facilities coordinator for the Property, David MacAllister, as their corporate designee with

respect to the condition of the Property immediately prior to the 2001 flood.

S82.   At his December 9, 2004 deposition, David MacAllister stated that the only areas

on the first floor of the Property which Defendants repaired or restored after the 2001 flood were

only those areas needed to performed services for a client called Virbac.

S83.    With respect to what flood-damaged items Defendants replaced on the first floor of the Property after the 2001 flood, on page 51 of his December 9, 2004 deposition, David MacAllister and Plaintiffs' counsel stated:

```
13      Q.        So if it wasn't required for the VIRBAC

14      contract, it wasn't evaluated and/or replaced?

15      A.        It was evaluated but was not replaced.
```

(December 9, 2004 Deposition of Defendants' corporate designee, David MacAllister, at 51).

S84.    At his December 9, 2004 deposition, Mr. MacAllister was shown a "coordination plan" of the 1st floor of the building at the Property (marked as Exhibit MacAllister-1, Bates-stamped HUB 4774).  (December 9, 2004 Deposition of Defendants' corporate designee, David MacAllister, at 58).

S85.    At his December 9, 2004 deposition, Mr. MacAllister marked on Exhibit MacAllister-1 in red ink those areas on the 1st floor in which Defendants made repairs after the 2001 flood.  (December 9, 2004 Deposition of Defendants' corporate designee, David MacAllister, at 65-66).

S86.    At his December 9, 2004 deposition, Mr. MacAllister and Plaintiffs' counsel stated:

```
19      Q.        So as I understand your testimony, let's

20      make sure we get this, the area shown by the red

21      line on Exhibit 1 is the area in which you made

22      repairs after the flood?

23      A.        Yes.
```

(December 9, 2004 Deposition of Defendants' corporate designee, David MacAllister, at 65).

S87.    At his December 9, 2004 deposition, Mr. MacAllister and Plaintiffs' counsel stated:

```
24      Q.          And with the exception of Room 216 and

 1      302, you restored all the other areas within the

 2      red line to the condition they were in prior to

 3      the flood, is that true?

 4      A.          There was another room in here down in

 5      here that I had mentioned too, 102, which is next

 6      door here.

 7      Q.          Why don't you put 102, why don't you

 8      mark that as repaired.  And you have previously

 9      described it, it was not returned to its condition

10      prior to the flood, but you did make repairs in

11      it?

12      A.      Yes.

13      Q.          Again, I ask you are there any other

14      areas in which you made repairs to return those

15      areas to the condition they were in prior to the

16      flood?

17      A.          I don't believe so.
```

(December 9, 2004 Deposition of Defendants' corporate designee, David MacAllister, at 65-66).

S88.        At his December 9, 2004 deposition, Mr. MacAllister and Plaintiffs'

counsel stated:

```
18      Q.          Are there any other areas where you made

19      any repairs at all, whether you returned them to

20      the condition prior to the flood or not, that you

21      haven't previously described?

22      A.          As far as the first floor here?

23      Q.      Yes.

24      A.      Yes.
```

```
1    Q.        What area or areas have you not

2    previously described in which you did make

3    repairs?

4    A.        Well, they are no longer here, but I

5    made repairs to the air compressors, the boiler.

6    Q.        I am talking about the physical plant

7    that remains.

8    A.        Okay.  This room here.

9    Q.        This being the cafeteria?

10   A.        Yes.

11   Q.        And you previously described that.  Any

12   other or areas?

13   A.        I don't believe so.
```

(December 9, 2004 Deposition of Defendants' corporate designee, David MacAllister, at 66-67).

S89.   On page 74 of his December 9, 2004 deposition, Mr. MacAllister and Plaintiffs'
counsel stated:

```
2    Q.        You indicated that with respect to the

3    storage area which has sheet rock cut out in

4    something of a swiss cheese fashion, that is to

5    say not all of it is cut at the four foot level,

6    some of it runs from floor to ceiling, that

7    occurred because you, not you personally, but the

8    company couldn't get access to those areas where

9    the sheet rock runs all the way to the floor?

10   A.        Yes.

11   Q.        And that was because there was some

12   storage containers in front of that sheet rock?
```

```
13      A.          Yes.

14      Q.          Was that sheet rock decontaminated at

15      any time after the flood?

16      A.          No.
```

(December 9, 2004 Deposition of Defendants' corporate designee, David MacAllister, at 74).

S90.    Attached hereto as Exhibit "14" is a true and correct and authentic copy of

Philadelphia Construction Services' December 28, 2004 estimate.

S91.    After the 2001 flood, Defendants cut off the building sheetrock

at approximately four feet in various rooms throughout the first floor of the building at the

Property.

S92.    On page 40 of his December 9, 2004 deposition, David MacAllister and

Plaintiffs' counsel stated:

```
11      Q.          Did you notice in various rooms

12      throughout the building sheet rock has been cut

13      off at approximately four feet?

14      A.          Yes.

15      Q.          Was that done as a result of the damage

16      from the flood?

17      A.          Yes.

18      Q.          To your knowledge, was it in every case

19      it was done as a result of damage from the flood?

20      A.          Yes.
```

(December 9, 2004 Deposition of Defendants' corporate designee, David MacAllister, at 40).

S93.    After the June 2001 flood, other than areas needed to service the Virbac contract,

Defendants did not restore or repair the building sheetrock that had been cut off at approximately

four feet.

S94.    On pages 40-41 of his December 9, 2004 deposition, David MacAllister and

Plaintiffs' counsel stated:

```
21      Q.          Now, in your judgement as a facilities

22      manager, in order to restore those walls where

23      that sheet rock was cut to its condition prior to

24      the flood, will it be necessary to replace the

1       full eight foot heighths of the sheet rock?

2                            MR. SHARE:  Objection.  You can

3              answer.

4          · ·               THE WITNESS:  Yes.
```

(December 9, 2004 Deposition of Defendants' corporate designee, David MacAllister, at 40-41).

S95.    With regard to why sheetrock should be replaced at the full eight foot heights as

opposed to four feet, Mr. MacAllister and Plaintiffs' counsel stated on page 37 of his December

9, 2004 deposition:

```
8       Q.          Sheet rock has to have two beveled edges

9       so you can put mud and tape in?

10      A.          Yes.

11      Q.          If you cut off at four feet you don't

12      have an edge to put the beveled seam in?

13      A.          That's correct.

14      Q.          Therefore, if you replace a sheet rock

15      wall that has been cut at four feet, you are going

16      to see the seam?

17      A.          More than likely, yes.

18      Q.          It is for that reason that your sheet

19      rock wall hanger suggested, at least in this room,

20      you use eight foot sections?
```

21      A.          Yes.

(December 9, 2004 Deposition of Defendants' corporate designee, David MacAllister, at 37).

S96.    In its December 28, 2004 estimate, PCS estimates that it will cost an additional

$381,081 over and above its base $561,292 amount to replace the sheetrock at full length rather

than at 4 feet.

S97.    After the June 2001 flood, other than in areas needed to service the Virbac

contract, Defendants did not replace certain ceiling tiles on the first floor of the building.

S98.    On page 67 of his December 9, 2004 deposition, Mr. MacAllister stated that after

the June 2001 flood, Defendants had replaced certain ceiling tiles on the first floor "for fear of

any airborne contaminants" but only in those areas needed for the Virbac contract.  (December

9, 2004 Deposition of Defendants' corporate designee, David MacAllister, at 67).

S99.    On page 70 of his December 9, 2004 deposition, Mr. MacAllister and Plaintiffs'

counsel stated:

    2      Q.          Is there or was there not a concern for

    3      microbial contamination in other areas of the

    4      building, whether or not it was to be used for the

    5      VIRBAC contract?

    6      A.          I believe so, yes.

(December 9, 2004 Deposition of Defendants' corporate designee, David MacAllister, at 37).

S100.   On page 72 of his December 9, 2004 deposition, Mr. MacAllister and Plaintiffs'

counsel stated:

    9      Q.          Okay.  Would it be safe for me to assume

    10     that if I am looking at an area outside the

    11     service area of the VIRBAC contract and I see

    12     ceiling tiles, those ceiling tiles need to be

```
13      replaced as a result of the flood?

14      A.      Yes.

15      Q.      And within the VIRBAC area, the ceiling

16      tiles in the so-called storage area that remain

17      would need to be replaced as well, is that right?

18      A.      Yes.
```

(December 9, 2004 Deposition of Defendants' corporate designee, David MacAllister, at 72).

S101.  In its December 28, 2004 estimate, PCS estimates that it will cost $8,800 over and above its base $561,292 amount to replace the flood-damaged ceiling tiles Defendants did not replace after the June 2001 flood.

S102.  After the June 2001 flood, other than areas needed to service the Virbac contract, Defendants did not replace or restore certain doors on the first floor.

S103.  On pages 53-54 of his December 9, 2004 deposition, Mr. MacAllister and Plaintiffs' counsel stated:

```
22      Q.      So your testimony is then that doors

23      that were needed for servicing the VIRBAC-- is

24      that how you pronounce it?

1       A.      Yes.

2       Q.      -- VIRBAC contract were repaired or

3       replaced as needed?

4       A.      Yes.

5       Q.      But other doors damaged by the flood

6       waters were not addressed?

7       A.      That's correct.

8       Q.      So it is not correct to say that all

9       doors within the facility that were damaged by the
```

```
10      flood waters have been repaired or replaced?
11      A.      That's correct.
```

(December 9, 2004 Deposition of Defendants' corporate designee, David MacAllister, at 53-54).

S104. On page 82 of his December 9, 2004 deposition, Mr. MacAllister and Plaintiffs' counsel stated:

```
13                      Were doors in other areas of the
14      building that is, to say, outside of the service
15      area for VIRBAC repaired or replaced?
16      A.      No.
```

(December 9, 2004 Deposition of Defendants' corporate designee, David MacAllister, at 82).

S105. In its December 28, 2004 estimate, PCS estimates that it will cost an additional $15,000 over and above its base $561,292 amount to replace the flood-damaged doors which Defendants did not replace after the June 2001 flood.

S106. In its December 28, 2004 estimate, PCS estimates that it will cost an additional $26,344 over and above its base $561,292 amount to install epoxy-painted gypsum board in the rooms listed in ¶ C44 below.

S107. In its December 28, 2004 estimate, PCS estimates that it will cost an additional $5,403 over and above its base $561,292 amount to install vinyl-coated gypsum ceiling tiles in the rooms listed in ¶ C45 below.

S108. After the June 2001 flood, Defendants did not restore or repair the freight elevator at the Property.

S109. On pages 51–52 of his December 9, 2004 deposition, Mr. MacAllister and Plaintiffs' counsel stated:

```
16      Q.      What was the condition of the elevators
```

17    prior to the flood?

18    A.      They were all in working condition.

19    Q.      And have you learned what the condition

20    of them was as a result of the flood?

21    A.      Yes.

22    Q.      What was that?

23    A.      They had sustained damage, electrical

24    damage on the passenger elevator, the freight

1    elevator, my understanding is that the seals might

2    have been corrupted.

3    Q.      The seals on the freight elevator may

4    have been corrupted, is that what you said?

5    A.      Yes.

6    Q.      Any other damage to the freight

7    elevator?

8    A.      I know there was a report, I can't

9    honestly say exactly what was in that report as

10    far as remembering.

11    Q.      Okay.  And it was the passenger elevator

12    that was repaired?

13    A.      Yes.

14    Q.      Freight elevator has had no work done on

15    it, is that right?

16    A.      No.

(December 9, 2004 Deposition of Defendants' corporate designee, David MacAllister, at 51-52).

S110.   The document attached hereto as Exhibit "16" is a true and correct and authentic copy of Tri-State Elevator Company's March 2, 2005 estimate to repair the freight elevator at the Property.

S111.   The document attached hereto as Exhibit "17" is a true and correct and authentic copy of A&S Sprinkler Co.'s September 11, 2003 estimate to repair the fire sprinkler system at the Property.

S112.   Plaintiffs have not paid any of the expenses which they claim Defendants owe for restoration of the interior of 525 Virginia Drive ("the Property") after the 2001 Flood.

## CONTESTED FACTS

## I.    PLAINTIFFS' PROPOSED STIPULATED FACTS CONTESTED BY DEFENDANTS

Defendants contest the following proposed stipulated facts by Plaintiffs as incorrect, incomplete and/or improper:

## FIXED BASIC RENT

CD1.   The reasonable period of time by which Defendants should have repaired and restored the Premises to the condition which existed immediately prior to the June 2001 flood was by September 30, 2001.

CD2.   Defendants' corporate designee, David Morra, stated at deposition that after the June 2001 flood they resumed some, albeit not all, operations and began generating certain revenues from the Property by September 2001.  (October 29, 2002 Deposition of Defendants' corporate designee, David Morra, at 145, 153-55).

CD3.   Defendants' corporate designee, Ronald Greenspan, stated at deposition that Defendants generated in excess of one million dollars in revenue for work performed in the building at the Property after the June 2001 flood.  (October 30, 2002 Deposition of Defendants' corporate designee, Ronald Greenspan, at 30-31).

CD4.   Applying Pennsylvania law, the Court of Appeals for the Third Circuit stated in Pollice v. National Tax Funding, L.P., 225 F.3d 379, 395 (3d Cir. 2000), that pursuant to well-established Pennsylvania Law, "where there has been a failure to pay a fixed or liquidated sum due on a certain date -- the party to whom the sum is owed may as a matter of right recover prejudgment interest at the legal rate of six percent running from the date the sum is due."

CD5.   Accordingly, under Pennsylvania law, Plaintiffs are entitled, at a minimum, to six percent (6%) simple interest per annum with respect to the total of: (a) the fixed basic rent under the Lease during the time period from October 1, 2001 to March 30, 2002 ($434,000.04); and (b) the 5% late charges due under §2.05 of the Lease with respect to the amount of fixed basic rent due under the Lease during the time period from October 1, 2001 to March 30, 2002, as set forth herein in subsection (a), ($21,700.00) -- calculated from the date each monthly payment was due to the date Defendants pay such fixed basic rent and late charges.

CD6.   Further, the Court of Appeals for the Third Circuit stated in Peterson v. Crown Financial Corp., 661 F.2d 287, 297 (3d Cir. 1981), that the Court may award pre-judgment interest at a rate in excess of the statutory rate or may award compound interest in claims based on unjust enrichment, "whenever a defendant holds money or property which belongs in good conscience to the plaintiff."

CD7.   The Lease at §12.01(d) provides that an event of default occurs, *inter alia*, "if Tenant shall fail to pay any installment of Fixed Basic Rent or Additional Rent, or any part

26

thereof, when the same shall become due and payable for a period of ten (10) business days after written notice to Tenant from Landlord."

CD8.    The Lease at §12.01(e) provides that an event of default occurs, *inter alia*, "if Tenant shall abandon the Premises, without the prior consent of the Landlord, by removing all or substantially all of Tenants' furniture, equipment, and personal property from the Premises, providing that Tenant shall also be delinquent in the payment of Fixed Basic Rent or fail to obtain any additional insurance coverage that may be required by Tenant's insurance carrier in order to insure a vacant building."

CD9.    The Lease at §12.01(f) provides that an event of default occurs, *inter alia*, "if Tenant shall fail to perform or observe any other material provision, condition or requirement of this Lease (not hereinbefore in this Section 12.01 specifically referred to) on the part of Tenant to be performed or observed, and such failure shall continue for thirty (30) days after notice thereof from Landlord to Tenant, or, if such Event of Default is of such nature that it cannot, with due diligence, be cured within a period of thirty (30) days, if Tenant shall have failed to commence the curing of such default within the period of thirty (30) days referred to above and shall thereafter fail to continue with all due diligence to complete the curing of such default and completes such cure in any event within ninety (90) days after notice hereof."

CD10. In his March 12, 2002 Supplemental Notice of Default; Notice of Acceleration, attached hereto as Exhibit "10", HUB's former counsel, William Maffucci, stated:

> Tenant is "in default of its obligations of the Lease because (i) Tenant has failed to comply with its obligations under Lease §§ 4.02, 8.01, 10.02(a), and 10.02(c) to maintain the Leased Property in good working order and condition and to take prompt and diligent action to restore the Leased Property after the damage caused by flood conditions in June 2001, and (ii) Tenant has failed to pay all rent that has come due since October 1, 2001, that being

> the date by which, as determined by Landlord (and as Landlord so
> advised Tenant by letter dated September 26, 2001), Tenant's
> compliance with the aforesaid obligations would have restored the
> Leased Property to its condition before the flood."

CD11. Prior to any discounting to present value, under the terms of the Lease, the
amount of fixed basic rent during the time period from April 1, 2002 to February 16, 2012 is
$9,130,925.36, computed as follows:

$$\$72{,}333.34 \times 11 \text{ months} \quad = \quad \$ \ 795{,}666.74$$

$$\$77{,}500 \times 107 \text{ months} \quad = \quad \$8{,}292{,}500.00$$

$$\$77{,}500 \times 16 \text{ days/29 days} \ = \quad \$ \ \underline{\ \ 42{,}758.62}$$

$$\text{TOTAL} \quad = \quad \$9{,}130{,}925.36$$

CD12. In accordance with §2.05 of the Lease, Plaintiffs are entitled to a 5% late charge
with respect to the amount of fixed basic rent which Defendants have failed to pay under the
Lease for the time period from April 1, 2002 to February 16, 2012 ($9,130,925.36).

CD13. 5% x $9,130,925.36 = $456,546.27

CD14. Under the Lease, the amount of fixed basic rent during the time period from April
1, 2002 to February 16, 2012, combined with the 5% late charge set forth in § 2.05 of the Lease,
is 5% x $9,130,925.36 = $456,546.27 + $9,130,925.36 = $9,587,471.63.

CD15. Under Pennsylvania law, Plaintiffs are entitled, at a minimum, to six percent (6%)
simple interest per annum with respect to the total of: (a) the amount of fixed basic rent due
under the Lease for the time period from April 1, 2002 to February 16, 2012 ($9,130,925.36);
and (b) the 5% late charge set forth in § 2.05 of the Lease with respect to the amount of fixed
basic rent due under the Lease for the time period from April 1, 2002 to February 16, 2012, as set

forth herein in subsection (a) ($456,546.27) – calculated from the date this amount was due (March 12, 2002) to the date Defendants pay such fixed basic rent and late charges.

CD16. Under §12.02 of the Lease, the total of: (a) the amount of fixed basic rent due under the Lease for the time period from April 1, 2002 to February 16, 2012; (b) the 5% late charge set forth in § 2.05 of the Lease with respect to the amount of fixed basic rent due under the Lease for the time period from April 1, 2002 to February 16, 2012; and (c) 6% simple interest per annum with respect to the amount of fixed basic rent due under the Lease for the time period from April 1, 2002 to February 16, 2012 combined with the 5% late charge set forth in §2.05 of the Lease -- shall be discounted to present value on the basis of a discount rate equal to the prime rate offered by Wachovia Bank, applied on and calculated from the date Defendants make payment to the end of the term of the Lease (April 16, 2012).

CD17. Accordingly, with respect to fixed basic rent only, Plaintiffs are entitled, at a minimum, in damages to:

| 1 | Fixed basic rent due under the Lease during the time period from October 1, 2001 to March 30, 2002 ($434,000.04), combined with the late charge due under §2.05 of the Lease ($21,700.00)<br><br>PLUS<br><br>6% pre-judgment interest (simple) per annum with respect to the above fixed basic rent and late charges from date each monthly rental payment was due to the date Defendants make such payment | $455,700.04.<br><br><br><br>To be determined (depending on date Defendants make payment) |
|---|---|---|
| 2 | Fixed basic rent due under the Lease during the time period from April 1, 2002 to February 16, 2012 ($9,130,925.36), combined with the 5% late charge set forth in § 2.05 of the Lease ($456,546.27)<br><br>PLUS | $9,587,471.63 |

| | |
|---|---|
| 6% pre-judgment interest (simple) per annum with respect to the above fixed basic rent and late charges from March 12, 2002 to date Defendants make such payment | To be determined (depending on date Defendants make payment) |
| AND<br><br>Discounted to present value on the basis of a discount rate equal to the prime rate offered by Wachovia Bank, calculated from the date Defendants make such payment to April 16, 2012. | To be determined (depending on date Defendants make payment and prime rate on such date) |

## ADDITIONAL RENT

CD18. The amount of Additional Rent owed Plaintiffs from October 1, 2001 through March 4, 2005 is $973,364.57, $16,800 of which constitutes the Manager's Fees under the Lease for the same time period.

CD19. Attached hereto as Exhibit "11" are true and correct and authentic copies of invoices with respect to Additional Rent owned Plaintiffs from October 1, 2001 through March 4, 2005, accompanied by a summary of the invoices.

CD20. Except for the summary of invoices, the documents attached in Exhibit "11" are business records kept and maintained in the ordinary course of business and are admissible at trial.

CD21. 5% x $973,364.57 = $48,668.23.

CD22. The amount of 5% late charges owed under §2.05 of the Lease with respect to the amount of Additional Rent owed Plaintiffs from October 1, 2001 through the date of these Stipulations, ($973,364.57), is $48,668.23.

CD23. Under Pennsylvania law, Plaintiffs are entitled to 6% pre-judgment simple interest per annum with respect to the amount of additional rent and late charges owed -- from the date said amounts were owed to the date Defendants make such payment.

CD24. Plaintiffs are entitled to payment in accordance with terms of the Lease of any additional rent incurred after the date Defendants make payment of the additional rent and associated late charges due and owed to date, as additional rent becomes due under the Lease.

**RESTORATION COSTS**

CD25. Certain construction/building plans (the "Building Plans") were prepared with respect to the first and second floors of the building at the Property from 1996 through 1998.

CD26. Attached hereto as Exhibit "12" are true and correct and authentic copies of the Building Plans.

CD27. With the exception of those areas mentioned by Defendants' facilities coordinator, David MacAllister, at his December 9, 2004 deposition, the Building Plans largely reflect the condition of the Property immediately prior to the 2001 flood.

CD28. The "Coordination Plan," which was marked at Mr. MacAllister's December 9, 2004 deposition as "Exhibit MacAllister-1," and which was Bates-Stamped "HUB 4774" reflects the condition of the 1st floor of the Property immediately prior to the 2001 flood, with the exception of additional work at certain rooms which Mr. MacAllister identified at his December 9, 2004 deposition as being completed after the preparation of the Building Plans.

CD29. On pages 75-81 and 86-94 of his December 9, 2004 deposition, Mr. MacAllister stated that subsequent to the preparation of HUB 4774, Defendants made renovations to the rooms identified on HUB 4774 as future 3.06 (the inclusion of the "stability chambers" and the "drug vault"); future 2.20 (inclusion of "storage" facilities), future 2.21 (inclusion of "storage"

facilities for "drug returns"), 1.38 future (inclusion for "some storage for clinical research"), the future areas next to rooms 1.17 and 1.16 (inclusion of a "conference room" and a "coffee lunch area, sink, microwave"); and future 1.28 (inclusion of facilities for "document storage").

CD30. After the June 2001 flood, Plaintiffs received an estimate dated September 11, 2003 to repair and restore the fire sprinkler system at the Property from A&S Sprinkler Co., Inc. in the amount of $4,950.00.

CD31. Steve Purdy, Defendants' Senior Manager of Project Management, stated at deposition that "carpeting, drywall was never replaced; ceiling tiles were never replaced." (Purdy November 20, 2002 Deposition at 79).

CD32. Attached hereto as Exhibit "13" is a true and correct and authentic copy of Exhibit MacAllister-1, as marked by Mr. MacAllister at his December 9, 2004 deposition.

CD33. Marking Exhibit MacAllister-1 with red ink, Mr. MacAllister indicated that only the following rooms on the 1st floor of the Property were restored or repaired by Defendants after the June 2001 flood:

| | |
|---|---|
| 1.01 | CAFETERIA |
| 1.02 | FUTURE |
| 1.03 | CONFERENCE ROOM |
| 1.04 | WAITING ROOM |
| 1.05 | VESTIBULE ROOM |
| 1.06 | LOBBY ROOM |
| 1.31 | BATHROOM |
| 1.32 | BATHROOM |
| 2.02 | KALISH PRIMARY |
| 2.03 | OVER ENCAP |
| 2.04 | OVER ENCAP |
| 2.05 | BLISTER PACKAGING |
| 2.06 | CARD SEALING ROOM |
| 2.07 | UTENSIL WASH ROOM |
| 2.11 | CARD SEALING ROOM |
| 2.12 | BLISTER PACKAGING |
| 2.15 | CORRIDOR |
| 2.16 | TECHS ROOM |

| | |
|---|---|
| **2.18** | **COORIDOR** |
| **2.19** | **CORRIDOR** |
| **2.22** | **CORRIDOR** |
| **2.23** | **UTILITY ROOM** |
| **3.01** | **FACILITY RECEIVING** |
| **3.02** | **SHIPPING PREP** |

CD34. The following rooms and corridors on the 1st floor of the Property were outside

the areas Mr. MacAllister marked in red ink on Exhibit MacAllister-1:

**2.01**
**2.21**
**2.20**
**2.10**
**2.08**
**2.09**
**2.13**
**2.14**
**2.17**
**2.25**
**2.24A**
**2.24B**
**Corr 3.09**
**Corr 3.08**
**3.08**
**3.06**
**3.05**
**3.03**
**3.04**
**1.07**
**1.08**
**1.42**
**1.17**
**1.16**
**1.15**
**1.14**
**1.13**
**1.11**
**Corr 1.18**
**1.19**
**1.20**
**1.21**
**1.22**
**1.23**

1.24
1.25
1.27
1.28
1.29
1.30
1.35
Corr 1.10
Corr. 1.54
1.43
1.44
1.45
1.46
1.47
1.49
1.50
1.51
Corr. 1.55
1.38

CD35. The rooms and corridors listed in ¶ CD34 above were not repaired or restored by Defendants after the June 2001 flood to the condition they were in immediately prior to the 2001 flood.

CD36. After the June 2001 flood, Defendants did not replace certain millwork and plumbing in the coffee area in the cafeteria on the first floor (Room 1.01) that existed at the Property immediately prior to the June 2001 flood.

CD37. After the June 2001 flood, Defendants did not replace certain flood-damaged sheetrock in the cold storage room (Room 2.01).

CD38. After the June 2001 flood, Philadelphia Construction Services submitted an estimate dated December 28, 2004 to restore and repair, the areas referenced in, *inter alia,* ¶¶ S86-S89 and CD34, CD36 and CD37 above.

CD39. In its December 28, 2004 estimate, Philadelphia Construction Services estimates that it will cost $561,292.00 to repair and restore the areas referenced in, *inter alia*, ¶¶ S86-S89 and CD34, CD36 and CD37 above.

CD40. The Building Plans indicate that following rooms were to have epoxy-painted gypsum board: Rooms 2.01, 2.08, 2.09, 2.10, 2.13, 2.14, 2.17, 2.24a, 2.24B, 2.25, 3.03, 3.04, 3.05, 3.06, 3.08, 3.09 and 3.10.

CD41. The Building Plans indicate that following rooms were to have vinyl-coated gypsum ceiling tiles: Rooms 2.01, 2.08, 2.09, 2.10, 2.13, 2.14, 2.17, and 3.03.

CD42. After the June 2001 flood, Plaintiffs received an estimate dated March 21, 2003, to repair and restore the freight elevator at the Property from Liberty Elevators in the amount of $45,000.00.

CD43. The document attached hereto as Exhibit "15" is a true and correct and authentic copy of Liberty Elevator's March 21, 2003 estimate to repair the elevator at the Property.

CD44. Since the March 21, 2003 estimate, the code requirements regarding the necessary repairs to the freight elevator have changed.

CD45. On March 2, 2005, Liberty Elevator, through its successor, Tri-State Elevator Company, submitted a revised estimate in the amount of $54,900.

CD46. Among the items associated with the Property Defendants have failed to restore or repair to the condition which existed immediately prior to the June 2001 flood was the fire sprinkler system at the Property.

CD47. The total cost to restore or repair items at the Property, which Defendants did not restore or repair to the condition which existed immediately prior to the June 2001 flood, and

which are described in estimates from PCS, Tri-State Elevator Company, and A&S Sprinkler Co. is $1,057,770, computed as follows:

| | |
|---|---|
| PCS | $997,920 |
| Tri-State Elevator | $54,900 |
| A&S Sprinkler | $4,950 |
| TOTAL: | $1,057,770. |

CD48. Defendants should have made the repairs described in estimates from PCS, Tri-State Elevator Company, and A&S Sprinkler Co. by October 1, 2001.

CD49. Under § 2.05 of the Lease, Plaintiffs are entitled to a 5% late charge with respect to costs Plaintiffs must incur to restore or repair items at the Property Defendants have failed to restore or repair to the condition which existed immediately prior to the June 2001 flood.

CD50. 5% x $1,057,770 = $52,888.50.

CD51. $1,057,770 + $52,888.50 = $1,110,658.50.

CD52. The total cost to restore or repair items at the Property, which Defendants did not restore or repair to the condition which existed immediately prior to the June 2001 flood, and which are described in estimates from PCS, Tri-State Elevator Company, and A&S Sprinkler Co., when combined with the 5% late charge set forth in §2.05 of the Lease, totals $1,110,658.50.

CD53. Under Pennsylvania law, Plaintiffs are entitled, at a minimum, to 6% pre-judgment simple interest per annum with respect to the $1,110,658.50 amount set forth in ¶ CD52 above -- calculated from October 1, 2001 to the date Defendants make payment.

## ATTORNEY'S FEES

CD54. Section 7.01 of the Lease provides:

Subject to Section 10.05 hereof, Tenant will protect, indemnify and hold harmless Landlord and its agents, affiliates, subsidiaries, parent companies and the officers and directors thereof, from and against any and all claims, actions, damages, liability and expense (including fees of attorneys, investigators, and experts) in connection with loss of life, personal injury or damage to property in or about the Premises or arising out of the occupancy or use of the Premises by Tenant or its Agents or occasioned wholly or in part by any act or omission of Tenant or its Agents, whether during the Term, except to the extent such loss, injury or damage was caused by the negligence of willful misconduct of Landlord or its agents.

CD55. As of the date of these Stipulations, HUB has incurred damages and expense in the form of over $1.5 million in fees of attorneys and experts, in connection with damage to property in or about the Premises or arising out of the occupancy or use of the Premises by Tenant or its Agents or occasioned wholly or in part by any act or omission of Tenant or its Agents.

## II.    DEFENDANTS' PROPOSED STIPULATED FACTS CONTESTED BY PLAINTIFFS

Plaintiffs contest the following proposed stipulated facts by Defendants as incorrect, incomplete and/or improper:

CP1.    Fixed Basic Rent for the time period from October 1, 2001 (post-abatement period) to March 29, 2005 (start of trial) is $3,167,166.78.

CP2.    A late charge of 5% on the Fixed Basic Rent amount of $3,167,166.78, per Section 2.05 of the Lease, is $158,358.34.

CP3.    Prejudgment interest at the legal rate of six percent per annum on the Fixed Basic Rent amount of $3,167,166.78, calculated from the date each monthly rental payment was due to

the start of trial on March 29, 2005, is $332,617.95.

CP4.    Prejudgment interest at the legal rate of six percent per annum on the late charge amount of $158,358.34, calculated from the date each late charge was due to the start of trial on March 29, 2005, is $16,396.80.

CP5.    Fixed Basic Rent for the time period from April 1, 2005 to February 16, 2012 (end of Lease) is $6,397,758.62

CP6.    The present value of $6,397,758.62, using a 5.50% prime rate currently offered by Wachovia Bank (the successor of CoreStates Bank, N.A.), per Section 12.02(a) of the Lease, is $5,361,034.84.

CP7.    Prior to the 2001 Flood, Defendants had always paid Fixed Basic Rent on a timely basis.

CP8.    Section 2.05 of the Lease does not state that the Landlord is entitled to receive from Tenant a late charge with respect to restoration expenses.

CP9.    When Flex buildings such as the Property change occupants, the practice in the commercial real estate market is to demolish and reconfigure the interior of the building.

CP10.  Plaintiffs will not pay the cost of restoring the interior of the Property to its pre-2001 Flood condition, because the interior of the Property will be demolished and reconfigured at the end of the Lease term.

CP11.  Section 4.01 of the Lease states that "Landlord, at Landlord's sole cost and expense, shall cause to be completed upon the Premises . . . (a) demolition of all interior improvements currently existing in the Premises. . . "

CP12.  Plaintiffs' predecessor 525 Virginia Drive Associates Limited Partnership (the original Landlord) paid to demolish the interior of the Property before the Lease commenced on

February 17, 1997, and delivered to Defendants' predecessor BioPharm Pharmaceutics Services, Inc. (the original Tenant) an empty structure with an open un-built interior at the commencement of the Lease.

CP13. Section 9.02 of the Lease states that "Tenant may, at its sole cost, and without the prior written consent of Landlord, make such interior nonstructural alterations, additions, and improvements in and to the Premises as it may deem desirable for its use . . . ."

CP14. Per Section 9.02 of the Lease, BioPharm and later Omnicare configured the Property's interior to suit its needs.

CP15. Section 8.01 of the Lease states that "[a]t the expiration of the Term, Tenant shall deliver the Premises in broom clean condition, reasonable wear and tear excepted."

CP16. Section 8.01 of the Lease does not state that the Premises is to be kept in broom clean condition during the Lease term.

Respectfully submitted,

JOSEPH J. MCGOVERN
STEPHEN W.W. CHING, JR.
**OBERMAYER REBMANN MAXWELL & HIPPEL LLP**
One Penn Center, 19th Floor
1617 John F. Kennedy Boulevard
Philadelphia, PA 19103-1895
(215) 665-3000

Attorneys for Plaintiffs

RICHARD P. MCELROY
ADAM M. SHARE
TODD A. SCHOENHAUS
**BLANK ROME, LLP**
One Logan Square
18th & Cherry Streets
Philadelphia, PA 19103-6998
(215) 569-5500

Attorneys for Defendants

Dated: March 8, 2005

604290                                    39