IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BARRY M. PORTNOY and<br>GERARD M. MARTIN, as Trustees for<br>HUB PROPERTIES TRUST,<br>          Plaintiffs, | :<br>:<br>:<br>:  NO. 02-CV-2905 |
| v. | :<br>:  HONORABLE CLIFFORD<br>:  SCOTT GREEN |
| OMNICARE PHARMACEUTICS, INC.<br>          and<br>OMNICARE CLINICAL RESEARCH, INC. ,<br>          Defendants. | :<br>:<br>:<br>: |

## PLAINTIFFS' TRIAL BRIEF

JOSEPH J. McGOVERN
STEPHEN W. W. CHING, JR.
STEPHEN P. BOSIO
**OBERMAYER REBMANN MAXWELL &**
**HIPPEL LLP**
One Penn Center, 19th Floor
1617 John F. Kennedy Boulevard
Philadelphia, PA  19103-1895
(215) 665-3000

Attorneys for plaintiffs, Barry M. Portnoy and
Gerard M. Martin, as Trustees for HUB Properties Trust

Date:  April 1, 2005

610448

## PLAINTIFFS' TRIAL BRIEF

In accordance with this Court's February 8, 2005 Pre-Trial Order, as modified on March 17, 2005, plaintiffs Barry M. Portnoy and Gerard M. Martin, as Trustees for HUB Properties Trust (collectively, "HUB" or "plaintiffs"), hereby submit their trial brief.

## I.    INTRODUCTION

This is an action for damages arising from breaches by defendants Omnicare Pharmaceutics, Inc. and Omnicare Clinical Research, Inc. (collectively, "defendants" or "Omnicare") of a 15-year commercial lease (the "Lease") and associated guaranty agreement for a two-story commercial building in Fort Washington, Pennsylvania (the "Premises"), which was leased by HUB to Omnicare.   On June 25, 2004 this Court held that Omnicare breached the Lease by:

- Failing to pay rent after a flood which damaged the Premises, despite continuing to occupy and conduct business at the Premises for 18 months thereafter;
- Failing to restore the "interior of the premises to the condition it was prior to the flood as required by the contract;" and
- Abandoning the Premises in 2003.

*Portnoy v. Omnicare Pharmaceutics, Inc.*, No. 02-2905, 2004 U.S. Dist. LEXIS 12235, at *16 (E.D. Pa. June 25, 2004) (Hon. Clifford Scott Green).

The Court has ordered further proceedings to determine damages.  Specifically, oral argument on unresolved legal issues is scheduled for April 13, 2005. A trial, to the extent necessary to resolve material factual disputes that preclude damage calculations, is scheduled to commence on April 14, 2005.

The parties filed a stipulation setting forth agreed to and contested facts on March 8, 2005.  (A copy of the Stipulation is attached hereto as Exhibit "1").  Plaintiffs believe that once

610448                                    1

this Court resolves the legal questions that are in issue, there will be few, if any, remaining genuine factual disputes, and the amount of damages to which plaintiffs are entitled will be readily calculable by the Court. This brief lays out the analysis which leads plaintiffs to those conclusions.

Plaintiffs seek four categories of damages under the Lease:

- Fixed Basic Rent, both past due and accelerated (Lease, §§2.01; 12.02(a));

- Additional Rent, both past due and accruing in the future (Lease, §2.02);

- Restoration Costs (Lease, §10.02(c)); and

- Attorneys' Fees (Lease, §§ 7.01; 9.03). [1]

The Lease provides that plaintiffs are entitled to a late fee of 5% on all amounts comprising Fixed Basic and Additional Rent, if such amounts are not received within 10 days of when due. (Lease, § 2.05). And, of course, Pennsylvania law provides that plaintiffs are entitled to pre-judgment interest at 6% on liquidated obligations from the date when due to the date of payment. Pollice v. National Tax Funding, L.P., 225 F.3d 379, 395 (3d Cir. 2000).

Plaintiffs are entitled to: Past Due Fixed Basic Rent in the amount of **$546,840.05;** Accelerated Fixed Basic Rent in the amount of **$9,998,005.87;** Past Due Additional Rent in the amount of **$1,178,300.15;** an Order requiring defendants to pay Additional Rent that accrues in the future; Restoration Costs in the amount of **$1,057,770.00;** Attorneys' Fees, through March 2005, in the amount of **$1,856,392.14;** and finally, an Order requiring defendants to pay attorneys' fees incurred in the future in this case and other cases in which the Court finds defendants liable for fees.

**Plaintiffs' total damages are therefore $14,637,308.21.**

---

[1] Alternatively, plaintiffs seek attorneys' fees as a sanction under state and federal law for defendants' bad faith and unrepentantly obdurate conduct.

## II.   FACTS

While plaintiffs' entitlement to each element of damage arises from a particular lease

provision, Pennsylvania common law or federal law, a nucleus of facts previously determined by

this Court or agreed to by the parties provides the framework within which plaintiffs' damages

are to be calculated. Those facts are as follows.

On December 3, 1996 the parties' predecessors entered into the Lease for the premises.

(S1).[2] The Lease term is 15 years, (S21), commencing February 17, 1997 and ending February

16, 2012. (S26).

The Premises sustained severe flood damage on June 16-17, 2001 during Tropical Storm

Allison. (Portnoy, 2004 U.S. Dist. LEXIS 12235, at *2). The parties contemplated such a

contingency and allocated their respective obligations in the Lease in the event of a casualty.

(Id. at *6). As per the Lease, plaintiffs abated the rent until October 1, 2001, (S38), to permit

Omnicare to restore the interior of the Premises to pre-flood condition, as Omnicare was required

to do under the Lease. (Portnoy, 2004 U.S. Dist. LEXIS 12235, at *6). Although Omnicare has

admitted that 14 weeks was a reasonable period of time within which to restore the Premises to

its pre-flood condition, (S34, S35), it failed to undertake such restoration. (Id. at *10).

Rather than perform proper restoration, Omnicare simply tore out all porous materials

affected by the flood, including carpeting, ceiling tiles and the bottom four feet of thousands of

linear feet of drywall to prevent the proliferation of mold, mildew and fungus. (S91-S93). It

replaced virtually none of those building finishes however. (S77-S79, S91-S93, S97-S100,

---

[2] The parties filed stipulated and contested facts on March 8, 2005. Stipulated facts are cited "S," meaning
"stipulated." "CD" refers to facts proffered by plaintiffs which are contested by defendants and "CP" refers to facts
proffered by defendants which are contested by plaintiffs. The number following each stipulated or contested fact
refers to the particular fact being stipulated or contested. See Parties' Stipulated and Contested Facts, filed March 8,
2005 ("Stipulation"), attached hereto as Exhibit "1".

S102-104).   Instead, Omnicare performed only limited restoration to enable it to conduct its business operations from a portion of the Premises.  (Portnoy, 2004 U.S. Dist. LEXIS 12235, at *2; S82-S83, S93, S97-S98, S100, S102-S104).

On March 12, 2002, as a result of defendants' prolonged failure to pay rent and refusal to restore the Premises, plaintiffs accelerated the rent for the balance of the term of the Lease, causing all future Fixed Basic Rent to be due and payable immediately. (S44).  Omnicare ignored plaintiffs' demand for accelerated rent and ignored its obligation to restore the Premises, but continued to occupy the Premises until January 2003.  (Portnoy, 2004 U.S. Dist. LEXIS 12235, at *2).  At that point, Omnicare abandoned the Premises, leaving plaintiffs with a property "in need of renovation."  (Id. at *10).

Defendants paid no Fixed Basic Rent after the flood, (S44), nor have they paid Additional Rent, (S69), nor did they restore the Premises to pre-flood condition. (S112).  The Lease has not been terminated.  Although they are not required to do so, plaintiffs have been attempting to re-tenant the Premises.  Despite their efforts, plaintiffs have been unsuccessful, due in large measure to the fact that the Premises are still desperately "in need of renovation."  (See Campoli Affidavit, attached hereto as Exhibit "2," at ¶¶ 28-29).

The balance of this brief sets forth the bases for plaintiffs' claims and plaintiffs' responses to objections plaintiffs anticipate defendants will raise to those claims.

4

## III.  PLAINTIFFS' CLAIMS

### A.  Fixed Basic Rent

1.  <u>Plaintiffs are Entitled to Fixed Basic Rent Under the Lease.</u>

The Lease provides at § 2.01 that "[t]he Fixed Basic Rent shall be payable during the Initial Term, in advance, without notice or demand, in equal monthly installments of one-twelfth of the annual amount, on the first day of each month." (S28).  In the Preamble, § F, the Lease provides that Fixed Basic Rent for the entire term of the Lease shall be $12,378,000, payable as follows:

| YEAR | YEARLY PAYMENTS | EQUAL MONTLY PAYMENTS |
|------|-----------------|------------------------|
| Lease Year 1 | $222,000.00 | $18,333.34 |
| Lease Year 2 | $444,000.00 | $36,666.67 |
| Lease Year 3-4 | $806,000.00 | $67,166.67 |
| Lease Year 5-6 | $868,000.00 | $72,333.34 |
| Lease Year 7-15 | $930,000.00 | $77,500.00 |

Omnicare stopped paying rent in the 5th year of the 15-year Lease and abandoned the Premises in the 7th year of the Lease.  (<u>Portnoy</u>, 2004 U.S. Dist. LEXIS 12235, at *7).  This Court has found that defendants' failure to pay rent was unjustified.  (<u>Id.</u> at *6-*15, *17).  Plaintiffs are entitled to both past due Fixed Basic Rent and the unpaid balance of Fixed Basic Rent through the end of the Lease term.  (<u>Id.</u> at *15; Lease, § 12.01 (default provisions)).

Plaintiffs' claim for past due Fixed Basic Rent covers the period from the **end of the abatement period** following the 2001 flood (October 1, 2001) to the **date of plaintiffs' acceleration of Fixed Basic Rent (March 12, 2002).**  Plaintiffs' claim for Accelerated Fixed Basic Rent covers the period from the **date of plaintiffs' acceleration of Fixed Basic Rent**

(March 12, 2002) to the **end of the term of the Lease** (February 16, 2012), with the portion of accelerated rent from and after April 15, 2005, the assumed date of payment, discounted to present value.[3]

2.    The Lease Provides for Abatement of Rent in the Wake of a Casualty.

The Lease, at § 10.02 (a), provides that:

> [I]n case the Premises or any portion thereof shall be totally or partially damaged or destroyed by fire or by any other casualty whatsoever, then Landlord and Tenant shall proceed with reasonable promptness, and in accordance with paragraph (c) below, to repair and restore the Premises to at least as good condition as that which existed immediately prior to such fire and other casualty and during such repair period, there shall be an abatement of rent.

After the flood, plaintiffs notified defendants that rent would be abated until October 1, 2001, in order for defendants to restore the Premises. (S38). Fixed Basic Rent was therefore abated during the period June 16, 2001 to October 1, 2001.

This 14 week abatement period provided defendants with a reasonable period of time to restore the interior of the Premises to pre-flood condition as set forth in § 10.02(a) of the Lease. This was confirmed by defendants' facilities coordinator, David MacAllister, who stated at deposition that it would have taken "possibly three months, give or take a few weeks" to get the Premises back to pre-flood condition (S35), had defendants actually made an effort to meet their restoration obligation.

Of course, defendants never had any intention of restoring the Premises in compliance with the Lease. Defendants never responded to plaintiffs' requests for a date when defendants

---

[3] April 15, 2005 has been chosen as the assumed payment date for all items of damage. To the extent payment is not made on that date, a *per diem* charge is to be applied to each item of damage.

would complete the required repairs to the interior. (Campoli Affidavit, Exhibit 2, ¶16). These were not idle inquiries: HUB needed to advise its insurance carrier of the date the Premises would be restored for purposes of business interruption insurance calculations. (Id.). Plaintiffs also asked defendants to advise plaintiffs' carrier of any circumstances that would delay the restoration of the Premises. (Id. at ¶ 17). No such information was ever provided. (Id.). Omnicare did nothing.

On September 26, 2001, HUB's regional manager, David J. Campoli, sent Dr. Kenneth Feld, President of Omnicare Pharmaceutics, Inc., a letter reminding Dr. Feld that "Omnicare has yet to commence reconstruction ..."; that the time period from the June 2001 to October 1, 2001 was a "fair estimate of the time required to plan and reconstruct the property interiors by Omnicare for occupancy as required in the lease"; and that defendants' "rental obligation will recommence at [the Premises]" as of October 1, 2001. (S38-S39). On October 16, 2001, John Mannix of HUB sent David Morra, CEO and President of Omnicare Clinical Research, Inc., a letter stating that "David Campoli has advised me that he has had numerous conversations with members of your staff to coordinate restoration of the premises, but Omnicare has taken no action." (S40-S41). The reason for defendants' inaction became apparent in discovery.

Rather than proceeding "with reasonable promptness" to restore the interior of the Premises as required by §10.02(a) of the Lease, defendants actually instructed their representatives to "hold off" commencing construction. James McDevitt, Omnicare Pharmaceutics' Controller, stated at deposition that despite offering to buy and install drywall himself and lay carpet at night by himself and with other workers, he was instructed by his superiors prior to October 1, 2001 to hold off commencing the construction needed to restore the Premises to pre-flood condition. (S43). As defendants never had any intention of restoring the

Premises, and made no effort to do so, they are estopped from attempting to explain their breach

by claiming that the duration of the restoration period was inadequate. Spaulding v. Justice, 68

Pa. Super. 133 (1917); Berger v. Pittsburg Auto Equipment Co., 387 Pa. 61, 127 A. 2d 334

1956).

      3.    Plaintiffs Were Authorized to Accelerate Fixed Basic Rent Upon Tenant's Default.

Section 12.02 of the Lease provides:

> Upon the occurrence of an Event of Default, and at any time thereafter,
> Landlord shall have the following rights and may elect any one or
> more of the following remedies:
>
> (a)    To accelerate the whole or any part of the Fixed Basic Rent for
> the remainder of the Term (the "Accelerated Rent"), which Accelerated
> Rent shall be discounted to present value on the basis of a discount rate
> equal to the prime rate offered by CoreStates Bank, N.A., applied and
> calculated on the date of receipt by Landlord of such Accelerated Rent;
> and shall be deemed due and payable as if, by the terms and provisions
> of this Lease, such Accelerated Rent was on that date payable in
> advance.

On March 12, 2002, plaintiffs issued a "Supplemental Notice of Default; Notice of

Acceleration" to defendants advising that they were invoking the acceleration provision and "all

rent scheduled to come due under the Lease is now immediately due and payable." (S54). A

copy of the Supplemental Notice of Default; Notice of Acceleration is attached hereto as Exhibit

"3". Defendants ignored, and continue to ignore, that notice and its legal effect.

      The parties have agreed that the acceleration clause is valid and applicable. In fact, it

appears that the parties' approach to calculating Fixed Basic Rent does not differ greatly, except

with respect to the application of late charges authorized by the §2.05 of the Lease and pre-

judgment interest authorized by Pennsylvania law.

      As a result of defendants' refusal to recognize the legal significance of the March 12,

2002 acceleration notice, i.e., that all rent from and after that date became due and payable on

that date, defendants' calculation significantly understates interest charges and the late fee due

plaintiffs. The details of the Fixed Basic Rent calculation are presented at page 12 below.

4.    Plaintiffs Are Entitled to Pre-Judgment Interest on Fixed Basic Rent.

Applying well-established Pennsylvania law, the Court of Appeals for the Third Circuit

stated in Pollice, 225 F.3d at 395, that "where there has been a failure to pay a fixed or liquidated

sum due on a certain date -- the party to whom the sum is owed may as a matter of right recover

prejudgment interest at the legal rate of six percent running from the date the sum is due."

Accordingly, plaintiffs are entitled, at a minimum, to six percent simple interest *per annum* on

Fixed Basic Rent -- calculated from the date the payment was due to the date paid.

Defendants failed to include pre-judgment interest in their calculation of Accelerated

Rent, because they contend that, somehow, accelerated Rent is not due until the date paid, which

they assume to be April 1, 2005, (CP6), rather than the date of the Notice of Acceleration, March

12, 2002. This contention is contrary to the acceleration language of §12.02(a) of the Lease

which provides that upon notice of acceleration the Accelerated Rent "shall be deemed due and

payable as if by the terms and provisions of this Lease, such Accelerated Rent was on that date

[of notice] payable in advance."

Further, the Court of Appeals for the Third Circuit stated in Peterson v. Crown Fin.

Corp., 661 F.2d 287, 297 (3d Cir. 1981), that the Court may award pre-judgment interest at a rate

in excess of the statutory rate or may award compound interest in claims based on unjust

enrichment, "whenever a defendant holds money or property which belongs in good conscience

to the plaintiff." Under the circumstances of this case, the Court would be warranted in awarding

pre-judgment interest at a rate in excess of the 6% statutory rate or awarding compound interest.

610448                                    9

An award of interest in **excess** of the statutory rate would be appropriate for the following reasons. First, defendants continued to conduct business at the Premises for 18 months after rent payments ceased. (Portnoy, 2004 U.S. Dist. LEXIS 12235, at *11). Indeed, defendants' corporate designee, Ronald Greenspan, stated at deposition that defendants generated in excess of one million dollars for work performed in the Premises after the June 2001 flood. (October 30, 2002 Deposition of defendants' corporate designee, Ronald Greenspan, at 30-31, and attached hereto as Exhibit "4"). Defendants' corporate designee, David Morra, stated at deposition that defendants generated $2.8 million in post-flood revenues from one client alone (VIRBAC). (Morra 10/29/02 Deposition at 185-86, attached hereto as Exhibit "5").

Second, as early as July 2001, plaintiffs repeatedly asked Omnicare for a date when it would complete the required repairs to the interior and resume operations. As set forth above, Omnicare not only failed to respond, it also instructed its representatives to "hold off" commencing the restoration work.

Third, despite defendants' awareness that plaintiffs had an obligation to keep their insurance carrier apprised of the status of the Premises, Omnicare told plaintiffs in August and September 2001 that the Premises were not being used after the flood when in fact they were. (Campoli Affidavit, Exhibit 2, ¶ 2). Omnicare had, in fact, resumed operations in the Premises after the flood, and had, in fact, rebuilt certain sections of the Premises to finish clinical trials for its client, VIRBAC. (Portnoy, 2004 U.S. Dist. LEXIS 12235, at *3, *11, *16; S42, S82). Obviously, in using the Premises to generate business revenues without paying rent, without completing the necessary interior repairs and while stonewalling and misleading plaintiffs about its activities, Omnicare was aiming to enrich itself at plaintiffs' expense.

Finally, plaintiffs have had to incur enormous costs in litigation that was unnecessarily complicated by defendants, simply to recover that to which they are entitled under the Lease. This Court has already held that none of Omnicare's defenses had any merit. (Portnoy, 2004 U.S. Dist. LEXIS 12235, at *7-*8). Plaintiffs are therefore entitled to pre-judgment interest in **at least** the amount of 6% per annum. See Pollice v. National Tax Funding, 225 F.3d 379, 395 (3d Cir 2000).

5.    Plaintiffs are Entitled to a 5% Late Charge on Fixed Basic Rent.

Section 2.05 of the Lease provides that:

> Landlord shall be entitled to receive from Tenant a late charge equal to five percent (5%) of the amount of any payment or installment of Fixed Basic Rent and Additional Rent, or any portion thereof, if not received within ten (10) days of the date when due.

Defendants have failed to include a late charge on the portion of Accelerated Fixed Basic Rent that they contend is not yet due, i.e., from April 1, 2005 (defendants' assumed payment date) to February 16, 2012 (the scheduled Lease expiration). As previously noted, all Accelerated Rent was in fact due on the date of Notice of Acceleration, March 12, 2002. (CP1-CP6).

6.    Computation of Fixed Basic Rent.

The total amount of both components of Fixed Basic Rent, past due and accelerated, including the 5% late charge required by the Lease and pre-judgment interest at 6% per annum required by Pennsylvania law, is **$10,544,845.92.** The computation is as follows:

| | |
|---|---|
| Past due Fixed Basic Rent covering the period from the end of abatement period, (October 1, 2001) to plaintiffs' acceleration of Fixed Basic Rent, (March 12, 2002): | $434,000.04 |
| PLUS | |
| 5% late charge due under §2.05 of the Lease: | $21,700.00 |
| PLUS | |
| 6% pre-judgment interest (simple) per annum with respect to the past due Fixed Basic Rent and late charge from the date each monthly rental payment was due to April 15, 2005: | $91,140.01 |
| SUBTOTAL: | $546,840.05 |
| Accelerated Fixed Basic Rent covering the period from plaintiffs' acceleration notice (March 12, 2002)  to the end of the term of the Lease (February 16, 2012): | $9,130,925.36 |
| Undiscounted portion of Accelerated Fixed Basic Rent (March 13, 2002 to April 15, 2005): | $2,810,666.74 |
| Contractual rent due from April 15, 2005 to February 16, 2012 totaling $6,320,258.62, discounted to present value at 5.75%: | $5,221,420.91 |
| PLUS | |
| 5% late charge on undiscounted and discounted Accelerated Fixed Basic Rent: | $401,604.00 |
| PLUS | |
| 6% pre-judgment interest (simple) per annum with respect to undiscounted and discounted Accelerated Fixed Basic Rent and late charge from March 12, 2002 to April 15, 2005: | $1,564,313.84 |
| SUBTOTAL: | $9,998,005.87 |
| **GRAND TOTAL  (PAST DUE AND ACCELERATED FIXED BASIC RENT):** | **$10,544,845.92** |
| 6% prejudgment interest *per diem* on Grand Total (post-April 15, 2005): | $1,733.40 |

**B.    Additional Rent**

The second component of plaintiffs' damages is "Additional Rent" owed under the Lease

from October 1, 2001 to the present.   In general, the Lease defines "Additional Rent" as "all

other amounts payable by Tenant hereunder, whether payable to Landlord or to third parties...."

(Lease §2.02).  It includes taxes, insurance, utility charges such as water, sewer, gas, electricity,

light, heat, power, and telephone, and other operating expenses incurred in connection with the

Premises.

　　　1.  Governing Lease Provisions.

The Lease at §2.02 provides that the Tenant shall pay as "Additional Rent" "[a]ll other

amounts payable by Tenant hereunder, whether payable to Landlord or to third parties, including,

without limitation, taxes pursuant to Section 3.01, insurance premiums, and utility charges."

(S59).  The Lease, at §3.01, provides that "[t]enant will pay and discharge, punctually as and

when the same shall become due and payable, but in any event not later than five (5) business

days before any fine, penalty, interest or costs may be added thereto for nonpayment, all real

estate taxes[,] water charges and sewer charges."  (S60).  The Lease, at §3.07, provides that

"[t]enant shall timely pay or cause to be paid all charges for gas, electricity, light, heat, power,

water, telephone or other communication service or other utility or service used, rendered or

supplied to, upon or in connection with the Premises throughout the Term [of the Lease]."

(S61).  The Lease, at §§3.07 and 10.01, requires the Tenant to maintain at its cost commercial

general liability insurance and all risk insurance for the Premises throughout the Lease term.

(S62-S64).  The Lease, at §8.04, also provides that "[t]enant shall pay Landlord ... a fee of

$400.00 per month, as Additional Rent in accordance with §2.02 hereof."  (S65).

2.    Calculation of Additional Rent.

Defendants stipulate that they have not paid all of the Additional Rent under the Lease

since the 2001 flood. (S69). Attached as Exhibit 11 to the Parties' Stipulated and Contested

Facts are copies of the relevant invoices, checks and other supporting documentation,

accompanied by a summary of same, showing the amount of Additional Rent up to March 4,

2005 that has been paid by HUB since defendants stopped paying rent. For the convenience of

the Court, a copy of a summary updated to April 15, 2005 is attached hereto as Exhibit "6".

A 5% late charge is due under §2.05 of the Lease with respect to the Additional Rent

owed plaintiffs from October 1, 2001 through April 15, 2005. In addition, plaintiffs are entitled

to 6% prejudgment interest from the date said amounts were owed to April 15, 2005.

**As of April 15, 2005, the total amount of Additional Rent owed under the Lease,**

**combined with late charges and pre-judgment interest to April 15, 2005 is  $1,178,300.15.**

C.    **Restoration Costs**

The third component of plaintiffs' damages is the restoration costs associated with

repairing those areas of the Premises which defendants indisputably failed to restore to the

condition they were in immediately prior to the 2001 flood. (Portnoy, 2004 U.S. Dist. LEXIS

12235, at *3, *11, *16). Plaintiffs maintain that defendants owe $1,057,770 in restoration costs,

calculated as follows:

| ITEM | RESTORATION COSTS |
|---|---|
| **FREIGHT ELEVATOR**<br><br>*Estimate by Tri-State Elevator* | $54,900 |

14

| | |
|---|---|
| **SPRINKLER SYSTEM**<br>(Excluding Rooms 3.08 and 2.01)<br><br>*Estimate by A&S Sprinkler* | $4,950 |
| **MILLWORK, METAL STUDS/DRYWALL, ACOUSTICAL CEILINGS, FLOORING, PAINTING/WALL COVERINGS, PLUMBING, SPRINKLERS (ROOM 3.08 AND 2.01 ONLY), ELECTRICAL, DOORS**<br><br>*Estimate by Philadelphia Construction Services* | $997,920 |
| **TOTAL** | **$1,057,770** |

1. Governing Lease Provisions.

This Court held on June 25, 2004, that the Lease is "unambiguous" regarding defendants'

restoration obligation, and clearly allocates to Omnicare the responsibility for interior repairs.

(Portnoy, 2004 U.S. Dist. LEXIS 12235, at \*10, \*16). As noted above, §10.02 requires

defendants to restore the Premises with "reasonable promptness" after a casualty.

The Lease, at §8.01, also requires Omnicare to keep the Premises in "good working order

and condition" throughout the term of the Lease, and to deliver the Premises in "broom clean

condition, reasonable wear and tear excepted" at the expiration of the Lease. The Lease, at

§5.02, further requires Omnicare to maintain the interior of the Premises, in compliance with all

laws and regulations:

> Tenant shall comply in all material aspects with all Laws
> respecting the occupancy, use, enjoyment, maintenance,
> management, improvement, repair, or alteration of the
> Premises,....

2. Repairs Defendants Failed to Make to the Interior of the Property.

610448                                15

At deposition on December 9, 2004, Omnicare's corporate designee and property manager, David MacAllister, identified on a building plan the portions of the Premises Omnicare did not repair to pre-flood condition. (S80-S89). In fact, the only areas in which Omnicare made repairs after the flood were those areas MacAllister marked on the building plan in red ink; no other areas were ever repaired. (S85-S88; Exhibit "13" to Stipulation). Included among the repairs Omnicare admittedly failed to make were:

- Drywall on the 1st floor which Omnicare removed after the flood but did not replace (S91-S95);
- Potentially contaminated ceiling tiles and flood-damaged doors which Omnicare admittedly failed to replace (S97-S105);
- The Freight Elevator (S108-S110); and
- Certain sprinkler pipes on the 2nd floor that had been cut off and left either dangling from the ceiling or abandoned on the floor.

Plaintiffs obtained estimates from Philadelphia Construction Services, Tri-State Elevators, and A&S Sprinkler to repair the items Omnicare identified as not having been repaired. **The total amount of restoration costs owed by defendants, based on those estimates, is $1,057,770.**

### 3.    Omnicare's Continuing Attempts to Evade Unambiguous Lease Provisions.

Except for Omnicare's claim that the four-foot sections of drywall it tore out but failed to replace after the flood do not have to be replaced to their full 10 foot height, (S91-S95), plaintiffs and defendants are in basic agreement on the costs of required repairs. **What Omnicare disputes is its obligation to pay restoration costs at all, despite the unambiguous language of the Lease.**

To escape its obligation to restore, Omnicare claims that any tenant to whom plaintiffs would lease the Premises following Omnicare's abandonment of the Lease would demolish and

reconfigure the interior. Therefore, Omnicare claims it need not bother with restoration.

Omnicare bases its position on the following "facts."

- When Flex buildings such as the Property change occupants, the practice in the commercial real estate market is to demolish and reconfigure the interior of the building; and

- Plaintiffs will not pay the costs of restoring the interior of the Property to its pre-2001 Flood condition, because the interior of the Property would be demolished and reconfigured at the end of the Lease term.

(CP9, CP10).

Omnicare is mistaken for two reasons. First, even if these so-called facts were true (which they are not), they would not excuse defendants from the contractual obligations they assumed under the Lease. Second, defendants' "facts" are wrong.

At the outset it must be noted that Pennsylvania courts routinely enforce clauses like §10.02 which obligate tenants to maintain and repair the leased premises at their expense. See Platt v. City of Philadelphia, 183 Pa. Super. 486, 133 A.2d 860, 862 (1957) (concluding "[A]s we construe this lease, the tenant would have the obligation to make the repairs."); Fayette R. Plumb, Inc. v. Cooper Indus. Inc., 587 F. Supp. 64 (E.D. Pa. 1984) (applying Pennsylvania law to enforce covenant to repair); Loughlin v. Carey, 21 Pa. Super. 477 (1902) (enforcing a covenant to repair); Mumma v. Club Plan of America, 6 Pa. D. & C.2d 266 (Dauphin Cty. 1955) (confirming that a covenant to repair will be enforced if negligence is shown as required by the lease), Giordano v. Brandywine Mushroom Corp., 32 Pa. D. & C.2d 522 (Chester Cty. 1963) (calculating damages for violation of covenant to repair). Omnicare is required to abide by the Lease terms. No cases have been found that even suggest the excuses Omnicare offers to avoid its obligation to pay restoration costs have any legal effect.

610448                                    17

Moreover, the factual predicates of defendants' excuses fail. First, the Premises is not a "Flex building." (Campoli Affidavit, Exhibit 2, at ¶¶ 31-34). Second, in all probability a new tenant will utilize a substantial portion (65% to 90%) of the interior of the building as currently configured. (Id. at ¶¶ 35, 36). In fact, the last prospective tenant plaintiffs had for the Premises, Allegheny Valley School, was planning to reuse a sizeable portion of the Premises consistent with Omnicare's required restorations. (Id. at ¶ 29).

The sections of the Premises which are less likely to be utilized by a new tenant are the actual laboratory facilities, which represent only a small portion of the space. (Id. at ¶ 36).

This Court has previously held that it "has to enforce the parties' agreement absent extreme circumstances." (Portnoy, 2004 U.S. Dist. LEXIS 12235, at *11-*15). The Court has also held that the provision of the Lease regarding restoration is "unambiguous" and "clearly allocated . . . to . . . Omnicare the responsibility for interior repair." (Id. at *14). Despite these holdings, defendants continue to raise baseless "defenses," like the claim that the duration of the restoration period was insufficient or that they are excused from paying for restoration because tenants to whom plaintiffs may relet the Premises, to mitigate the effect of defendants' breaches, may want a different interior configuration of the Premises. As this Court has previously observed, there are no extreme circumstances in this case.

It is well-established in Pennsylvania that when a breach of a lease occurs, the measure of damages should place "the aggrieved party as nearly as possible in the same position he would have occupied had there been no breach." See Harman v. Chambers, 358 Pa. 516, 521, 57 A.2d 842, 845 (1948). Accordingly, plaintiffs are entitled to the costs to restore the Premises so that they are in the position they would have occupied if Omnicare had not breached. See Harman, 358 Pa. at 521, 57 A.2d at 845; Reed v. Harrison, 196 Pa. 337, 340, 46 A. 415 (1900) (stating

that a landlord is entitled to keep tenant's security deposit when tenant fails to restore the property to original condition as set forth in the lease); <u>Appleton v. Marx</u>, 83 N.E. 563, 565 (N.Y. 1908) (stating that when a lease provision requires tenant to return the premises to a certain condition and tenant fails to do so, tenant must pay landlord's costs for returning the property to the agreed upon condition in the lease); <u>Gold Mining and Water Co. v. A.B. Swinerton</u>, 142 P.2d 22, 34 (Cal. 1943) (stating that where there has been a failure to perform and repudiation of the lease by the tenant, the landlord is "entitled to recover the reasonable cost of improvements or repairs which the [tenant] agreed to make under the terms of the lease").

Since leases are to be interpreted as contracts <u>See Hutchison v. Sunbeam Coal Corp.</u>, 519 A.2d 385,389 (Pa. 1986)("A lease is a contract and is to be interpreted according to contract principles."), <u>Smith v. Southeastern Pennsylvania Transportation Authority</u>, 707 A.2d 604 (Pa. Commw. Ct. 1998) (same), plaintiffs are entitled to incidental and consequential monetary damages available under standard contract law.  In <u>Pugh v. Holmes</u>, 384 A.2d 1234, 1240 (Pa. Super. 1978), the Pennsylvania Superior Court confirmed the availability of legal damages stating, "Because we have held that a lease is no longer to be treated as a conveyance, but as a contract, standard contract remedies are available to both landlord and tenant."

**As there is no justification for defendants' failure to pay for restoration, plaintiffs are entitled to receive payment for the cost of restoration of the Premises in the amount of $1,057,770.00.**

### D.      Attorneys' Fees

The fourth element of plaintiffs' damages is the attorneys' fees and costs they have incurred as a result of defendants' breaches and other misconduct.  There are four separate

categories of such expenses.  First, as of February 28, 2005 plaintiffs had incurred fees and costs

in the amount of $1,581,035.71 to prosecute this action, i.e., to recover that to which they are

entitled under their Lease.  (A billing memorandum summarizing the fees and costs in this action

as of February 28, 2005 is attached hereto as Exhibit "7").

Second, as of February 28, 2005 plaintiffs had incurred fees and costs in the amount of

$240,936.62 for defense of a suit bought by one of Omnicare's customers, Fujisawa Healthcare,

Inc., against Omnicare and against plaintiffs.  (Fujisawa Healthcare Inc. v. Omnicare

Pharmaceutics, Inc., HUB Properties Trust, et al. Montgomery CCP, No. 03-03835).  Fujisawa

claims that the pharmaceutical drugs Omnicare stored and maintained for Fujisawa in the

Premises were damaged in the flood as a result of Omnicare's negligence.  Fujisawa asserts that

plaintiffs failed to ensure that Omnicare protected the property.  (A billing summary setting forth

the fees and costs in the Fujisawa action as of February 28, 2005 is attached hereto as Exhibit

"8").

Third, as of February 28, 2005 plaintiffs had incurred $29,514.81 in attorneys' fees and

costs to obtain property tax relief from the county and school district in which the Premises is

located.  The reduction in taxes is sought because the value of the Premises plummeted upon

defendants' abandonment without restoration.  (A billing memorandum summarizing the fees

and costs in the tax matter as of February 28, 2005 is attached hereto as Exhibit "9").

Finally, plaintiffs incurred fees and costs in the amount of $4,905 to remove a

mechanic's lien that Omnicare allowed to be filed against the Premises by the contractor

Omnicare hired to clean the Premises after the flood.[4]  (The Schnader Law Firm's invoices

relating to the mechanic's liens are attached hereto as Exhibit "10").

---

[4] For the sake of simplicity, the Schnader Law Firm's mechanic's lien invoices are included in the section of this brief discussing attorneys' fees, even though they constitute Additional Rent under § 9.03 of the Lease.

1.    Legal Bases for Recovery of Attorneys' Fees and Costs.

There are several legal bases upon which plaintiffs' claims rest.  The fees and

costs incurred **in this litigation** are recoverable by plaintiffs from defendants under § 7.01 of the

Lease.  They are also recoverable under the federal common law exception to the "American

Rule" against fee-shifting,  which exception permits the Court to require a party to pay the fees

and costs of its adversary when the party has acted in "bad faith or vexatiously."  Plaintiffs may

also recover attorneys' fees and costs incurred in this litigation from defendants under 42 Pa.

C.S.A. § 2503, which provides for such recovery when a party has engaged in "dilatory, obdurate

or vexatious conduct."

Plaintiffs' claim for fees and costs in the Fujisawa case and the tax appeal are also

covered by §7.01 of the Lease.  Plaintiffs' claim for fees and costs incurred in connection with

removal of the mechanic's lien is covered by §9.03 of the Lease.

a.    Lease provisions permitting recovery of attorneys' fees and costs.

Two Lease provisions are relevant.  First, § 7.01 provides in pertinent part:

> Subject to Section 10.05 hereof, Tenant will protect, indemnify and
> hold harmless Landlord . . . **from and against any and all** claims,
> actions, damages, liability and **expense (including fees of
> attorneys,** investigators, and experts) **in connection with** loss of
> life, personal injury or **damage to property in** or about **the
> Premises** or arising out of the occupancy or use of the Premises by
> Tenant ... or **occasioned wholly or in part by any act or
> omission of Tenant**, except to the extent such loss, injury or
> damage was caused by the negligence of willful misconduct of
> Landlord or its agents.

Second, § 9.03 provides:

> Tenant shall not, in the making of any repairs or alterations
> pursuant to the provision of this Lease, suffer or permit any
> mechanic's, laborer's or materialmen's lien to be filed
> against the Premises, Building, or any part thereof by
> reason of labor or materials supplied or claimed to have

been supplied to Tenant; and if such lien shall be filed, Tenant, within forty-five days after notice of filing, shall cause it to be discharged of record. In the event that Tenant fails to discharge any such lien as foresaid, then Landlord may, but shall not be required to, cause such lien to be discharged. **Any such payment or expenses incurred by Landlord in connection therewith, shall constitute Additional Rent hereunder** and shall be due and payable with the next monthly installment of Fixed Basic Rent.

(Emphasis added).

On its face, §7.01 covers plaintiffs' expenses in defending the <u>Fujisawa case</u>. Specifically, defendants are required to pay plaintiffs' "expense[s] (including fees of attorneys, investigators and experts) in connection with . . . damage to property in . . . the Premises . . . ."

Section 7.01 also clearly covers plaintiffs' expenses occasioned by defendants' breaches of the Lease. Specifically, defendants are required to pay plaintiffs' "expense[s] (including fees of attorneys, investigators and experts). . . . occasioned wholly or in part by any act or omission of . . .[defendants]." Plaintiffs' attorneys' fees in this litigation were occasioned by acts or omissions of defendants, i.e., their failure to pay rent, failure to restore the Premises and their abandonment of the Premises.

The American Rule does not preclude an award of attorneys' fees where there is an agreement between the parties that permits or requires fee-shifting. Sections 7.0 and 9.03 of the Lease clearly constitute agreements that require fee-shifting in the present circumstances. <u>See Moore v. Walker</u>, 28 Pa. D. & C. 3d. 124, 127, 1983 Pa. D. & C. LEXIS 283; <u>Fidelity – Philadelphia Trust Company v. Philadelphia Transportation Company</u>, 404 Pa. 541, 548, 173 A.2d 109 (1961).

Two sophisticated parties negotiated this Lease, including these provisions. They agreed, in §7.01 that defendants will pay plaintiffs' expenses, including attorneys' fees, not only when

defending matters like <u>Fujisawa</u>, but also, in cases like this, when such expenses "arise out of" defendants' "use or occupancy of the Premises… or [are] occasioned wholly or in part by any act or omission of [defendants]." Had the parties intended to limit the scope or operative effect of §7.01 to a certain class of cases they were perfectly capable of doing so. They created no such limitations and there is no reason for this Court to do so now.

Section 9.03 clearly establishes the parties' agreement that in the event defendants allow a lien to be placed on the Premises, as they did, they will pay expenses incurred by plaintiffs in having the lien removed.

Leases are in the nature of contracts and are thus controlled by principles of contract law, including rules of interpretation and construction. <u>Moore</u>, 28 Pa. D. & C.3d at 127. Sections 7.01 and 9.03 are not ambiguous and must be accorded their plain meaning. Accordingly, attorneys' fees and costs incurred in this litigation and in having the liens removed are expenses that are owed by defendants to plaintiffs under the Lease. Similarly, plaintiffs are entitled to the defense costs they have incurred in <u>Fujisawa</u> and the attorneys' fees and costs they incurred in prosecuting the property tax appeal that was necessitated by defendants' breaches.

     b.     Federal law permits recovery of attorneys' fees under the bad faith exception to the American Rule.

The United States Supreme Court has stated that a court has the inherent power to award attorneys' fees on the grounds of bad faith. <u>Chambers v. NASCO</u>, 501 U.S. 32 (1991). <u>See Perichak v. International Union of Electrical Radio & Machine Workers Local 601</u>, 715 F.2d 78 (3d Cir. 1983) (same). The Supreme Court has held that a court may award attorneys' fees where a party has "acted in bad faith, vexatiously, wantonly or for oppressive reasons" under an exception to the so-called "American Rule." <u>Aleyska Pipeline Service Co. v. Wilderness</u>

Society, 421 U.S. 240 (1975).  Under the American Rule, parties to litigation normally pay their own attorneys' fees regardless of the outcome of the case.

Consistent with these decisions, courts have assessed attorneys' fees against defendants who have acted in bad faith by persisting with defenses that have no legal or factual bases.  E.g., Fairley v. Patterson, 493 F.2d 598 (5th Cir. 1974) (awarding attorneys' fees when defendants forced plaintiffs to prepare for trial even though defendants' actions were clearly unlawful); Sierra Club v. United States Army Corps of Eng'rs., 590 F. Supp. 1509 (S.D.N.Y. 1984) (awarding attorneys' fees when defendants knew that their defenses were without color when they asserted them); Cape Verde v. A&A Partners, 89 F.R.D. 14 (S.D.N.Y. 1980) (awarding attorneys' fees because defendant acted in bad faith in refusing to return funds to which plaintiff was clearly entitled, raised no colorable defenses to plaintiff's action, and continued to hold the funds even after judgment was entered for plaintiff).

In Cape Verde, the parties entered a contract for the purchase of property with a contingency clause which explicitly allowed for cancellation by a certain date.  Id., 89 F.R.D. at 16.  When the buyer cancelled the contract pursuant to the terms of the contract, the seller refused to return the funds.  Id., 89 F.R.D. at 17.  The seller continued to hold the funds even though the buyer's right to them was clear under the contract and had even been acknowledged by a representative of the seller and even though the seller had no colorable defenses.  Id., 89 F.R.D. at 22.  The buyer sued the seller and asked the court for an award of attorneys' fees.

Quoting the Supreme Court's decision in Alyeska, the Court stated that attorneys' fees are awarded to plaintiffs when defendant has unjustifiably put plaintiffs to the expense of litigation to obtain a benefit to which the plaintiff is plainly entitled.  In those circumstances, the Court stated "recovery of fees serves to compensate the prevailing party for costs which should

610448                                      24

not be incurred." Id., 89 F.R.D. at 21. Based on the above misconduct of defendant, the court

found that defendant had acted in bad faith, and awarded plaintiff attorneys' fees. The court

stated:

> Most significant to the 'bad faith' analysis is that the plaintiff was
> compelled to sue to recover a deposit clearly due and owing to it, a
> matter which was never seriously disputed by defendant prior to or
> during the litigation.

Id.

    The Third Circuit awarded attorneys' fees in similar circumstances in Perchiak, 715 F.2d

78 (3d. Cir. 1983). There, an individual who had stolen company property sued his former

employer for allegedly discharging him in violation of a collective bargaining agreement. The

Court found that the employee had acted vexatiously and in bad faith and awarded attorneys'

fees because:

- There was no merit to the employee's claims when filed;

- Not an iota of evidence was uncovered to bolster the employee's claims after
  years of discovery; and

- Knowing that his claims had no factual support, the employee built his case on
  sworn allegations that were false.

Id. at 83-85. Based on the above, the Court held that the party "could not have commenced his

action in other than bad faith, nor could he have maintained this action with any reasonable

prospect of prevailing on the merits." Id. at 84.  See Sierra Club v. United States Army Corps of

Eng'rs., 776 F.2d 383, 391 (2d Cir. 1985) (awarding attorneys' fees when defendants knew that

their defenses were without color when they asserted them and engaged in misrepresentations);

American Hosp. Ass'n v. Sullivan, 938 F.2d 216, 220 (D.C. Cir. 1991) (awarding attorneys' fees

where "the injured party is forced to undertake otherwise unnecessary litigation to vindicate

plain legal rights"; bad faith can support an award of attorneys' fees where it was an aspect of the

conduct giving rise to the lawsuit as well as during the lawsuit).

> d.     Defendants' misconduct before and after commencement of
>        this litigation justifies awarding plaintiffs' their fees and costs.

Defendants' vexatious misconduct and bad faith compel the award of attorneys' fees

against Omnicare in the case at bar. On June 25, 2004, this Court held that Omnicare had no

justification at all for refusing to pay rent and other Lease charges after the 2001 flood. Nor was

there any legitimate basis for Omnicare's refusal to restore the Premises to its pre-flood

condition. (Portnoy, 2004 U.S. Dist. LEXIS 12235, at *6 -*18). As its own employees have

admitted, Omnicare knew this, yet perpetrated what is essentially a scheme -- now entering its

fourth year -- to deny HUB what it is unequivocally entitled to under the Lease. Omnicare's

willful misconduct amounts to rank bad faith because it involves dishonesty, designed to deprive

plaintiffs of benefits to which they are indisputably entitled. The actions Omnicare has taken to

harm plaintiffs (both before and after the filing of the complaint) include:

- **Management's threats to fire any employee who paid HUB rent**, including Omnicare Pharmaceutics president and controller, Kenneth Feld and James McDevitt, who did not think there was any justification to withhold rent, and who were personally embarrassed by management's actions. (James McDevitt 4/22/03 Deposition at 138-39, attached hereto as Exhibit "11"; Kenneth Feld 3/3/03 Deposition at 100 attached hereto as Exhibit "12");

- **Management's instructions to employees to hold off on the required restoration**, despite Omnicare's clear obligation under the Lease and despite the employees' offer to purchase and install drywall and carpet themselves at night (Portnoy, 2004 U.S. Dist. LEXIS 12235, at *10; S43);

- **Misrepresentations to HUB.** Despite HUB's need to accurately advise its insurance carrier of a new occupancy date, Omnicare told HUB in August and September 2001 that the Premises were not being occupied or used after the flood. In fact, Omnicare had, resumed operations in the Premises starting in July 2001, and had rebuilt certain sections of the Premises to finish clinical trials for its client, VIRBAC. Further, Omnicare misled HUB into believing that it was genuinely considering returning to the Premises. In the wake of the flood, Omnicare worked with HUB regarding the preparation of a

Stormwater Management Study which would modify the Premises for Omnicare to mitigate future flood damage. HUB spent significant funds to prepare the Stormwater Management Study for Omnicare. Unbeknownst to HUB, Omnicare had already advised its customers that it was closing down operations at the Premises -- before Omnicare management may have even received a copy of the study. (McDevitt 7/22/03 Deposition at 69-72, attached hereto as Exhibit "13"); and

- **Misrepresentations to the Court and frivolous legal arguments** (as set forth below).

To avoid paying its lease obligations, Omnicare has forced HUB to spend significant sums to respond to arguments that clearly were and are without legal basis. This Court held on June 25, 2004, that none of Omnicare's barrage of affirmative defenses "had any merit as a matter of law." (Portnoy, 2004 U.S. Dist. LEXIS 12235, at *7-*8, *15). The Court also found, that the Lease was "unambiguous," involved "sophisticated parties," and "clearly allocated" to Omnicare the responsibility for interior repairs. (Id. at *10, *14, *16). Remarkably, Omnicare continues to argue that it has no obligation at all to restore the Premises, and is justified in leaving HUB with "a premises in need of renovation," (Portnoy, 2004 U.S. Dist. LEXIS 12235, at *16), that is proving very difficult to market and re-let. (Campoli Affidavit, at Exhibit 2 at ¶29).

Omnicare unnecessarily complicated this case and caused costs to escalate unreasonably. Indeed the Court held that Omnicare's defenses had "no factual support in the record." (Portnoy, 2004 U.S. Dist. LEXIS 12235, at *10-*11 and *15). As in the cases cited above, the testimony of Omnicare's employees and customers demonstrates that Omnicare's defenses not only appear to be devoid of evidentiary support, they appear to be based on misrepresentations to the Court. Indeed, each of the underlying factual predicates Omnicare offered the Court as the basis for its frustration of purpose, commercial impracticability and mutual mistake defenses was later refuted directly by Omnicare's own employees or customers.

Defendants have clearly engaged in a protracted course of conduct, both before and after

the commencement of this litigation, that may be fairly characterized as vexatious, oppressive

and sounding in bad faith.  Under these circumstances the Court should sanction defendants by

awarding plaintiffs the attorneys' fees and costs they have incurred to address defendants'

misconduct and prosecute this case.

       e.      Pennsylvania law provides for recovery of attorneys' fees and costs
               when a party's conduct during or prior to the litigation is arbitrary,
               <u>vexatious or in bad faith</u>

While a litigant may not be penalized merely because he has instituted or defended an action,

<u>Summit Valley Indus. v. United Bhd. of Carpenters & Joiners Local 112</u>, 456 U.S. 717 (1982), in

Pennsylvania, a party who raises a defense in bad faith or vexatiously or for oppressive reasons is liable

for his opponent's attorneys' fees and costs.  <u>Lichtenstein v. Lichtenstein</u>, 481 F.2d 682, 684 (3d Cir.

1973).

Pennsylvania's statutory exception to the American Rule against fee-shifting is found at

42 Pa. C.S.A §2503, which provides in pertinent part:

> The following participants shall be entitled to a reasonable counsel
> fee as part of the taxable costs of the matter:

>                x   x   x   x   x   x

>    (7) Any participant who is awarded counsel fees as a
> sanction against another participant for dilatory, obdurate or
> vexatious conduct during the pendency of a matter.

>                x   x   x   x   x   x

>    (9) Any participant who is awarded counsel fees because
> the conduct of another party in commencing the mater or otherwise
> was arbitrary, vexatious or in bad faith.

42 Pa. C.S.A. §2503(7)(9).

As discussed in detail above, defendants' conduct, both before suit was instituted and during the pendency of this litigation, has been "arbitrary" because it was often based on "convenient selection or choice rather than reason." Webster's Third New International Dictionary (1976). A good example was defendants' choice to continue business operations without paying rent.

Defendants' conduct also smacked of "bad faith" in that it involved fraud and dishonesty, as when defendants misled plaintiffs regarding their use of the Premises and their intentions regarding restoration. Frick v. McClelland, 384 Pa. 597, 600 122 A.2d43, (1956).

Omnicare's defenses have been "dilatory, obdurate and vexatious" in that not one has been shown to have any merit, yet they have all caused plaintiffs a great deal of annoyance and expense. Santoro v. City of Philadelphia, 59 Pa. Commw. 114, 122, 429 A.2d 113, 117 (1981).

Finally, and perhaps most importantly, an award of attorneys' fees is particularly appropriate when one party's conduct places the opposing party "in a position that he is compelled to act for legal relief and the conduct in doing so was arbitrary, vexatious or in bad faith." McLaughlin v. Gerdts, Pa 19 D. & C.3d 293, 298 (1981). Here, of course, defendants' arbitrary, vexatious and bad faith conduct were the sole motivators in plaintiffs' decision to bring suit. Accordingly, plaintiffs' attorneys' fees and costs in this litigation should be paid by defendants under §2503.

## IX.    CONCLUSION

For all the foregoing reasons, plaintiffs respectfully request the Court to enter a judgment in their favor and against defendants in the amount of **$14,637,308.21** and to enter an Order requiring Omnicare to make quarterly deposits, in an amount to be determined, until the end of

the Lease, in an interest bearing account controlled by plaintiffs for the purpose of enabling

plaintiffs to pay future Additional Rent obligations under the Lease, as such obligations come

due and directing defendants to pay all of plaintiffs' attorneys' fees and costs in this litigation

and in other litigation for which defendants are liable for attorneys' fees and costs pursuant to the

Lease or applicable law.

Respectfully submitted,

JOSEPH J. MCGOVERN
STEPHEN W.W. CHING, JR
STEPHEN P. BOSIO
**OBERMAYER REBMANN MAXWELL  &
HIPPEL LLP**
One Penn Center, 19th Floor
1617 John F. Kennedy Boulevard
Philadelphia, PA 19103-1895
(215) 665-3000

Attorneys for Plaintiffs,
Barry M. Portnoy and Gerard M. Marton, as
Trustees for HUB PROPERTIES TRUST

Dated: April 1, 2005

# EXHIBIT   1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BARRY M. PORTNOY and<br>GERARD M. MARTIN, as Trustees for<br>HUB PROPERTIES TRUST<br>      Plaintiffs,<br><br>        v.<br><br>OMNICARE PHARMACEUTICS, INC.<br>        and<br>OMNICARE CLINICAL RESEARCH, INC.,<br>        Defendants. | :<br>:<br>:<br>: NO. 02-CV-2905<br>:<br>:<br>: HONORABLE CLIFFORD<br>: SCOTT GREEN<br>:<br>:<br>:<br>: |

THE PARTIES'
STIPULATED AND CONTESTED FACTS
PURSUANT TO THE COURT'S FEBRUARY 8, 2005 PRE-TRIAL ORDER

JOSEPH J. MCGOVERN
STEPHEN W.W. CHING, JR.
**OBERMAYER REBMANN MAXWELL
& HIPPEL LLP**
One Penn Center, 19th Floor
1617 John F. Kennedy Boulevard
Philadelphia, PA 19103-1895
(215) 665-3000

Attorneys for Plaintiffs

RICHARD P. MCELROY
ADAM M. SHARE
TODD A. SCHOENHAUS
**BLANK ROME, LLP**
One Logan Square
18th & Cherry Streets
Philadelphia, PA 19103-6998
(215) 569-5500

Attorneys for Defendants

Date: March 8, 2005

604320

In accordance with the Court's Pre-Trial Order dated February 8, 2005, the parties hereby jointly submit their Stipulated and Contested Facts.

# THE PARTIES' STIPULATED FACTS

## I.    FACTUAL BACKGROUND & PARTIES

S1.    On December 3, 1996, Bio-Pharm Pharmaceutics Services, Inc. entered into a lease with 525 Virginia Drive Associates Limited Partnership for commercial property located at 525 Virginia Drive, Fort Washington, Pennsylvania (hereinafter referred to as the "Lease").

S2.    The document attached hereto as Exhibit "1" is a true and correct and authentic copy of the Lease.

S3.    On September 19, 1997, Bio-Pharm Pharmaceutics Services, Inc. changed its name to IBAH Pharmaceutics Services, Inc.

S4.    On September 19, 1997, Bio-Pharm Pharmaceutics Services, Inc. filed a Certificate of Amendment of Certificate of Incorporation dated September 18, 1997, indicating that by resolution of its board of directors, it was changing its name to IBAH Pharmaceutics Services, Inc.

S5.    The document attached hereto as Exhibit "2" is a true and correct and authentic copy of the Certificate of Amendment of Certificate of Incorporation dated September 18, 1997, reflecting Bio-Pharm Pharmaceutics Services, Inc's corporate name change to IBAH Pharmaceutics Services, Inc.

S6.    On June 15, 2000, IBAH Pharmaceutics Services, Inc. changed its name to Omnicare Pharmaceutics, Inc.

604320

S7.    On June 15, 2000, IBAH Pharmaceutics Services, Inc. filed a State of Delaware Certificate of Amendment of Certificate of Incorporation, indicating that by resolution of its board of directors, it was changing its name to Omnicare Pharmaceutics, Inc.

S8.    The document attached hereto as Exhibit "3" is a true and correct and authentic copy of the Certificate of Amendment of Certificate of Incorporation filed on June 15, 2000, reflecting IBAH Pharmaceutics Services, Inc.'s corporate name change to Omnicare Pharmaceutics, Inc.

S9.    On or about December 3, 1996, VDA and I.B.A.H., Inc. executed a Lease Guaranty with respect to the Lease (hereinafter referred to as the "Lease Guaranty").

S10.    The document attached hereto as Exhibit "4" is a true and correct and authentic copy of the December 3, 1996 Lease Guaranty between VDA and I.B.A.H., Inc.

S11.    The December 3, 1996 Lease Guaranty between VDA and I.B.A.H., Inc. provides that I.B.A.H., Inc. "guarantees to Landlord [at the time of the execution of the Lease Guaranty, VDA], its successors and assigns, including without limitation, Landlord's mortgage lender with rights to enforce Landlord's rights under the Lease, the full and prompt payment of all Fixed Basic Rent and Additional Rent (as those terms are defined in the Lease) payable by Tenant under the Lease and the full, faithful and prompt performance and observance of all the covenants, terms, conditions and agreements therein provided to be performed and observed by Tenant; and Guarantor [at the time of the execution of the Lease Guaranty, I.B.A.H., Inc.] does hereby become guarantor to Landlord, its successors and assigns, including without limitation, landlord's mortgage lender with rights to enforce landlord's rights under the Lease, for and with respect to all of the aforesaid obligations of Tenant under the Lease."

S12.    The December 3, 1996 Lease Guaranty between VDA and I.B.A.H., Inc. provides that I.B.A.H., Inc. as Guarantor "hereby covenants and agrees to and with Landlord, its successors and assigns, that if default shall at any time be made by Tenant which is not cured within the applicable cure periods under the Lease, in the payment of any Fixed Basic Rent or Additional Rent payable by Tenant under the Lease, and such sums are not paid by Tenant or otherwise recovered by Landlord within the time provided under the Lease, Guarantor shall forthwith pay such rent or other sums or charges to Landlord, its successors and assigns."

S13.    The December 3, 1996 Lease Guaranty between VDA and I.B.A.H., Inc. provides that "[t]his Guaranty shall be legally binding upon Guarantor, its successors and assigns, and shall inure to the benefit of Landlord, and its successors and assigns, including without limitation, Landlord's mortgage lender with rights to enforce Landlord's rights under this Lease."

S14.    On June 21, 2000, I.B.A.H., Inc. changed its name to Omnicare Clinical Research, Inc.

S15.    On June 21, 2000, I.B.A.H., Inc.(noted also as "IBAH, Inc.") filed a State of Delaware Certificate of Amendment of Certificate of Incorporation, indicating that by resolution of its board of directors, it was changing its name to Omnicare Clinical Research, Inc.

S16.    The document attached hereto as Exhibit 5 is a true and correct and authentic copy of the Certificate of Amendment of Certificate of Incorporation filed on June 21, 2000, reflecting I.B.A.H., Inc.'s corporate name change to Omnicare Clinical Research, Inc.

S17.    On September 19, 1997, VDA sold the Property, and assigned its rights under the Lease and Lease Guaranty, to HUB.

S18.    On or about September 19, 1997, VDA and HUB Properties Trust executed an Assignment and Assumption of Leases, Contracts and Agreements.

S19.    The September 19, 1997 Assignment and Assumption of Leases, Contracts and Agreements between VDA and HUB provides that VDA as Assignor shall "grant, bargain, sell, set over, assign, transfer and deliver unto" HUB Properties Trust as Assignee all of VDA's right, title and interest in and to the leases, contracts and agreements with respect to the Property, including, but not limited to, VDA's "right, title and interest in and to any and all leases, rental agreements or other agreements (including all amendments or modifications thereto) affecting any portion" of the Property and described in the Lease.

S20.    The document attached hereto as Exhibit "6" is a true and correct and authentic copy of the September 19, 1997 Assignment and Assumption of Leases, Contracts and Agreements between VDA and HUB.

## II.    TERM OF THE LEASE

S21.    The Lease at § 1.02(b) provides that "the Initial Term of this Lease shall continue for a period of fifteen years, unless this Lease shall be renewed by the Tenant in accordance with Article 14 hereof or sooner terminated as hereinafter provided."

S22.    The Lease at §1.02 (b) provides that "[t]he Initial Term of this Lease shall commence on the later to occur of the following: (i) January 15, 1997 or (ii) a date which is ten (10) days after the Landlord Improvements (as herein defined) have been substantially completed in accordance with Article 4 hereof."

S23.    On or about September 15, 1997, Bio-Pharm Pharmaceutics Services, Inc. executed a Lease Estoppel Certificate (the "Lease Estoppel Certificate").

S24.    The document attached hereto as Exhibit "7" is a true and correct and authentic copy of the Lease Estoppel Certificate.

S25.    In the Lease Estoppel Certificate, the tenant, Bio-Pharm Pharmaceutics Services, Inc., certified:

> 4.    That any work and all other improvements to the Leased Premises required to be furnished or constructed by the Landlord pursuant to the terms of the Lease have been completed, that Tenant has accepted the Leased Premises, and that the term of the Lease commenced on February 17, 1997.

S26.    Fifteen years from February 17, 1997 is February 16, 2012.

S27.    Under §1.02(b) of the Lease, the initial term of the Lease expires on February 16, 2012.

## III.    FIXED BASIC RENT

S28.    The Lease at §2.01 provides that "[t]he Fixed Basic Rent shall be payable during the Initial Term, in advance, without notice or demand, in equal monthly installments of one-twelfth of the annual amount, on first day of each month during the Initial Term."

S29.    The Lease at § 2.01 provides that "[e]xcept as hereinafter provided, the minimum annual rent for such Lease Years is in the amounts set forth in the Preamble as 'Fixed Basic Rent.'"

S30.    The Lease at Preamble, §F provides that the fixed basic rent for the entire term of the Lease shall be $12,378,000.00, payable as follows:

| YEAR | YEARLY PAYMENTS | EQUAL MONTLY PAYMENTS |
|---|---|---|
| Lease Year 1 | $222,000.00 | $18,333.34 |
| Lease Year 2 | $444,000.00 | $36,666.67 |
| Lease Year 3-4 | $806,000.00 | $67,166.67 |
| Lease Year 5-6 | $868,000.00 | $72,333.34 |

604320                                6

| Lease Year 7-15 | $930,000.00 | $77,500.00 |

S31.    No money was forwarded towards Fixed Basic Rent with respect to the Property by Defendants to Plaintiffs after the June 2001 flood nor after October 1, 2001. (October 29, 2002 Deposition of Defendants' corporate designee, David Morra, at 129-130 and October 30, 2002 Deposition of Defendants' corporate designee, Ronald Greenspan, at 68).

S32.    The Lease at § 10.02 (a) provides, *inter alia*, that "[I]n case the Premises or any portion thereof shall be totally or partially damaged or destroyed by fire or by any other casualty whatsoever, then Landlord and Tenant shall proceed with reasonable promptness, and in accordance with paragraph (c) below, to repair and restore the Premises to at least as good condition as that which existed immediately prior to such fire and other casualty and during such repair period, there shall be an abatement of rent."

S33.    The Lease at §10.02 (c) provides, *inter alia*, that "[a]ll repairs, restoration and reconstruction to the interior of the Building, or other portions of the Premises comprising the Tenant Work shall be performed by Tenant subject to the conditions set forth in Section 4.02 and Section 9.01 hereof."

S34.    When asked at deposition, "[a]nd when was the building put back in the condition when you could have continued operation?", Defendants' corporate designee, David Morra, stated that "probably late September 2001." (October 29, 2002 Deposition of Defendants' corporate designee, David Morra, at 159).

S35.    Defendants' facilities coordinator, David MacAllister, stated at deposition that it would have taken "possibly three months, give or take a few weeks" to the get the Property back into the condition that it was prior to the 2001 flood. (MacAllister November 21, 2002 Deposition at 53).

S36.    Defendants have not fully restored and repaired the interior of the Building, or other portions of the Premises comprising the Tenant Work to the condition which existed immediately prior to the June 2001 flood.

S37.    While making certain restorations to the interior of the building after the June 2001 flood, Defendants have not fully restored the building to the condition it was in prior to the June 2001 flood. (October 29, 2002 Deposition of Defendants' corporate designee, David Morra, at 176-78; October 30, 2002 Deposition of Defendants' corporate designee, Ronald Greenspan, at 33-34).

S38.    On September 26, 2001, the regional manager for HUB's property manager, David J. Campoli, sent Mr. Ken Feld of Omnicare Pharmaceuticals, Inc. a letter, stating that "Omnicare has yet to commence reconstruction at its own direction"; the time period from the June 2001 to October 1, 2001 was "a fair estimate of the time required to plan and reconstruct the property interiors by Omnicare for occupancy as required in the lease"; and "rental obligation will recommence at 525 Virginia" as of October 1, 2001.

S39.    A true and correct and authentic copy of Campoli's September 26, 2001 letter to Feld is attached hereto as Exhibit "8".

S40.    On October 16, 2001, John Mannix of HUB sent David Morra of Omnicare Clinical Research, Inc. a letter stating that "David Campoli has advised me that he has had numerous conversations with members of your staff to coordinate restoration of the premises, but Omnicare has taken no action."

S41.    A true and correct and authentic copy of Mannix's October 16, 2001 letter to Morra is attached hereto as Exhibit "9".

S42.    With regard to restoring the Property to the condition it was in prior to the June 2001 flood, David MacAllister, Defendants' facilities coordinator, stated at deposition:

```
7    Q.        Were you asked to try to get the building

8    back into the condition it was in prior to the

9    flood?

10   A.        No.

11   Q.        Well, you were only asked to try to get

12   the building back into a condition so that you

13   could accommodate the Virbac project?

14   A.        Yes.
```

(MacAllister November 21, 2002 Deposition at 47).

S43.    James McDevitt, Omnicare Pharmaceutics' Controller, stated at deposition that despite offering to buy drywall himself, and to install drywall and lay carpet at night by himself and with other workers, he was instructed by his superiors prior to October 1, 2001 to hold off commencing the construction needed to restore the Property to the condition the Property was prior to the June 2001 flood.  (McDevitt April 22, 2003 Deposition at 190-191; McDevitt July 22, 2003 Deposition at 38-40 and Exhibit 34 at McDevitt 1118).

S44.    On March 12, 2002, HUB's former counsel then, William J. Maffucci, sent a "supplemental notice of default; notice of acceleration" to David Morra of Omnicare Clinical Research, Inc. and Kenneth Feld of Omnicare Pharmaceuticals, Inc., stating as a result of Defendants' defaults under the Lease, HUB "hereby exercises its right under Lease § 12.02 to accelerate Tenant's rental obligation, such that all rent scheduled to come due under the Lease is now immediately due and payable" (emphasis in original) and stating that "[d]emand is hereby

made under the Lease and Guaranty for immediate payment by Tenant and/or by Guarantor of the full Accelerated Rent."

S45.    A true and correct and authentic copy of Maffucci's March 12, 2002 Supplemental Notice of Default; Notice of Acceleration is attached hereto as Exhibit "10".

S46.    Maintaining that the obligation to pay rent is in dispute, Defendants have not paid the fixed basic rent for the time period from October 1, 2001 to March 31, 2002.

S47.    Under the terms of the Lease, the amount of fixed basic rent during the time period from October 1, 2001 to March 31, 2002 is $434,000.04.

S48.    The Lease at §2.05 provides that the "Landlord shall be entitled to receive from Tenant a late charge equal to five percent (5%) of the amount of any payment or installment of Fixed Basic Rent and Additional Rent, or any portion thereof, if not received within ten (10) days of the date when due."

S49.    5% x $434,000 = $21,700.

S50.    Under §2.05 of the Lease, the late charge with respect to the amount of fixed basic rent for the time period from October 1, 2001 to March 30, 2002 is $21,700.00.

S51.    $434,000.04 + $21,700 = $455,700.04.

S52.    Under the Lease, the amount of fixed basic rent during the time period from October 1, 2001 to March 30, 2002 ($434,000), when combined with the late charge under §2.05 of the Lease ($21,700) is $455,700.04.

S53.    The Lease at §12.02(a) provides that upon the occurrence of an Event of Default by the Tenant, the Landlord may "accelerate the whole or any part of the Fixed Basic Rent for the remainder of the Term (the "Accelerated Rent"), which Accelerated Rent shall be discounted to present value on the basis of a discount rate equal to the prime rate offered by Corestates

604320                                  10

Bank, N.A., applied and calculated on the date of receipt by Landlord of such Accelerated Rent;

and shall be deemed due and payable as if, by the terms and provisions of this Lease, such

Accelerated Rent was on that date payable in advance."

S54.    In his March 12, 2002 Supplemental Notice of Default; Notice of Acceleration

attached hereto as Exhibit "10", HUB's former counsel, William Maffuci, stated:

> Landlord hereby exercises its right under Lease § 12.02 to
> <u>accelerate</u> Tenant's rental obligations, such that all rent scheduled
> to come due under the Lease is now immediately due and payable.
> (emphasis in original).

S55.    Due to mergers and acquisitions, CoreStates Bank, N.A. is currently doing

business as Wachovia Bank.

S56.    As of the date of these Stipulations, the prime rate offered by Wachovia Bank is

5.50%.

S57.    The time period from April 1, 2002 to February 16, 2012 is 118 months and 16

days.

S58.    Under the Lease, the Fixed Basic Rent during the time period from April 1, 2002

to February 1, 2003 is $72,333.34 per month; the Fixed Basic Rent during the time period from

March 1, 2003 to February 16, 2012 is $77,500 per month.

**ADDITIONAL RENT**

S59.    The Lease at §2.02 provides that the Tenant shall pay as "Additional Rent" "[a]ll

other amounts payable by Tenant hereunder, whether payable to Landlord or to third parties,

including, without limitation, Taxes pursuant to Section 3.01, insurance premiums, and utility

charges."

S60.    The Lease at §3.01 provides that the "Tenant will pay and discharge, punctually as and when the same shall become due and payable, but in any event not later than five (5) business days before any fine, penalty, interest or costs may be added thereto for nonpayment, all real estate taxes[,] water charges and sewer charges."

S61.    The Lease at §3.07 provides that the "Tenant shall timely pay or cause to be paid all charges for gas, electricity, light, heat, power, water, telephone or other communication service or other utility or service used, rendered or supplied to, upon or in connection with the Premises throughout the Term [of the Lease]."

S62.    The Lease at §3.08 provides that the "Tenant shall pay or cause to be paid all insurance premiums for the coverages required to be purchased and maintained by Tenant in accordance with Article 10 of th[e] Lease."

S63.    The Lease at §10.01 provides that the "Tenant, at Tenant's sole cost and expense, shall keep or cause the Premises to be kept continuously insured during the Term, under policies providing the following insurance coverages: (i) commercial general liability insurance on an occurring basis with a combined single limit for bodily injury and property damage of not less than $2,000,000.00, including the broad form general liability endorsement, contract liability, and products liability coverage; and (ii) a policy of standard fire, extended coverage, and special extended coverage insurance (all risks), including a vandalism and malicious mischief endorsement, in an amount equal to the full replacement value of the Premises, new and without deduction for depreciation of fixtures, furniture and improvements."

S64.    The Lease at §10.01 provides that "[I]n the event that Tenant shall fail to maintain any such insurance coverages during the Term, Landlord may, but shall not be obligated to, procure and obtain such insurance coverages and Landlord's costs for such insurance shall

12

constitute Additional Rent hereunder and shall be due and payable within the next monthly installment of Fixed Basic Rent."

S65.    The Lease at §8.04 provides that "Tenant shall pay Landlord, or at Landlord's direction, to Landlord's agent, a fee of $400.00 per month, as Additional Rent in accordance with Section 2.02 hereof (the 'Manager's Fee')".

S66.    The number of months between October 1, 2001 and March 31, 2005 is 42 months.

S67.    $400/month x 42 months = $16,800.00.

S68.    Under the Lease, the management fees during the time period from October 1, 2001 to March 31, 2005 amounts to $16,800.00.

S69.    Defendants have not completely paid all of the Additional Rent under the Lease since the 2001 flood.

S70.    Section 2.05 of the Lease provides that "Landlord shall be entitled to receive from Tenant a late charge equal to five percent (5%) of the amount of any payment or installment of Fixed Basic Rent and Additional Rent, or any portion thereof, if not received within ten (10) days of the date when due."

## RESTORATION COSTS

S71.    The Lease at § 8.01 provides that "Tenant shall, throughout the Term [of the Lease], keep the Premises in good working order and condition, at Tenant's sole cost and expense, including all driveways, parking areas, curbs, landscaped areas, and sidewalks, and other improvements now or hereafter erected thereon, including but not limited to the roof,

HVAC equipment, finishes, plumbing, lighting and other improvements now or hereinafter located upon the Building, or any part of the Premises."

S72.    The Lease at § 8.01 provides that "[a]t the expiration of the Term [of the Lease], Tenant shall deliver the Premises in broom clean condition, reasonable wear and tear excepted."

S73.    The Lease at § 10.02 (a) provides that "in case the Premises or any portion thereof shall be totally or partially damaged or destroyed by fire or by any other casualty whatsoever, then Landlord and Tenant shall proceed with reasonable promptness, and in accordance with paragraph (c) below, to repair and restore the Premises to at least as good a condition as that which existed immediately prior to such fire or other casualty and during such repair period, there shall be an abatement of rent."

S74.    The Lease at §10.02(c) provides, *inter alia,* that "[a]ll repairs, restoration and reconstruction to the interior of the Building, or other portions of the Premises comprising the Tenant Work shall be performed by Tenant subject to the conditions set forth in Section 4.02 and Section 9.01 hereof."

S75.    The "Coordination Drawing," which was marked at Mr. MacAllister's December 9, 2004 deposition as "Exhibit MacAllister-4," and which was Bates-Stamped "HUB 4796," reflects the condition of the second floor of the Property immediately prior to the 2001 flood.

S76.    On page 85 of his December 9, 2004 deposition, Mr. MacAllister stated:

```
7       Q.       Where is the floor plan of the second

8       floor?  I think we probably marked it.  Okay.

9       It's 4.

10                        Just walk me through this,

11      please.  First of all, I ask you to consider this

12      Exhibit 4.  Tell me if that is a fair and accurate

13      representation of the configuration in use of the
```

```
14      second floor of this building immediately prior to
15      the flood.  You can take your time to study it.
16      A.      Yes.
```

(December 9, 2004 Deposition of Defendants' corporate designee, David MacAllister, at 85).

S77.    While making certain repairs to the interior of the building,  Defendants did not completely restore the Property to the condition that which existed immediately prior to the June 2001 flood. *See* October 29, 2002 Deposition of Defendants' corporate designee, David Morra, at 176-80 and October 30, 2002 Deposition of Defendants' corporate designee, Ronald Greenspan, at 33-34, 70-71); Defendants' Answer to the Complaint at ¶25.

S78.    Defendants' corporate designee, David Morra, stated at deposition that Defendants "have not replaced all of the wall board that has been removed"; "have not put carpeting back on certain parts of the floor"; and "have not refurbished the offices or any of that area." (October 29, 2002 Deposition of Defendants' corporate designee, David Morra, at 177).

S79.    Defendants' Head of Quality Assurance Department, Christopher Cichon, stated at deposition that "three-quarters of the building is still not sheet rocked"; the "warehousing is still all open"; and "the administration is all open." (Cichon November 11, 2002 Deposition at 142).

S80.    In December 2004, Plaintiffs noticed the deposition of Defendants' corporate designee with respect to the condition of the Property immediately prior to the 2001 flood.

S81.    At a deposition on December 9, 2004 at the Property, Defendants  produced their facilities coordinator for the Property, David MacAllister, as their corporate designee with respect to the condition of the Property immediately prior to the 2001 flood.

S82.    At his December 9, 2004 deposition, David MacAllister stated that the only areas on the first floor of the Property which Defendants repaired or restored after the 2001 flood were only those areas needed to performed services for a client called Virbac.

S83.    With respect to what flood-damaged items Defendants replaced on the first floor

of the Property after the 2001 flood, on page 51 of his December 9, 2004 deposition, David

MacAllister and Plaintiffs' counsel stated:

```
13      Q.      So if it wasn't required for the VIRBAC

14      contract, it wasn't evaluated and/or replaced?

15      A.      It was evaluated but was not replaced.
```

(December 9, 2004 Deposition of Defendants' corporate designee, David MacAllister, at 51).

S84.    At his December 9, 2004 deposition, Mr. MacAllister was shown a "coordination

plan" of the 1st floor of the building at the Property (marked as Exhibit MacAllister-1, Bates-

stamped HUB 4774).  (December 9, 2004 Deposition of Defendants' corporate designee, David

MacAllister, at 58).

S85.    At his December 9, 2004 deposition, Mr. MacAllister marked on Exhibit

MacAllister-1 in red ink those areas on the 1st floor in which Defendants made repairs after the

2001 flood.  (December 9, 2004 Deposition of Defendants' corporate designee, David

MacAllister, at 65-66).

S86.    At his December 9, 2004 deposition, Mr. MacAllister and Plaintiffs' counsel

stated:

```
19      Q.      So as I understand your testimony, let's

20      make sure we get this, the area shown by the red

21      line on Exhibit 1 is the area in which you made

22      repairs after the flood?

23      A.      Yes.
```

(December 9, 2004 Deposition of Defendants' corporate designee, David MacAllister, at 65).

S87.    At his December 9, 2004 deposition, Mr. MacAllister and Plaintiffs' counsel

stated:

24    Q.      And with the exception of Room 216 and

1    302, you restored all the other areas within the

2    red line to the condition they were in prior to

3    the flood, is that true?

4    A.      There was another room in here down in

5    here that I had mentioned too, 102, which is next

6    door here.

7    Q.      Why don't you put 102, why don't you

8    mark that as repaired.  And you have previously

9    described it, it was not returned to its condition

10    prior to the flood, but you did make repairs in

11    it?

12    A.      Yes.

13    Q.      Again, I ask you are there any other

14    areas in which you made repairs to return those

15    areas to the condition they were in prior to the

16    flood?

17    A.      I don't believe so.

(December 9, 2004 Deposition of Defendants' corporate designee, David MacAllister, at 65-66).

      S88.        At his December 9, 2004 deposition, Mr. MacAllister and Plaintiffs'

counsel stated:

18    Q.      Are there any other areas where you made

19    any repairs at all, whether you returned them to

20    the condition prior to the flood or not, that you

21    haven't previously described?

22    A.      As far as the first floor here?

23    Q.      Yes.

24    A.      Yes.

004320

17

```
1    Q.        What area or areas have you not

2    previously described in which you did make

3    repairs?

4    A.        Well, they are no longer here, but I

5    made repairs to the air compressors, the boiler.

6    Q.        I am talking about the physical plant

7    that remains.

8    A.        Okay.  This room here.

9    Q.        This being the cafeteria?

10   A.        Yes.

11   Q.        And you previously described that.  Any

12   other or areas?

13   A.        I don't believe so.
```

(December 9, 2004 Deposition of Defendants' corporate designee, David MacAllister, at 66-67).

S89.    On page 74 of his December 9, 2004 deposition, Mr. MacAllister and Plaintiffs'

counsel stated:

```
2    Q.        You indicated that with respect to the

3    storage area which has sheet rock cut out in

4    something of a swiss cheese fashion, that is to

5    say not all of it is cut at the four foot level,

6    some of it runs from floor to ceiling, that

7    occurred because you, not you personally, but the

8    company couldn't get access to those areas where

9    the sheet rock runs all the way to the floor?

10   A.        Yes.

11   Q.        And that was because there was some

12   storage containers in front of that sheet rock?
```

```
13      A.          Yes.

14      Q.          Was that sheet rock decontaminated at

15      any time after the flood?

16      A.          No.
```

(December 9, 2004 Deposition of Defendants' corporate designee, David MacAllister, at 74).

S90.    Attached hereto as Exhibit "14" is a true and correct and authentic copy of

Philadelphia Construction Services' December 28, 2004 estimate.

S91.    After the 2001 flood, Defendants cut off the building sheetrock

at approximately four feet in various rooms throughout the first floor of the building at the

Property.

S92.    On page 40 of his December 9, 2004 deposition, David MacAllister and

Plaintiffs' counsel stated:

```
11      Q.          Did you notice in various rooms

12      throughout the building sheet rock has been cut

13      off at approximately four feet?

14      A.          Yes.

15      Q.          Was that done as a result of the damage

16      from the flood?

17      A.          Yes.

18      Q.          To your knowledge, was it in every case

19      it was done as a result of damage from the flood?

20      A.          Yes.
```

(December 9, 2004 Deposition of Defendants' corporate designee, David MacAllister, at 40).

S93.    After the June 2001 flood, other than areas needed to service the Virbac contract,

Defendants did not restore or repair the building sheetrock that had been cut off at approximately

four feet.

S94.    On pages 40-41 of his December 9, 2004 deposition, David MacAllister and

Plaintiffs' counsel stated:

```
21      Q.          Now, in your judgement as a facilities

22      manager, in order to restore those walls where

23      that sheet rock was cut to its condition prior to

24      the flood, will it be necessary to replace the

1       full eight foot heighths of the sheet rock?

2                        MR. SHARE:  Objection.  You can

3               answer.

4               ··          THE WITNESS:  Yes.
```

(December 9, 2004 Deposition of Defendants' corporate designee, David MacAllister, at 40-41).

S95.    With regard to why sheetrock should be replaced at the full eight foot heights as

opposed to four feet, Mr. MacAllister and Plaintiffs' counsel stated on page 37 of his December

9, 2004 deposition:

```
8       Q.          Sheet rock has to have two beveled edges

9       so you can put mud and tape in?

10      A.          Yes.

11      Q.          If you cut off at four feet you don't

12      have an edge to put the beveled seam in?

13      A.          That's correct.

14      Q.          Therefore, if you replace a sheet rock

15      wall that has been cut at four feet, you are going

16      to see the seam?

17      A.          More than likely, yes.

18      Q.          It is for that reason that your sheet

19      rock wall hanger suggested, at least in this room,

20      you use eight foot sections?
```

20

```
21      A.      Yes.
```

(December 9, 2004 Deposition of Defendants' corporate designee, David MacAllister, at 37).

S96.    In its December 28, 2004 estimate, PCS estimates that it will cost an additional

$381,081 over and above its base $561,292 amount to replace the sheetrock at full length rather

than at 4 feet.

S97.    After the June 2001 flood, other than in areas needed to service the Virbac

contract, Defendants did not replace certain ceiling tiles on the first floor of the building.

S98.    On page 67 of his December 9, 2004 deposition, Mr. MacAllister stated that after

the June 2001 flood, Defendants had replaced certain ceiling tiles on the first floor "for fear of

any airborne contaminants" but only in those areas needed for the Virbac contract.   (December

9, 2004 Deposition of Defendants' corporate designee, David MacAllister, at 67).

S99.    On page 70 of his December 9, 2004 deposition, Mr. MacAllister and Plaintiffs'

counsel stated:

```
2      Q.      Is there or was there not a concern for

3      microbial contamination in other areas of the

4      building, whether or not it was to be used for the

5      VIRBAC contract?

6      A.      I believe so, yes.
```

(December 9, 2004 Deposition of Defendants' corporate designee, David MacAllister, at 37).

S100.   On page 72 of his December 9, 2004 deposition, Mr. MacAllister and Plaintiffs'

counsel stated:

```
9      Q.      Okay.  Would it be safe for me to assume

10     that if I am looking at an area outside the

11     service area of the VIRBAC contract and I see

12     ceiling tiles, those ceiling tiles need to be
```

```
13        replaced as a result of the flood?

14        A.        Yes.

15        Q.        And within the VIRBAC area, the ceiling

16        tiles in the so-called storage area that remain

17        would need to be replaced as well, is that right?

18        A.        Yes.
```

(December 9, 2004 Deposition of Defendants' corporate designee, David MacAllister, at 72).

S101.   In its December 28, 2004 estimate, PCS estimates that it will cost $8,800 over and above its base $561,292 amount to replace the flood-damaged ceiling tiles Defendants did not replace after the June 2001 flood.

S102.   After the June 2001 flood, other than areas needed to service the Virbac contract, Defendants did not replace or restore certain doors on the first floor.

S103.   On pages 53-54 of his December 9, 2004 deposition, Mr. MacAllister and Plaintiffs' counsel stated:

```
22        Q.        So your testimony is then that doors

23        that were needed for servicing the VIRBAC-- is

24        that how you pronounce it?

1         A.        Yes.

2         Q.        -- VIRBAC contract were repaired or

3         replaced as needed?

4         A.        Yes.

5         Q.        But other doors damaged by the flood

6         waters were not addressed?

7         A.        That's correct.

8         Q.        So it is not correct to say that all

9         doors within the facility that were damaged by the
```

```
10       flood waters have been repaired or replaced?

11       A.       That's correct.
```

(December 9, 2004 Deposition of Defendants' corporate designee, David MacAllister, at 53-54).

S104.  On page 82 of his December 9, 2004 deposition, Mr. MacAllister and Plaintiffs'

counsel stated:

```
13                       Were doors in other areas of the

14.      building that is, to say, outside of the service

15       area for VIRBAC repaired or replaced?

16       A. ..       No.
```

(December 9, 2004 Deposition of Defendants' corporate designee, David MacAllister, at 82).

S105.  In its December 28, 2004 estimate, PCS estimates that it will cost an additional

$15,000 over and above its base $561,292 amount to replace the flood-damaged doors which

Defendants did not replace after the June 2001 flood.

S106.  In its December 28, 2004 estimate, PCS estimates that it will cost an additional

$26,344 over and above its base $561,292 amount to install epoxy-painted gypsum board in the

rooms listed in ¶ C44 below.

S107.  In its December 28, 2004 estimate, PCS estimates that it will cost an additional

$5,403 over and above its base $561,292 amount to install vinyl-coated gypsum ceiling tiles in

the rooms listed in ¶ C45 below.

S108.  After the June 2001 flood, Defendants did not restore or repair the freight elevator

at the Property.

S109.  On pages 51–52 of his December 9, 2004 deposition, Mr. MacAllister and

Plaintiffs' counsel stated:

```
16       Q.       What was the condition of the elevators
```

17    prior to the flood?

18    A.        They were all in working condition.

19    Q.        And have you learned what the condition

20    of them was as a result of the flood?

21    A.        Yes.

22    Q.        What was that?

23    A.        They had sustained damage, electrical

24    damage on the passenger elevator, the freight

1    elevator, my understanding is that the seals might

2    have been corrupted.

3    Q.        The seals on the freight elevator may

4    have been corrupted, is that what you said?

5    A.        Yes.

6    Q.        Any other damage to the freight

7    elevator?

8    A.        I know there was a report, I can't

9    honestly say exactly what was in that report as

10    far as remembering.

11    Q.        Okay.  And it was the passenger elevator

12    that was repaired?

13    A.        Yes.

14    Q.        Freight elevator has had no work done on

15    it, is that right?

16    A.        No.

(December 9, 2004 Deposition of Defendants' corporate designee, David MacAllister, at 51-52).

S110.   The document attached hereto as Exhibit "16" is a true and correct and authentic copy of Tri-State Elevator Company's March 2, 2005 estimate to repair the freight elevator at the Property.

S111.   The document attached hereto as Exhibit "17" is a true and correct and authentic copy of A&S Sprinkler Co.'s September 11, 2003 estimate to repair the fire sprinkler system at the Property.

S112.   Plaintiffs have not paid any of the expenses which they claim Defendants owe for restoration of the interior of 525 Virginia Drive ("the Property") after the 2001 Flood.

## CONTESTED FACTS

### I.   PLAINTIFFS' PROPOSED STIPULATED FACTS CONTESTED BY DEFENDANTS

Defendants contest the following proposed stipulated facts by Plaintiffs as incorrect, incomplete and/or improper:

### FIXED BASIC RENT

CD1.   The reasonable period of time by which Defendants should have repaired and restored the Premises to the condition which existed immediately prior to the June 2001 flood was by September 30, 2001.

CD2.   Defendants' corporate designee, David Morra, stated at deposition that after the June 2001 flood they resumed some, albeit not all, operations and began generating certain revenues from the Property by September 2001.  (October 29, 2002 Deposition of Defendants' corporate designee, David Morra, at 145, 153-55).

CD3.  Defendants' corporate designee, Ronald Greenspan, stated at deposition that Defendants generated in excess of one million dollars in revenue for work performed in the building at the Property after the June 2001 flood. (October 30, 2002 Deposition of Defendants' corporate designee, Ronald Greenspan, at 30-31).

CD4.  Applying Pennsylvania law, the Court of Appeals for the Third Circuit stated in Pollice v. National Tax Funding, L.P., 225 F.3d 379, 395 (3d Cir. 2000), that pursuant to well-established Pennsylvania Law, "where there has been a failure to pay a fixed or liquidated sum due on a certain date -- the party to whom the sum is owed may as a matter of right recover prejudgment interest at the legal rate of six percent running from the date the sum is due."

CD5.  Accordingly, under Pennsylvania law, Plaintiffs are entitled, at a minimum, to six percent (6%) simple interest per annum with respect to the total of: (a) the fixed basic rent under the Lease during the time period from October 1, 2001 to March 30, 2002 ($434,000.04); and (b) the 5% late charges due under §2.05 of the Lease with respect to the amount of fixed basic rent due under the Lease during the time period from October 1, 2001 to March 30, 2002, as set forth herein in subsection (a), ($21,700.00) -- calculated from the date each monthly payment was due to the date Defendants pay such fixed basic rent and late charges.

CD6.  Further, the Court of Appeals for the Third Circuit stated in Peterson v. Crown Financial Corp., 661 F.2d 287, 297 (3d Cir. 1981), that the Court may award pre-judgment interest at a rate in excess of the statutory rate or may award compound interest in claims based on unjust enrichment, "whenever a defendant holds money or property which belongs in good conscience to the plaintiff."

CD7.  The Lease at §12.01(d) provides that an event of default occurs, inter alia, "if Tenant shall fail to pay any installment of Fixed Basic Rent or Additional Rent, or any part

thereof, when the same shall become due and payable for a period of ten (10) business days after written notice to Tenant from Landlord."

CD8.    The Lease at §12.01(e) provides that an event of default occurs, *inter alia*, "if Tenant shall abandon the Premises, without the prior consent of the Landlord, by removing all or substantially all of Tenants' furniture, equipment, and personal property from the Premises, providing that Tenant shall also be delinquent in the payment of Fixed Basic Rent or fail to obtain any additional insurance coverage that may be required by Tenant's insurance carrier in order to insure a vacant building."

CD9.    The Lease at §12.01(f) provides that an event of default occurs, *inter alia*, "if Tenant shall fail to perform or observe any other material provision, condition or requirement of this Lease (not hereinbefore in this Section 12.01 specifically referred to) on the part of Tenant to be performed or observed, and such failure shall continue for thirty (30) days after notice thereof from Landlord to Tenant, or, if such Event of Default is of such nature that it cannot, with due diligence, be cured within a period of thirty (30) days, if Tenant shall have failed to commence the curing of such default within the period of thirty (30) days referred to above and shall thereafter fail to continue with all due diligence to complete the curing of such default and completes such cure in any event within ninety (90) days after notice hereof."

CD10. In his March 12, 2002 Supplemental Notice of Default; Notice of Acceleration, attached hereto as Exhibit "10", HUB's former counsel, William Maffucci, stated:

> Tenant is "in default of its obligations of the Lease because (i) Tenant has failed to comply with its obligations under Lease §§ 4.02, 8.01, 10.02(a), and 10.02(c) to maintain the Leased Property in good working order and condition and to take prompt and diligent action to restore the Leased Property after the damage caused by flood conditions in June 2001, and (ii) Tenant has failed to pay all rent that has come due since October 1, 2001, that being

the date by which, as determined by Landlord (and as Landlord so advised Tenant by letter dated September 26, 2001), Tenant's compliance with the aforesaid obligations would have restored the Leased Property to its condition before the flood."

CD11. Prior to any discounting to present value, under the terms of the Lease, the amount of fixed basic rent during the time period from April 1, 2002 to February 16, 2012 is $9,130,925.36, computed as follows:

| | | | |
|---|---|---|---|
| $72,333.34 x 11 months | = | $ | 795,666.74 |
| $77,500 x 107 months | = | | $8,292,500.00 |
| $77,500 x 16 days/29 days | = | $ | 42,758.62 |
| TOTAL | = | | $9,130,925.36 |

CD12. In accordance with §2.05 of the Lease, Plaintiffs are entitled to a 5% late charge with respect to the amount of fixed basic rent which Defendants have failed to pay under the Lease for the time period from April 1, 2002 to February 16, 2012 ($9,130,925.36).

CD13. 5% x $9,130,925.36 = $456,546.27

CD14. Under the Lease, the amount of fixed basic rent during the time period from April 1, 2002 to February 16, 2012, combined with the 5% late charge set forth in § 2.05 of the Lease, is 5% x $9,130,925.36 = $456,546.27 + $9,130,925.36 = $9,587,471.63.

CD15. Under Pennsylvania law, Plaintiffs are entitled, at a minimum, to six percent (6%) simple interest per annum with respect to the total of: (a) the amount of fixed basic rent due under the Lease for the time period from April 1, 2002 to February 16, 2012 ($9,130,925.36); and (b) the 5% late charge set forth in § 2.05 of the Lease with respect to the amount of fixed basic rent due under the Lease for the time period from April 1, 2002 to February 16, 2012, as set

forth herein in subsection (a) ($456,546.27) – calculated from the date this amount was due (March 12, 2002) to the date Defendants pay such fixed basic rent and late charges.

CD16. Under §12.02 of the Lease, the total of: (a) the amount of fixed basic rent due under the Lease for the time period from April 1, 2002 to February 16, 2012; (b) the 5% late charge set forth in § 2.05 of the Lease with respect to the amount of fixed basic rent due under the Lease for the time period from April 1, 2002 to February 16, 2012; and (c) 6% simple interest per annum with respect to the amount of fixed basic rent due under the Lease for the time period from April 1, 2002 to February 16, 2012 combined with the 5% late charge set forth in §2.05 of the Lease -- shall be discounted to present value on the basis of a discount rate equal to the prime rate offered by Wachovia Bank, applied on and calculated from the date Defendants make payment to the end of the term of the Lease (April 16, 2012).

CD17. Accordingly, with respect to fixed basic rent only, Plaintiffs are entitled, at a minimum, in damages to:

| 1 | Fixed basic rent due under the Lease during the time period from October 1, 2001 to March 30, 2002 ($434,000.04), combined with the late charge due under §2.05 of the Lease ($21,700.00)  PLUS  6% pre-judgment interest (simple) per annum with respect to the above fixed basic rent and late charges from date each monthly rental payment was due to the date Defendants make such payment | $455,700.04.  To be determined (depending on date Defendants make payment) |
|---|---|---|
| 2 | Fixed basic rent due under the Lease during the time period from April 1, 2002 to February 16, 2012 ($9,130,925.36), combined with the 5% late charge set forth in § 2.05 of the Lease ($456,546.27)  PLUS | $9,587,471.63 |

| | |
|---|---|
| 6% pre-judgment interest (simple) per annum with respect to the above fixed basic rent and late charges from March 12, 2002 to date Defendants make such payment | To be determined (depending on date Defendants make payment) |
| AND | To be determined (depending on date Defendants make payment |
| Discounted to present value on the basis of a discount rate equal to the prime rate offered by Wachovia Bank, calculated from the date Defendants make such payment to April 16, 2012. | and prime rate on such date) |

## ADDITIONAL RENT

CD18. The amount of Additional Rent owed Plaintiffs from October 1, 2001 through March 4, 2005 is $973,364.57, $16,800 of which constitutes the Manager's Fees under the Lease for the same time period.

CD19. Attached hereto as Exhibit "11" are true and correct and authentic copies of invoices with respect to Additional Rent owned Plaintiffs from October 1, 2001 through March 4, 2005, accompanied by a summary of the invoices.

CD20. Except for the summary of invoices, the documents attached in Exhibit "11" are business records kept and maintained in the ordinary course of business and are admissible at trial.

CD21. 5% x $973,364.57 = $48,668.23.

CD22. The amount of 5% late charges owed under §2.05 of the Lease with respect to the amount of Additional Rent owed Plaintiffs from October 1, 2001 through the date of these Stipulations, ($973,364.57), is $48,668.23.

CD23. Under Pennsylvania law, Plaintiffs are entitled to 6% pre-judgment simple interest per annum with respect to the amount of additional rent and late charges owed -- from the date said amounts were owed to the date Defendants make such payment.

CD24. Plaintiffs are entitled to payment in accordance with terms of the Lease of any additional rent incurred after the date Defendants make payment of the additional rent and associated late charges due and owed to date, as additional rent becomes due under the Lease.

## RESTORATION COSTS

CD25. Certain construction/building plans (the "Building Plans") were prepared with respect to the first and second floors of the building at the Property from 1996 through 1998.

CD26. Attached hereto as Exhibit "12" are true and correct and authentic copies of the Building Plans.

CD27. With the exception of those areas mentioned by Defendants' facilities coordinator, David MacAllister, at his December 9, 2004 deposition, the Building Plans largely reflect the condition of the Property immediately prior to the 2001 flood.

CD28. The "Coordination Plan," which was marked at Mr. MacAllister's December 9, 2004 deposition as "Exhibit MacAllister-1," and which was Bates-Stamped "HUB 4774" reflects the condition of the 1st floor of the Property immediately prior to the 2001 flood, with the exception of additional work at certain rooms which Mr. MacAllister identified at his December 9, 2004 deposition as being completed after the preparation of the Building Plans.

CD29. On pages 75-81 and 86-94 of his December 9, 2004 deposition, Mr. MacAllister stated that subsequent to the preparation of HUB 4774, Defendants made renovations to the rooms identified on HUB 4774 as future 3.06 (the inclusion of the "stability chambers" and the "drug vault"); future 2.20 (inclusion of "storage" facilities), future 2.21 (inclusion of "storage"

facilities for "drug returns"), 1.38 future (inclusion for "some storage for clinical research"), the future areas next to rooms 1.17 and 1.16 (inclusion of a "conference room" and a "coffee lunch area, sink, microwave"); and future 1.28 (inclusion of facilities for "document storage").

CD30. After the June 2001 flood, Plaintiffs received an estimate dated September 11, 2003 to repair and restore the fire sprinkler system at the Property from A&S Sprinkler Co., Inc. in the amount of $4,950.00.

CD31. Steve Purdy, Defendants' Senior Manager of Project Management, stated at deposition that "carpeting, drywall was never replaced; ceiling tiles were never replaced." (Purdy November 20, 2002 Deposition at 79).

CD32. Attached hereto as Exhibit "13" is a true and correct and authentic copy of Exhibit MacAllister-1, as marked by Mr. MacAllister at his December 9, 2004 deposition.

CD33. Marking Exhibit MacAllister-1 with red ink, Mr. MacAllister indicated that only the following rooms on the 1st floor of the Property were restored or repaired by Defendants after the June 2001 flood:

| | |
|---|---|
| 1.01 | CAFETERIA |
| 1.02 | FUTURE |
| 1.03 | CONFERENCE ROOM |
| 1.04 | WAITING ROOM |
| 1.05 | VESTIBULE ROOM |
| 1.06 | LOBBY ROOM |
| 1.31 | BATHROOM |
| 1.32 | BATHROOM |
| 2.02 | KALISH PRIMARY |
| 2.03 | OVER ENCAP |
| 2.04 | OVER ENCAP |
| 2.05 | BLISTER PACKAGING |
| 2.06 | CARD SEALING ROOM |
| 2.07 | UTENSIL WASH ROOM |
| 2.11 | CARD SEALING ROOM |
| 2.12 | BLISTER PACKAGING |
| 2.15 | CORRIDOR |
| 2.16 | TECHS ROOM |

2.18    COORIDOR
2.19    CORRIDOR
2.22    CORRIDOR
2.23    UTILITY ROOM
3.01    FACILITY RECEIVING
3.02    SHIPPING PREP


CD34. The following rooms and corridors on the 1st floor of the Property were outside

the areas Mr. MacAllister marked in red ink on Exhibit MacAllister-1:

2.01
2.21
2.20
2.10
2.08
2.09
2.13
2.14
2.17
2.25
2.24A
2.24B
Corr 3.09
Corr 3.08
3.08
3.06
3.05
3.03
3.04
1.07
1.08
1.42
1.17
1.16
1.15
1.14
1.13
1.11
Corr 1.18
1.19
1.20
1.21
1.22
1.23

1.24
1.25
1.27
1.28
1.29
1.30
1.35
**Corr 1.10**
**Corr. 1.54**
1.43
1.44
1.45
1.46
1.47
1.49
1.50
1.51
**Corr. 1.55**
1.38

CD35. The rooms and corridors listed in ¶ CD34 above were not repaired or restored by Defendants after the June 2001 flood to the condition they were in immediately prior to the 2001 flood.

CD36. After the June 2001 flood, Defendants did not replace certain millwork and plumbing in the coffee area in the cafeteria on the first floor (Room 1.01) that existed at the Property immediately prior to the June 2001 flood.

CD37. After the June 2001 flood, Defendants did not replace certain flood-damaged sheetrock in the cold storage room (Room 2.01).

CD38. After the June 2001 flood, Philadelphia Construction Services submitted an estimate dated December 28, 2004 to restore and repair, the areas referenced in, *inter alia*, ¶¶ S86-S89 and CD34, CD36 and CD37 above.

CD39. In its December 28, 2004 estimate, Philadelphia Construction Services estimates that it will cost $561,292.00 to repair and restore the areas referenced in, *inter alia*, ¶¶ S86-S89 and CD34, CD36 and CD37 above.

CD40. The Building Plans indicate that following rooms were to have epoxy-painted gypsum board: Rooms 2.01, 2.08, 2.09, 2.10, 2.13, 2.14, 2.17, 2.24a, 2.24B, 2.25, 3.03, 3.04, 3.05, 3.06, 3.08, 3.09 and 3.10.

CD41. The Building Plans indicate that following rooms were to have vinyl-coated gypsum ceiling tiles: Rooms 2.01, 2.08, 2.09, 2.10, 2.13, 2.14, 2.17, and 3.03.

CD42. After the June 2001 flood,  Plaintiffs received an estimate dated March 21, 2003, to repair and restore the freight elevator at the Property from Liberty Elevators in the amount of $45,000.00.

CD43. The document attached hereto as Exhibit "15" is a true and correct and authentic copy of Liberty Elevator's March 21, 2003 estimate to repair the elevator at the Property.

CD44. Since the March 21, 2003 estimate, the code requirements regarding the necessary repairs to the freight elevator have changed.

CD45. On March 2, 2005, Liberty Elevator, through its successor, Tri-State Elevator Company, submitted a revised estimate in the amount of $54,900.

CD46. Among the items associated with the Property Defendants have failed to restore or repair to the condition which existed immediately prior to the June 2001 flood was the fire sprinkler system at the Property.

CD47. The total cost to restore or repair items at the Property, which Defendants did not restore or repair to the condition which existed immediately prior to the June 2001 flood, and

which are described in estimates from PCS, Tri-State Elevator Company, and A&S Sprinkler Co.

is $1,057,770, computed as follows:

| | |
|---|---|
| PCS | $997,920 |
| Tri-State Elevator | $54,900 |
| A&S Sprinkler | $4,950 |
| TOTAL: | $1,057,770. |

CD48. Defendants should have made the repairs described in estimates from PCS, Tri-State Elevator Company, and A&S Sprinkler Co. by October 1, 2001.

CD49. Under § 2.05 of the Lease, Plaintiffs are entitled to a 5% late charge with respect to costs Plaintiffs must incur to restore or repair items at the Property Defendants have failed to restore or repair to the condition which existed immediately prior to the June 2001 flood.

CD50. 5% x $1,057,770 = $52,888.50.

CD51. $1,057,770 + $52,888.50 = $1,110,658.50.

CD52. The total cost to restore or repair items at the Property, which Defendants did not restore or repair to the condition which existed immediately prior to the June 2001 flood, and which are described in estimates from PCS, Tri-State Elevator Company, and A&S Sprinkler Co., when combined with the 5% late charge set forth in §2.05 of the Lease, totals $1,110,658.50.

CD53. Under Pennsylvania law, Plaintiffs are entitled, at a minimum, to 6% pre-judgment simple interest per annum with respect to the $1,110,658.50 amount set forth in ¶ CD52 above -- calculated from October 1, 2001 to the date Defendants make payment.

<u>ATTORNEY'S FEES</u>

CD54. Section 7.01 of the Lease provides:

Subject to Section 10.05 hereof, Tenant will protect, indemnify and hold harmless
Landlord and its agents, affiliates, subsidiaries, parent companies and the officers
and directors thereof, from and against any and all claims, actions, damages,
liability and expense (including fees of attorneys, investigators, and experts) in
connection with loss of life, personal injury or damage to property in or about the
Premises or arising out of the occupancy or use of the Premises by Tenant or its
Agents or occasioned wholly or in part by any act or omission of Tenant or its
Agents, whether during the Term, except to the extent such loss, injury or damage
was caused by the negligence of willful misconduct of Landlord or its agents.

CD55. As of the date of these Stipulations, HUB has incurred damages and expense in
the form of over $1.5 million in fees of attorneys and experts, in connection with damage to
property in or about the Premises or arising out of the occupancy or use of the Premises by
Tenant or its Agents or occasioned wholly or in part by any act or omission of Tenant or its
Agents.

## II.    DEFENDANTS' PROPOSED STIPULATED FACTS CONTESTED BY PLAINTIFFS

Plaintiffs contest the following proposed stipulated facts by Defendants as incorrect,
incomplete and/or improper:

CP1.    Fixed Basic Rent for the time period from October 1, 2001 (post-abatement
period) to March 29, 2005 (start of trial) is $3,167,166.78.

CP2.    A late charge of 5% on the Fixed Basic Rent amount of $3,167,166.78, per
Section 2.05 of the Lease, is $158,358.34.

CP3.    Prejudgment interest at the legal rate of six percent per annum on the Fixed Basic
Rent amount of $3,167,166.78, calculated from the date each monthly rental payment was due to

the start of trial on March 29, 2005, is $332,617.95.

CP4.    Prejudgment interest at the legal rate of six percent per annum on the late charge amount of $158,358.34, calculated from the date each late charge was due to the start of trial on March 29, 2005, is $16,396.80.

CP5.    Fixed Basic Rent for the time period from April 1, 2005 to February 16, 2012 (end of Lease) is $6,397,758.62

CP6.    The present value of $6,397,758.62, using a 5.50% prime rate currently offered by Wachovia Bank (the successor of CoreStates Bank, N.A.), per Section 12.02(a) of the Lease, is $5,361,034.84.

CP7.    Prior to the 2001 Flood, Defendants had always paid Fixed Basic Rent on a timely basis.

CP8.    Section 2.05 of the Lease does not state that the Landlord is entitled to receive from Tenant a late charge with respect to restoration expenses.

CP9.    When Flex buildings such as the Property change occupants, the practice in the commercial real estate market is to demolish and reconfigure the interior of the building.

CP10.    Plaintiffs will not pay the cost of restoring the interior of the Property to its pre-2001 Flood condition, because the interior of the Property will be demolished and reconfigured at the end of the Lease term.

CP11.    Section 4.01 of the Lease states that "Landlord, at Landlord's sole cost and expense, shall cause to be completed upon the Premises . . . (a) demolition of all interior improvements currently existing in the Premises. . . "

CP12.    Plaintiffs' predecessor 525 Virginia Drive Associates Limited Partnership (the original Landlord) paid to demolish the interior of the Property before the Lease commenced on

February 17, 1997, and delivered to Defendants' predecessor BioPharm Pharmaceutics Services, Inc. (the original Tenant) an empty structure with an open un-built interior at the commencement of the Lease.

CP13.   Section 9.02 of the Lease states that "Tenant may, at its sole cost, and without the prior written consent of Landlord, make such interior nonstructural alterations, additions, and improvements in and to the Premises as it may deem desirable for its use . . . ."

CP14.   Per Section 9.02 of the Lease, BioPharm and later Omnicare configured the Property's interior to suit its needs.

CP15.   Section 8.01 of the Lease states that "[a]t the expiration of the Term, Tenant shall deliver the Premises in broom clean condition, reasonable wear and tear excepted."

CP16.   Section 8.01 of the Lease does not state that the Premises is to be kept in broom clean condition during the Lease term.

Respectfully submitted,

JOSEPH J. MCGOVERN
STEPHEN W.W. CHING, JR.
**OBERMAYER REBMANN MAXWELL
& HIPPEL LLP**
One Penn Center, 19th Floor
1617 John F. Kennedy Boulevard
Philadelphia, PA 19103-1895
(215) 665-3000

Attorneys for Plaintiffs

RICHARD P. MCELROY
ADAM M. SHARE
TODD A. SCHOENHAUS
**BLANK ROME, LLP**
One Logan Square
18th & Cherry Streets
Philadelphia, PA 19103-6998
(215) 569-5500

Attorneys for Defendants

Dated: March 8, 2005

604290

39

# EXHIBIT   2

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BARRY M. PORTNOY and | : |
| GERARD M. MARTIN, as Trustees for | : |
| HUB PROPERTIES TRUST | : |
|           Plaintiffs, | :   NO. 02-CV-2905 |
| | : |
|     v. | :   HONORABLE CLIFFORD |
| | :   SCOTT GREEN |
| OMNICARE PHARMACEUTICS, INC. | : |
|         and | : |
| OMNICARE CLINICAL RESEARCH, INC. , | : |
|         Defendants. | : |
| | : |

## AFFIDAVIT OF DAVID J. CAMPOLI

I, DAVID J. CAMPOLI, being duly sworn according to law, depose and state:

1.     I am a regional manager for REIT Management & Research LLC ("REIT").

REIT manages properties throughout the United States owned by HUB Properties Trust

("HUB"), the trustees of which are the individual plaintiffs in the above-captioned action. The

facts contained in this affidavit are stated on the basis of my personal knowledge. The opinions,

as set forth below, have been formed and are held by me to a reasonable degree of certainty as an

expert in commercial property management, leasing, financing, fit-out, conversion, renovation

and construction.

2.     I have worked for REIT since July of 1998. Prior to working for REIT, I worked

for 13 years in property management at the real estate brokerage and property management firm

of Grubb & Ellis. At Grubb & Ellis, I was responsible for managing properties in Philadelphia,

the Philadelphia suburbs, South Jersey, Delaware, Rochester and Buffalo.

3.     I am accredited by the Building Owners and Managers Association ("BOMA") as

a "Real Property Administrator" or "RPA," having taken BOMA's specialized seven-course

608811

program relating to property management, leasing, finance, insurance, property structures and systems.

4.      As set forth in more detail in the transcript of my deposition in this case on January 14, 2003, as regional manager, I am in charge of, responsible for, and directly oversee the operation, leasing, finance, acquisition, and disposition of HUB's properties within the Mid-Atlantic Region, including, but not limited to, the commercial property at issue in this case located at 525 Virginia Drive, Fort Washington, Pennsylvania (the "Property"). In total, I am in charge of approximately 50 properties in the Mid-Atlantic Region.

5.      As regional manager for the Mid-Atlantic Region, I am in charge of, responsible for, and directly oversee the day-to-day operations, management, and maintenance of HUB's properties located in the Fort Washington Industrial Park, which includes the Property, but which also includes commercial properties located at the following Fort Washington, Pennsylvania addresses: 515 West Pennsylvania Drive, 535 West Pennsylvania Avenue, 1035 Virginia Drive, 475 Virginia Drive, and 580 Virginia Drive.

6.      As regional manager, I am in charge of, responsible for, and directly oversee tenant fit-outs, renovations, and/or other construction relating to HUB's 50 or so properties in the Mid-Atlantic Region, including those located in the Fort Washington Industrial Park. I was, and continue to be, directly involved in the planning of tenant fit-outs, renovations, and/or other construction, including aspects relating to construction costs and timing; obtaining bids from and subsequently coordinating with contractors to perform the construction; and actual construction. At Grubb & Ellis and REIT, I have been involved in and have overseen numerous tenant fit-outs, renovations and other construction.

7.     As regional manager in charge of the Property, I am familiar with the terms of the lease relating to the Property (the "Lease").  The Lease was entered into between the predecessors of HUB and Omnicare in December 1996.

8.     As regional manager in charge of the Property, I am familiar with the amount of Fixed Basic Rent and associated late charges and prejudgment interest HUB asserts are due under the Lease from October 1, 2001 to the end of the term of the Lease.

9.     As regional manager in charge of the Property, I am familiar with the "Additional Rent" expenses HUB incurred relating to the Property, including, but not limited to, Additional Rent expenses HUB incurred relating to the Property from October 1, 2001 to the present.

10.     Under the Lease, Omnicare was obligated to perform or pay for many of the services and expenses needed to maintain the Property.   Omnicare failed to perform or pay for those services and expenses after the 2001 flood.

11.     As a result of Omnicare's breaches, HUB was forced to spend time and money to maintain the Property, all of which were Omnicare's obligations under the Lease.  Required maintenance was performed by members of REIT's staff responsible for servicing and maintaining HUB's other suburban properties in Pennsylvania and New Jersey.

12.     Typically, HUB allocates the expenses incurred by REIT's staff in maintaining HUB's suburban properties among those properties on a *pro rata* basis based on each properties' square footage.

13.     Thus, in its claim for Additional Rent, HUB includes a portion of the total maintenance-related expenses of REIT's staff for HUB's suburban properties.  That total was pro rated based on the ratio of the square footage of the Property to the total square footage of all

HUB's suburban Philadelphia properties. The pool of pro rated expenses includes the costs of telecommunications, vehicles and supplies.

14.     I believe that Defendants reasonably should have completed the required repairs to the interior of the Property needed to restore the interior of the Property to its pre-flood condition by October 1, 2001. Accordingly, I believe that rent should have been abated under § 10.02 of the Lease from the date of the flood to October 1, 2001 and that Defendants should have resumed paying rent and other Lease charges as of October 1, 2001.

15.     Starting on or about July 1, 2001, I repeatedly urged Omnicare to commence reconstruction of the interior of the Property.

16.     Starting on or about July 1, 2001, I repeatedly asked Omnicare for a date when Omnicare would complete the restoration to the interior of the Property.  As I explained to Omnicare, HUB needed to advise its insurance carrier of the date the Premises would be restored for purpose of business interruption insurance calculations. Omnicare never gave HUB such a date.

17.     Starting on or about July 1, 2001, I also asked Omnicare to advise HUB's insurance carrier of any circumstances that would delay the restoration of the Property. Omnicare never identified any such circumstances.

18.     On September 26, 2001, I sent a letter to Ken Feld, President of Omnicare Pharmaceutics, Inc., a copy of which is attached to the Appendix to the Parties' Stipulated and Contested Facts as Exhibit "8," observing that "Omnicare has yet to commence reconstruction at its own direction . . . "; noting that the time period from the June 2001 to October 1, 2001 was "a fair estimate of the time required to plan and reconstruct the property interiors by Omnicare for

occupancy as required in the lease"; and advising that the "rental obligation will recommence at 525 Virginia" as of October 1, 2001.

19.    On October 16, 2001, John Mannix of HUB sent a letter to David Morra of Omnicare Clinical Research, Inc., a copy of which is attached to the Appendix to the Parties' Stipulated and Contested Facts as Exhibit "9," stating that "David Campoli has advised me that he has numerous conversations with members of your staff to coordinate restoration of the premises, but Omnicare has taken no action."

20.    Rather than promptly restoring the Property to its pre-flood condition as required by § 10.02 of the Lease, Omnicare representatives were apparently instructed by management not to commence construction.

21.    As set forth in more detail in my January 14, 2003 deposition, despite HUB's need to accurately advise its insurance carrier of a new occupancy date, Omnicare told me in August and September 2001 that the Premises were not being occupied after the flood. However, Omnicare had, in fact, resumed operations in the Premises after the flood starting in July 2001, and had, in fact, rebuilt certain sections of the Property to finish clinical trials for its client, VIRBAC.

22.    Omnicare continued to occupy and/or conduct business at the Property until 2003, approximately 18 months after it stopped paying rent.

23.    As regional manager for the Mid-Atlantic Region, I directly oversaw and was involved in efforts to restore several of HUB's other properties in the Fort Washington Industrial Park which had suffered flood damage as a result of Tropical Storm Allison in June 2001 including, but not limited to: 515 West Pennsylvania Avenue, 535 West Pennsylvania Avenue, 475 Virginia Drive, and 1035 Virginia Drive

5

24.    I also oversaw efforts to restore some of HUB's properties as a result of flood damage suffered in 1999 from Hurricane Floyd including, but not limited to: 535 West Pennsylvania Avenue, 475 Virginia Drive, and 1035 Virginia Drive.

25.    Following the June 2001 flood, HUB was able to complete the flood-related restoration of its other Fort Washington properties by October 1, 2001, except 475 Virginia Drive.  With regard to 475 Virginia Drive, at the tenant's request, instead of restoring the property to its pre-flood condition, HUB rebuilt the interior of the property to a completely new configuration (including the addition of a conference center), which required additional time to obtain township permits.  Nonetheless, upon obtaining those permits, HUB completed the construction work within 14 weeks.

26.    As a result of Hurricane Floyd in 1999, several of HUB's Fort Washington properties, including those located at 475 and 1035 Virginia Drive and 535 West Pennsylvania Avenue, suffered extensive damage to the first floor of the properties.  HUB was able to complete the post-flood restoration of those properties within 14 weeks.

27.    Based, in part, on my experiences and the above-described experiences involving other flood-damaged properties, I believe that Defendants reasonably could have completed the required restoration of the interior of the Property by October 1, 2001.

28.    In abandoning the Property without restoration, Defendants left HUB with the Property in need of significant renovations.  Required renovations include, but are not limited to: the replacement of significant 4-foot sections of drywall throughout the 1st floor, which Defendants had removed after the flood but did not replace; the replacement of significant sections of carpet and other flooring, which Defendants had removed after the flood but did not replace; the replacement of a significant amount of ceiling tiles, some of which Defendants failed

to remove, despite contamination by flood waters, others of which Defendants removed but did not replace; and other items identified in the estimates of Philadelphia Construction Services, Liberty Elevators/Tri-State Elevator, and A&S Sprinkler Company.

29.    The condition in which Defendants abandoned the Property has adversely affected HUB's ability to market and relet the Property to a new tenant. Tenants who have considered relocating to the Property, including Allegheny Valley School ("AVS") and Kolicke & Soffa, have commented on the missing drywall and other items that Defendants failed to restore after the flood.

30.    The condition in which Defendants abandoned the Property appears to have exacerbated the erroneous perception perpetuated by Defendants that the 2001 flood damage has made it impossible to conduct business from the Property. Defendants' own post-flood operations at the Property prove that this is not true. Moreover, government agencies are considering lowering the flood-risk rating for the vicinity within which the Property is located, following the repairs that SEPTA and the U.S. Army Corps of Engineers made to the SEPTA trestle/overpass that resulted in the significant level of flood damage the Fort Washington area suffered in 2001.

31.    Defendants are mistaken in the following contentions:

- CP9.    When Flex buildings such as the Property change occupants, the practice in the commercial real estate market is to demolish and reconfigure the interior of the building.

- CP10.    Plaintiffs will not pay the cost of restoring the interior of the Property to its pre-2001 Flood condition, because the interior of the Property will be demolished and reconfigured at the end of the Lease term.

- The buildings that were flooded have some level of stigmatization in the local marketplace, and face a difficult time being released to other tenants by their owners;

- The landlord will likely demolish many or all of the existing renovations that are currently in place at its expense;

- The interior of 525 Virginia Drive will be demolished and rebuilt, either by the landlord, the new tenant, or both before it is reoccupied. This is true regardless of any additional interior improvements made during the balance of the current lease term.

32.    Traditionally, a "Flex building" is a term for buildings that were originally built to be easily and quickly converted among office, warehouse and light industrial uses without major renovation and with relatively small investment. *Cf.* definitions provided by the National Association of Industrial and Office Properties, Debi Carter, "Industrial Space: Developing Properties for a New Generation of Industrial Tenants: The Flex Direction," www.naiop.org/developmentmag/ pastissues/winter01/article2.htm (in flex buildings, a company can reconfigure space "at a minimal cost and with very little disruption in its business"); PS Business Parks, Inc., www.psbusinessparks.com/about/profile.htm ("Flex space is space originally built as part office space and part warehouse space and can be easily reconfigured to suit a variety of uses"); Archined, www.classic.archined.nl/news/0105/flex_eng.html (Flex buildings "can be rapidly transformed without any major construction work"); Centerra, www.centerracolorado.com/news/newshandler.cfm?NewsID=400&CatID=2 ("Flex space is a term for buildings that are easily converted between office, warehouse and light industrial uses"); Urban Realty Partners, www.urbanrealtypartners.com/project.html (flex space is space that "makes it possible to implement alternative work schemes without major office renovation. It also leaves open the options to change building use from office to industrial or vice versa with relatively small investment").

33.    Contrary to Defendants' arguments, the Property was not originally designed or constructed as a "Flex building" nor was the Property marketed as a "Flex building." Contrary to the Defendants' suggestion, neither the Property's construction nor design lends itself to easy

8

and quick conversion among office, warehouse and light industrial uses. Such conversion of the

Property would require major renovation and substantial investment.

      34.    In addition, the Property is not a "Flex building" because:

- "Flex buildings" have high ceilings (typically 10-18 feet) to allow conversion to warehouse use. The front of the Property, however, has only a 9 foot ceiling, which may not be high enough to be used for a warehouse. Cf. Studley, Glossary to Report, 2003 Q4, www.studleyreport.com/quarterly_2002/4q02/Washington_dc/glossary.html (defining flex space as "low-rise structures that typically have high ceilings"); Colliers International, Real Estate Glossary, www.colliers.com/Corporate/Tools/Glossary (defining flex space as "single-story buildings that have 10- to 18-foot ceilings"); National Council of Real Estate Investment Fiduciaries, Glossary, www.ncreif.com/resources/glossary.phtml?range=p-z (same); Mary Carr Mayle, "Flex space," savannahnow.com/exchange/stories/112703/ECXwarehouse.shtml ("the higher ceilings . . . will allow potential tenants to maximize the use of space. At a minimum of 29 feet, the ceilings will allow the bigger distribution warehousers to rack their products higher something that's also important to national companies");

- The building shells of "Flex buildings" are typically made of cinderblock or other materials or are otherwise designed to allow flexibility and to reduce construction costs. The space at the back of the Property is, however, constructed of sheet metal walls which normally can only be converted to another use with significant time and expense. The design of the current warehouse space further makes it difficult and costly to install windows there for office use. Cf. www.dividenddetective.com/all_about_reits.htm ("Flex building shells are designed to accommodate companies needing office, light manufacturing and/or warehouse space"); Gallina Development Corporation, Kurt J. Sertl, Flex Space-Defined, www.gallinadev.com/data/news/127_kurtarticle.pdf ("the demising wall separating the spaces is easily removed or accessed, to allow the tenant to absorb the additional space…[m]odifications to the built outs in Flex space at the end of a lease term, to accommodate the space needs of a new tenant, are also easily accomplished"); Mary Carr Mayle, "Flex space," savannahnow.com/exchange/stories/112703/ECXwarehouse.shtml (ideally, flex space foregoes the metal exterior construction more typical in warehouses and distribution centers in favor of concrete tilt-up walls");

- Unlike traditional "Flex buildings" which are designed to minimize heating, cooling and other operating expenses, the Property's outside wall materials make heating and cooling in the warehouse space very inefficient and expensive. "Looking to cut costs, improve efficiency? Flex office space can help," Broward Daily Business Review, July 13, 1998, available on LEXIS); and

- The Property has two stories as well as a small lobby area and two elevators, unlike "Flex buildings," which are typically one story and do not have lobbies or elevators. Cf. Debi Carter, "Industrial Space: Developing Properties for a New Generation of Industrial

Tenants: The Flex Direction," www.naiop.org/developmentmag/ pastissues/winter01/ article2.htm; Colliers International, Real Estate Glossary, www.colliers.com/Corporate/ Tools/Glossary; "Looking to cut costs, improve efficiency?  Flex office space can help," Broward Daily Business Review, July 13, 1998, available on LEXIS).

35.    The Defendants are mistaken in their assertion that, had Defendants restored the Property to the condition it was immediately prior to the 2001 flood, in all probability the interior of the Property would not have to be completely demolished or reconfigured for a new tenant. Rather, in all probability a new tenant would utilize a sizeable portion of the interior of the building, probably 65% to 90%.

36.    The only interior portions of the Property a new tenant most likely will not reuse are the actual laboratory facilities which represent a small portion of the building.

37.    Further, Defendants are also incorrect in stating that such renovations would be at the landlord's expense because §12.02(b) of the Lease provides that upon reletting, rents received by a new tenant shall be applied first to, *inter alia*, all costs of alternations and repairs associated with the reletting.  Thus, under the Lease, Defendants are ultimately responsible for renovations required by a new tenant.

38.    Moreover, the Defendants are mistaken when they suggest that the 2001 flood has stigmatized the Property, and that the flood was a primary reason for any difficulty in reletting the Property to a new tenant.

39.    A significant reason why the Fort Washington area suffered significant flood damage in 2001 was a SEPTA trestle/overpass, the opening to which became clogged when floodwaters washed cars from a nearby automobile dealership into the opening, effectively creating a dam which prevented floodwaters from subsiding.  After the flood, SEPTA, in conjunction with the U.S. Army Corps of Engineers, widened the opening and performed other

repairs to the SEPTA trestle. Those actions have prompted discussions to actually lower the flood risk rating for the vicinity associated with the Property.

40.    Moreover, difficulty in leasing commercial property in the Fort Washington area may involve market factors that either preceded or are unrelated to the 2001 flood.

41.    Further, as explained above, the condition in which Defendants abandoned the Property adversely affected HUB's ability to market and relet the Property.

42.    This concludes my affidavit.


DAVID J. CAMPOLI

Dated: *April 1, 2005*

Sworn to and subscribed before me
this 1st day of *April*, 2005.

Notary Public

My Commission Expires:

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
MICHELE L. COYLE, Notary Public
City of Philadelphia, Phila. County
My Commission Expires December 28, 2008

608811                                    11

# EXHIBIT  3

**SCHNADER HARRISON SEGAL & LEWIS LLP**

ATTORNEYS AT LAW

SUITE 3600 • 1600 MARKET STREET • PHILADELPHIA, PENNSYLVANIA 19103-7286

215-751-2000 • FAX: 215-751-2205

http://www.schnader.com

March 12, 2002

William J. Maffucci
Direct Dial 215-751-2210
Internet Address: wjmaffucci@schnader.com

VIA FAX AND
VIA CERTIFIED MAIL
(Return Receipt Requested)

Mr. David Morra                          Kenneth Feld, Ph.D., President
Chief Executive Officer                  OmniCare Pharmaceutics, Inc.
OmniCare Clinical Research, Inc.         525 Virginia Drive
630 Allendale Road                       Fort Washington, Pennsylvania 19034
King of Prussia, Pennsylvania 19406      (Fax No. 484-679-2410)
(Fax No. 484-679-2410)                   (7000 0600 0023 7955 2800)
(7000 0600 0023 7955 2817)

SUPPLEMENTAL NOTICE OF DEFAULT;
NOTICE OF ACCELERATION

Re:    Lease ("Lease") dated December 3, 1996, by OmniCare Pharmaceutics,
       Inc. ("Tenant"), Formerly Known as Bio-Pharm Pharmaceutics Services,
       Inc., of Commercial Real Estate ("Leased Property") Owned by HUB
       Properties Trust ("Landlord") and Located at and Known as 525 Virginia
       Drive, Fort Washington (Upper Dublin Township), Pennsylvania;
       Guaranty and Suretyship Agreement (the "Guaranty") dated December 3,
       1996, by I.B.A.H., Inc (a/k/a IBAH, Inc.), Now Known as OmniCare
       Clinical Research, Inc. ("Guarantor"), for the Benefit of Landlord, with
       Regard to Tenant's Obligations Under the Lease

Gentlemen:

       We represent the Landlord in connection with the above-referenced matter.

       Under Lease §§ 12.01(d) & 12.01(f), Tenant is in default of its obligations of the
Lease because (i) Tenant has failed to comply with its obligations under Lease §§ 4.02, 8.01,
10.02(a), and 10.02(c) to maintain the Leased Property in good working order and condition and
to take prompt and diligent action to restore the Leased Property after the damage caused by
flood conditions in June 2001, and (ii) Tenant has failed to pay all rent that has come due since
October 1, 2001, that being the date by which, as determined by Landlord (and as Landlord so
advised Tenant by letter dated September 26, 2001), Tenant's compliance with the aforesaid
obligations would have restored the Leased Property to its condition before the flood.



SCHNADER HARRISON
SEGAL & LEWIS LLP

Mr. David Morra
Dr. Kenneth Feid
March 12, 2002
Page 2

Tenant's obligation to resume rental payments following the period of time reasonably required to restore the Leased Property would have been clear even if Tenant had elected not to resume occupancy of the Leased Premises. Landlord has recently confirmed however, that — contrary to Tenant's representations that it cannot use the Leased Property and that it intends to abandon it permanently (an abandonment that Landlord has never and does not now accept) — Tenant has actually and continuously occupied substantial portions of the Property throughout much or most of the post-flood period.

In light of the above, Landlord hereby exercises its right under Lease § 12.02 to accelerate Tenant's rental obligations, such that all rent scheduled to come due under the Lease is now immediately due and payable. Attached hereto is Landlord's calculation of the "Accelerated Rent," as contemplated by Lease § 12.02(a): $8,333,267, to be discounted to present value on the basis of a discount rate "equal to the prime rate offered by CoreStates Bank, N.A., applied and calculated on the date of receipt by Landlord . . . ."

The attachment hereto also includes projections for other amounts, totaling $4,658,016, for which Tenant is responsible as "Additional Rent" through the end of the lease term. Landlord demands payment thereof and reserves its rights with regard thereto.

Demand is hereby made under the Lease and Guaranty for immediate payment by Tenant and/or by Guarantor of the full Accelerated Rent. If Landlord does not actually receive that payment in full within ten (10) days from the date of this notice, Landlord shall have the right to exercise any, some, or all of its remedies under the Lease and the Guaranty, immediately and without further notice (except such notice, if any, required by law).

Landlord's letter of February 12, 2002, is hereby superseded as to the amount required by Landlord to release Tenant of its obligations under the Lease. Nothing less than payment in full of the Accelerated Rent, calculated as aforesaid, will release Tenant of its obligations under the Lease. Moreover, Landlord accepts no obligation to mitigate Landlord's


SCHNADER HARRISON
SEGAL & LEWIS LLP

Mr. David Morra
Dr. Kenneth Feld
March 12, 2002
Page 3


.damages in any way. By way of illustration and not by way of limitation, Landlord assumes no
obligation to attempt to find a new tenant or tenants for the Leased Property or for any portion of
it.

Sincerely,

William J. Maffucci
For SCHNADER HARRISON SEGAL & LEWIS LLP

cc: Harris Ominsky, Esq.
    (via fax and certified mail (return receipt requested))
    *Blank Rome Comisky & McCauley, LLP*
    *One Logan Square*
    *Philadelphia, Pennsylvania 19103-6998*
    *(Fax No. 215-832-5668)*
    *(7000 0600 0023 7955 2794)*
    Addressee at alternate address:
      *(via certified mail (return receipt requested))*
      *425 Delaware Drive*
      *Fort Washington, Pennsylvania 19034-2703*
      *(Z 367 121 478))*
    Linda Ann Galante, Esquire
      *(via certified mail (return receipt requested))*
      *Stradley Ronan Stevens & Young, LLP*
      *30 Valley Stream Parkway*
      *Malvern, PA 19355*
      *(P 582 150 433)*
    John A. Mannix
    David J. Campoli

Base Rent:

| Period | Monthly Rental Income | Annual Rent Per SF | Total Rent for Period | Total Obligation |
|---|---|---|---|---|
| October 1, 2001 - Feb. 28, 2003 | 72,333 | 7.00 | 1,229,667 | |
| March 1, 2003 - Feb 16, 2012 | 77,500 | 7.50 | 8,333,267 | |
| Total Rent over remaining term | | | | 9,562,934 |

Management Fee paid to Landlord per the Lease:

| Period | Monthly Mgt Fee Income | Annual Mgt Fee Inc. Per SF | Total MF Inc. for Period | |
|---|---|---|---|---|
| October 1, 2001 - Feb. 16, 2012 | 400 | 0.04 | 49,810 | |
| Total Mgt Fee Income over remaining term | | | | 49,810 |

Operating Expenses & Taxes (Tenant Responsible):

| Period | | Annual Estimated Per SF | Total Opex & Tax Exp. for Period |
|---|---|---|---|
| $2.00 Fixed Operating & $1.07 Taxes (3% annual inflation rate) | | | |
| Oct. 1 - December 31 | 2001 | 3.07 | 95,170 |
| Jan. 1 - December 31 | 2002 | 3.16 | 392,100 |
| " " | 2003 | 3.26 | 403,863 |
| " " | 2004 | 3.35 | 415,979 |
| " " | 2005 | 3.46 | 428,459 |
| " " | 2006 | 3.56 | 441,312 |
| " " | 2007 | 3.67 | 454,552 |
| " " | 2008 | 3.78 | 468,188 |
| " " | 2009 | 3.89 | 482,234 |
| " " | 2010 | 4.01 | 496,701 |
| " " | 2011 | 4.13 | 511,602 |
| Jan. 1 - February 16 | 2012 | 4.25 | 67,854 |
| Total Estimated Operating & Taxes over remaining term | | | 4,658,016 |

Total Remaining Lease Value                                                            14,270,760

Discounted Total Remaining Lease Value

# EXHIBIT  4

RONALD L. GREENSPAN

1

1            IN THE UNITED STATES DISTRICT COURT

             FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2

                              NO. 02-CV-2905

3

4

5

     BARRY M. PORTNOY and GERARD ) DEPOSITION UPON

6    M. MARTIN, as Trustees for

     HUB PROPERTIES TRUST,        ) ORAL EXAMINATION

7

                   Plaintiffs,  )         OF

8

              - vs -            ) RONALD L. GREENSPAN

9

     OMNICARE PHARMACEUTICS, INC.)

10   and OMNICARE CLINICAL

     RESEARCH, INC.,             )

11

                   Defendants.  )

12   - - - - - - - - - - - - - - -

13

14

15                 TRANSCRIPT OF DEPOSITION,

16   taken by and before F. DAVID DAMIANI, Registered

17   Professional Reporter and Notary Public, at the LAW

18   OFFICES OF OBERMAYER, REBMANN, MAXWELL & HIPPEL,

19   LLP, 19th Floor, One Penn Center, 1617 JFK

20   Boulevard, Philadelphia, Pennsylvania, on

21   Wednesday, October 30, 2002, commencing at 10:04

22   a.m.

23                     - - -

24          REPORTING SERVICE ASSOCIATES (RSA)

RONALD L. GREENSPAN

26

1  Q.    Would there be a better person than you to
2  be asking these questions?
3  A.    We could ask Lisa if she's aware.
4  Q.    How about the controller of the
5  Pharmaceutics company?
6  A.    He might be aware.
7  Q.    Do you know where I can find him?
8  A.    The controller?
9  Q.    The former controller.
10 A.    Well, I assume we could reach him at his
11 home.
12 Q.    Do you know where he lives?
13 A.    No.
14 Q.    Do you know if he's employed?
15 A.    I don't know.
16 Q.    When was the last time you spoke to him?
17 A.    Probably on the 20th of October.
18 Q.    What was the occasion?
19 A.    It was his last day.
20 Q.    Can you quantify the damages suffered to
21 your facility at 525 Virginia as a result of
22 Tropical Storm Allison?
23 A.    I've identified certain components that
24 would add up to that, the results of that.

27

1  Q.    Can you do that for me?
2  A.    Not without documents.
3  Q.    Do you have any documents?
4  A.    No.
5  Q.    What kind of documents do you need?
6  A.    There were various analyses that I had put
7  together at various times that would have shown the
8  impacts as they were known at the time.
9  Q.    Well, I could show you the exhibits that I
10 marked during Mr. Morra's deposition. Perhaps you
11 could look through it and see if any of the
12 material in there that would help you.
13        (At this time, the witness
14        complies with request.)
15 A.    No.
16 Q.    What documents do you need? Identify them
17 specifically for me, please.
18 A.    There were typically one or two-page Excel
19 files. Just kind of one or two columns with
20 descriptions and dollar amounts.
21 Q.    And these Excel spread sheets would be
22 your analysis of the damage suffered as a result of
23 the storm?
24 A.    As best I could quantify them at the time,

28

1  right.
2  Q.    It would have been a continual process?
3  You would have done more than one such analysis?
4  A.    I would have updated it at various times.
5  Q.    And would you have the various drafts
6  still saved somewhere?
7  A.    I could. I'd have to look. I don't know.
8  Q.    Would you please look for that material
9  and provide it to your counsel so that he can
10 provide them to me?
11 A.    Yes.
12        MR. SHARE:  Off the record.
13        (At this time, a discussion was
14 held off the record.)
15        MR. HABER: Back on the record.
16 BY MR. HABER:
17 Q.    You're not able to tell me the dollar
18 amount of the losses that occurred as a result of
19 the flood, right?
20 A.    Right.
21 Q.    You need to go back and look at certain
22 documents that you have in your office, and if you
23 had those, you could tell me?
24 A.    Yes.

29

1  Q.    Are you able to tell me qualitatively
2  about the damage that occurred as a result of the
3  2001 flood to 525 Virginia Drive?
4  A.    Qualitatively, in what respect?
5  Q.    In any respect other than giving me the
6  numbers, which you don't know.
7        For example, did you witness the damage in
8  the building after the flood?
9  A.    No.
10 Q.    Did anybody tell you about what happened
11 inside the building as a result of the flood?
12 A.    Yes.
13 Q.    What were you told?
14 A.    Well, there was four or five feet of water
15 that came through there.
16 Q.    Who told you that?
17 A.    Oh, probably a number of people told me
18 that. Jim McDevitt, Ken Feld, Dave Morra.
19 Q.    Did the flood have an impact on the income
20 statement of the Pharmaceutics company?
21 A.    Yes.
22 Q.    What kind of impact did it have?
23 A.    A revenue impact, an expense impact and a
24 profit impact. It was significant.

8 (Pages 26 to 29)

Veritext PA Reporting Services

RONALD L. GREENSPAN

**30**

1 Q. How did the flood impact on the revenue of
2 the Pharmaceutics company?
3 A. Well, initially there was nothing that
4 could be done. There was no revenue being
5 generated at all. The primary focus at that time
6 was cleaning up the building and contacting
7 customers with regard to the status of the
8 situation.
9 Q. Did there come a time when revenue was
10 generated once again at 525 Virginia Drive after
11 the flood?
12 A. Yes.
13 Q. When did that revenue begin to be
14 generated again?
15 A. I couldn't precisely tell you the answer
16 to that. Initially there was some work done
17 in stability, which was on the second floor of the
18 building. Later on there was work done on one
19 particular customer called Virbac, that was
20 performed in the building. That was probably the
21 extent of the work that was done, or that generated
22 revenue at the time.
23 Q. Do you know how much revenue was generated
24 for work that was performed in the building after

**31**

1 the flood?
2 A. Not off the top of my head, no.
3 Q. Can you approximate?
4 A. I would say it was generally in excess of
5 a million dollars.
6 Q. It was in excess of one million dollars?
7 A. Yeah.
8 Q. How about the expense impact; tell me
9 about how the flood impacted on the expenses of the
10 Pharmaceutics company's income statement.
11 A. Well, they were pretty significant.
12 Obviously without much revenue we still had ongoing
13 costs and depreciation, et cetera, et cetera, that
14 we incurred on some parts of the equipment they
15 were still using, the analytical stuff.
16 Q. Okay. Well, you had your general
17 overhead, right? You still had to pay whatever
18 your fixed overhead was, right?
19 A. Right.
20 Q. But did you have any extraordinary
21 expenses as a result of the flood?
22 A. We had salaries of employees that
23 obviously weren't working on what they were
24 supposed to be working on.

**32**

1 Q. Okay. Anything else?
2 A. Cleanup costs and those types of things.
3 Q. Okay. How much was the cleanup cost?
4 A. They were probably somewhere in the
5 neighborhood of two million plus.
6 Q. Is there somebody who could tell me
7 exactly how much was necessary to clean up the
8 building after the flood in 2001?
9 A. Jim McDevitt may be able to tell you. My
10 schedules would tell you.
11 Q. You would have documents that would
12 indicate how much it cost to clean up the building?
13 A. Yes.
14 Q. Where would those documents be located?
15 A. The same place the other files are.
16 Q. Will you also provide copies of those to
17 your counsel so that I can see them?
18 A. Yes.
19 Q. You approximate that the cleanup cost was
20 two million dollars?
21 A. Yeah. We had two vendors that originally
22 came in to help clean up the building.
23 Q. One of them was Belfor?
24 A. Yes.

**33**

1 Q. And who was the other vendor?
2 A. TGI.
3 Q. I've seen reports from them regarding some
4 of the work that they did, although I don't
5 remember seeing invoices or numbers relating to
6 them.
7 Q. Other than Belfor and -- TGI?
8 A. Right.
9 Q. Were there any other outside vendors to
10 which you attribute the two million dollars in
11 cleanup costs?
12 A. No. The rest of it was primarily just
13 incidental things employees incurred in terms of
14 cleanup.
15 Q. So did you charge some of the employees'
16 salaries to the cleanup costs, given the fact that
17 they were doing cleanup functions?
18 A. Yes.
19 Q. So there was internal charges?
20 A. Yes.
21 Q. Do you know when the cleanup of the
22 building was completed?
23 A. Within two to three months.
24 Q. Do you know whether or not the building

9 (Pages 30 to 33)

# EXHIBIT  5

DAVID MORRA

1

```
1        IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2
                              NO. 02-CV-2905

3

4

5

   BARRY M. PORTNOY and GERARD ) DEPOSITION UPON

6  M. MARTIN, as Trustees for
   HUB PROPERTIES TRUST,        ) ORAL EXAMINATION

7
                Plaintiffs, )        OF

8
                - vs -         )   DAVID MORRA

9

   OMNICARE PHARMACEUTICS, INC.)

10 and OMNICARE CLINICAL
   RESEARCH, INC.,             )

11
                Defendants. )

12 - - - - - - - - - - - - - - -

13

14

15             TRANSCRIPT OF DEPOSITION,

16 taken by and before F. DAVID DAMIANI, Registered

17 Professional Reporter and Notary Public, at the LAW

18 OFFICES OF OBERMAYER, REBMANN, MAXWELL & HIPPEL,

19 LLP, 19th Floor, One Penn Center, 1617 JFK

20 Boulevard, Philadelphia, Pennsylvania, on Tuesday,

21 October 29, 2002, commencing at 10:07 a.m.

22                  - - -

23         REPORTING SERVICE ASSOCIATES (RSA)

24
```

DAVID MORRA

182

1  A.    General description, yes.
2  Q.    And do you know what customers asked you
3  to continue to do stability testing in 525 Virginia
4  post June 2001?
5  A.    Not specifically.
6  Q.    Do you know generally?
7  A.    It's a specific question. For me to
8  answer who, I would have to name names, and I
9  don't know who specifically we were doing business
10 with.
11 Q.    Who would know the answer to those
12 questions regarding the entities for whom you
13 performed services in the building post flood?
14 A.    That would be a matter of record. I'm
15 sure within our finance group, the people who
16 document the revenues that we generate in the
17 company.
18 Q.    Are you telling me this fellow will know
19 tomorrow?
20 A.    Well, I'm telling you that someone in his
21 department might know. I doubt that Ron
22 specifically would know.
23 Q.    You said you were also doing storage work
24 on the premises.

183

1  A.    Well, stability -- that was -- that
2  comment was related to stability storage, not
3  general storage.
4  Q.    Not warehouse?
5  A.    Not warehouse. No warehousing done there.
6  Q.    So you never did any further warehousing
7  after the flood?
8  A.    Not in 525.
9  Q.    Where did you do warehousing?
10 A.    We did some very minimal light warehousing
11 in King of Prussia.
12 Q.    You also mentioned that you did one
13 manufacturing project in the building at some point
14 after the flood.
15 A.    Yes.
16 Q.    Where was that? On the first floor or
17 second?
18 A.    On the first floor.
19 Q.    What sort of manufacturing did you do post
20 flood?
21 A.    We were running a packaging -- what we
22 call primary packaging. That's taking an actual
23 tablet, in this case putting it into a foil -- a
24 foil pack. We were doing that on the first

184

1  floor.
2  Q.    Did you need equipment to do that?
3  A.    Yes.
4  Q.    Did you use the equipment that you owned
5  prior to the flood to perform that work?
6  A.    No. We didn't use it.
7  Q.    Did you buy new equipment?
8  A.    We did.
9  Q.    And you put the new equipment in 525 on
10 the first floor?
11 A.    Yes.
12 Q.    Was this the Virbac --
13 A.    Virbac.
14 Q.    Virbac project?
15 A.    Yes.
16 Q.    V-I-R-B-A-C?
17 A.    V-I-R-B-A-C.
18 Q.    When did you do this work for Virbac in
19 525 Virginia?
20 A.    I believe that started up again -- again,
21 it would have actually started up -- it never
22 started up prior to that. It started up in
23 September, I believe, sometime in September of
24 2001.

185

1  Q.    It started in September of 2001, and when
2  did it end?
3  A.    It ended probably some time in April or
4  May of this year.
5  Q.    How many employees did you have working on
6  the Virbac manufacturing project in 525 Virginia?
7  A.    Rough guess, about 40. Thirty to forty
8  people.
9  Q.    Did any of those employees report any
10 medical problems as a result of working in the
11 building during that time period?
12 A.    Not to my knowledge.
13 Q.    Is Virbac a name of a company?
14 A.    Yes, it is.
15 Q.    If we look back at DD No. 10, Virbac had
16 provided you with, or you had backlog for Virbac in
17 the amount of two point eight million dollars.
18 Would you agree with me?
19 A.    I remember that. Yeah, I remember that.
20 Q.    Had you done some of the work for Virbac
21 prior to the flood?
22 A.    No.
23 Q.    So Virbac was a new project that you had
24 contracted for prior to the flood, but were unable

47 (Pages 182 to 185)

186

1  to realize any of the revenue until after the
2  flood?
3  A.    Yes. That's correct.
4          MR. HABER: Let's go off the
5    record.
6          (At this time, a discussion was
7    held off the record.)
8  BY MR. HABER:
9  Q.    So you had 30 to 40 employees in the
10 building performing a manufacturing job for Virbac
11 between September of 2001 and May of 2002?
12 A.    That's correct.
13 Q.    Did you pay any rent to the landlord for
14 your use of the building during that time period?
15 A.    We did not.
16 Q.    Is the Virbac manufacturing project
17 completed?
18 A.    It been moved to another site.
19 Q.    Okay. So you haven't --
20 A.    It's an ongoing relationship.
21 Q.    But the two point eight million dollars in
22 backlog, have you realized all that revenue now?
23 A.    I believe we've recognized most of it.
24 Q.    Is there a reason why that work had to be

187

1  done at 525 Virginia?
2  A.    Yes. There is.
3  Q.    What is that reason?
4  A.    We signed an agreement with -- a contract
5  to manufacture for Virbac, but more importantly
6  Omnicare was listed in the drug master file with
7  that drug and the FDA as the only manufacturer.
8          The decision was made. Now, this was a
9  new drug for them, and they were expecting to
10 launch the product for the first time on the market
11 by November or December of 2001. It was really a
12 dialogue, you know, we don't want to miss the
13 launch, we don't necessarily want you to have it
14 in Fort Washington long term, but we need the
15 product. So we were between a rock and a hard
16 place, I guess you might call it, in terms of they
17 could not qualify another manufacturer in the
18 amount of time to satisfy the drug master file and
19 to launch the product on time.
20        So in collaboration, we decided that we
21 would buy the piece of equipment, set it up in Fort
22 Washington, understood between us and Virbac that
23 it would be temporary, because, again, they were
24 not excited about it being in that site. Again,

188

1  this is a commercial product now, and of a much
2  higher value than a clinical trial product. So we
3  agreed to do that, to service that account and
4  service that need.
5          They really had no other options and
6  neither did we.
7  Q.    Have there been any negative repercussions
8  from the product that you manufactured in 525
9  Virginia for Virbac?
10 A.    No.
11 Q.    That you're aware of?
12 A.    I'm not aware of any negative --
13 Q.    Nobody got sick from the use of the drug
14 that somebody could tie to the fact that it was
15 manufactured in your facility?
16 A.    It's an animal product, but we're still
17 not aware of any ill-effects.
18 Q.    An animal product?
19 A.    It's a veterinary product used in animals.
20 Q.    Do you have any other special projects
21 planned for the facility at 525 Virginia similar in
22 nature to what you did to Virbac? For Virbac?
23 A.    All operations have ceased. We have no
24 further plans.

189

1  Q.    All operations ceased when?
2  A.    Well, as of -- when Virbac moved, that was
3  April. That was April.
4  Q.    Where are you doing or performing the
5  manufacturing for Virbac now?
6  A.    We're doing it in an Omnicare-owned
7  facility in Toledo, Ohio.
8  Q.    That would be a facility owned by
9  Omnicare, Inc.?
10 A.    Yes.
11 Q.    Is Omnicare, Inc. in the drug
12 manufacturing business?
13 A.    They're in the drug packaging business.
14 Q.    Drug packaging business?
15 A.    Yes.
16 Q.    A similar business as the Pharmaceutics
17 company was in?
18 A.    No. Well, no. Similar to the Virbac
19 work. Specifically similar to the Virbac work.
20 Q.    In other words, Virbac was a commercial
21 drug that you were packaging?
22 A.    Repacking. Packaging or repacking, yes.
23 Q.    And the normal course of business for the
24 Pharmaceutics company was not to repackage product

# EXHIBIT  6

## INDEX TO EXHIBIT 11

| Bates # PLSTP* | Lease Prov. | Vendor Name | Invoice Date | Transaction Desc | Invoice Amt | # Days Late | 5% Late Chg | 6% simple int on Invoice amt + late chg |
|---|---|---|---|---|---|---|---|---|
| 0001-0003 | 2.02, 3.07, 8.01 | @Road Mobile Res. Mgt | 5/6/04 | 4/2-5/6/04 | $ 321.02 | 314 | $ 16.05 | $ 17.40 |
| 0004-0006 | 2.02, 3.07, 8.01 | @Road Mobile Res. Mgt | 6/5/04 | 5/7/04 - 6/5/04 GPS | $ 24.96 | 284 | $ 1.25 | $ 1.22 |
| | 2.02, 3.07, 8.01 | @Road Mobile Res. Mgt | 7/3/04 | 6/5/04-7/3/04 GPS | $ 24.96 | 256 | $ 1.25 | $ 1.10 |
| | 2.02, 3.07, 8.01 | @Road Mobile Res. Mgt | 8/5/04 | 7/3/04-8/5/04 GPS | $ 24.96 | 223 | $ 1.25 | $ 0.96 |
| | 2.02, 3.07, 8.01 | @Road Mobile Res. Mgt | 9/3/04 | 8/5/04-9/3/04 | $ 24.96 | 194 | $ 1.25 | $ 0.84 |
| 0007-0009 | 2.02, 3.07, 8.01 | @Road Mobile Res. Mgt | 10/5/04 | 9/3-10/5 GPS | $ 24.96 | 162 | $ 1.25 | $ 0.70 |
| 0010-0013 | 2.02, 3.07, 8.01 | @Road Mobile Res. Mgt | 11/3/04 | 10/5/04-11/3/04 GPS | $ 24.96 | 133 | $ 1.25 | $ 0.57 |
| 0013-0016 | 2.02, 3.07, 8.01 | @Road Mobile Res. Mgt | 12/7/04 | 11/3/04-12/7/04 GPS | $ 24.96 | 99 | $ 1.25 | $ 0.43 |
| | 2.02, 3.07, 8.01 | @Road Mobile Res. Mgt | 1/3/05 | 12/7/04-1/3/05 GPS | $ 24.96 | 72 | $ 1.25 | $ 0.31 |
| | 2.02, 3.07, 8.01 | @Road Mobile Res. Mgt | 2/3/05 | 1/3/05-2/3/05 GPS | $ 24.96 | 41 | $ 1.25 | $ 0.18 |
| | 2.02, 3.07, 8.01 | @Road Mobile Res. Mgt | 4/15/05 | 2/3-3/3 GPS: set monthly amount | $ 24.96 | | | |
| | 2.02, 3.07, 8.01 | @Road Mobile Res. Mgt | 4/15/05 | 3/3-4/3 GPS: set monthly amount | $ 24.96 | | | |
| | 2.02, 3.07, 8.01 | @Road Mobile Res. Mgt | 4/15/05 | 4/3-4/15 GPS: set monthly amount | $ 10.82 | | | |
| 0017-0018 | 2.02, 3.07, 8.01,5.02 | A.T. Chadwick Co. | 1/30/04 | 12/1 BOILER REPAIR | $ 279.00 | 411 | $ 13.95 | $ 19.79 |
| 0019-0020 | 2.02, 3.07, 8.01 | ABM Janitorial Service | 5/1/04 | 3/28-430 Extra clean | $ 831.61 | 319 | $ 41.58 | $ 45.79 |
| | 2.02, 3.07, 8.01 | ABM Janitorial Services | 8/2/04 | 7/24-7/25 GNRL CLEAN | $ 302.55 | 226 | $ 15.13 | $ 11.80 |
| 0021-0022 | 2.02, 3.07, 8.01 | ABM Janitorial Services | 8/2/04 | 7/24-7/25 GNRL CLEAN | $ 674.82 | 226 | $ 33.74 | $ 26.32 |
| 0023-0025 | 2.02, 3.07, 8.01 | ABM Janitorial Services | 10/6/04 | 9/04 CLEANING | $ 1,143.13 | 161 | $ 57.16 | $ 31.77 |
| | 2.02, 3.07, 8.01 | ABM Janitorial Services | 11/3/04 | 10/04 CLEAN CNTRCT | $ 800.64 | 133 | $ 40.03 | $ 18.38 |
| | 2.02, 3.07, 8.01 | ABM Janitorial Services | 12/8/04 | 11/04 MNTHLY CLEANING | $ 633.01 | 98 | $ 31.65 | $ 10.71 |
| | 2.02, 3.07, 8.01 | ABM Mid atlantic | 1/31/04 | 1/25 CLEANING | $ 913.22 | 410 | $ 45.66 | $ 64.63 |
| 0026-0028 | 2.02, 3.07, 8.01 | ABM Mid atlantic | 6/30/04 | 6/30 Clean empty bldg | $ 2,052.65 | 259 | $ 102.63 | $ 91.76 |
| 0029-0030 | 2.02, 3.07 | ABM Mid atlantic | 7/8/04 | 504 CLEANING BLDG | $ 74.47 | 251 | $ 3.72 | $ 3.23 |
| 0031-0032 | 2.02, 3.07, 8.01 | ABM Mid atlantic | 7/8/04 | 85-8/6 CLN EMPTY SPACE | $ 81.92 | 251 | $ 4.10 | $ 3.55 |
| | 2.02, 3.07, 8.01 | ABM Mid atlantic | 1/3/04 | 1/3 MISC CLEAN | $ 81.92 | 438 | $ 4.10 | $ 6.19 |
| | 2.02, 3.07 | About Flags, Inc. | 12/24/03 | 12/4 US FLAG | $ 83.07 | 448 | $ 4.15 | $ 6.42 |
| | 2.02, 3.07 | About Flags, Inc. | 11/2/04 | FLAGS | $ 48.16 | 134 | $ 2.41 | $ 1.11 |
| | 2.01 | American Sewer Service, Inc. | 3/23/03 | 3/29/03 Sewer Work | $ 337.09 | 750 | $ 16.85 | $ 43.64 |
| | 2.02, 8.01 | American Sewer Service, Inc. | 9/22/03 | 9/18 Plumbing | $ 365.00 | 541 | $ 18.25 | $ 34.44 |
| 0033-0035 | 2.02, 3.07, 8.01 | Aramark | 2/12/05 | 2/12 UNIFORMS | $ 63.42 | 32 | $ 3.17 | $ 0.35 |
| 0036-0037 | 2.02, 3.07, 8.01 | AT & T | 6/1/203 | 6/12 Phone | $ 3.02 | 643 | $ 0.15 | $ 0.34 |
| 0038-0040 | 2.02, 3.07, 8.01 | AT & T | 7/12/03 | 7/12 Fax marchine | $ 2.88 | 613 | $ 0.14 | $ 0.30 |
| | 2.02, 3.07, 8.01 | AT & T | 8/12/03 | 8/12 Fax | $ 4.81 | 582 | $ 0.24 | $ 0.48 |
| 0041-0043 | 2.02, 3.07, 8.01 | AT & T | 9/12/03 | 9/12 Fax machine | $ 2.92 | 551 | $ 0.15 | $ 0.28 |
| 0044-0046 | 2.02, 3.07, 8.01 | AT & T | 10/12/03 | 10/12/03 Fax | $ 3.03 | 521 | $ 0.15 | $ 0.27 |
| 0047-0049 | 2.02, 3.07, 8.01 | AT & T | 11/12/03 | 11/12/03 Fax Machine | $ 3.04 | 490 | $ 0.15 | $ 0.26 |
| | 2.02, 3.07, 8.01 | AT & T | 12/12/03 | 12/12 FAX | $ 3.52 | 460 | $ 0.18 | $ 0.29 |
| | 2.02, 3.07, 8.01 | AT & T | 1/12/04 | 1/12 FAX MACHINE | $ 3.38 | 429 | $ 0.17 | $ 0.25 |
| | 2.02, 3.07, 8.01 | AT & T | 2/12/04 | 2/12 Fax machine | $ 3.37 | 398 | $ 0.17 | $ 0.23 |
| | 2.02, 3.07, 8.01 | AT & T | 3/12/04 | 3/12 FAX Machine | $ 3.43 | 369 | $ 0.17 | $ 0.22 |
| | 2.02, 3.07, 8.01 | AT & T | 4/12/04 | 4/12 Fax machine | $ 3.37 | 338 | $ 0.17 | $ 0.20 |
| | 2.02, 3.07, 8.01 | AT & T | 5/12/04 | 5/12 Phone | $ 3.54 | 308 | $ 0.18 | $ 0.19 |
| | 2.02, 3.07, 8.01 | AT & T | 6/12/04 | 6/12 FAX LINE | $ 3.46 | 277 | $ 0.17 | $ 0.17 |
| | 2.02, 3.07, 8.01 | AT & T | 7/1/04 | 8/12 FAX LINE | $ 3.98 | 258 | $ 0.20 | $ 0.18 |
| | 2.02, 3.07, 8.01 | AT & T | 7/12/04 | 7/12 FAX LINE | $ 3.59 | 247 | $ 0.18 | $ 0.15 |
| 0090-0051 | 2.02, 3.07, 8.01 | AT & T | 11/12/04 | 11/12 FAX LINE | $ 2.32 | 124 | $ 0.12 | $ 0.05 |
| 0052-0053 | 2.02, 3.07, 8.01 | AT & T | 9/12/04 | 9/12 FAX LINE | $ 3.39 | 185 | $ 0.17 | $ 0.11 |

## INDEX TO EXHIBIT 11

| Bates # PLSTP* | Lease Prov. | Vendor Name | Invoice Date | Transaction Desc | Invoice Amt | # Days Late | 5% Late Chg | 6% simple int on Invoice amt + late chg |
|---|---|---|---|---|---|---|---|---|
| 0054-0056 | 2.02, 3.07, 8.01 | AT & T | 10/12/04 | 10/12 FAX LINE | $ 4.05 | 155 | $ 0.20 | $ 0.11 |
| | 2.02, 3.07, 8.01 | AT & T | 12/12/04 | 12/12 FAX LINE | $ 3.76 | 94 | $ 0.19 | $ 0.06 |
| | 2.02, 3.07, 8.01 | AT & T | 1/12/05 | 1/12 FAX LINE | $ 3.65 | 63 | $ 0.18 | $ 0.04 |
| | 2.02, 3.07, 8.01 | AT & T | 2/12/05 | 2/12 FAX LINE | $ 3.78 | 32 | $ 0.19 | $ 0.02 |
| | 2.02, 3.07, 8.01 | AT & T | 4/15/05 | 3/12 Fax Line-Estimated based on last 3 mnth avg | $ 3.73 | | | |
| 0057-0058 | 3.01 | AT & T | 4/15/05 | 4/12 Fax Line-Estimated based on last 3 mnth avg | $ 3.73 | | | |
| 0059-0060 | 3.01 | BC Water & Sewer Authority | 1/13/03 | 10/1-12/31/02 Water & Sewer | $ 491.12 | 793 | $ 24.56 | $ 67.22 |
| 0061-0062 | 3.01 | BC Water & Sewer Authority | 4/2/03 | 1/1-3/31 Water & Sewer | $ 491.12 | 695 | $ 24.56 | $ 58.91 |
| 0063-0064 | 3.01 | BC Water & Sewer Authority | 8/1/03 | 4/1-6/30 Water/Sewer | $ 491.12 | 593 | $ 24.56 | $ 50.27 |
| | 3.01 | BC Water & Sewer Authority | 9/3/03 | 7/1-9/30/03 Water & Sewer | $ 491.12 | 533 | $ 24.56 | $ 45.18 |
| 0065-0066 | 3.01 | BC Water & Sewer Authority | 11/14/03 | 7/3-9/30 Water & Sewer | $ 491.12 | 488 | $ 24.56 | $ 41.37 |
| 0067-0068 | 3.01 | BC Water & Sewer Authority | 1/16/04 | 9/30-12/30 SEWER | $ 540.23 | 425 | $ 27.01 | $ 39.63 |
| 0069-0070 | 3.01 | BC Water & Sewer Authority | 4/7/04 | 12/30-03-3/31/04 Water | $ 491.12 | 343 | $ 24.56 | $ 29.08 |
| | 3.01 | BC Water & Sewer Authority | 7/15/04 | 3/31-7/15 SEWER | $ 491.12 | 244 | $ 24.56 | $ 20.68 |
| 0071-0072 | 3.01 | BC Water & Sewer Authority | 10/13/04 | 7/15-10/6 SEWER | $ 491.12 | 154 | $ 24.56 | $ 13.05 |
| | 3.01 | BC Water & Sewer Authority | 1/6/05 | 10/6-1/4 SEWER | $ 531.41 | 69 | $ 26.57 | $ 6.33 |
| | 3.01 | BC Water & Sewer Authority | 3/3/05 | 1/4/05-3/3/05 Sewer-Est., not yet rec'd | $ 354.28 | 13 | $ 17.71 | $ 0.79 |
| | 3.01 | BC Water & Sewer Authority | 4/15/05 | 3/3/05-4/4/05 Sewer-Estimated | $ 177.14 | | | |
| | 3.01 | BC Water & Sewer Authority | 4/15/05 | 4/4/05-4/15/05 -Estimated | $ 70.85 | | | |
| 0073-0075 | 2.02, 3.07, 8.01 | BF Moltz | 9/13/03 | Supplies | $ 44.94 | 550 | $ 2.25 | $ 4.27 |
| | 2.02, 3.07, 8.01 | BF Moltz | 9/1/04 | 9/1 OFFICE SUPPLIES | $ 33.08 | 196 | $ 1.65 | $ 1.12 |
| | 2.02, 3.07, 8.01 | BF Moltz | 2/11/05 | SUPPLIES | $ 13.97 | 33 | $ 0.70 | $ 0.08 |
| | 2.02, 8.01 | BOMA/PHILADELPHIA | 12/11/04 | 05 MEMBER DUES | $ 92.72 | 95 | $ 4.64 | $ 1.52 |
| | 2.02, 8.01 | Building Owners Management | 9/1/04 | SEMINAR T.BOYES | $ 9.28 | 196 | $ 0.46 | $ 0.31 |
| 0076-0077 | 2.02, 3.07, 5.02 | Commonwealth of PA | 7/28/03 | APP fee for small projected | $ 100.00 | 597 | $ 5.00 | $ 10.30 |
| | 2.02, 3.07, 5.02 | Commonwealth of PA | 9/15/03 | 9/15 Truck Registration | $ 11.66 | 548 | $ 0.58 | $ 1.10 |
| | 2.02, 3.07, 5.02 | Commonwealth of PA | 9/15/03 | 9/15 Truck Registration | $ 11.66 | 548 | $ 0.58 | $ 1.10 |
| 0078-0079 | 2.02, 3.07, 8.01 | Dave's Pest Control | 8/13/03 | 8/13 Extermination | $ 132.50 | 581 | $ 6.63 | $ 13.29 |
| 0080-0081 | 2.02, 3.07, 8.01 | Dave's Pest Control | 9/10/03 | 9/10 Extermination | $ 132.50 | 553 | $ 6.63 | $ 12.65 |
| 0082-0083 | 2.02, 3.07, 8.01 | Dave's Pest Control | 10/8/03 | 10/8 Extermination | $ 132.50 | 525 | $ 6.63 | $ 12.01 |
| 0084-0085 | 2.02, 3.07, 8.01 | Dave's Pest Control | 10/11/03 | 10/11 Extermination | $ 238.50 | 522 | $ 11.93 | $ 21.49 |
| 0086-0087 | 2.02, 3.07, 8.01 | Dave's Pest Control | 11/12/03 | 11/12 Extermination | $ 132.50 | 490 | $ 6.63 | $ 11.21 |
| | 2.02, 3.07, 8.01 | Dave's Pest Control | 11/12/03 | 11/12 Extermination | $ 37.10 | 490 | $ 1.86 | $ 3.14 |
| 0088-0089 | 2.02, 3.07, 8.01 | Dave's Pest Control | 12/10/03 | 12/10 Extermination | $ 132.50 | 462 | $ 6.63 | $ 10.57 |
| 0090-0091 | 2.02, 3.07, 8.01 | Dave's Pest Control | 1/14/04 | 1/14 EXTERMINATION | $ 132.50 | 427 | $ 6.63 | $ 9.77 |
| 0092-0093 | 2.02, 3.07, 8.01 | Dave's Pest Control | 2/11/04 | 2/11 EXTERMINATION | $ 132.50 | 399 | $ 6.63 | $ 9.13 |
| 0094-0095 | 2.02, 3.07, 8.01 | Dave's Pest Control | 3/10/04 | Extermination | $ 132.50 | 371 | $ 6.63 | $ 8.48 |
| 0096-0097 | 2.02, 3.07, 8.01 | Dave's Pest Control | 4/16/04 | 4/16 Extermination | $ 132.50 | 334 | $ 6.63 | $ 7.64 |
| 0098-0099 | 2.02, 3.07, 8.01 | Dave's Pest Control | 5/1/04 | 5/1 Extermination | $ 238.50 | 319 | $ 11.93 | $ 13.13 |
| 0100-0101 | 2.02, 3.07, 8.01 | Dave's Pest Control | 5/12/04 | 5/12 Extermination | $ 132.50 | 308 | $ 6.63 | $ 7.04 |
| 0102-0103 | 2.02, 3.07, 8.01 | Dave's Pest Control | 6/9/04 | 6/9 Extermination | $ 132.50 | 280 | $ 6.63 | $ 6.40 |
| | 2.02, 3.07, 8.01 | Dave's Pest Control | 7/14/04 | 7/14 EXTERMINATION | $ 132.50 | 245 | $ 6.63 | $ 5.60 |
| | 2.02, 3.07, 8.01 | Dave's Pest Control | 7/17/04 | 7/17 EXTERMINATION | $ 238.50 | 242 | $ 11.93 | $ 9.96 |
| | 2.02, 3.07, 8.01 | Dave's Pest Control | 8/11/04 | 8/11 EXTERMINATION | $ 132.50 | 217 | $ 6.63 | $ 4.96 |
| | 2.02, 3.07, 8.01 | Dave's Pest Control | 8/17/04 | 9/8 EXTERMINATION | $ 78.11 | 211 | $ 3.91 | $ 2.84 |
| 0104-0105 | 2.02, 3.07, 8.01 | Dave's Pest Control | 10/11/04 | 10/11 EXTERMINATION | $ 78.11 | 156 | $ 3.91 | $ 2.10 |
| 0106-0107 | 2.02, 3.07, 8.01 | Dave's Pest Control | 10/23/04 | 10/23 EXTERMINATION | $ 240.75 | 144 | $ 12.04 | $ 5.98 |
| 0108-0109 | 2.02, 3.07, 8.01 | Dave's Pest Control | 11/10/04 | 11/10 EXTERMINATION | $ 78.11 | 126 | $ 3.91 | $ 1.70 |

2

# INDEX TO EXHIBIT 11

| Bates # PLSTP* | Lease Prov. | Vendor Name | Invoice Date | Transaction Desc. | Invoice Amt | # Days Late | 5% Late Chg | 6% simple int on invoice amt + late chg |
|---|---|---|---|---|---|---|---|---|
| 0110-0111 | 2.02, 3.07, 8.01 | Dave's Pest Control | 12/8/04 | 12/8 EXTERMINATION | $ 78.11 | 98 | $ 3.91 | $ 1.32 |
| | 2.02, 3.07, 8.01 | Dave's Pest Control | 1/12/05 | 1/12 EXTERMINATION | $ 78.11 | 63 | $ 3.91 | $ 0.85 |
| | 2.02, 3.07, 8.01 | Dave's Pest Control | 2/9/05 | 2/9 EXTERMINATION | $ 78.11 | 35 | $ 3.91 | $ 0.47 |
| | 2.02, 3.07, 8.01 | Dave's Pest Control | 3/9/05 | 3/9 EXTERMINATION | $ 78.11 | 7 | $ 3.91 | $ 0.09 |
| 0112-0113 | 2.02, 3.07, 8.01 | Donnelly Roofing | 10/11/02 | Roof Repair - Toof Trobleshoot svc | $ 330.00 | 887 | $ 16.50 | $ 50.52 |
| 0114-0115 | 2.02, 3.07, 8.01 | Duff Company | 5/8/03 | 5/8 Plumbing Supplies | $ 91.94 | 678 | $ 4.60 | $ 10.76 |
| | 2.02, 5.03 | E&Y | 10/30/03 | Audit HRPT 1st Prog bill | $ 16.14 | 503 | $ 0.81 | $ 1.40 |
| | 2.02, 5.03 | E&Y | 11/3/04 | Audit fee Rcl to 12999 | $ 39.80 | 133 | $ 1.99 | $ 0.91 |
| | 2.02, 5.03 | E&Y | 12/3/04 | Audit fee Rcl to 12999 | $ 17.27 | 103 | $ 0.86 | $ 0.31 |
| 0117-0118 | 2.02, 3.02 | Edward F. Monorella | 2/1/05 | EMERGENCY & EVACUATION PLAN | $ 750.00 | 43 | $ 37.50 | $ 5.57 |
| | 2.02, 3.07, 8.01 | Euro Fibers, Inc. | 6/12/03 | 6/12 - 30 YRD Open Top | $ 395.00 | 643 | $ 19.75 | $ 43.84 |
| | 2.02, 3.07, 8.01 | Euro Fibers, Inc. | 6/17/04 | 6/17 TRSH RMVL | $ 408.80 | 272 | $ 20.44 | $ 19.19 |
| | 2.02, 3.07, 8.01 | Exxon Mobil | 6/2/03 | 5/03 Fuel for truck | $ 75.67 | 653 | $ 3.78 | $ 8.53 |
| | 2.02, 3.07, 8.01 | Exxon Mobil | 8/1/03 | Fuel for truck | $ 98.33 | 593 | $ 4.92 | $ 10.06 |
| | 2.02, 3.07, 8.01 | Exxon Mobil | 9/1/03 | 8/03 Truck Lease | $ 116.17 | 562 | $ 5.81 | $ 11.27 |
| | 2.02, 3.07, 8.01 | Exxon Mobil | 10/1/03 | 9/2-9/30 Auto Fuel | $ 135.51 | 532 | $ 6.78 | $ 12.44 |
| | 2.02, 3.07, 8.01 | Exxon Mobil | 11/1/03 | 10/1-10/31 Auto Fuel · | $ 133.39 | 501 | $ 6.67 | $ 11.53 |
| 0119-0121 | 2.02, 3.07, 8.01 | Exxon Mobil | 12/1/03 | 11/4-11/26 Auto Fuel | $ 90.58 | 471 | $ 4.53 | $ 7.36 |
| 0122-0124 | 2.02, 3.07, 8.01 | Exxon Mobil | 1/1/04 | 12/1 - 12/31 AUTO FUEL | $ 116.69 | 440 | $ 5.83 | $ 8.86 |
| 0122-0127 | 2.02, 3.07, 8.01 | Exxon Mobil | 2/2/04 | 1/3/-2/1 AUTO FUEL | $ 129.02 | 408 | $ 6.45 | $ 9.09 |
| 0128-0130 | 2.02, 3.07, 8.01 | Exxon Mobil | 3/1/04 | 2/2-2/27 Auto fuel | $ 104.53 | 380 | $ 5.23 | $ 6.86 |
| 0131-0133 | 2.02, 3.07, 8.01 | Exxon Mobil | 3/31/04 | Auto fuel | $ 129.16 | 350 | $ 6.46 | $ 7.80 |
| | 2.02, 3.07, 8.01 | Exxon Mobil | 4/1/04 | 3/01-3/31 AUTO FUEL | $ 951.20 | 349 | $ 47.56 | $ 57.30 |
| 0134-0136 | 2.02, 3.07, 8.01 | Exxon Mobil | 5/1/04 | 4/2-4/30 Fuel | $ 125.18 | 319 | $ 6.26 | $ 6.89 |
| 0137-0139 | 2.02, 3.07, 8.01 | Exxon Mobil | 6/1/04 | 5/5-5/29 Fuel | $ 111.51 | 288 | $ 5.58 | $ 5.54 |
| | 2.02, 3.07, 8.01 | Exxon Mobil | 7/27/04 | 6/1-6/30 AUTO FUEL | $ 128.48 | 232 | $ 6.42 | $ 5.14 |
| | 2.02, 3.07, 8.01 | Exxon Mobil | 8/2/04 | 7/2-7/31 AUTO FUEL | $ 127.29 | 226 | $ 6.36 | $ 4.97 |
| | 2.02, 3.07, 8.01 | Exxon Mobil | 8/31/04 | 8/2-8/31 AUTO FUEL | $ 125.17 | 197 | $ 6.26 | $ 4.26 |
| 0140-0142 | 2.02, 3.07, 8.01 | Exxon Mobil | 10/1/04 | 9/4-9/30 AUTO FUEL | $ 99.59 | 166 | $ 4.98 | $ 2.85 |
| 0143-0145 | 2.02, 3.07, 8.01 | Exxon Mobil | 11/1/04 | 9/30-10/30 AUTO FUEL | $ 119.10 | 135 | $ 5.96 | $ 2.78 |
| 0146-0147 | 2.02, 3.07, 8.01 | Exxon Mobil | 12/1/04 | 11/2-11/30 AUTO FUEL | $ 122.93 | 105 | $ 6.15 | $ 2.23 |
| | 2.02, 3.07, 8.01 | Exxon Mobil | 12/31/04 | 12/1-12/28 AUTO FUEL | $ 124.48 | 75 | $ 6.22 | $ 1.61 |
| | 2.02, 3.07, 8.01 | Exxon Mobil | 1/31/05 | 12/30-1/29 AUTO FUEL | $ 121.18 | 44 | $ 6.06 | $ 0.92 |
| | 2.02, 3.07, 8.01 | Exxon Mobil | 7/1/03 | 6/2-6/30 Fuel for Truck | $ 112.95 | 624 | $ 5.65 | $ 12.17 |
| | 2.02, 3.07, 8.01 | Exxon Mobil | 2/18/05 | 2/1-2/25 AUTO FUEL | $ 114.84 | 26 | $ 5.74 | $ 0.52 |
| | 2.02, 3.07, 8.01 | Exxon Mobil | 4/15/05 | 2/26-3/31 Truck Fuel-Based on last 3 mnth avg | $ 360.50 | | | |
| 0148-0150 | 2.02, 3.07, 8.01 | Fast Page Radio Co | 6/24/04 | 6/24 PHONE CLIP | $ 2.16 | 265 | $ 0.10 | $ 0.10 |
| 0151-0153 | 2.02, 3.07, 8.01 | Fast Page Radio Co | 7/15/03 | 7/15 Cell Phone | $ 80.10 | 610 | $ 4.01 | $ 8.43 |
| 0154-0155 | 2.02, 3.07, 8.01 | Genserve, Inc. | 6/16/04 | 6/16 GENERATOR REPAIR | $ 1,405.56 | 273 | $ 70.28 | $ 66.23 |
| 0156-0157 | 2.02, 3.07, 8.01 | Genserve, Inc. | 5/26/04 | 5/6 Emergency call | $ 315.00 | 294 | $ 15.75 | $ 15.98 |
| 0158-0160 | 2.02, 3.07, 8.01 | GMAC | 6/20/03 | 6/20 Truck Lease | $ 55.85 | 635 | $ 2.79 | $ 6.12 |
| | 2.02, 3.07, 8.01 | GMAC | 6/20/03 | 6/20 Truck Lease | $ 55.85 | 635 | $ 2.79 | $ 6.12 |
| | 2.02, 3.07, 8.01 | GMAC | 6/20/03 | 6/20 Truck Lease | $ 52.69 | 604 | $ 2.63 | $ 5.49 |
| 0161-0163 | 2.02, 3.07, 8.01 | GMAC | 7/21/03 | 7/21 Truck lease | $ 52.68 | 604 | $ 2.63 | $ 5.21 |
| 0164-0166 | 2.02, 3.07, 8.01 | GMAC | 8/21/03 | 9/03 Truck lease | $ 52.68 | 573 | $ 2.63 | $ 5.21 |
| | 2.02, 3.07, 8.01 | GMAC | 8/21/03 | 9/03 Truck lease | $ 52.68 | 573 | $ 2.63 | $ 5.21 |
| 0167-0169 | 2.02, 3.07, 8.01 | GMAC | 9/19/03 | Truck lease | $ 52.68 | 544 | $ 2.63 | $ 4.95 |
| | 2.02, 3.07, 8.01 | GMAC | 9/30/03 | Truck lease | $ 52.68 | 533 | $ 2.63 | $ 4.85 |
| 0170-0172 | 2.02, 3.07, 8.01 | GMAC | 10/21/03 | 11/03 Truck lease | $ 52.68 | 512 | $ 2.63 | $ 4.66 |
| | 2.02, 3.07, 8.01 | GMAC | 10/21/03 | 11/03 Truck lease | $ 52.68 | 512 | $ 2.63 | $ 4.66 |

## INDEX TO EXHIBIT 11

| Bates # PLSTP* | Lease Prov. | Vendor Name | Invoice Date | Transaction Desc | Invoice Amt | # Days Late | 5% Late Chg | 6% simple int on Invoice amt + late chg |
|---|---|---|---|---|---|---|---|---|
| 0173-0175 | 2.02, 3.07, 8.01 | GMAC | 11/25/03 | 12/03 Truck lease | $ 56.03 | 477 | $ 2.80 | $ 4.61 |
| 0176-0178 | 2.02, 3.07, 8.01 | GMAC | 11/25/03 | 12/03 Truck lease | $ 56.03 | 477 | $ 2.80 | $ 4.61 |
| | 2.02, 3.07, 8.01 | GMAC | 1/21/04 | EXCESS MILAGE LESS SEC DEP | $ 19.89 | 420 | $ 0.99 | $ 1.44 |
| 0179-0180 | 2.02, 3.07, 8.01 | GMAC | 7/21/03 | 7/21 Truck lease | $ 52.69 | 604 | $ 2.63 | $ 5.49 |
| 0181-0182 | 2.02, 3.07, 8.01 | Goldhorn Electric Contr. Inc | 4/22/04 | 4/20 Electrical PM | $ 2,506.00 | 330 | $ 125.30 | $ 142.74 |
| 0183-0184 | 2.02, 3.07, 8.01 | Goldhorn Electrical Constr. Inc | 5/16/03 | 5/14 Repair Lighting | $ 811.22 | 670 | $ 40.56 | $ 93.81 |
| | 2.02, 3.07, 8.01 | Goldhorn Electrical Constr. Inc | 12/31/03 | 12/29 RPR PRKNG LT LGHTS | $ 768.85 | 441 | $ 38.44 | $ 58.52 |
| 0185-0186 | 2.02, 3.07, 8.01 | HGO Services | 8/31/03 | WO#1019387 | $ 1,229.71 | 563 | $ 61.24 | $ 119.01 |
| 0187-0189 | 2.02, 3.07, 8.01 | HGO Services | 7/24/03 | 6/18 Extra cleaning | $ 1,420.40 | 601 | $ 71.02 | $ 147.34 |
| | 2.02, 3.07, 8.01 | HGO Services | 7/1/03 | WO#1019374 | $ 1,378.64 | 624 | $ 68.93 | $ 148.49 |
| 0190-0192 | 2.02, 3.07, 5.02, 8.01 | Hightech signs | 5/30/03 | 5/22 Signs | $ 44.51 | 656 | $ 2.23 | $ 5.04 |
| 0193-0195 | 2.02, 3.07, 5.02, 8.01 | Hightech signs | 1/29/04 | 1/29 SIGNS | $ 42.40 | 412 | $ 2.12 | $ 3.02 |
| 0196-0198 | 2.02, 3.07, 8.01 | Home Depot | 6/2/03 | 5/03 Maint Supplies | $ 598.02 | 653 | $ 29.90 | $ 67.40 |
| | 2.02, 3.07, 8.01 | Home Depot | 8/5/03 | 7/14/8/4 Maint supplie | $ 656.59 | 589 | $ 32.83 | $ 66.75 |
| 0201-0203 | 2.02, 3.07, 8.01 | Home Depot | 8/28/03 | 8/28 Maint supplies | $ 727.78 | 566 | $ 36.39 | $ 71.10 |
| 0204-0206 | 2.02, 3.07, 8.01 | Home Depot | 9/28/03 | 8/28-9/26 Maint supplies | $ 499.32 | 535 | $ 24.97 | $ 46.11 |
| 0207-0209 | 2.02, 3.07, 8.01 | Home Depot | 10/28/03 | 9/29-10/27 Maint Supplies | $ 566.35 | 505 | $ 28.32 | $ 49.37 |
| 0210-0211 | 2.02, 3.07, 8.01 | Home Depot | 11/28/03 | 10/29-11/26 Maint Supplies | $ 721.34 | 474 | $ 36.07 | $ 59.02 |
| 0212-0214 | 2.02, 3.07, 8.01 | Home Depot | 12/28/03 | 11/30 - 12/24 | $ 486.78 | 444 | $ 24.34 | $ 37.30 |
| 0215-0217 | 2.02, 3.07, 8.01 | Home Depot | 1/28/04 | 12/28-1/28 MAINT Supplies | $ 679.43 | 413 | $ 33.97 | $ 48.43 |
| | 2.02, 3.07, 8.01 | Home Depot | 2/27/04 | 1/28-2/25 Maint supplies | $ 372.19 | 383 | $ 18.61 | $ 24.60 |
| 0218-0220 | 2.02, 3.07, 8.01 | Home Depot | 3/24/04 | 2/27-3/26 Maint supplies | $ 569.65 | 357 | $ 28.48 | $ 35.10 |
| 0221-0223 | 2.02, 3.07, 8.01 | Home Depot | 4/28/04 | 3/29-4/27 Maint supplies | $ 484.73 | 322 | $ 24.24 | $ 26.94 |
| 0224-0226 | 2.02, 3.07, 8.01 | Home Depot | 5/28/04 | 4/28-5/27 Maint Supplies | $ 571.87 | 292 | $ 28.59 | $ 28.82 |
| | 2.02, 3.07, 8.01 | Home Depot | 6/28/04 | 5/28-6/27 SUPPLIES | $ 609.76 | 261 | $ 30.49 | $ 27.47 |
| | 2.02, 3.07, 8.01 | Home Depot | 7/28/04 | 6/28-7/27 MAINT SUPPLIES | $ 470.85 | 231 | $ 23.54 | $ 18.77 |
| | 2.02, 3.07, 8.01 | Home Depot | 8/27/04 | 7/28-8/26 MAINT SUPPLIES | $ 663.87 | 201 | $ 33.19 | $ 23.03 |
| 0227-0233 | 2.02, 3.07, 8.01 | Home Depot | 9/28/04 | 8/30-9/27 SUPPLIES | $ 498.20 | 169 | $ 24.91 | $ 14.53 |
| 0234-0240 | 2.02, 3.07, 8.01 | Home Depot | 10/28/04 | 9/28-10/27 MAINT SUPPLY | $ 748.85 | 139 | $ 37.49 | $ 17.99 |
| 0241-0247 | 2.02, 3.07, 8.01 | Home Depot | 11/28/04 | 10/28-11/24 MAINT SUPPLY | $ 570.13 | 108 | $ 28.51 | $ 10.63 |
| | 2.02, 3.07, 8.01 | Home Depot | 12/28/04 | 11/29-12/27 MAINT SUPPLY | $ 708.94 | 78 | $ 35.45 | $ 9.54 |
| | 2.02, 3.07, 8.01 | Home Depot | 1/27/05 | 12/28-1/27 MAINT SUPPLY | $ 668.35 | 48 | $ 33.42 | $ 5.54 |
| | 2.02, 3.07, 8.01 | Home Depot | 2/28/05 | 1/28-2/24 MAINT SUPPLY | $ 587.87 | 16 | $ 29.39 | $ 1.62 |
| 0248-0250 | 2.02, 3.07, 8.01 | Imagistics | 12/15/03 | 12/15 FAX TONER | $ 35.48 | 457 | $ 1.77 | $ 2.80 |
| | 2.02, 3.07, 8.01 | Initially Yours | 2/7/03 | 2/7 Lttrng for nw vans | $ 67.89 | 768 | $ 3.39 | $ 9.00 |
| 0248-0253 | 2.02, 3.07, 8.01 | Interstate Fleet | 6/1/03 | 6/3 Truck lease | $ 160.51 | 654 | $ 8.03 | $ 18.12 |
| 0254-0256 | 2.02, 3.07, 8.01 | Infrastructure, Inc. | 6/11/03 | 4/1-5/31 Archtectrl Srv | $ 665.00 | 644 | $ 33.25 | $ 73.92 |
| | 2.02, 3.07, 8.01 | Interstate Fleet | 7/1/03 | 7/1 Truck Lease | $ 160.51 | 624 | $ 8.03 | $ 17.29 |
| 0257-0259 | 2.02, 3.07, 8.01 | Interstate Fleet | 8/1/03 | 8/03 Truck lease | $ 151.40 | 593 | $ 7.57 | $ 15.50 |
| | 2.02, 3.07, 8.01 | Interstate Fleet | 8/1/03 | 10/03 Truck lease | $ 151.39 | 593 | $ 7.57 | $ 15.50 |
| 0260-0262 | 2.02, 3.07, 8.01 | Interstate Fleet | 8/14/03 | 8/14 Services van | $ 59.46 | 580 | $ 2.97 | $ 5.95 |
| 0263-0265 | 2.02, 3.07, 8.01 | Interstate Fleet | 9/1/03 | 9/03 Truck lease | $ 151.39 | 562 | $ 7.57 | $ 14.69 |
| | 2.02, 3.07, 8.01 | Interstate Fleet | 10/1/03 | 10/01 TRUCK LEASE | $ 151.39 | 532 | $ 7.57 | $ 13.90 |
| 0266-0268 | 2.02, 3.07, 8.01 | Interstate Fleet | 11/1/03 | 11/03 Truck Lease | $ 151.39 | 501 | $ 7.57 | $ 13.09 |
| | 2.02, 3.07, 8.01 | Interstate Fleet | 12/03 | 12/03 Truck lease | $ 151.39 | 471 | $ 7.57 | $ 12.31 |
| | 2.02, 3.07, 8.01 | Interstate Fleet | 12/12/03 | 2001 ASTRO REPAIRS | $ 22.11 | 460 | $ 1.11 | $ 1.76 |
| 0269-0271 | 2.02, 3.07, 8.01 | Interstate Fleet | 1/1/04 | 01/04 TRUCK LEASE | $ 151.39 | 440 | $ 7.57 | $ 11.50 |

4

## INDEX TO EXHIBIT 11

| Bates # PLSTP* | Lease Prov. | Vendor Name | Invoice Date | Transaction Desc | Invoice Amt | # Days Late | 5% Late Chg | 6% simple int on invoice amt + late chg |
|---|---|---|---|---|---|---|---|---|
| 0272-0274 | 2.02, 3.07, 8.01 | Interstate Fleet | 1/9/04 | 1/9 - 1/31 TRUCK LEASE | $ 50.37 | 432 | $ 2.52 | $ 3.76 |
| 0275-0277 | 2.02, 3.07, 8.01 | Interstate Fleet | 1/12/04 | 1/9/1/31 TRUCK LEASE | $ 54.91 | 429 | $ 2.75 | $ 4.07 |
| 0278-0280 | 2.02, 3.07, 8.01 | Interstate Fleet | 2/1/04 | 01/04 TRUCK LEASE | $ 303.22 | 409 | $ 15.16 | $ 21.41 |
| 0281-0283 | 2.02, 3.07, 8.01 | Interstate Fleet | 2/25/04 | 2/25-2/29 Additional rental | $ 1.09 | 385 | $ 0.05 | $ 0.07 |
| 0284-0286 | 2.02, 3.07, 8.01 | Interstate Fleet | 3/1/04 | 3/04 Truck lease | $ 311.98 | 380 | $ 15.60 | $ 20.46 |
| 0287-0289 | 2.02, 3.07, 8.01 | Interstate Fleet | 4/1/04 | Truck lease | $ 311.98 | 349 | $ 15.60 | $ 18.79 |
| 0290-0292 | 2.02, 3.07, 8.01 | Interstate Fleet | 5/1/04 | 5/04 Truck lease | $ 311.98 | 318 | $ 15.60 | $ 17.18 |
| | 2.02, 3.07, 8.01 | Interstate Fleet | 5/4/04 | 5/04 Truck maint | $ 12.66 | 316 | $ 0.63 | $ 0.69 |
| 0293-0295 | 2.02, 3.07, 8.01 | Interstate Fleet | 6/1/04 | 6/04 Truck Lease | $ 311.98 | 288 | $ 15.60 | $ 15.51 |
| | 2.02, 3.07, 8.01 | Interstate Fleet | 7/30/04 | TRUCK SERVICE | $ 3.28 | 229 | $ 0.16 | $ 0.13 |
| | 2.02, 3.07, 8.01 | Interstate Fleet | 8/1/04 | 7/04 TRUCK LEASES | $ 311.98 | 227 | $ 15.60 | $ 12.22 |
| | 2.02, 3.07, 8.01 | Interstate Fleet | 8/5/04 | 8/04 TRUCK LEASES | $ 311.98 | 223 | $ 15.60 | $ 12.01 |
| | 2.02, 3.07, 8.01 | Interstate Fleet | 9/1/04 | 9/04 TRUCK LEASES | $ 311.98 | 196 | $ 15.60 | $ 10.55 |
| 0296-0298 | 2.02, 3.07, 8.01 | Interstate Fleet | 10/1/04 | 10/04 TRUCK LEASES | $ 311.98 | 166 | $ 15.60 | $ 8.94 |
| 0299-0301 | 2.02, 3.07, 8.01 | Interstate Fleet | 11/1/04 | 11/04 TRUCK LEASES | $ 311.98 | 135 | $ 15.60 | $ 7.27 |
| 0302-0304 | 2.02, 3.07, 8.01 | Interstate Fleet | 12/1/04 | 12/04 TRUCK LEASES | $ 311.98 | 105 | $ 15.60 | $ 5.65 |
| | 2.02, 3.07, 8.01 | Interstate Fleet | 1/1/05 | 1/05 TRUCK LEASE | $ 311.98 | 74 | $ 15.60 | $ 3.98 |
| | 2.02, 3.07, 8.01 | Interstate Fleet | 1/1/05 | 1204 TRUCK LEASE | $ 311.98 | 74 | $ 15.60 | $ 3.98 |
| | 2.02, 3.07, 8.01 | Interstate Fleet | 2/1/05 | 2/05 TRUCK LEASE | $ 311.98 | 43 | $ 15.60 | $ 2.32 |
| | 2.02, 3.07, 8.01 | Interstate Fleet | 3/1/05 | 3/05 TRUCK LEASES | $ 311.98 | 15 | $ 15.60 | $ 0.81 |
| | 2.02, 3.07, 8.01 | Interstate Fleet | 4/15/05 | 4/1/05-4/15/05 Truck Leases-set monthly amount | $ 155.99 | | | |
| | 2.02, 3.07, 8.01 | Janet Ballarino | 4/25/03 | 4/3-25/03 Travel Expenses | $ 3.61 | 691 | $ 0.18 | $ 0.43 |
| | 2.02, 3.07, 8.01 | Joe H. Foley | 12/29/03 | 12/12 Barbaro Exp | $ 19.79 | 443 | $ 0.99 | $ 1.51 |
| | 2.02, 3.07, 8.01 | Joe H. Foley | 9/17/04 | 8/17-9/13 MILEAGE | $ 74.24 | 180 | $ 3.71 | $ 2.31 |
| | 2.02, 3.07, 8.01 | Joe H. Foley | 4/21/04 | 12/29/03-4/19/04 Mileage | $ 351.76 | 329 | $ 17.59 | $ 19.98 |
| | 2.02, 3.07, 8.01 | Joseph Bertino | 12/12/03 | 10/8-12/26 JoeFol Exp | $ 220.64 | 460 | $ 11.03 | $ 17.52 |
| | 2.02, 3.07, 8.01 | Joseph Bertino | 5/3/04 | IBoots | $ 10.87 | 289 | $ 0.54 | $ 0.54 |
| | 2.02, 12.02 | Len Waddell | 2/5/03 | 1/03 Travel expenses | $ 15.69 | 770 | $ 0.78 | $ 2.09 |
| | 2.02, 12.02 | Len Waddell | 2/28/03 | 2/1-28/03 Travel Expenses | $ 15.50 | 747 | $ 0.78 | $ 2.00 |
| | 2.02, 12.02 | Len Waddell | 3/16/04 | 1/1/03-1/31/04 Mileage / phone | $ 45.68 | 365 | $ 2.28 | $ 2.88 |
| | 2.02, 12.02 | Len Waddell | 7/1/04 | 6/04 MILEAGE | $ 26.95 | 298 | $ 1.35 | $ 1.33 |
| 0310-0312 | 2.02, 12.02 | Len Waddell | 10/21/04 | 9/04 TRAVEL EXPENSE | $ 3.70 | 146 | $ 0.19 | $ 0.09 |
| | 2.02, 12.02 | Len Waddell | 12/1/04 | 10/1-11/30 MEALS/MILEAGE | $ 37.42 | 105 | $ 1.87 | $ 0.68 |
| | 2.02, 12.02 | Len Waddell | 5/3/04 | 4/1-5/31 Travel Expenses | $ 32.39 | 289 | $ 1.62 | $ 1.62 |
| | 2.02, 8.01 | Lorman Education Services | 9/7/04 | AIA CNSTRC CNTR-J.BOYES | $ 48.81 | 190 | $ 2.44 | $ 1.60 |
| | 2.02, 12.02 | Len Waddell | 10/15/03 | 10/15/03 Mold Seminar | $ 57.56 | 518 | $ 2.88 | $ 5.15 |
| 0313-0315 | 2.02, 3.07, 8.01 | Mall Chevrolet | 11/25/03 | 11/25 '01 Astro Repair | $ 113.90 | 477 | $ 5.70 | $ 9.38 |
| | 2.02, 3.07, 8.01 | Mall Chevrolet Inc. | 4/9/03 | 4/09 - '01 Astro repair | $ 90.56 | 707 | $ 4.53 | $ 11.05 |
| 0316-0319 | 2.02, 3.07, 5.02 | MCCD/Clean Water Fund | 7/28/03 | NPDES general permit | $ 250.00 | 597 | $ 12.50 | $ 25.76 |
| | 2.02, 12.02 | McMahon Associates Inc. | 2/9/05 | TRAFFIC ENGINEERING RETENATING PROPERTY | $ 2,055.00 | 35 | $ 102.75 | $ 12.41 |
| 0320-0321 | 2.02, 3.07, 5.02, 8.01 | Millstat Inc | 2/25/03 | 2/25 Fire Com Installed | $ 625.00 | 750 | $ 31.25 | $ 80.91 |
| | 2.02, 3.07, 5.02, 8.01 | Millstat Inc | 2/25/03 | 2/25 Fire Com Installed | $ 625.00 | 750 | $ 31.25 | $ 80.91 |
| | 2.02, 3.07, 5.02, 8.01 | Millstat Inc | 4/27/03 | 2/27 Fire monitoring | $ 300.00 | 689 | $ 15.00 | $ 35.68 |
| 0322-0323 | 2.02, 3.07, 5.02, 8.01 | Millstat Inc | 6/5/03 | 6/5 Service Call | $ 165.00 | 650 | $ 8.25 | $ 18.51 |

5

# INDEX TO EXHIBIT 11

| Bates # PLSTP* | Lease Prov. | Vendor Name | Invoice Date | Transaction Desc | Invoice Amt | # Days Late | 5% Late Chg | 6% simple int on invoice amt + late chg |
|---|---|---|---|---|---|---|---|---|
| 0324-0325 | 2.02, 3.07, 5.02, 8.01 | Millstat Inc | 9/25/03 | 9/25 Battery & Charger | $209.20 | 538 | $10.46 | $19.43 |
| 0326-0327 | 2.02, 3.07, 5.02, 8.01 | Millstat Inc | 3/1/04 | 3/1 Fire monitoring | $300.00 | 380 | $15.00 | $19.68 |
| | 2.02, 3.07, 8.01 | Millstat Inc | 3/1/05 | 3/1 FIRE MONITORING | $300.00 | 15 | $15.00 | $0.78 |
| | 2.02, 3.07, 5.02 | Montgomery County Treasurer | 2/4/05 | FEE FOR PRELIMINARY PLAN | $150.00 | 40 | $7.50 | $1.04 |
| | 3.08 | Nathan Sallop Insurance | 1/9/04 | 6/03-04 AMND CAR PKG- PA-NJ | $109.55 | 432 | $5.50 | $7.90 |
| | 3.08 | Nathan Sallop Insurance | 1/9/04 | 6/03-04 AMND CAR PKG- PA-NJ | $4.55 | 432 | $0.03 | $0.04 |
| | 3.08 | Nathan Sallop Insurance | 7/1/01 | Ins Policy 7/1/01-7/1/02 | $4,767.75 | 1,354 | $238.39 | $1,114.24 |
| | 3.08 | Nathan Sallop Insurance | 7/1/02 | Ins Policy 7/1/02-7/1/03 | $8,553.04 | 989 | $427.65 | $1,460.04 |
| | 3.08 | Nathan Sallop Insurance | 7/1/03 | Ins Policy 7/1/03-7/1/04 | $8,561.56 | 624 | $428.08 | $922.12 |
| | 3.08 | Nathan Sallop Insurance | 7/1/04 | Ins Policy 7/1/04-7/1/05 (prorated-4/15) | $6,868.11 | 258 | $343.41 | $305.85 |
| | 3.08 | Nathan Sallop Insurance | 3/28/01 | Flood Ins 3/28/01-3/28/02 | $2,413.00 | 1,449 | $120.65 | $603.49 |
| | 3.08 | Nathan Sallop Insurance | 3/28/02 | Flood Ins 3/28/02-3/28/03 | $5,078.00 | 1,084 | $253.90 | $950.10 |
| | 3.08 | Nathan Sallop Insurance | 3/28/03 | Flood Ins 3/28/03-3/28/04 | $5,118.00 | 719 | $255.90 | $635.15 |
| | 3.08 | Nathan Sallop Insurance | 3/28/04 | Flood Ins 3/28/04-3/28/05 | $5,555.00 | 353 | $277.75 | $338.46 |
| | 3.08 | Nathan Sallop Insurance | 3/28/05 | Flood Ins 3/28/05-3/27/06 (prorated - 4/15) | $289.16 | | | |
| 0328-0330 | 2.02, 3.07, 8.01 | Nextel | 5/2/03 | 4/18-5/17 Cell Phone | $245.34 | 664 | $12.27 | $28.12 |
| 0331-0332 | 2.02, 3.07, 8.01 | Nextel | 6/22/03 | 5/18-6/17 Phone | $267.72 | 633 | $13.39 | $29.25 |
| 0333-0335 | 2.02, 3.07, 8.01 | Nextel | 7/22/03 | 6/18-7/17 Phone | $309.37 | 603 | $15.47 | $32.20 |
| 0336-0338 | 2.02, 3.07, 8.01 | Nextel | 8/2/03 | 7/18-8/17/03 | $316.38 | 572 | $15.82 | $31.24 |
| 0339-0341 | 2.02, 3.07, 8.01 | Nextel | 9/2/03 | 8/18-9/17/03 | $268.83 | 541 | $13.44 | $25.10 |
| 0342-0344 | 2.02, 3.07, 8.01 | Nextel | 10/22/03 | 9/18-10/17/03 | $236.58 | 511 | $11.83 | $20.87 |
| 0345-0347 | 2.02, 3.07, 8.01 | Nextel | 11/22/03 | 10/18-11/17/03 Nextel | $212.38 | 480 | $10.62 | $17.60 |
| 0348-0350 | 2.02, 3.07, 8.01 | Nextel | 12/22/03 | 11/18-12/17/03 Nextel | $221.25 | 450 | $11.06 | $17.18 |
| 0351-0353 | 2.02, 3.07, 8.01 | Nextel | 1/22/04 | 12/18/03-1/17/04 Nextel | $205.09 | 419 | $10.25 | $14.83 |
| 0354-0356 | 2.02, 3.07, 8.01 | Nextel | 2/22/04 | 1/18-2/17/04 | $367.93 | 388 | $18.40 | $24.64 |
| 0357-0359 | 2.02, 3.07, 8.01 | Nextel | 3/22/04 | 2/18-3/17/04 | $295.25 | 359 | $14.76 | $18.29 |
| 0360-0362 | 2.02, 3.07, 8.01 | Nextel | 4/17/04 | 4/18/04 - 5/17/04 Phone | $294.81 | 333 | $14.74 | $16.94 |
| | 2.02, 3.07, 8.01 | Nextel | 5/22/04 | 5/18-6/17/04 | $271.16 | 298 | $13.56 | $13.95 |
| | 2.02, 3.07, 8.01 | Nextel | 6/22/04 | 6/18-7/17/04 | $285.22 | 267 | $14.26 | $13.14 |
| 0363-0365 | 2.02, 3.07, 8.01 | Nextel | 7/22/04 | 7/18/04-8/17/04 | $292.23 | 237 | $14.61 | $11.95 |
| 0366-0368 | 2.02, 3.07, 8.01 | Nextel | 8/17/04 | 8/18-9/17 | $322.36 | 211 | $16.12 | $11.74 |
| 0369-0371 | 2.02, 3.07, 8.01 | Nextel | 9/17/04 | 9/18/04-10/17/04 | $240.84 | 180 | $12.04 | $7.48 |
| | 2.02, 3.07, 8.01 | Nextel | 10/22/04 | 10/18/04-11/17/04 | $208.10 | 145 | $10.41 | $5.21 |
| | 2.02, 3.07, 8.01 | Nextel | 11/22/04 | 11/18/04-12/17/04 | $210.44 | 114 | $10.52 | $4.14 |
| | 2.02, 3.07, 8.01 | Nextel | 12/22/04 | 12/18/04-1/17/05 | $247.69 | 84 | $12.38 | $3.59 |
| | 2.02, 3.07, 8.01 | Nextel | 1/22/05 | 1/18-2/17 | $211.86 | 53 | $10.59 | $1.94 |
| | 2.02, 3.07, 8.01 | Nextel | 2/22/05 | 2/18-3/17 | $238.76 | 22 | $11.94 | $0.91 |
| | 2.02, 3.07, 8.01 | Nextel | 4/15/05 | 2/18-3/17 Cell Phone-Based on last 3 mnth avg | $232.77 | | $11.64 | |
| 0372-0373 | 3.01 | North Wales Water Authority | 1/2/03 | 11/20-12/20/02 | $110.64 | 804 | $5.53 | $15.35 |
| 0374-0377 | 3.01 | North Wales Water Authority | 3/4/03 | 6/21-9/21 Water & Sewer | $121.33 | 744 | $6.07 | $15.58 |
| | 3.01 | North Wales Water Authority | 4/1/03 | 12/21-3/27 Water & Sewer | $121.33 | 715 | $6.07 | $14.97 |
| 0378-0379 | 3.01 | North Wales Water Authority | 5/2/03 | 3/31-4/30 Water | $156.33 | 684 | $7.82 | $18.46 |
| 0380-0382 | 3.01 | North Wales Water Authority | 6/2/03 | 4/30-5/30 | $121.33 | 653 | $6.07 | $13.68 |
| 0383-0384 | 3.01 | North Wales Water Authority | 6/12/03 | 6/12/03 Bal forward | $1,245.66 | 643 | $62.28 | $138.25 |
| 0385-0386 | 3.01 | North Wales Water Authority | 7/1/03 | 5/30-6/30 | $285.33 | 624 | $14.27 | $30.73 |
| 0387-0388 | 3.01 | North Wales Water Authority | 8/5/03 | 6/30-7/31 | $121.33 | 589 | $6.07 | $12.33 |
| 0389-0390 | 3.01 | North Wales Water Authority | 9/2/03 | 7/31-8/29 Water & Sewer | $121.33 | 561 | $6.07 | $11.75 |

## INDEX TO EXHIBIT 11

| Bates # PLSTP* | Lease Prov. | Vendor Name | Invoice Date | Transaction Desc | Invoice Amt | # Days Late | 5% Late Chg | 6% simple int on invoice amt + late chg |
|---|---|---|---|---|---|---|---|---|
| 0391-0392 | 3.01 | North Wales Water Authority | 10/3/03 | 8/29-9/30 Water & Sewer | $ 156.33 | 530 | $ 7.82 | $ 14.30 |
| 0393-0394 | 3.01 | North Wales Water Authority | 11/3/03 | 9/30-10/30 Water | $ 121.33 | 499 | $ 6.07 | $ 10.45 |
| 0395-0396 | 3.01 | North Wales Water Authority | 12/4/03 | 10/30-12/2/03 Water | $ 121.33 | 468 | $ 6.07 | $ 9.80 |
| | 3.01 | North Wales Water Authority | 12/30/03 | 9/30-12/30 SEWER | $ 491.12 | 442 | $ 24.56 | $ 37.47 |
| 0397-0398 | 3.01 | North Wales Water Authority | 1/2/04 | 12/2 - 12/30 WATER | $ 121.33 | 439 | $ 6.07 | $ 9.19 |
| 0399-0400 | 3.01 | North Wales Water Authority | 2/4/04 | 12/30-1/30 | $ 121.33 | 406 | $ 6.07 | $ 8.50 |
| 0401-0402 | 3.01 | North Wales Water Authority | 3/2/04 | 1/30-2/28 | $ 121.33 | 379 | $ 6.07 | $ 7.94 |
| 0403-0404 | 3.01 | North Wales Water Authority | 4/6/04 | 2/28-3/31 Water | $ 121.33 | 344 | $ 6.07 | $ 7.20 |
| 0405-0406 | 3.01 | North Wales Water Authority | 5/4/04 | 3/31-5/1 Water | $ 156.33 | 316 | $ 7.82 | $ 8.63 |
| 0407-0408 | 3.01 | North Wales Water Authority | 6/1/04 | 5/1-5/27 Water | $ 121.33 | 286 | $ 6.07 | $ 6.03 |
| | 3.01 | North Wales Water Authority | 7/1/04 | 5/27-5/30 WATER | $ 121.33 | 258 | $ 6.07 | $ 5.40 |
| | 3.01 | North Wales Water Authority | 8/2/04 | 6/30-7/29 WATER | $ 121.33 | 226 | $ 6.07 | $ 4.73 |
| | 3.01 | North Wales Water Authority | 9/2/04 | 7/29-8/31 WATER | $ 121.33 | 195 | $ 6.07 | $ 4.08 |
| 0409-0410 | 3.01 | North Wales Water Authority | 10/6/04 | 8/31-9/30 | $ 159.83 | 161 | $ 7.99 | $ 4.44 |
| 0411-0412 | 3.01 | North Wales Water Authority | 11/4/04 | 9/30-11/3 WATER | $ 121.33 | 132 | $ 6.07 | $ 2.76 |
| 0413-0413 | 3.01 | North Wales Water Authority | 12/2/04 | 11/3-11/30 | $ 121.33 | 104 | $ 6.07 | $ 2.18 |
| | 3.01 | North Wales Water Authority | 1/5/05 | 11/30/04-1/3/05 WATER | $ 121.33 | 70 | $ 6.07 | $ 1.47 |
| | 3.01 | North Wales Water Authority | 2/1/05 | 1/3-1/31 | $ 121.33 | 43 | $ 6.07 | $ 0.90 |
| | 3.01 | North Wales Water Authority | 3/1/05 | 2/1/05-2/28/05 Water-Est, not yet rec'd | $ 121.33 | 15 | $ 6.07 | $ 0.31 |
| | 3.01 | North Wales Water Authority | 3/1/05 | 3/1/05-3/4/05 Water-Est, not yet rec'd | $ 16.18 | 15 | $ 0.81 | $ 0.04 |
| | 3.01 | North Wales Water Authority | 3/3/05 | 1/31-3/1 WATER | $ 121.33 | 13 | $ 6.07 | $ 0.27 |
| | 3.01 | North Wales Water Authority | 3/1/05 | 3/1/05-3/31/05 Water Estimated | $ 121.33 | | | |
| | 3.01 | North Wales Water Authority | 4/15/05 | 3/31/05-4/15/05 Water-Estimated | $ 61.67 | | | |
| | 2.02, 5.03 | Office Depot | 6/19/03 | 6/19 Office Supplies | $ 59.62 | 636 | $ 2.98 | $ 6.54 |
| | 2.02, 5.03 | Office Depot | 8/11/03 | 8/11 Office Supplies | $ 11.92 | 583 | $ 0.60 | $ 1.20 |
| | 2.02, 5.03 | Office Depot | 11/2/003 | 10/3/03 Office Supplies | $ 16.05 | 482 | $ 0.80 | $ 1.34 |
| | 2.02, 5.03 | Office Depot | 12/29/03 | Office Supplies | $ 22.82 | 443 | $ 1.14 | $ 1.74 |
| | 2.02, 5.03 | Office Depot | 12/31/03 | 12/18 OFFICE SUPPLIES | $ 25.69 | 441 | $ 1.28 | $ 1.96 |
| | 2.02, 5.03 | Office Depot | 1/15/04 | 1/12 OFFICE SUPPLIES | $ 20.05 | 426 | $ 1.00 | $ 1.47 |
| | 2.02, 5.03 | Office Depot | 1/29/04 | 1/27 OFFICE SUPPLIES | $ 8.55 | 412 | $ 0.43 | $ 0.61 |
| | 2.02, 5.03 | Office Depot | 4/8/04 | 3/31 Office Supplies | $ 12.04 | 342 | $ 0.60 | $ 0.71 |
| | 2.02, 5.03 | Office Depot | 4/8/04 | 4/5 Credit Memo - Office Supplies | $ (4.56) | 342 | $ (0.23) | $ (0.27) |
| | 2.02, 5.03 | Office Depot | 4/8/04 | Office Supplies | $ 18.29 | 342 | $ 0.91 | $ 1.08 |
| | 2.02, 3.07, 8.01 | Office Depot | 4/22/04 | 4/20 Office supplies | $ 30.88 | 328 | $ 1.54 | $ 1.75 |
| | 2.02, 3.07, 8.01 | Office Depot | 6/3/04 | 5/27 Office Supplies | $ 12.66 | 286 | $ 0.63 | $ 0.62 |
| | 2.02, 3.07, 8.01 | Office Depot | 7/1/04 | 6/23 OFFICE SUPPLIES | $ 31.17 | 258 | $ 1.56 | $ 1.39 |
| | 2.02, 3.07, 8.01 | Office Depot | 8/5/04 | 7/30 FAX MACHINE | $ 33.69 | 223 | $ 1.68 | $ 1.30 |
| | 2.02, 3.07, 8.01 | Office Depot | 9/1/04 | OFFICE SUPPLIES | $ 120.85 | 196 | $ 6.04 | $ 4.09 |
| | 2.02, 3.07, 8.01 | Office Depot | 9/1/04 | OFFICE SUPPLIES | $ 2.33 | 196 | $ 0.12 | $ 0.08 |
| | 2.02, 3.07, 8.01 | Office Depot | 10/28/04 | OFFICE SUPPLIES | $ 72.15 | 139 | $ 3.61 | $ 1.73 |
| | 2.02, 3.07, 8.01 | Office Depot | 11/4/04 | OFFICE SUPPLIES | $ 2.97 | 132 | $ 0.15 | $ 0.07 |
| | 2.02, 3.07, 8.01 | Office Depot | 11/11/04 | OFFICE SUPPLIES | $ 1.34 | 125 | $ 0.07 | $ 0.03 |
| | 2.02, 3.07, 8.01 | Office Depot | 12/16/04 | OFFICE SUPPLIES | $ 12.49 | 90 | $ 0.62 | $ 0.19 |
| | 2.02, 3.07, 8.01 | Office Depot | 3/1/005 | OFFICE SUPPLIES | $ 19.81 | 9 | $ 0.99 | $ 0.02 |
| | 2.02, 3.07, 8.01 | Office Depot | 3/10/05 | OFFICE SUPPLIES | $ 10.07 | 6 | $ 0.50 | $ 0.01 |
| | 2.02, 3.07, 8.01 | Office Depot | 2/24/05 | OFFICE SUPPLIES | $ 24.66 | 20 | $ 1.23 | $ 0.09 |
| | 2.02, 3.07, 8.01 | PA Department of Labor | 1/9/04 | 1/9 BOILER CERT | $ 42.50 | 432 | $ 2.13 | $ 3.17 |
| | 2.02, 3.07, 8.01 | PA Department of Labor | 11/30/04 | 11/30 ELEV CERT | $ 36.00 | 106 | $ 1.80 | $ 0.66 |
| 0419-0418 | 2.02, 3.07, 8.01 | PCA Industrial & Paper | 3/7/05 | CLEANING SUPPLIES | $ 311.45 | 9 | $ 15.57 | $ 0.48 |

7

# INDEX TO EXHIBIT 11

| Bates # PLSTP* | Lease Prov. | Vendor Name | Invoice Date | Transaction Desc | Invoice Amt | # Days Late | 5% Late Chg | 6% simple int on Invoice amt + late chg |
|---|---|---|---|---|---|---|---|---|
| 0422-0421 | 2.02, 3.07, 8.01 | PECO | 4/11/03 | 2/5-4/4 | $ 3,922.93 | 705 | $ 196.15 | $ 477.36 |
| 0422-0424 | 2.02, 3.07, 8.01 | PECO | 5/8/03 | 4/4-5/6 Electric | $ 637.69 | 678 | $ 31.88 | $ 74.63 |
| | 2.02, 3.07, 8.01 | PECO | 6/9/03 | 5/6-6/5 | $ 426.26 | 646 | $ 21.31 | $ 47.53 |
| | 2.02, 3.07, 8.01 | PECO | 7/9/03 | 6/5-7/7 Gas | $ 176.78 | 616 | $ 8.84 | $ 18.80 |
| | 2.02, 3.07, 8.01 | PECO | 7/14/03 | 6/5-7/7 Electric | $ 4,037.32 | 611 | $ 201.87 | $ 425.78 |
| | 2.02, 3.07, 8.01 | PECO | 8/7/03 | 7/7 - 8/6 | $ 4,054.57 | 587 | $ 202.73 | $ 410.80 |
| 0425-0426 | 2.02, 3.07, 5.02, 8.01 | PECO | 8/8/03 | 7/7 - 8/6 Gas | $ 104.33 | 586 | $ 5.22 | $ 10.55 |
| 0425-0428 | 2.02, 3.07, 5.02, 8.01 | PECO | 9/8/03 | 8/6-9/9/03 Electric | $ 4,933.34 | 555 | $ 246.67 | $ 472.59 |
| | | PECO | 9/9/03 | 8/6-9/9/03 Gas | $ 106.50 | 554 | $ 5.33 | $ 10.18 |
| 0429-0430 | 3.7 | PECO | 10/7/03 | 9/5-10/6 Electric | $ 4,586.69 | 526 | $ 229.33 | $ 416.42 |
| 0431-0432 | 3.7 | PECO | 10/8/03 | 9/5-10/6 Gas | $ 196.24 | 525 | $ 9.81 | $ 17.78 |
| 0433-0434 | 3.7 | PECO | 11/5/03 | 10/6-11/4 Electric | $ 4,198.72 | 497 | $ 209.94 | $ 360.18 |
| 0435-0436 | 3.7 | PECO | 11/6/03 | 10/6-11/4 Gas | $ 435.21 | 496 | $ 21.76 | $ 37.26 |
| 0437-0438 | 3.7 | PECO | 12/5/03 | 11/4-12/4 Electric | $ 4,512.45 | 467 | $ 225.62 | $ 363.73 |
| 0439-0440 | 3.7 | PECO | 12/8/03 | 11/4-12/4 Gas | $ 1,077.78 | 464 | $ 53.89 | $ 86.32 |
| 0441-0442 | 3.7 | PECO | 1/7/04 | 12/4 - 1/6 ELECTRIC | $ 3,425.06 | 434 | $ 171.25 | $ 266.57 |
| 0443-0444 | 3.7 | PECO | 1/8/04 | 12/4 - 1/6 GAS | $ 2,889.24 | 433 | $ 144.46 | $ 224.93 |
| 0445-0446 | 3.7 | PECO | 2/6/04 | 1/6-2/5 ELECTRIC | $ 3,451.36 | 404 | $ 172.57 | $ 240.67 |
| 0447-0448 | 3.7 | PECO | 2/9/04 | 1/6-2/5 GAS | $ 4,336.56 | 401 | $ 216.83 | $ 300.15 |
| 0449-0450 | 3.7 | PECO | 3/8/04 | 2/5-3/4 Gas | $ 3,099.13 | 373 | $ 154.96 | $ 199.52 |
| 0451-0452 | 3.7 | PECO | 3/5/04 | 2/5-3/4 Electric | $ 3,222.72 | 376 | $ 161.14 | $ 209.15 |
| 0453-0454 | 3.7 | PECO | 4/8/04 | 3/4-4/6 Gas | $ 1,916.76 | 342 | $ 95.84 | $ 113.15 |
| 0455-0456 | 3.7 | PECO | 5/7/04 | 4/6-5/6 Electric | $ 3,873.18 | 313 | $ 193.66 | $ 209.25 |
| 0457-0458 | 3.7 | PECO | 5/10/04 | 4/6-5/6 Gas | $ 752.67 | 310 | $ 37.63 | $ 40.27 |
| 0459-0460 | 3.7 | PECO | 6/8/04 | 5/6-6/4 Gas | $ 246.28 | 281 | $ 12.31 | $ 11.94 |
| 0461-0462 | 3.7 | PECO | 6/7/04 | 5/6-6/4 ELECTRIC | $ 4,522.03 | 282 | $ 226.10 | $ 220.11 |
| 0463-0464 | 3.7 | PECO | 6/22/04 | 6/4-7/7 ELECTRIC | $ 4,867.48 | 267 | $ 243.37 | $ 224.32 |
| 0465-0466 | 3.7 | PECO | 7/15/04 | 6/4-7/7 GAS | $ 201.27 | 244 | $ 10.06 | $ 8.48 |
| 0467-0468 | 3.7 | PECO | 8/6/04 | 7/7-8/5 ELECTRIC | $ 4,303.03 | 222 | $ 215.15 | $ 164.88 |
| 0469-0470 | 3.7 | PECO | 8/9/04 | 7/7-8/5 GAS | $ 132.50 | 219 | $ 6.63 | $ 5.01 |
| 0471-0472 | 3.7 | PECO | 9/8/04 | 8/5-9/7 ELECTRIC | $ 2,937.13 | 189 | $ 146.86 | $ 95.81 |
| 0473-0474 | 3.7 | PECO | 9/9/04 | 8/5-9/7 GAS | $ 116.25 | 188 | $ 5.81 | $ 3.77 |
| 0475-0476 | 3.7 | PECO | 10/7/04 | 9/7-10/6 GAS | $ 2,842.73 | 160 | $ 142.14 | $ 78.51 |
| 0477-0478 | 3.7 | PECO | 10/8/04 | 9/7-10/6-GAS | $ 448.84 | 159 | $ 22.44 | $ 12.32 |
| 0479-0480 | 3.7 | PECO | 11/5/04 | 10/6-11/4 ELECTRIC | $ 3,287.11 | 131 | $ 164.36 | $ 74.32 |
| | 3.7 | PECO | 11/8/04 | 10/6-11/4 GAS | $ 938.98 | 128 | $ 46.95 | $ 20.75 |
| | 3.7 | PECO | 12/7/04 | 11/4-12/6 ELECTRIC | $ 3,506.12 | 99 | $ 175.31 | $ 59.91 |
| | 3.7 | PECO | 12/9/04 | 11/4-12/6 GAS | $ 2,149.37 | 97 | $ 107.47 | $ 35.59 |
| | 3.7 | PECO | 1/7/05 | 12/6-1/6 ELECTRIC | $ 3,870.99 | 68 | $ 193.55 | $ 45.43 |
| | 3.7 | PECO | 1/7/05 | 12/6-1/6 GAS | $ 4,960.73 | 68 | $ 248.04 | $ 58.46 |
| | 3.7 | PECO | 2/7/05 | 1/6-2/4 ELECTRIC | $ 4,631.76 | 37 | $ 231.59 | $ 29.58 |
| 0481-0482 | 3.7 | PECO | 2/8/05 | 1/6-2/4 GAS | $ 5,910.89 | 36 | $ 295.54 | $ 36.73 |
| 0483-0483 | 3.7 | PECO | 3/1/05 | 2/4-3/4 Electric-Est based on the last 3 month avg. | $ 4,002.96 | 15 | $ 200.15 | $ 10.36 |
| 0484-0485 | 3.7 | PECO | 3/1/05 | 2/4-3/4 Gas-Est based on the last 3 month avg | $ 4,347.00 | 15 | $ 217.35 | $ 11.25 |
| 0486-0487 | 3.7 | PECO | 3/8/05 | 2/4-3/7 Electric | $ 3,655.62 | 8 | $ 182.78 | $ 5.05 |
| 0488-0489 | | PECO | 4/7/05 | 3/4-4/6 Electric | | | | |
| 0490-0491 | | PECO | 3/9/05 | 2/4-3/7 GAS | $ 5,676.45 | 7 | $ 283.82 | $ 6.86 |

## INDEX TO EXHIBIT 11

| Bates # PLSTP* | Lease Prov. | Vendor Name | Invoice Date | Transaction Desc | Invoice Amt | # Days Late | 5% Late Chg | 6% simple int on Invoice amt + late chg |
|---|---|---|---|---|---|---|---|---|
| | | PECO | 4/1/05 | 3/7-4/5 Electric-Estimated based on last 3 mnth avg | $ 4,052.79 | | | $ 1.67 |
| | | PECO | 4/1/05 | 4/5-4/15 Electric-Estimated based on last 3 mnth avg | $ 1,486.02 | | | $ 48.52 |
| | | PECO | 4/1/05 | 3/7-4/5 Gas-Estimated based on last 3 mnth avg | $ 5,522.69 | | | $ 3.39 |
| | | PECO | 4/1/05 | 4/5-4/15 Gas-Estimated based on last 3 mnth avg | $ 2,024.99 | | | $ 10.45 |
| | | PM Associates | 9/21/04 | 9/21 ELEV INSPECTION | $ 55.00 | 176 | $ 2.75 | $ 1.67 |
| | | PNC Bank | 5/9/03 | 59 Mileage Coverage | $ 415.22 | 677 | $ 20.76 | $ 48.52 |
| | | R.A.M.M Inc | 1/12/05 | 12/13 RPR BOILER | $ 312.00 | 63 | $ 15.60 | $ 3.39 |
| 0492-0493 | | R.A.M.M Inc | 1/31/05 | IGNITION COILS | $ 1,376.00 | 44 | $ 68.80 | $ 10.45 |
| | | R.A.M.M Inc | 1/13/05 | 1/13 RPR THRSH PUMP | $ 5,150.00 | 64 | $ 257.50 | $ 5.11 |
| | | Ralph Derazio | 11/6/03 | 3/12-11/6 Travel Exp | $ 15.49 | 496 | $ 0.77 | $ 1.33 |
| | | Replica | 6/10/02 | 6/10 Copies | $ 57.78 | 1,010 | $ 2.89 | $ 10.07 |
| | | Replica | 8/12/02 | 8/12 Copies | $ 33.71 | 947 | $ 1.69 | $ 5.51 |
| | | Replica | 10/21/02 | 10/21 Copies | $ 33.71 | 877 | $ 1.69 | $ 5.10 |
| | 2.02, 3.7, 8.01 | Replica | 12/24/02 | 12/24 Copies | $ 4.82 | 813 | $ 0.24 | $ 0.68 |
| | 2.02, 12.02 | Replica | 6/2/03 | 6/2 Copies for broker | $ 12.04 | 653 | $ 0.60 | $ 1.36 |
| | 2.02, 5.03 | Replica | 3/11/03 | 3/11 Copies | $ 28.89 | 736 | $ 1.44 | $ 3.67 |
| | 2.02, 3.07, 8.01 | Replica | 3/19/03 | 3/19 Copies | $ 24.08 | 728 | $ 1.20 | $ 3.03 |
| | 2.02, 3.07, 8.01 | Replica | 7/18/03 | 7/18 Copies | $ 65.12 | 607 | $ 3.26 | $ 6.82 |
| | 2.02, 12.02 | Sabia Landscaping | 10/18/01 | 10/18 Vegetation Clearing | $ 540.00 | 1,245 | $ 27.00 | $ 116.04 |
| | 2.02, 5.03 | Sabia Landscaping | 12/25/02 | 12/25 Snow Removal | $ 710.00 | 812 | $ 35.50 | $ 99.51 |
| | 2.02, 5.03 | Sabia Landscaping | 1/8/03 | 1/8 Snow Removal | $ 280.00 | 798 | $ 14.00 | $ 38.57 |
| | 2.02, 5.03 | Sabia Landscaping | 1/17/03 | 1/16 & 1/17 Snow Removal | $ 1,070.00 | 789 | $ 53.50 | $ 145.72 |
| 0494-0495 | 2.02, 3.07, 8.01 | Sabia Landscaping | 1/17/03 | 1/17 Snow Removal | $ 765.00 | 789 | $ 38.25 | $ 104.18 |
| 0496-0497 | 2.02, 12.02 | Sabia Landscaping | 1/27/03 | 1/27 Snow Removal | $ 575.00 | 779 | $ 28.75 | $ 77.31 |
| 0498-0499 | 2.02, 12.02 | Sabia Landscaping | 1/29/03 | 1/29 Snow Removal | $ 775.00 | 777 | $ 38.75 | $ 103.94 |
| 0500-0501 | 2.02, 12.02 | Sabia Landscaping | 2/7/03 | 2/7/03 Snow Removal | $ 955.00 | 768 | $ 47.75 | $ 126.59 |
| 0502-0503 | 2.02, 12.02 | Sabia Landscaping | 2/11/03 | 2/11/03 Snow Removal | $ 502.50 | 764 | $ 25.13 | $ 66.26 |
| 0504-0505 | 2.02, 12.02 | Sabia Landscaping | 2/12/03 | 2/12/03 Snow Removal | $ 355.00 | 763 | $ 17.75 | $ 46.75 |
| 0506-0507 | 2.02, 12.02 | Sabia Landscaping | 2/15/03 | 2/15/03 Snow Removal | $ 520.00 | 760 | $ 26.00 | $ 68.21 |
| 0508-0510 | 2.02, 12.02 | Sabia Landscaping | 2/19/03 | 2/17-2/19/03 Snow Removal | $ 2,065.00 | 756 | $ 103.25 | $ 269.46 |
| 0511-0512 | 2.02, 3.07, 8.01 | Sabia Landscaping | 2/24/03 | 2/24/03 Snow Removal | $ 222.50 | 751 | $ 11.13 | $ 28.84 |
| 0513-0514 | 2.02, 3.07, 8.01 | Sabia Landscaping | 2/28/03 | 2/28/03 Snow Removal | $ 632.50 | 747 | $ 31.63 | $ 81.55 |
| 0515-0516 | 2.02, 3.07, 8.01 | Sabia Landscaping | 3/25/03 | 3/25 Landscaping Contract | $ 8,050.00 | 722 | $ 402.50 | $ 1,003.18 |
| | 2.02, 3.07, 8.01 | Sabia Landscaping | 6/3/03 | Landscaping 3 of 8 | $ 776.25 | 625 | $ 38.81 | $ 83.74 |
| 0517-0518 | 2.02, 3.07, 8.01 | Sabia Landscaping | 7/3/03 | 7/03 Landscap Contr | $ 1,361.25 | 594 | $ 68.06 | $ 139.56 |
| 0519-0520 | 2.02, 3.07, 8.01 | Sabia Landscaping | 11/3/03 | 11/03 Landscaping | $ 776.25 | 472 | $ 38.81 | $ 63.24 |
| 0521-0522 | 2.02, 3.07, 8.01 | Sabia Landscaping | 12/9/03 | 12/6 Snow Removal | $ 1,320.00 | 463 | $ 66.00 | $ 105.49 |
| 0523-0524 | 2.02, 3.07, 8.01 | Sabia Landscaping | 1/17/04 | 1/15 SNOW REMOVAL | $ 1,030.00 | 424 | $ 51.50 | $ 75.38 |
| 0525-0526 | 2.02, 3.07, 8.01 | Sabia Landscaping | 1/20/04 | 1/20 SNOW REMOVAL | $ 800.00 | 421 | $ 40.00 | $ 58.13 |
| 0527-0528 | 2.02, 3.07, 8.01 | Sabia Landscaping | 1/29/04 | 1/28 SNOW REMOVAL | $ 640.00 | 412 | $ 32.00 | $ 45.51 |
| | 2.02, 3.07, 8.01 | Sabia Landscaping | 1/30/04 | 1/28 SNOW REMOVAL | $ 960.00 | 411 | $ 48.00 | $ 68.10 |
| 0529-0530 | 2.02, 3.07, 8.01 | Sabia Landscaping | 3/21/04 | 3/19 SNOW REMOVAL | $ 785.00 | 360 | $ 39.25 | $ 48.78 |
| 0531-0532 | 2.02, 3.07, 8.01 | Sabia Landscaping | 4/2/04 | 404 Landscaping | $ 1,965.00 | 348 | $ 98.25 | $ 118.03 |
| 0533-0534 | 2.02, 3.07, 8.01 | Sabia Landscaping | 5/5/04 | Landscaping Contr 2 of 8 | $ 1,965.00 | 319 | $ 98.25 | $ 108.19 |
| 0535-0536 | 2.02, 3.07, 8.01 | Sabia Landscaping | 6/2/04 | 6/04 Landscaping | $ 1,965.00 | 287 | $ 98.25 | $ 97.34 |
| 0537-0538 | 2.02, 3.07, 8.01 | Sabia Landscaping | 9/1/04 | 904 LNDSC CNTRC 6 OF 8 | $ 1,965.00 | 196 | $ 98.25 | $ 66.48 |
| 0539-0540 | 2.02, 3.07, 8.01 | Sabia Landscaping | 10/1/04 | 10/04 LNDCP CNTRC 7 OF 8 | $ 1,965.00 | 166 | $ 98.25 | $ 56.30 |
| 0541-0542 | 2.02, 3.07, 8.01 | Sabia Landscaping | 11/1/04 | 11/04 LNDSC CNTRC 8 OF 8 | $ 1,965.00 | 135 | $ 98.25 | $ 45.79 |
| 0543-0544 | 2.02, 3.07, 8.01 | Sabia Landscaping | 12/2004 | 12/20-12/21 SALTED | $ 477.50 | 86 | $ 23.88 | $ 7.09 |

9

## INDEX TO EXHIBIT 11

| Bates # PLSTP* | Lease Prov. | Vendor Name | Invoice Date | Transaction Desc | Invoice Amt | # Days Late | 5% Late Chg | 6% simple Int on Invoice amt + late chg |
|---|---|---|---|---|---|---|---|---|
| 0545-0546 | 2.02, 3.07, 8.01 | Sabia Landscaping | 12/28/04 | 1227 SNW RMVL | $ 765.95 | 78 | $ 38.30 | $ 10.31 |
| 0547-0548 | 2.02, 3.07, 8.01 | Sabia Landscaping | 1/19/05 | 1/19 SNOW REMOVAL | $ 1,100.95 | 56 | $ 55.05 | $ 10.64 |
| 0549-0550 | 2.02, 3.07, 8.01 | Sabia Landscaping | 1/25/05 | 1/23-1/25 SNOW REMOVAL | $ 1,812.25 | 50 | $ 90.61 | $ 15.64 |
| | 2.02, 3.07, 8.01 | Sabia Landscaping | 1/27/05 | 1/26-1/27 SALTED | $ 302.50 | 48 | $ 15.13 | $ 2.51 |
| 0551-0552 | 2.02, 3.07, 8.01 | Sabia Landscaping | 1/31/05 | 1/30-1/31 SNOW REMOVAL | $ 487.50 | 44 | $ 24.38 | $ 3.70 |
| 0553-0554 | 2.02, 3.07, 8.01 | Sabia Landscaping | 2/2/05 | 2/1 & 2/2 SALTED | $ 131.25 | 42 | $ 6.56 | $ 0.95 |
| 0555-0556 | 2.02, 3.07, 8.01 | Sabia Landscaping | 2/8/05 | 2/3-2/8 SALTED | $ 262.50 | 36 | $ 13.13 | $ 1.63 |
| 0557-0558 | 2.02, 3.07, 8.01 | Sabia Landscaping | 10/1/02 | 9/02 LNDSCP Maint | $ 1,220.00 | 897 | $ 61.00 | $ 188.89 |
| | 2.02, 3.07, 8.01 | Sabia Landscaping | 11/1/02 | 10/02 Landscp Maint | $ 1,897.50 | 866 | $ 94.88 | $ 283.63 |
| 0559-0560 | 2.02, 3.07, 8.01 | Sabia Landscaping | 12/5/02 | Snow Removal | $ 1,000.00 | 832 | $ 50.00 | $ 143.61 |
| 0561-0562 | 2.02, 3.07, 8.01 | Sabia Landscaping | 4/30/03 | 4/03 Landscaping Contr 1of8 | $ 776.25 | 686 | $ 38.81 | $ 87.89 |
| 0563-0564 | 2.02, 3.07, 8.01 | Sabia Landscaping | 5/30/03 | 5/03 landscaping Contr 2 of 8 | $ 776.25 | 656 | $ 38.81 | $ 87.89 |
| | 2.02, 3.07, 8.01 | Sabia Landscaping | 8/31/03 | 8/03 Landscaping Cont 5 of 8 | $ 776.25 | 563 | $ 38.81 | $ 75.43 |
| 0565-0566 | 2.02, 3.07, 8.01 | Sabia Landscaping | 9/30/03 | 9/03 Landscaping Contr | $ 1,636.25 | 533 | $ 81.81 | $ 150.53 |
| | 2.02, 3.07, 8.01 | Sabia Landscaping | 1/14/03 | 10/03 Landscaping | $ 866.25 | 498 | $ 43.31 | $ 74.46 |
| | 2.02, 3.07, 8.01 | Sabia Landscaping | 3/21/04 | Snow removal | $ 785.00 | 360 | $ 39.25 | $ 48.78 |
| | 2.02, 3.07, 8.01 | Sabia Landscaping | 4/2/04 | 4/04 Landscaping Contr 1 of 8 | $ 1,965.00 | 348 | $ 98.25 | $ 118.03 |
| | 2.02, 3.07, 8.01 | Sabia Landscaping | 6/2/04 | 6/04 Landscaping CNTRC 3 OF8 | $ 1,965.00 | 287 | $ 98.25 | $ 97.34 |
| | 2.02, 3.07, 8.01 | Sabia Landscaping | 8/2/04 | 8/04 LNDCP CNTRC 5 OF 8 | $ 1,965.00 | 226 | $ 98.25 | $ 76.65 |
| 0565-0566 | 2.02, 3.07, 8.01 | Sabia Landscaping | 2/22/05 | 2/21-2/22 SNOW REMOVAL | $ 1,148.45 | 22 | $ 57.42 | $ 4.36 |
| 0567-0568 | 2.02, 3.07, 8.01 | Sabia Landscaping | 2/26/05 | 2/21-2/22 SNOW REMOVAL | $ 1,502.75 | 18 | $ 75.14 | $ 4.67 |
| 0569-0570 | 2.02, 3.07, 8.01 | Safeguard Business Systems | 6/2/04 | 6/2 Purchase Order | $ 52.25 | 287 | $ 2.61 | $ 2.59 |
| 0571-0572 | 2.02, 3.07, 8.01 | Site Stuff, Inc. | 7/2/04 | 7/04 LNSCP CNTRC 4 OF 8 | $ 1,965.00 | 257 | $ 98.25 | $ 87.17 |
| 0573-0574 | 2.02, 3.07, 8.01 | Site Stuff, Inc. | 9/1/03 | 9/1 Generator | $ 99.24 | 545 | $ 9.96 | $ 7.45 |
| 0575-0576 | 2.02, 3.07, 8.01 | Site Stuff, Inc. | 9/23/03 | 9/17 Generator | $ 79.24 | 540 | $ 3.96 | $ 7.39 |
| 0577-0578 | 2.02, 3.07, 8.01 | Site Stuff, Inc. | 4/4/04 | 4/2 Headset | $ 22.82 | 346 | $ 1.14 | $ 1.36 |
| 0579-0580 | 2.02, 3.07, 8.01 | Site Stuff, Inc. | 5/6/04 | 5/6 Maint supplies | $ 27.48 | 314 | $ 1.37 | $ 1.49 |
| | 2.02, 3.07, 8.01 | Site Stuff, Inc. | 7/30/04 | 7/30 TOOLS | $ 22.86 | 229 | $ 1.14 | $ 0.90 |
| | 2.02, 3.07, 8.01 | Tilley Fire Equipment Co. | 2/28/03 | Semi - Annl Sprinkler Inspection | $ 405.00 | 747 | $ 20.25 | $ 52.22 |
| | 2.02, 3.07, 8.01 | Tilley Fire Equipment Co. | 2/28/03 | 2/24/03 Fire Alarm Inspection | $ 650.00 | 747 | $ 32.50 | $ 83.81 |
| | 2.02, 3.07, 8.01 | Tilley Fire Equipment Co. | 2/13/04 | 2/5 SPRINKLER INSP | $ 606.19 | 397 | $ 30.31 | $ 41.54 |
| | 2.02, 3.07, 8.01 | Tilley Fire Equipment Co. | 2/16/04 | 2/5 FIRE ALARM INSPECTION | $ 680.00 | 394 | $ 34.00 | $ 46.24 |
| | 2.02, 3.07, 8.01 | Tilley Fire Equipment Co. | 8/26/04 | 8/16 FIRE ALARM INSP | $ 707.00 | 202 | $ 35.35 | $ 24.65 |
| 0581-0583 | 2.02, 3.07, 8.01 | Tilley Fire Equipment Co. | 8/31/04 | 8/19 SPRINKLER TEST | $ 465.00 | 197 | $ 23.25 | $ 15.81 |
| | 2.02, 3.07, 8.01 | Tilley Fire Equipment Co. | 2/14/05 | 2/4 FIRE ALARM INSPECTION | $ 787.00 | 30 | $ 33.35 | $ 3.86 |
| | 2.02, 3.07, 8.01 | Tilley Fire Equipment Co. | 8/27/03 | 8/21 SPRINKLER Inspection | $ 450.00 | 567 | $ 22.50 | $ 44.04 |
| | 2.02, 3.07, 8.01 | Tilley Fire Equipment Co. | 2/25/05 | 2/25 SPRINKLER INSPECTION | $ 465.00 | 19 | $ 23.25 | $ 1.52 |
| | 2.02, 3.07, 8.01 | Tim Boyes | 12/31/03 | X 1/1-12/31 TimBoy Exp | $ 429.90 | 441 | $ 21.50 | $ 32.72 |
| | 2.02, 3.07, 8.01 | Tim Boyes | 1/4/05 | X 10/1-12/31 MILEAGE/MEETING | $ 127.98 | 71 | $ 6.40 | $ 1.57 |
| | 2.02, 3.07, 8.01 | Tim Boyes | 1/4/05 | X 1/1-3/31/04 MILEAGE | $ 139.93 | 71 | $ 7.00 | $ 1.71 |
| 0595-0596 | 2.02, 3.07, 8.01 | Tim Boyes | 1/4/05 | X 4/1-6/30/04 MILEAGE | $ 125.12 | 71 | $ 6.26 | $ 1.53 |
| 0597-0598 | 2.02, 3.07, 8.01 | Tim Boyes | 1/4/05 | X 7/1-9/30/04 MILEAGE | $ 100.18 | 71 | $ 5.01 | $ 1.23 |
| 0599-0600 | 2.02, 3.07, 8.01 | Tim Boyes | 1/4/05 | X 12/17/04 MILEAGE | $ 8.97 | 71 | $ 0.45 | $ 0.11 |
| | 2.02, 3.07, 8.01 | United Refrigeration Inc | 10/21/03 | 10/21 Maint Supplies | $ 7.67 | 512 | $ 0.38 | $ 0.68 |
| | 2.02, 3.07, 8.01 | United Refrigeration Inc | 7/9/03 | 7/9 HVAC Supplies | $ 34.52 | 616 | $ 1.73 | $ 3.67 |
| | 2.02, 3.07, 8.01 | United Refrigeration Inc | 7/18/03 | 7/18 HVAC Supplies | $ 172.12 | 607 | $ 8.61 | $ 18.03 |
| | 2.02, 3.07, 8.01 | Upper Dublin Township | 9/28/01 | 7/1-9/28 SEWER | $ 674.01 | 1,265 | $ 33.70 | $ 147.17 |
| 0601-0602 | 2.02, 3.07, 8.01 | Upper Dublin Township | 12/31/01 | 4th Quarter Sewer | $ 491.12 | 1,171 | $ 24.56 | $ 99.26 |
| | 2.02, 3.07, 8.01 | Upper Dublin Township | 3/29/02 | 1/1-3/29 SEWER | $ 491.12 | 1,083 | $ 24.56 | $ 91.80 |

10

## INDEX TO EXHIBIT 11

| Bates # PLSTP* | Lease Prov. | Vendor Name | Invoice Date | Transaction Desc | Invoice Amt | # Days Late | 5% Late Chg | 6% simple int on Invoice amt + late chg |
|---|---|---|---|---|---|---|---|---|
| | 2.02, 12.02 | Upper Dublin Township | 2/4/05 | FEE FOR PRELIMINARY PLAN | $ 910.00 | 40 | $ 45.50 | $ 6.28 |
| | 2.02, 12.02 | Upper Dublin Township | 2/4/05 | ESCROW FUND | $ 4,000.00 | 40 | $ 200.00 | $ 27.62 |
| | 2.02, 12.02 | Upper Dublin/Montgomery Co | 2/1/01 | 1/01-12/01 - Town/County Taxes | $ 32,413.53 | 1,504 | $ 1,620.68 | $ 8,414.37 |
| | 2.02, 12.02 | Upper Dublin/Montgomery Co | 2/1/02 | 1/02-12/02 - Town/County Taxes | $ 36,608.10 | 1,139 | $ 1,830.41 | $ 7,196.95 |
| | 2.02, 12.02 | Upper Dublin/Montgomery Co | 2/1/03 | 1/03-12/03 - Town/County Taxes | $ 37,676.69 | 404 | $ 1,883.83 | $ 5,920.31 |
| | 2.02, 12.02 | Upper Dublin/Montgomery Co | 2/1/04 | 1/04-12/04 - Town/County Taxes | $ 41,376.92 | 404 | $ 2,069.00 | $ 2,833.33 |
| 0603-0605 | 2.02, 3.07, 8.01 | Upper Dublin/Montgomery Co | 2/1/05 | 1/05-12/05 - Town/County Taxes | $ 43,123.44 | 43 | $ 2,156.17 | $ 320.06 |
| 0606-0609 | 2.02, 3.07, 8.01 | Upper Dublin School District | 7/1/01 | 7/01-6/02 - School Tax | $ 99,736.78 | 1,354 | $ 4,986.84 | $ 23,308.90 |
| 0607-0609 | 2.02, 3.07, 8.01 | Upper Dublin School District | 7/1/02 | 7/02-603 - School Tax | $ 105,325.83 | 989 | $ 5,266.29 | $ 17,979.55 |
| 0610-0611 | 3.01, 3.07 | Upper Dublin School District | 7/1/03 | 7/03-6/04 - School Tax | $ 107,957.52 | 624 | $ 5,397.88 | $ 11,627.47 |
| 0612-0613 | 3.01, 3.07 | Upper Dublin School District | 7/1/04 | 7/04-605 - School Tax | $ 117,494.10 | 258 | $ 5,874.71 | $ 5,232.19 |
| 0614-0615 | 3.01, 3.07 | Valcourt Building Svc | 3/18/04 | Window cleaning | $ 551.20 | 363 | $ 27.56 | $ 34.54 |
| | 2.02, 5.02 | Valcourt Building Svc | 8/19/04 | 8/19 SERVICE | $ 551.20 | 209 | $ 27.56 | $ 19.88 |
| 0616-0617 | 2.02, 5.02 | Verizon | 2/18/03 | 1/31-2/17 Fier Protection | $ 39.20 | 757 | $ 1.96 | $ 5.12 |
| 0618-0619 | 2.02, 3.01 | Verizon | 3/31/03 | 3/31 Fire protection | $ 1.14 | 716 | $ 0.06 | $ 0.14 |
| 0620-0621 | 2.02, 3.01 | Verizon | 6/6/03 | 6/6-7/5 Phone | $ 4.69 | 649 | $ 0.23 | $ 0.53 |
| 0622-0623 | 2.02, 3.01 | Verizon | 8/6/03 | 8/6-9/5 Fax | $ 4.27 | 588 | $ 0.21 | $ 0.43 |
| 0624-0624 | 2.02, 3.01 | Verizon | 9/6/03 | 9/6-10/5 Fax | $ 4.48 | 557 | $ 0.22 | $ 0.43 |
| 0625-0626 | 2.02, 3.01 | Verizon | 10/6/03 | 10/6-11/5 Fax | $ 4.23 | 527 | $ 0.21 | $ 0.38 |
| 0627-0628 | 2.02, 3.01 | Verizon | 11/6/03 | 11/6-12/5 Fax | $ 3.96 | 496 | $ 0.20 | $ 0.34 |
| 0629-0630 | 2.02, 3.01 | Verizon | 12/6/03 | 12/6-1/5 Fax | $ 3.81 | 466 | $ 0.19 | $ 0.31 |
| 0631-0632 | 2.02, 3.01 | Verizon | 1/6/04 | 1/6 - 2/5 FAX MACHINE | $ 4.00 | 435 | $ 0.20 | $ 0.30 |
| 0633-0634 | 2.02, 3.01 | Verizon | 2/6/04 | 2/6-3/5 FAX | $ 4.13 | 404 | $ 0.21 | $ 0.29 |
| 0635-0636 | 2.02, 3.07, 8.01 | Verizon | 3/6/04 | 3/6-4/5 Fax machine | $ 4.10 | 375 | $ 0.21 | $ 0.27 |
| | 2.02, 3.07, 8.01 | Verizon | 4/6/04 | 4/6-5/5 Fax Machine | $ 3.86 | 344 | $ 0.19 | $ 0.23 |
| | 3.07, 2.02 | Verizon | 5/6/04 | 5/6-6/5 Fax | $ 4.18 | 314 | $ 0.21 | $ 0.23 |
| 0637-0638 | 3.07, 2.02 | Verizon | 6/6/04 | 6/6-7/5 Fax Lines | $ 3.88 | 283 | $ 0.19 | $ 0.19 |
| 0640-0643 | 3.07, 2.02 | Verizon | 7/3/004 | 7/6-8/5 FAX LINE | $ 4.32 | 229 | $ 0.22 | $ 0.17 |
| 0643-0645 | 3.07, 2.02 | Verizon | 8/6/04 | 8/6-9/5 FAX LINE | $ 4.16 | 229 | $ 0.21 | $ 0.16 |
| 0646-0648 | 3.07, 2.02 | Verizon | 9/6/04 | 9/6-10/5 FAX LINE | $ 3.95 | 191 | $ 0.20 | $ 0.13 |
| 0649-0651 | 3.07, 2.02 | Verizon | 10/6/04 | 10/6-11/5 | $ 3.85 | 161 | $ 0.19 | $ 0.11 |
| 0652-0654 | 3.07, 2.02 | Verizon | 10/18/04 | 10/18-11/17 FIRE PRTCTN | $ 246.16 | 149 | $ 12.31 | $ 6.33 |
| | 3.07, 2.02 | Verizon | 11/6/04 | 11/6-12/5 | $ 3.88 | 130 | $ 0.19 | $ 0.09 |
| | 3.07, 2.02 | Verizon | 11/18/04 | 11/18-12/17 FIRE PRTCTN | $ 50.10 | 118 | $ 2.51 | $ 1.02 |
| | 3.07, 2.02 | Verizon | 12/6/04 | 12/6-1/5 FAX LINE | $ 4.30 | 100 | $ 0.22 | $ 0.07 |
| | 3.07, 2.02 | Verizon | 12/18/04 | 12/18-1/17 FIRE PRCTCN | $ 50.10 | 88 | $ 2.51 | $ 0.76 |
| | 3.07, 2.02 | Verizon | 1/6/05 | 1/6-2/5 FAX Lines | $ 4.27 | 69 | $ 0.21 | $ 0.05 |
| | 3.07, 2.02 | Verizon | 1/18/05 | 1/18-2/17 FIRE PROTECTION | $ 51.68 | 57 | $ 2.58 | $ 0.51 |
| | 3.07, 2.02 | Verizon | 2/6/05 | 2/6-3/5 FAX LINE | $ 4.47 | 38 | $ 0.22 | $ 0.03 |
| | 3.07, 2.02 | Verizon | 2/6/05 | 2/05-3 ESTIMATOR Estimated, not yet received | $ 51.54 | 38 | $ 2.58 | $ 0.34 |
| | 3.07, 2.02 | Verizon | 7/6/03 | 7/6-8/5 Fax | $ 4.19 | 619 | $ 0.21 | $ 0.45 |
| | 3.07, 2.02 | Verizon | 2/18/05 | 2/18-3/17 FIRE PROTECTION | $ 53.63 | 26 | $ 2.68 | $ 0.24 |
| 0055-0057 | 3.07, 2.02 | Verizon | 4/15/05 | 3/18-4/15-Based on last 3 mnth avg | $ 51.80 | | | |
| 0058-0659 | 3.07, 2.02 | Verizon | 4/15/05 | 3/5-4/5 Fax Line-Estimated based on last 3 mth avg | $ 4.35 | | | |
| 0660-0662 | 3.07, 2.02 | Verizon | 4/15/05 | 4/3-4/15 Fax Line-Estimated based on last 3 mnth avg | $ 1.90 | | | |
| 0663-0664 | 3.07, 2.02 | Waste System Authority | 2/28/02 | 2002 Waste Generation Fee | $ 6,548.00 | 1,112 | $ 327.40 | $ 1,256.79 |
| 0665-0667 | 3.07, 2.02 | Waste System Authority | 3/24/03 | ID 2003 Waste Generation Fee | $ 5,718.00 | 723 | $ 285.90 | $ 713.56 |
| | 3.07, 2.02 | Waste System Authority | 3/1/04 | Waste Gen Fee - 2004 | $ 5,798.00 | 380 | $ 289.90 | $ 380.29 |
| | 3.07, 2.02 | Wear Guard | 3/27/03 | 3/27 Uniform | $ 75.02 | 720 | $ 3.75 | $ 9.32 |

11

## INDEX TO EXHIBIT 11

| Bates # PLSTP* | Lease Prov. | Vendor Name | Invoice Date | Transaction Desc | Invoice Amt | # Days Late | 5% Late Chg | 6% simple int on invoice amt + late chg |
|---|---|---|---|---|---|---|---|---|
| | 3.07, 2.02 | Wear Guard | 6/4/03 | Uniform | $ 57.54 | 651 | $ 2.88 | $ 6.47 |
| | 3.07, 2.02 | Wear Guard | 6/6/03 | Uniform | $ 24.29 | 649 | $ 1.21 | $ 2.72 |
| | 3.07, 2.02 | Wear Guard | 6/6/03 | Uniform | $ 17.45 | 649 | $ 0.87 | $ 1.95 |
| 0668-0670 | 3.07, 2.02 | Willow Grove Oil Service Co | 5/31/04 | 5/26 Fuel | $ 275.37 | 289 | $ 13.77 | $ 13.74 |
| | 3.07, 2.02 | Weinstein Supply | 1/12/2003 | 11/20 HVAC Supplies | $ 183.61 | 482 | $ 9.18 | $ 15.28 |
| | 3.07, 2.02 | Wolff Architects, Inc. | 11/19/03 | 9/16-10/03 Base Bldg Survey | $ 2,921.71 | 483 | $ 146.09 | $ 243.57 |
| | 3.07, 2.02 | Wolff Architects, Inc. | 1/13/04 | 11/03 - 12/03 SPACE PLAN | $ 5,278.76 | 428 | $ 263.94 | $ 389.96 |
| 0671-0672 | 3.01, 3.07 | Wolff Architects, Inc. | 3/15/04 | Common Area Measurements | $ 168.33 | 366 | $ 8.42 | $ 10.63 |
| | 3.01, 3.07 | | | SUBTOTAL | $ 1,001,139.59 | | $ 49,134.21 | $ 108,333.35 |
| | 3.01, 3.07 | | | | | | | |
| | 2.02, 8.01 | | | GRAND TOTAL | $ 1,158,607.15 | 19,693 | 1,178,300.15 | |
| | 2.02, 8.01 | | | | | 1,158,607.15 | | |
| | 2.02, 8.01 | | | Interest Per Diem @ 6% (simple) | $ 172.65 | | | |
| 0675-0676 | 2.02, 3.07, 8.01 | | | | | | | |
| 0677-0679 | 2.02, 12.02 | | | | | | | |
| 0680-0683 | 2.02, 12.02 | | | | | | | |
| 0684-0685 | 2.02, 12.02 | | | | | | | |

12

# EXHIBIT   7

Date 03/31/05          OBERMAYER REBMANN MAXWELL & HIPPEL LLP - PHILADELPHIA,PA          Page 16
Billing Memorandum Summary

Client  064157 HRPT PROPERTIES TRUST
Matter  00034  OMNICARE PHARMACEUTICS-DISPUTE

Billing Attorney       0046 J.B. ROTWITT
Originating Attorney   0046 J.B. ROTWITT
Responsible Attorney   0417 P.S. DIAMOND

---

Date Opened: 07/01/98                          Contact:
Type of Law:  LT  - LITIGATION                 Comment:

| Unbilled — Thru 2/28/05 | | | | Fees | Disb |
|---|---|---|---|---|---|
| Fees | 78,860.00 | | Last entry | 03/28/05 | 03/29/05 |
| Disb | 3,312.49 | | Billed Thru | 01/31/05 | 01/31/05 |
| | | | Last Bill Date | 03/21/05 | 03/21/05 |
| Total | 82,172.49 | | Bill Amount | 20,490.50 | 1,942.31 |
| Retainer | 1,146.70 | | Last Payment | 03/23/05 | 22,432.81 |
| | | | YTD Billed | 98,146.00 | 4,998.67 |
| Net | 81,025.79 | | YTD Paid | 99,292.70 | 4,998.67 |
| Open A/R | 0.00 | | Total Billed Thru | 1,372,387.00 | 126,476.22 |
| Total Investment | 81,025.79 | | Total Paid 1/31 | 1,373,533.70 | 126,476.22 |

| Attorney | Time | Value | Disbursement Class | Amount |
|---|---|---|---|---|
| 0046 J.B. ROTWITT | 8.00 | 4,000.00 | 002 Xeroxing | 597.75 |
| 0190 W.W. AYRES | 1.10 | 467.50 | 005 Telephone | 17.70 |
| 0309 M.P. WEINSTEIN | 7.60 | 2,470.00 | 024 Reimb. Staff Serv | 45.54 |
| 0314 P.N. ALLEN | 8.20 | 3,280.00 | 041 Travel | 6.60 |
| 0393 J.J. MCGOVERN | 37.40 | 15,895.00 | 056 Telecopy/Fax | 46.00 |
| 0429 S. W. CHING | 83.20 | 31,200.00 | 143 COURT REPORTER | 425.00 |
| 0609 Kenneth C. NORTON | 45.00 | 5,850.00 | 166 OUTSIDE COPYING | 1,027.20 |
| 0654 STEPHEN P. BOSIO | 58.50 | 13,747.50 | 197 MISCELLANEOUS | 1,146.70 |
| 0658 SARAH A. SHAPIRO | 15.00 | 1,950.00 | | |
| Totals | 264.00 | 78,860.00 | Total | 3,312.49 |

_TOTAL CHARGES #1,581,035.71_

|  | Fees | Disbursements |
|---|---|---|
| Amount to be Billed | _____ | _____ |
| Amount to be Relieved | _____ | _____ |
| Amount to be Anticipated | _____ | _____ |
| Amount to be Applied from Retainer | _____ | _____ |

Bill Number _____    Bill Date _____    Close Matter:   Yes  or  No

Comment:

# EXHIBIT   8

# OBERMAYER REBMANN MAXWELL & HIPPEL LLP
## BILLING SUMMARY

## JANUARY 1, 2004 THROUGH FEBRUARY 28, 2005

**CLIENT:**    **064157 HRPT PROPERTIES TRUST**

**MATTER :**    **00041 FUJISAWA HEALTHCARE, INC.  vs.**

| MONTH | FEES |
|---|---|
| JANUARY 2004 – DECEMBER 2004 | $215,115.57 |
| JANUARY 2005 | $23,013.90 |
| FEBRUARY 2005 | $2807.15 |
| **TOTAL:** | **$240,936.62** |

610496

# EXHIBIT  9

Date 04/01/05              OBERMAYER REBMANN MAXWELL & HIPPEL LLP - PHILADELPHIA,PA                 Page 5
                                        Billing Memorandum Summary

Client  064157 HRPT PROPERTIES TRUST                          Billing Attorney      0046 J.B. ROTWITT
Matter  00027   FT. WASHINGTON TAX APPEALS FOR 2002           Originating Attorney  0046 J.B. ROTWITT
                                                              Responsible Attorney  0463 W. G. SCHWARTZ

Date Opened:  08/22/01                        Contact:
Type of Law:  TO  - TAX ADVICE OTHER          Comment:

| Unbilled | | | Fees | Disb |
|---|---|---|---|---|
| Fees | 31,147.50 | Last entry | 03/01/05 | 09/13/04 |
| Disb | 0.00 | Billed Thru | 01/31/05 | 10/31/04 |
| | | Last Bill Date | 03/21/05 | 12/13/04 |
| Total | 31,147.50 | Bill Amount | 3,977.50 | 14.80 |
| Retainer | 0.00 | Last Payment | 02/25/05 | 24,602.50 |
| Net | 31,147.50 | YTD Billed | 28,580.00 | 0.00 |
| | | YTD Paid | 24,602.50 | 0.00 |
| Open A/R | 3,977.50 | Total Billed  thru 1/3/05  113,916.00 | | 2,510.54 |
| Total Investment | 35,125.00 | Total Paid | 109,938.50 | 2,510.54 |

| Attorney | Time | Value | Disbursement Class | Amount |
|---|---|---|---|---|
| 0309 M.P. WEINSTEIN | 42.30 | 16,357.50 | | |
| 0393 J.J. MCGOVERN | 7.80 | 3,315.00 | | |
| 0429 S. W. CHING | 30.60 | 11,475.00 | | |
| Totals | 80.70 | 31,147.50 | Total | 0.00 |

|  | Fees | Disbursements |
|---|---|---|
| Amount to be Billed | _____ | _____ |
| Amount to be Relieved | _____ | _____ |
| Amount to be Anticipated | _____ | _____ |
| Amount to be Applied from Retainer | _____ | _____ |

Bill Number _____    Bill Date _____    Close Matter:  Yes  or  No

Comment:

Total CHARGES to 525 Virginia Drive
= $29,514.81

# EXHIBIT  10

**Schnader Harrison Segal & Lewis LLP**
Suite 3600
1600 Market Street
Philadelphia, PA 19103
(215) 751-2000

HUB Properties Trust
David J. Campoli
c/o REIT Management & Research, Inc.
1600 Market Street, Suite 505
Philadelphia, PA 19103

Date          January 23, 2002
Invoice Number    2053412
Client No          0358245

For Professional Services Rendered through December 31, 2001

| Matter Number | Matter Name | Fee Amount | Cost Amount |
|---|---|---|---|
| 0358245-0011 | Belfor Mechanics Lien | $  2,448.00 | 0.00 |

| | | |
|---|---|---|
| Total Services | | $  2,448.00 |
| Total Costs | | 0.00 |
| Total Services and Costs | | $  2,448.00 |
| Total Due | | $  2,448.00 |

*(handwritten stamp)*
BLDG. CODE 602 400
VENDOR # Schnar 245
INV. # 2053412 - 475
INV. DATE 1/23/02
DUE DATE ASAP
G/L ACCT. # 52030
AMOUNT 2448.00
DESC Belfor Mech. Lien
P/C #
BUDGETED: Y    N
CONTRACT: Y    N
TENANT BILL BACK: Y X N
TENANT(s) Biophram -
_____ DJC 2/6/02

*(handwritten)* Check 145989
3/1/2002

Due upon receipt

Please send payments by check to:
SCHNADER HARRISON SEGAL & LEWIS LLP
P O BOX 8500-6030
PHILADELPHIA, PA 19178-6030
(Please reference client# and invoice# on check.)

Please send payments by wire transfer to:
FIRST UNION NATIONAL BANK, NA
BROAD AND WALNUT STREETS
PHILADELPHIA, PA 19107
ABA#: 031201467 ACCOUNT#: 2000049309139
(Please reference client# and invoice#.)

Federal tax identification number: 23-1383844

Please enclose the remittance copy of this invoice with your payment to ensure proper credit. Questions may be directed to our billing
department at 215-751-2514. Note that payments received after the invoice date are not reflected.

PLSTP 0584

HUB CHECKS 00015

**Schnader Harrison Segal & Lewis LLP**
Suite 3600
1600 Market Street
Philadelphia, PA 19103
(215) 751-2000

HUB Properties Trust
David J. Campoli
c/o REIT Management & Research, Inc.
1600 Market Street, Suite 505
Philadelphia, PA 19103

| | | |
|---|---|---|
| Date | February 15, 2002 | |
| Invoice Number | 2056427 | |
| Client No | 0358245 | |

For Professional Services Rendered through January 31, 2002

| Matter Number | Matter Name | | Fee Amount | Cost Amount |
|---|---|---|---|---|
| 0358245-0011 | Belfor Mechanics Lien | $ | 9.00 | 0.00 |

|  |  |
|---|---|
| Total Services | $ 9.00 |
| Total Costs | 0.00 |
| Total Services and Costs | $ 9.00 |
| Previous Balance Due | 2,448.00 |
| Total Due | $ 2,457.00 |

BLDG. CODE 602400
VENDOR # Schnar3245
INV. # 205 698 1-4751
INV. DATE 2.15.02
DUE DATE ASP
G/L ACCT. # 60620
AMOUNT 9.00
DESC Michanwl Lien
P/C #
BUDGETED: Y___ N___
CONTRACT: Y___ N___
TENANT BILL BACK: Y X N___
TENANT(s) Omnicare - BioPharm

APPROVAL ___

REDACTED

Due upon receipt

Please send payments by check to:
SCHNADER HARRISON SEGAL & LEWIS LLP
P O BOX 8500-6030
PHILADELPHIA, PA 19178-6030
(Please reference client# and invoice# on check.)

Please send payments by wire transfer to:
FIRST UNION NATIONAL BANK, NA
BROAD AND WALNUT STREETS
PHILADELPHIA, PA 19107
ABA#: 031201467 ACCOUNT#: 2000049309139
(Please reference client# and invoice#.)

Federal tax identification number: 23-1363844

Please enclose the remittance copy of this invoice with your payment to ensure proper credit. Questions may be directed to our billing department at 215-751-2514. Note that payments received after the invoice date are not reflected.

4/5/2002

Check 150295

PLSTP 0586

HUB CHECKS 00032

# EXHIBIT 11

1           IN THE UNITED STATES DISTRICT COURT
      FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2

3                                    NO.  02-CV-2905

4  BARRY M. PORTNOY and GERARD  ) DEPOSITION UPON
   M. MARTIN, as Trustees for   )
5  HUB PROPERTIES TRUST         ) ORAL EXAMINATION
                                )
6        - vs -                 )      OF
                                )
7  ONMICARE PHARMACEUTICS, INC. ) JAMES McDEVITT
   and OMNICARE CLINICAL        )
8  RESEARCH, INC.               )
   - - - - - - - - - - - - - - -

9

10

11

                 TRANSCRIPT OF DEPOSITION, taken
12
   by and before KRISTIN N. LAFTY, Professional
13
   Reporter and Notary Public, at the Law Offices
14
   of OBERMAYER, REBMAN, MAXWELL & HIPPEL, LLP,
15
   19th Floor, One Penn Center, 1617 JFK Boulevard,
16
   Philadelphia, PA, on Tuesday, April 22, 2003,
17
   commencing at 10:05 a.m.
18

19

20                    -   -   -

21

22          REPORTING SERVICE ASSOCIATES (RSA)
                  A Veritext Company
23          1845 Walnut Street - 15th Floor
               Philadelphia, Pennsylvania 19103
24                   (215) 241-1000

453694

5    product.  And that continued until, let's say,

6    July of 2002.  We were also using the plant to

7    store the machinery and equipment that we were

8    trying to figure out what to do with.

9    Q.        And those activities that you

10   described, analytical, packaging, refurbishment,

11   inventory disposal activities, were they earning

12   revenue for the company?

13   A.        The analytical services were and

14   Virbac were.  The rest of it was basically using

15   the facility as a storage warehouse.  And also,

16   again, we were still getting rid of all those

17   drugs, the drug product -- project, the

18   incineration with Onyx.  That persisted in the

19   parking lot until July or August, I would say.

20   Q.        Of what year?

21   A.        2002.

22   Q.        Okay.  The next sentence of that

23   paragraph is, "Rent payments have been cut 50

24   percent in accordance with the terms of the

JAMES McDEVITT

138

1    lease and it is anticipated the reduced rent

2    payments will continue for one year."

3    A.        Right.

453694

4    Q.        Was that your understanding, that rent

5    had been cut by 50 percent?

6    A.        Yeah, right.

7    Q.        Have you since learned that, in fact,

8    rent wasn't being paid at all?

9    A.        Rent was never paid.  And that --

10   personally I was embarrassed by that, as the

11   controller of the company.  But the company

12   didn't pay the rent.

13   Q.        Was Dr. Feld -- Dr. Feld testified

14   that Pharmaceutics was informed -- and I think

15   it was by Mr. Morra, possibly Mr. Greenspan --

16   that if anybody at Pharmaceutics -- anybody at

17   Pharmaceutics who pays rent will be fired.  Was

18   that communicated to you?

19   A.        Yes.  Now, again, working in a team

20   there, I considered Ron Greenspan to be a

21   teammate.  But he called me in his office and he

22   was kind of smiling.  He goes, Jim, you've been

23   worried about the rent.  Well, hear this.  If

24   you pay the rent, you will get fired.  And I

RSA Court Reporters

JAMES McDEVITT

139

1    said, well, that makes that decision easy.  He

2    said, you ought to take -- make sure Ken knows

453694

3    that and Dave Morra.  He said, if Dave Morra

4    pays the rent, Ken pays the rent or Tom Marsh

5    pays the rent, you will be fired.  And I said,

6    now I don't have to think anymore.  And we

7    laughed.  And that was it.

8    Q.        When did that take place?

9    A.        I wrote that in my details some time

10    in the fall of 2001.

11    Q.        So this was after you wrote this memo?

12    A.        Yes.  It was July or August.  You have

13    to remember, I was an advocate of doing

14    something.  I mean, I had written all these

15    different alternatives.  And I was trying to

16    protect people's jobs.  And I wanted capital.

17    So I was trying to hustle or, you know, process

18    or expedite a decision.  So that's what I was

19    trying to accomplish.

20    Q.        As I look through this document, it

21    seems to me that you go through various options

22    through the company.  And they include refitting

23    525 Virginia Ave?

24    A.        Yes.

RSA Court Reporters


JAMES McDEVITT

140

1    Q.        Now, that suggests to me that you

# EXHIBIT   12

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

NO. 02-CV-2905

| | | |
|---|---|---|
| BARRY M. PORTNOY and GERARD | ) | DEPOSITION UPON |
| M. MARTIN, as Trustees for | ) | |
| HUB PROPERTIES TRUST, | ) | ORAL EXAMINATION |
| | ) | |
| Plaintiffs, | ) | OF |
| | ) | |
| | ) | |
| - vs - | ) | KENNETH FELD |
| | ) | |
| | ) | |
| OMNICARE PHARMACEUTICS, | ) | |
| INC. and OMNICARE CLINICAL | ) | |
| RESEARCH, INC., | ) | |
| | ) | |
| Defendants. | ) | |

- - - - - - - - - - - - - - - -

         TRANSCRIPT OF DEPOSITION, taken by and

before JENNIFER WEARNE, Professional Reporter

and Notary Public, at the offices of OBERMAYER,

REBMANN, MAXWELL & HIPPEL, LLP, One Penn Center,

19th Floor, 1617 J.F. Kennedy Boulevard,

Philadelphia, Pennsylvania, on Monday,

March 3, 2003, commencing at 11:25 a.m.

REPORTING SERVICE ASSOCIATES (RSA)
A VERITEXT COMPANY
1845 Walnut Street - 15th Floor
Philadelphia, Pennsylvania  19103
(215) 241-1000

2

441252

21    facilities or whether or not they wanted to pull

22    up stakes and move in the days -- the weeks,

23    we'll say, the first three or four weeks

24    following the flood?

RSA Court Reporters

KENNETH FELD                    100

1    A.        I was told by my supervisor,

2    Mr. Morra, that I was to get the business up and

3    running any way I could as quickly as possible.

4              In fact, he wanted a 48-hour plan as

5    to what I was going to do and how I was going to

6    get the business back up and running, making use

7    of whatever resources we could possibly muster

8    in terms of facilities and equipment.

9    Q.        Were you ever told that either

10   Corporate or Clinical wanted to simply turn

11   their backs on the leases at 425, 525?

12                   MR. PARRY:  At any time?

13   BY MR. DIAMOND:

14   Q.        In the two or three weeks after the

15   flood?

16   A.        No.

17   Q.        What were you told about paying rent?

18   A.        We were told that if anybody paid

19   rent, that we would be fired immediately.

20   Q.        Who told you that?

21    A.        That came from Mr. Greenspan.

22    Q.        Do you remember when he told you that?

23    A.        I'd say the late summer, August.

24    Q.        2001?

KENNETH FELD                    101

1     A.        August 2001, maybe September of 2001.

2               MR. DIAMOND:  Feld-14.

3               (Report of discussion marked

4         for identification as Exhibit

5         Feld-14.)

6               (Discussion off the record.)

7               MR. PARRY:  May the witness

8         clarify the answer about paying rent?

9               MR. DIAMOND:  Sure.

10              THE WITNESS:  The

11        clarification would be that at

12        Omnicare Pharmaceutics, my business

13        unit at that point in time, I had no

14        ability to make any kind of payment,

15        much less the rent payment.

16              Corporate had taken that

17        responsibility back into their

18        purview.  So, you know, the issue of

19        paying rent and us being told we'd

20        lose our jobs was really a moot point

21        as far as we at Omnicare Pharmaceutics

# EXHIBIT  13

1

1          IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2
                              NO. 02-CV-2905
3


4


5
    BARRY M. PORTNOY and GERARD ) DEPOSITION UPON
6   M. MARTIN, as Trustees for
    HUB PROPERTIES TRUST,        ) ORAL EXAMINATION
7
                Plaintiffs,  )      OF
8
            - vs -           ) RONALD L. GREENSPAN
9
    OMNICARE PHARMACEUTICS, INC.)
10  and OMNICARE CLINICAL
    RESEARCH, INC.,              )
11
                Defendants.  )
12  - - - - - - - - - - - - - - -

13

14

15                    TRANSCRIPT OF DEPOSITION,

16   taken by and before F. DAVID DAMIANI, Registered

17   Professional Reporter and Notary Public, at the LAW

18   OFFICES OF OBERMAYER, REBMANN, MAXWELL & HIPPEL,

19   LLP, 19th Floor, One Penn Center, 1617 JFK

20   Boulevard, Philadelphia, Pennsylvania, on

21   Wednesday, October 30, 2002, commencing at 10:04

22   a.m.

23                    - - -

24          REPORTING SERVICE ASSOCIATES (RSA)


417090

22    Q.        Can you find in the lease the section that

23    you're referring to?

24    A.        I can try.


RSA COURT REPORTERS


70


1                      (At this time, the witness

2              complies with request.)

3                      MR. SHARE:  Before you answer

4              that question, I'll be right back.

5                      (At this time, a short break was

6              taken.)

7                      MR. SHARE:  Off the record.

8                      (At this time, a discussion was

9              held off the record.)

10                     THE WITNESS:  Yes.

11    BY MR. HABER:

12    Q.        What provision of the lease led you to

13    believe that you were entitled to an abatement

14    after the flood?

15    A.        Ten point 02 A.

16    Q.        Ten point 02 is entitled damage or

17    casualty, right?

18    A.        Yes.

417090

19  Q.       And section A provides:  In case the

20  premises, or any portion thereof, shall be totally

21  or partially damaged or destroyed by fire or by any

22  other casualty whatsoever, then landlord and tenant

23  shall proceed with reasonable promptness, and in

24  accordance with paragraph (c) below, to repair and


RSA COURT REPORTERS


71


1   restore the premises to at least as good a

2   condition as that which existed immediately prior

3   to such fire or other casualty, and during such

4   repair period, there shall be an abatement of rent.

5            There's another sentence which I'm not

6   going to read right now.  That's the language that

7   you relied upon for the rent abatement?

8   A.       I believe so.

9   Q.       Now, did the Pharmaceutics company repair

10  or restore the premises to at least as good a

11  condition as to that which existed immediately

12  prior to the flood?

13  A.       No.

14  Q.       Why not?

15  A.       Because we were trying to determine what

417090

16    was the appropriate level to improve the building

17    after the flood.

18    Q.        And did you eventually come to some

19    conclusion?

20    A.        Yeah.  We eventually decided not to make

21    the improvements, the improvements necessary to get

22    it back to the level it was prior to the flood.

23                    MR. SHARE:  You have to keep

24            your voice up.


                        RSA COURT REPORTERS


                                                72


1    BY MR. HABER:

2    Q.        The abatement of rent provided for by that

3    provision, was it your understanding that that rent

4    abatement would continue indefinitely?

5    A.        I knew it would become an issue at some

6    point.

7    Q.        Well, why have you not resumed paying rent

8    to the landlord?

9    A.        I think the belief was that there was not

10    a need to reinstate the rent payment.

11    Q.        That was your belief?

12    A.        That was my understanding.

417090

13    Q.      And from where did you reach that

14    understanding?

15    A.      Well, after we had determined that we can

16    stop paying rent, we informed Omnicare, Inc. of our

17    findings, and they concurred with those findings,

18    and as a result of that we stopped paying rent.

19    And we never reinstated paying rent.

20    Q.      Well, you understand what an abatement

21    means?

22    A.      I think I do.

23    Q.      And an abatement, is it fair to say, is a

24    temporary excuse from performing a certain action

RSA COURT REPORTERS

73

1     while something else is being done; does that kind

2     of jibe with what your understanding is?

3     A.      Yep.

4     Q.      I guess the operative term there is

5     temporary, isn't it?

6     A.      I would assume that's a correct statement.

7                          MR. SHARE:  Objection to the

8              form.

9     BY MR. HABER:

417090

10  Q.      Well, when do you think you have to start

11  paying rent again?

12  A.      That really wasn't my decision.

13  Q.      Well, I'm asking -- you're the

14  representative here testifying on behalf of the

15  Pharmaceutics company and CRO on the issue, so I'd

16  like to get your statement on the issue.

17              MR. SHARE:  Wait a minute.

18          Don't answer that question.  The witness

19          has not been designated to testify as to

20          the decision process of resuming to pay

21          rent, and indeed that particular topic is

22          not designated on the notice.

23              MR. HABER:  Okay.  Well, we can

24          agree to disagree in what the notice says.


                    RSA COURT REPORTERS


                                                    74


1           But I have a question pending that I'd

2           like to have answered.

3               THE WITNESS:  Could he repeat

4           the question?

5               MR. HABER:  Absolutely.

6               (At this time, the court

417090

7          reporter read back from the record as was

8          requested.)

9              MR. SHARE:  I object to the

10         question.  I'm going to let you answer it

11         if you can.  Read it back again.

12             (At this time, the court

13         reporter read back from the record as was

14         requested.)

15             THE WITNESS:  I guess when the

16         building becomes functional back to the

17         level that it was before.

18    BY MR. HABER:

19    Q.      You would agree with me that you continued

20    operations in the building after the flood, right?

21    A.      Some operations, yes.

22    Q.      I understand, from what I heard from you

23    and Dave Morra, that the operations were

24    significantly reduced from the operations -- from


RSA COURT REPORTERS


75


1    the level of operations prior to the flood,

2    right?

3    A.      Yes.

417090

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| BARRY M. PORTNOY and | : | |
| GERARD M. MARTIN, as Trustees for | : | |
| HUB PROPERTIES TRUST | : | |
|         Plaintiffs, | : | NO. 02-CV-2905 |
| | : | |
|     v. | : | |
| | : | |
| OMNICARE PHARMACEUTICS, INC. | : | |
|     and | : | HON.  CLIFFORD SCOTT GREEN |
| OMNICARE CLINICAL RESEARCH, INC. , | : | |
|     Defendants. | : | |
| | : | |

## CERTIFICATE OF SERVICE

I, Stephen W.W. Ching, Jr., Esquire, hereby certify that on April 1, 2005, I caused to be

served Plaintiffs' Trial Brief (accompanied by exhibits and this Certificate of Service), via e-mail

and Monday hand delivery, upon the following:

Adam Share, Esquire
Todd Schoenhaus, Esquire
Blank Rome LLP
One Logan Square
Philadelphia, PA 19103-6998

STEPHEN W.W. CHING, JR.

Attorney for Plaintiffs

610506