IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BARRY M. PORTNOY and GERARD M. MARTIN, as Trustees for HUB PROPERTIES TRUST 400 Center Street Newton, MA 02458, | : : : : : : | Civil Action No. 02-CV-2905 |
| Plaintiffs, | : : | |
| v. | : : | |
| OMNICARE PHARMACEUTICS, INC. 630 Allendale Road King of Prussia, PA 19406 | : : : : | |
| and | : : | |
| OMNICARE CLINICAL RESEARCH, INC. 630 Allendale Road King of Prussia, PA 19406, | : : : : | |
| Defendants. | : | |

## DEFENDANTS' TRIAL BRIEF

Defendants Omnicare Pharmaceutics, Inc. ("OPI") and Omnicare Clinical Research, Inc.

("OCR") hereby submit their trial brief in response to the trial brief submitted by Plaintiffs Barry

M. Portnoy and Gerard M. Martin, Trustees for HUB Properties Trust (collectively "HUB"). In

short, while Defendants do not dispute (for purposes of the trial on damages in this Court) that

HUB is entitled to past Fixed Basic Rent owed to date, and have just reached an agreement with

HUB concerning the amount of past Additional Rent owed to date, this Court should deny

HUB's attempt to accelerate, as of March 12, 2002, the final ten years of Fixed Basic Rent under

the lease term. Should the Court choose to accelerate, however, then HUB's incorrect

methodology should be rejected in favor of Defendants' methodology. Finally, the Court should deny HUB's claims for restoration costs and attorneys' fees in their entirety.[1]

## I.    STATEMENT OF FACTS

On December 3, 1996, Bio-Pharm Pharmaceutics Services, Inc. ("Bio-Pharm") entered into a lease agreement ("the Lease") with 525 Virginia Drive Associates Limited Partnership ("VDA") for a building located at 525 Virginia Drive, Fort Washington, Pennsylvania ("525").[2] 525 is a two-story slab on grade building which includes both manufacturing and office space and which is situated in a suburban office/industrial park setting.[3]

The Lease is for a term of fifteen years. See Ex. A, § 1.02(b); Stipulation S21. Rent totaling $12,378,000 is to be paid in monthly installments over fifteen years. See Ex. A, Preamble ¶ F; Stipulation S30. The Lease requires the lessee to use 525 as space for its "offices, laboratories, and warehouse use in connection with the conduct of [its] business of manufacturing, testing and analyzing, packaging and distribution of pharmaceutical products, and in support of [its] clinical research divisions . . . and for no other purpose." See Ex. A, § 5.01.

525 was originally built in 1967 for use as an electronics manufacturing facility. Prior to the execution of the Lease, 525 had never been used as a site for the contract manufacturing, packaging or testing of pharmaceuticals. In the late 1970s, the property was sold to a different

---

[1] Whereas the parties disagree as to Defendants' legal obligation to pay any restoration costs, they reached an agreement, after HUB filed its trial brief, as to the cost to restore the interior of the premises to its pre-flood condition. Moreover, the portion of HUB's attorneys' fees claim related to the removal of a mechanic's lien actually constitutes additional rent, and is conceded by Defendants on that basis.

[2] Relevant portions of the Lease are attached hereto as Exhibit "A." A full and complete copy of the Lease is attached to The Parties' Stipulated and Contested Facts Pursuant to the Court's February 8, 2005 Pre-Trial Order (the "Stipulations"), Docket #49, at Exhibit 1.

[3] In 1997, VDA assigned its rights under the Lease to HUB. Stipulation S17. In 1998, OPI acquired Bio-Pharm, and succeeded to Bio-Pharm's rights and obligations under the Lease.

owner who converted it to a defense contracting manufacturing facility. The property was then
later decommissioned and was vacant from 1992 until Bio-Pharm leased it in late 1996. See
HUB 00369 (attached hereto as Exhibit "B"). At that time, 525's use was again changed, this
time to the manufacture and packaging of pharmaceuticals. Under the terms of the Lease, it was
Landlord's obligation to demolish all interior improvements that had currently existed in the
premises and to make certain exterior improvements. See Ex. A, § 4.01. All interior
improvements, which were "necessary or desirable to Tenant," were to be done by Tenant at its
sole cost. See Ex. A, § 4.02.

On June 16 and 17, 2001, 525 was inundated by heavy rains associated with the remnants
of Tropical Storm Allison (the "2001 Flood"). See Deposition of Upper Dublin Township
Manager Paul Leonard (the relevant pages of which are attached hereto as Exhibit "C") at 18.
The entire first floor of 525 was heavily damaged by two feet of floodwater. See Deposition of
OPI's former Controller Jim McDevitt (April 22, 2003) (the relevant pages of which are attached
hereto as Exhibit "D") at 96-97. All OPI operations ceased. Significant quantities of OPI's
customers' manufactured and packaged drug products were destroyed, damaged and/or
adulterated. OPI's equipment and manufacturing facilities and office suites in 525 were
destroyed. Furthermore, the flood waters contained fecal coliform and other bacteria which
rendered 525 contaminated and wholly unsuitable for pharmaceutical manufacturing. See
Deposition of OPI's former President Kenneth Feld (March 3, 2003) (the relevant pages of
which are attached hereto as Exhibit "E") at 80:23–82:1; 95:14–96:11; 128:12–18; Ex. D at
95:23–99:12; see also Deposition of Defendants' corporate designee David Morra (October 29,
2002) (the relevant pages of which are attached hereto as Exhibit "F") at 133:8–137:11; 145:19-
24.

3

Following the 2001 Flood, OPI spent over $2 million to clean and renovate the building, reconstructing large portions of the interior. See Deposition of OPI's Chief Financial Officer Ronald Greenspan (the relevant portions of which are attached hereto as Exhibit "G") at 32:2-5. Among other things, OPI paid to restore drywall, flooring, ceiling tiles, painting, electrical equipment, boiler, HVAC, stairway and a passenger elevator. See Stipulations S77-79. Certain parts of the interior of 525 were not restored to the same condition as they were before the 2001 Flood; some sections of the interior walls have partial or no drywall where mold and fecal contaminated dry wall was removed. Id. Likewise, portions of ceilings where contaminated tile was removed remain open, and contaminated floor coverings in areas of the first floor were removed and not replaced. Id. OPI did not completely reconstruct the interior of 525 to its pre-2001 Flood condition because it made no sense to do so – OPI could no longer use 525 and knew that any subsequent tenant would have different configuration needs.

For several months following the 2001 Flood, rental payments were abated by operation of the Lease. However, because OPI could not resume its clinical pharmaceutical business at 525, OPI transferred whatever operations it could to other facilities, either by making arrangements to use the facilities of competitors or by establishing its own temporary production facilities. See Ex. E at 138:1-12; Ex. F at 138:1–139:19. In addition to making these temporary arrangements OPI worked closely with HUB in a genuine effort to determine the feasibility of re-establishing its business at 525. For instance, on August 20, 2001, OPI representatives and HUB representatives, including David Campoli, met with Upper Dublin Township Manager Paul Leonard concerning flood remediation. See Ex. C at 41:11–43:2; Deposition of HUB's corporate designee David Campoli (the relevant pages of which are attached hereto as Exhibit "H") at 117:7-13. Mr. Leonard advised the representatives to "get out" of 525 and stated that the

4

building was worth "less than zero" because of the flooding problem.[4]  Ex. C at 45-46; Ex. H at
151:3–153:3.  Further, OPI spent months discussing with HUB possible structural changes to
525 and even alternative buildings to lease.  See Ex. H at 119:15-122:12; 139:24–140:19; Ex. I at
75:4-14; 98:8–99:5; Feld Dep. (April 9, 2003) (the relevant pages of which are attached hereto as
Exhibit "K") at 201:24-202:6.  HUB made this offer because of OPI's customers' fears of the
risk to their future clinical trials posed by doing business in 525.  See Ex. I at 98:8–99:5.

OPI also kept HUB informed of the reactions to the flooding which OPI was receiving
from its customers – reactions which indicated that customers would not send significant future
work to OPI at 525.  See Ex. I at 71:2–8; 75:4-11; Ex. F at 82:1-83:8; 87:4-13; 109:22-110:18;
Ex. D at 133:3-9.  In fact, after the 2001 Flood, OPI was only able to perform marginal
temporary work at 525, most of which was a discreet manufacturing project for one customer,
Virbac Corporation, who had obtained FDA approval for 525 only and who could not seek FDA
approval for a different site.  See Ex. K at 180:7–181:16; Deposition of OPI's former Senior
Manager Steve Purdy (the relevant pages of which are attached hereto as Exhibit "L") at 145:20-
146:20.  Contrary to the gross exaggerations in HUB's trial brief, the work performed by
necessity at 525 after the 2001 Flood generated only a small fraction of the revenue compared to
before the 2001 Flood; OPI did not enrich itself by not immediately evacuating 525.  See Ex. D
at 172:21-174:6; Ex. L at 187:10-13; Ex. K at 49:2-11; 51:14–52:3; 86:11-22.

Because OPI's customers would not do business with OPI at 525 as intended under the
Lease, OPI informed HUB within months of the 2001 Flood that OPI intended to vacate 525 and
considered its obligations under the Lease excused under the common law doctrines of

---

[4] HUB apparently agreed with Mr. Leonard, as it filed appeals with the Township to reduce its tax liability on 525
and a handful of its other properties in the same industrial park, on the grounds that flooding caused high vacancies.
See Deposition of HUB's President John Mannix (the relevant pages of which are attached hereto as Exhibit "I") at
57:4-18; HUB's tax appeal documents (attached hereto as Exhibit "J").

frustration of purpose and impossibility of performance. See Ex. I at 75:4-14; Ex. K at 201:24-202:6. HUB waited until March, 2002 to send a Notice of Default and Acceleration, seeking at that time to accelerate all fixed rent due until the end of the Lease term in 2012. Stipulation S44. OPI thereafter ceased whatever remaining operations it had at 525 and vacated the premises by the end of January, 2003.

HUB filed this suit in May, 2002. On June 25, 2004, this Court granted summary judgment on the issue of liability in favor of HUB, holding that OPI's obligations were not excused, and deferred entry of final judgment until the resolution of damages issues. See Docket Entry #34. On April 1, 2005, HUB filed a trial brief claiming damages for Fixed Basic Rent comprised of "past due" fixed rent from October 1, 2001 (end of abatement period) to March 12, 2002 (date of Notice) and "accelerated" fixed rent from March 13, 2002 to February 16, 2012 (end of Lease term); Additional Rent from October 1, 2001 to April 15, 2005 (last scheduled day of damages trial); costs to restore 525's interior to its pre-flood condition; and attorneys' fees incurred in prosecuting this action, defending an ongoing suit brought by one of OPI's customers Fujisawa Healtchare, Inc. ("Fujisawa") against both OPI and HUB, and seeking property tax relief from Upper Dublin Township ("the Township").

On April 6, 2005, the parties stipulated that the amount of past Additional Rent is $1,078,594.42 (inclusive of late charges and prejudgment interest), thereby rendering moot the $1,178,300.15 claim asserted in HUB's trial brief. See Docket Entry #49. The parties also stipulated that the cost to restore 525's interior to its pre-2001 Flood condition is $928,885.00, with Defendants explicitly reserving all legal arguments and defenses against any alleged obligation to pay such restoration costs.

6

## II.     SUMMARY OF THE ARGUMENT

Under this Court's holding that OPI is not legally excused from performance under the Lease, Defendants do not challenge HUB's claim for past due Fixed Basic Rent.  In fact, whereas HUB views the "past due" period as ending on March 12, 2002, Defendants contend that all Fixed Basic Rent owed from October 1, 2001 to April 15, 2005 is now "past due."  As for future Fixed Basic Rent owed from April 15, 2005 until February 16, 2012, this Court should order Defendants to pay such rent as it becomes due, rather than accelerating, because the Lease provision upon which HUB relies violates well-settled Pennsylvania law which precludes HUB from both accelerating OPI's rental obligation and obtaining possession of and/or re-letting 525. Furthermore, irrespective of the acceleration provision's violating Pennsylvania law, as explained in detail below, under the circumstances of this case, the Court is not obligated to and should not enforce the acceleration provision against OPI.  However, should the Court adopt HUB's view that all rent from March 13, 2002 through February 16, 2012 was indeed accelerated as of March 12, 2002, the entire accelerated amount must be discounted to present value as of that date.

With respect to the $928,885.00 of stipulated interior restoration costs, HUB has not incurred such costs and thus has not been damaged in whole or in part by any breach on Defendants' part.  In fact, for reasons set forth below, HUB could not incur these costs to restore the interior because it is simultaneously seeking to enforce the Lease by way of an acceleration of rent payments.  If HUB prevails on its acceleration argument, OPI would have an unassailable right to occupy 525 until the end of the Lease term in 2012.  If OPI is occupying 525, HUB cannot compel OPI to perform the interior restoration for which it is seeking payment before the end of the Lease term.  Moreover, for reasons set forth in the reports of Defendants' expert

Timothy B. Monahan, 525's interior will be demolished and rebuilt to suit the needs of a new tenant. Therefore, it would as a practical matter be nonsensical for OPI to be obligated to restore the interior of 525 to its pre-2001 Flood condition only so it can be demolished and again rebuilt for a new tenant.

Finally, HUB's claim for attorneys' fees is wholly devoid of any merit. The Lease's third party indemnification provision clearly has no applicability to any fees incurred to prosecute this suit or appeal property taxes associated with 525. Nor is the indemnification provision triggered by the lawsuit brought by OPI's customer Fujisawa, as HUB may be found negligent in that lawsuit. Defendants would then have no duty to indemnify per the provision's terms. Equally groundless is HUB's reliance on both federal and Pennsylvania law providing a bad faith exception to the American Rule against fee-shifting. Notwithstanding HUB's gross mischaracterizations concerning Defendants' pre-suit conduct and behavior during this litigation, Defendants never acted to mislead HUB and at all times relied upon reasonable legal arguments.

Consequently, the calculation of past due Fixed Basic Rent and Accelerated Rent is **$4,849,419.20**, itemized as follows:

| | |
|---|---|
| Fixed Basic Rent (October 1, 2001 to April 15, 2005) | $3,244,666.78 |
| Late Charge of 5% on Fixed Basic Rent | $162,233.34 |
| Prejudgment Interest of 6% on Fixed Basic Rent and Late Charge | $359,019.66 |
| Additional Rent (October 1, 2001 to April 15, 2005) | $1,078,594.42 |
| Mechanics' Lien Fees as Other Additional Rent | $4,905.00 |

## III.    ARGUMENT

### A.    The Acceleration Provision In The Lease Should Not Be Enforced

As a component of Fixed Basic Rent, HUB claims that rent from March 12, 2002 through February 16, 2012 became due and owing at the time of HUB's Notice of Default and

8

Acceleration on March 12, 2002.  HUB relies on Section 12.02 of the Lease, entitled

"Remedies," which states in pertinent part as follows:

> Section 12.02.  <u>Remedies</u>.  Upon the occurrence of an Event of Default, and at any time thereafter, Landlord shall have the following rights **and may elect any one or more** [emphasis added] of the following remedies:
>
> (a)      To accelerate the whole or any part of the Fixed Basic Rent for the remainder of the Term ("the Accelerated Rent"), which Accelerated Rent shall be discounted to present value on the basis of a discount rate equal to the prime rate offered by CoreStates Bank, N.A., applied and calculated on the date of receipt by Landlord of such Accelerated Rent; and shall be deemed due and payable as if, by the terms and provisions of this Lease, such Accelerated Rent was on that date payable in advance.
>
> (b)      Without waiving Landlord's right to recover the Accelerated Rent as herein provided, Landlord may re-enter the Premises, and, at the option of Landlord . . . repossess and enjoy the Premises.  Upon recovering possession of the Premises by reason of an Event of Default, Landlord may, at Landlord's option, either terminate this Lease or . . . relet the Premises . . . .
>
> (c)      Without waiving Landlord's right to recover the Accelerated Rent as herein provided, Landlord may terminate the Lease and thereupon all rights of Tenant under this Lease shall expire and terminate and Tenant shall forthwith quit and surrender possession of the Premises in the condition specified in Section 8.01 hereof.

Ex. A, § 12.02.

The Lease defines the events which constitute an "Event of Default", including the failure

to pay rent and utilities, and Tenant's failure to "perform or observe any other material provision,

condition or requirement of this Lease. . . ." Ex. A, § 12.01. With respect to rent acceleration,

the Lease enables HUB to elect to accelerate the rent for the remainder of the term "[u]pon the

occurrence of an Event of Default." Ex. A, § 12.02(a).[5] As additional cumulative remedies,  the

---

[5] Accelerated Rent is to be discounted to present value as stated in section 12.02(a).

9

Lease states that HUB could repossess the Premises, relet the Premises and terminate the Lease. Ex. A, § 12.02(b) and (c); § 12.04. When bringing this lawsuit, HUB elected to accelerate only and did not seek to terminate the Lease.

Accelerated rent provisions are generally enforceable in Pennsylvania on the theory that they serve as a "guarantee to the lessor that he will receive immediately all of the monies (or other compensation) to which he is entitled under the lease without having to harass a reluctant tenant as periodical payments become due." Pierce v. Hoffstot, 236 A.2d 828, 830 (Pa. Super. 1967). See also Moretti v. Zanfini, 193 A.106, 108 (Pa. Super. 1937) (describing acceleration of rent provisions as "penalties in favor of the lessor"). In this matter, OPI argued that the Lease was terminated after the 2001 Flood because OPI could not longer conduct business at 525 as prescribed in the Lease. In granting HUB's motion for summary judgment, this Court has decided that OPI breached the lease by stopping rent payments. However, there is no indication that HUB will have to harass OPI for payments as they become due. Under the circumstances of this case, as they now exist, Pennsylvania law does not require that an acceleration provision be enforced. See American Multi-Cinema, Inc. v. Posel Enterprises, Civ. A. No. 91-3783, 1992 WL 328891 (E.D. Pa. Oct. 27, 1992).

In American Multi-Cinema ("AMC"), this Court adopted the reasoning set forth in the above Pennsylvania Superior Court cases to determine that there may be occasions where a landlord is not entitled to accelerate rent following a default by a tenant **even if the lease contains a valid acceleration provision**. Plaintiff AMC brought a declaratory judgment action seeking to terminate its lease with a movie theater owned by defendant Posel Enterprises. After AMC occupied Posel's building for more than 15 years, an asbestos problem was discovered

10

which was not appropriately remedied by Posel. AMC vacated the property and Posel asserted

claims for accelerated rent under a valid acceleration provision in the lease.

While this Court held that AMC was liable for future rent under the lease, it denied

Posel's claim for acceleration. Judge O'Neill cited the Pierce v. Hoffstot and Moretti v. Zanfino

cases in support of the proposition that acceleration clauses are intended to guarantee that the

lessor will receive all monies to which he is entitled without having to harass a reluctant tenant

as the rent becomes due. AMC, 1992 WL 328891, at *9. Judge O'Neill then stated:

> In accordance with my findings and conclusions, AMC is
> responsible for making rental payments pursuant to the terms of
> the lease. Because the evidence does not support a conclusion that
> Posel will have to harass a reluctant tenant to receive rental
> payments, **acceleration of rent would be a draconian remedy at
> this time**.

Id. (emphasis added). Judge O'Neill did not enforce the acceleration clause.

Importantly, this Court's discretion not to enforce an acceleration clause finds further

support in the Restatement (Second) of Property § 12.1 cmt. k (1977):

> The greater severity of the rent acceleration clause justifies
> blunting its thrust where equitable considerations are present. A
> willingness on the part of the tenant to provide adequate security
> for the future payment of rent as it becomes due should block the
> enforcement of the rent acceleration clause.

Id.; see also Cain Partnership Ltd. v. Federal Deposit Ins. Corp., 961 F.2d 1576, 1992 WL

98024, at *5 (6th Cir. 1992) (unpublished disposition) (applying Restatement to hold that,

although generally valid under Tennessee law, "courts may deny enforcement if a clause is

unconscionable or blocked by equitable considerations").

Under section 12 of the Lease, upon OPI's discontinuing rent payments HUB had the

option of either terminating the Lease, retaking possession of 525 and attempting to re-let 525, or

11

accelerating OPI's rental obligation. After having had many months to consider these options, HUB chose only the latter.

Here, equitable considerations warrant non-enforcement of the Lease's accelerated rent provision. First, there is no question that, from the inception of the Lease in 1997 until the 2001 Flood, OPI and its predecessor always paid rent on a timely basis. See Account Listings (attached hereto as Exhibit "M".) After the 2001 Flood, OPI ceased paying rent, solely because, like in the AMC case, it reasonably believed then that the Lease was terminated, due to 525 being rendered unsuitable for its intended purpose.

Second, since the 2001 Flood, OPI has not given HUB reason to fear that OPI is not financially capable of fulfilling its obligations under the Lease. Following the 2001 Flood, OPI communicated to HUB that it could no longer perform its business at 525, and that the Lease was therefore terminated under the doctrines of frustration of purpose and impracticability. The parties then spent many months attempting to resolve their disagreement over the remaining Lease obligation. It was only when HUB determined that there was no way for the parties to resolve their disagreement that it sent a notice of default and demand for accelerated rent on March 12, 2002 and filed this lawsuit two months later. Then, of course, from the inception of the litigation, and since this Court's grant of summary judgment in favor of HUB, OPI has not made rent payments because it has the right to appeal that order. However, OPI's not having made rent payments since the 2001 Flood should not be taken as an inability to make the rent payments or an unwillingness to abide by any final Court judgment entered at the conclusion of this case. OPI has at all times been and remains able to meet its financial obligations under the Lease. HUB will not have to pursue OPI to collect rent as it becomes due in the future. Despite

12

the catastrophic nature of the 2001 Flood, OPI and its parent OCR can readily satisfy their

obligation under the Lease to pay rent on a monthly basis as they did prior to the 2001 Flood.

Third, this Court need look no further than the Lease Estoppel Certificate (attached hereto

as Exhibit "N") for grounds against enforcement of the Lease's acceleration provision.  On

September 15, 1997, in connection with HUB's purchase of 525 from VDA, OPI's predecessor

Bio-Pharm provided certain certifications with respect to the Lease "for the benefit" of VDA and

HUB.  See Ex. N.  Notably, the Certificate states:

> 3.    That the Lease constitutes a legally valid instrument
> binding and enforceable upon Tenant in accordance with its terms,
> **subject to equitable principles** of general application (whether in
> a proceeding at law or in equity) and applicable bankruptcy,
> insolvency, reorganization, moratorium or other similar laws
> affecting the rights of creditors generally and **the exercise of
> judicial discretion;**

Ex. N, ¶ 3.  Thus, the parties clearly intended and understood that all Lease provisions would not

necessarily be enforced in all circumstances.

In light of these significant equitable considerations, compelling OPI to now pay

accelerated rent through 2012 (a lump sum in excess of $5 million)  would be imposing a

punitive and draconian remedy contrary to Posel.[6]  In addition, as demonstrated by several recent

decisions from other courts, an acceleration clause such as the one at issue operates as an

unenforceable penalty when it applies to an assortment of major and minor breaches, allows for

immediate repossession, and does not require a re-renting of the premises.  See IPC Retail

Props., LLC v. Oriental Gardens, Inc., 86 P.3d 543 (Kan. Ct. App. 2004); Cummings Props.,

---

[6] Fixed Basic Rent due on the balance of the Lease term from April 15, 2005 to February 16, 2012 totals
$6,320,258.62.  Per Section 12.02(a) of the Lease, discounting this amount to present value using a discount rate of
5.75% as of April 15, 2005 results in a calculation of $5,256,884.29.

13

LLC v. Nat'l Communications Corp., 2004 Mass. App. Div. 112 (Mass. Dist. Ct. 2004); Ross

Realty v. V & A Iron Fabricators, Inc., 2004 WL 2381207 (N.Y. App. Div. Oct. 21, 2004).

In IPC Retail Properties, the court held that an acceleration rent clause was an

unenforceable penalty because it allowed the commercial landlord to terminate the lease and

declare all future payments immediately due and payable upon major or minor breach of contract

(such as painting an unauthorized sign) without regard to the actual injury suffered. The court

stated that "the proper measure of damages is the difference, reduced to present value, between

the rent fixed in the lease and the sum for which the premises are rented to other parties for the

remainder of the term." 86 P.3d at 550. In Cummings Properties, the court did not enforce an

accelerated rent provision, which applied to lessee's failure to pay rent as well as additional rent

such as taxes or service invoices, because the acceleration could be "greatly disproportionate" to

the loss. In Ross Realty, the court refused to enforce an accelerated rent clause which did not

"require the landlord to re-rent the premises upon its recovery of possession after a default in rent

and to apply the rent received from the re-renting to the benefit of the tenant." 2004 WL

2381207, at *1. These recent decisions are consistent with the decision of this Court in Mid-

Atlantic Equip. Corp. v. Elder, No. 95-CV-886, 1995 WL 447602 (E.D. Pa. July 25, 1995),

wherein this Court applied California law to invalidate an accelerated rent provision providing

for acceleration and repossession on the grounds that the lessor was not required to repossess,

relet or sell, and then hold the lessee "liable for the excess of the rent reserved over any proceeds

from the relet or sale." 1995 WL 447602, at *4.

Indeed, the Lease as written affords HUB the same draconian relief which courts,

including this one, have found to be unenforceable. Read literally, HUB could actually force an

acceleration of millions of dollars, and repossess 525, simply because OPI did not pay a utility

14

bill within 10 days of a demand by HUB to do so. See Ex. A, § 12.01(d).[7] Further, HUB could

obtain a double recovery, which is contrary to Pennsylvania law, by exercising cumulative

remedies (such as acceleration and repossession), resulting in a substantial windfall. Hence, it is

beyond dispute that the acceleration provision in the Lease is punitive in nature and is not

intended to safeguard HUB's right to receive rent payments. It therefore violates Pennsylvania

law and should not be enforced.[8]

Accordingly, because there is no possibility that HUB would have to pursue OPI to

collect the rent under the Lease as it becomes due, and because the broad remedies provision

which HUB seeks to invoke constitutes an unenforceable penalty, this Court should not enforce

the acceleration clause.

Alternatively, should the Court enforce HUB's March 12, 2002 Notice of Acceleration

and deem all Fixed Basic Rent from March 12, 2002 through February 16, 2012 due and payable

as of the Notice date, then it should reject HUB's incorrect methodology in favor of the

methodology provided by Defendants below. On page 12 of its trial brief, HUB divides the ten

year period of rent into two portions: 1) an undiscounted portion from March 13, 2002 to April

15, 2005; and 2) a discounted portion from April 15, 2005 to February 16, 2012, reduced to

---

[7] The right to accelerate for this type of minor breach persuaded the IPC Reatil Properties and Cummings Properties courts not to enforce acceleration clauses.

[8] Although HUB apparently does not dispute the point, it must be noted that, if Defendants are required to pay rent, accelerated or not, they are undoubtedly entitled to possession and use of 525 until the end of the Lease term. See, e.g., Finkle v. Gulf Western Mfg. Co., 744 F.2d 1015, 1021 (3d Cir. 1984); Onal v. BP Amoco Corp., 275 F. Supp. 2d 650, 668 (E.D. Pa. 2003); H.A. Steen Indus., Inc. v. Richer Communications, Inc., 226 Pa. Super 219, 225 (1973); Pierce v. Hoffstot, 211 Pa. Super 380, 384 (1967). This rule of law applies even where the parties signed a lease which provides for such cumulative remedies, as does the Lease at issue. See Homart Dev. Co. v. Sgrenci, 443 Pa. Super. 538 (1995); Hirsh v. Carbon Lehigh Intermediate Unit #21, 65 Pa. D. & C.4th 390, 403 (Pa. C.C.P. 2003). Further, interference with the possessory rights of the tenant by re-letting the premises after payment of accelerated rent entitles the tenant to receive a credit in the amount of rent paid by the replacement tenant. See, e.g., H.A. Steen, 226 Pa.Super at 223-25. As this Court stated: "This rule prevents a non-breaching lessor even from obtaining the 'double recapture' that would result from a rule allowing a landlord to possess the property, and possibly reap a profit from renting or selling it, at the same time that he collects rent from a breaching tenant." Onal, 275 F. Supp.2d at 668.

present value as of April 15, 2005 using today's discount rate of 5.75%. HUB apples a 6% prejudgment interest from its March 12, 2002 Notice of Acceleration until April 15, 2005, however, on both the undiscounted and discounted portions. This approach is flawed in several respects.

First, HUB fails to discount the 2002-2005 years, despite the fact that Section 12.02(a) of the Lease requires the discounting of all Accelerated Rent. In addition to contravening the Lease, HUB's failure to discount is inconsistent with its own demand for a late charge and prejudgment interest for the same three year period. By failing to discount 2002-2005 rent to its value in 2002, but simultaneously charging prejudgment interest from 2002, HUB is seeking a windfall. Essentially, HUB wants 6% interest starting from 2002 on money it was not scheduled to receive until 2003, 2004, or early 2005 without having to first discount that same money back to the date when the interest starts to accrue. This approach would award HUB an amount greater than the value of all the rent HUB would have actually received if Defendants had paid past rent over time as it accrued monthly.

Second, by discounting the 2005-2012 rent to its value in 2005, but simultaneously charging prejudgment interest from 2002, HUB is seeking another windfall. Essentially, HUB wants 6% interest on future money without having to first discount that same money back to the date when the interest starts to accrue. As was the case with rent from 2002-2005, HUB's approach would award HUB an amount greater than the value of all the rent HUB would actually receive if Defendants had paid future rent over time as it accrued monthly.

In short, although HUB states on page 18 of its brief that Pennsylvania law seeks to place the aggrieved party "in the same position he would have occupied had there been no breach," HUB asks this Court to place it in a <u>better</u> position. Accordingly, HUB's methodology should be

16

rejected.

Instead, in the event this Court agrees with HUB that all future rent was accelerated on March 12, 2002, such that HUB is entitled to a late charge and prejudgment interest, the only correct methodology is to first discount such future rent to its present value on the date of acceleration, March 12, 2002, using the appropriate discount rate in effect at that time, 4.75%.[9] Consequently, the total amount of Fixed Basic Rent, with acceleration, would be **$9,645,679.91**, computed as follows:

| | |
|---|---|
| Rent due from October 1, 2001 to March 12, 2002 | $434,000.04 |
| 5% Late Charge | $ 21,700.00 |
| 6% pre-judgment simple interest on Rent Due and Late Charges from October 1, 2001 to April 15, 2005 | $ 90,958.09 |
| Subtotal | $   546,658.13 |
| Rent due from March 12, 2002 to February 16, 2012 | $9,130,925.36 |
| Rent due from March 12, 2002 to February 16, 2012 Discounted to Present Value as of March 12, 2002 at 4.75% | $7,309,223.29 |
| 5% Late Charge | $   365,461.16 |
| 6% pre-judgment simple interest on Present Value of Rent Due and Late Charge from March 12, 2002 to April 15, 2005 | $1,424,337.33 |
| Subtotal | $9,099,021.78 |
| GRAND TOTAL | **$9,645,679.91** |
| 6% *per diem* on Grand Total (post April 15, 2005) | $1,585.59 |

---

[9] One of Defendants' damage experts, David L. Crawford, Ph.D. of Econsult Corporation, is prepared to testify as to the accuracy of this discount rate in accordance with the Lease and to the soundness of the methodology presented herein from an economic perspective.

**B.**    <u>A Discretionary Award of Greater Than 6% Interest Is Not Warranted</u>

Despite presenting calculations of Fixed Basic Rent based upon 6% prejudgment interest,

HUB claims in its trial brief that it would be appropriate for the Court to award prejudgment

interest at a rate in excess of the statutory rate of 6% due to Defendants' alleged unjust

enrichment. As noted by the Third Circuit in <u>Peterson v. Crown Financial Corp.</u> 661 F.2d 287,

(C.A.Pa., 1981), however, Pennsylvania courts "without exception" apply the mandatory 6%

pre-judgment interest rate in situations like the present one in which the defendant is held liable

for breach of a contract to pay a definite sum of money and the plaintiff sues for contract

damages. <u>Id.</u> at 295; <u>see also</u> <u>Sun Shipbuilding & Dry Dock Co. v. United States Lines, Inc.</u>, 439

F.Supp. 671 (E.D.Pa. 1977) (6% pre-judgment interest rate applied to action to recover contract

damages); <u>Barney Machinery Co. v. Continental M.D.M., Inc.</u>, 434 F.Supp. 596 (W.D.Pa. 1977)

(same); <u>Formigli Corp. v. Fox</u>, 348 F.Supp. 629 (E.D.Pa. 1972) (same); <u>Penneys v. Pennsylvania</u>

<u>Railroad Co.</u>, 408 Pa. 276 (1962) (same); <u>Miller v. City of Reading</u>, 369 Pa. 471 (1952) (same).

The application of a prejudgment interest rate above the 6% statutory rate has

consistently been denied by Pennsylvania courts where plaintiffs' claims are based in contract

and not equity. <u>See</u> <u>The Mountbatten Surety Co., Inc. v. Fidelity and Deposit Co. of Maryland</u>,

2000 WL 375259 (E.D. Pa. Apr. 11, 2000)("While there are indeed elements of a restitution

claim in Mountbatten's action, these are not sufficient to take this case out of the standard rubric

of interest calculation for breach of contract cases."); <u>Carroll v. Philadelphia Board of Pensions</u>

<u>and Retirement Municipal Pension Fund</u>, 735 A.2d 141, 146-147 (Pa. Commw. Ct. 1999) ("The

six-percent statutory rate applies in contract matters."); <u>Daset Mining Corp. v. Industrial Fuels</u>

<u>Corp.</u>, 473 A.2d 584, 596-597 (Pa. Super. 1984) (same).

18

In the instant case, HUB's claims sound in contract, not equity, as recognized by this Court. See Portnoy v. Omnicare Pharmaceutics, Inc., No. Civ. A. 02-2905, 2004 WL 1535780, *5 (E.D. Pa. Jun. 25, 2004) (J. Green) ("Plaintiffs' Motion for Summary Judgment will be granted as to the breach of contract claims, which subsumes any claims under the unjust enrichment theory."). Therefore, an award of prejudgment interest in excess of the statutory rate in not appropriate as a matter of law and should be denied.

## C.    Defendants Are Not Obligated To Restore The Interior Of 525

In addition to its rent claims, HUB is claiming damages of almost $1 million for costs it allegedly must incur to restore and repair the interior of 525.  Four separate sections of the Lease address Defendants' alleged obligation regarding the condition of the interior of 525.  Article 8 is entitled "Maintenance and Repairs".  Section 8.01 states in pertinent part: "At the expiration of the Term, Tenant shall deliver the Premises in broom clean condition, reasonable wear and tear excepted." Exhibit A, § 8.01.  Article 10 is entitled "Insurance and Damage." Section 10.02 of Article 10 is entitled "Damage or Casualty" and states in pertinent part as follows:

> (a)  In case the Premises or any portion thereof shall be totally or partially damaged or destroyed by fire or by any other casualty whatsoever, then Landlord and Tenant shall proceed with reasonable promptness, and in accordance with paragraph (c) below, to repair and restore the Premises to at least as good a condition as that which existed immediately prior to such fire or other casualty . . .

Exhibit A, § 10.02(a).

However, three other sections of the Lease bear more directly on the question of Defendants' alleged obligation with respect to the interior of 525 in the context of this case. Article 4  is entitled "Construction of Improvements."  Section 4.01(a) states that at the outset the Landlord would be responsible for "demolition of all interior improvements currently existing in

the Premises . . ." Exhibit A, § 4.01(a). The remainder of Article 4 outlines the parties'

obligations for a complete reconstruction of the interior of 525 in preparation for conducting the

clinical pharmaceutical manufacturing business. Thus, it is clear that when VDA leased 525 to

Bio-Pharm in 1996, what VDA delivered to Bio-Pharm was a building with an open interior

which Bio-Pharm then refitted specifically for its needs. See Stipulation CP11-CP14.

Since BioPharm completed its construction of the interior of 525, it and now OPI's

ability to further alter the interior during the lease term has been controlled by section 9.02 of the

Lease, entitled "Alterations," which states in pertinent part that:

> **Tenant may, at its sole cost, and without the prior written consent of Landlord**, make such interior nonstructural alterations, additions, and improvements in and to the Premises **as it may deem desirable for its use**, provided that Tenant notifies Landlord of Tenant's intention to perform such alterations, additions and improvements and provides Landlord with a copy of any plans and specifications relating thereto. . . ."

Ex. A, § 9.02 (emphasis added).

Finally, section 12.02(b) of the Lease speaks directly to the financial obligation for

restoration of the interior in the event of an alleged default by OPI:

> . . .Upon recovering possession of the Premises by reason of an Event of Default, Landlord may, at Landlord's option. . .make such alterations and repairs as may be necessary in order to relet the Premises . . .upon such reletting all rents received by Landlord from such reletting shall be applied: first, to the payment of any costs and expenses of such reletting, including. . .all costs of such alterations and repairs. . .

Ex. A, § 12.02(b).

First, HUB can in no way sustain its burden of proving any damages in this regard

because HUB has decided not to terminate the Lease. In fact, as discussed in section III(A)

supra, HUB is precluded from reconstructing 525's interior because, as a matter of law, such an

20

act would interfere with OPI's possession of 525. See, e.g., Finkle v. Gulf Western Mfg. Co.,
744 F.2d 1015, 1021 (3d Cir. 1984); Onal v. BP Amoco Corp., 275 F. Supp.2d 650, 668 (E.D.
Pa. 2003); H.A. Steen Indus., Inc. v. Richer Communications, Inc., 226 Pa. Super 219, 225
(1973); Pierce v. Hoffstot, 211 Pa. Super 380, 384 (1967); see also Ex. A, § 9.02 (empowering
Tenant with interior alterations).

Furthermore, the specific terms of the Lease defeat HUB's claim for interior restoration
costs. HUB bases its claim for these repair costs on Section 10.02 of the Lease, which governs
the obligations of the parties regarding the repair of 525 following a casualty. Section 10
addresses the availability of insurance proceeds, abatement of rent and other matters associated
with repairing 525 so that business operations can continue. However, Section 10 is limited to
specifying (as between the landlord and the tenant) who is to be responsible for repairs following
a casualty, and presumes that 525 is going to be repaired for the purpose of continuing business
operations. Section 10 does not contemplate OPI's rights and obligations concerning the interior
of 525 over the duration of the term of the Lease in the absence of a casualty, and does not
address the situation where, as here, the tenant's business terminated as a result of a casualty.
Section 10 also does not contemplate a scenario where, as here, a court might order that rent
continue to be paid for the duration of the Lease term, regardless of whether the building is
actually reoccupied. Therefore, although section 10 of the Lease may have been relevant if OPI
were able to restart its business at 525, it is no longer applicable to this dispute.

Rather, obligations of the parties in this case concerning the condition of the interior of
525 during the Lease term are governed by the other sections of the Lease pertaining to physical
changes to 525. See Ex. A, "Construction of Improvements" (Section 4.01 et seq.);
"Maintenance and Repairs" (Section 8.01 et seq.);"Alterations" (Section 9.01 et seq.) and, most

21

importantly for purposes of this dispute, "Remedies" (Section 12.02(b)). As described above, the Lease states that the interior of 525 was demolished by OPI's predecessors and refitted for the clinical pharmaceutical manufacturing business. The Lease also states that the Tenant would over the term of the lease alter the interior of 525 to suit its needs. Finally, the Lease requires the Tenant to deliver 525 to the Landlord at the conclusion of the lease term in broom-clean condition, reasonable wear and tear excepted. Nowhere does the Lease require the Tenant to maintain 525's interior in "broom clean" or any other specific condition or configuration <u>during the lease term</u>. Finally, section 12.02(b) specifies that any costs for repairs to 525 which are made in conjunction with reletting are to be born by HUB, not OPI, as section 12.02(b) states that the rents received from a new tenant following reletting of 525 are to be applied first to costs of reletting, including costs of repairs. This is consistent with section 4.02 of the Lease, which anticipated that the interior of 525 would be built out at the beginning of the tenant's occupancy, not if 525 is vacant and unused.

Therefore, it would be unreasonable and contrary to the language and intent of the Lease to require OPI to pay HUB to restore the interior of 525 to its pre-flood condition. HUB's predecessor VDA delivered to OPI's predecessor Bio-Pharm an empty structure with an open interior, which BioPharm then built out to suit its needs. <u>See</u> Stipulation CP11-CP14. The Lease only requires OPI to deliver 525 back to HUB at the conclusion of the Lease term in broom clean condition; the Lease does <u>not</u> require OPI to deliver 525 with the interior improvements intact, which improvements were uniquely tailored to OPI's business.[10]

---

[10] Taken to its logical extension, HUB's argument would entail the reinstallation of such specialized and dedicated improvements such as the special air handling system which OPI used to maintain consistent temperatures during its stability testing. This would be absurd as 525 is no longer being used for that purpose.

22

OPI is simply not required to deliver 525 in any condition other than that which the

building was in when OPI's predecessor took possession of it in 1997.  See <u>United States</u>

<u>Gypsum Co. v. Schiavo Bros., Inc.</u>, 668 F.2d 172 (3d Cir. 1981) (questioning whether "the

condition of the property, viewed in light of its potential for sale or re-rental, has deteriorated so

unreasonably that the tenants, rather than the landlord, should be required to pay for its

restoration"); <u>Kaplan Co. v. SCM Corp.</u>, Civ. A. No. 83-4762, 1986 WL 8115 (E.D. Pa. July 21,

1986) (discussing covenant to surrender premises at end of lease term in same condition as

received); <u>Platt v. City of Philadelphia</u>, 133 A.2d 860, 862 (Pa. Super. Ct. 1957) (finding

obligation to deliver in the "same state of repair as when the lease commenced"); <u>cf.</u> <u>J.R. Simplot</u>

<u>Co. v. Rycair, Inc.</u>, 67 P.3d 36 (Id. 2003) (holding covenant to surrender in as good condition

must be construed with other lease provisions and does not impose an obligation to rebuild

destroyed premises).  <u>See</u> <u>also</u> Restatement (Second) of Property § 12.2 (3) (1977) (stating tenant

not obligated to restore permissible physical changes where "it would be unreasonable to require

the restoration in the light of the probable future use of the leased property").  None of the cases

cited by HUB stands for the contrary proposition that a tenant must restore the leased premises to

a condition other than the condition of the premises at the time the lease was commenced.  <u>See</u>

HUB's Trial Brief at 17-19.  Accordingly, OPI is only required to deliver to HUB a building,

without interior improvements, and with no damage to the open interior space other than

reasonable wear and tear.

HUB's claim for damages to restore 525's interior is particularly overreaching given the

clear practices in the commercial leasing business with respect to buildings like 525.  <u>See</u>

December 2004 and April 1, 2005 Reports of OPI's damages' expert Timothy Monahan,

Corporate Managing Director of Studley, Inc. (attached hereto as Exhibits "O" & "P").

According to Mr. Monahan, the uniform custom with respect to a flex building like 525 is for the landlord to demolish the interior of the premises when the building is sold or re-let, just as 525 was demolished at the outset of the Lease. See Ex. O at 3.

Indeed, HUB's recent negotiations with Allegheny Valley School ("AVS"), a prospective replacement tenant at 525, validated Mr. Monahan's opinion. These negotiations, which were ongoing as recently as February 23, 2005 (see e-mail from AVS counsel to HUB representatives, attached hereto as Exhibit "Q"), involved the exchange of draft lease agreements and a November, 2004 space plan designed by Wulff Architects (attached hereto as Exhibit "R").[11] As Mr. Monahan opined in his supplemental report of April 1, 2005, and contrary to the opinions expressed in paragraphs 35 and 36 of the Campoli Affidavit, see Exhibit 2 to HUB's trial brief, the Wulff space plan reflects a drastically altered interior from that which currently exists at 525. See Ex. P at 1-2. Consequently, because there is no indication that HUB would actually spend the almost $1 million it is claiming to restore the interior of 525 to its pre-2001 Flood condition, and because all indications are to the contrary, HUB's claim for interior restoration costs seeks to unfairly pocket a windfall.[12]

In short, there is no question that the requirements in Section 10.02 concerning the restoration of the interior of 525 are limited to post-casualty repairs necessary to resume the conduct of the tenant's business and generation of revenue; they are not intended to restrict the Tenant's options in terms of what it can and cannot do to the interior of 525 during the lease term. Interpreting Section 10.02 as such would contradict other sections of the Lease, which

---

[11] Other documentation exchanged between HUB and AVS included HUB's November 29, 2004 lease proposal and December 13, 2004 revised lease proposal. These documents were reviewed by Mr. Monahan in connection with his April 1, 2005 Supplemental Report and are therefore attached hereto as Exhibits "S" and "T".

[12] Although HUB's Trial Brief claims restoration costs in the amount of $1,057,770.00, the parties subsequently stipulated that such costs would be $928,885.00. See Docket #49.

specifically contemplate interior changes by the Tenant at its pleasure during the term of the

Lease and the return of 525 to HUB in the condition in which it was leased in 1996, that is, with

an open, unbuilt interior. Accordingly, HUB's claims for damages to restore the interior of 525

to its pre-flood condition is wholly unsupportable and should be dismissed.

> **D.** **If Defendants Are Obligated To Restore The Interior Of 525, Such**
> **Obligation Does Not Arise Until The End Of The Lease Term**

In the event this Court orders Defendants to restore the interior of 525, the Court should

find that the obligation does not arise until 2012, at the end of the Lease term. Notably, Section

8.01 of the Lease provides: "**At the expiration of the Term**, Tenant shall deliver the Premises in

broom clean condition, reasonable wear and tear excepted." Ex. A, § 8.01 (emphasis added). As

discussed in section III(A) supra, if the Lease is enforced, OPI is entitled to possession and use

of 525 until the end of the lease term in 2012. Further, as discussed in section III(C) supra, there

are little to no restrictions on how OPI is to maintain the interior **during** the lease term. In fact,

the Lease provides OPI  great flexibility in this regard. OPI may alter the interior of 525 as it sees

fit during the term of the Lease.

OPI's interpretation of its obligation to surrender is well supported in the law. See

Kaplan Co. v. SCM Corp., Civ. A. No. 83-4762, 1986 WL 8115 (E.D. Pa. July 21, 1986). See

also Gehan Props II, LTD v. Performance Interconnect, Inc., No. 05-01-01678 –CV, 2002 WL

1136989 (Tex. App. May 30, 2002) (holding obligation to surrender "broom clean and in good

order" accrued when lease terminated); Cruzan v. Franklin Stores Corp., 380 P.2d 190, 194

(N.M. 1963) (finding covenant to keep in repair and surrender in good condition "relates to the

end of the term of the lease and cannot be asserted before expiration of the term"). None of the

cases cited by HUB provides that a tenant must restore the leased premises to the condition of

the premises at the time the lease was commenced prior to the expiration of the lease. See HUB's Trial Brief at 17-19.

Accordingly, if this Honorable Court determines that OPI is obligated to reconstruct the interior prior to delivering 525 to HUB, this obligation does not arise until the end of the Lease term in 2012, or at such earlier time as the Lease may be terminated by the parties.

**E.      HUB Is Not Entitled To Recover Any Attorneys' Fees**

HUB seeks to recover attorneys' fees and costs incurred (a) in this litigation, (b) in defense of a suit brought by one of OPI's customers, Fujisawa Healthcare, Inc., against OPI and against Plaintiffs (Fujisawa Healthcare, Inc. v. Omnicare Pharm., Inc., HUB Properties Trust, et al.), and (c) to obtain property tax relief from the county and school district in which 525 is located.[13] HUB sets forth three legal bases upon which its claims for attorneys' fees rest: the Lease, the "bad faith" exception to the federal "American Rule", and Pennsylvania statute 42 Pa. C.S.A. § 2503. For the reasons discussed infra., none of HUB's arguments have merit.

**1.      HUB is not entitled to recover attorneys' fees under the Lease.**

HUB seeks attorneys' fees from OPI pursuant to the Lease for costs incurred (a) in this litigation, (b) in defense of the Fujisawa case, and (c) in its tax appeal. Under Pennsylvania law, however, there can be no recovery of attorneys' fees without express statutory authority or clear agreement of the parties. See Corace v. Balint, 418 Pa. 262, 271 (1965).   Neither exist here.

**a.      The Lease does not entitle HUB to recover attorneys' fees incurred in defense of this action.**

HUB maintains that the indemnification provision of the Lease affords it the opportunity to collect attorneys' fees from OPI. The provision relied upon, however, is a third party

---

[13] HUB's remaining claim for entitlement to attorneys' fees related to the removal of a mechanic's lien is conceded as it constitutes additional rent per the Lease Agreement.

indemnification clause, and is pertinent only to claims instituted by others in connection with the

tenant's use or possession of the Premises. Section 7.01 of the Lease only protects HUB from

exposure to claims by third parties. It does not contemplate disputes arising between the parties

to the of Lease. It reads:

> Section 7.01. <u>Tenant's Indemnity</u>. Subject to Section 10.05 hereof, Tenant will protect, indemnify and hold harmless Landlord and its agents, affiliates, subsidiaries, parent companies and the officers and directors thereof, from and against any and all claims, actions, damages, liability and expense (including fees of attorneys, investigators and experts) in connection with loss of life, personal injury or damage to property in or about the Premises or arising out of the occupancy or use of the Premises by Tenant or its Agents or occasioned wholly or in part by any act or omission of Tenant or its Agents, whether during the Term, except to the extent such loss, injury or damage was caused by the negligence or willful misconduct of Landlord or its agents. In case any action or proceeding is brought against Landlord and/or its agents, affiliates, parent companies, officers, directors by reason of the foregoing, Tenant, at its expense, shall resist and defend such action or proceeding, or cause the same to be resisted and defended by counsel (reasonably acceptable to Landlord and its Agents) designated by the insurer whose policy covers such occurrence or by counsel designated by Tenant and approved by Landlord. Tenant's obligations pursuant to this Section 7.01 shall survive the expiration or termination of this Lease.

Ex. A at § 7.01.

HUB claims that Section 7.01 requires OPI to indemnify HUB for "expenses occasioned

by defendants' breaches of the Lease." HUB's Trial Brief at 22. The Lease, however, does not

warrant such a broad construction. A lease is a contract and is to be interpreted according to

contract principles. See <u>Hutchinson v. Sunbeam Coal Corp.</u>, 513 Pa. 192, 200 (1986). A

fundamental rule in construing a contract is to ascertain and give effect to the intent of the

contracting parties. See <u>Shovel Transfer & Storage, Inc. v. Pennsylvania Liquor Control Brd.</u>,

559 Pa. 56, 65 (1999). "It is firmly settled that the intent of the parties to a written contract is

contained in the writing itself." Id. at 66.  When the words of a contract are clear and unambiguous, the meaning of the contract is ascertained from the contents alone.  Steuart v. McChesney, 498 Pa. 45, 49 (1982).  See also J.K. Willison, Jr. v. Consolidation Coal Co., 536 Pa. 49, 54 (1994) (contract terms must be construed as manifestly expressed by the parties and according to the accepted and plain meaning of the language used by the parties).  Under Pennsylvania law, indemnification agreements "must be construed strictly and the contract must state the intention of the parties with the greatest particularity."  Kreuger Assoc., Inc. v. ADT Sec. Sys., 11 F. Supp.2d 634, 636 (E.D. Pa. 1998).  Furthermore, "[a]ny ambiguity in the contract must be construed against the party seeking indemnification."  Id.

Section 7.01 of the Lease evidences absolutely no intention to impose a contractual duty on OPI to indemnify HUB for attorneys' fees incurred as a result of litigation between OPI and HUB.  Courts passing on provisions similar to Section 7.01 of the Lease have consistently found that these types of clauses are third-party indemnifications designed to protect landlords from claims instituted by others in connection with the tenant's use or possession of the premises.  See Law v. Reading Co., 312 F.2d 841, 844-45 (3d Cir. 1965); Moore v. Walker, 28 Pa. D. & C.3d 124, 127-28 (Comm. P. Wash. Cty. 1983); accord Hallmark Ins. Administrators, Inc. v. Colonial Penn Life Ins., 697 F.Supp. 319 (N.D. Ill. 1988) (rejecting claim that indemnification provision applied to contractual disputes between parties to the contract even though provision did not expressly limit its application to third-party actions; Sprayberry v. MGC, Inc., 467 So.2d 1 (Fla. Dist. Ct. App. 1985) (holding indemnification clause in lease did not authorize payment of attorney fees incurred by lessor in suing for rent due under lease).

In Moore v. Walker, a case cited by HUB in support of its overly broad construction of Section 7.01, the court specifically rejected the argument that the indemnification clause at issue

applied to litigation between the parties to a lease. See Moore, 28 Pa. D. & C.3d at 127. In fact,

the indemnification clause in Moore contained language that provided a much stronger argument

for HUB's proffered interpretation than the Lease language currently at issue does. That clause

required the tenant to indemnify the lessor for attorney's fees:

> for defense ... [of claims] arising from the **conduct or**
> **management of the business** conducted by Tenant in the leased
> premises, or **from any breach or default on the part of Tenant**,
> in the performance of any covenant or agreement on the part of
> Tenant to be performed pursuant to the terms of this lease ....

Id. (emphasis added). Despite the lessor's contention that this indemnification clause placed the

tenant under a contractual duty to indemnify the lessor for costs incurred as a result of actions

required to be taken by the lessor to enforce the tenant's obligations under the lease, the court

rejected this interpretation. The Moore court concluded that the clause was "a third party

indemnification clause intended to hold [the landlord] harmless for any actions brought by third

parties against the [landlord] in connection with the [tenant's] use or possession of the demised

premises." Id. at 128.[14]

Just as in Moore, the Lease indemnification provision at issue here applies only to third

party claims brought against HUB. Had the parties intended to create a contractual duty for OPI

to indemnify HUB for "expenses occasioned by defendants' breaches of the Lease", they

certainly were capable of doing so. See, e.g., Fitzpatrick v. Consolidated Rail Corp., 1991 WL

61114, *7 (E.D. Pa. 1991) ("In the event of any litigation between Landlord and Tenant with

respect to any of the provisions of this lease, the prevailing party shall be entitled to receive from

---

[14] The only other case cited by HUB in support of its construction of the indemnification clause is Fidelity-
Philadelphia Trust Co. v. Philadelphia Trans. Co., 404 Pa. 541, 173 A.2d 109 (1961), wherein the court held that an
indemnification clause was sufficiently clear to require defendant to indemnify plaintiff for attorney fees incurred in
that case. This case lends no support to HUB's claim for indemnity, however, because the Fidelity court did not
recite the language of the clause in its opinion. Obviously, that clause was much more specific with respect to
attorneys' fees than the clauses before the court in Moore and the instant case.

the other the amount of its reasonable legal fees and related costs of attorneys in connection therewith."); Meritor Credit Corp. v. Total Funding Officenters, Inc., 1989 WL 79765 (E.D. Pa. 1989) (J. Green) (contract required party to pay "fees and expenses of any litigation incident to [a breach of that agreement]."); Storage Realty Corp. v. N. Am. Envtl. Serv., Inc., 841 A.2d 812, 813 (Me. 2004) ("Tenant shall also pay Landlord in successfully enforcing any obligation, covenant or agreement of this Lease or resulting from Tenant's breach of any provisions of this Lease."). In each of the foregoing cases, the indemnification clause sufficiently stated the intention of the parties with the "greatest particularity." Kreuger, 11 F. Supp.2d at 636.

In contrast, HUB's interpretation of Section 7.01 of the Lease finds no support in the plain language of the clause. Indeed, Section 7.01 is silent with respect to whether the parties intended the clause to apply to disputes between the parties. In the absence of such a stated intention, the Court must find the indemnity provision inapplicable to disputes between the parties. Id. Further, to the extent that the Lease is ambiguous, HUB has presented no extrinsic evidence that supports its interpretation. Accordingly, HUB's request for attorneys' fees related to the prosecution of the instant matter, based on the Lease, must be rejected.

> **b.    The Lease does not entitle HUB to recover attorneys' fees incurred in defense of the Fujisawa matter.**

HUB seeks fees and costs in the amount of $240,936.62 for defense of a suit brought by one of OPI's customers, Fujisawa Healthcare Inc. ("Fujisawa"), against both OPI and HUB. HUB alleges that Section 7.01 of the Lease requires OPI to pay for HUB's expenses in defending the Fujisawa case. HUB's claim for recovery, however, is premature because the parties' liability to Fujisawa has not yet been determined.

Section 7.01 of the Lease requires OPI to pay HUB's expenses resulting from third party claims related to property damage "except to the extent such loss, injury or damage was caused

by the negligence or willful misconduct of Landlord or its agents." Ex. A at § 7.01. Fujisawa

alleges in its suit against OPI and HUB that it is entitled to recover damages stemming from,

*inter alia*, the negligence of HUB. Fujisawa Complaint at ¶¶ 61-67 (attached hereto as Exhibit

"U"). Fujisawa's suit is ongoing. To date, there has been no final adjudication of Fujisawa's

negligence claim against HUB. See Docket for Fujisawa v. OPI, HUB et al., Civil Action No.

03-03835 (attached hereto as Exhibit "V"). If it is determined in that case that HUB is liable to

Fujisawa due to its own negligence, OPI will have no duty to indemnify.[15] The Third Circuit has

noted:

> Where a person is under a duty to another to indemnify the other
> against losses suffered as the result of a breach of contract or for a
> tort, the indemnitor is entitled to a trial to determine whether his
> liability has come into existence. He may or may not be under a
> duty to the indemnitee to defend the action against the latter and if
> he is under no such duty he commits no breach by failing to
> defend.

Crawford v. Pope & Talbot, Inc., 206 F.2d 784, 795 (3d Cir. 1953).

Because the parties' liability to Fujisawa, if any, has not yet been determined in that case,

HUB's request to recover attorneys' fees under Section 7.01 of the Lease is premature.[16]

### c. The Lease does not entitle HUB to recover attorneys' fees incurred to obtain property tax relief.

HUB alleges entitlement to nearly $30,000 in attorneys' fees and costs incurred to obtain

property tax relief from the county and school district in which 525 is located, claiming such

relief was required "because the value of the Premises plummeted upon defendants'

---

[15] In fact, depending on the outcome of the Fujisawa case, HUB may have the duty to indemnify OPI for its attorneys' fees related to that matter pursuant to HUB's obligation to indemnify OPI in Section 7.02 of the Lease.

[16] Upon information and belief, HUB's insurer is defending it in the Fujisawa matter. Therefore, if a right to indemnification does exist in favor of HUB, such a right would be limited to HUB's out-of-pocket expenses only, and not the total costs incurred in defense of that action.

abandonment without restoration." HUB's Trial Brief at 20. HUB blatantly mischaracterizes the basis for its application for tax relief in an attempt to recover its attorneys' fees under Section 7.01 of the Lease. As discussed *supra.*, Section 7.01 of the Lease does not afford HUB with the ability to recover its own attorneys' fees arising from disputes between parties to the Lease. Moreover, even if the Lease did allow HUB to recover such fees, HUB would not be entitled to seek reimbursement for attorneys' fees associated with its application for tax relief under these circumstances.

HUB filed tax appeals with respect to 525 due to "floods caus[ing] high vacancy with accompanying loss of income." See Ex. J. HUB's allegation that the relief was required due to "defendants' abandonment without restoration" has no support in the record and at odds with HUB's own tax appeal filing. Further belying HUB's allegation is the fact that HUB filed tax appeals not only for 525, but also for an additional four properties located within the Office Park and not leased by OPI, all of which had been adversely affected by the flood. Id. Quite simply, there is absolutely no support for HUB's allegation that the tax appeals were necessitated by OPI's failure to restore 525. Therefore, HUB's claim for indemnity arising out of its tax appeal expenses should be summarily dismissed.[17]

      **2.**      **HUB is not entitled to recover any attorneys' fees under the bad faith exception to the American Rule.**

HUB claims that OPI's "vexatious misconduct and bad faith" compel the award of attorneys' fees against OPI in this matter under the bad faith exception to the American Rule, which generally prohibits fee-shifting. HUB asserts that OPI has engaged in bad faith conduct

---

[17] HUB's claim should also be dismissed for failure to present competent evidence of expenses associated with the tax appeal for 525. As noted, HUB sought tax relief related to five separate properties located in the Office Park, yet proffered only a single un-itemized invoice for all "Ft. Washington Tax Appeals for 2002." See HUB's Trial Brief at Exhibit 9.

by (a) threatening to fire employees who paid HUB rent, (b) instructing employees to hold off on restoration, (c) allegedly misrepresenting to HUB its intent regarding 525 after the 2001 Flood, and (d) allegedly advancing misrepresentations and frivolous legal arguments to the Court. None of these allegations of bad faith or vexatious misconduct has any merit.

**a.    HUB's allegations of bad faith have no factual support.**

OPI management did not resume rental payments after the abatement period ended based on a good faith belief that the Lease had been terminated due to the consecutive floods which rendered 525 useless for OPI's long-term purposes. The so-called "threats" to fire any employee who paid rent do not evidence of any "bad faith" on the part of OPI, but rather an effort to enforce corporate authority. Kenneth Feld, former President of OPI, testified that, although he was told if anyone paid rent they would be fired, he clarified that neither he, nor any other OPI employee, had authority to pay rent to HUB in the first place:

> I had no ability to make any kind of payment, much less the rent payment. Corporate had taken that responsibility back into their purview. So, you know, the issue of paying rent and us being told we'd lose our jobs was really a moot point as far as we at Omnicare Pharmaceutics felt because we couldn't cut a check anyways.

Ex. E at 101. Thus, there was no bad faith behind management's instruction to OPI employees to not pay rent.

Nor was instructing OPI employees to hold off on restoration "bad faith" conduct. Immediately following the 2001 Flood, OPI transferred whatever manufacturing and packaging work it could to other sites, either by way of arrangements with competitors for use of their facilities, or by setting up temporary production facilities of its own. See Ex. E at 138:1-12; Ex. F at 138:1–139:19. After the 2001 Flood, OPI did conduct extensive cleaning and demolition at 525, at a cost in excess of $2 million. See Ex. G at 32:2-5.

33

After making these arrangements, OPI attempted to ascertain the risk of future flooding at 525 in an effort to determine the feasibility of re-establishing its business there. On August 20, 2001, OPI representatives including Dr. Feld and HUB representatives including David Campoli met with Paul Leonard, Manager of the Township. The meeting was requested by Dr. Feld so that he could learn from the Township what steps if any were being taken by local government to correct the flooding problem at 525. Dr. Feld was seeking assurances from the Township about flood remediation which he could then convey to OPI's customers in an effort to persuade them to continue doing business with OPI at 525. See Ex. C at 41:11–43:2; Ex. H at 117:7-13. At the August 20, 2001 meeting, Mr. Leonard provided no such assurances: "it's not a question of *if* the property is going to flood. It's a question of *when*." Ex. C at 45-46 (emphasis added). Instead, he told everyone that the best strategy for dealing with the risk of future flooding in 525 was to "get out." Ex. H at 151:3–153:3. Mr. Leonard also told Mr. Campoli that 525 was worth "less than zero" because of the flooding problem. Ex. C at 63:5-9.

In the months following the 2001 Flood, OPI communicated with HUB about the future flooding problem in 525. Based upon its customers' reactions to the floods, OPI determined that its customers were not going to send significant future work to OPI at 525.[18] See Ex. F at 82:1-83:8; 87:4-13; 109:22-110:18; see also Ex. D at 133:3-9 ("Numerous clients have made it clear that due to the frequency and severity of the floods in the [Office Park] and due to the fact that the current plants are located on a flood plane [sic] that if operations are not relocated to another location, they will be forced to find alternative suppliers.") OPI also communicated with HUB about this customer problem. See Ex. I at 71:2–8; 75:4-11.

---

[18] This determination was based upon communications with a multitude of customers, including but not limited to Astra Zeneca, Novartis, and Sanofi, as well as Bristol-Myers Squibb, Integrated Therapeutics, Schering-Plough, Macrochem, Geltex and McNeil. See Ex. L at 85:16-86:3; 152:16-153:10; 190:2-16.

34

HUB attempted to ascertain whether the future flooding risk problem at 525 could be remedied by way of physical modifications to the building so that OPI could assure its customers that 525 was no longer going to be subject to flooding. See Ex. H at 119:5-120:7; 139:24–140:6. HUB engaged an engineering firm which proposed various structural changes to 525 to reduce the risk of flooding in the building. Id. at 120:8-122:12; 140:7-19. None of these proposed changes, however, would have prevented flood water from entering 525 in another rain storm similar to that which caused the 2001 Flood. See Ex. I at 94:11-17. Also, the physical modifications to 525 proposed by HUB's engineers would have materially changed the terms of the Lease, because HUB was insisting that the majority of the cost, $4 million, be borne by OPI. See Ex. H at 140:7-19.

As an alternative, HUB offered to address the unsuitability of 525 for future OPI operations due to the risk of future flooding by offering OPI a different building to lease from within its portfolio of properties. See Ex. I at 75:4-14; Ex. K at 201:24-202:6. HUB made this offer because of OPI's customers' fears of the risk to their future clinical trials posed by doing business in 525. See Ex. I at 98:8–99:5. Each of the alternative properties offered by HUB, however, was not suitable due to either space or location. See Morra Dep. (March 4, 2003) (the relevant pages of which are attached hereto as Exhibit "W") at 63:18-21.

Given the foregoing, it was completely reasonable for OPI to instruct its employees to hold off on remediating 525. At the time, it was unclear whether the Township or the engineering firm hired by HUB would propose structural changes to prevent future flooding that would make remediation prior to such changes a waste of time. It was also uncertain whether OPI would accept a different building to lease from within HUB's portfolio of properties. In addition, when it became apparent that the purpose of the Lease was no longer achievable at 525,

it made no sense to continue to outfit the interior to bring 525 back to its original condition, when it would be of no use even in such condition. OPI determined not to waste money reinstalling drywall and ceiling tiles which had been removed as part of the cleaning process, when they will surely be demolished and reconfigured, if and when 525 is ever leased to a different tenant. Thus, the decision to hold off on restoring 525 to its pre-Flood condition was entirely reasonable.

Finally, HUB's allegations that OPI misrepresented to HUB its intent regarding 525 after the 2001 Flood, and misrepresented and advanced frivolous legal arguments to the Court in defending this matter, are unsupportable. With respect to the alleged misrepresentations prior to the commencement of this action, OPI advised HUB that it intended to vacate 525 within a few months of the June 2001 Flood, not, as HUB contends, in mid-2002. Indeed, by November 2001, HUB was actively offering OPI a substitute building from its portfolio of properties because of 525's unsuitability for the clinical trial manufacturing and testing operations mandated by the Lease. HUB's implication that OPI hid its intention is flatly contradicted by the fact that HUB was offering OPI different buildings from its portfolio in November 2001 and as late as February 2002, to substitute for 525.

HUB's allegations that OPI made misrepresentations to the Court and made frivolous legal arguments are also unsupportable. HUB alleges that the factual predicates to OPI's defenses of frustration of purpose, commercial impracticability, and mutual mistake, "appear to be based on misrepresentations to the Court." HUB's Trial Brief at 27. However, HUB proffers no evidence in support of this allegation. This is because no support for it exists. Likewise, HUB offers no support for its claim that the defenses advanced by OPI in this action were frivolous, e.g., "lacking in any arguable basis or merit in either law or fact." See

115304.00401/21375805v1

http://www.dictionary.com. This Court did not find so in its June 25, 2004 opinion. Rather, the Court acknowledged that the defenses of frustration of purpose, commercial impracticability, and mutual mistake were valid exceptions to enforcement of contracts under Pennsylvania law, but determined not to apply them here because it found that the parties contemplated and contractually allocated the risk of casualty between the parties. See Portnoy v. Omnicare Pharmaceutics, Inc., 2004 WL 1535780, *3. The Pennsylvania Supreme Court has recognized that lack of merit is not the legal equivalent of frivolity. Smith v. Com., Pennsylvania Bd. of Probation and Parole, 524 Pa. 500, 507, 574 A.2d 558, 562 (1990). Here, OPI's defenses may have been determined to not be meritorious, but they were far from frivolous.

### b.    HUB's allegations of bad faith have no legal support.

Under the "American Rule," parties to a lawsuit bear their own expenses, regardless of which party prevails. Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 247 (1975). Several exceptions to the American Rule have been created. One such exception is where a party engages in bad faith or oppressive litigation practices. Keck v. Commercial Union Ins. Co., 758 F. Supp. 1034, 1041 (M.D. Pa. 1991). This bad faith exception is punitive in nature and warranted only when a party's conduct reflects a "willful and persistent defiance of the law." Id. (quoting Kahan v. Rosenstiel, 424 F.2d 161, 167 (3d Cir. 1970)). "[T]he standard for applying counsel fees under the bad faith exception is quite stringent." Id. See also Singer v. Uni-Marts, Inc., Civ. Action No. 84-668, 1985 WL 351, *5 (W.D. Pa. Apr. 30, 1985) ("[T]he moving party bears a heavy burden in establishing bad faith and the Court must exercise this power sparingly… An award should be made only in extraordinary circumstances and requires more than a showing of a weak or legally inadequate case.").

As discussed supra., OPI's conduct did not constitute "bad faith." Indeed, the cases cited by HUB in support of its entitlement to attorneys' fees under the bad faith exception make clear why application of the exception is not applicable to the facts before the Court. In each of the cases cited by HUB, the sanctioned party engaged in a course of conduct in bad faith that went well beyond the bounds of conventional litigation tactics to gain an unfair advantage over an adversary. Specifically:

- In Chambers v. NASCO, 501 U.S. 32 (1991), the Court upheld the award of attorney fees where the defendant made multiple attempts to contravene the court's injunctive orders and judgment on the merits, and filed frivolous appeals;

- In Perichak v. Int'l Union of Elec. Radio & Mach. Workers Local 601, 715 F.2d 78 (3d Cir. 1983), the court upheld the award of attorney fees where the complaint was based on perjury and action could not have been maintained with any reasonable prospect of prevailing on the merits;

- In Aleyska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240 (1975), the Court found that the bad faith exception was inapposite where the position taken by the party was manifestly reasonable and assumed in good faith;

- In Fairley v. Patterson, 493 F.2d 598 (5th Cir. 1974), the court awarded attorney fees against the State under the "private attorney general theory" where the State had violated clearly established law;

- In Sierra Club v. United States Army Corps of Eng'rs, 590 F. Supp. 1509 (S.D.N.Y. 1984), Sierra Club v. United States Army Corps of Eng'rs, 776 F.2d 383 (2d Cir. 1985), and American Hosp. Ass'n v. Sullivan, 938 F.2d 216 (D.C. Cir. 1991), the courts sanctioned the government for fraudulently buttressing the administrative record to rebut challenges to agency actions; and

- In Cape Verde v. A&A Partners, 89 F.R.D. 14 (S.D.N.Y. 1980), the defendant was sanctioned for asserting non-colorable defenses, in light of an admission that a debt was due and owing, and also improperly attempted to shield assets from judgment while the case was pending.

In none of the foregoing cases was a defendant sanctioned for simply asserting defenses that were ultimately rejected by a court. Indeed, it is hard to imagine a scenario where a losing party in any litigation would not be entitled to attorney fees under HUB's line of reasoning –

HUB's argument would effectively have the exception that allows recovery of attorneys' fees consume the rule prohibiting such recovery. HUB's claim for attorneys' fees under the bad faith exception to the American Rule should therefore be rejected.

### 3. HUB is not entitled to recover any attorneys' fees under state law.

Similarly, HUB's argument that it is entitled to attorney fees under Pennsylvania law has no merit. As consistently noted by Pennsylvania courts, 42 Pa. C.S.A. §2503 does not entitle a party to an award of counsel fees where the record contains no evidence that the adverse party's actions are intended to harass, the methods the adverse party employed in the litigation are not oppressive, and the primary issue raised is ripe for judicial review. Baverso v. State Farm Ins. Co., 407 Pa. Super. 164 (1991). In addition, 42 Pa. C.S.A. §2503 is not applicable to sanction conduct that occurs before a suit is initiated. Bruno v. Masser, 10 Pa. D. & C.4th 117 (1990) (holding 42 Pa. C.S.A. §2503 only applies to a party "who commences a clearly frivolous lawsuit or otherwise act[s] in such a manner *during the lawsuit* that is arbitrary, vexatious or in bad faith.") (emphasis added). As discussed supra., OPI's conduct during this litigation (as well as prior to the litigation) does not constitute arbitrary, vexatious or bad faith conduct.

Once again, a close examination of each of the cases relied upon by HUB reveals that a sanction of attorney fees under 42 Pa. C.S.A. §2503 is not appropriate under the present circumstances. Specifically:

- In Lichtenstein v. Lichtenstein, 481 F.2d 682 (3d Cir. 1973), the Third Circuit reversed a sanction of attorney fees where the sanctioned party refused to pay plaintiff according to a court-supervised settlement agreement where the objection to pay was based on a plausible construction of the agreement;

- In Frick v. McClelland, 384 Pa. 597 (1956), the Pennsylvania Supreme Court held it was improper to assess attorney fees against a coroner defendant who acted properly pursuant to a statutorily assigned duty;

39

- In <u>Santoro v. City of Philadelphia</u>, 59 Pa. Commw. 114 (1981), the court sanctioned appellant for filing an appeal based on a groundless allegation of dereliction on the part of the trial judge; and

- In <u>McLaughlin v. Gerdts</u>, 19 Pa D. & C.3d 293 (1981), the court denied a motion to sanction defendants with payment of attorney fees where defendants refused to pay in accordance with an agreed upon payment schedule.

The <u>McLaughlin</u> case, in particular, is notable due to its similarity with HUB's argument in the instant case. In that case, the parties entered into a written contract for construction of a residence that contained a payment schedule. <u>Id.</u> at 294. Plaintiff commenced suit after defendants failed to make timely payments in accordance with the contract, forcing plaintiff to borrow money and incur significant expense. <u>Id.</u> at 296. Plaintiff argued he was entitled to recover attorney fees under Pennsylvania law because defendants refused to pay in accordance with the payment schedule and, by so doing, acted "arbitrarily, vexatiously or in bad faith all to the expense of plaintiff in incurring counsel fees to collect same." <u>Id.</u> at 298. The court summarily rejected plaintiff's contention, noting that "[i]f plaintiff be correct this means in every dispute between contracting parties" attorney fees could be awarded under the statute. <u>Id.</u> The court concluded, "[o]ur interpetation of the section is not that broad ... [w]e cannot fairly conclude every litigant contemplating commencing an action or defending one is automatically confronted with the unhappy though he may have to pay his opponent's counsel fees ...." <u>Id.</u> at 298-99. <u>See also</u> <u>Moore</u>, 28 Pa. D. & C.3d at 128-29 (finding consistent failure to make timely rental payments did not constitute arbitrary, vexatious or bad faith conduct under 42 Pa. C.S.A. §2503).

In this matter the record is devoid of any evidence that Defendants' conduct was intended to harass HUB or that Defendants' methods in this litigation have been oppressive. Furthermore, the primary issue raised by Defendants in defense to HUB's action was ripe for judicial review,

40

as the application of the defenses of frustration of purpose, commercial impracticability and

mutual mistake to the facts at issue were open questions of law. HUB's claim for attorneys' fees

under 42 Pa. C.S.A. §2503 should therefore be rejected.

## IV.    CONCLUSION

For all the foregoing reasons, under this Court's decision that Defendants are not legally

excused from performance under the Lease (a decision subject to appeal once final judgment is

entered), Defendants calculate past due Fixed Basic Rent and Additional Rent to be

$4,849,419.20. Further, HUB's request to accelerate Fixed Basic Rent should be denied;

however, should the Court choose to accelerate, the Court should accept Defendants' Fixed

Basic Rent calculation of $9,645,679.91. Finally, Defendants respectfully request the Court to

deny HUB's claim for restoration costs, an amount stipulated to be $928,885.00, and claim for

attorneys' fees in their entirety.

BLANK ROME LLP

BY: _____
Richard P. McElroy
Adam M. Share
Todd A. Schoenhaus
One Logan Square
Philadelphia, PA 19103-6998
(215) 569-5500
Attorneys for Defendants

Dated: April 8, 2005

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of April, 2005, I caused a true and correct copy of

Defendants' Trial Brief to be served upon the following counsel by E-mail and Hand-Delivery

(delivered on Monday, April 11, 2005):

Stephen W.W. Ching, Esquire
OBERMAYER REBMANN MAXWELL & HIPPEL LLP
One Penn Center Plaza, 19th Floor
1617 John F. Kennedy Boulevard
Philadelphia, PA  19103

TODD A. SCHOENHAUS