## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **BARRY M. PORTNOY and** : | |
| **GERARD M. MARTIN, as Trustees for** : | |
| **HUB PROPERTIES TRUST,** : | |
| **Plaintiffs,** : | **NO. 02-CV-2905** |
| : | |
| **v.** : | **HONORABLE CLIFFORD** |
| : | **SCOTT GREEN** |
| **OMNICARE PHARMACEUTICS, INC.** : | |
| **and** : | |
| **OMNICARE CLINICAL RESEARCH, INC. ,** : | |
| **Defendants.** : | |

### PLAINTIFFS' REPLY TO DEFENDANTS' TRIAL BRIEF

JOSEPH J. McGOVERN
STEPHEN W. W. CHING, JR.
STEPHEN P. BOSIO
**OBERMAYER REBMANN MAXWELL &**
 **HIPPEL LLP**
One Penn Center, 19th Floor
1617 John F. Kennedy Boulevard
Philadelphia, PA 19103-1895
(215) 665-3000

Attorneys for plaintiffs, Barry M. Portnoy and
Gerard M. Martin, as Trustees for HUB Properties Trust

Date: April 12, 2005

612309

## PLAINTIFFS' REPLY TO DEFENDANTS' TRIAL BRIEF

### I.    INTRODUCTION

Despite defendants' relentless efforts to obfuscate the facts and the law, any accurate assessment of this case leads inexorably to the conclusion that HUB is entitled to past due rent, accelerated rent, additional rent, restoration costs, late charges, interest and attorneys' fees. Moreover, a trial is unnecessary; applicable legal principles applied to the undisputed evidence before the Court permits easy calculation of HUB's damages. HUB's damages are $14,637,308.21.

Defendants raise three points which warrant a reply.

**First**, for the first time in this litigation, defendants attempt to challenge the acceleration clause, claiming it is "illegal." Having failed to affirmatively plead illegality in their answer, as required by Fed.R.Civ. P. 8(c), defendants are barred from raising that defense now. Defendants ignore this procedural nicety and argue that the acceleration clause should not be enforced, based on the proposition that HUB need not worry about receiving timely rent payments in the future from Omnicare Pharmaceutics, Inc., - - an entity that has been defunct for at least two years. As detailed below, there is simply no factual or legal basis for defendants' claim that the acceleration clause is not enforceable.

**Second**, defendants again ask to be relieved of their obligation to restore the Premises - - an obligation this Court has already stated rests squarely on defendants under the unambiguous terms of the Lease. In light of that reality, the "analysis" used to support defendants' position, i.e., ignoring the casualty clause on which the Court's determination is based and pointing instead to irrelevant Lease provisions, is baseless.

**Third**, defendants attempt to deny their obligation to pay HUB's attorneys' fees, principally by pretending that they have done nothing wrong. Defendants' conduct, *vis a vis* their legal obligations to HUB, has smacked of bad faith since the time of the flood. HUB was required by defendants' obdurate conduct, specifically their total and unjustified repudiation of their contractual obligations, to commence this action. Thereafter, over the course of almost three years, defendants forced HUB to incur more than $1.8 million in attorneys' fees - - a sum vastly greater than what should have been spent on a collection action - - using the guise of a flood to avoid a contract defendants no longer liked or wished to honor.

Defendants have tried to wear HUB down with litigation: They conducted massive and unnecessary discovery, including nearly 30 depositions. They have inundated and continue to inundate this Court, including in their most recent brief, with a barrage of "defenses" which this Court resoundingly rejected almost a year ago; defenses which directly contradict their obligations under unambiguous Lease terms; and which clearly had and have no factual or legal basis.

Plaintiffs' claim for attorneys' fees proceeds from the fact that the heart of defendants' case has been pretextual and completely without merit from the start[1]. Defendants' claim that they were excused from their Lease obligations rests soley on the false premise, developed initially by unscrupulous executives and later refined by lawyers, that suddenly, five years into a 15-year lease, for reasons previously completely unknown to defendants, the Premises could no longer be used for pharmaceutical – related purposes. The facts of record, have always belied defendants' claim. The reality is that after the flood, defendants decided they would not remain in the Premises because the costs of restoration exceeded the insurance proceeds defendants

---

[1] Defendants have failed to convince the Court of the merits of even a single substantive point in this litigation.

collected and because defendants believed they would not be able to generate as much profit as they did prior to the flood. (Portnoy, 2004 U.S. Dist LEXIS 12235, at *14).

Of equal or greater importance to HUB's claim for attorneys' fees is the fact that Omnicare knew its defense was specious, as "exhibited by their use [of the Premises] after they made partial repairs." (Id.) at 13. In truth, defendants made their decision to abandon the Premises even before they made any attempt to determine whether it could be reused, as reflected by *inter alia*:

- Omnicare's executives' discussions with insurance adjusters *9 days after the flood,* wherein Omnicare disclosed that it wanted to "break the lease" and "to withhold any work beyond those activities absolutely necessary" (Report of Discussions by J&H Marsh & McLennan, MAR-C 4353, attached hereto as Exhibit "1");

- Instructions Omnicare management gave to the president of its pharmaceutical division *16 days after the flood* not to do any work "above and beyond the needs of a "normal" [i.e., non-pharmaceutical] tenant," including instructions "not to remove ceiling tiles [containing microbial contamination] throughout the facility…" (July 3, 2001 Omnicare Pharmaceutics, Inc. Interoffice Memo from Kenneth Feld to Dave Morra and Ron Greenspan, Exhibit Feld-65 to 4-9-03 Deposition of Kenneth Feld, attached hereto as Exhibit "2");

- The fact that Omnicare made its decision not to return to the Premises around August 2001 – *more than 4 months before* the engineering firm HUB had hired for defendants' benefit had even released its final report as to the flood mitigation measures that could be taken. (October 29, 2003 Deposition of defendants' corporate designee, David Morra, at 163-164, attached hereto as Exhibit "3"; 7-22-03 Deposition of Omnicare Pharmaceutics Controller, James McDevitt, at 71-72, attached hereto as Exhibit "4"); and

- Instructions that Omnicare management gave to the controller of its pharmaceutical division in August 2001 to "hold off" commencing construction needed to restore the Premises to pre-flood condition, despite his offer to buy and install drywall and carpet at night by himself. (S43; Exhibit McDevitt-34 to 7-22-03 deposition of Omnicare Pharmaceutics Controller, James McDevitt, at McDevitt 1118, attached hereto as Exhibit "5").

Defendant's own employees' testimony establish that defendants decided to "break" the Lease sometime between June 26, 2001 and August 2001. That decision was made not because

3

of any "an inability to use the building" but because defendants foresaw that they would not have generated as much profit after the flood as they had previously. (Portnoy, 2004 U.S. Dist. LEXIS 12235, at *14). This reality is and has been embedded in the record since the commencement of this case and cannot be changed no matter how much lawyering defendants bring to bear.

Defendants' also have admitted that they failed to purchase adequate flood insurance. As a result, they faced over $7 million in out-of-pocket expenses to restore the Premises. (10-29-01 Deposition of Defendants' corporate designee, David Morra, at 147-48, attached hereto as Exhibit "6"). As defendants' vice president admitted, had defendants "received adequate insurance proceeds . . . , then [they] most likely would have continued to stay in business." (03-12-03 Deposition of David Froesel at 96-97, attached hereto as Exhibit "7"). As Omnicare Pharmaceutics president, Kenneth Feld, admitted, this "screw-up [of ] the insurance coverage" -- not the inability to use the Premises -- was "the basic cause of this whole situation." (December 13, 2001 e-mail from Ken Feld to Ronald Greenspan, Omnicare 9363, attached hereto as Exhibit "8"). Defendants are prisoners of Dr. Feld's words. Their defenses have been pretextual and hopeless from the start and they knew it; yet they never stopped vigorously litigating. Such conduct amounts to bad faith and serves as a basis for an award of HUB's attorneys' fees.

4

## II.    THE ACCELERATION CLAUSE OF THE LEASE IS FULLY ENFORCEABLE AND HUB CORRECTLY APPLIED IT IN THIS CASE.

Conceding that the Lease allows HUB to accelerate rent upon default, defendants nevertheless ask the Court not to enforce the acceleration provision and to deny HUB's claim for accelerated rent on the basis of three assertions: (1) the accelerated rent provision of the Lease exacts an illegal penalty and thus is unenforceable; (2) HUB's repossession of the Premises precludes any claim for accelerated rent; and (3) the Court, in its equitable discretion, should not enforce the acceleration clause because "there is no possibility that HUB would have to pursue OPI to collect the rent under the Lease as it becomes due."

Defendants' claim that the acceleration clause is illegal is totally groundless. First, defendants waived this affirmative defense by failing to assert it in their pleadings trial. Prinz v. Greate Bay Casino Corp., 705 F.2d 692, 694 (3d Cir. 1983). Second, courts have repeatedly upheld the enforceability of acceleration clauses where, as in the Lease here, the landlord is required to credit the defaulting tenant with amounts received from a subsequent tenant. Onal v. BP Amoco Corp., 275 F. Supp. 650, 670 (E.D. Pa. 2003).

Similarly, defendants' claim that repossessing the Premises upon defendants' abandonment bars HUB's claim for accelerated rent is baseless. The same argument was recently rejected by the United States District Court for the Eastern District of Pennsylvania in Onal, which defendants cite in their Trial Brief. The Court in Onal held that a landlord was "right" in "accelerating the rent, if the lease so provides, taking possession and re-letting the premises with a **credit to the tenant** in the amount of rent paid by the replacement tenant." Id. (emphasis added).

Further, the "equities" in this case certainly do not require the Court to disregard the acceleration clause,  in favor of allowing defendants to pay future rent as it becomes due,

5

because "there is no possibility that HUB would have to pursue OPI to collect the rent under the Lease as it becomes due." This statement, is undermined by defendants' complete and unjustified refusal for almost four years to pay **any** monies to HUB. It is further undisputed that rather than being a viable, creditworthy business entity, OPI has been defunct for years. (October 29, 2002 Deposition of Defendants' Corporate Designee, David Morra, at 267). In the words of OPI's counsel "The OPI business no longer exists." (Email from Adam Share, Esq. to Joseph McGovern, attached hereto to Exhibit 9). HUB would be hard pressed to collect monthly payments from an entity whose business no longer exists.

Defendants also maintain that: (1) HUB is not entitled to pre-judgment interest on past due rent from the date it gave its acceleration notice but only from the date each monthly rent payment became due, irrespective of HUB's acceleration demand; and (2) rent past due and owed as of the date of trial must be discounted to present value.

It is well-settled that only future damages should be discounted to present value. See, e.g., Shealy v. City of Albany, 137 F.Supp.2d 1359, 1368 (M.D. Ga. 2001) ("Only those amounts actually representing amounts to be paid from the date of this Order forward are discounted to present value); Bernier v. Burris, 113 Ill.2d 219, 235, 497 N.E.2d 763, 771 (Ill. 1986) ("Only future damages to be paid at the present time require reduction to present value"). Thus, HUB's approach is correct. The discount is to be applied only to accelerated rent from April 15, 2005 the February 16, 2012.

Courts, including this Court, have repeatedly allowed pre-judgment interest on accelerated rent from the date of acceleration.[2] See, e.g., Midlantic Commercial Leasing Co v.

---

[2] Contrary to defendants' assertions, HUB is not seeking pre-judgment interest on that portion of accelerated rent from the date of trial (April 15, 2005) forward.

6

Tender Loving Care, Civil Action No. 88-9545, 1990 U.S. Dist. LEXIS 6520, *9 (E.D. Pa. May 23, 1990).

Defendants are proceeding in bad faith. The Court must reject the defenses respecting accelerated rent and award HUB $10,544,845.92 in past due and accelerated fixed basic rent.

## III. THE LEASE UNEQUIVOCALLY REQUIRES DEFENDANTS TO RESTORE THE INTERIOR OF THE PROPERTY WITHIN A REASONABLE TIME AFTER THE FLOOD.

Defendants stipulate that it will cost almost $1 million to restore the interior of the Premises to pre-flood condition (See, April 6, 2005 Stipulation as to Additional Rent and Restoration Costs), but they maintain that they are not obligated to make those restorations because: (1) their obligation to make post-flood restorations is not governed by the provision specifically relating to casualty damage (§10.02) but by Lease provisions unrelated to casualty which generally relate to "construction of improvements"; (2) §10.02 does not apply since defendants were unable to use the Premises after the flood for its intended purposes; (3) contrary to §10.02's explicit obligation to make the repairs "with reasonable promptness," any obligation to restore the Premises would arise only at the end of the term of the Lease; and (4) HUB "has not been damaged in whole or in part" by defendants' failure to make the required restorations because HUB will have to completely demolish the interior for a new tenant regardless of any repairs defendants make. (Defendants' Trial Brief at 7-8, 19-25).

This Court already definitively ruled that (1) the plain language of §10.02 of the Lease required defendants to restore the interior after the flood (which they have still not done); and (2) the Premises is and was useable after the flood for its intended purposes as evidenced by defendants' actual use. (Portnoy, 2004 U.S. Dist. LEXIS 12235, at *10, *13-*14). Defendants'

assertions that HUB "has not been damaged" by defendants' failure to restore is equally baseless. One has only to drive by the Premises to observe that defendants left HUB with severely damaged premises which is desperately "in need of renovation." (Id., 2004 U.S. Dist. LEXIS 12235 at *16). As set forth in ¶¶ 29 and 30 of the affidavit of David Campoli attached to Plaintiffs' Trial Brief, defendants' failure to restore the Premises has significantly affected HUB's ability to market and relet the Premises to a new tenant, and thus, ironically, has limited HUB's ability to mitigate the damages HUB seeks against defendants. Contrary to the assertions of defendants' expert, Tim Monahan, Mr. Campoli states that in all probability, had defendants completed the required restorations, a new tenant (including Allegheny Valley School) would have been able to reuse a sizeable portion of Premise's interior, probably 65%-90%. (Campoli Affidavit, Exhibit 2 to Plaintiffs' Trial, at ¶¶35-36).

Accordingly, none of defendants' excuses for repudiating their restoration obligation has any factual or legal support. This Court should award HUB $928,885.00 in restoration costs.

## IV. HUB IS ENTITLED TO RECOVER ITS ATTORNEYS' FEES.

Under the so-called "American Rule", parties to litigation normally pay their own attorney's fees regardless of the outcome. *Aleyska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240 (1975). There are, however, certain exceptions to this general rule, including where the unsuccessful party "acted in bad faith, vexatiously, wantonly or for oppressive reasons. *Id.* See also *Chambers v. NASCO*, 501 U.S.32 (1991)(A court has inherent power to award attorney fees on grounds of bad faith.), *Perichak v. Int'l Union of Electrical Radio & Machine Workers Local 601*, 715 F.2d 78 (3rd Cir. 1983)(same). Omnicare's actions both before and during the

8

pendancy of this litigation more than amply establish bad faith and justify an award of attorneys'
fees to HUB.

## A.    The Contract Provisions Are Unambiguous.

Where the provisions of a contract are unambiguous, litigants who pursue spurious
claims or defenses are by definition acting in bad faith. In *ABEX, Inc. v. Koll Real Estate Group*,
1994 Del. Ch. LEXIS 213 (De. Ch. Ct. 1994), a tax sharing agreement unambiguously stated that
the two corporations were to share tax liability under the circumstances of the case, and the
defendant corporation did not deny its responsibility under the agreement. Rather, they asserted
several affirmative defenses as to why it should not be obligated to pay. The court concluded
"Actions by a defendant which necessitate judicial intervention to secure a clearly defined and
established right, are evidence of bad faith. So also are actions by the defendant designed to force
an opposing party to resort to litigation for the purpose of causing unreasonable delay." *ABEX*,
1994 Del. Ch. LEXIS 213 at * 61. *See also First Bank of Marietta v. Hartford Underwriters
Insurance Co.*, 115 F. Supp.2d 898 (S.D.Oh. 2000)(assessing attorneys' fees against plaintiff
who failed to fulfill an express contract requirement but sued to recover under the contract
nonetheless), *Universal Resources Corp. v. Panhandle Eastern Pipeline Co.*, 1986 U.S. Dist.
LEXIS 27373 (N.D.Tx. 1986) (granting summary judgment and attorneys' fees where a
defendant presented erroneous defenses for violation of an unambiguous contract which was the
result of arms'-length negotiations), *Cape Verde v. A&A Partners*, 89 F.R.D. 14,22 (S.D.N.Y.
1980)("Most significant to the 'bad faith' analysis is that plaintiff was compelled to sue to
recover a deposit clearly due and owing, a matter which was never seriously disputed by
defendant prior to or during the litigation.").

Omnicare's behavior is similar to that described in these cases. Omnicare and HUB were both sophisticated parties engaging in an arms'-length transaction. The contract they made, as this Court has held, could not have been clearer about Omnicare's obligations. They were obliged to pay rent, regardless of whether they were making money and they were obliged to repair the interior of the Premises after the flood, regardless of whether they had insurance. Despite the clarity of the agreement, Omnicare has forced HUB to spend $1.8 million of dollars to obtain what was legally, clearly and unequivocally **theirs by right**. Omnicare has behaved in bad faith and attorneys' fees should be assessed against them.

**B.    Omnicare Acted In Bad Faith Both Before And During The Pendancy Of The Suit.**

Third Circuit courts have granted attorneys' fees where defendants' behavior *before* the litigation was reprehensible and that behavior continued in mounting spurious defenses *during* the litigation. In *Nagy v. Bistricer*, 770 A.2d 43 (Del.Ch.Ct. 2000), a minority shareholder sued the two majority shareholders for appraisal and for breach of fiduciary duty and bad faith in connection with a merger of the corporation with another entity that the majority shareholders also controlled. In pursuing the merger, the majority shareholders did not consult the minority shareholder in deciding to proceed with the merger, did not disclose any information to the minority shareholder regarding the merger, and did not set a firm offer for the minority shareholder's shares until after the minority shareholder was required to file an appraisal petition. To justify these actions to the court, the majority shareholders made arguments that the court concluded "In view of the clarity of legal principles involved, it is difficult to fathom why [they] were advanced." *Nagy*, 770 A.2d at 65. As a result, the court granted attorneys' fees under the bad faith exception to the American Rule. *See also Perichak v. Int'l Union of Electrical Radio &*

*Machine Workers Local 601*, 715 F.2d 78, 83 (3rd Cir. 1983)("On the basis of the record developed in the...merits findings and credibility determinations, Perchiak could not have commenced his action in other than 'bad faith', *nor could he have maintained this action with any reasonable prospect of prevailing on the merits.*"), Horst *Masonry Construction, Inc. v. ProControls Corp.*, 2000 U.S. App. LEXIS 3688 (8th Cir 2000) (awarding attorneys fees where general contractor failed to acknowledge money owed to subcontractor and asserted meritless defenses to the claim until two days before trial).

The majority shareholders behavior in *Nagy* is analogous to Omnicare's actions in abandoning their obligations to HUB. Prior to the litigation, Omnicare acted in bad faith by deciding to breach the lease upon the event of the flood without allowing even enough time to evaluate the damage, then stringing HUB along while they completed a few lucrative contracts, and then out-and-out lying that the Premises was no longer usable for the purposes set forth in the Lease. Subsequently, during the litigation, Omnicare has repeatedly and knowingly made specious arguments. As in *Nagy*, this Court should grant HUB's request for attorneys' fees in the amount of $1,856,392.14, through March, 2005.

V.    **CONCLUSION**

For the reasons set forth above and in HUB's Trial Brief, HUB respectfully requests an

assessment of damages in the amount of $14,637,308.21.

Respectfully submitted,

JOSEPH J. MCGOVERN
STEPHEN W.W. CHING, JR
STEPHEN P. BOSIO
**OBERMAYER REBMANN MAXWELL  &
    HIPPEL LLP**
One Penn Center, 19th Floor
1617 John F. Kennedy Boulevard
Philadelphia, PA  19103-1895
(215) 665-3000

Attorneys for Plaintiffs,
Barry M. Portnoy and Gerard M. Martin, as
Trustees for HUB PROPERTIES TRUST

Dated: April 12, 2005

# EXHIBIT 1



**J&H MARSH & McLENNAN**

## REPORT OF DISCUSSION    ☐ PHONE CALL    ☐ MEETING    PEND FOR:

| DATE:  /  / | SPOKE TO: _Janicak_ |  |
|---|---|---|
| TIME START: | ACCT/COMPANY: _Ron Brosnan_  484-679-2896 |  |
| FINISH: | PHONE: _6-16-01_  _oop_ |  |
| SUBJECT/POLICY: |  |  |

ITEMS DISCUSSED:

_[handwritten notes, partially legible:]_

6-16-01 Ron Brosnan called in inv[...] c/...

- Called Ron back - Bill Thursby
- Ron faxed Belfor proposal w/ $
- Ron to fax Thal dollr estimate to accounts
- Belfor - day and ½ take at [...] & plan [...]
  [...] for on [...] not necessary
- Twice / Ron spoke c/ [...] - Wass to [...] both
  [...] - He wants to w/ hold any work beyond only
  [...] these activities absolute necessary
- [...] [...] may be used - [...] [...] used
  [...] value that if 10-w s/ loss, [...] will
  [...] difference.
- Bill Thursby acknowledged that 2 no shift is inefficient and
  once customers get their inventory out, we should knock it
  down to one shift.

| ITEMS DISCUSSED: | COPY TO: | INFO | ACTION |
|---|---|---|---|
|  |  | ☐ | ☐ |
|  |  | ☐ | ☐ |
|  |  | ☐ | ☐ |
|  |  | ☐ | ☐ |
| REPORTED BY: |  | ☐ | ☐ |
| (Print Full Name) |  | PAGE | OF |

CONFIDENTIAL

# EXHIBIT  2

```
 1           IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2
 3                                  NO.   02-CV-2905
 4   BARRY M. PORTNOY and GERARD  ) DEPOSITION UPON
     M. MARTIN, as Trustees for   )
 5   HUB PROPERTIES TRUST         ) ORAL EXAMINATION
                                  )
 6        - vs -                  )        OF
                                  )
 7   OMNICARE PHARMACEUTICS, INC. ) KEN FELD
     and OMNICARE CLINICAL        )
 8   RESEARCH, INC.               )
     - - - - - - - - - - - - - - -
 9
10
11              TRANSCRIPT OF DEPOSITION, taken
12   by and before KRISTIN N. LAFTY, Professional
13   Reporter and Notary Public, at the Law Offices
14   of OBERMAYER, REBMANN, MAXWELL & HIPPEL, LLP,
15   19th Floor, One Penn Center, 1617 JFK Boulevard,
16   Philadelphia, PA, on Wednesday, April 9, 2003,
17   commencing at 10:15 a.m.
18
19
                     - - -
20
21
22         REPORTING SERVICE ASSOCIATES (RSA)
                  A Veritext Company
23         1845 Walnut Street - 15th Floor
           Philadelphia, Pennsylvania 19103
24                (215) 241-1000
```

**OMNICARE PHARMACEUTICS, INC.**

**INTEROFFICE MEMO**



To: Dave Morra and Ron Greenspan
From: Kenneth Feld
Subject: Clean-up of 525 Virginia Drive Facility
Date: July 3, 2001

It has come to my attention that you have directed Belfor not to remove the ceiling tiles throughout the facility and clean and sanitize the space above the tiles.

As you know, I had previously instructed Belfor to add this activity to their scope of work for the project. I did this as the ceiling tiles are a very good breeding ground for microbial contamination given the fact that 1) the facility, post flood exhibited > or = to 100% relative humidity and 2) E. coli, fecal coliforms, extremely high bacterial loads and yeast and molds were found in the facility. Removing tiles and cleaning/sanitizing the space above is the only prudent course of action for future safety concerns. This would be true whether Omnicare or another tenant occupies the facility in the future. If Omnicare does occupy the facility in the future, it must also be remembered that we will be operating a cGMP facility. We must do everything possible to control contamination as we handle pharmaceutical products.

This position has been discussed with experts from Perritt Laboratories, the microbiological testing laboratory routinely used by many pharmaceutical companies. They have concurred with the position stated above.

Based on these facts I will again ask Belfor to add this activity to their scope of work for this project.

*K. M. Feld*

3/c
D. Morra
K. Feld

Note:

The concern I raised was whether any work currently being considered was above & beyond the needs of a "normal" tenant — e.g. ceiling tiles

*Clar* 7/5/01

# EXHIBIT 3

DAVID MORRA

1

```
 1          IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 2
                              NO. 02-CV-2905
 3

 4

 5

    BARRY M. PORTNOY and GERARD ) DEPOSITION UPON
 6  M. MARTIN, as Trustees for
    HUB PROPERTIES TRUST,        ) ORAL EXAMINATION
 7

                    Plaintiffs,  )      OF
 8

                    - vs -       )   DAVID MORRA
 9

    OMNICARE PHARMACEUTICS, INC.)
10  and OMNICARE CLINICAL
    RESEARCH, INC.,              )
11

                    Defendants.  )
12  - - - - - - - - - - - - - -

13

14

15              TRANSCRIPT OF DEPOSITION,

16  taken by and before F. DAVID DAMIANI, Registered

17  Professional Reporter and Notary Public, at the LAW

18  OFFICES OF OBERMAYER, REBMANN, MAXWELL & HIPPEL,

19  LLP, 19th Floor, One Penn Center, 1617 JFK

20  Boulevard, Philadelphia, Pennsylvania, on Tuesday,

21  October 29, 2002, commencing at 10:07 a.m.

22                   - - -

23          REPORTING SERVICE ASSOCIATES (RSA)

24
```

DAVID MORRA

162

1  here. Clearly a flat surface of stainless-steel
2  could be cleaned and disinfected, so those types of
3  equipment, or that part of the equipment could be
4  cleaned. The concern was with electronics and
5  those that had places that couldn't easily be
6  gotten out.
7  Q.    Where things would get inside the
8  intricate inner workings?
9  A.    Right.
10  Q.    That makes sense. Attached on page 256
11  and 257 seems to be a list of equipment.
12  A.    Yeah, it may be. Again, we can ask them
13  to go through -- you know, go through -- yes,
14  that's exactly what that is. Major equipment. So
15  we did ask them to look at kind of the big stuff.
16  Q.    It looks like they said that some of this
17  was reclaimable and some of it wasn't. More of it
18  wasn't.
19  A.    Yes, that is correct. At the end of the
20  day most of it was not reclaimable.
21  Q.    Now, the refrigerators, coolers and
22  freezers identified on this equipment list, are
23  they different than the ones that you put back into
24  service in September?

163

1  A.    Where are you looking?
2  Q.    I'm looking at page 257, the very last
3  item.
4  A.    Well, when you say put back, we were
5  talking about stability chambers being put back
6  into operation, not refrigerators, coolers and
7  freezers. These were different items.
8  Q.    Are stability chambers identified anywhere
9  on this major equipment list?
10  A.    Well, I don't think they would have been,
11  because we can't identify those, being able to
12  clean those. So they shouldn't -- I don't believe
13  it would be on this list.
14  Q.    The equipment that these people were
15  looking at, this was all found out in the trailers
16  in front of the building? Is that when they looked
17  at it?
18  A.    Yeah, on the side of the building we had
19  trailers that were locked up.
20  Q.    Like the back of a tractor-trailer, right?
21  A.    Yes. Rented trailers that were on the --
22  you know, laying on the ground.
23  Q.    When was the decision made not to return
24  to 525 Virginia with the Pharmaceutics operation?

164

1  A.    Well, I believe it was around August of
2  2001 where we had a meeting, an internal meeting
3  discussing the potential options, and concluding
4  that based on quite a number of customer data
5  points, that the site wasn't going to be viable.
6  And from that point we then actually
7  proceeded to have discussions with your client to
8  see if there was a way we could work this out.
9  Some win/win solution whereby we could move our
10  operations to perhaps another site within their
11  portfolio, as one example.
12  So, you know, we kept HRPT informed of the
13  issues we had at that site. Had a face-to-face
14  meeting with the president of HRPT Properties
15  Trust. I thought it was important to have a
16  meeting face to face so that he understood the
17  nature of our business and why it was critical that
18  we not be in that kind of a site. The propensity
19  for flooding, the criticalty of the products that
20  we make there, you know, for the customers that we
21  service.
22  So we began that dialogue in trying to
23  explore how we could work this out in a way that
24  everybody was made whole, so that we didn't end up

165

1  -- because we had had a very good long-term
2  relationship with HRPT. We paid our rent every
3  month. They were a good landlord and we believed
4  we were a good tenant.
5      MR. SHARE: Answer the question.
6      You've answered the question.
7      THE WITNESS: Okay.
8  BY MR. HABER:
9  Q.    August of '01 is when you decided not to
10  go back?
11  A.    By August it was, I believe, one of the --
12  we were beginning to heavily lean in that
13  direction, to say it's probably going to be
14  difficult to convince our customers to come back.
15  Q.    So this report that's been marked as DD
16  No. 14, which is dated January of 2002, why were
17  you doing a report on the reclamation of the
18  equipment at that time?
19  A.    Well, because, again, under the -- the
20  report was -- it was in January, but the work began
21  before that.
22      We wanted -- this is for equipment. This
23  is not for the building.
24  Q.    Right.

# EXHIBIT  4

JAMES MCDEVITT

```
 1          IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2
 3                               NO. 02-CV-2905
 4    BARRY M. PORTNOY and GERARD  ) DEPOSITION UPON
      M. MARTIN, as Trustees for   )
 5    HUB PROPERTIES TRUST          ) ORAL EXAMINATION
                                    )
 6       - vs -                     )       OF
                                    )
 7    OMNICARE PHARMACEUTICS, INC.  ) JAMES McDEVITT
      and OMNICARE CLINICAL         )
 8    RESEARCH, INC.                )
      - - - - - - - - - - - - - - - -
 9
10
11
                   TRANSCRIPT OF DEPOSITION, taken
12
      by and before KRISTIN N. LAFTY, Professional
13
      Reporter and Notary Public, at the Law Offices
14
      of OBERMAYER, REBMAN, MAXWELL & HIPPEL, LLP,
15
      19th Floor, One Penn Center, 1617 JFK Boulevard,
16
      Philadelphia, PA, on Tuesday, July 22, 2003,
17
      commencing at 9:05 a.m.
18
19
20                        -  -  -
21
22         REPORTING SERVICE ASSOCIATES (RSA)
                   A Veritext Company
23          1845 Walnut Street - 15th Floor
             Philadelphia, Pennsylvania 19103
24                   (215) 241-1000
```

JAMES MCDEVITT

70

1 opportunities into modifying the building to
2 handle flood abatement.
3 Q.    Who attended that meeting?
4 A.    I think Ken. I didn't attend the
5 meeting. I ended up getting reports. And I may
6 have had a discussion with Dave Campoli. I
7 forget. But I remember the reports came in.
8 And they were very lengthy and comprehensive.
9 Q.    Okay. Well, let me just start off,
10 Dr. Ken Feld attended?
11 A.    Yes.
12 Q.    And I assume individuals from
13 Intrastructure attended?
14 A.    Right. They were the consultant hired
15 by HUB Properties.
16 Q.    Did Mr. Morra attend the meeting?
17 A.    I don't know.
18 Q.    And you said that you received
19 information as a result of that meeting?
20 A.    Uh-huh.
21 Q.    You said detailed reports?
22 A.    Yes.
23 Q.    Is that what you said?
24 A.    I think I got them later on. Let's

71

1 say January, February of 2002.
2 Q.    Do you know if those reports were
3 forwarded to Omnicare Corporate?
4 A.    That I don't know. I know that I got
5 them. But I don't know if they were received or
6 reviewed. I can't really answer that.
7 Q.    Just along the lines of, you know,
8 what we were discussing before, do you know if
9 anyone from any of the Omnicare entities did
10 anything to further study what was brought up
11 and what was considered by Intrastructure?
12 A.    No. The main thing I remember is that
13 the decision to close the plant was made in
14 February of 2002, which was concurrent or very
15 close to the arrival of the Intrastructure
16 reports. Because I remember getting the report
17 close to the date that we were being closed.
18 And I said, I really can't use this report now.
19 Q.    But I think you just said before that
20 Omnicare -- that people in the Omnicare entities
21 were aware that the landlord intended to examine
22 possible flood mitigation efforts?
23 A.    That's correct.
24 Q.    Right. Had the concept -- had the

72

1 name Intrastructure been mentioned prior to this
2 meeting?
3 A.    No. This would have been the first
4 day or one of the first times I had heard about
5 the company Intrastructure. Because they came
6 out to the facility, now that I recall. They
7 came out to our building and actually visited.
8 And Ken and I were at that meeting.
9 Q.    Do you remember when that was?
10 A.    It was around this time frame. I just
11 remember there was a meeting and then a
12 two-month gap or maybe three-month gap prior to
13 the arrival of the report. And then the report
14 came out, and we had already known we were going
15 to close.
16 Q.    So Omnicare did not wait for the
17 report to come out before making their decision
18 to close down the facility?
19 A.    Yes, yes.
20 Q.    Was there any discussion about waiting
21 for the engineering reports to come in?
22 A.    Not with me.
23 Q.    Let me direct your attention to
24 McDevitt 1181, please. Do you have that in

73

1 front of you?
2 A.    Yes.
3 Q.    Towards the middle of the page, let's
4 start off with the line that says -- I think
5 that's end February?
6 A.    Yes.
7 Q.    60 days to close business, exclamation
8 point, Joel Germunder, right?
9 A.    Uh-huh.
10 Q.    Message on bulletin board from Morra.
11 Did I read that correctly?
12 A.    Uh-huh.
13 Q.    Decision made to relocate business to
14 Toledo. Did I read that correctly?
15 A.    Uh-huh.
16 Q.    Straw dog. Is that straw dog? And
17 below that, is that a lie?
18 A.    Uh-huh.
19 Q.    And then to the right of that it says,
20 no cap dollar sign for Toledo?
21 A.    Uh-huh.
22 Q.    Coma no plan?
23 A.    Right.
24 Q.    No personnel in Toledo. That's the

19 (Pages 70 to 73)

# EXHIBIT  5

JAMES MCDEVITT

1          IN THE UNITED STATES DISTRICT COURT

        FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2

3                         NO. 02-CV-2905

4  BARRY M. PORTNOY and GERARD  ) DEPOSITION UPON

    M. MARTIN, as Trustees for  )

5  HUB PROPERTIES TRUST       ) ORAL EXAMINATION

                         )

6     - vs -             )    OF

                         )

7  OMNICARE PHARMACEUTICS, INC.  ) JAMES McDEVITT

    and OMNICARE CLINICAL     )

8  RESEARCH, INC.          )

  - - - - - - - - - - - - - - -

9

10

11

12             TRANSCRIPT OF DEPOSITION, taken

by and before KRISTIN N. LAFTY, Professional

13

Reporter and Notary Public, at the Law Offices

14

of OBERMAYER, REBMAN, MAXWELL & HIPPEL, LLP,

15

19th Floor, One Penn Center, 1617 JFK Boulevard,

16

Philadelphia, PA, on Tuesday, July 22, 2003,

17

commencing at 9:05 a.m.

18

19

20              - - -

21

22        REPORTING SERVICE ASSOCIATES (RSA)

            A Veritext Company

23       1845 Walnut Street - 15th Floor

        Philadelphia, Pennsylvania 19103

24           (215) 241-1000

8/27/10  Budget          8/3/01 (BD Meeting)

→ Celebrex → Hamill → 315 431 6918

IK 03 00 07 L 6

Comm Notes → Payroll

MON → Campoli   Drawings, civil & structural }  ✓

8/30/01   1 - 215 - 979 - 8067

→ Alliance   Allianz  ✓

{ Billings , Invoicing, AR's, }  June
  → June

McCann  { Space requirements }  Rep. local Est. div.
          { 35 - 40 buildings }  414 530 2884
          { space requirements }

          Relocation

TEVA → Renkard contracted TEVA
      → on what to do w. inventory

Tues
8/31/01  Presentation   (AR's)

- Burns - called
  Ron Granger held up construction

MCDEVITT 1118

# EXHIBIT  6

DAVID MORRA

1

1          IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2

                  NO. 02-CV-2905

3

4

5

   BARRY M. PORTNOY and GERARD ) DEPOSITION UPON

6   M. MARTIN, as Trustees for

   HUB PROPERTIES TRUST,      ) ORAL EXAMINATION

7

            Plaintiffs, )      OF

8

          - vs -        )  DAVID MORRA

9

   OMNICARE PHARMACEUTICS, INC.)

10  and OMNICARE CLINICAL

   RESEARCH, INC.,         )

11

           Defendants. )

12  - - - - - - - - - - - -.- - -

13

14

15           TRANSCRIPT OF DEPOSITION,

16  taken by and before F. DAVID DAMIANI, Registered

17  Professional Reporter and Notary Public, at the LAW

18  OFFICES OF OBERMAYER, REBMANN, MAXWELL & HIPPEL,

19  LLP, 19th Floor, One Penn Center, 1617 JFK

20  Boulevard, Philadelphia, Pennsylvania, on Tuesday,

21  October 29, 2002, commencing at 10:07 a.m.

22           - -. -

23       REPORTING SERVICE ASSOCIATES (RSA)

24

DAVID MORRA

146

1    So it happened at a time when we were able
2  to secure that area and be reasonably confident
3  that we weren't exposing it to biohazards.
4    Q.    So in the time period immediately after
5  the flood, you went and hired some outside outfits
6  to clean the building up, I guess?
7    A.    Yeah. There are firms that specialize in
8  flood recovery that got all the proper equipment
9  and trained personnel to handle this sort of thing.
10  They came in and essentially started recovering,
11  taking walls out, drying the area, you know,
12  whatever they had to do to recover it. And also
13  bringing more material out so our people, our
14  Omnicare Pharmaceutics people could be sorting
15  through it and see if they could identify specific
16  projects for other customers, whatever remained of
17  those projects.
18    Q.    Did you ever completely clean up that
19  building?
20    A.    Clean, yes. I would say we completely
21  cleaned it up. It is cleaned up today.
22    Q.    How much did it cost you to get that
23  building cleaned up?
24    A.    A million dollars, maybe. Again, Ron I

147

1  think would have more of those numbers. But it was
2  a significant amount of money to clean that up.
3    Q.    How much money would it have cost you if
4  you were going to put the building back in the
5  condition it was in prior to the flood? By that I
6  mean replace the equipment with new or cleaned
7  equipment, which is something I understand that you
8  were trying to do.
9    A.    Yeah, I seem to recall the number was
10  somewhere around eleven million dollars.
11    Q.    So about eleven million dollars would have
12  put you back in the same position as you were in
13  before the flood?
14    A.    I believe that's the number.
15    Q.    How much flood insurance did you have?
16    A.    In actuality when all was said and done,
17  about four million.
18    Q.    Did you recover that four million dollars
19  in flood insurance?
20    A.    Yes.
21    Q.    So if you wanted to put the building back
22  in the same position it was in, at least physically
23  before the flood, your company would have been out
24  of pocket seven million dollars?

148

1    A.    The insurance -- yeah, you could look at
2  it that way. Out of pocket would have been an
3  investment, perhaps.
4    Q.    Now, you said that this drug industry is
5  heavily regulated. I mean, the FDA was, I think,
6  an entity that you mentioned, and there might be
7  others that sort of were --
8    A.    Primarily FDA. Primarily the FDA
9  regulates the environment under which we produce
10  product.
11    Q.    Is there some FDA procedure known as a 483
12  report that you're familiar with?
13    A.    Yes.
14    Q.    What's a 483?
15    A.    Well, when the FDA comes in and does an
16  inspection on the facility, typically that's
17  unannounced. Sometimes they do announce it, they
18  tell you they're coming in.
19    A 483 would be a citation, if they note
20  any observations, things that they, you know, don't
21  like. They would issue a 483 citation on that
22  observation. So it's their follow-up report after
23  their inspection to the company that they've
24  inspected.

149

1    Q.    Did the FDA come in after the flood to
2  inspect the building?
3    A.    No, I don't think they inspected the
4  building. They wanted to review our procedures for
5  dealing with the drug product that had been
6  destroyed by the flood.
7    Q.    Okay. But they weren't interested in the
8  condition of the building?
9    A.    No. You would not want the FDA to inspect
10  the building in that condition, because it's going
11  to fail completely. So their intent -- they had
12  asked -- we notified them of what happened, they
13  wanted to come in and specifically look at the
14  procedures that we followed, you know, post flood,
15  did we handle the product properly, did we dispose
16  of it properly and all that. We did well in that
17  inspection.
18    MR. HABER: Would you mark this
19  as the next exhibit, please? DD No. 12.
20    (At this time, a document was
21  marked for identification as Exhibit
22  Defendant's Designee No. 12.)
23  BY MR. HABER:
24    Q.    I'm showing you a document that's been

38 (Pages 146 to 149)

# EXHIBIT  7

1

2                    UNITED STATES DISTRICT COURT

3                   EASTERN DISTRICT OF PENNSYLVANIA

4

5        -----------------------------------
                                            :
6     BARRY M. PORTNOY and GERARD M.        :
      MARTIN, Trustees for HUB             :
7     Properties Trust,                     :
                                            :
8              Plaintiffs,                  :
                                            :
9        vs.                                :       CASE NO.
                                            :       02-CV-2905
10    OMNICARE PHARMACEUTICS, INC., and     :
      OMNICARE CLINICAL RESEARCH, INC.,     :
11                                          :
                                            :
              Defendants.                   :
12                                          :
         -----------------------------------
13

14

15              Deposition of:    DAVID W. FROESEL, JR.

16              Taken:           By the Plaintiffs
                                 Pursuant to Agreement
17
                Date:            March 12, 2003
18
                Time:            Commencing at 10:18 a.m.
19
                Place:           Thompson Hine, LLP
20                               312 Walnut Street
                                 Suite 1400
21                               Cincinnati, Ohio  45202-4029

22              Before:          Wendy L. Raymer, RPR
                                 Notary Public - State of Ohio
23                                    ORIGINAL
24

1    as opposed to move it elsewhere?

2           A.    If we had received adequate insurance proceeds

3    from Marsh, then we most likely would have continued to

4    stay in the business.

5                  (Plaintiffs' Exhibit 13 was marked for

6                  identification.)

7    BY MR. HABER:

8           Q.    Before you look at the new document I just

9    marked, if you had received adequate insurance proceeds

10   from Marsh, that would have made it less expensive for the

11   company to restart your operations, and, therefore, make it

12   a more worthwhile investment; is that correct?

13          A.    What I was saying is if Marsh had provided

14   Omnicare with the correct recommendation in terms of the

15   amount of insurance that the CRO or Omnicare should have

16   had in place with respect to that business, then the

17   decision would have been a lot easier for Omnicare to

18   continue the business.  Without the adequate insurance

19   funding, it became a very difficult decision, from a

20   financial perspective, to justify.  The insurance proceeds

21   were critical to the decision process in terms of whether

22   to restart the business or not.

23          Q.    Without the insurance proceeds, Omnicare would

24   have had to obtain or contribute its own funds to start the

1      business up again?

2          A.    Yes.

3          Q.    Which would have reduced the financial

4      attractiveness of such an investment?

5          A.    Yes.

6          Q.    Is that right?

7          A.    Yes.

8          Q.    Let's look at the next exhibit.  Froesel 13 is

9      a February 22nd, 2002 memo to Joel Gemunder from David

10     Morra, upon which you are copied, regarding "Pharmaceutics

11     transition."  Do you recall receiving this interoffice

12     memo?

13         A.    No.

14         Q.    The memo reads, "The following actions were

15     taken this week:  Informed Ken Feld on Thursday of the

16     decision to move operations to Toledo.

17             "Ken Feld met with employees on Friday to ·

18     inform them of the decision."  And it goes on.  What was

19     moved to Toledo?

20         A.    The only thing I recall is at about the time of

21     the flood, or shortly thereafter, sometime, I believe, in

22     2001, the Pharmaceutics business either had or was working

23     on some sort of contract with an animal health-care

24     company, I think called Virbac, and we were working on an

# EXHIBIT 8

*Dave*
*We need to discuss*

**Greenspan, Ronald**

| | |
|---|---|
| **From:** | Feld, Ken |
| **Sent:** | Thursday, December 13, 2001 2:24 PM |
| **To:** | Greenspan, Ronald |
| **Cc:** | Morra, David; McDevitt, Jim |
| **Subject:** | RE: FW Waste/Onyx |

Ron,

No. I do not believe there is a more cost effective answer, given the amount of time and resources it will take my team to investigate. I do not have the heads I need to do the work I have. You have been insisting that we get the waste off our site ASAP. I have now found a way to do it. Please do not second guess.

Again, if you want the responsibility, you take it and I will be more than happy to stay out of your way. Remember, I did not screw-up the insurance coverage. That has been the basic cause of this whole situation.

Ken

----Original Message----
| | |
|---|---|
| **From:** | Greenspan, Ronald |
| **Sent:** | Thursday, December 13, 2001 1:37 PM |
| **To:** | Feld, Ken |
| **Cc:** | Morra, David |
| **Subject:** | RE: FW Waste/Onyx |

Ken

The question remains-Do you believe there is there a more cost effective answer? Since the action will not begin until January, could the we use this time to discuss with other? Obviously you or your staff's would be required to do the evaluation of alternative proposals.

Ron

----Original Message----
| | |
|---|---|
| **From:** | Feld, Ken |
| **Sent:** | Thursday, December 13, 2001 1:26 PM |
| **To:** | Greenspan, Ronald |
| **Cc:** | McDevitt, Jim |
| **Subject:** | RE: FW Waste/Onyx |

Ron,

1) Probably somewhere between, because the "dump" site would be more local. But remember, that would significantly delay the removal process because the sites could not handle all the material in a short time period.

2) We are not going to look for other haulers. If you want to investigate, please feel free to do so. You can then be present to handle all the paperwork and logistics needed from Omnicare's side to effect the entire clean-up.

Ken
----Original Message----

**Omnicare09363**

# EXHIBIT 9

**McGovern, Joseph**

| | |
|---|---|
| **From:** | Share, Adam [Share@BlankRome.com] |
| **Sent:** | Monday, April 11, 2005 1:48 PM |
| **To:** | McGovern, Joseph |
| **Cc:** | Schoenhaus, Todd |
| **Subject:** | HUB v. Omnicare |

Joe: This will reiterate my message of yesterday afternoon regarding HUB's inquiry concerning Omnicare's intentions for the use of 525 Virginia Drive going forward. Currently, it is Omnicare's intention to use the building for storage. The OPI business no longer exists and there is no plan to put any other manufacturing, production or office facilities in the building. -Adam

Adam M. Share
Blank Rome LLP
One Logan Square
Philadelphia, PA  19103
Phone:(215) 569-5447
Fax:  (215) 832-5447
share@blankrome.com


This message and any attachments may contain confidential or privileged information and are intended only for the use of the intended recipients of this message. If you are not the intended recipient of this message, please notify the sender by return email, and delete this and all copies of this message and any attachments from your system. Any unauthorized disclosure, use, distribution, or reproduction of this message or any attachments is prohibited and may be unlawful.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **BARRY M. PORTNOY and** | : |
| **GERARD M. MARTIN, as Trustees for** | : |
| **HUB PROPERTIES TRUST,** | : |
| **Plaintiffs,** | : **NO. 02-CV-2905** |
| | : |
| **v.** | : **HONORABLE CLIFFORD** |
| | : **SCOTT GREEN** |
| **OMNICARE PHARMACEUTICS, INC.** | : |
| **and** | : |
| **OMNICARE CLINICAL RESEARCH, INC. ,** | : |
| **Defendants.** | : |
| | : |

## CERTIFICATE OF SERVICE

I, Stephen P. Bosio, Esquire, hereby certify that on April 12, 2005, I caused to be

served *Plaintiffs' Reply to Defendants' Trial Brief* via hand delivery upon the following:

Adam Share, Esquire
Blank Rome LLP
One Logan Square
Philadelphia, PA 19103-6998

STEPHEN P. BOSIO
Attorney for Plaintiffs

612861